**No. 22-1895**

IN THE

# United States Court of Appeals

## FOR THE FEDERAL CIRCUIT

———————————

MASIMO CORPORATION,

*Appellant,*

*v.*

APPLE INC.,

*Appellee,*

---

APPEAL FROM THE PATENT TRIAL AND APPEAL BOARD
CASE NO. IPR2020-01722

---

**BRIEF OF APPELLANT MASIMO CORPORATION**

---

Joseph R. Re, *Principal Counsel*
Stephen C. Jensen
John M. Grover
Shannon Lam
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main Street, 14th Floor
Irvine, CA 92614
(949) 760-0404

November 7, 2022

Jeremiah S. Helm
**KNOBBE, MARTENS, OLSON &
BEAR, LLP**
1717 Pennsylvania Ave., N.W.
Washington, D.C. 20006
(202) 640-6400

*Attorneys for Appellant
Masimo Corporation*

**Illustrative U.S. Patent No. 10,470,695 Claim 6 (and Independent Claim 1)**

1.    A wrist-worn physiological monitoring device configured for placement on a user at a tissue measurement site, the device comprising:

a light emission source comprising a plurality of emitters configured to irradiate the tissue measurement site by emitting light towards the tissue measurement site, the tissue measurement site being located on a wrist of the user, the plurality of emitters configured to emit one or more wavelengths;

a plurality of detectors configured to detect the light emitted by the plurality of emitters after attenuation by a circular portion of the tissue measurement site, the plurality of detectors further configured to output at least one signal responsive to the detected light;

a processor configured to receive the at least one signal responsive to the output and determine a physiological parameter of the user; and

a light block forming an enclosing wall between the light emission source and the plurality of detectors, the light block defining the circular portion of the tissue measurement site, the light emission source arranged proximate a first side of the enclosing wall and the plurality of detectors arranged proximate a second side of the enclosing wall, the first side being different than the second side,

wherein the enclosing wall prevents at least a portion of light emitted from the light emission source from being detected by the plurality of detectors without attenuation by the tissue, and wherein the plurality of detectors are arranged in an array having a spatial configuration corresponding to the circular portion of the tissue measurement site.

6.    The physiological monitoring device of claim 1, further comprising a diffuser which receives, spreads, and emits the spread light, wherein the emitted spread light is directed at the tissue measurement site.

Appx0153.

## CERTIFICATE OF INTEREST

Counsel for Appellant Masimo Corporation certifies the following:

1.     The full name of every party represented by me is:

Masimo Corporation.

2.     The name of the real party-in-interest represented by me is:

Masimo Corporation.

3.     All parent corporations and any publicly held companies that own more than 10 percent or more of the stock of the party represented by me are:

BlackRock Inc. owns at least 10% of the stock of Masimo Corporation

4.     The name of all law firms and the partners or associates that appeared for the party in the lower tribunal or are expected to appear for the party in this court and who are not listed on the docket for the current case:

Knobbe, Martens, Olson & Bear, LLP: Stephen W. Larson, Jarom D. Kesler, Benjamin A. Katzenellenbogen

5.     The case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal:

None.

6.    Information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees):

None.

# **TABLE OF CONTENTS**

**Page No.**

STATEMENT OF RELATED CASES ................................................................ 1

JURISDICTIONAL STATEMENT ................................................................ 2

I.    INTRODUCTION ................................................................ 3

II.   STATEMENT OF THE ISSUES ................................................................ 7

III.  STATEMENT OF THE CASE ................................................................ 7

    A.    The '695 Patent ................................................................ 7

    B.    The Petition and Cited Art ................................................................ 13

        1.    Chin ................................................................ 13

        2.    Sarantos ................................................................ 18

        3.    Mendelson-1991 ................................................................ 21

        4.    Ackermans ................................................................ 22

    C.    Masimo's Response ................................................................ 23

    D.    The Board's Final Written Decision ................................................................ 26

IV.   SUMMARY OF THE ARGUMENT ................................................................ 27

V.    STANDARD OF REVIEW ................................................................ 30

VI.   ARGUMENT ................................................................ 30

    A.    The Board Erred By Substituting Its Own "Expert" Analysis ................................................................ 31

    B.    Chin Does Not Recognize "General Benefits" For A Diffuser At "Any Body Part" ................................................................ 39

# **TABLE OF CONTENTS**
## (*cont'd*)

**Page No.**

C.   Chin Does Not Teach A Diffuser Would Benefit A
Reflectance-Type Sensor By Producing A Stronger
Reflected Signal ................................................................... 45

D.   The Board's Findings Regarding Sarantos And Ackermans
Undermine Those Sensor's Operation And Are Not
Supported By Substantial Evidence ................................................. 51

VII.   CONCLUSION............................................................................. 58

CERTIFICATE OF COMPLIANCE.................................................... Addendum-2

# <u>TABLE OF AUTHORITIES</u>

**Page No(s).**

*Adidas AG v. Nike, Inc.*,
   963 F.3d 1355 (Fed. Cir. 2020), *cert. denied*, 209 L. Ed. 2d 121,
   141 S. Ct. 1376 (2021) ...................................................................................... 56

*Chemours Co. FC, LLC v. Daikin Indus., Ltd.*,
   4 F.4th 1370 (Fed. Cir. 2021), *cert. denied*, 212 L. Ed. 2d 405,
   142 S. Ct. 1418 (2022) ...................................................................................... 55

*Consol. Edison Co. v. N.L.R.B.*,
   305 U.S. 197 (1938) ........................................................................................... 30

*DSS Tech. Mgmt., Inc. v. Apple Inc.*,
   885 F.3d 1367 (Fed. Cir. 2018) ......................................................................... 34

*In re Enhanced Sec. Rsch., LLC*,
   739 F.3d 1347 (Fed. Cir. 2014) ......................................................................... 49

*In re Gartside*,
   203 F.3d 1305 (Fed. Cir. 2000) ......................................................................... 30

*Henny Penny Corp. v. Frymaster LLC*,
   938 F.3d 1324 (Fed. Cir. 2019) ......................................................................... 49

*Mallinckrodt, Inc. v. Masimo Corp.*,
   147 F. App'x. 158 (Fed. Cir. 2005) ..................................................................... 3

*Masimo Corp. v. Philips Elec. N. Am. Corp.*,
   2015 WL 2379485 (D. Del. May 18, 2015) ......................................................... 3

*Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd.*,
   719 F.3d 1346 (Fed. Cir. 2013) ......................................................................... 45

*OSI Pharms., LLC v. Apotex Inc.*,
   939 F.3d 1375 (Fed. Cir. 2019) ......................................................................... 30

*Panduit Corp. v. Dennison Mfg. Co.*,
   810 F.2d 1561 (Fed. Cir. 1987) ......................................................................... 49

# TABLE OF AUTHORITIES
## (*cont'd*)

**Page No(s).**

*TQ Delta, LLC v. Cisco Sys., Inc.*,
   942 F.3d 1352 (Fed. Cir. 2019) ...........................................................................30

## **STATEMENT OF RELATED CASES**

Pursuant to Federal Circuit Rule 47.5, Masimo Corporation states as follows: there are no cases known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal.

## <u>JURISDICTIONAL STATEMENT</u>

The Board issued a final written decision on May 5, 2022. Appx0001-0031. Masimo timely appealed on June 9, 2022. Appx0093-0094. The Court has jurisdiction under 35 U.S.C. §§ 141(c), 319 and 28 U.S.C. § 1295(a)(4)(A).

# I. **INTRODUCTION**

In 1989, Masimo was a small two-person startup run out of an inventor's condo.  Today, Masimo is a publicly traded company that employs 6,300 people worldwide and has annual revenues exceeding one billion dollars.  Over the years, Masimo developed a range of technologies that revolutionized the field of noninvasive monitoring.[1]

Masimo is best known for its proprietary highly accurate pulse oximetry technology, which provides the safest, most reliable noninvasive method for monitoring a person's blood oxygen levels.  Masimo's pulse oximetry technology is used to monitor over 200 million patients per year, and it is the primary pulse oximetry technology used in many of the top hospitals in the United States.

The patent at issue in this appeal describes and claims one of Masimo's technologies.  The invention at issue here, embodied in U.S. Patent No. 10,470,695 ('695 Patent) claims 6, 14, and 21, is a wrist-worn physiological sensor that determines a physiological parameter by measuring light reflected from the user's wrist at different wavelengths.  Each of the appealed claims includes a diffuser that receives, spreads, and emits the spread light into the tissue at the wrist.  The

---

[1] *See Mallinckrodt, Inc. v. Masimo Corp.*, 147 F. App'x. 158, 163 (Fed. Cir. 2005) (nonprecedential); *Masimo Corp. v. Philips Elec. N. Am. Corp.*, 2015 WL 2379485 at *1 (D. Del. May 18, 2015).

innovators of the '695 Patent discovered the positive benefits of adding a diffuser into the light path in a wrist-worn, reflectance-type sensor could outweigh the conventionally known negatives surrounding diffuser use.

In general, noninvasive optical sensors include emitters and detectors. The emitters, such as light emitting diodes, emit light into skin tissue. The tissue absorbs, reflects, or allows the light to transmit through to the other side. Detectors, such as photodetectors, detect the reflected or transmitted light.

Sensors with reflectance-type geometries, such as those recited in the '695 Patent claims on appeal, position the emitters and detectors on the same tissue surface to enable the detectors to capture reflected light. Sensors with an alternate transmissive-type geometry position the emitters and detectors on opposite sides of tissue–such as the top and bottom sides of a finger–to enable the detectors to capture light passing through the body. As signals in pulse oximetry are often weak and plagued with undesired corruption or noise, in both reflectance and transmissive sensors, designers seek to increase desired light arriving at the detectors.

Adding a diffuser in a reflectance-type sensor can reduce signal strength at the detector. For example, a diffuser spreads light out and reduces light entering the tissue at a particular location, thus less light will backscatter and reflect to a detector from that location. In general, less light at the detector negatively equates with less desired signal. Accordingly, conventional wisdom for reflectance-type sensors held

that a concentrated beam of light, not a diffused one, provided the most desired light backscattered and reflected to the same-side detector. Unsurprisingly, no cited reference discloses a diffuser used with a reflectance-type sensor.

Against this backdrop, the inventors of the '695 Patent found that in particularly hard-to-measure body locations, such as the wrist, the ultimately weaker signal caused by the inclusion of a diffuser was offset by an increased likelihood of the light probing desired tissue. That is, spreading out the light at the wrist allowed an increased diversity in the tissue sampled. And contrary to conventional belief, the innovative inclusion of a diffuser improved physiological parameter determinations when the sensor was applied to the wrist.

The Board, however, relied on a series of unsupported and inconsistent findings to wrongly conclude that the inclusion of the diffuser would have been obvious. Among them, the Board found that a diffuser would have provided a "stronger reflected signal." Appx0021. No reference discloses that a diffuser used with a reflectance-type sensor produces a stronger reflected signal. Masimo's expert, Dr. Madisetti, submitted unrebutted experimental testing that demonstrated the opposite–that a diffuser applied to a reflectance-type sensor decreases the reflected signal substantially. Dr. Madisetti explained a skilled artisan would have understood what the experimental results clearly showed: that a diffuser would reduce signal strength in a reflectance-type sensor.

The Board, however, gave no weight to Dr. Madisetti's testimony because the reflectance-type sensor Dr. Madisetti tested "has only a single detector." Appx0024-0025. The Board, however, took the opposite position when evaluating the Chin prior art. Chin—like the sensor tested by Dr. Madisetti—has a single detector. And Chin's diffuser is applied to a transmissive-type sensor, not a reflectance-type sensor as claimed. But the Board nevertheless found Chin highly relevant to the obviousness analysis. If anything, Dr. Madisetti's testing is more relevant since it actually addressed reflectance-type sensors. But the Board found the opposite. The Board's arbitrary and inconsistent distinction discounting evidence supporting patentability was an error.

This appeal ultimately presents the question of whether the Board crossed the line from adjudicatory fact-finding to ill-informed pseudo-expert testimony. Petitioner never submitted a rebuttal expert declaration addressing Dr. Madisetti's opinions. Without the benefit of expert analysis, the Board nevertheless made a series of arbitrary and conflicting findings unsupported by substantial evidence. The Board buttressed its wrong conclusions by improperly reading isolated sentences plucked from the Chin reference while ignoring the reference as a whole. As a result of this legally erroneous approach, the Board held Masimo's claims obvious.

The Board's decision is not supported by substantial evidence and is the product of legal error. The references themselves and the unrebutted testimony from

Dr. Madisetti demonstrate the Board's error.  The Board's judgment should be reversed.

## II.  <u>STATEMENT OF THE ISSUES</u>

1.  Did the Board err by discounting unrebutted expert testimony based on its own incorrect and unsupported interpretation of the cited art?

2.  Did the Board err by relying on isolated statements taken out of context instead of reading the cited art as a whole?

3.  Are the Board's findings supported by substantial evidence?

## III.  <u>STATEMENT OF THE CASE</u>

### A.  <u>The '695 Patent</u>

This appeal involves three claims from U.S. Patent No. 10,470,695 ('695 Patent).  Appx0130-0154.  The '695 Patent is generally directed to optical physiological sensors, and specifically to advanced pulse oximeters.  Appx146 1:19-23.  The optical physiological sensors disclosed and claimed in the '695 Patent use multiple light sources (e.g., LEDs) and multiple detectors. *See, e.g.*, Appx153 (claim 1, claim 6).  The sensors take physiological measurements by monitoring the change in light intensity at multiple wavelengths.

In a conventional sensor, the light source approximates a point.  Appx0148 5:43-46.  As the '695 Patent explains, light beams emitted from, *e.g.*, an LED point source, often have a strong focus that produces "a usually sharply-defined and

evenly-lit illuminated spot." Appx0148 5:50-54. For example, the '695 Patent illustrates a conventional reflectance-type pulse oximeter in Figure 6. Appx0143. A reflectance-type pulse oximeter positions the emitter and detector on the same side of the tissue measurement site. Appx0150 10:11-16. Light from the emitter enters the tissue measurement site and passes into the tissue. Appx0150 10:16-17. Some light reflects from the tissue and backscatters towards the surface with the emitter and detector producing a banana-shaped light path within the tissue. As illustrated in Figure 6, the conventional reflectance pulse oximeter emits and detects a point light source. Appx0150 10:32-33.



FIG. 6
(PRIOR ART)

At the time of the invention, the conventional understanding was that for a reflectance-type pulse oximeter, reducing the variability in the light's path length

produced a more accurate measurement. Appx0148 5:66–6:1. The tight focus of a

point emitter could potentially reduce differences in the length the light 620 travels

as it moves from the emitter 602, reflects off tissue, and reaches the detector 610.

*Id*. In practice, however, the tight focus of the light source did not address the

variable path length issue. Instead, light scattering caused by blood and tissue

resulted in variations in path length that cause errors. Appx0148 at 6:1-8, Appx0150

10:33-36.

The '695 Patent addresses problems associated with reflectance sensors by

taking an unusual step. Instead of attempting to control reflection using a focused

beam of light, the '695 Patent uses a diffuse light source that spreads light over a

larger area. Figures 7A and 7B (Appx0143-0144) illustrate the '695 Patent's

approach:



FIG. 7A                     FIG. 7B

Unlike the conventional reflectance sensor's point light source, the '695 Patent combines an emitter (702) with a light diffuser (704). The diffuser 704 (shaded blue) "homogenously spreads the [light] over a wide, donut-shaped area, such as the area . . . as depicted in FIG. 7B [(also shaded blue)]." Appx0150-0151 10:65–11:2. The diffuse reflected light backscatters and reaches a detector 710 (shaded green) located on the same side of the wrist as the emitters 702. Appx0150 10:45-49.

The inventors of the '695 Patent realized that even though the emitted light was less focused, it nevertheless could improve the signal for a reflectance-type device by increasing the diversity of the sampled tissue. Thus, the '695 Patent explains that a diffuser "provides the opportunity to take an average of the detected light, to derive a more accurate measurement of the emitted light absorbed by the tissue, which will lead to a more accurate oxygen saturation measurement." Appx0151 11:47-53. This surprising result runs against the conventional understanding that better measurements required increasing signal strength. Appx0148 5:66–6:1. Even if a diffuser provided a weaker reflectance-type signal, the inventors nevertheless found that the resulting averaging improved signal quality and allowed measurements from hard-to-measure locations such as the wrist. Appx0150 10:45-49. Figures 7A and 7B illustrate a single emitter and single detector arrangement, but the '695 Patent's approach also applies to multi-emitter/multi-detector sensors. Appx0151 11:37-43.

The claims at issue in this appeal claim a wrist-worn physiological monitoring device that includes a diffuser. Appx0153-0154 (claim 6, claim 14, claim 21). The diffuser "receives, spreads, and emits the spread light, wherein the emitted spread light is directed at the tissue measurement site." Appx0153 (claim 6); *see also* Appx0154 (claims 14 & 21, claiming a diffuser with similar limitations). Claim 6 generally illustrates the invention at issue in this appeal. Claim 6 and independent claim 1 are below:

1. A wrist-worn physiological monitoring device configured for placement on a user at a tissue measurement site, the device comprising:

a light emission source comprising a plurality of emitters configured to irradiate the tissue measurement site by emitting light towards the tissue measurement site, the tissue measurement site being located on a wrist of the user, the plurality of emitters configured to emit one or more wavelengths;

a plurality of detectors configured to detect the light emitted by the plurality of emitters after attenuation by a circular portion of the tissue measurement site, the plurality of detectors further configured to output at least one signal responsive to the detected light;

a processor configured to receive the at least one signal responsive to the output and determine a physiological parameter of the user; and

a light block forming an enclosing wall between the light emission source and the plurality of detectors, the light block defining the circular portion of the tissue measurement site, the light emission source arranged proximate a first side of the enclosing wall and the plurality of detectors arranged proximate a second side of the enclosing wall, the first side being different than the second side,

wherein the enclosing wall prevents at least a portion of light emitted from the light emission source from being detected by the plurality of detectors without attenuation by the tissue, and wherein the plurality of detectors are arranged in an array having a spatial configuration corresponding to the circular portion of the tissue measurement site.

6. The physiological monitoring device of claim 1, further comprising a diffuser which receives, spreads, and emits the spread light, wherein the emitted spread light is directed at the tissue measurement site.

Appx0153 claims 1, 6.

The claimed wrist-worn device is a reflectance-type sensor with the emitters and detectors separated by a wall. *See* Appx0153 claim 1 ("light emission source arranged proximate a first side of the enclosing wall and the plurality of detectors arranged proximate a second side of the enclosing wall, the first side being different than the second side"); *see also* Appx0153-0154 (claims 9, 19). The claims on

appeal thus claim a diffuser used with a reflectance-type physiological sensor, with the claimed plurality of emitters and plurality of detectors on the same side of the tissue measurement site. *See* claims 6, 14, 21.

## B.    The Petition and Cited Art

Apple petitioned for review of the '695 Patent. The petition raised two grounds relevant to the claims on appeal. The first ground proposed obviousness by combining a Sarantos (and Mendelson-1991) reflectance type sensor with a diffuser taught by Chin. Appx0009-0010. The second ground proposed obviousness by combining an Ackermans reflectance type sensor with the diffuser taught by Chin. *Id*. Both grounds rely on Chin for the diffuser limitation. *Id*. But unlike the claims, Chin does not teach a diffuser used with a reflectance pulse oximeter sensor.

### 1.    Chin

Chin is a patent directed to a particular sensor configuration using emitters offset from a detector in combination with a heating device. *See, e.g.,* Appx1321 (Title, Abstract). Chin explains that it "provides a method and apparatus for improving blood perfusion by both heating a patient's skin and providing emitters and a detector which are offset from each other." Appx1327 2:35-45. Chin states that the offset between the emitters and the detector "causes the light emitted by the emitters to pass through more blood-perfused tissue to reach the detector than it would on the direct path through the appendage." Appx1327 2:43-46. As an

alternate embodiment Chin discusses "a reflectance-type sensor…with a reflective surface on the opposite side of the appendage." Appx1328 3:35-40.

In contrast, Chin only mentions a diffuser twice. Chin first mentions a diffuser in its discussion of the prior art. Appx1327 2:4-9. The only other mention of a diffuser is Chin's discussion of a "nostril sensor," illustrated in Chin Figure 7B (Appx1325, annotated below). Appx1330 8:20-29.



As illustrated, Chin's nostril sensor includes an emitter (176) and a detector (178). Appx1330 8:20-29. Chin's nostril sensor is not a reflectance-type sensor. Instead, it is a transmissive-type sensor where the emitter and detector sandwich the nostril tissue from opposite sides. Appx1325 Fig. 7B. Light from the emitter must travel through the tissue and reach the offset detector on the other side. *Id*.; *see also, e.g.*, Appx1324 Fig. 5B (illustrating offset transmissive-type detector), Appx1329-1330 6:64-7:3 (discussing transmission path through tissue). In the context of the nose sensor, Chin states that "an optional diffuser 180…causes a further spreading or mixing of light and may enhance the amount of tissue penetrated in some instances." Appx1330 8:25-29. The diffuser thus works with Chin's specific arrangement of an

offset emitter and opposing detector. The diffuser spreads the light, which allows more light to move diagonally *across* the tissue to the offset detector instead of directly through—in the orientation of Figure 7B, downward vertically—the tissue. *See* Appx1325 Fig. 7B; *see also* Appx1324 Fig. 5B-5C (illustrating diagonal path to offset detector).

Chin does not teach or suggest that a reflectance-type sensor, which uses an emitter and detector on the *same* tissue surface, would benefit from a diffuser. Instead, when discussing reflectance-type sensors, Chin suggests use of, *e.g.*, reflective surfaces. Appx1330 7:28-57. For example, Chin's Figures 5E and 5F (below) show tissue 146 at the measurement site is so thin that light readily passes through the tissue, from one side to the other. Appx1324. Chin's reflectance-type sensor traps the light in the tissue measurement site using layers of reflective material (150) that reflect light from the emitter (e) passing through the tissue back into the tissue and towards the detector (d). *See* Appx1330 7:13-20; 7:35-41 (light "bouncing back and forth between the reflectors until it reaches the detector from the emitter").



Thus, for reflectance sensors, Chin's concern is redirecting light that would otherwise pass through the tissue back into the measurement tissue. This effectively increases the thickness of the tissue and allows emitter and detector positioning farther offset apart. The distance separating the emitter and detector is greater than the thickness of the measurement site, and preferably more than twice the thickness of the measurement site. Appx1324 Fig. 5F; Appx1330 7:39-57.

Chin never connects its brief mention of a diffuser with a reflectance-type sensor. Likewise, Chin's claims only include a diffuser when the light emitter and light detector are on opposite sides of the patient's tissue. *See, e.g.*, Apx1331-1332 Chin claims 8, 20; *compare* Chin claim 21 (claiming a light source and light collector on the same side of the tissue, but no diffuser).

In reference to its disclosed innovations, those of "improving blood perfusion by both heating [tissue] … and providing emitters and a detector which are offset from each other" (Appx1327 2:36-38), Chin discloses in Figure 2 a block diagram of a four-wire measurement system including a sensor 15 having a thermistor 60,

emitters 14 and a detector 16. Appx1329 5:26-62, Appx1323 (Fig. 2); *see also* Appx1328 4:8-14.



**FIG. 2.**

Although clearly providing its heater and offset optical components, Chin's Figure 2 sensor is devoid of any diffusers 180, reflective surfaces 133, 134, clip-on structural elements, metal structural components, 160, 170, clips, pads, 162, 164 or other site-specific details from Chin's additional sensor embodiments. Appx1329 5:26-62, Appx1323 (Fig. 2). In the context of Chin's heater and offset optical components, Chin discloses that its block diagram Figure 2 sensor "could attach to any body part" (Appx1329 5:55-56).

Additionally, to contextualize "any body part," Chin specifically states, the sensor 15 "could attach to any body part, such as the earlobe, finger, etc." Appx1329 5:55-56. Thus, Chin's sensor designs are for measurement sites thin enough that light passes from one side to the other. *See, e.g.*, Appx1324 Fig. 5; *see also* Appx1323 Fig. 3 (reflectance-type sensor used on ear); Appx1331 9:36-57, Appx1326 Fig. 11 (reflectance-type sensor used on ear). There is no indication in

Chin that its sensor designs are relevant to thicker measurement sites where light does not pass from one side of the tissue to the opposite side.  In fact, every Chin attachment mechanism is specifically designed for a thin site.  *See, e.g.*, Appx1324-1326; Appx1328 3:61-65 (ear and nostril sensors); Appx1330 8:3-4 (ear clip), 8:20-21 (nostril sensor).  Every single Chin embodiment—including its reflectance sensors—addresses light passing through a thin measurement site and emerging on the opposite side.  *See, e.g.*, Appx1324 Fig. 5a-g; *see also* Appx1331 9:36-57, Appx1326 Fig. 11 (reflectance-type sensor used on ear).

## 2.    Sarantos

Sarantos discloses a wristband wearable fitness monitor 200. Appx1354 7:12-16.  Sarantos Figure 2 (Appx1337, below annotated) includes a monitor 200 with light emitters 108 and a detector 212. Appx1354 7:16-23. Sarantos uses a reflectance-type sensor with the emitters 108 and the detector 212 on the same side of the wrist.  Appx1337 Fig. 2 (annotated).



FIG. 2

Light from the emitters irradiates a wearer's skin near the wrist, backscatters (or reflects), off the tissue and emerges back out of the skin. Appx1354 7:25-30. Sarantos Figure 6 illustrates the expected backscattered light intensity for an emitter. As shown in Sarantos Figure 6 (Appx1341, annotated below), the backscattered light intensity for a reflectance-type sensor decreases with increasing distance from the emitter. Appx1355 10:51-67.



FIG. 6

Appx1341 Fig. 6 (color added).

Sarantos positions rectangular detectors (shaded blue, above) over the areas of greatest backscattered light intensity.  Appx1355 10:67–11:3.  As shown in Sarantos Figure 6, a rectangular detector captures the intense backscattered light better than the prior art square detector.  Appx1355 10:67–11:3.  Sarantos also explains that its detectors should be close to the emitters, typically between 1 mm to 4 mm apart. Appx1359 18:61-66. Sarantos warns that designs outside this range "may prove counterproductive, as a higher-intensity [emitter] may be needed . . . in

order to obtain a sufficiently strong signal at the []detector." Appx1360 19:13-18. A higher-intensity emitter, and/or driving an emitter harder to generate more intensity, *i.e.*, more light, consumes additional power, which "may be undesirable in a wearable fitness monitor context." Appx1360 19:18-21. Sarantos does not teach or suggest using a diffuser with its reflectance-type sensor.

### 3. <u>Mendelson-1991</u>

Mendelson describes a reflectance-type sensor. Appx1363 at Abstract, Appx1364 (Fig. 1). Mendelson-1991 Figure 1 (Appx1364, annotated below) illustrates the structure of the reflectance-type sensor. Appx1364-1365. Mendelson-1991's reflectance sensor positions its detectors close to the centrally-located emitters. Appx1364 Fig. 1; *see also* Appx1365 (inner diameter 15 mm). Mendelson-1991 indicates "[t]his arrangement maximizes the amount of backscattered light that is detected by the sensor." Appx1364.



*Fig 1. (A) Frontal and (B) side views of the heated skin reflectance pulse oximeter sensor. See text for explanation. R & IR LEDs = red and infrared light-emitting diodes.*

Mendelson-1991 explains that the "major practical limitation of reflectance pulse oximetry is the comparatively low-level photoplethysmograms recorded from low-density vascular areas of the skin." Appx1364. Due to the low capillary density at the forearm and calf, and corresponding lower light detected, Mendelson-1991 observed higher errors for its oxygen saturation measurements than those from other locations. Appx1368. Mendelson-1991 does not teach or suggest using a diffuser with its reflectance-type sensor.

### 4. **Ackermans**

Ackermans describes a reflectance-type sensor arranged into nodes of a hexagonal lattice structure (Appx1386, Fig. 4 below left). Appx1377 7:29-34;

Appx1386 (Fig. 4). Ackermans Figure 1 (Appx1385, annotated below right) illustrates a sensor (10) from one of its nodes with a solid ring detector (30) arranged around and below an emitter (20).



As illustrated in Ackermans Figure 1, light from the emitter irradiates the skin. The light (21) backscatters or reflects off the tissue and travels to the detector (30). Appx1374-1375 4:33-5:4. Ackermans does not teach or suggest using a diffuser with its reflectance-type sensor.

## C. **Masimo's Response**

Masimo responded to the petition (Appx0350-0400) by explaining that Chin dealt with a specific situation. Appx0371-0375. Masimo pointed out that Chin attempted to effectively increases the tissue's thickness, for example by using an emitter offset from an opposing detector such that light must travel diagonally through the tissue. *Id*.



Masimo explained that Chin's approach was relevant to thin tissue measurement sites where light could pass through the tissue. Appx0374. In contrast, the devices in Sarantos, Mendelson-1991, and Ackermans were all designed for thicker measurement sites, for example the wrist or forearm. Appx0374-075 (*citing* Ex. 1014 7:12-16 (Appx1354); Ex. 1015 at Abstract (Appx1363); Ex. 1016 at 10:31-32 (Appx1380)).

Masimo also addressed Chin's nostril sensor, which the petition relied on for the diffuser limitation. Appx0367. Masimo explained that Chin's diffuser extended the light towards an offset detector on the opposite side of the tissue. Appx0367.



Appx0367

Masimo explained that the nostril tissue is so thin that Chin used three different

modification to increase tissue penetration including adding a heater, offsetting the

emitter and detector, and adding an optional diffuser.  Appx0374 (citing Ex. 1006

(Appx1321-1332) at 2:59-62; 2:39-41; 8:25-29; Fig. 7B).  Masimo explained that all

of Chin's modifications address problems with the thin nostril tissue, unlike the other

petition references (*e.g.*, Sarantos, Mendleson, and Ackermans) that all measured

signals from a thick tissue measurement site.  Appx0374-0375.  Thus, the solutions

discussed in Chin addressed a problem not present in the other cited references.  *Id.*

Masimo supported its petition with an expert declaration from Dr. Vijay

Madisetti.  Appx0375-0376; Appx1771-1825.  Dr. Madisetti explained that a skilled

artisan would have understood that a diffuser, like the one discussed in Chin, would

dramatically reduce the measured optical signal for a reflectance-type sensor.

Appx0375-0376; Appx1800-1802.  As such, Dr. Madisetti explained, a skilled

artisan would not have understood Chin as teaching a diffuser used in conjunction with a reflectance-type sensor. *Id*. Dr. Madisetti supported his declaration with measurements taken using a reflectance pulse oximeter in conjunction with two different commonly-used diffusers. Appx1800-1802; Appx1821-1825. For one diffuser, Dr. Madisetti measured a decrease in measured signal of 14% to 17% relative to no diffuser. *Id*. For another diffuser, Dr. Madisetti measured a decrease in signal strength of up to 40% or 50% compared to no diffuser, depending on the wavelength of light. *Id*.

Apple could have submitted an expert declaration rebutting Dr. Madisetti's results. Apple did not submit a responsive expert declaration. Dr. Madisetti's opinions, including his supporting experimental work, were thus unrebutted.

## D.    The Board's Final Written Decision

The Board issued a Final Written Decision holding claims 6, 14, and 21 unpatentable as obvious based on Sarantos and Mendelson-1991 combined with Chin, and also based on Ackermans combined with Chin. Appx0029. Among other things, the Board found that Dr. Madisetti's unrebutted experiments were not "adequate or particularly probative." Appx0025. Because there was no rebuttal expert declaration, the Board based this finding on its own analysis that there was a "significant" difference between the sensor tested by Dr. Madisetti, which included a single detector, and the "pertinent prior art," which the Board asserted included

multi-detector sensors. Appx0024. But the "pertinent prior art" applied by the Board in its obviousness analysis also included Chin. And Chin is the only reference cited for a diffuser. Chin's sensor—like the sensor Dr. Madisetti tested—only has one detector. *See, e.g.*, Appx1324 (Fig. 5); Appx1326 (Fig. 11). The Board did not explain or justify its inconsistent finding that Chin's single-detector sensor was relevant prior art but Dr. Madisetti's single-detector testing results were "significant[ly]" different from the "pertinent prior art." Appx0024-0025.

## IV. SUMMARY OF THE ARGUMENT

1. Masimo's expert Dr. Madisetti submitted an expert declaration supporting patentability. Dr. Madisetti's declaration included testing results that confirmed what would have been known to an artisan at the time: that adding a diffuser to a reflectance-type sensor decreases the signal strength dramatically. Dr. Madisetti's declaration also analyzed the different problems associated with, *e.g.*, a thin tissue measurement site as compared to a measurement site with thicker tissue. Dr. Madisetti explained that the cited art addressed specific problems at specific measurement sites, and the proposed solutions were not generally applicable.

The petitioner did not submit a rebuttal expert declaration addressing Dr. Madisetti's testing and opinions. Although Dr. Madisetti's opinions were unrebutted, the Board stepped out of its role as an adjudicator and into the shoes of a rebuttal expert. By departing from the evidence of record and engaging in its own

speculative analysis, the Board made a series of unsupported, inconsistent, and incorrect findings. The Board ultimately concluded—contrary to Dr. Madisetti's testing results—that adding a diffuser to reflectance-type sensor would increase the reflected signal and therefore the claims would have been obvious. The Board erred in its approach which led to findings unsupported by substantial evidence. Because the evidence of record demonstrates adding a diffuser to a reflectance-type sensor would have been expected to reduce signal strength, the Board's obviousness holding falls apart, and should be reversed

2.   Other key Board findings are likewise the product of legal error and unsupported by substantial evidence. The Board repeatedly erred by reading individual sentences from the cited references in isolation. The Board's approach runs afoul of the requirement that a reference must be read as a whole. The Board's error propagated into unsupported factual findings.

The Board found the Chin reference discloses a general benefit for a diffuser only by stitching together disparate pieces of Chin's disclosure. But a skilled artisan would have understood from Chin's disclosure as a whole that Chin only applies to particular situations not present in the other cited references. The Board erred by picking-and-choosing small parts from Chin, and made factual findings unsupported by the reference as a whole. The Board's erroneous conclusion that Chin generally teaches that a diffuser would be beneficial to any type of sensor at any measurement

site is not supported by substantial evidence. This is an independent reason why the Board's holding should be reversed.

3.    The Board's analysis of the other references in the obviousness combination with either Saratos or Ackermans is similarly flawed. Dr. Madisetti's unrebutted testimony demonstrates that adding a diffuser to either Sarantos's sensor or Ackermans's sensor undermines their respective operation.

Sarantos designed its sensor with detectors shaped to capture the ring of relatively intense light close to the device's center. Sarantos repeatedly emphasizes the detector's long rectangular shape compared to the square prior art detectors, and explains that its thin detectors could nevertheless capture most of the signal when shaped correctly. Adding a diffuser would have been expected to spread out the light and eliminate the tight ring of higher-intensity light targeted by Sarantos's thin rectangular detector design. The Board's conclusion that Sarantos was agnostic about the reflected light pattern detected ignores Sarantos's characterization of its own design. The Board's analysis is cursory, conclusory, and does not adequately account for the fundamental change in Sarantos's sensor caused by a diffuser. The Board's approach to the Ackermans combination is even worse: despite differences between the Sarantos and Ackermans sensors, the Board provided no independent analysis. The Board's obviousness determination should be reversed for this independent reason as well.

## V.  <u>STANDARD OF REVIEW</u>

This Court reviews the "Board's legal conclusions de novo and its fact findings for substantial evidence." *OSI Pharms., LLC v. Apotex Inc*., 939 F.3d 1375, 1381 (Fed. Cir. 2019).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. N.L.R.B*., 305 U.S. 197, 229 (1938).  Substantial evidence review "involves examination of the record as a whole, taking into account evidence that both justifies and detracts from an agency's decision." *In re Gartside*, 203 F.3d 1305, 1312 (Fed. Cir. 2000); *see also TQ Delta, LLC v. Cisco Sys., Inc.*, 942 F.3d 1352, 1358 (Fed. Cir. 2019).  "'Mere speculation' is not substantial evidence." *OSI*, 939 F.3d at 1382.

## VI.  <u>ARGUMENT</u>

Chin is the sole reference that discloses a diffuser.  Appx0017-0018.  Each appealed claim requires a diffuser used with a reflectance-type sensor.  Appx0153-0154 (claims 6, 14, 21).  Without Chin there is no basis for obviousness.  Chin, however, does not disclose a diffuser used with a reflectance-type sensor.  In fact, Chin only includes one embodiment with a diffuser, and that embodiment is a transmissive-type sensor with offset emitter and detector.  In that specific situation, where light reaching the detector must pass diagonally through the tissue, Chin indicates the light spreading effect of the diffuser "***may*** enhance the amount of tissue penetrated in ***some*** instances."  Appx0149 8:20-29 (emphasis added).  Chin's only

other mention of a diffuser is in the background, where Chin observes that "*[o]ne type* of oximeter sensor will add a diffusing optic…." Appx0146 2:4-9 (emphasis added). Chin's disclosures are qualified statements about "some instances" or "one type" of device. Chin does not teach a diffuser is generally useful in all sensors, let alone in a reflectance-type sensor as claimed. Nevertheless, the Board found "Chin explains generally that use of a diffuser is understood to be beneficial in causing light 'to pass through more tissue, and thus more blood.'" Appx0020 (*citing* Appx0146 2:4-7). The Board found "persuasive Petitioner's view…that the light spreading benefits of a diffuser provide for a 'stronger reflected signal.'" Appx0021 (quoting the Petition at 63). But the "Petitioner's view" is not evidence. The Board's obviousness analysis relied on a legally erroneous approach and resulted in findings unsupported by substantial evidence.

## A.    The Board Erred By Substituting Its Own "Expert" Analysis

A key issue in this proceeding was whether it would have been obvious to combine a diffuser with a reflectance-type sensor. During the proceedings, Masimo's expert Dr. Madisetti submitted an expert declaration that included experimental results measuring the impact of a diffuser on a reflectance-type pulse oximeter sensor. Appx1800-1802; Appx1821-1825. Dr. Madisetti's experiments used an industry-specific biomimic medium that mimics light scattering by tissue. Appx1800-1801 ¶58. Dr. Madisetti first measured the amount of light that reached

the reflectance-type sensor's detector without a diffuser in the light path. Appx1800-1801 ¶58. Dr. Madisetti then measured the signal reaching the detector with a diffuser in the light path. Appx1800-1801 ¶58. Dr. Madisetti documented the experimental details in an appendix to his declaration. Appx1821-1825.

Dr. Madisetti summarized his experimental results in the table below.

**Table 1: Effect of Diffuser on Reflective Sensor**

|  | Red 50mA | Red 100 mA | IR 50 mA | IR 100 mA |
|---|---|---|---|---|
| No Diffuser | 0.23 | 0.45 | 0.33 | 0.63 |
|  | 0.24 | 0.46 | 0.34 | 0.65 |
|  | 0.23 | 0.45 | 0.33 | 0.64 |
| Berry Diffuser | 0.12 | 0.23 | 0.19 | 0.37 |
|  | 0.12 | 0.23 | 0.19 | 0.37 |
|  | 0.12 | 0.23 | 0.19 | 0.37 |
| Luminit Diffuser | 0.20 | 0.38 | 0.28 | 0.52 |
|  | 0.20 | 0.39 | 0.28 | 0.54 |
|  | 0.20 | 0.38 | 0.28 | 0.53 |

| Means | Red 50 | Red 100 | IR 50 | IR 100 |
|---|---|---|---|---|
| No Diffuser | 0.23 | 0.45 | 0.33 | 0.64 |
| Berry Diffuser | 0.12 | 0.23 | 0.19 | 0.37 |
| Luminit Diffuser | 0.20 | 0.39 | 0.28 | 0.53 |
|  |  |  |  |  |
| Loss Berry | 50% | 50% | 42% | 42% |
| Loss Luminit | 14% | 15% | 17% | 17% |

Appx1800-1801 ¶58

Dr. Madisetti's experiments illustrate that positioning a diffuser over a reflectance-type oximeter's emitter results in substantially decreased signal strength detected. One diffuser (Luminit) still reduced the light reaching the detector by 14-17%. Appx1802 ¶59. Another diffuser (Berry) reduced the light reaching the

detector by 40-50%. Appx1802 ¶59. Dr. Madisetti explained that his experiments "confirm what a POSITA would have already known about the effects of different diffuser materials on reflectance-type sensors." Appx1802 ¶58. Namely, that a diffuser applied to a reflectance-type sensor would have reduced the measured signal and resulted in significant detrimental consequences for a reflectance-type sensor. Appx1800-1802 ¶¶57-60.

As Dr. Madisetti testified, his experiment applies broadly because it was "a representative experiment using industry standard tools, technologies, materials, and configurations in a controlled environment." Appx1760 57:12-20. The experiment confirmed "the basic knowledge of…a POSITA that a diffuser reduces the signal strength [for a reflectance-type device] by spreading it out across a larger area." Appx1761 58:1-14. As Dr. Madisetti explained, "it's a basic physical property that if you take light and spread it over a larger area…the intensity of light will decrease. And it is seen every day. If you move a flashlight from 3 feet away from the wall to 10 feet away from the wall, the intensity of light decreases per unit area." Appx1764 61:16-62:1. Dr. Madisetti thus provided copious testimony explaining that his results confirmed a basic principle familiar to a skilled artisan, and that his experimental results were not restricted to just a single detector configuration. *See, e.g.*, Appx1800-1802; Appx1821-1825; Appx1760-Appx1765.

Apple did not rebut Dr. Madisetti's testing with any expert testimony. Indeed, Apple submitted no responsive expert declaration at all. Instead, Apple only raised attorney arguments. The Board's final written decision, however, "question[ed] the significance of the 'experiments' performed by Dr. Madisetti as alleged support for the proposition that a diffuser would have 'detrimental consequences' if applied to a 'reflectance-type' pulse oximeter sensor." Appx0024.

Instead of addressing Dr. Madisetti's opinion directly, the Board put itself into the role of a rebuttal expert, and asserted that "[o]n its face" it was "significant" that the sensor tested had "only a single detector" but "the pertinent prior art…included multiple detectors." Appx0024. Beyond noting the difference, however, the Board provided no factual basis or any scientific explanation for its finding of a "significant" difference that justified discounting Dr. Madisetti's unrebutted opinion. Appx0024-0025. That type of conclusory testimony from an expert is routinely rejected as insufficient support for obviousness. *See, e.g., DSS Tech. Mgmt., Inc. v. Apple Inc.*, 885 F.3d 1367, 1377 (Fed. Cir. 2018) ("'conclusory statements and unspecific expert testimony' are insufficient to support the Board's findings"). Conclusory assertions by the Board are likewise insufficient.

The Board's findings are also internally inconsistent. Chin, one of the key references for both grounds and the only source of a diffuser, discloses a sensor with only one detector. *See, e.g.*, Appx1328 4:45-47 ("the photodetector"), Appx1329

6:28-32 ("a detector"); Appx1331 9:42-44 ("the photodetector"), Appx1323 (Fig. 3, with one detector 78). Appx1324 (Fig. 5E and 5F, with one detector (d)), Appx1326 (Fig. 11, illustrating one photodetector (210)).  The Board found there was "no cogent basis to conclude that Chin's diffuser [applied to a single detector sensor] would not function predictably…when used in conjunction with other types of sensor devices." Appx0021.  In contrast, the Board found that the single-detector system Dr. Madisetti tested was "significant[ly]" different from a multi-detector sensor, and not "probative" of the effect of a diffuser on a multi-detector sensor. Appx0024-0025.  Indeed, the Board nonsensically held that Chin's single-detector reflectance-type sensor (which does not even include a diffuser) established obviousness but Dr. Madisetti's testing results were not "probative of the obviousness question" because they tested a diffuser's impact on a reflectance sensor with a single detector.  *Compare, e.g.*, Appx0021 ("a skilled artisan would have recognized from Chin's disclosure that the light spreading benefits of a diffuser provide for a 'stronger reflected signal'") *with* Appx0024-0025 (the "sensor used by Dr. Madisetti is one that has only a single detector…[o]n its face, that difference appears significant"; Dr. Madisetti's experiments are not "probative of the obviousness question").

If a single detector sensor is not "probative of the obviousness question," Chin's single detector reflectance-type sensor cannot support obviousness.  If a

single detector sensor is "probative of the obviousness question," then the Board improperly discounted Dr. Madisetti's unrebutted opinions. The Board's conflicting findings underscore its erroneous analysis.

Indeed, as shown below (left), Chin's reflectance-type sensor is very similar to the device Dr. Madisetti tested. Chin's sensor includes only one detector (d). *See* Appx1330 7:30-32, 7:46-48 ("a detector 142"; "detector 142"); Appx 1324 Fig. 5E. Dr. Madisetti tested a comparable sensor, with a single detector, shown below (right). Appx1800-1802; Appx1821-1825. The outcome of Dr. Madisetti's testing illustrates that an artisan would have expected that adding a diffuser to a reflectance-type sensor undesirably produces a weaker signal, and relates directly to an artisan's narrow understanding of Chin's limited disclosure.



The Board is wrong that the "pertinent prior art" only "include[d] multiple detectors." Appx0024. Chin, the sole reference disclosing a diffuser, only includes a single detector—just like the sensor tested by Dr. Madisetti. Thus, the Board

improperly discounted Dr. Madisetti's testimony based on the incorrect finding that the "pertinent prior art" only included sensors with "multiple detectors."

There is nothing in the record rebutting Dr. Madisetti's testing results, and no evidence that a diffuser would have a different effect for a multi-detector system instead of a single detector system. Likewise, there is no evidence supporting the Board's finding that Dr. Madisetti's experiments were not "adequate or particularly probative." Appx0025. The Board improperly dismissed Dr. Madisetti's opinion by incorrectly asserting that there was no "meaningful explanation as to why the outcome of the experiments sheds light on the question of obviousness." Appx0025. But Dr. Madisetti repeatedly explained that his experiments provided evidence supporting his opinion that an artisan's understanding at the time would have been that "a diffuser in a reflectance sensor significantly reduces the amount of light reaching the detector." *See, e.g.*, Appx1803-Appx1817 ¶¶63, 65, 67, 71, 78-79, 81, 85. The Board's misunderstanding of the record is reversible error.

Also left unexplained is why the Board believed testing results carried using a single detector do not "shed[] light on the question of obviousness." Appx0025. Dr. Madisetti explained that the addition of a diffuser results in less signal in a single detector environment. That evidence is unrebutted. Moreover, as Dr. Madisetti testified, his opinion applies to multi-detector sensors as well. Appx1760 57:12-20. In the multi-detector environment each individual detector in a reflectance-type

sensor—like the one tested by Dr. Madisetti—would receive less signal after adding a diffuser. Even if more detectors ultimately collect more reflected light than a single detector, the effect of the diffuser is the same: a reduced reflected light signal compared to the same system without a diffuser. An artisan understood that weak signal strength was a "major practical limitation" in reflectance-type sensors, and that the "feasibility of reflectance pulse oximetry depends on…detect[ing] sufficiently strong reflectance photoplethysmogram[]" signals. Appx1364. An artisan would have avoided decreasing the already weak reflectance-type signal by adding a diffuser. Appx1802 ¶¶59-60.

Dr. Madisetti's unrebutted testimony, supported by experimental results, demonstrates that an artisan would have understood a diffuser substantially decreases the measured signal for a reflectance-type pulse-oximeter. Dr. Madisetti's testimony helps explain how a skilled artisan would have understood Chin. Dr. Madisetti's testimony also demonstrates that the Board incorrectly found that an artisan would have expected a diffuser would provide a "stronger reflected signal." Appx0021. But the Board discarded Dr. Madisetti's evidence when assessing an artisan's motivation to combine the Sarantos, Mendelson-1991, and Chin references (and the Board applied the same flawed reasoning to the combination of Chin and Ackermans). Appx0024, Appx0028. The Board's erroneous approach resulted in incorrect factual findings and its obvious determination should be reversed.

**B.    Chin Does Not Recognize "General Benefits" For A Diffuser At "Any Body Part"**

The Board also erred by finding that "Chin's plain disclosure recogniz[es] the general benefits of a diffuser and that its sensor may be attached 'to any body part' in the form of either a 'reflectance or a transmittance sensor.'" Appx0023.  The Board further found "[f]rom at least that disclosure, a person of ordinary skill and creativity reasonably would have recognized that Chin contemplates various sensor types and that those sensors, including use of a diffuser, may be applied to various body parts of a user."  Appx0023.  The Board's finding is not supported by substantial evidence and is instead the product of picking and choosing from Chin's disclosure.

Chin does not generally disclose that its sensor can be attached to "any body part."  Instead, Chin's "any body part" statement comes specifically in the context of describing Chin's Figure 2.  Appx1329 5:26-53.  Chin's Figure 2 is an illustration of "a four-wire measurement system for a thermistor of the present invention" (below).  Appx1329 5:26-53.



*FIG. 2.*

A thermistor is a device that generates heat.  Appx1327 2:47-49.  In the context of Chin's disclosure, the heater "warm[s] the optically-probed tissue region," which improves blood flow.  Appx1327 2:47-58.  Chin's generic "any body part" teaching—the key statement that the Board relied on—is thus specifically about Chin's heating system.  Appx1329 5:26-53.

In contrast, the "any body part" statement is not repeated for any of Chin's other embodiments.  Instead, all of Chin's other teachings come in the context of thin tissue measurement sites where light passes from one side of the tissue to the other, such as the ear or nostril.  For example, Chin includes an embodiment with "a reflectance geometry" used as an ear sensor.  Appx1329 5:63-67; *see also* Appx1330 7:28-32 (the "alternate embodiments" in Figures 5E and 5F are "a sensor attached to an appendage…such as an earlobe"); Appx1331 9:36-57 (reflectance sensor from Chin Figure 11 attaches to ear).  More generally, Chin explains that in its particular reflectance-type sensors, light must go "across the entire appendage" before "being reflected back in" with Chin's specially adapted external reflective surface.  *See* Appx1330 7:13-20; 7:35-41 (light "bouncing back and forth between the reflectors until it reaches the detector from the emitter").

Chin's only embodiment that includes a diffuser is a nostril sensor, yet another thin tissue measurement site where light readily passes from one side of the tissue and through to the other side.  Appx1330 8:20-29.  As illustrated, Chin's nostril

sensor with a diffuser is a transmissive-type device, where light must pass through the tissue to reach the opposing detector. Because of the very thin tissue at the nostril, Chin uses three different enhancements. First, Chin includes a heater (60). Appx1327 2:59-62. Next, Chin includes an offset emitter and detector. Appx1327 2:39-41. Finally, Chin includes a diffuser. Appx1325 Fig. 7B; Appx1330 8:20-29.



As Dr. Madisetti explained, Chin's different approaches were specifically designed for thin tissue measurement sites. Appx1796-1800. Dr. Madisetti explained, consistent with Chin's overall disclosure, that "[w]hen measurement sites involve thin tissue, there is less tissue to reflect attenuated light back to the detector." Appx1798 ¶53. For example, Dr. Madisetti cited Chin's description and figures, which illustrate the benefits of reflective surfaces that redirect light back into the measurement site, thereby increasing the time spent in the tissue. Appx1798-1799 ¶54. A reflective surface serves no function unless light passes "across the entire appendage," as Chin requires. Appx1330 7:13-20.

In contrast, Dr. Madisetti explained that thicker tissue measurement sites reflect and backscatter the emitted light. Appx1800 ¶56. Every claim requires a

device that takes measurements from a "tissue measurement site…located on a wrist." Appx0153-Appx0154 (claims 1, 9, 19). Thus, many of the techniques discussed in Chin would be either irrelevant or unnecessary at a thicker measurement site such as the wrist. Appx1800 ¶56.

The Board characterized Dr. Madisetti's testimony as "uncorroborated" and found it insufficient to "establish the proposed dichotomy" between thin and thick tissue measurement sites. Appx0019. Dr. Madisetti's testimony was not uncorroborated, and included numerous citations to both Chin and other references. Appx1797-1800 ¶¶52-56. To the extent the Board based its judgment on its finding that Dr. Madisetti's testimony regarding the differences between thick and thin tissue was "uncorroborated," that finding is wrong.

The Board also took "note, as does Petitioner (Pet. Reply 5 n.4), that neither Patent Owner nor Dr. Madisetti provides adequate explanation as to how 'thick' or 'thin' tissue sites are even defined." Appx0019. But once again, the Board's findings are not supported.

Dr. Madisetti did explain how thick and thin tissue sites are defined. For example, Dr. Madisetti explained (citing Chin) that at a thin tissue measurement site, light passes through the tissue and thus has less opportunity for reflection back to the detector of a reflectance-type sensor. Appx1798-1799 ¶54. Chin repeatedly illustrates this phenomenon, and includes a specific tissue thickness of 3-5 mm

(Figure 5B, below) in its illustration of how the various embodiments improve on the prior art. *See, e.g*, Appx1324 Figs. 5A-5G; Appx1722-1723 19:15-20:12 (Dr. Madisetti testifying that "Figure 5B also confirms that [Chin was directed to thin tissue measurement sites] by saying that the tissue is between 3 and 5 millimeter.").



Chin's embodiments also illustrate that the modifications attempt to improve thin-tissue measurements.    In one embodiment (Fig. 5E, above) Chin uses a reflective surface that redirects light back into the tissue after it passes through. Appx1330 7:28-45; Appx1324 Figs. 5E, 5F.    Chin's reflective surface, however, would be irrelevant at a thicker tissue measurement site (since light would not reach

the reflective surface on the opposite side of the tissue). Dr. Madisetti explained that a measurement site with thicker tissue would lead to backscattering or reflection without the need for Chin's thin-tissue adapted strategies. Appx1800. Dr. Madisetti cited the wrist as an example of a thick tissue measurement site that reflects light instead of allowing light to pass through to the opposite side. Appx1797 ¶52, Appx1800 ¶56. And the appealed claims are limited to a "tissue measurement site being located on a wrist of the user," not a thin tissue measurement site like the ear or nostril. Appx0153-0154 (claim 1, *see also* claim 9, claim 19).

Dr. Madisetti's unrebutted testimony explains a key difference between Chin and the other cited art that limits the generality of Chin's teachings. Chin's repeated illustration of its sensors at thin tissue measurement sites undermines the Board's finding that Chin "unambiguously provides that its sensor can attach 'to any body part,' and lists, by way of examples, 'the earlobe, finger, etc.'" Appx0019-0020 (citing Ex. 1006 5:55-56). Indeed, an earlobe or finger are both thin enough for light to pass through. A skilled artisan would have no reason to add the diffuser from Chin's transmissive-type nostril sensor to a reflectance-type sensor at a thick tissue measurement site such as the wrist. *See, e.g.*, Appx1803-1804 ¶¶62-65. Indeed, as illustrated by Dr. Madisetti's experiments, discussed above, a skilled artisan would have understood that a diffuser added to a reflectance-type sensor would decrease signal strength—not increase it.

The Board focused on Chin's statement regarding its Figure 2 heating embodiment in isolation, without accounting for the remainder of Chin's disclosure. The Board thus erred by picking and choosing only so much of Chin's disclosure as supported its position and ignoring the remainder. *See Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd.*, 719 F.3d 1346, 1365 (Fed. Cir. 2013) ("'[o]ne cannot ... pick and choose among isolated disclosures in the prior art to deprecate the claimed invention'") (internal citation omitted). The Board's erroneous approach led to unsupported factual findings.

## C.    Chin Does Not Teach A Diffuser Would Benefit A Reflectance-Type Sensor By Producing A Stronger Reflected Signal

The Board also erred by finding that Chin taught that a diffuser benefits a reflectance-type sensor by "provid[ing] for a 'stronger reflected signal' that facilitates determining measured physiological parameters." Appx0021 (quoting Petition (Appx0229) at 63). Chin does not teach that a diffuser provides a "stronger reflected signal." As discussed above, Dr. Madisetti's experiments demonstrate that a skilled artisan would not have shared the Board's understanding of Chin. But even setting aside Dr. Madisetti's unrebutted testimony, the Board's findings are not supported by substantial evidence.

The Board cites three disparate parts of Chin in support of its finding. First, the Board cites Chin's discussion of a prior art reference. Appx0021 (citing Appx1327 2:4-7). Chin states that "[o]ne type of oximeter sensor will add a

diffusing optic" that causes emitted light "to pass through more tissue, and thus more blood." Appx1327 2:4-7. This discussion of the prior art refers to light passing "through" tissue, not reflected from tissue. *Id.* The discussion of the prior art does not indicate that a diffuser provides a "stronger reflected signal." *Id.* And this teaching is only for "[o]ne type" of sensor, not pulse oximetry sensors generally. Chin provides no details about what other features that "[o]ne type" of sensor might include. *Id.*

Next the Board cites one of Chin's embodiments, which uses a diffuser with a nostril sensor. Appx0021 (*citing* Appx1330 8:25-29). The cited embodiment (in Figures 7A and 7B) is the only embodiment in Chin that includes a diffuser.



As shown in Chin's Figure 7B (Appx1325), the nostril sensor is not a reflectance-type sensor. Instead, the emitter and detector are on opposite sides of the tissue. Appx1330 8:20-29. Chin's Figure 7A (Appx1325) shows a top-down view of the relative positioning of the emitter and detector on opposite sides of the tissue measurement site, with the "detector 178 shown in phantom." Appx1330 8:30-31. Chin's Figure 7 embodiment does not indicate that a diffuser provides a "stronger

reflected signal." Instead, Chin states the "optional" diffuser "*may* enhance the amount of tissue *penetrated* in *some* instances." Appx1330 8:20-29 (emphasis added). Penetration is the opposite of reflection and there is no reason why a skilled artisan would have believed increased penetration would benefit a reflectance-type sensor. Moreover, Chin qualifies its teachings even for the illustrated offset transmissive-type sensor, noting that it "*may* enhance…in *some* instances." Appx1330 8:20-29 (emphasis added). This is not substantial evidence of the general benefit of a diffuser.

Finally, the Board cites a general statement in Chin that "[t]he present invention provides a number of advantages," including increased "cardiac pulse modulation." Appx0021 (citing Appx1331 9:64-10:7). Chin does not link this disclosure with a diffuser. Appx1331 9:64-10:7. Indeed, Chin's "Summary of the Invention" does not mention a diffuser at all. Appx1327-1328 2:35-3:45. Instead, Chin states that "*warming* of the tissue region increases the amount of blood perfused in the tissue" and "substantially strengthens the pulse oximetry signal." Appx1327 2:59-64 (emphasis added). And Chin's discussion of a reflectance-type sensor involves a different feature—a reflective surface that redirects light back into the tissue—and not a diffuser. Appx1328 3:35-40.

A skilled artisan would not have designed a reflectance-type sensor with reduced signal strength. The cited portions of Chin do not provide substantial

evidence support for the Board's finding that Chin teaches that a diffuser results in a "stronger reflected signal." As discussed above, the unrebutted evidence (which the Board discounted in its analysis) demonstrates that an artisan would have expected that a diffuser would decrease the reflected signal strength. There is no evidence that a skilled artisan would have been motivated to add a diffuser to a reflectance-type device to obtain a *weaker* signal.

The Board also erred by finding that "Chin's plain disclosure recogniz[es] the general benefits of a diffuser and that its sensor may be attached 'to any body part' in the form of either a 'reflectance or a transmittance sensor.'" Appx0022-0023 (citing Appx1327 2:4-7; Appx1329 5:54-57.). The Board mixes and matches different parts of Chin discussing different issues. As discussed, the "any body part" and "reflectance or transmittance sensor" disclosure relates specifically to Chin's heater. *See* Appx1329 5:26-62. In contrast, the alleged "general benefits" of a diffuser is from Chin's background discussion of only "[o]ne type of oximeter sensor." Appx1327 2:4-7. The Board gives no reason why a skilled artisan would have combined these two distinct teachings.

Moreover, the Board's reliance on Chin's background illustrates its arbitrary and inconsistent analysis: the Board dismissed Masimo's arguments because "the portions of Chin on which Patent Owner relies simply describe a general background of oximeter sensors." Appx0019. Yet the Board relied on Chin's background

discussion of a diffuser for "[o]ne type of oximeter." Appx0022-0023. The Board gives no reason why an artisan would rely on one piece of Chin's background but ignore another.

It is a "longstanding principle that the prior art must be considered for all its teachings, not selectively." *Henny Penny Corp. v. Frymaster LLC*, 938 F.3d 1324, 1332 (Fed. Cir. 2019). Indeed, it is legal error to "select[] bits and pieces" from the prior art "that might be modified" to fit the claim. *Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d 1561, 1578 (Fed. Cir. 1987); *see also In re Enhanced Sec. Rsch., LLC*, 739 F.3d 1347, 1355 (Fed. Cir. 2014) ("*Panduit* explains that § 103 does not permit a court to stitch together an obviousness finding from discrete portions of prior art references without considering the references as a whole."). The Board's arbitrary approach of relying only on those portions of Chin that support obviousness is legally erroneous and indicates hindsight reconstruction.

Likewise, the Board incorrectly relied on Chin's statements that "[t]he sensor could be a reflectance or a transmittance sensor" as evidence that Chin's teachings specific to transmissive-type sensors also apply to reflectance-type sensors. Appx0023 (citing Appx1329 5:54-57). As discussed, the cited piece of Chin deals specifically with Chin's heating approach, and the Board improperly discarded the surrounding context that made clear the limits of Chin's disclosure. Appx1329 5:26-62. Indeed, Chin's disclosure repeatedly distinguishes transmissive-type pulse

oximeters from reflectance-type pulse oximeters.  For a transmissive-type pulse oximeter, Chin explains that the relevant consideration is the amount of light passing from the emitter on one side of the tissue to the detector on the other.  Thus, in Chin's sensor, the emitter(s) and the detector "are not directly opposite each other" and therefore "light is forced to pass *through* more blood perfused tissue…than it would on the direct path *through the appendage* if the emitters and detector were opposite each other."  Appx1327 2:35-46 (emphasis added).  In contrast, Chin identifies a reflectance-type sensor as an "alternate embodiment" used with "a reflective surface on the opposite side of the appendage."  Appx1328 3:35-40; Appx1330 7:28-45.  Chin uses a reflective surface with its reflectance-type sensor (below) because the reflective surface "allows…more light to be directed *back into* the tissue to arrive at detector 142."  Appx1330 7:32-42 (emphasis added).



Appx1324 (annotated)

Thus, Chin indicates that its transmissive-type and reflectance-type sensors require different approaches.  It is within this context that Chin indicates that a diffuser used with a transmissive-type nostril sensor "may enhance the amount of tissue penetrated in some instances."  Appx1330 8:25-29.  As discussed, Chin

teaches tissue penetration improves a transmissive-type sensor because the light from the emitter must pass through tissue to the opposing detector on the other side. In contrast, Chin indicates that changes that increase the amount of light reflected and backscattered by the tissue (not penetrating through the tissue) improves reflectance-type sensors.  Once again, the Board's findings are not supported by substantial evidence.

D. **The Board's Findings Regarding Sarantos And Ackermans Undermine Those Sensor's Operation And Are Not Supported By Substantial Evidence**

The Board also erred in its analysis of the Sarantos and Ackermans references. Both Sarantos and Ackermans use a very particular arrangement of detectors around a central emitter.  Adding a diffuser would have disrupted both Sarantos's and Ackermans's sensor design and respective principle of operation.

Sarantos's sensor design takes advantage of a typical pattern of backscattered light intensity.  Sarantos indicates that the expected backscattered light intensity for a reflectance-type sensor with a centrally-located emitter decreases dramatically with increasing distance from the emitter.  Appx1355 10:51-67.  Sarantos illustrates the relative change in light intensity in Figure 6 (below).



FIG. 6

Appx1341 Fig. 6 (colored).  As shown, most of the reflected light intensity is close to the emitter.  Sarantos's sensor design positions rectangular detectors (shaded blue, above) over the areas of greatest backscattered light intensity.  Appx1355-1366 10:67–11:3.  Sarantos thus explains that its detectors should be close to the emitters, typically between 1 mm to 4 mm apart.  Appx1359 18:61-66.  Sarantos warns that designs outside this range "may prove counterproductive, as a higher-intensity [emitter] may be needed . . . in order to obtain a sufficiently strong signal at the []detector."  Appx1360 19:13-18.  A higher-intensity emitter, and/or driving an

emitter harder to generate more intensity, consumes additional power, which "may be undesirable in a wearable fitness monitor context." Appx1360 19:18-21.

Dr. Madisetti explained that a diffuser would have disrupted Sarantos's sensor design by spreading light over a larger area. Appx1811-1812 ¶74. As Dr. Madisetti explained, "If you move a flashlight from 3 feet away from the wall to 10 feet away from the wall, the intensity of light decreases per unit area." Appx1764-1765 61:16-62:1. Thus, including a diffuser changes Saranto's Figure 6 pattern and decreases the density of the inner dark ring by spreading the concentrated light out, resulting in a less concentrated signal for capture. Appx1810-1812. And it is that very dark ring of relatively more-concentrated reflected light that Sarantos's rectangular detectors are shaped to capture. Appx1340-1341 Fig. 5-6 (annotated below).



As Dr. Madisetti explained, in unrebutted testimony, "Sarantos already carefully arranged its optical elements to maximize the amount of light reaching the

detector." Appx1811-1812 ¶74. Sarantos confirms that its rectangularly-shaped high-aspect ratio ("HAR") photodetectors capture "nearly 85% of the available AC power in the overall area." Appx1355 10:30-34; *see also id*. 10:34-36 (HAR detectors "collect nearly four times as much light as the square photodetector"). As illustrated in Figure 6 (above), the improved light collection relies on the interaction between Sarantos's rectangular detector and the relatively thin ring of high intensity reflected light surrounding the emitter. Appx1341 Fig. 6. Dr. Madisetti explained that an artisan would have expected that a diffuser would spread the light out from the center across more tissue. Appx1810-1812 ¶¶73-74. A more diffuse light pattern negates Sarantos's design that captures "nearly 85% of the available AC power in the overall area" using a thin rectangular detector. Appx1355 10:30-34. Even assuming a diffuser did not reduce the light signal (and Dr. Madisetti's testing showed a substantial reduction in signal), adding a diffuser would still require a larger and wider detector to capture the same amount of reflected light signal, contrary to Sarantos's design.

The Board nevertheless rejected Dr. Madisetti's unrebutted testimony because it found that Dr. Madisetti did not "adequately explain[] why a skilled artisan would have regarded Sarantos's teachings as being limited solely to a singular light spreading pattern that effectively precludes any modification that alters the pattern." Appx0025. As discussed, both Dr. Madisetti and Sarantos explain that the improved

sensor design relies on the particular depicted tightly focused light pattern. Appx1355 10:30-36; Appx1340-1341 Fig. 5, Fig. 6. Indeed, Sarantos recognized "a significant performance increase" by "deviating from the typical square (or nearly-square) aspect ratios that are used in photodetector elements of conventional PPG sensors." Appx1355 9:49-51; *see also* Appx1354 8:31-36 (discussing "inventors determin[ations]" motivating detector shape). Sarantos defines it HAR detectors as having a "maximum first dimension…at least *twice* as large as a maximum second dimension." Appx1355 9:57-67 (emphasis added). Adding the claimed diffuser would spread light out and reduce or eliminate the benefit of Sarntos's detector's "at least" 2:1 dimension ratio. *See, e.g.*, Appx1355 9:57-67, *see also* Appx0153 Claim 6 (requiring "a diffuser which receives, spreads, and emits the spread light").

The Board is thus wrong that Sarantos does not limit itself to a particular distribution of light. Sarantos's inventive concept—and distinction from the prior art—relies on increasing the light captured using a detector with at least a 2:1 dimension ratio. Appx1355 9:57-67. A skilled artisan thus would not have added a diffuser to Sarantos's sensor because it fundamentally changes its principle of operation and undermines Sarantos's inventive concept of a long, thin detector. *See Chemours Co. FC, LLC v. Daikin Indus., Ltd.,* 4 F.4th 1370, 1377 (Fed. Cir. 2021), *cert. denied,* 212 L. Ed. 2d 405, 142 S. Ct. 1418 (2022) ("We hold that the Board relied on an inadequate evidentiary basis and failed to articulate a satisfactory

explanation that is based on substantial evidence for why a POSA would have been motivated to [make the proposed change] … when doing so would necessarily involve altering the inventive concept."). The Board erred by ignoring the "[f]undamental differences between the references [that] are central to [the] motivation to combine inquiry." *Adidas AG v. Nike, Inc.*, 963 F.3d 1355, 1359 (Fed. Cir. 2020), *cert. denied*, 209 L. Ed. 2d 121, 141 S. Ct. 1376 (2021).

The Board's finding that a diffuser would not "have some sort of negating effect that would disrupt the operation of [Sarantos's] device" relies solely on petitioner's attorney argument. Appx0025 (citing Petitioner's Reply at 12 (Appx0426)). Indeed, the Board did not analyze Sarantos at all. Appx0025-0026. And although the Board cloaked its findings in the guise of "credit[ing]" petitioner's expert's testimony as "more consistent with the teachings of the prior art," the cited testimony does not address Sarantos's principle of operation either. Appx0025-0026 (citing Ex. 1003 ¶¶ 96–101 (Appx1178-1180)). The Board used the incorrect assertion that Dr. Madisetti's testimony was not "adequately explain[ed]" as a way to discount both Dr. Madisetti's unrebutted testimony and Sarantos's disclosure. Appx0025. This was an error.

The Board's Ackermans analysis is even more flawed. Dr. Madisetti explained that Ackermans's "light emitter and the photodetector are arranged concentric to each other in a compact way." Appx1817-1818 ¶87 (*quoting*

Appx1372 2:31-32).  Dr. Madisetti further explained that Ackermans requires a compact design "to minimize the effects of motion artifacts." Appx1818-1819 ¶89 (*citing* Appx1375 5:28-33).  Adding a diffuser, which spreads light over a larger area, undermines this compact design.  Appx1818-1819 ¶89.  The proposed combination thus also undermines the operation of Ackermans' compact device.  Dr. Madisetti's testimony was unrebutted.

The Board did not acknowledge Dr. Madisetti's unrebutted testimony about Ackermans' operation and inventive concept.  Appx0027-0029.  In fact, the Board provided no independent analysis for its decision for the Ackermans-Chin combination.   Instead, the Board stated "our reasoning presented above in connection with the combination of Sarantos, Mendelson-1991 and Chin also applies to the combination based on Ackermans and Chin." Appx0028.  Ackermans's sensor, however, has a substantially different structure than the sensors from Sarantos, Mendelson-1991, or Chin.  Indeed, Ackermans's tightly-packed hexagonal lattice structure (below left) is completely different from Sarantos's HAR-detector approach (below right, annotated).   Appx1377 7:29-34, Appx1386 (Fig. 4); Appx1341 Fig. 6.



FIG. 4



The Board's cursory analysis cannot support its judgment. The Board did not consider the difference in sensor structure between Sarantos and Ackermans. The Board did not account for Dr. Madisetti's unrebutted testimony. And the Board cited no evidence supporting its analysis. The Board's analysis is unsupported by substantial evidence and facially deficient.

## VII. **CONCLUSION**

For the reasons discussed above, the Board's holding of unpatentability should be reversed. In the alternative, if the Court deems it necessary, the Board's holding should be vacated and remanded.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated: <u>November 7, 2022</u>    By: <u>*/s/ Jeremiah S. Helm*</u>
                                      Joseph R. Re, *Principal Counsel*
                                        Stephen C. Jensen
                                        John M. Grover
                                        Shannon Lam
                                        Jeremiah S. Helm

                                        *Attorneys for Appellant*
                                        *Masimo Corporation*

# ADDENDUM

# Table of Contents

| No. | Description | Appx Nos. |
|-----|-------------|-----------|
| 1. | May 5, 2022 Judgment: Final Written Decision | Appx1 – Appx31 |
| 2. | U.S. Patent No. 10,470,695 | Appx130 – Appx154 |

56580425

Trials@uspto.gov                                                    Paper 29
571-272-7822                                               Entered: May 5, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

APPLE INC.,
Petitioner,

v.

MASIMO CORPORATION,
Patent Owner.

_____

IPR2020-01722
Patent 10,470,695 B2

_____

Before JOSIAH C. COCKS, ROBERT L. KINDER, and
AMANDA F. WIEKER, *Administrative Patent Judges.*

COCKS, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

IPR2020-01722
Patent 10,470,695 B2

# I. INTRODUCTION

## A. Background

Apple Inc. ("Petitioner") filed a Petition requesting an *inter partes* review of claims 1–6, 8, 9, 11–19, and 21–30 of U.S. Patent No. 10,470,695 B2 (Ex. 1001, "the '695 patent"). Paper 2 ("Pet."). We instituted the petitioned review. Paper 8 ("Institution Decision" or "Inst. Dec.").

Masimo Corporation ("Patent Owner") filed a Patent Owner Response (Paper 13, "PO Resp.") to oppose the Petition. Petitioner filed a Reply (Paper 18, "Pet. Reply") to the Patent Owner Response. Patent Owner filed a Sur-reply (Paper 19, "PO Sur-reply") to the Reply. We conducted an oral hearing on February 9, 2022. A transcript has been entered in the record (Paper 28, "Tr.").[1]

We have jurisdiction under 35 U.S.C. § 6(b)(4) and § 318(a). This Decision is a final written decision under 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73 as to the patentability of claims 6, 14, and 21 of the '695 patent. We determine Petitioner has shown by a preponderance of the evidence that those claims are unpatentable.

---

[1] In the Patent Owner Response, Patent Owner indicates that claims 1–5, 8, 9, 11–13, 15–19, and 22–30 "have been statutorily disclaimed under 35 U.S.C. § 253(a)," and are "no longer at issue in this proceeding." PO Resp. 15 (citing Ex. 2004). At oral argument, Patent Owner again acknowledged that claims 1–5, 8, 9, 11–13, 15–19, and 22–30 have been disclaimed. Tr. 13. In its Reply, Petitioner also notes that those claims have been disclaimed "leaving claims 6, 14, and 21 as the only remaining challenged claims." Pet. Reply 1 n.1 (citing Ex. 2004). Exhibit 2004 is titled "Disclaimer in Patent Under 37 CFR 1.321(a)" and indicates that claims 1–5, 8, 9, 11–13, 15–19, and 22–30 have been disclaimed. Ex. 2004, 1. Accordingly, we regard claims 6, 14, and 21 as the only remaining challenged claims in this proceeding.

IPR2020-01722
Patent 10,470,695 B2

## B. *Related Matters*

Patent Owner identifies the following matters related to the
'695 patent:

*Masimo Corporation v. Apple Inc.*, Civil Action No. 8:20-cv-00048
(C.D. Cal.) (filed Jan. 9, 2020);

*Apple Inc. v. Masimo Corporation*, IPR2020-01520 (PTAB
Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,258,265 B1);

*Apple Inc. v. Masimo Corporation*, IPR2020-01521 (PTAB
Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,292,628 B1);

*Apple Inc. v. Masimo Corporation*, IPR2020-01523 (PTAB
Aug. 31, 2020) (challenging claims of U.S. Patent No. 8,457,703 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01524 (PTAB
Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,433,776 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01526 (PTAB
Aug. 31, 2020) (challenging claims of U.S. Patent No. 6,771,994 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01536 (PTAB
Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,588,553 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01537 (PTAB
Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,588,553 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01538 (PTAB
Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,588,554 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01539 (PTAB
Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,588,554 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01713 (PTAB Sept. 30,
2020) (challenging claims of U.S. Patent No. 10,624,564 B1);

IPR2020-01722
Patent 10,470,695 B2

*Apple Inc. v. Masimo Corporation*, IPR2020-01714 (PTAB Sept. 30, 2020) (challenging claims of U.S. Patent No. 10,631,765 B1 patent);

*Apple Inc. v. Masimo Corporation*, IPR2020-01715 (PTAB Sept. 30, 2020) (challenging claims of U.S. Patent No. 10,631,765 B1 patent);

*Apple Inc. v. Masimo Corporation*, IPR2020-01716 (PTAB Sept. 30, 2020) (challenging claims of U.S. Patent No. 10,702,194 patent);

*Apple Inc. v. Masimo Corporation*, IPR2020-01723 (PTAB Oct. 2, 2020) (challenging claims of U.S. Patent No. 10,470,695 B2);[2]

*Apple Inc. v. Masimo Corporation*, IPR2020-01733 (PTAB Sept. 30, 2020) (challenging claims of U.S. Patent No. 10,702,195 B1); and

*Apple Inc. v. Masimo Corporation*, IPR2020-01737 (PTAB Sept. 30, 2020) (challenging claims of U.S. Patent No. 10,709,366 B1).

Paper 4, 2–3.

Patent Owner also identifies the following pending patent applications that claim priority to, or share a priority claim with, the '695 patent:

U.S. Patent Application No. 15/195,199;

U.S. Patent Application No. 16/532,061;

U.S. Patent Application No. 16/532,065;

U.S. Patent Application No. 16/791,955;

U.S. Patent Application No. 16/791,963;

U.S. Patent Application No. 16/835,712;

---

[2] Pursuant to the Board's November 2019, Consolidated Trial Practice Guide, *available at* https://www.uspto.gov/TrialPracticeGuideConsolidated, Petitioner filed a Notice ranking its two petitions that challenge the '695 patent, ranking first the instant proceeding and ranking second IPR2020-01723. Paper 3, 2. We exercised our discretion to deny institution of *inter partes* review in IPR2020-01723. *See* IPR2020-01723, Paper 8.

4

U.S. Patent Application No. 16/835,772; and

U.S. Patent Application No. 16/871,874.

*Id.* at 1–2.

## C. The '695 Patent

The '695 patent is titled "Advanced Pulse Oximetry Sensor," and issued on November 12, 2019, from U.S. Patent Application No. 16/226,249, filed December 19, 2018.  Ex. 1001, codes (21), (22), (45), (54). The '695 patent summarizes its disclosure as follows:

> This disclosure describes embodiments of non-invasive methods, devices, and systems for measuring blood constituents, analytes, and/or substances such as, by way of non-limiting example, oxygen, carboxyhemoglobin, methemoglobin, total hemoglobin, glucose, proteins, lipids, a percentage therefor (e.g., saturation), pulse rate, perfusion index, oxygen content, total hemoglobin, Oxygen Reserve Index™ (ORI™) or for measuring many other physiologically relevant patient characteristics.  These characteristics can relate to, for example, pulse rate, hydration, trending information and analysis, and the like.

*Id.* at 2:36–46.

IPR2020-01722
Patent 10,470,695 B2

Figures 7A and 7B of the '695 patent are reproduced below:



FIG. 7A                    FIG. 7B

Figures 7A and 7B above depict side and top views, respectively, of a three-dimensional pulse oximetry sensor according to an embodiment of the '695 patent. *Id.* at 5:28–33. Sensor 700 includes emitter 702, light diffuser 704, light block (or blocker) 706, light concentrator 708, and detector 710. *Id.* at 10:49–51. The sensor functions to irradiate tissue measurement site 102, e.g., a patient's wrist, and detects emitted light that is reflected by the tissue measurement site. *Id.* at 10:43–49. "[L]ight blocker 706 includes an annular ring having cover portion 707 sized and shaped to form a light isolation chamber for the light concentrator 708 and the detector 710." *Id.* at 11:10–12. "[L]ight blocker 706 and cover 70[7] ensures that the only light detected by the detector 710 is light that is reflected from the tissue measurement site." *Id.* at 11:16–20.

6

IPR2020-01722
Patent 10,470,695 B2

Figure 8 of the '695 patent is reproduced below:



FIG. 8

Figure 8 above illustrates "a block diagram of an example pulse oximetry system capable of noninvasively measuring one or more blood analytes in a monitored patient." *Id.* at 5:34–36. Pulse oximetry system 800 includes sensor 801 (or multiple sensors) coupled to physiological monitor 809. *Id.* at 12:21–23. Monitor 809 includes "signal processor 810 that includes processing logic that determines measurements for desired analytes based on the signals received from the detector 806" that is a part of sensor 801. *Id.* at 13:37–40. Monitor 809 also includes user interface 812 that provides "an output, e.g., on a display, for presentation to a user of pulse oximetry system 800." *Id.* at 13:64–66.

7

IPR2020-01722
Patent 10,470,695 B2

*D. Illustrative Claim*

Claim 6 is illustrative and is reproduced below.[3]

1. A wrist-worn physiological monitoring device configured for placement on a user at a tissue measurement site, the device comprising:

a light emission source comprising a plurality of emitters configured to irradiate the tissue measurement site by emitting light towards the tissue measurement site, the tissue measurement site being located on a wrist of the user,

the plurality of emitters configured to emit one or more wavelengths;

a plurality of detectors configured to detect the light emitted by the plurality of emitters after attenuation by a circular portion of the tissue measurement site,

the plurality of detectors further configured to output at least one signal responsive to the detected light;

a processor configured to receive the at least one signal responsive to the output and determine a physiological parameter of the user; and

a light block forming an enclosing wall between the light emission source and the plurality of detectors,

the light block defining the circular portion of the tissue measurement site, the light emission source arranged proximate a first side of the enclosing wall and the plurality of detectors arranged proximate a second side of the enclosing wall, the first side being difference than the second side,

wherein the enclosing wall prevents at least a portion of light emitted from the light emission source from being detected by the plurality of detectors without attenuation by the tissue, and wherein the plurality of detectors are arranged in an array having a spatial configuration corresponding to the circular portion of the tissue measurement site.

Ex. 1001, 15:32–63.

---

[3] Because claim 6 depends from independent claim 1, we also reproduce disclaimed claim 1 for completeness.

IPR2020-01722
Patent 10,470,695 B2

> 6. The physiological monitoring device of claim 1, further comprising a diffuser which receives, spreads, and emits the spread light, wherein the emitted spread light is directed at the tissue measurement site.

*Id.* at 16:16–19.[4]

### E. *Evidence Relied Upon*

Petitioner relies on the following references:

| Reference | Publication/Patent Number | Exhibit |
|---|---|---|
| Sarantos | U.S. Patent No. 9,392,946 B1 issued July 19, 2016 | 1014 |
| Mendelson-1991 | Mendelson et al., *Skin Reflectance Pulse Oximetry: In Vivo Measurements from the Forearm and Calf*, Journal of Clinical Monitoring Vol. 7 No. 1, pp. 7–12 (January 1991) | 1015 |
| Chin | U.S. Patent No. 6,343,223 B1 issued Jan. 29, 2002 | 1006 |
| Ackermans | WO 2011/051888 A2 published May 5, 2011 | 1016 |

Pet. 3–4. Petitioner also relies on the Declaration of Brian W. Anthony, Ph.D. (Ex. 1003). Patent Owner relies on the Declaration of Vijay K. Madisetti, Ph.D. (Ex. 2001).

---

[4] Claim 14 (which depends from independent claim 9) and claim 21 (which depends from independent claim 19) add a similar "diffuser" limitation as is set forth in claim 6.

IPR2020-01722
Patent 10,470,695 B2

### F. Asserted Grounds

Petitioner asserts that claims 6, 14, and 21 are unpatentable based upon the following grounds (Pet. 3):[5]

| Claims Challenged | 35 U.S.C. § | References/Basis |
|---|---|---|
| 6, 14, 21 | 103 | Sarantos, Mendelson-1991, Chin |
| 6, 14, 21 | 103 | Ackermans, Chin |

## II.  ANALYSIS

### A. Claim Construction

For petitions filed on or after November 13, 2018, a claim shall be construed using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. § 282(b).  37 C.F.R. § 42.100(b) (2019).  Both parties submit that no claim term requires express construction. Pet. 5; PO Resp. 14.  Based on our analysis of the issues, we conclude that no claim terms require express construction.  *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017).

### B. Principles of Law

A claim is unpatentable under 35 U.S.C. § 103 if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406

---

[5] As noted by both parties, because of Patent Owner's statutory disclaimer, these are the only claims and grounds that remain at issue in this proceeding. *See* PO Resp. 16; *see generally* Pet. Reply, PO Sur-reply.

IPR2020-01722
Patent 10,470,695 B2

(2007).  The question of obviousness is resolved on the basis of underlying factual determinations, including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) objective evidence of non-obviousness.[6]  *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).  When evaluating a combination of teachings, we must also "determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue." *KSR*, 550 U.S. at 418 (citing *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)).  Whether a combination of prior art elements would have produced a predictable result weighs in the ultimate determination of obviousness.  *Id.* at 416–417.

In an *inter partes* review, the petitioner must show with particularity why each challenged claim is unpatentable.  *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016); 37 C.F.R. § 42.104(b).  The burden of persuasion never shifts to Patent Owner.  *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015).

We analyze the challenges presented in the Petition in accordance with the above-stated principles.

## C.  *Level of Ordinary Skill in the Art*

Petitioner identifies the appropriate level of skill in the art as follows:

The person would have had a Bachelor of Science degree in an academic discipline emphasizing the design of electrical, computer, or software technologies, in combination with training or at least one to two years of related work experience with capture and processing of data or information, including but not limited to physiological monitoring technologies.  .  .  .

---

[6] Patent Owner does not present objective evidence of non-obviousness.

IPR2020-01722
Patent 10,470,695 B2

> Alternatively, the person could have also had a Master of Science
> degree in a relevant academic discipline with less than a year of
> related work experience in the same discipline.

Pet. 4–5 (citing Ex. 1003 ¶¶ 17–19).

Patent Owner does not offer its own assessment of the level of
ordinary skill.  Patent Owner, however, does level a measure of criticism of
Petitioner's assessment of the level of skill in the art as not accounting for
experience in optics or physiology, and focusing on "data processing and not
sensor design."  PO Resp. 13.  Nevertheless, Patent Owner expresses that it
"applies [Petitioner's] asserted level of skill."  *Id.* (citing Ex. 2001 ¶¶ 34–
36).  We determine that the Petitioner's expressed level of ordinary skill in
the art is consistent with the '695 patent and the prior art of record.
Accordingly, we adopt it in this Decision.

### D.  Obviousness Over Sarantos, Mendelson-1991, and Chin

Petitioner contends that claims 6, 14, and 21 would have been obvious
based on the teachings of Sarantos, Mendelson-1991, and Chin.  Pet. 61–63.
Patent Owner disagrees and presents several arguments in opposition.  PO
Resp. 16–42; PO Sur-reply 2–13.

### 1.  Overview of Sarantos

Sarantos is titled "Heart Rate Sensor With High-Aspect-Ratio
Photodetector Element."  Ex. 1014, code (54).  Sarantos describes
"[photoplethysmographic (PPG)] sensors designed for use with wearable
biometric monitoring devices" and which measure "physiological
parameters" of a wearer such as "heart rate" and "blood oxygenation levels."
*Id.* at 6:66–7:3, 13:39–47.

IPR2020-01722
Patent 10,470,695 B2

Sarantos's Figure 2 is reproduced on the right.  Figure 2 illustrates "a wristband-type wearable fitness monitor that incorporates a PPG sensor[.]"  *Id.* at 5:55–56.  Fitness monitor 200 includes housing 104, back face 128 and light sources 108.  *Id.* at 7:12–23.  "PPG sensors operate by shining light into a person's skin.  This light diffuses through the person's flesh and a portion of this light is then emitted back out of the person's skin in close proximity to where the light was introduced into the flesh."  *Id.* at 7:24–28.



FIG. 2

Sarantos's Figure 18 is reproduced below.



FIG. 18

Figure 18 above illustrates an example of a PPG sensor photodetector layout with multiple light-emitting devices.  *Id.* at 6:39–42.  Photodetector elements 1812 are characterized as being in a "circular array" centered on

13

IPR2020-01722
Patent 10,470,695 B2

light source 1808, which includes two light-emitting devices 1810. *Id.* at

14:60–62; 15:24–43. Sarantos describes that the PPG sensor

> may also include control logic, which may be communicatively
> connected with the light source and each photodetector element
> and configured to cause the light source to emit light, obtain one
> or more measured light intensity measurements from the one or
> more photodetector elements, and determine a heart rate
> measurement based, at least in part, on the one or more light
> intensity measurements.

*Id.* at 2:5–12.

Sarantos's Figure 22 is reproduced below:



**FIG. 22**

Figure 22 above depicts another example configuration of a PPG sensor

according to Sarantos's invention. *Id.* at 6:52–54. Substrate 2272 supports

two high-aspect-ratio (HAR) photodetector elements 2212 positioned on

either side of light source 2208. *Id.* at 17:1–3. Window 2278 is offset from

substrate 2272. *Id.* at 17:3–4. Sarantos explains the following:

14

IPR2020-01722
Patent 10,470,695 B2

> The window 2278 may be held against a person's skin e.g., by being held in place with a strap, when heart rate measurements are obtained to allow light from the light source 2208 to shine through its associated window region 2226 and into the person's skin, where the light then diffuses into the surrounding flesh and is then emitted back out of the person's skin and into the HAR photodetector elements 2212 through the respective window regions 2226 associated with the HAR photodetector elements 2212.

*Id.* at 17:16–25.

Sarantos additionally explains the following:

> In order to reduce the chance that light from the light source 2208 will reach either of the HAR photodetector elements 2212 without first being diffused through the person's skin, the light source 2208 may be separated from the HAR photodetector elements 2212 within the PPG sensor by walls 2274, which may extend to the window 2278 or may stop short of the window 2278.

*Id.* at 17:26–32.

### 2. *Overview of Mendelson-1991*

Mendelson-1991 is an article from the Journal of Clinical Monitoring titled "Skin Reflectance Pulse Oximetry: In Vivo Measurements from the Forearm and Calf." Ex. 1015, 1. The article "describe[s] preliminary in vivo evaluation of a new optical reflectance sensor for noninvasive monitoring of $SaO_2$ with a modified commercial transmittance pulse oximeter." *Id.* at 2.

15

IPR2020-01722
Patent 10,470,695 B2

Mendelson-1991's Figures 1A and 1B are reproduced below:



The figures above illustrate "(A) Frontal and (B) side views of the heated skin reflectance pulse oximeter sensor." *Id.* The figures show a pulse oximeter sensor that includes, among other things, multiple "photodiodes," "light-emitting diodes (LEDs)," and an "optical shield." *Id.*

3. *Overview of Chin*

Chin is titled "Oximeter Sensor with Offset Emitters and Detector and Heating Device." Ex. 1006, code (54). Chin's Figures 7A and 7B are reproduced below:

16

IPR2020-01722
Patent 10,470,695 B2



FIG. 7A.    FIG. 7B.

Figures 7A and 7B "are side and top views of a nostril sensor according to the invention." *Id.* at 3:64–65. Chin describes that pads 172 and 174 include emitter 176 and detector 178, respectively. *Id.* at 8:20–25. Chin also explains that the sensor may include "optical diffuser 180 for diffusing the light from emitter 176, which causes a further spreading or mixing of light and may enhance the amount of tissue penetrated in some instances." *Id.* at 8:25–28. Chin additionally explains generally that a diffusing optic causes light emitted from an emitter "to pass through more tissue, and thus more blood." *Id.* at 2:4–7.

Chin further describes that "[t]he sensor could be any type of sensor, such as a durable sensor or a disposable sensor" and "could attach to any body part, such as the earlobe, finger, etc." *Id.* at 5:54–56. Chin additionally describes that its sensor "could be a reflectance or a transmittance sensor." *Id.* at 5:56–57.

### 4. Discussion

Petitioner provides a detailed assessment as to where all of the limitations required by claims 6, 14, and 21 are found in Sarantos, Mendelson-1991, and Chin. Pet. 7–25, 63. Specifically, Petitioner expresses that all features of claims 6, 14, and 21, with the exception of a

17

IPR2020-01722
Patent 10,470,695 B2

diffuser, are found in Sarantos and Mendelson-1991. Petitioner points to Chin as disclosing a diffuser. Petitioner also explains that a person of ordinary skill in the art would have had adequate reason to combine the teachings of Sarantos, Mendelson-1991, and Chin. *Id.* at 36–38, 63.

Patent Owner does not dispute that all the features of claims 6, 14, and 21 are found in the cited prior art references, but Patent Owner does disagree that Petitioner has established adequate reasoning to combine those references' teachings. PO Resp. 16–33; PO Sur-reply 8–13. A core basis of that disagreement is said to arise from purported differences between "thick tissue" and "thin tissue" of a user's skin, and that such differences preclude combination of sensors that are intended to be applied to those different tissue types. *See, e.g.*, PO Resp. 16–20; PO Sur-reply 9–10.[7] As a result of that alleged tissue thickness dichotomy, according to Patent Owner, a person of ordinary skill in the art would not have combined aspects of a sensor, e.g., a diffuser, used for "thin tissue" as in Chin, with sensors intended for use on a wrist, e.g., the sensors of Sarantos and Mendelson-1991. PO Resp. 21–33; PO Sur-reply 7–13. We have considered all of Patent Owner's arguments, but for the following reasons find them unavailing.

At the outset, we observe that Patent Owner's attempt to establish a distinction between sensors or devices applied to alleged "thin" tissue as opposed to "thick" tissue draws little, if any, support from the prior art evidence of this proceeding. Patent Owner attempts to discount Chin's

---

[7] We understand that, in Patent Owner's view, "thin tissue" is present at such sites as a user's nostrils and earlobes, whereas "thick tissue" is present, for instance, at a user's wrist. *See, e.g.*, PO Sur-reply 2 ("thin tissue measurement sites (e.g., ear lobe or nostril)"); *id.* at 10 ("thicker tissue sites like the wrist").

IPR2020-01722
Patent 10,470,695 B2

teachings as being limited to "sensors worn at thin tissue measurement sites." PO Resp. 17 (citing Ex. 1006, 1:14–21, 8:21–29). Yet, we do not discern that Patent Owner points to any disclosure in Chin that limits its teachings to any particular tissue sites, let alone only sites regarded as "thin." Indeed, Chin does not describe any tissue site to which its sensor is applied as being "thin." Furthermore, the portions of Chin on which Patent Owner relies simply describe a general background of oximeter sensors (Ex. 1006, 1:41–21) and the sensor configuration of one particular embodiment (*id.* at 8:21–29). While Chin characterizes that particular embodiment as directed to a "nostril sensor" (*id.* at 8:20–21), there is no disclosure purporting to restrict Chin's teachings to use with only a user's nostril.

We share Petitioner's view that Patent Owner provides inadequate evidentiary support to make out a case that there is a dichotomy as between "thin tissue" and "thick tissue" pulse oximeters such that they represent distinct classes of sensors whose various aspects and features are uncombinable. Pet. Reply 3–4. We agree with Petitioner that Patent Owner's reliance only on the uncorroborated testimony of Dr. Madisetti is inadequate to establish the proposed dichotomy. *Id.* at 4 (citing PO Resp. 16–20; Ex. 2001 ¶¶ 52–56). Dr. Madisetti points to no adequate evidence or basis to support his conclusions on the matter. We also take note, as does Petitioner (Pet. Reply 5 n.4), that neither Patent Owner nor Dr. Madisetti provides adequate explanation as to how "thick" or "thin" tissues sites are even defined.

Moreover, in our view, Patent Owner neglects to consider the full extent of Chin's teachings. Although Chin associates its embodiment shown in Figures 7A and 7B with a "nostril sensor," Chin's teachings are not

19

IPR2020-01722
Patent 10,470,695 B2

limited strictly to a nostril sensor as the reference unambiguously provides that its sensor can attach "to any body part," and lists, by way of examples, "the earlobe, finger, etc." Ex. 1006, 5:55–56. Although, Patent Owner attempts to discount that disclosure as somehow being limited only to the specific "wiring arrangement" shown in Chin's Figure 2 (*see, e.g.*, PO Sur-reply 4–5), that attempt is ill explained and is not consistent with Chin's plain disclosure that its sensor "could be any type of sensor" and is "attach[ed] to any body part." Ex. 1006, 5:55–56. Patent Owner also admonishes Petitioner for offering "no context" for that disclosure (PO Sur-reply 1), but Chin, itself, provides the context in setting forth that its sensor is not limited to use with any particular body part. There can be no credible argument that a skilled artisan would not readily regard Chin's teachings as extending beyond simply a sensor that is used for a nostril.

We also find unavailing Patent Owner's arguments that one of ordinary skill in the art would somehow regard Chin's teaching of a diffuser as being limited either solely to use with a nostril sensor (*see, e.g.*, Tr. 23:13–17),[8] or only such measurement sites as an "earlobe or nostril" (*see* PO Sur-reply 2). Chin explains generally that use of a diffuser is understood to be beneficial in causing light "to pass through more tissue, and thus more blood." Ex. 1006, 2:4–7. Chin describes that benefit more particularly in the context of the nostril sensor shown in the embodiment of

---

[8] "[JUDGE]: Yes. Okay. So I've heard what you said but I have a couple of clarifying questions. So are you suggesting that Chin's teachings are limited to applying a diffuser to a nostril sensor? It sounds like you have been and I just wanted to verify.
[COUNSEL]: I definitely am, yes."

IPR2020-01722
Patent 10,470,695 B2

Figures 7A and 7B (*id.* at 8:25–29),[9] but there is nothing that suggests that Chin limits the benefits of a diffuser to one particular tissue type (e.g., nostril tissue). We find persuasive Petitioner's view, and the supporting testimony of Dr. Anthony, that a skilled artisan would have recognized from Chin's disclosure that the light spreading benefits of a diffuser provide for a "stronger reflected signal" that facilitates determining measured physiological parameters. Pet. 63 (citing Ex. 1006, 2:4–7, 8:25–29, 9:64–10:7; Ex. 1003 ¶ 99). Patent Owner simply provides no cogent basis to conclude that Chin's diffuser would not function predictably as is disclosed, i.e., spreading light so that it passes through more tissue and blood, when used in conjunction with other types of sensor devices, such as those of Santos and Mendelson-1991. *See KSR,* 550 U.S. 398 at 416 ("The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results.")

We additionally find unavailing Patent Owner's general argument that a skilled artisan would not have had a reasonable expectation of success in applying a diffuser used in one type of oximeter sensor, such as that in Chin, to other types of oximeter sensors, such as those of Sarantos and Mendelson-1991. *See, e.g.*, PO Resp. 24–25. We do not agree that "Chin fails to disclose any specific way of implement[ing]" its diffuser into a sensor. *See id.* at 24. It clearly does. Chin shows, at least in Figure 7B, a diffuser associated with a nostril sensor. Chin also does not limit its teachings as to a diffuser to any one particular type of sensor, e.g., a nostril sensor. We are

---

[9] "Also shown is an optional optical diffuser 180 for diffusing the light from emitter 176, which causes a further spreading or mixing of light and may enhance the amount of tissue penetrated in some instances." Ex. 1006, 8:25–29.

Appx0021

not satisfied by Patent Owner's arguments that some structural and operational differences between the sensors of Sarantos and Mendelson-1991 as compared with that of Chin means that a skilled artisan would not have expected success in combining those teachings. *See id.* at 24; *see also id.* at 25–29 (discussing differences between wrist-worn sensors and nostril sensors). A person of ordinary skill in the art is a person of ordinary creativity. *See KSR*, 550 U.S. at 421. It follows readily that a person of ordinary skill and creativity reasonably would have understood how to implement such diffusers in other types of heart rate or pulse oximeter sensors, such as those of Sarantos and Mendelson-1991, in structural configurations necessary to harness the recognized benefits of such diffusers. We credit Dr. Anthony's testimony to that effect. *See, e.g.*, Ex. 1003 ¶¶ 96–101.

Patent Owner's and Dr. Madisetti's opposing views are rooted only in speculation that a skilled artisan would not have appreciated the benefits of a diffuser in other sensors beyond Chin's nostril sensor, which are intended for application to different body parts. *See, e.g.*, PO Resp. 25–29; Ex. 2001 ¶¶ 69–71. Patent Owner and Dr. Madisetti also seemingly attempt to draw distinctions between a wrist-worn "reflectance-type sensor" and a "transmittance-type sensor" for a nostril in connection with use of a diffuser. *See* PO Resp. 25–29; Ex. 2001 ¶¶ 69–71. Yet, those views overly focus on the specific configurations of single embodiments of each of the pertinent references and do not reflect an appropriate obviousness analysis that takes into account the inferences and creatives steps that a skilled artisan would employ. *See KSR*, 550 U.S. at 421 ("[T]he [obviousness] analysis need not seek out precise teachings directed to the specific subject matter of the

IPR2020-01722
Patent 10,470,695 B2

challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ.").  Specifically, those views do not account adequately for Chin's plain disclosure recognizing the general benefits of a diffuser and that its sensor may be attached "to any body part" in the form of either a "reflectance or a transmittance sensor."  *See* Ex. 1003, 2:4–7, 5:54–57.  From at least that disclosure, a person of ordinary skill and creativity reasonably would have recognized that Chin contemplates various sensor types and that those sensors, including use of a diffuser, may be applied to various body parts of a user.  *See, e.g.*, Ex. 1003 ¶¶ 96–101.

We also find unavailing Patent Owner's arguments that there is inadequate reasoning to combine the pertinent prior art because Petitioner's proposed combination involving Chin "would make Sarantos-Mendelson perform worse."  PO Resp. 29–32; *see also id.* at 20–21 (discussing "experiments" performed by Dr. Madisetti on certain sensors).  Importantly, the obviousness evaluation does not require that the combined teachings of references must produce a device that is somehow superior, or free of disadvantages, as compared with other prior art devices.  *See Medichem, S.A. v. Rolabo, S.L.,* 437 F.3d 1157, 1165 (Fed. Cir. 2006) ("[A] given course of action often has simultaneous advantages and disadvantages, and this does not necessarily obviate motivation to combine."); *Winner Int'l Royalty Corp. v. Wang*, 202 F.3d 1340, 1349 n.8 (Fed. Cir. 2000) ("The fact that the motivating benefit comes at the expense of another benefit, however, should not nullify its use as a basis to modify the disclosure of one reference with the teachings of another.  Instead, the benefits, both lost and gained, should be weighed against one another.").  In this case, even if some

IPR2020-01722
Patent 10,470,695 B2

negative or undesirable conditions were to emerge in some circumstances from the use of a diffuser as a part of one type of oximeter sensor, that does not establish the non-obviousness of such a sensor with a diffuser. We find more persuasive Petitioner's view, and Dr. Anthony's supporting testimony, that a skilled artisan would have appreciated that a diffuser provides a benefit in spreading light and providing for it to pass through more tissue irrespective of the particular anatomical location of the tissue. *See* Pet. 61–63; Pet. Reply 3–6, 9–12; Ex. 1003 ¶¶ 96–101.

We also question the significance of the "experiments" performed by Dr. Madisetti as alleged support for the proposition that a diffuser would have "detrimental consequences" if applied to a "reflectance-type" pulse oximeter sensor, presumably such as in Sarantos or Mendelson-1991. *See* PO Resp. 20–21; Ex. 2001 ¶¶ 57–60, Appendix. Evidently, Dr. Madisetti applied diffusers of different diffuser material to one commercially available "reflectance-type" pulse oximeter sensor and conducted experiments to detect light based on the different materials juxtaposed with a sensor without any diffuser material. Left unexplained, however, is the basis to conclude that the commercially available sensor and the particular diffuser materials used somehow should be regarded as constituting the type of sensor that emerges from the combined teachings of Sarantos, Mendelson-1991, and Chin. The record provides considerable doubt in that regard. For instance, as noted by Petitioner (*see* Pet. Reply 6–9), the commercially available sensor used by Dr. Madisetti is one that has only a single detector, whereas the type of sensors involved in the context of the '695 patent and the pertinent prior art are those that include multiple detectors. On its face, that difference appears significant, but is not addressed or accounted for by

24

IPR2020-01722
Patent 10,470,695 B2

Patent Owner or Dr. Madisetti.  Neither Patent Owner nor Dr. Madisetti

provides any meaningful explanation as to why the outcome of the

experiments sheds light on the question of the obviousness of claims 6, 14,

and 21 of the '695 patent in view of the particular prior art teachings on

which Petitioner relies.  We do not find Patent Owner's assertions of non-

obviousness based on Dr. Madisetti's experiments to be adequate or

particularly probative of the obviousness question.

Lastly, we do not find credible Patent Owner's argument that a skilled

artisan lacks motivation to incorporate a diffuser into a "Sarantos-

Mendelson[-1991] device" because Sarantos discloses positioning of its

detectors in such a way that allegedly already maximizes light receipt by the

detector, which would be "negat[ed]" were the device to incorporate a

diffuser.  PO Resp. 31–32 (citing Ex. 2001 ¶ 74).  Neither Patent Owner nor

Dr. Madisetti adequately explains why a skilled artisan would have regarded

Sarantos's teachings as being limited solely to a singular light spreading

pattern that effectively precludes any modification that alters the pattern.

Indeed, we agree with Petitioner that it simply does not follow from the

teachings of the prior art, specifically Chin, that a diffuser applied to a

different device such as that arising from the Sarantos and Mendelson-1991

combination, would have some sort of negating effect that would disrupt

operation of the device.  *See* Pet. Reply 12.  Rather, it follows from the

evidence of record that a skilled artisan would have recognized that a

diffuser provides for light to be desirably "further spread[]" to pass, in some

instances, through more tissue and more blood.  *See* Pet. Reply 12; Ex. 1006

2:4–9, 8:25–29; Ex. 1003 ¶¶ 96–101.  We credit Dr. Anthony's testimony in

that respect over the contrary testimony of Dr. Madisetti (*see, e.g.*, Ex. 2001

¶ 74), as we conclude that Dr. Anthony's testimony is more consistent with the teachings of the prior art of record.

### 5. Summary

We have considered the final record before us including the respective briefings of the parties, and the underlying evidence offered in support thereof. Based on this record, we conclude that Petitioner has shown by a preponderance of the evidence that claims 6, 14, and 21 would have been obvious in view of the combined teachings of Sarantos, Mendelson-1991, and Chin. *See* Pet. 61–63.

### E. Obviousness Over Ackermans and Chen

Petitioner also contends that claims 6, 14, and 21 are unpatentable based on the combined teachings of Ackermans and Chin. Pet. 102–106 (citing Ex. 1003 ¶¶ 160–163, 167–168). Patent Owner disagrees. PO Response 34–43; PO Sur-reply 13–16.

### 1. Overview of Ackermans

Ackermans is titled "Medical Optical Sensor." Ex. 1016, code (54). Ackermans characterizes its invention as relating to the measurement of blood oxygenation level using optical sensors. *Id.* at 1:2–5. Ackermans's Figure 1 is reproduced below:

IPR2020-01722
Patent 10,470,695 B2



## FIG. 1

Figure 1 shows a three-dimensional sectional schematic drawing of an embodiment of a medical optical sensor. *Id.* at 4:5–6. Medical optical sensor 10 "is designed to be attached to the skin with at least the rims 42 and 44 touching the skin." *Id.* at 4:33–34. The medical optical sensor includes light emitter 20 for emitting light 21 and photodetector 30 for detecting reflected light 31 from a user's skin. *Id.* at 4:22–24.

### 2. Discussion

Petitioner presents Ackermans's teachings as effectively equivalent to the combined teachings of Sarantos and Mendelson-1991. As with the grounds based on Sarantos and Mendelson-1991, Petitioner contends that Ackermans discloses all the features required by claims 6, 14, and 21 with the exception of a diffuser. Petitioner relies on Chin for disclosure of a

27

IPR2020-01722
Patent 10,470,695 B2

diffuser.  Patent Owner does not dispute that all the features required by claims 6, 14, and 21 are present in the combined teachings of Ackerman and Chin, but Patent Owner does disagree that Petitioner has established adequate reasoning to combine those references' teachings.

Patent Owner offers arguments to Petitioner's proposed ground based on Ackermans and Chin that essentially mirror those that were offered for the ground based on Sarantos, Mendelson-1991, and Chin.  *See* PO Resp. 34–43; PO Sur-reply 13–16.  For instance, Patent Owner contends the following:  (1) Ackerman discloses a wrist-worn sensor applied to "thick tissue" whereas Chin is limited to a nostril sensor applied to "thin tissue" (*see, e.g.*, PO Resp. 34–35); (2) Petitioner has not explained how Chin's teachings of a diffuser would improve Ackerman's sensor (*see, e.g., id.* at 34–36); (3) Petitioner has not established that a person of ordinary skill in the art would have had a reasonable expectation of success in combining the teachings of Ackermans and Chin (*see, e.g., id.* at 36–37); (4) Petitioner has not accounted for the differences between a wrist-worn sensor and a nostril-based sensor (*see, e.g., id.* at 38–40); (5) combining Chin's diffuser with Ackerman's sensor "would make Ackermans' device perform worse" (*see, e.g., id.* at 40–41); and (6) Ackerman's device already spreads light and that adding a diffuser would "negate[]" that light spreading (*see, e.g., id.* at 41–42).

We conclude that our reasoning presented above in connection with the combination of Sarantos, Mendelson-1991 and Chin also applies to the combination based on Ackermans and Chin.  *See supra* § II.D.4.  For all of those reasons, we also find Patent Owner's arguments unavailing in the context of the Ackermans and Chin combination.

IPR2020-01722
Patent 10,470,695 B2

We determine that Petitioner has shown by a preponderance of the evidence that claim 6, 14, and 21 of the '695 patent are unpatentable based on the combined teachings of Ackermans and Chin.  *See* Pet. 102–106.

### III. CONCLUSION

In summary, we determine that a preponderance of the evidence establishes that claims 6, 14, and 21 of the '695 patent are unpatentable, as shown in the following table:[10]

| Claim(s) | 35 U.S.C. § | References/Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 6, 14, 21 | 103 | Sarantos, Mendelson-1991, Chin | 6, 14, 21 | |
| 6, 14, 21 | 103 | Ackermans, Chin | 6, 14, 21 | |
| **Overall Outcome** | | | 6, 14, 21 | |

---

[10] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding.  See* 84 Fed. Reg. 16,654 (Apr. 22, 2019).  If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices.  *See* 37 C.F.R. §§ 42.8(a)(3), (b)(2).

IPR2020-01722
Patent 10,470,695 B2

## IV.    ORDER

Upon consideration of the record before us, it is:

ORDERED that claims 6, 14, and 21 of the '695 patent have been shown to be unpatentable; and

FURTHER ORDERED that, because this is a final written decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

30

IPR2020-01722
Patent 10,470,695 B2

For PETITIONER:

Walter Renner
Dan Smith
Kenneth Hoover
FISH & RICHARDSON P.C.
axf-ptab@fr.com
dsmith@fr.com
hoover@fr.com


For PATENT OWNER:

John M. Grover
Joseph Re
Stephen Larson
Shannon Lam
Jarom Kesler
Ben Katzenellenbogen
KNOBBE, MARTENS, OLSON, & BEAR, LLP
2jmg@knobbe.com
2jrr@knobbe.com
2swl@knobbe.com
2sxl@knobbe.com
2jzk@knobbe.com
2bak@knobbe.com



US010470695B2

(12) **United States Patent**
Al-Ali

(10) **Patent No.:** US 10,470,695 B2
(45) **Date of Patent:** *Nov. 12, 2019

(54) **ADVANCED PULSE OXIMETRY SENSOR**

(71) Applicant: **MASIMO CORPORATION**, Irvine, CA (US)

(72) Inventor: **Ammar Al-Ali**, San Juan Capistrano, CA (US)

(73) Assignee: **MASIMO CORPORATION**, Irvine, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/226,249**

(22) Filed: **Dec. 19, 2018**

(65) **Prior Publication Data**

US 2019/0117140 A1      Apr. 25, 2019

**Related U.S. Application Data**

(63) Continuation of application No. 15/195,199, filed on Jun. 28, 2016.

(Continued)

(51) **Int. Cl.**
*A61B 5/1455* (2006.01)
*A61B 5/00* (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC ........ *A61B 5/14552* (2013.01); *A61B 5/0002* (2013.01); *A61B 5/02416* (2013.01);
(Continued)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,960,128 A     10/1990 Gordon et al.
4,964,408 A     10/1990 Hink et al.
(Continued)

FOREIGN PATENT DOCUMENTS

EP          0781527 A1      7/1997
EP          2277440 A1      1/2011
WO     WO 02/028274      4/2002

OTHER PUBLICATIONS

US 8,845,543 B2, 09/2014, Diab et al. (withdrawn)
(Continued)

*Primary Examiner* — Eric F Winakur
*Assistant Examiner* — Marjan Fardanesh
(74) *Attorney, Agent, or Firm* — Knobbe, Martens, Olson & Bear, LLP

(57) **ABSTRACT**

A non-invasive, optical-based physiological monitoring system is disclosed. One embodiment includes an emitter configured to emit light. A diffuser is configured to receive and spread the emitted light, and to emit the spread light at a tissue measurement site. The system further includes a concentrator configured to receive the spread light after it has been attenuated by or reflected from the tissue measurement site. The concentrator is also configured to collect and concentrate the received light and to emit the concentrated light to a detector. The detector is configured to detect the concentrated light and to transmit a signal representative of the detected light. A processor is configured to receive the transmitted signal and to determine a physiological parameter, such as, for example, arterial oxygen saturation, in the tissue measurement site.

**30 Claims, 7 Drawing Sheets**



## US 10,470,695 B2

Page 2

### Related U.S. Application Data

(60) Provisional application No. 62/188,430, filed on Jul. 2, 2015.

(51) **Int. Cl.**
*A61B 5/024* (2006.01)
*A61B 5/145* (2006.01)

(52) **U.S. Cl.**
CPC ...... *A61B 5/14532* (2013.01); *A61B 5/14546* (2013.01); *A61B 5/4875* (2013.01); *A61B 5/6826* (2013.01); *A61B 5/7278* (2013.01); *A61B 5/742* (2013.01); *A61B 2562/04* (2013.01)

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,041,187 A | 8/1991 | Hink et al. | |
| 5,069,213 A | 12/1991 | Polczynski | |
| 5,099,842 A | 3/1992 | Mannheimer et al. | |
| 5,163,438 A | 11/1992 | Gordon et al. | |
| 5,319,355 A | 6/1994 | Russek | |
| 5,337,744 A | 8/1994 | Branigan | |
| 5,341,805 A | 8/1994 | Stavridi et al. | |
| D353,195 S | 12/1994 | Savage et al. | |
| D353,196 S | 12/1994 | Savage et al. | |
| 5,377,676 A | 1/1995 | Vari et al. | |
| D359,546 S | 6/1995 | Savage et al. | |
| 5,431,170 A | 7/1995 | Mathews | |
| D361,840 S | 8/1995 | Savage et al. | |
| D362,063 S | 9/1995 | Savage et al. | |
| 5,452,717 A | 9/1995 | Branigan et al. | |
| D363,120 S | 10/1995 | Savage et al. | |
| 5,456,252 A | 10/1995 | Vari et al. | |
| 5,479,934 A | 1/1996 | Imran | |
| 5,482,036 A | 1/1996 | Diab et al. | |
| 5,490,505 A | 2/1996 | Diab et al. | |
| 5,494,043 A | 2/1996 | O'Sullivan et al. | |
| 5,497,771 A | 3/1996 | Rosenheimer | |
| 5,533,511 A | 7/1996 | Kaspari et al. | |
| 5,534,851 A | 7/1996 | Russek | |
| 5,561,275 A | 10/1996 | Savage et al. | |
| 5,562,002 A | 10/1996 | Lalin | |
| 5,584,296 A * | 12/1996 | Cui ...................... A61B 5/14552 356/41 |
| 5,590,649 A | 1/1997 | Caro et al. | |
| 5,601,079 A | 2/1997 | Wong et al. | |
| 5,602,924 A | 2/1997 | Durand et al. | |
| 5,623,925 A * | 4/1997 | Swenson .............. A61B 5/0205 600/301 |
| 5,632,272 A | 5/1997 | Diab et al. | |
| 5,638,816 A | 6/1997 | Kiani-Azarbayjany et al. | |
| 5,638,818 A | 6/1997 | Diab et al. | |
| 5,645,440 A | 7/1997 | Tobler et al. | |
| 5,685,299 A | 11/1997 | Diab et al. | |
| D393,830 S | 4/1998 | Tobler et al. | |
| 5,743,262 A | 4/1998 | Lepper, Jr. et al. | |
| 5,758,644 A | 6/1998 | Diab et al. | |
| 5,760,910 A | 6/1998 | Lepper, Jr. et al. | |
| 5,769,785 A | 6/1998 | Diab et al. | |
| 5,782,757 A | 7/1998 | Diab et al. | |
| 5,785,659 A | 7/1998 | Caro et al. | |
| 5,791,347 A | 8/1998 | Flaherty et al. | |
| 5,810,734 A | 9/1998 | Caro et al. | |
| 5,823,950 A | 10/1998 | Diab et al. | |
| 5,830,131 A | 11/1998 | Caro et al. | |
| 5,830,137 A | 11/1998 | Scharf | |
| 5,833,618 A | 11/1998 | Caro et al. | |
| 5,860,919 A | 1/1999 | Kiani-Azarbayjany et al. | |
| 5,890,929 A | 4/1999 | Mills et al. | |
| 5,904,654 A | 5/1999 | Wohltmann et al. | |
| 5,919,134 A | 7/1999 | Diab | |
| 5,934,925 A | 8/1999 | Tobler et al. | |
| 5,940,182 A | 8/1999 | Lepper, Jr. et al. | |
| 5,987,343 A | 11/1999 | Kinast | |
| 5,995,855 A | 11/1999 | Kiani et al. | |
| 5,997,343 A | 12/1999 | Mills et al. | |
| 6,002,952 A | 12/1999 | Diab et al. | |
| 6,011,986 A | 1/2000 | Diab et al. | |
| 6,027,452 A | 2/2000 | Flaherty et al. | |
| 6,036,642 A | 3/2000 | Diab et al. | |
| 6,045,509 A | 4/2000 | Caro et al. | |
| 6,067,462 A | 5/2000 | Diab et al. | |
| 6,081,735 A | 6/2000 | Diab et al. | |
| 6,088,607 A | 7/2000 | Diab et al. | |
| 6,110,522 A | 8/2000 | Lepper, Jr. et al. | |
| 6,124,597 A | 9/2000 | Shehada | |
| 6,128,521 A | 10/2000 | Marro et al. | |
| 6,129,675 A | 10/2000 | Jay | |
| 6,144,868 A | 11/2000 | Parker | |
| 6,151,516 A | 11/2000 | Kiani-Azarbayjany et al. | |
| 6,152,754 A | 11/2000 | Gerhardt et al. | |
| 6,157,850 A | 12/2000 | Diab et al. | |
| 6,165,005 A | 12/2000 | Mills et al. | |
| 6,184,521 B1 | 2/2001 | Coffin, IV et al. | |
| 6,206,830 B1 | 3/2001 | Diab et al. | |
| 6,223,063 B1 | 4/2001 | Chaiken et al. | |
| 6,229,856 B1 | 5/2001 | Diab et al. | |
| 6,232,609 B1 | 5/2001 | Snyder et al. | |
| 6,236,872 B1 | 5/2001 | Diab et al. | |
| 6,241,683 B1 | 6/2001 | Macklem et al. | |
| 6,253,097 B1 | 6/2001 | Aronow et al. | |
| 6,256,523 B1 | 7/2001 | Diab et al. | |
| 6,263,222 B1 | 7/2001 | Diab et al. | |
| 6,278,522 B1 | 8/2001 | Lepper, Jr. et al. | |
| 6,280,213 B1 | 8/2001 | Tobler et al. | |
| 6,285,896 B1 | 9/2001 | Tobler et al. | |
| 6,301,493 B1 | 10/2001 | Marro et al. | |
| 6,308,089 B1 | 10/2001 | von der Ruhr et al. | |
| 6,317,627 B1 | 11/2001 | Ennen et al. | |
| 6,321,100 B1 | 11/2001 | Parker | |
| 6,325,761 B1 | 12/2001 | Jay | |
| 6,334,065 B1 | 12/2001 | Al-Ali et al. | |
| 6,343,223 B1 | 1/2002 | Chin et al. | |
| 6,343,224 B1 | 1/2002 | Parker | |
| 6,349,228 B1 | 2/2002 | Kiani et al. | |
| 6,360,114 B1 | 3/2002 | Diab et al. | |
| 6,368,283 B1 | 4/2002 | Xu et al. | |
| 6,371,921 B1 | 4/2002 | Caro et al. | |
| 6,377,829 B1 | 4/2002 | Al-Ali | |
| 6,388,240 B2 | 5/2002 | Schulz et al. | |
| 6,397,091 B2 | 5/2002 | Diab et al. | |
| 6,430,437 B1 | 8/2002 | Marro | |
| 6,430,525 B1 | 8/2002 | Weber et al. | |
| 6,463,311 B1 | 10/2002 | Diab | |
| 6,470,199 B1 | 10/2002 | Kopotic et al. | |
| 6,501,975 B2 | 12/2002 | Diab et al. | |
| 6,505,059 B1 | 1/2003 | Kollias et al. | |
| 6,515,273 B2 | 2/2003 | Al-Ali | |
| 6,519,487 B1 | 2/2003 | Parker | |
| 6,525,386 B1 | 2/2003 | Mills et al. | |
| 6,526,300 B1 | 2/2003 | Kiani et al. | |
| 6,541,756 B2 | 4/2003 | Schulz et al. | |
| 6,542,764 B1 | 4/2003 | Al-Ali et al. | |
| 6,580,086 B1 | 6/2003 | Schulz et al. | |
| 6,584,336 B1 | 6/2003 | Ali et al. | |
| 6,595,316 B2 | 7/2003 | Cybulski et al. | |
| 6,597,932 B2 | 7/2003 | Tian et al. | |
| 6,597,933 B2 | 7/2003 | Kiani et al. | |
| 6,606,511 B1 | 8/2003 | Ali et al. | |
| 6,632,181 B2 | 10/2003 | Flaherty et al. | |
| 6,639,668 B1 | 10/2003 | Trepagnier | |
| 6,640,116 B2 | 10/2003 | Diab | |
| 6,643,530 B2 | 11/2003 | Diab et al. | |
| 6,650,917 B2 | 11/2003 | Diab et al. | |
| 6,654,624 B2 | 11/2003 | Diab et al. | |
| 6,658,276 B2 | 12/2003 | Kiani et al. | |
| 6,661,161 B1 | 12/2003 | Lanzo et al. | |
| 6,671,526 B1 | 12/2003 | Aoyagi et al. | |
| 6,671,531 B2 | 12/2003 | Al-Ali et al. | |
| 6,678,543 B2 | 1/2004 | Diab et al. | |
| 6,684,090 B2 | 1/2004 | Ali et al. | |
| 6,684,091 B2 | 1/2004 | Parker | |

**US 10,470,695 B2**

Page 3

(56)        **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,697,656 | B1 | 2/2004 | Al-Ali |
| 6,697,657 | B1 | 2/2004 | Shehada et al. |
| 6,697,658 | B2 | 2/2004 | Al-Ali |
| RE38,476 | E | 3/2004 | Diab et al. |
| 6,699,194 | B1 | 3/2004 | Diab et al. |
| 6,714,804 | B2 | 3/2004 | Al-Ali et al. |
| RE38,492 | E | 4/2004 | Diab et al. |
| 6,721,582 | B2 | 4/2004 | Trepagnier et al. |
| 6,721,585 | B1 | 4/2004 | Parker |
| 6,725,075 | B2 | 4/2004 | Al-Ali |
| 6,728,560 | B2 | 4/2004 | Kollias et al. |
| 6,735,459 | B2 | 5/2004 | Parker |
| 6,745,060 | B2 | 6/2004 | Diab et al. |
| 6,760,607 | B2 | 7/2004 | Al-Ali |
| 6,770,028 | B1 | 8/2004 | Ali et al. |
| 6,771,994 | B2 | 8/2004 | Kiani et al. |
| 6,792,300 | B1 | 9/2004 | Diab et al. |
| 6,813,511 | B2 | 11/2004 | Diab et al. |
| 6,816,741 | B2 | 11/2004 | Diab |
| 6,822,564 | B2 | 11/2004 | Al-Ali |
| 6,826,419 | B2 | 11/2004 | Diab et al. |
| 6,830,711 | B2 | 12/2004 | Mills et al. |
| 6,850,787 | B2 | 2/2005 | Weber et al. |
| 6,850,788 | B2 | 2/2005 | Al-Ali |
| 6,852,083 | B2 | 2/2005 | Caro et al. |
| 6,861,639 | B2 | 3/2005 | Al-Ali |
| 6,898,452 | B2 | 5/2005 | Al-Ali et al. |
| 6,920,345 | B2 | 7/2005 | Al-Ali et al. |
| 6,931,268 | B1 | 8/2005 | Kiani-Azarbayjany et al. |
| 6,934,570 | B2 | 8/2005 | Kiani et al. |
| 6,939,305 | B2 | 9/2005 | Flaherty et al. |
| 6,943,348 | B1 | 9/2005 | Coffin, IV |
| 6,950,687 | B2 | 9/2005 | Al-Ali |
| 6,961,598 | B2 | 11/2005 | Diab |
| 6,970,792 | B1 | 11/2005 | Diab |
| 6,979,812 | B2 | 12/2005 | Al-Ali |
| 6,985,764 | B2 | 1/2006 | Mason et al. |
| 6,993,371 | B2 | 1/2006 | Kiani et al. |
| 6,996,427 | B2 | 2/2006 | Ali et al. |
| 6,999,904 | B2 | 2/2006 | Weber et al. |
| 7,003,338 | B2 | 2/2006 | Weber et al. |
| 7,003,339 | B2 | 2/2006 | Diab et al. |
| 7,015,451 | B2 | 3/2006 | Dalke et al. |
| 7,024,233 | B2 | 4/2006 | Ali et al. |
| 7,027,849 | B2 | 4/2006 | Al-Ali |
| 7,030,749 | B2 | 4/2006 | Al-Ali |
| 7,039,449 | B2 | 5/2006 | Al-Ali |
| 7,041,060 | B2 | 5/2006 | Flaherty et al. |
| 7,044,918 | B2 | 5/2006 | Diab |
| 7,048,687 | B1 | 5/2006 | Reuss et al. |
| 7,067,893 | B2 | 6/2006 | Mills et al. |
| 7,096,052 | B2 | 8/2006 | Mason et al. |
| 7,096,054 | B2 | 8/2006 | Abdul-Hafiz et al. |
| 7,132,641 | B2 | 11/2006 | Schulz et al. |
| 7,142,901 | B2 | 11/2006 | Kiani et al. |
| 7,149,561 | B2 | 12/2006 | Diab |
| 7,186,966 | B2 | 3/2007 | Al-Ali |
| 7,190,261 | B2 | 3/2007 | Al-Ali |
| 7,215,984 | B2 | 5/2007 | Diab |
| 7,215,986 | B2 | 5/2007 | Diab |
| 7,221,971 | B2 | 5/2007 | Diab |
| 7,225,006 | B2 | 5/2007 | Al-Ali et al. |
| 7,225,007 | B2 | 5/2007 | Al-Ali |
| RE39,672 | E | 6/2007 | Shehada et al. |
| 7,239,905 | B2 | 7/2007 | Kiani-Azarbayjany et al. |
| 7,245,953 | B1 | 7/2007 | Parker |
| 7,254,429 | B2 | 8/2007 | Schurman et al. |
| 7,254,431 | B2 | 8/2007 | Al-Ali |
| 7,254,433 | B2 | 8/2007 | Diab et al. |
| 7,254,434 | B2 | 8/2007 | Schulz et al. |
| 7,272,425 | B2 | 9/2007 | Al-Ali |
| 7,274,955 | B2 | 9/2007 | Kiani et al. |
| D554,263 | S | 10/2007 | Al-Ali |
| 7,280,858 | B2 | 10/2007 | Al-Ali et al. |
| 7,289,835 | B2 | 10/2007 | Mansfield et al. |
| 7,292,883 | B2 | 11/2007 | De Felice et al. |
| 7,295,866 | B2 | 11/2007 | Al-Ali |
| 7,328,053 | B1 | 2/2008 | Diab et al. |
| 7,332,784 | B2 | 2/2008 | Mills et al. |
| 7,340,287 | B2 | 3/2008 | Mason et al. |
| 7,341,559 | B2 | 3/2008 | Schulz et al. |
| 7,343,186 | B2 | 3/2008 | Lamego et al. |
| D566,282 | S | 4/2008 | Al-Ali et al. |
| 7,355,512 | B1 | 4/2008 | Al-Ali |
| 7,356,365 | B2 | 4/2008 | Schurman |
| 7,371,981 | B2 | 5/2008 | Abdul-Hafiz |
| 7,373,193 | B2 | 5/2008 | Al-Ali et al. |
| 7,373,194 | B2 | 5/2008 | Weber et al. |
| 7,376,453 | B1 | 5/2008 | Diab et al. |
| 7,377,794 | B2 | 5/2008 | Al Ali et al. |
| 7,377,899 | B2 | 5/2008 | Weber et al. |
| 7,383,070 | B2 | 6/2008 | Diab et al. |
| 7,415,297 | B2 | 8/2008 | Al-Ali et al. |
| 7,428,432 | B2 | 9/2008 | Ali et al. |
| 7,438,683 | B2 | 10/2008 | Al-Ali et al. |
| 7,440,787 | B2 | 10/2008 | Diab |
| 7,454,240 | B2 | 11/2008 | Diab et al. |
| 7,467,002 | B2 | 12/2008 | Weber et al. |
| 7,469,157 | B2 | 12/2008 | Diab et al. |
| 7,471,969 | B2 | 12/2008 | Diab et al. |
| 7,471,971 | B2 | 12/2008 | Diab et al. |
| 7,483,729 | B2 | 1/2009 | Al-Ali et al. |
| 7,483,730 | B2 | 1/2009 | Diab et al. |
| 7,489,958 | B2 | 2/2009 | Diab et al. |
| 7,496,391 | B2 | 2/2009 | Diab et al. |
| 7,496,393 | B2 | 2/2009 | Diab et al. |
| D587,657 | S | 3/2009 | Al-Ali et al. |
| 7,499,741 | B2 | 3/2009 | Diab et al. |
| 7,499,835 | B2 | 3/2009 | Weber et al. |
| 7,500,950 | B2 | 3/2009 | Al-Ali et al. |
| 7,509,154 | B2 | 3/2009 | Diab et al. |
| 7,509,494 | B2 | 3/2009 | Al-Ali |
| 7,510,849 | B2 | 3/2009 | Schurman et al. |
| 7,519,327 | B2 | 4/2009 | White |
| 7,526,328 | B2 | 4/2009 | Diab et al. |
| 7,530,942 | B1 | 5/2009 | Diab |
| 7,530,949 | B2 | 5/2009 | Al Ali et al. |
| 7,530,955 | B2 | 5/2009 | Diab et al. |
| 7,563,110 | B2 | 7/2009 | Al-Ali et al. |
| 7,596,398 | B2 | 9/2009 | Al-Ali et al. |
| 7,601,123 | B2 | 10/2009 | Tweed et al. |
| 7,618,375 | B2 | 11/2009 | Flaherty |
| D606,659 | S | 12/2009 | Kiani et al. |
| 7,647,083 | B2 | 1/2010 | Al-Ali et al. |
| D609,193 | S | 2/2010 | Al-Ali et al. |
| D614,305 | S | 4/2010 | Al-Ali et al. |
| RE41,317 | E | 5/2010 | Parker |
| 7,726,209 | B2 | 6/2010 | Ruotoistenmäki |
| 7,729,733 | B2 | 6/2010 | Al-Ali et al. |
| 7,734,320 | B2 | 6/2010 | Al-Ali |
| 7,761,127 | B2 | 7/2010 | Al-Ali et al. |
| 7,761,128 | B2 | 7/2010 | Al-Ali et al. |
| 7,764,982 | B2 | 7/2010 | Dalke et al. |
| D621,516 | S | 8/2010 | Kiani et al. |
| 7,791,155 | B2 | 9/2010 | Diab |
| 7,801,581 | B2 | 9/2010 | Diab |
| 7,822,452 | B2 | 10/2010 | Schurman et al. |
| RE41,912 | E | 11/2010 | Parker |
| 7,844,313 | B2 | 11/2010 | Kiani et al. |
| 7,844,314 | B2 | 11/2010 | Al-Ali |
| 7,844,315 | B2 | 11/2010 | Al-Ali |
| 7,862,523 | B2 | 1/2011 | Ruotoistenmaki |
| 7,865,222 | B2 | 1/2011 | Weber et al. |
| 7,873,497 | B2 | 1/2011 | Weber et al. |
| 7,880,606 | B2 | 2/2011 | Al-Ali |
| 7,880,626 | B2 | 2/2011 | Al-Ali et al. |
| 7,891,355 | B2 | 2/2011 | Al-Ali et al. |
| 7,894,868 | B2 | 2/2011 | Al-Ali et al. |
| 7,899,507 | B2 | 3/2011 | Al-Ali et al. |
| 7,899,518 | B2 | 3/2011 | Trepagnier et al. |
| 7,904,132 | B2 | 3/2011 | Weber et al. |
| 7,909,772 | B2 | 3/2011 | Popov et al. |
| 7,910,875 | B2 | 3/2011 | Al-Ali |
| 7,919,713 | B2 | 4/2011 | Al-Ali et al. |

Appx0132

**US 10,470,695 B2**

Page 4

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 7,937,128 | B2 | 5/2011 | Al-Ali |
| 7,937,129 | B2 | 5/2011 | Mason et al. |
| 7,937,130 | B2 | 5/2011 | Diab et al. |
| 7,941,199 | B2 | 5/2011 | Kiani |
| 7,951,086 | B2 | 5/2011 | Flaherty et al. |
| 7,957,780 | B2 | 6/2011 | Lamego et al. |
| 7,962,188 | B2 | 6/2011 | Kiani et al. |
| 7,962,190 | B1 | 6/2011 | Diab et al. |
| 7,976,472 | B2 | 7/2011 | Kiani |
| 7,988,637 | B2 | 8/2011 | Diab |
| 7,990,382 | B2 | 8/2011 | Kiani |
| 7,991,446 | B2 | 8/2011 | Al-Ali et al. |
| 8,000,761 | B2 | 8/2011 | Al-Ali |
| 8,008,088 | B2 | 8/2011 | Bellott et al. |
| RE42,753 | E | 9/2011 | Kiani-Azarbayjany et al. |
| 8,019,400 | B2 | 9/2011 | Diab et al. |
| 8,028,701 | B2 | 10/2011 | Al-Ali et al. |
| 8,029,765 | B2 | 10/2011 | Bellott et al. |
| 8,036,727 | B2 | 10/2011 | Schurman et al. |
| 8,036,728 | B2 | 10/2011 | Diab et al. |
| 8,046,040 | B2 | 10/2011 | Ali et al. |
| 8,046,041 | B2 | 10/2011 | Diab et al. |
| 8,046,042 | B2 | 10/2011 | Diab et al. |
| 8,048,040 | B2 | 11/2011 | Kiani |
| 8,050,728 | B2 | 11/2011 | Al-Ali et al. |
| RE43,169 | E | 2/2012 | Parker |
| 8,118,620 | B2 | 2/2012 | Al-Ali et al. |
| 8,126,528 | B2 | 2/2012 | Diab et al. |
| 8,128,572 | B2 | 3/2012 | Diab et al. |
| 8,130,105 | B2 | 3/2012 | Al-Ali et al. |
| 8,145,287 | B2 | 3/2012 | Diab et al. |
| 8,150,487 | B2 | 4/2012 | Diab et al. |
| 8,175,672 | B2 | 5/2012 | Parker |
| 8,180,420 | B2 | 5/2012 | Diab et al. |
| 8,182,443 | B1 | 5/2012 | Kiani |
| 8,185,180 | B2 | 5/2012 | Diab et al. |
| 8,190,223 | B2 | 5/2012 | Al-Ali et al. |
| 8,190,227 | B2 | 5/2012 | Diab et al. |
| 8,203,438 | B2 | 6/2012 | Kiani et al. |
| 8,203,704 | B2 | 6/2012 | Merritt et al. |
| 8,204,566 | B2 | 6/2012 | Schurman et al. |
| 8,219,172 | B2 | 7/2012 | Schurman et al. |
| 8,224,411 | B2 | 7/2012 | Al-Ali et al. |
| 8,228,181 | B2 | 7/2012 | Al-Ali |
| 8,229,533 | B2 | 7/2012 | Diab et al. |
| 8,233,955 | B2 | 7/2012 | Al-Ali et al. |
| 8,244,325 | B2 | 8/2012 | Al-Ali et al. |
| 8,255,026 | B1 | 8/2012 | Al-Ali |
| 8,255,027 | B2 | 8/2012 | Al-Ali et al. |
| 8,255,028 | B2 | 8/2012 | Al-Ali et al. |
| 8,260,577 | B2 | 9/2012 | Weber et al. |
| 8,265,723 | B1 | 9/2012 | McHale et al. |
| 8,274,360 | B2 | 9/2012 | Sampath et al. |
| 8,280,473 | B2 | 10/2012 | Al-Ali |
| 8,289,130 | B2 | 10/2012 | Nakajima et al. |
| 8,301,217 | B2 | 10/2012 | Al-Ali et al. |
| 8,306,596 | B2 | 11/2012 | Schurman et al. |
| 8,310,336 | B2 | 11/2012 | Muhsin et al. |
| 8,315,683 | B2 | 11/2012 | Al-Ali et al. |
| RE43,860 | E | 12/2012 | Parker |
| 8,337,403 | B2 | 12/2012 | Al-Ali et al. |
| 8,346,330 | B2 | 1/2013 | Lamego |
| 8,353,842 | B2 | 1/2013 | Al-Ali et al. |
| 8,355,766 | B2 | 1/2013 | MacNeish, III et al. |
| 8,359,080 | B2 | 1/2013 | Diab et al. |
| 8,364,223 | B2 | 1/2013 | Al-Ali et al. |
| 8,364,226 | B2 | 1/2013 | Diab et al. |
| 8,364,389 | B2 | 1/2013 | Dorogusker et al. |
| 8,374,665 | B2 | 2/2013 | Lamego |
| 8,385,995 | B2 | 2/2013 | Al-ali et al. |
| 8,385,996 | B2 | 2/2013 | Smith et al. |
| 8,388,353 | B2 | 3/2013 | Kiani et al. |
| 8,399,822 | B2 | 3/2013 | Al-Ali |
| 8,401,602 | B2 | 3/2013 | Kiani |
| 8,405,608 | B2 | 3/2013 | Al-Ali et al. |
| 8,414,499 | B2 | 4/2013 | Al-Ali et al. |
| 8,418,524 | B2 | 4/2013 | Al-Ali |
| 8,423,106 | B2 | 4/2013 | Lamego et al. |
| 8,428,967 | B2 | 4/2013 | Olsen et al. |
| 8,430,817 | B1 | 4/2013 | Al-Ali et al. |
| 8,437,825 | B2 | 5/2013 | Dalvi et al. |
| 8,452,364 | B2 * | 5/2013 | Hannula ............ A61B 5/14552 600/322 |
| 8,455,290 | B2 | 6/2013 | Siskavich |
| 8,457,703 | B2 | 6/2013 | Al-Ali |
| 8,457,707 | B2 | 6/2013 | Kiani |
| 8,463,349 | B2 | 6/2013 | Diab et al. |
| 8,466,286 | B2 | 6/2013 | Bellot et al. |
| 8,471,713 | B2 | 6/2013 | Poeze et al. |
| 8,473,020 | B2 | 6/2013 | Kiani et al. |
| 8,483,787 | B2 | 7/2013 | Al-Ali et al. |
| 8,489,364 | B2 | 7/2013 | Weber et al. |
| 8,498,684 | B2 | 7/2013 | Weber et al. |
| 8,504,128 | B2 | 8/2013 | Blank et al. |
| 8,509,867 | B2 | 8/2013 | Workman et al. |
| 8,515,509 | B2 | 8/2013 | Bruinsma et al. |
| 8,523,781 | B2 | 9/2013 | Al-Ali |
| 8,529,301 | B2 | 9/2013 | Al-Ali et al. |
| 8,532,727 | B2 | 9/2013 | Ali et al. |
| 8,532,728 | B2 | 9/2013 | Diab et al. |
| D692,145 | S | 10/2013 | Al-Ali et al. |
| 8,547,209 | B2 | 10/2013 | Kiani et al. |
| 8,548,548 | B2 | 10/2013 | Al-Ali |
| 8,548,549 | B2 | 10/2013 | Schurman et al. |
| 8,548,550 | B2 | 10/2013 | Al-Ali et al. |
| 8,560,032 | B2 | 10/2013 | Al-Ali et al. |
| 8,560,034 | B1 | 10/2013 | Diab et al. |
| 8,570,167 | B2 | 10/2013 | Al-Ali |
| 8,570,503 | B2 | 10/2013 | Vo et al. |
| 8,571,617 | B2 | 10/2013 | Reichgott et al. |
| 8,571,618 | B1 | 10/2013 | Lamego et al. |
| 8,571,619 | B2 | 10/2013 | Al-Ali et al. |
| 8,577,431 | B2 | 11/2013 | Lamego et al. |
| 8,581,732 | B2 | 11/2013 | Al-Ali et al. |
| 8,584,345 | B2 | 11/2013 | Al-Ali et al. |
| 8,588,880 | B2 | 11/2013 | Abdul-Hafiz et al. |
| 8,600,467 | B2 | 12/2013 | Al-Ali et al. |
| 8,606,342 | B2 | 12/2013 | Diab |
| 8,615,290 | B2 | 12/2013 | Lin et al. |
| 8,626,255 | B2 | 1/2014 | Al-Ali et al. |
| 8,630,691 | B2 | 1/2014 | Lamego et al. |
| 8,634,889 | B2 | 1/2014 | Al-Ali et al. |
| 8,641,631 | B2 | 2/2014 | Sierra et al. |
| 8,652,060 | B2 | 2/2014 | Al-Ali |
| 8,655,004 | B2 | 2/2014 | Prest et al. |
| 8,663,107 | B2 | 3/2014 | Kiani |
| 8,666,468 | B1 | 3/2014 | Al-Ali |
| 8,667,967 | B2 | 3/2014 | Al-Ali et al. |
| 8,670,811 | B2 | 3/2014 | O'Reilly |
| 8,670,814 | B2 | 3/2014 | Diab et al. |
| 8,676,286 | B2 | 3/2014 | Weber et al. |
| 8,682,407 | B2 | 3/2014 | Al-Ali |
| RE44,823 | E | 4/2014 | Parker |
| RE44,875 | E | 4/2014 | Kiani et al. |
| 8,690,799 | B2 | 4/2014 | Telfort et al. |
| 8,700,112 | B2 | 4/2014 | Kiani |
| 8,702,627 | B2 | 4/2014 | Telfort et al. |
| 8,706,179 | B2 | 4/2014 | Parker |
| 8,712,494 | B1 | 4/2014 | MacNeish, III et al. |
| 8,715,206 | B2 | 5/2014 | Telfort et al. |
| 8,718,735 | B2 | 5/2014 | Lamego et al. |
| 8,718,737 | B2 | 5/2014 | Diab et al. |
| 8,718,738 | B2 | 5/2014 | Blank et al. |
| 8,720,249 | B2 | 5/2014 | Al-Ali |
| 8,721,541 | B2 | 5/2014 | Al-Ali et al. |
| 8,721,542 | B2 | 5/2014 | Al-Ali et al. |
| 8,723,677 | B1 | 5/2014 | Kiani |
| 8,740,792 | B1 | 6/2014 | Kiani et al. |
| 8,754,776 | B2 | 6/2014 | Poeze et al. |
| 8,755,535 | B2 | 6/2014 | Telfort et al. |
| 8,755,856 | B2 | 6/2014 | Diab et al. |
| 8,755,872 | B1 | 6/2014 | Marinow |
| 8,760,517 | B2 | 6/2014 | Sarwar et al. |
| 8,761,850 | B2 | 6/2014 | Lamego |

4

**US 10,470,695 B2**

Page 5

(56)　　　　　**References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 8,764,671 | B2 | 7/2014 | Kiani |
| 8,768,423 | B2 | 7/2014 | Shakespeare et al. |
| 8,771,204 | B2 | 7/2014 | Telfort et al. |
| 8,777,634 | B2 | 7/2014 | Kiani et al. |
| 8,781,543 | B2 | 7/2014 | Diab et al. |
| 8,781,544 | B2 | 7/2014 | Al-Ali et al. |
| 8,781,549 | B2 | 7/2014 | Al-Ali et al. |
| 8,788,003 | B2 | 7/2014 | Schurman et al. |
| 8,790,268 | B2 | 7/2014 | Al-Ali |
| 8,801,613 | B2 | 8/2014 | Al-Ali et al. |
| 8,821,397 | B2 | 9/2014 | Al-Ali et al. |
| 8,821,415 | B2 | 9/2014 | Al-Ali et al. |
| 8,830,449 | B1 | 9/2014 | Lamego et al. |
| 8,831,700 | B2 | 9/2014 | Schurman et al. |
| 8,840,549 | B2 | 9/2014 | Al-Ali et al. |
| 8,847,740 | B2 | 9/2014 | Kiani et al. |
| 8,849,365 | B2 | 9/2014 | Smith et al. |
| 8,852,094 | B2 | 10/2014 | Al-Ali et al. |
| 8,852,994 | B2 | 10/2014 | Wojtczuk et al. |
| 8,868,147 | B2 | 10/2014 | Stippick et al. |
| 8,868,150 | B2 | 10/2014 | Al-Ali et al. |
| 8,870,792 | B2 | 10/2014 | Al-Ali et al. |
| 8,886,271 | B2 | 11/2014 | Kiani et al. |
| 8,888,539 | B2 | 11/2014 | Al-Ali et al. |
| 8,888,708 | B2 | 11/2014 | Diab et al. |
| 8,892,180 | B2 | 11/2014 | Weber et al. |
| 8,897,847 | B2 | 11/2014 | Al-Ali |
| 8,909,310 | B2 | 12/2014 | Lamego et al. |
| 8,911,377 | B2 | 12/2014 | Al-Ali |
| 8,912,909 | B2 | 12/2014 | Al-Ali et al. |
| 8,920,317 | B2 | 12/2014 | Al-Ali et al. |
| 8,921,699 | B2 | 12/2014 | Al-Ali et al. |
| 8,922,382 | B2 | 12/2014 | Al-Ali et al. |
| 8,929,964 | B2 | 1/2015 | Al-Ali et al. |
| 8,942,777 | B2 | 1/2015 | Diab et al. |
| 8,948,834 | B2 | 2/2015 | Diab et al. |
| 8,948,835 | B2 | 2/2015 | Diab |
| 8,965,471 | B2 | 2/2015 | Lamego |
| 8,983,564 | B2 | 3/2015 | Al-Ali |
| 8,989,831 | B2 | 3/2015 | Al-Ali et al. |
| 8,996,085 | B2 | 3/2015 | Kiani et al. |
| 8,998,809 | B2 | 4/2015 | Kiani |
| 9,028,429 | B2 | 5/2015 | Telfort et al. |
| 9,037,207 | B2 | 5/2015 | Al-Ali et al. |
| 9,060,721 | B2 | 6/2015 | Reichgott et al. |
| 9,066,666 | B2 | 6/2015 | Kiani |
| 9,066,680 | B1 | 6/2015 | Al-Ali et al. |
| 9,072,437 | B2 | 7/2015 | Paalasmaa |
| 9,072,474 | B2 | 7/2015 | Al-Ali et al. |
| 9,078,560 | B2 | 7/2015 | Schurman et al. |
| 9,081,889 | B2 | 7/2015 | Ingrassia, Jr. et al. |
| 9,084,569 | B2 | 7/2015 | Weber et al. |
| 9,095,316 | B2 | 8/2015 | Welch et al. |
| 9,106,038 | B2 | 8/2015 | Telfort et al. |
| 9,107,625 | B2 | 8/2015 | Telfort et al. |
| 9,107,626 | B2 | 8/2015 | Al-Ali et al. |
| 9,113,831 | B2 | 8/2015 | Al-Ali |
| 9,113,832 | B2 | 8/2015 | Al-Ali |
| 9,119,595 | B2 | 9/2015 | Lamego |
| 9,131,881 | B2 | 9/2015 | Diab et al. |
| 9,131,882 | B2 | 9/2015 | Al-Ali et al. |
| 9,131,883 | B2 | 9/2015 | Al-Ali |
| 9,131,917 | B2 | 9/2015 | Telfort et al. |
| 9,138,180 | B1 | 9/2015 | Coverston et al. |
| 9,138,182 | B2 | 9/2015 | Al-Ali et al. |
| 9,138,192 | B2 | 9/2015 | Weber et al. |
| 9,142,117 | B2 | 9/2015 | Muhsin et al. |
| 9,153,112 | B1 | 10/2015 | Kiani et al. |
| 9,153,121 | B2 | 10/2015 | Kiani et al. |
| 9,161,696 | B2 | 10/2015 | Al-Ali et al. |
| 9,161,713 | B2 | 10/2015 | Al-Ali et al. |
| 9,167,995 | B2 | 10/2015 | Lamego et al. |
| 9,176,141 | B2 | 11/2015 | Al-Ali et al. |
| 9,186,102 | B2 | 11/2015 | Bruinsma et al. |
| 9,192,312 | B2 | 11/2015 | Al-Ali |
| 9,192,329 | B2 | 11/2015 | Al-Ali |
| 9,192,351 | B1 | 11/2015 | Telfort et al. |
| 9,195,385 | B2 | 11/2015 | Al-Ali et al. |
| 9,210,566 | B2 | 12/2015 | Ziemianska et al. |
| 9,211,072 | B2 | 12/2015 | Kiani |
| 9,211,095 | B1 | 12/2015 | Al-Ali |
| 9,218,454 | B2 | 12/2015 | Kiani et al. |
| 9,226,696 | B2 | 1/2016 | Kiani |
| 9,241,662 | B2 | 1/2016 | Al-Ali et al. |
| 9,245,668 | B1 | 1/2016 | Vo et al. |
| 9,259,185 | B2 | 2/2016 | Abdul-Hafiz et al. |
| 9,267,572 | B2 | 2/2016 | Barker et al. |
| 9,277,880 | B2 | 3/2016 | Poeze et al. |
| 9,289,167 | B2 | 3/2016 | Diab et al. |
| 9,295,421 | B2 | 3/2016 | Kiani et al. |
| 9,307,928 | B1 | 4/2016 | Al-Ali et al. |
| 9,311,382 | B2 | 4/2016 | Varoglu et al. |
| 9,323,894 | B2 | 4/2016 | Kiani |
| D755,392 | S | 5/2016 | Hwang et al. |
| 9,326,712 | B1 | 5/2016 | Kiani |
| 9,333,316 | B2 | 5/2016 | Kiani |
| 9,339,220 | B2 | 5/2016 | Lamego et al. |
| 9,341,565 | B2 | 5/2016 | Lamego et al. |
| 9,351,673 | B2 | 5/2016 | Diab et al. |
| 9,351,675 | B2 | 5/2016 | Al-Ali et al. |
| 9,357,665 | B2 | 5/2016 | Myers et al. |
| 9,364,181 | B2 | 6/2016 | Kiani et al. |
| 9,368,671 | B2 | 6/2016 | Wojtczuk et al. |
| 9,370,325 | B2 | 6/2016 | Al-Ali et al. |
| 9,370,326 | B2 | 6/2016 | McHale et al. |
| 9,370,335 | B2 | 6/2016 | Al-ali et al. |
| 9,375,185 | B2 | 6/2016 | Ali et al. |
| 9,386,953 | B2 | 7/2016 | Al-Ali |
| 9,386,961 | B2 | 7/2016 | Al-Ali et al. |
| 9,392,945 | B2 | 7/2016 | Al-Ali et al. |
| 9,397,448 | B2 | 7/2016 | Al-Ali et al. |
| 9,408,542 | B1 | 8/2016 | Kinast et al. |
| 9,436,645 | B2 | 9/2016 | Al-Ali et al. |
| 9,445,759 | B1 | 9/2016 | Lamego et al. |
| 9,466,919 | B2 | 10/2016 | Kiani et al. |
| 9,474,474 | B2 | 10/2016 | Lamego et al. |
| 9,480,422 | B2 | 11/2016 | Al-Ali |
| 9,480,435 | B2 | 11/2016 | Olsen |
| 9,489,081 | B2 | 11/2016 | Anzures et al. |
| 9,492,110 | B2 | 11/2016 | Al-Ali et al. |
| 9,497,534 | B2 | 11/2016 | Prest et al. |
| 9,510,779 | B2 | 12/2016 | Poeze et al. |
| 9,517,024 | B2 | 12/2016 | Kiani et al. |
| 9,526,430 | B2 | 12/2016 | Srinivas et al. |
| 9,532,722 | B2 | 1/2017 | Lamego et al. |
| 9,538,949 | B2 | 1/2017 | Al-Ali et al. |
| 9,538,980 | B2 | 1/2017 | Telfort et al. |
| 9,549,696 | B2 | 1/2017 | Lamego et al. |
| 9,553,625 | B2 | 1/2017 | Hatanaka et al. |
| 9,554,737 | B2 | 1/2017 | Schurman et al. |
| 9,560,996 | B2 | 2/2017 | Kiani |
| 9,560,998 | B2 | 2/2017 | Al-Ali et al. |
| 9,566,019 | B2 | 2/2017 | Al-Ali et al. |
| 9,579,039 | B2 | 2/2017 | Jansen et al. |
| 9,591,975 | B2 | 3/2017 | Dalvi et al. |
| 9,593,969 | B2 | 3/2017 | King |
| 9,622,692 | B2 | 4/2017 | Lamego et al. |
| 9,622,693 | B2 | 4/2017 | Diab |
| D788,312 | S | 5/2017 | Al-Ali et al. |
| 9,636,055 | B2 | 5/2017 | Al-Ali et al. |
| 9,636,056 | B2 | 5/2017 | Al-Ali |
| 9,649,054 | B2 | 5/2017 | Lamego et al. |
| 9,651,405 | B1 | 5/2017 | Gowreesunker et al. |
| 9,662,052 | B2 | 5/2017 | Al-Ali et al. |
| 9,668,676 | B2 | 6/2017 | Culbert |
| 9,668,679 | B2 | 6/2017 | Schurman et al. |
| 9,668,680 | B2 | 6/2017 | Bruinsma et al. |
| 9,668,703 | B2 | 6/2017 | Al-Ali |
| 9,675,286 | B2 | 6/2017 | Diab |
| 9,687,160 | B2 | 6/2017 | Kiani |
| 9,693,719 | B2 | 7/2017 | Al-Ali et al. |
| 9,693,737 | B2 | 7/2017 | Al-Ali |
| 9,697,928 | B2 | 7/2017 | Al-Ali et al. |
| 9,699,546 | B2 | 7/2017 | Qian et al. |

## US 10,470,695 B2
Page 6

(56)        **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 9,716,937 | B2 | 7/2017 | Qian et al. |
| 9,717,425 | B2 | 8/2017 | Kiani et al. |
| 9,717,458 | B2 | 8/2017 | Lamego et al. |
| 9,723,997 | B1 | 8/2017 | Lamego |
| 9,724,016 | B1 | 8/2017 | Al-Ali et al. |
| 9,724,024 | B2 | 8/2017 | Al-Ali |
| 9,724,025 | B1 | 8/2017 | Kiani et al. |
| 9,730,640 | B2 | 8/2017 | Diab et al. |
| 9,743,887 | B2 | 8/2017 | Al-Ali et al. |
| 9,749,232 | B2 | 8/2017 | Sampath et al. |
| 9,750,442 | B2 | 9/2017 | Olsen |
| 9,750,443 | B2 | 9/2017 | Smith et al. |
| 9,750,461 | B1 | 9/2017 | Telfort |
| 9,775,545 | B2 | 10/2017 | Al-Ali et al. |
| 9,775,546 | B2 | 10/2017 | Diab et al. |
| 9,775,570 | B2 | 10/2017 | Al-Ali |
| 9,778,079 | B1 | 10/2017 | Al-Ali et al. |
| 9,781,984 | B2 | 10/2017 | Baranski et al. |
| 9,782,077 | B2 | 10/2017 | Lamego et al. |
| 9,782,110 | B2 | 10/2017 | Kiani |
| 9,787,568 | B2 | 10/2017 | Lamego et al. |
| 9,788,735 | B2 | 10/2017 | Al-Ali |
| 9,788,768 | B2 | 10/2017 | Al-Ali et al. |
| 9,795,300 | B2 | 10/2017 | Al-Ali |
| 9,795,310 | B2 | 10/2017 | Al-Ali |
| 9,795,358 | B2 | 10/2017 | Telfort et al. |
| 9,795,739 | B2 | 10/2017 | Al-Ali et al. |
| 9,801,556 | B2 | 10/2017 | Kiani |
| 9,801,588 | B2 | 10/2017 | Weber et al. |
| 9,808,188 | B1 | 11/2017 | Perea et al. |
| 9,814,418 | B2 | 11/2017 | Weber et al. |
| 9,820,691 | B2 | 11/2017 | Kiani |
| 9,833,152 | B2 | 12/2017 | Kiani et al. |
| 9,833,180 | B2 | 12/2017 | Shakespeare et al. |
| 9,838,775 | B2 | 12/2017 | Qian et al. |
| 9,839,379 | B2 | 12/2017 | Al-Ali et al. |
| 9,839,381 | B1 | 12/2017 | Weber et al. |
| 9,847,002 | B2 | 12/2017 | Kiani et al. |
| 9,847,749 | B2 | 12/2017 | Kiani et al. |
| 9,848,800 | B1 | 12/2017 | Lee et al. |
| 9,848,806 | B2 | 12/2017 | Al-Ali et al. |
| 9,848,807 | B2 | 12/2017 | Lamego |
| 9,848,823 | B2 | 12/2017 | Raghuram et al. |
| 9,861,298 | B2 | 1/2018 | Eckerbom et al. |
| 9,861,304 | B2 | 1/2018 | Al-Ali et al. |
| 9,861,305 | B1 | 1/2018 | Weber et al. |
| 9,866,671 | B1 | 1/2018 | Thompson et al. |
| 9,867,575 | B2 | 1/2018 | Maani et al. |
| 9,867,578 | B2 | 1/2018 | Al-Ali et al. |
| 9,872,623 | B2 | 1/2018 | Al-Ali |
| 9,876,320 | B2 | 1/2018 | Coverston et al. |
| 9,877,650 | B2 | 1/2018 | Muhsin et al. |
| 9,877,686 | B2 | 1/2018 | Al-Ali et al. |
| 9,891,079 | B2 | 2/2018 | Dalvi |
| 9,895,107 | B2 | 2/2018 | Al-Ali et al. |
| 9,898,049 | B2 | 2/2018 | Myers et al. |
| 9,913,617 | B2 | 3/2018 | Al-Ali et al. |
| 9,918,646 | B2 | 3/2018 | Singh Alvarado et al. |
| 9,924,893 | B2 | 3/2018 | Schurman et al. |
| 9,924,897 | B1 | 3/2018 | Abdul-Hafiz |
| 9,936,917 | B2 | 4/2018 | Poeze et al. |
| 9,943,269 | B2 | 4/2018 | Muhsin et al. |
| 9,949,676 | B2 | 4/2018 | Al-Ali |
| 9,952,095 | B1 | 4/2018 | Hotelling et al. |
| 9,955,937 | B2 | 5/2018 | Telfort |
| 9,965,946 | B2 | 5/2018 | Al-Ali |
| 9,980,667 | B2 | 5/2018 | Kiani et al. |
| D820,865 | S | 6/2018 | Muhsin et al. |
| 9,986,919 | B2 | 6/2018 | Lamego et al. |
| 9,986,952 | B2 | 6/2018 | Dalvi et al. |
| 9,989,560 | B2 | 6/2018 | Poeze et al. |
| 9,993,207 | B2 | 6/2018 | Al-Ali et al. |
| 10,007,758 | B2 | 6/2018 | Al-Ali et al. |
| D822,215 | S | 7/2018 | Al-Ali et al. |
| D822,216 | S | 7/2018 | Barker et al. |
| 10,010,276 | B2 | 7/2018 | Al-Ali et al. |
| 10,032,002 | B2 | 7/2018 | Kiani et al. |
| 10,039,080 | B2 | 7/2018 | Miller et al. |
| 10,039,482 | B2 | 8/2018 | Al-Ali et al. |
| 10,052,037 | B2 | 8/2018 | Kinast et al. |
| 10,055,121 | B2 | 8/2018 | Chaudhri et al. |
| 10,058,275 | B2 | 8/2018 | Al-Ali et al. |
| 10,064,562 | B2 | 9/2018 | Al-Ali |
| 10,066,970 | B2 | 9/2018 | Gowreesunker et al. |
| 10,076,257 | B2 | 9/2018 | Lin et al. |
| 10,078,052 | B2 | 9/2018 | Ness et al. |
| 10,086,138 | B1 | 10/2018 | Novak, Jr. |
| 10,092,200 | B2 | 10/2018 | Al-Ali et al. |
| 10,092,249 | B2 | 10/2018 | Kiani et al. |
| 10,098,550 | B2 | 10/2018 | Al-Ali et al. |
| 10,098,591 | B2 | 10/2018 | Al-Ali et al. |
| 10,098,610 | B2 | 10/2018 | Al-Ali et al. |
| D833,624 | S | 11/2018 | DeJong et al. |
| 10,123,726 | B2 | 11/2018 | Al-Ali et al. |
| 10,130,289 | B2 | 11/2018 | Al-Ali et al. |
| 10,130,291 | B2 | 11/2018 | Schurman et al. |
| D835,282 | S | 12/2018 | Barker et al. |
| D835,283 | S | 12/2018 | Barker et al. |
| D835,284 | S | 12/2018 | Barker et al. |
| D835,285 | S | 12/2018 | Barker et al. |
| 10,149,616 | B2 | 12/2018 | Al-Ali et al. |
| 10,154,815 | B2 | 12/2018 | Al-Ali et al. |
| 10,159,412 | B2 | 12/2018 | Lamego et al. |
| 10,188,296 | B2 | 1/2019 | Al-Ali et al. |
| 10,188,331 | B1 | 1/2019 | Al-Ali et al. |
| 10,188,348 | B2 | 1/2019 | Kiani et al. |
| RE47,218 | E | 2/2019 | Al-Ali |
| RE47,244 | E | 2/2019 | Kiani et al. |
| RE47,249 | E | 2/2019 | Kiani et al. |
| 10,194,847 | B2 | 2/2019 | Al-Ali |
| 10,194,848 | B1 | 2/2019 | Kiani et al. |
| 10,201,298 | B2 | 2/2019 | Al-Ali et al. |
| 10,205,272 | B2 | 2/2019 | Kiani et al. |
| 10,205,291 | B2 | 2/2019 | Scruggs et al. |
| 10,213,108 | B2 | 2/2019 | Al-Ali |
| 10,219,706 | B2 | 3/2019 | Al-Ali |
| 10,219,746 | B2 | 3/2019 | McHale et al. |
| 10,226,187 | B2 | 3/2019 | Al-Ali et al. |
| 10,226,576 | B2 | 3/2019 | Kiani |
| 10,231,657 | B2 | 3/2019 | Al-Ali et al. |
| 10,231,670 | B2 | 3/2019 | Blank et al. |
| 10,231,676 | B2 | 3/2019 | Al-Ali et al. |
| RE47,353 | E | 4/2019 | Kiani et al. |
| 10,251,585 | B2 | 4/2019 | Al-Ali et al. |
| 10,251,586 | B2 | 4/2019 | Lamego |
| 10,255,994 | B2 | 4/2019 | Sampath et al. |
| 10,258,265 | B1 | 4/2019 | Poeze et al. |
| 10,258,266 | B1 | 4/2019 | Poeze et al. |
| 10,271,748 | B2 | 4/2019 | Al-Ali |
| 10,278,626 | B2 | 5/2019 | Schurman et al. |
| 10,278,648 | B2 | 5/2019 | Al-Ali et al. |
| 10,279,247 | B2 | 5/2019 | Kiani |
| 10,292,628 | B1 | 5/2019 | Poeze et al. |
| 10,292,657 | B2 | 5/2019 | Abdul-Hafiz et al. |
| 10,292,664 | B2 | 5/2019 | Al-Ali |
| 10,299,708 | B1 | 5/2019 | Poeze et al. |
| 10,299,709 | B2 | 5/2019 | Perea et al. |
| 10,305,775 | B2 | 5/2019 | Lamego et al. |
| 10,307,111 | B2 | 6/2019 | Muhsin et al. |
| 10,325,681 | B2 | 6/2019 | Sampath et al. |
| 10,327,337 | B2 | 6/2019 | Triman et al. |
| 2002/0042558 | A1 | 4/2002 | Mendelson |
| 2003/0036690 | A1 * | 2/2003 | Geddes ............... A61B 5/02233 600/323 |
| 2004/0054290 | A1 | 3/2004 | Chance |
| 2004/0114783 | A1 | 6/2004 | Spycher et al. |
| 2005/0277819 | A1 | 12/2005 | Kiani et al. |
| 2006/0161054 | A1 | 7/2006 | Reuss et al. |
| 2007/0282478 | A1 | 12/2007 | Al-Ali et al. |
| 2008/0030468 | A1 | 2/2008 | Al-Ali et al. |
| 2009/0247984 | A1 | 10/2009 | Lamego et al. |
| 2009/0275813 | A1 | 11/2009 | Davis |
| 2009/0275844 | A1 | 11/2009 | Al-Ali |
| 2010/0004518 | A1 | 1/2010 | Vo et al. |

**US 10,470,695 B2**

Page 7

(56)                    **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 2010/0030040 A1 | 2/2010 | Poeze et al. |
| 2011/0004106 A1 | 1/2011 | Iwamiya et al. |
| 2011/0082711 A1 | 4/2011 | Poeze et al. |
| 2011/0085721 A1 | 4/2011 | Guyon et al. |
| 2011/0105854 A1 | 5/2011 | Kiani et al. |
| 2011/0125060 A1 | 5/2011 | Telfort et al. |
| 2011/0208015 A1 | 8/2011 | Welch et al. |
| 2011/0213212 A1 | 9/2011 | Al-Ali |
| 2011/0230733 A1 | 9/2011 | Al-Ali |
| 2011/0237969 A1 | 9/2011 | Eckerbom et al. |
| 2011/0288383 A1 | 11/2011 | Diab |
| 2011/0301444 A1 | 12/2011 | Al-Ali |
| 2012/0041316 A1 | 2/2012 | Al-Ali et al. |
| 2012/0046557 A1 | 2/2012 | Kiani |
| 2012/0059267 A1 | 3/2012 | Lamego et al. |
| 2012/0088984 A1 | 4/2012 | Al-Ali et al. |
| 2012/0165629 A1 | 6/2012 | Merritt et al. |
| 2012/0179006 A1 | 7/2012 | Jansen et al. |
| 2012/0209082 A1 | 8/2012 | Al-Ali |
| 2012/0209084 A1 | 8/2012 | Olsen et al. |
| 2012/0283524 A1 | 11/2012 | Kiani et al. |
| 2012/0296178 A1 | 11/2012 | Lamego et al. |
| 2012/0319816 A1 | 12/2012 | Al-Ali |
| 2012/0330112 A1 | 12/2012 | Lamego et al. |
| 2013/0006076 A1 | 1/2013 | McHale |
| 2013/0023775 A1 | 1/2013 | Lamego et al. |
| 2013/0041591 A1 | 2/2013 | Lamego |
| 2013/0046204 A1 | 2/2013 | Lamego et al. |
| 2013/0060147 A1 | 3/2013 | Welch et al. |
| 2013/0096405 A1 | 4/2013 | Garfio |
| 2013/0096936 A1 | 4/2013 | Sampath et al. |
| 2013/0190581 A1 | 7/2013 | Al-Ali et al. |
| 2013/0211214 A1 | 8/2013 | Olsen |
| 2013/0243021 A1 | 9/2013 | Siskavich |
| 2013/0253334 A1 | 9/2013 | Al-Ali et al. |
| 2013/0262730 A1 | 10/2013 | Al-Ali et al. |
| 2013/0267804 A1 | 10/2013 | Al-Ali |
| 2013/0274572 A1 | 10/2013 | Al-Ali et al. |
| 2013/0296672 A1 | 11/2013 | O'Neil et al. |
| 2013/0296713 A1 | 11/2013 | Al-Ali et al. |
| 2013/0317370 A1 | 11/2013 | Dalvi et al. |
| 2013/0324808 A1 | 12/2013 | Al-Ali et al. |
| 2013/0331660 A1 | 12/2013 | Al-Ali et al. |
| 2013/0331670 A1 | 12/2013 | Kiani |
| 2014/0012100 A1 | 1/2014 | Al-Ali et al. |
| 2014/0034353 A1 | 2/2014 | Al-Ali et al. |
| 2014/0051953 A1 | 2/2014 | Lamego et al. |
| 2014/0066783 A1 | 3/2014 | Kiani et al. |
| 2014/0077956 A1 | 3/2014 | Sampath et al. |
| 2014/0081100 A1 | 3/2014 | Muhsin et al. |
| 2014/0081175 A1 | 3/2014 | Telfort |
| 2014/0094667 A1 | 4/2014 | Schurman et al. |
| 2014/0100434 A1 | 4/2014 | Diab et al. |
| 2014/0114199 A1 | 4/2014 | Lamego et al. |
| 2014/0120564 A1 | 5/2014 | Workman et al. |
| 2014/0121482 A1 | 5/2014 | Merritt et al. |
| 2014/0121483 A1 | 5/2014 | Kiani |
| 2014/0127137 A1 | 5/2014 | Bellott et al. |
| 2014/0129702 A1 | 5/2014 | Lamego et al. |
| 2014/0135588 A1 | 5/2014 | Al-Ali et al. |
| 2014/0142401 A1 | 5/2014 | Al-Ali et al. |
| 2014/0163344 A1 | 6/2014 | Al-Ali |
| 2014/0163402 A1 | 6/2014 | Lamego et al. |
| 2014/0166076 A1 | 6/2014 | Kiani et al. |
| 2014/0171146 A1 | 6/2014 | Ma et al. |
| 2014/0171763 A1 | 6/2014 | Diab |
| 2014/0180038 A1 | 6/2014 | Kiani |
| 2014/0180154 A1 | 6/2014 | Sierra et al. |
| 2014/0180160 A1 | 6/2014 | Brown et al. |
| 2014/0187973 A1 | 7/2014 | Brown et al. |
| 2014/0194766 A1 | 7/2014 | Al-Ali et al. |
| 2014/0206963 A1 | 7/2014 | Al-Ali |
| 2014/0213864 A1 | 7/2014 | Abdul-Hafiz et al. |
| 2014/0266790 A1 | 9/2014 | Al-Ali et al. |
| 2014/0275808 A1 | 9/2014 | Poeze et al. |
| 2014/0275835 A1 | 9/2014 | Lamego et al. |
| 2014/0275871 A1 | 9/2014 | Lamego et al. |
| 2014/0275872 A1 | 9/2014 | Merritt et al. |
| 2014/0275881 A1 | 9/2014 | Lamego et al. |
| 2014/0276115 A1 | 9/2014 | Dalvi et al. |
| 2014/0288400 A1 | 9/2014 | Diab et al. |
| 2014/0303520 A1 | 10/2014 | Telfort et al. |
| 2014/0316217 A1 | 10/2014 | Purdon et al. |
| 2014/0316218 A1 | 10/2014 | Purdon et al. |
| 2014/0316228 A1 | 10/2014 | Blank et al. |
| 2014/0323825 A1 | 10/2014 | Al-Ali et al. |
| 2014/0323897 A1 | 10/2014 | Brown et al. |
| 2014/0323898 A1 | 10/2014 | Purdon et al. |
| 2014/0330092 A1 | 11/2014 | Al-Ali et al. |
| 2014/0330098 A1 | 11/2014 | Merritt et al. |
| 2014/0330099 A1 | 11/2014 | Al-Ali et al. |
| 2014/0336481 A1 | 11/2014 | Shakespeare et al. |
| 2014/0357966 A1 | 12/2014 | Al-Ali et al. |
| 2014/0371548 A1 | 12/2014 | Al-Ali et al. |
| 2014/0371632 A1 | 12/2014 | Al-Ali et al. |
| 2014/0378784 A1 | 12/2014 | Kiani et al. |
| 2015/0005600 A1 | 1/2015 | Blank et al. |
| 2015/0011907 A1 | 1/2015 | Purdon et al. |
| 2015/0012231 A1 | 1/2015 | Poeze et al. |
| 2015/0018650 A1 | 1/2015 | Al-Ali et al. |
| 2015/0025406 A1 | 1/2015 | Al-Ali |
| 2015/0032029 A1 | 1/2015 | Al-Ali et al. |
| 2015/0038859 A1 | 2/2015 | Dalvi et al. |
| 2015/0045637 A1 | 2/2015 | Dalvi |
| 2015/0045685 A1 | 2/2015 | Al-Ali et al. |
| 2015/0051462 A1 | 2/2015 | Olsen |
| 2015/0080754 A1 | 3/2015 | Purdon et al. |
| 2015/0087936 A1 | 3/2015 | Al-Ali et al. |
| 2015/0094546 A1 | 4/2015 | Al-Ali |
| 2015/0097701 A1 | 4/2015 | Al-Ali et al. |
| 2015/0099324 A1 | 4/2015 | Wojtczuk et al. |
| 2015/0099950 A1 | 4/2015 | Al-Ali et al. |
| 2015/0099951 A1 | 4/2015 | Al-Ali et al. |
| 2015/0099955 A1 | 4/2015 | Al-Ali et al. |
| 2015/0101844 A1 | 4/2015 | Al-Ali et al. |
| 2015/0106121 A1 | 4/2015 | Muhsin et al. |
| 2015/0112151 A1 | 4/2015 | Muhsin et al. |
| 2015/0116076 A1 | 4/2015 | Al-Ali et al. |
| 2015/0126830 A1 | 5/2015 | Schurman et al. |
| 2015/0133755 A1 | 5/2015 | Smith et al. |
| 2015/0140863 A1 | 5/2015 | Al-Ali et al. |
| 2015/0141781 A1 | 5/2015 | Weber et al. |
| 2015/0165312 A1 | 6/2015 | Kiani |
| 2015/0173671 A1 | 6/2015 | Paalasmaa et al. |
| 2015/0196237 A1 | 7/2015 | Lamego |
| 2015/0201874 A1 | 7/2015 | Diab |
| 2015/0208966 A1 | 7/2015 | Al-Ali |
| 2015/0216459 A1 | 8/2015 | Al-Ali et al. |
| 2015/0230755 A1 | 8/2015 | Al-Ali et al. |
| 2015/0238722 A1 | 8/2015 | Al-Ali |
| 2015/0245773 A1 | 9/2015 | Lamego et al. |
| 2015/0245793 A1 | 9/2015 | Al-Ali et al. |
| 2015/0245794 A1 | 9/2015 | Al-Ali |
| 2015/0255001 A1 | 9/2015 | Haughav et al. |
| 2015/0257689 A1 | 9/2015 | Al-Ali et al. |
| 2015/0272514 A1 | 10/2015 | Kiani et al. |
| 2015/0281424 A1 | 10/2015 | Vock et al. |
| 2015/0318100 A1 | 11/2015 | Rothkopf et al. |
| 2015/0351697 A1 | 12/2015 | Weber et al. |
| 2015/0351704 A1 | 12/2015 | Kiani et al. |
| 2015/0359429 A1 | 12/2015 | Al-Ali et al. |
| 2015/0366472 A1 | 12/2015 | Kiani |
| 2015/0366507 A1 | 12/2015 | Blank |
| 2015/0374298 A1 | 12/2015 | Al-Ali et al. |
| 2015/0380875 A1 | 12/2015 | Coverston et al. |
| 2016/0000362 A1 | 1/2016 | Diab et al. |
| 2016/0007930 A1 | 1/2016 | Weber et al. |
| 2016/0019360 A1 | 1/2016 | Pahwa et al. |
| 2016/0023245 A1 | 1/2016 | Zadesky et al. |
| 2016/0029932 A1 | 2/2016 | Al-Ali |
| 2016/0029933 A1 | 2/2016 | Al-Ali et al. |
| 2016/0038045 A1 | 2/2016 | Shapiro |
| 2016/0045118 A1 | 2/2016 | Kiani |
| 2016/0051157 A1 | 2/2016 | Waydo |

**Appx0136**

US 10,470,695 B2

Page 8

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 2016/0051158 A1 | 2/2016 | Silva |
| 2016/0051205 A1 | 2/2016 | Al-Ali et al. |
| 2016/0058302 A1 | 3/2016 | Raghuram et al. |
| 2016/0058309 A1 | 3/2016 | Han |
| 2016/0058312 A1 | 3/2016 | Han et al. |
| 2016/0058338 A1 | 3/2016 | Schurman et al. |
| 2016/0058347 A1 | 3/2016 | Reichgott et al. |
| 2016/0058356 A1 | 3/2016 | Raghuram et al. |
| 2016/0058370 A1 | 3/2016 | Raghuram et al. |
| 2016/0066823 A1 | 3/2016 | Kind et al. |
| 2016/0066824 A1 | 3/2016 | Al-Ali et al. |
| 2016/0066879 A1 | 3/2016 | Telfort et al. |
| 2016/0071392 A1 | 3/2016 | Hankey et al. |
| 2016/0072129 A1 | 3/2016 | Kiani et al. |
| 2016/0073967 A1 | 3/2016 | Lamego et al. |
| 2016/0081552 A1 | 3/2016 | Wojtczuk et al. |
| 2016/0095543 A1 | 4/2016 | Telfort et al. |
| 2016/0095548 A1 | 4/2016 | Al-Ali et al. |
| 2016/0103598 A1 | 4/2016 | Al-Ali et al. |
| 2016/0113527 A1 | 4/2016 | Al-Ali et al. |
| 2016/0143548 A1 | 5/2016 | Al-Ali |
| 2016/0154950 A1 | 6/2016 | Nakajima et al. |
| 2016/0157780 A1 | 6/2016 | Rimminen et al. |
| 2016/0166182 A1 | 6/2016 | Al-Ali et al. |
| 2016/0166183 A1 | 6/2016 | Poeze et al. |
| 2016/0196388 A1 | 7/2016 | Lamego |
| 2016/0197436 A1 | 7/2016 | Barker et al. |
| 2016/0213281 A1 | 7/2016 | Eckerbom et al. |
| 2016/0213309 A1 | 7/2016 | Sannholm et al. |
| 2016/0228043 A1 | 8/2016 | O'Neil et al. |
| 2016/0233632 A1 | 8/2016 | Scruggs et al. |
| 2016/0234944 A1 | 8/2016 | Schmidt et al. |
| 2016/0256058 A1 | 9/2016 | Pham et al. |
| 2016/0256082 A1 | 9/2016 | Ely et al. |
| 2016/0267238 A1 | 9/2016 | Nag |
| 2016/0270735 A1 | 9/2016 | Diab et al. |
| 2016/0283665 A1 | 9/2016 | Sampath et al. |
| 2016/0287090 A1 | 10/2016 | Al-Ali et al. |
| 2016/0287181 A1 | 10/2016 | Han et al. |
| 2016/0287786 A1 | 10/2016 | Kiani |
| 2016/0296169 A1 | 10/2016 | McHale et al. |
| 2016/0296173 A1 | 10/2016 | Culbert |
| 2016/0296174 A1 | 10/2016 | Isikman et al. |
| 2016/0310027 A1 | 10/2016 | Han |
| 2016/0310052 A1 | 10/2016 | Al-Ali et al. |
| 2016/0314260 A1 | 10/2016 | Kiani |
| 2016/0324488 A1 | 11/2016 | Olsen |
| 2016/0327984 A1 | 11/2016 | Al-Ali et al. |
| 2016/0331332 A1 | 11/2016 | Al-Ali |
| 2016/0367173 A1 | 12/2016 | Dalvi et al. |
| 2016/0378069 A1 | 12/2016 | Rothkopf |
| 2016/0378071 A1 | 12/2016 | Rothkopf |
| 2017/0000394 A1 | 1/2017 | Al-Ali et al. |
| 2017/0007134 A1 | 1/2017 | Al-Ali et al. |
| 2017/0007183 A1 | 1/2017 | Dusan et al. |
| 2017/0007198 A1 | 1/2017 | Al-Ali et al. |
| 2017/0010858 A1 | 1/2017 | Prest et al. |
| 2017/0014083 A1 | 1/2017 | Diab et al. |
| 2017/0014084 A1 | 1/2017 | Al-Ali et al. |
| 2017/0024748 A1 | 1/2017 | Haider |
| 2017/0042488 A1 | 2/2017 | Muhsin |
| 2017/0055851 A1 | 3/2017 | Al-Ali |
| 2017/0055882 A1 | 3/2017 | Al-Ali et al. |
| 2017/0055887 A1 | 3/2017 | Al-Ali |
| 2017/0055896 A1 | 3/2017 | Al-Ali et al. |
| 2017/0074897 A1 | 3/2017 | Mermel et al. |
| 2017/0079594 A1 | 3/2017 | Telfort et al. |
| 2017/0084133 A1 | 3/2017 | Cardinali et al. |
| 2017/0086689 A1 | 3/2017 | Shui et al. |
| 2017/0086723 A1 | 3/2017 | Al-Ali et al. |
| 2017/0086742 A1 | 3/2017 | Harrison-Noonan et al. |
| 2017/0086743 A1 | 3/2017 | Bushnell et al. |
| 2017/0094450 A1 | 3/2017 | Tu et al. |
| 2017/0143281 A1 | 5/2017 | Olsen |
| 2017/0147774 A1 | 5/2017 | Kiani |
| 2017/0156620 A1 | 6/2017 | Al-Ali et al. |
| 2017/0164884 A1 | 6/2017 | Culbert et al. |
| 2017/0173632 A1 | 6/2017 | Al-Ali |
| 2017/0187146 A1 | 6/2017 | Kiani et al. |
| 2017/0188919 A1 | 7/2017 | Al-Ali et al. |
| 2017/0196464 A1 | 7/2017 | Jansen et al. |
| 2017/0196470 A1 | 7/2017 | Lamego et al. |
| 2017/0224262 A1 | 8/2017 | Al-Ali |
| 2017/0228516 A1 | 8/2017 | Sampath et al. |
| 2017/0245790 A1 | 8/2017 | Al-Ali et al. |
| 2017/0248446 A1 | 8/2017 | Gowreesunker et al. |
| 2017/0251974 A1 | 9/2017 | Shreim et al. |
| 2017/0251975 A1 | 9/2017 | Shreim et al. |
| 2017/0258403 A1 | 9/2017 | Abdul-Hafiz et al. |
| 2017/0273619 A1 | 9/2017 | Alvarado et al. |
| 2017/0281024 A1 | 10/2017 | Narasimhan et al. |
| 2017/0293727 A1 | 10/2017 | Klaassen et al. |
| 2017/0311851 A1 | 11/2017 | Schurman et al. |
| 2017/0311891 A1 | 11/2017 | Kiani et al. |
| 2017/0325698 A1 | 11/2017 | Allec et al. |
| 2017/0325728 A1 | 11/2017 | Al-Ali et al. |
| 2017/0325744 A1 | 11/2017 | Allec et al. |
| 2017/0332976 A1 | 11/2017 | Al-Ali et al. |
| 2017/0340209 A1 | 11/2017 | Klaassen et al. |
| 2017/0340219 A1 | 11/2017 | Sullivan et al. |
| 2017/0340293 A1 | 11/2017 | Al-Ali et al. |
| 2017/0347885 A1 | 12/2017 | Tan et al. |
| 2017/0354332 A1 | 12/2017 | Lamego |
| 2017/0354795 A1 | 12/2017 | Blahnik et al. |
| 2017/0358239 A1 | 12/2017 | Arney et al. |
| 2017/0358240 A1 | 12/2017 | Blahnik et al. |
| 2017/0358242 A1 | 12/2017 | Thompson et al. |
| 2017/0360306 A1 | 12/2017 | Narasimhan et al. |
| 2017/0360310 A1 | 12/2017 | Kiani et al. |
| 2017/0366657 A1 | 12/2017 | Thompson et al. |
| 2017/0367632 A1 | 12/2017 | Al-Ali et al. |
| 2018/0008146 A1 | 1/2018 | Al-Ali et al. |
| 2018/0013562 A1 | 1/2018 | Haider et al. |
| 2018/0014752 A1 | 1/2018 | Al-Ali et al. |
| 2018/0014781 A1 | 1/2018 | Clavelle et al. |
| 2018/0025287 A1 | 1/2018 | Mathew et al. |
| 2018/0028124 A1 | 2/2018 | Al-Ali et al. |
| 2018/0042556 A1 | 2/2018 | Shahparnia et al. |
| 2018/0049694 A1 | 2/2018 | Singh Alvarado et al. |
| 2018/0050235 A1 | 2/2018 | Tan et al. |
| 2018/0055375 A1 | 3/2018 | Martinez et al. |
| 2018/0055385 A1 | 3/2018 | Al-Ali |
| 2018/0055390 A1 | 3/2018 | Kiani et al. |
| 2018/0055430 A1 | 3/2018 | Diab et al. |
| 2018/0055439 A1 | 3/2018 | Pham et al. |
| 2018/0056129 A1 | 3/2018 | Narasimha Rao et al. |
| 2018/0064381 A1 | 3/2018 | Shakespeare et al. |
| 2018/0069776 A1 | 3/2018 | Lamego et al. |
| 2018/0070867 A1 | 3/2018 | Smith et al. |
| 2018/0078151 A1 | 3/2018 | Allec et al. |
| 2018/0078182 A1 | 3/2018 | Chen et al. |
| 2018/0082767 A1 | 3/2018 | Al-Ali et al. |
| 2018/0085068 A1 | 3/2018 | Telfort |
| 2018/0087937 A1 | 3/2018 | Al-Ali et al. |
| 2018/0103874 A1 | 4/2018 | Lee et al. |
| 2018/0103905 A1 | 4/2018 | Kiani |
| 2018/0110469 A1 | 4/2018 | Maani et al. |
| 2018/0110478 A1 | 4/2018 | Al-Ali |
| 2018/0116575 A1 | 5/2018 | Perea et al. |
| 2018/0125368 A1 | 5/2018 | Lamego et al. |
| 2018/0125430 A1 | 5/2018 | Al-Ali et al. |
| 2018/0125445 A1 | 5/2018 | Telfort et al. |
| 2018/0130325 A1 | 5/2018 | Kiani et al. |
| 2018/0132769 A1 | 5/2018 | Weber et al. |
| 2018/0132770 A1 | 5/2018 | Lamego |
| 2018/0146901 A1 | 5/2018 | Al-Ali et al. |
| 2018/0146902 A1 | 5/2018 | Kiani et al. |
| 2018/0153418 A1 | 6/2018 | Sullivan et al. |
| 2018/0153442 A1 | 6/2018 | Eckerbom et al. |
| 2018/0153446 A1 | 6/2018 | Kiani |
| 2018/0153447 A1 | 6/2018 | Al-Ali et al. |
| 2018/0153448 A1 | 6/2018 | Weber et al. |
| 2018/0161499 A1 | 6/2018 | Al-Ali et al. |
| 2018/0164853 A1 | 6/2018 | Myers et al. |

Appx0137

(56)        **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2018/0168491 | A1 | 6/2018 | Al-Ali et al. |
| 2018/0174679 | A1 | 6/2018 | Sampath et al. |
| 2018/0174680 | A1 | 6/2018 | Sampath et al. |
| 2018/0182484 | A1 | 6/2018 | Sampath et al. |
| 2018/0184917 | A1 | 7/2018 | Kiani |
| 2018/0192924 | A1 | 7/2018 | Al-Ali |
| 2018/0192953 | A1 | 7/2018 | Shreim et al. |
| 2018/0192955 | A1 | 7/2018 | Al-Ali et al. |
| 2018/0196514 | A1 | 7/2018 | Allec et al. |
| 2018/0199871 | A1 | 7/2018 | Pauley et al. |
| 2018/0206795 | A1 | 7/2018 | Al-Ali |
| 2018/0206815 | A1 | 7/2018 | Telfort |
| 2018/0213583 | A1 | 7/2018 | Al-Ali |
| 2018/0214031 | A1 | 8/2018 | Kiani et al. |
| 2018/0214090 | A1 | 8/2018 | Al-Ali et al. |
| 2018/0218792 | A1 | 8/2018 | Muhsin et al. |
| 2018/0225960 | A1 | 8/2018 | Al-Ali et al. |
| 2018/0228414 | A1 | 8/2018 | Shao et al. |
| 2018/0238718 | A1 | 8/2018 | Dalvi |
| 2018/0238734 | A1 | 8/2018 | Hotelling et al. |
| 2018/0242853 | A1 | 8/2018 | Al-Ali |
| 2018/0242921 | A1 | 8/2018 | Muhsin et al. |
| 2018/0242923 | A1 | 8/2018 | Al-Ali et al. |
| 2018/0242924 | A1 | 8/2018 | Barker et al. |
| 2018/0242926 | A1 | 8/2018 | Muhsin et al. |
| 2018/0247353 | A1 | 8/2018 | Al-Ali et al. |
| 2018/0247712 | A1 | 8/2018 | Muhsin et al. |
| 2018/0249933 | A1 | 9/2018 | Schurman et al. |
| 2018/0253947 | A1 | 9/2018 | Muhsin et al. |
| 2018/0256087 | A1 | 9/2018 | Ai-Ali et al. |
| 2018/0256113 | A1 | 9/2018 | Weber et al. |
| 2018/0279956 | A1 | 10/2018 | Waydo et al. |
| 2018/0285094 | A1 | 10/2018 | Housel et al. |
| 2018/0289325 | A1 | 10/2018 | Poeze et al. |
| 2018/0289337 | A1 | 10/2018 | Ai-Ali et al. |
| 2018/0296161 | A1 | 10/2018 | Shreim et al. |
| 2018/0300919 | A1 | 10/2018 | Muhsin et al. |
| 2018/0310822 | A1 | 11/2018 | Indorf et al. |
| 2018/0310823 | A1 | 11/2018 | Ai-Ali et al. |
| 2018/0317826 | A1 | 11/2018 | Muhsin |
| 2018/0317841 | A1 | 11/2018 | Novak, Jr. |
| 2018/0333055 | A1 | 11/2018 | Lamego et al. |
| 2018/0333087 | A1 | 11/2018 | Al-Ali |
| 2019/0000317 | A1 | 1/2019 | Muhsin et al. |
| 2019/0000362 | A1 | 1/2019 | Kiani et al. |
| 2019/0015023 | A1 | 1/2019 | Monfre |
| 2019/0021638 | A1 | 1/2019 | Ai-Ali et al. |
| 2019/0029574 | A1 | 1/2019 | Schurman et al. |
| 2019/0029578 | A1 | 1/2019 | Ai-Ali et al. |
| 2019/0038143 | A1 | 2/2019 | Ai-Ali |
| 2019/0058280 | A1 | 2/2019 | Ai-Ali et al. |
| 2019/0058281 | A1 | 2/2019 | Ai-Ali et al. |
| 2019/0069813 | A1 | 3/2019 | Ai-Ali |
| 2019/0069814 | A1 | 3/2019 | Al-Ali |
| 2019/0076028 | A1 | 3/2019 | Ai-Ali et al. |
| 2019/0082979 | A1 | 3/2019 | Ai-Ali et al. |
| 2019/0090748 | A1 | 3/2019 | Ai-Ali |
| 2019/0090760 | A1 | 3/2019 | Kinast et al. |
| 2019/0090764 | A1 | 3/2019 | Al-Ali |
| 2019/0104973 | A1 | 4/2019 | Poeze et al. |
| 2019/0110719 | A1 | 4/2019 | Poeze et al. |
| 2019/0117070 | A1 | 4/2019 | Muhsin et al. |
| 2019/0117139 | A1 | 4/2019 | Al-Ali et al. |
| 2019/0117140 | A1 | 4/2019 | Al-Ali et al. |
| 2019/0117141 | A1 | 4/2019 | Al-Ali |
| 2019/0117930 | A1 | 4/2019 | Al-Ali |
| 2019/0122763 | A1 | 4/2019 | Sampath et al. |
| 2019/0133525 | A1 | 5/2019 | Al-Ali et al. |
| 2019/0142283 | A1 | 5/2019 | Lamego et al. |
| 2019/0142344 | A1 | 5/2019 | Telfort et al. |
| 2019/0150800 | A1 | 5/2019 | Poeze et al. |
| 2019/0150856 | A1 | 5/2019 | Kiani et al. |
| 2019/0167161 | A1 | 6/2019 | Al-Ali et al. |
| 2019/0175019 | A1 | 6/2019 | Al-Ali et al. |
| 2019/0192076 | A1 | 6/2019 | McHale et al. |

OTHER PUBLICATIONS

Written Opinion received in International Application No. PCT/US2016/040190, dated Jan. 2, 2018.
Konig, V. et al., "Reflectance Pulse Oximetry—Principles and Obstetric Application in the Zurich System," J Clin Monit 1998; 14: 403-412.

* cited by examiner



FIG. I
(PRIOR ART)

FIG. 2



FIG. 3



FIG. 4A



FIG. 4B



FIG. 5



FIG. 7A

FIG. 6
(PRIOR ART)



FIG. 7B



FIG. 8

US 10,470,695 B2

1

# ADVANCED PULSE OXIMETRY SENSOR

## INCORPORATION BY REFERENCE TO ANY PRIORITY APPLICATIONS

The present application is a continuation of U.S. patent application Ser. No. 15/195,199 filed Jun. 28, 2016, which claims priority benefit under 35 U.S.C. § 119(e) from U.S. Provisional Application No. 62/188,430, filed Jul. 2, 2015, entitled "Advanced Pulse Oximetry Sensor," which is incorporated by reference herein. Any and all applications for which a foreign or domestic priority claim is identified in the Application Data Sheet as filed with the present application are hereby incorporated by reference under 37 CFR 1.57.

## FIELD OF THE DISCLOSURE

The present disclosure relates to the field of non-invasive optical-based physiological monitoring sensors, and more particularly to systems, devices and methods for improving the non-invasive measurement accuracy of oxygen saturation, among other physiological parameters.

## BACKGROUND

Spectroscopy is a common technique for measuring the concentration of organic and some inorganic constituents of a solution. The theoretical basis of this technique is the Beer-Lambert law, which states that the concentration $c_i$ of an absorbent in solution can be determined by the intensity of light transmitted through the solution, knowing the pathlength $d_\lambda$, the intensity of the incident light $I_{0,\lambda}$, and the extinction coefficient $\varepsilon_{i,\lambda}$ at a particular wavelength $\lambda$.

In generalized form, the Beer-Lambert law is expressed as:

$$I_\lambda = I_{0,\lambda} e^{-d_\lambda \cdot \mu_{a,\lambda}} \tag{1}$$

$$\mu_{a,\lambda} = \sum_{i=1}^{n} \varepsilon_{i,\lambda} \cdot c_i \tag{2}$$

where $\mu_{a,\lambda}$ is the bulk absorption coefficient and represents the probability of absorption per unit length. The minimum number of discrete wavelengths that are required to solve equations 1 and 2 is the number of significant absorbers that are present in the solution.

A practical application of this technique is pulse oximetry, which utilizes a noninvasive sensor to measure oxygen saturation and pulse rate, among other physiological parameters. Pulse oximetry relies on a sensor attached externally to the patient to output signals indicative of various physiological parameters, such as a patient's blood constituents and/or analytes, including for example a percent value for arterial oxygen saturation, among other physiological parameters. The sensor has an emitter that transmits optical radiation of one or more wavelengths into a tissue site and a detector that responds to the intensity of the optical radiation after absorption by pulsatile arterial blood flowing within the tissue site. Based upon this response, a processor determines the relative concentrations of oxygenated hemoglobin (HbO₂) and deoxygenated hemoglobin (Hb) in the blood so as to derive oxygen saturation, which can provide early detection of potentially hazardous decreases in a patient's oxygen supply.

2

A pulse oximetry system generally includes a patient monitor, a communications medium such as a cable, and/or a physiological sensor having one or more light emitters and a detector, such as one or more light-emitting diodes (LEDs) and a photodetector. The sensor is attached to a tissue site, such as a finger, toe, earlobe, nose, hand, foot, or other site having pulsatile blood flow which can be penetrated by light from the one or more emitters. The detector is responsive to the emitted light after attenuation or reflection by pulsatile blood flowing in the tissue site. The detector outputs a detector signal to the monitor over the communication medium. The monitor processes the signal to provide a numerical readout of physiological parameters such as oxygen saturation (SpO2) and/or pulse rate. A pulse oximetry sensor is described in U.S. Pat. No. 6,088,607 entitled Low Noise Optical Probe; pulse oximetry signal processing is described in U.S. Pat. Nos. 6,650,917 and 6,699,194 entitled Signal Processing Apparatus and Signal Processing Apparatus and Method, respectively; a pulse oximeter monitor is described in U.S. Pat. No. 6,584,336 entitled Universal/Upgrading Pulse Oximeter; all of which are assigned to Masimo Corporation, Irvine, Calif., and each is incorporated by reference herein in its entirety.

There are many sources of measurement error introduced to pulse oximetry systems. Some such sources of error include the pulse oximetry system's electronic components, including emitters and detectors, as well as chemical and structural physiological differences between patients. Another source of measurement error is the effect of multiple scattering of photons as the photons pass through the patient's tissue (arterial blood) and arrive at the sensor's light detector.

## SUMMARY

This disclosure describes embodiments of non-invasive methods, devices, and systems for measuring blood constituents, analytes, and/or substances such as, by way of non-limiting example, oxygen, carboxyhemoglobin, methemoglobin, total hemoglobin, glucose, proteins, lipids, a percentage thereof (e.g., saturation), pulse rate, perfusion index, oxygen content, total hemoglobin, Oxygen Reserve Index™ (ORI™) or for measuring many other physiologically relevant patient characteristics. These characteristics can relate to, for example, pulse rate, hydration, trending information and analysis, and the like.

In an embodiment, an optical physiological measurement system includes an emitter configured to emit light of one or more wavelengths. The system also includes a diffuser configured to receive the emitted light, to spread the received light, and to emit the spread light over a larger tissue area than would otherwise be penetrated by the emitter directly emitting light at a tissue measurement site. The tissue measurement site can include, such as, for example, a finger, a wrist, or the like. The system further includes a concentrator configured to receive the spread light after it has been attenuated by or reflected from the tissue measurement site. The concentrator is also configured to collect and concentrate the received light and to emit the concentrated light to a detector. The detector is configured to detect the concentrated light and to transmit a signal indicative of the detected light. The system also includes a processor configured to receive the transmitted signal indicative of the detected light and to determine, based on an amount of absorption, an analyte of interest, such as, for example, arterial oxygen saturation or other parameter, in the tissue measurement site.

17

US 10,470,695 B2

3

In certain embodiments of the present disclosure, the diffuser comprises glass, ground glass, glass beads, opal glass, or a microlens-based, band-limited, engineered diffuser that can deliver efficient and uniform illumination. In some embodiments the diffuser is further configured to define a surface area shape by which the emitted spread light is distributed onto a surface of the tissue measurement site. The defined surface area shape can include, by way of non-limiting example, a shape that is substantially rectangular, square, circular, oval, or annular, among others.

According to some embodiments, the optical physiological measurement system includes an optical filter having a light-absorbing surface that faces the tissue measurement site. The optical filter also has an opening that is configured to allow the spread light, after being attenuated by the tissue measurement site, to be received by the concentrator. In an embodiment, the opening has dimensions, wherein the dimensions of the opening are similar to the defined surface area shape by which the emitted spread light is distributed onto the surface of the tissue measurement site. In an embodiment, the opening has dimensions that are larger than the defined surface area shape by which the emitted spread light is distributed onto the surface of the tissue measurement site. In other embodiments, the dimensions of the opening in the optical filter are not the same as the diffuser opening, but the dimensions are larger than the detector package.

In other embodiments of the present disclosure, the concentrator comprises glass, ground glass, glass beads, opal glass, or a compound parabolic concentrator. In some embodiments the concentrator comprises a cylindrical structure having a truncated circular conical structure on top. The truncated section is adjacent the detector. The light concentrator is structured to receive the emitted optical radiation, after reflection by the tissue measurement site, and to direct the reflected light to the detector.

In accordance with certain embodiments of the present disclosure, the processor is configured to determine an average level of the light detected by the detector. The average level of light is used to determine a physiological parameter in the tissue measurement site.

According to another embodiment, a method to determine a constituent or analyte in a patient's blood is disclosed. The method includes emitting, from an emitter, light of at least one wavelength; spreading, with a diffuser, the emitted light and emitting the spread light from the diffuser to a tissue measurement site; receiving, by a concentrator, the spread light after the spread light has been attenuated by the tissue measurement site; concentrating, by the concentrator, the received light and emitting the concentrated light from the concentrator to a detector; detecting, with the detector, the emitted concentrated light; transmitting, from the detector, a signal responsive to the detected light; receiving, by a processor, the transmitted signal responsive to the detected light; and processing, by the processor, the received signal responsive to the detected light to determine a physiological parameter.

In some embodiments, the method to determine a constituent or analyte in a patient's blood includes filtering, with a light-absorbing detector filter, scattered portions of the emitted spread light. According to an embodiment, the light-absorbing detector filter is substantially rectangular in shape and has outer dimensions in the range of approximately 1-5 cm in width and approximately 2-8 cm in length, and has an opening through which emitted light may pass, the opening having dimensions in the range of approximately 0.25-3 cm in width and approximately 1-7 cm in

4

length. In another embodiment, the light-absorbing detector filter is substantially square in shape and has outer dimensions in the range of approximately 0.25-10 cm$^2$, and has an opening through which emitted light may pass, the opening having dimensions in the range of approximately 0.1-8 cm$^2$. In yet another embodiment, the light-absorbing detector filter is substantially rectangular in shape and has outer dimensions of approximately 3 cm in width and approximately 6 cm in length, and has an opening through which emitted light may pass, the opening having dimensions of approximately 1.5 cm in width and approximately 4 cm in length.

In still other embodiments of the method to determine a constituent or analyte in a patient's blood, spreading, with a diffuser, the emitted light and emitting the spread light from the diffuser to a tissue measurement site is performed by at least one of a glass diffuser, a ground glass diffuser, a glass bead diffuser, an opal glass diffuser, and an engineered diffuser. In some embodiments the emitted spread light is emitted with a substantially uniform intensity profile. And in some embodiments, emitting the spread light from the diffuser to the tissue measurement site includes spreading the emitted light so as to define a surface area shape by which the emitted spread light is distributed onto a surface of the tissue measurement site.

According to yet another embodiment, a pulse oximeter is disclosed. The pulse oximeter includes an emitter configured to emit light at one or more wavelengths. The pulse oximeter also includes a diffuser configured to receive the emitted light, to spread the received light, and to emit the spread light directed at a tissue measurement sight. The pulse oximeter also includes a detector configured to detect the emitted spread light after being attenuated by or reflected from the tissue measurement site and to transmit a signal indicative of the detected light. The pulse oximeter also includes a processor configured to receive the transmitted signal and to process the received signal to determine an average absorbance of a blood constituent or analyte in the tissue measurement site over a larger measurement site area than can be performed with a point light source or point detector. In some embodiments, the diffuser is further configured to define a surface area shape by which the emitted spread light is distributed onto a surface of the tissue measurement site, and the detector is further configured to have a detection area corresponding to the defined surface area shape by which the emitted spread light is distributed onto the surface of the tissue measurement site. According to some embodiments, the detector comprises an array of detectors configured to cover the detection area. In still other embodiments, the processor is further configured to determine an average of the detected light.

For purposes of summarizing, certain aspects, advantages and novel features of the disclosure have been described herein. It is to be understood that not necessarily all such advantages can be achieved in accordance with any particular embodiment of the systems, devices and/or methods disclosed herein. Thus, the subject matter of the disclosure herein can be embodied or carried out in a manner that achieves or optimizes one advantage or group of advantages as taught herein without necessarily achieving other advantages as can be taught or suggested herein.

BRIEF DESCRIPTION OF THE DRAWINGS

Throughout the drawings, reference numbers can be re-used to indicate correspondence between referenced ele-

18

5

ments. The drawings are provided to illustrate embodiments of the disclosure described herein and not to limit the scope thereof.

FIG. **1** illustrates a conventional approach to two-dimensional pulse oximetry in which the emitter is configured to emit optical radiation as a point optical source.

FIG. **2** illustrates the disclosed three-dimensional approach to pulse oximetry in which the emitted light irradiates a substantially larger volume of tissue as compared to the point source approach described with respect to FIG. **1**.

FIG. **3** illustrates schematically a side view of a three-dimensional pulse oximetry sensor according to an embodiment of the present disclosure.

FIG. **4A** is a top view of a portion of a three-dimensional pulse oximetry sensor according to an embodiment of the present disclosure.

FIG. **4B** illustrates the top view of a portion of the three-dimensional pulse oximetry sensor shown in FIG. **4A**, with the addition of a tissue measurement site in operational position.

FIG. **5** illustrates a top view of a three-dimensional pulse oximetry sensor according to an embodiment of the present disclosure.

FIG. **6** illustrates a conventional two-dimensional approach to reflective pulse oximetry in which the emitter is configured to emit optical radiation as a point optical source.

FIG. **7A** is a simplified schematic side view illustration of a reflective three-dimensional pulse oximetry sensor according to an embodiment of the present disclosure.

FIG. **7B** is a simplified schematic top view illustration of the three-dimensional reflective pulse oximetry sensor of FIG. **7A**.

FIG. **8** illustrates a block diagram of an example pulse oximetry system capable of noninvasively measuring one or more blood analytes in a monitored patient, according to an embodiment of the disclosure.

DETAILED DESCRIPTION

FIG. **1** illustrates schematically a conventional pulse oximetry sensor having a two-dimensional (2D) approach to pulse oximetry. As illustrated, the emitter **104** is configured to emit optical radiation as a point optical source, i.e., an optical radiation source that has negligible dimensions such that it may be considered as a point. This approach is referred to herein as "two-dimensional" pulse oximetry because it applies a two-dimensional analytical model to the three-dimensional space of the tissue measurement site **102** of the patient. Point optical sources feature a defined, freely selectable, and homogeneous light beam area. Light beams emitted from LED point sources often exhibit a strong focus which can produce a usually sharply-defined and evenly-lit illuminated spot often with high intensity dynamics. Illustratively, when looking at the surface of the tissue measurement site **102** (or "sample tissue"), which in this example is a finger, a small point-like surface area of tissue **204** is irradiated by a point optical source. In some embodiments, the irradiated circular area of the point optical source is in the range between 8 and 150 microns. Illustratively, the emitted point optical source of light enters the tissue measurement site **102** as a point of light. As the light penetrates the depth of the tissue **102**, it does so as a line or vector, representing a two-dimensional construct within a three-dimensional structure, namely the patient's tissue **102**.

Use of a point optical source is believed to reduce variability in light pathlength which would lead to more

6

accurate oximetry measurements. However, in practice, photons do not travel in straight paths. Instead, the light particles scatter, bouncing around between various irregular objects (such as, for example, red blood cells) in the patient's blood. Accordingly, photon pathlengths vary depending on, among other things, their particular journeys through and around the tissue at the measurement site **102**. This phenomenon is referred to as "multiple scattering." In a study, the effects of multiple scattering were examined by comparing the results of photon diffusion analysis with those obtained using an analysis based on the Beer-Lambert law, which neglects multiple scattering in the determination of light pathlength. The study found that that the difference between the average lengths of the paths traveled by red and infrared photons makes the oximeter's calibration curve (based on measurements obtained from normal subjects) sensitive to the total attenuation coefficients of the tissue in the two wavelength bands used for pulse oximetry, as well as to absorption by the pulsating arterial blood.

FIG. **2** illustrates schematically the disclosed systems, devices, and methods to implement three-dimensional (3D) pulse oximetry in which the emitted light irradiates a larger volume of tissue at the measurement site **102** as compared to the 2D point optical source approach described with respect to FIG. **1**. In an embodiment, again looking at the surface of the tissue measurement site **102**, the irradiated surface area **206** of the measurement site **102** is substantially rectangular in shape with dimensions in the range of approximately 0.25-3 cm in width and approximately 1-6 cm in length. In another embodiment, the irradiated surface area **206** of the measurement site **102** is substantially rectangular in shape and has dimensions of approximately 1.5 cm in width and approximately 2 cm in length. In another embodiment, the irradiated surface area **206** of the measurement site **102** is substantially rectangular in shape and has dimensions of approximately 0.5 cm in width and approximately 1 cm in length. In another embodiment, the irradiated surface area **206** of the measurement site **102** is substantially rectangular in shape has dimensions of approximately 1 cm in width and approximately 1.5 cm in length. In yet another embodiment, the irradiated surface area **206** of the measurement site **102** is substantially square in shape and has dimensions in a range of approximately 0.25-9 cm². In certain embodiments, the irradiated surface area **206** of the measurement site **102** is within a range of approximately 0.5-2 cm in width, and approximately 1-4 cm in length. Of course a skilled artisan will appreciate that many other shapes and dimensions of irradiated surface area **206** can be used. Advantageously, by irradiating the tissue measurement site **102** with a surface area **206**, the presently disclosed systems, devices, and methods apply a three-dimensional analytical model to the three-dimensional structure being measured, namely, the patient's sample tissue **102**.

According to the Beer-Lambert law, the amount of light absorbed by a substance is proportional to the concentration of the light-absorbing substance in the irradiated solution (i.e., arterial blood). Advantageously, by irradiating a larger volume of tissue **102**, a larger sample size of light attenuated (or reflected) by the tissue **102** is measured. The larger, 3D sample provides a data set that is more representative of the complete interaction of the emitted light as it passes through the patient's blood as compared to the 2D point source approach described above with respect to FIG. **1**. By taking an average of the detected light, as detected over a surface area substantially larger than a single point, the disclosed pulse oximetry systems, devices, and methods will yield a

19

7
8

more accurate measurement of the emitted light absorbed by the tissue, which will lead to a more accurate oxygen saturation measurement.

FIG. **3** illustrates schematically a side view of a pulse oximetry 3D sensor **300** according to an embodiment of the present disclosure. In the illustrated embodiment, the 3D sensor **300** irradiates the tissue measurement site **102** and detects the emitted light, after being attenuated by the tissue measurement site **102**. In other embodiments, for example, as describe below with respect to FIGS. **7A** and **7B**, the 3D sensor **300** can be arranged to detect light that is reflected by the tissue measurement site **102**. The 3D sensor **300** includes an emitter **302**, a light diffuser **304**, a light-absorbing detector filter **306**, a light concentrator **308**, and a detector **310**. In some optional embodiments, the 3D sensor **300** further includes a reflector **305**. The reflector **305** can be a metallic reflector or other type of reflector. Reflector **305** can be a coating, film, layer or other type of reflector. The reflector **305** can serve as a reflector to prevent emitted light from emitting out of a top portion of the light diffuser **304** such that light from the emitter **302** is directed in the tissue rather than escaping out of a side or top of the light diffuser **304**. Additionally, the reflector **305** can prevent ambient light from entering the diffuser **304** which might ultimately cause errors within the detected light. The reflector **305** also prevent light piping that might occur if light from the detector **302** is able to escape from the light diffuser **304** and be pipped around a sensor securement mechanism to detector **310** without passing through the patient's tissue **102**.

The emitter **302** can serve as the source of optical radiation transmitted towards the tissue measurement site **102**. The emitter **302** can include one or more sources of optical radiation, such as LEDs, laser diodes, incandescent bulbs with appropriate frequency-selective filters, combinations of the same, or the like. In an embodiment, the emitter **302** includes sets of optical sources that are capable of emitting visible and near-infrared optical radiation. In some embodiments, the emitter **302** transmits optical radiation of red and infrared wavelengths, at approximately 650 nm and approximately 940 nm, respectively. In some embodiments, the emitter **302** includes a single source optical radiation.

The light diffuser **304** receives the optical radiation emitted from the emitter **302** and spreads the optical radiation over an area, such as the area **206** depicted in FIG. **2**. In some embodiments, the light diffuser **304** is a beam shaper that can homogenize the input light beam from the emitter **302**, shape the output intensity profile of the received light, and define the way (e.g., the shape or pattern) the emitted light is distributed to the tissue measurement site **102**. Examples of materials that can be used to realize the light diffuser **304** include, without limitation, a white surface, glass, ground glass, glass beads, polytetrafluoroethylene (also known as Teflon®), opal glass, and greyed glass, to name a few. Additionally, engineered diffusers can be used to realize the diffuser **304** by providing customized light shaping with respect to intensity and distribution. Such diffusers can, for example, deliver substantially uniform illumination over a specified target area (such as, for example, irradiated surface area **206**) in an energy-efficient manner. Examples of engineered diffusers can include molded plastics with specific shapes, patterns or textures designed to diffuse the emitter light across the entirety of the patient's tissue surface.

Advantageously, the diffuser **304** can receive emitted light in the form of a point optical source and spread the light to fit a desired surface area on a plane defined by the surface of the tissue measurement site **102**. In an embodiment, the diffuser **304** is made of ground glass which spreads the

emitted light with a Gausian intensity profile. In another embodiment the diffuser **304** includes glass beads. In some embodiments, the diffuser **304** is constructed so as to diffuse the emitted light in a Lambertian pattern. A Lambertian pattern is one in which the radiation intensity is substantially constant throughout the area of dispersion. One such diffuser **304** is made from opal glass. Opal glass is similar to ground glass, but has one surface coated with a milky white coating to diffuse light evenly. In an embodiment, the diffuser **304** is capable of distributing the emitted light on the surface of a plane (e.g., the surface of the tissue measurement site **102**) in a predefined geometry (e.g., a rectangle, square, or circle), and with a substantially uniform intensity profile and energy distribution. In some embodiments, the efficiency, or the amount of light transmitted by the diffuser **304**, is greater than 70% of the light emitted by the emitter **302**. In some embodiments, the efficiency is greater than 90% of the emitted light. Other optical elements known in the art may be used for the diffuser **304**.

In an embodiment, the diffuser **304** has a substantially rectangular shape having dimensions within a range of approximately 0.5-2 cm in width and approximately 1-4 centimeters in length. In another embodiment, the substantially rectangular shape of the diffuser **304** has dimensions of approximately 0.5 cm in width and approximately 1 cm in length. In another embodiment, the diffuser's **304** substantially rectangular shape has dimensions of approximately 1 cm in width and approximately 1.5 cm in length. In yet another embodiment, the diffuser **304** has a substantially square shape with dimensions in the range of approximately 0.25-10 cm².

The light-absorbing detector filter **306**, which is also depicted in FIG. **4A** in a top view, is a planar surface having an opening **402** through which the emitted light may pass after being attenuated by the tissue measurement site **102**. In the depicted embodiment, the opening **402** is rectangular-shaped, with dimensions substantially similar to the irradiated surface area **206**. According to an embodiment, the light-absorbing detector filter is substantially rectangular in shape and has outer dimensions of 4 cm in width and 8 cm in length, and has an opening through which emitted light may pass, the opening having dimensions of 2 cm in width and 5 cm in length. In another embodiment, the light-absorbing detector filter is substantially rectangular in shape and has outer dimensions in the range of 1-3 cm in width and 2-8 cm in length, and has an opening through which emitted light may pass, the opening having dimensions in the range of 0.25-2 cm in width and 1-4 cm in length. In yet another embodiment, the light-absorbing detector filter is substantially rectangular in shape and has outer dimensions of 3 cm in width and 6 cm in length, and has an opening through which emitted light may pass, the opening having dimensions of 1.5 cm in width and 4 cm in length.

The top surface of the light-absorbing filter **306** (facing the tissue measurement site **102** and the emitter **302**) is coated with a material that absorbs light, such as, for example, black pigment. Many other types of light-absorbing materials are well known in the art and can be used with the detector filter **306**. During operation, light emitted from the emitter **302** can reflect off of the tissue measurement site **102** (or other structures within the 3D sensor **300**) to neighboring portions of the 3D sensor **300**. If those neighboring portions of the 3D sensor **300** possess reflective surfaces, then the light can reflect back to the tissue measurement site **102**, progress through the tissue and arrive at the detector **310**. Such multiple scattering can result in detecting photons whose pathlengths are considerably lon-

20

US 10,470,695 B2

9                                                    10

ger than most of the light that is detected, thereby introducing variations in pathlength which will affect the accuracy of the measurements of the pulse oximetry 3D sensor **300**. Advantageously, the light-absorbing filter **306** reduces or eliminates the amount of emitted light that is reflected in this manner because it absorbs such reflected light, thereby stopping the chain of scattering events. In certain embodiments, the sensor-facing surfaces of other portions of the 3D sensor **300** are covered in light-absorbing material to further decrease the effect of reflective multiple scattering.

The light concentrator **308** is a structure to receive the emitted optical radiation, after attenuation by the tissue measurement site **102**, to collect and concentrate the dispersed optical radiation, and to direct the collected and concentrated optical radiation to the detector **310**. In an embodiment, the light concentrator **308** is made of ground glass or glass beads. In some embodiments, the light concentrator **308** includes a compound parabolic concentrator.

As described above with respect to FIG. **1**, the detector **310** captures and measures light from the tissue measurement site **102**. For example, the detector **310** can capture and measure light transmitted from the emitter **302** that has been attenuated by the tissue in the measurement site **102**. The detector **310** can output a detector signal responsive to the light captured or measured. The detector **310** can be implemented using one or more photodiodes, phototransistors, or the like. In addition, a plurality of detectors **310** can be arranged in an array with a spatial configuration corresponding to the irradiated surface area **206** to capture the attenuated or reflected light from the tissue measurement site.

Referring to FIG. **4A**, a top view of a portion of the 3D sensor **300** is provided. The light-absorbing detector filter **306** is illustrated having a top surface coated with a light-absorbing material. The light-absorbing material can be a black opaque material or coating or any other dark color or coating configured to absorb light. Additionally, a rectangular opening **402** is positioned relative to the light concentrator **308** (shown in phantom) and the detector **310** such that light may pass through the rectangular opening **402**, into the light concentrator **308**, and to the detector **310**. FIG. **4B** illustrates the top view of a portion of the 3D sensor **300** as in FIG. **4A**, with the addition of the tissue measurement site **102** in operational position. Accordingly, the rectangular opening **402**, the light concentrator **308** and the detector **310** are shown in phantom as being under the tissue measurement site **102**. In FIGS. **4A** and **4B**, the light concentrator **308** is shown to have dimensions significantly larger than the dimensions of the rectangular opening **402**. In other embodiments, the dimensions of the light concentrator **308**, the rectangular opening **402**, and the irradiated surface area **206** are substantially similar.

FIG. **5** illustrates a top view of a 3D pulse oximetry sensor **500** according to an embodiment of the present disclosure. The 3D sensor **500** is configured to be worn on a patient's finger **102**. The 3D sensor **500** includes an adhesive substrate **502** having front flaps **504** and rear flaps **506** extending outward from a center portion **508** of the 3D sensor **500**. The center portion **508** includes components of the 3D pulse oximetry sensor **300** described with respect to FIGS. **3**, **4A** and **4B**. On the front side of the adhesive substrate **502** the emitter **302** and the light diffuser **304** are positioned. On the rear side of the adhesive substrate **502** the light-absorbent detector filter **306**, the light concentrator **308** and the detector **310** are positioned. In use, the patient's finger serving as the tissue measurement site **102** is positioned over the rectangular opening **402** such that when the front portion of the adhesive substrate is folded over on top of the patient's

finger **102**, the emitter **302** and the light diffuser **304** are aligned with the measurement site **102**, the filter **306**, the light concentrator **308** and the detector **310**. Once alignment is established, the front and rear flaps **504**, **506** can be wrapped around the finger measurement site **102** such that the adhesive substrate **502** provides a secure contact between the patient's skin and the 3D sensor **500**. FIG. **5** also illustrates an example of a sensor connector cable **510** which is used to connect the 3D sensor **500** to a monitor **809**, as described with respect to FIG. **8**.

FIG. **6** is a simplified schematic illustration of a conventional, 2D approach to reflective pulse oximetry in which the emitter is configured to emit optical radiation as a point optical source. Reflective pulse oximetry is a method by which the emitter and detector are located on the same side of the tissue measurement site **102**. Light is emitted into a tissue measurement site **102** and attenuated. The emitted light passes into the tissue **102** and is then reflected back to the same side of the tissue measurement site **102** as the emitter. As illustrated in FIG. **6**, a depicted reflective 2D pulse oximetry sensor **600** includes an emitter **602**, a light block **606**, and a detector **610**. The light block **606** is necessary because the emitter **602** and the detector **610** are located on the same side of the tissue measurement site **102**. Accordingly, the light block **606** prevents incident emitter light, which did not enter the tissue measurement site **102**, from arriving at the detector **610**. The depicted 2D pulse oximetry sensor **600** is configured to emit light as a point source. As depicted in FIG. **6**, a simplified illustration of the light path **620** of the emitted light from the emitter **602**, through the tissue measurement site **102**, and to the detector **610** is provided. Notably, a point source of light is emitted, and a point source of light is detected. As discussed above with respect to FIG. **1**, use of a point optical source can result in substantial measurement error due to pathlength variability resulting from the multiple scatter phenomenon. The sample space provided by a 2D point optical emitter source is not large enough to account for pathlength variability, which will skew measurement results.

FIGS. **7A** and **7B** are simplified schematic side and top views, respectively, of a 3D reflective pulse oximetry sensor **700** according to an embodiment of the present disclosure. In the illustrated embodiment, the 3D sensor **700** irradiates the tissue measurement site **102** and detects the emitted light that is reflected by the tissue measurement site **102**. The 3D sensor **700** can be placed on a portion of the patient's body that has relatively flat surface, such as, for example a wrist, because the emitter **702** and detector **710** are on located the same side of the tissue measurement site **102**. The 3D sensor **700** includes an emitter **702**, a light diffuser **704**, a light block **706**, a light concentrator **708**, and a detector **710**.

As previously described, the emitter **702** can serve as the source of optical radiation transmitted towards the tissue measurement site **102**. The emitter **702** can include one or more sources of optical radiation. Such sources of optical radiation can include LEDs, laser diodes, incandescent bulbs with appropriate frequency-selective filters, combinations of the same, or the like. In an embodiment, the emitter **702** includes sets of optical sources that are capable of emitting visible and near-infrared optical radiation. In some embodiments, the emitter **702** transmits optical radiation of red and infrared wavelengths, at approximately 650 nm and approximately 940 nm, respectively. In some embodiments, the emitter **702** includes a single source of optical radiation.

The light diffuser **704** receives the optical radiation emitted from the emitter **302** and homogenously spreads the optical radiation over a wide, donut-shaped area, such as the

21

US 10,470,695 B2

11                                                                12

area outlined by the light diffuser **704** as depicted in FIG. 7B. Advantageously, the diffuser **704** can receive emitted light in the form of a 2D point optical source (or any other form) and spread the light to fit the desired surface area on a plane defined by the surface of the tissue measurement site **102**. In an embodiment, the diffuser **704** is made of ground glass or glass beads. A skilled artisan will understand that may other materials can be used to make the light diffuser **704**.

The light blocker **706** includes an annular ring having a cover portion **707** sized and shaped to form a light isolation chamber for the light concentrator **708** and the detector **710**. (For purposes of illustration, the light block cover **707** is not illustrated in FIG. 7B.) The light blocker **706** and the cover **707** can be made of any material that optically isolates the light concentrator **708** and the detector **710**. The light isolation chamber formed by the light blocker **706** and cover **708** ensures that the only light detected by the detector **710** is light that is reflected from the tissue measurement site.

The light concentrator **708** is a cylindrical structure with a truncated circular conical structure on top, the truncated section of which of which is adjacent the detector **710**. The light concentrator **708** is structured to receive the emitted optical radiation, after reflection by the tissue measurement site **102**, and to direct the reflected light to the detector **710**. In an embodiment, the light concentrator **708** is made of ground glass or glass beads. In some embodiments, the light concentrator **708** includes a compound parabolic concentrator.

As previously described, the detector **710** captures and measures light from the tissue measurement site **102**. For example, the detector **710** can capture and measure light transmitted from the emitter **702** that has been reflected from the tissue in the measurement site **102**. The detector **710** can output a detector signal responsive to the light captured or measured. The detector **710** can be implemented using one or more photodiodes, phototransistors, or the like. In addition, a plurality of detectors **710** can be arranged in an array with a spatial configuration corresponding to the irradiated surface area as depicted in FIG. 7B by the light concentrator **708** to capture the reflected light from the tissue measurement site.

Advantageously, the light path **720** illustrated in FIG. 7A depicts a substantial sample of reflected light that enter the light isolation chamber formed by the light blocker **706** and cover **707**. As previously discussed, the large sample of reflected light (as compared to the reflected light collected using the 2D point optical source approach) provides the opportunity to take an average of the detected light, to derive a more accurate measurement of the emitted light absorbed by the tissue, which will lead to a more accurate oxygen saturation measurement.

Referring now to FIG. 7B, a top view of the 3D sensor **700** is illustrated with both the emitter **702** and the light blocker cover **707** removed for ease of illustration. The outer ring illustrates the footprint of the light diffuser **704**. As light is emitted from the emitter **702** (not shown in FIG. 7B), it is diffused homogenously and directed to the tissue measurement site **102**. The light blocker **706** forms the circular wall of a light isolation chamber to keep incident light from being sensed by the detector **710**. The light blocker cover **707** blocks incidental light from entering the light isolation chamber from above. The light concentrator **708** collects the reflected light from the tissue measurement site **102** and funnels it upward toward the detector **710** at the center of the 3D sensor **700**.

FIG. **8** illustrates an example of an optical physiological measurement system **800**, which may also be referred to herein as a pulse oximetry system **800**. In certain embodiments, the pulse oximetry system **800** noninvasively measures a blood analyte, such as oxygen, carboxyhemoglobin, methemoglobin, total hemoglobin, glucose, proteins, lipids, a percentage thereof (e.g., saturation), pulse rate, perfusion index, oxygen content, total hemoglobin, Oxygen Reserve Index™ (ORI™) or many other physiologically relevant patient characteristics. These characteristics can relate to, for example, pulse rate, hydration, trending information and analysis, and the like. The system **800** can also measure additional blood analytes and/or other physiological parameters useful in determining a state or trend of wellness of a patient.

The pulse oximetry system **800** can measure analyte concentrations at least in part by detecting optical radiation attenuated by tissue at a measurement site **102**. The measurement site **102** can be any location on a patient's body, such as a finger, foot, earlobe, wrist, forehead, or the like.

The pulse oximetry system **800** can include a sensor **801** (or multiple sensors) that is coupled to a processing device or physiological monitor **809**. In an embodiment, the sensor **801** and the monitor **809** are integrated together into a single unit. In another embodiment, the sensor **801** and the monitor **809** are separate from each other and communicate with one another in any suitable manner, such as via a wired or wireless connection. The sensor **801** and monitor **809** can be attachable and detachable from each other for the convenience of the user or caregiver, for ease of storage, sterility issues, or the like.

In the depicted embodiment shown in FIG. **8**, the sensor **801** includes an emitter **804**, a detector **806**, and a front-end interface **808**. The emitter **804** can serve as the source of optical radiation transmitted towards measurement site **102**. The emitter **804** can include one or more sources of optical radiation, such as light emitting diodes (LEDs), laser diodes, incandescent bulbs with appropriate frequency-selective filters, combinations of the same, or the like. In an embodiment, the emitter **804** includes sets of optical sources that are capable of emitting visible and near-infrared optical radiation.

The pulse oximetry system **800** also includes a driver **811** that drives the emitter **804**. The driver **111** can be a circuit or the like that is controlled by the monitor **809**. For example, the driver **811** can provide pulses of current to the emitter **804**. In an embodiment, the driver **811** drives the emitter **804** in a progressive fashion, such as in an alternating manner. The driver **811** can drive the emitter **804** with a series of pulses for some wavelengths that can penetrate tissue relatively well and for other wavelengths that tend to be significantly absorbed in tissue. A wide variety of other driving powers and driving methodologies can be used in various embodiments. The driver **811** can be synchronized with other parts of the sensor **801** to minimize or reduce jitter in the timing of pulses of optical radiation emitted from the emitter **804**. In some embodiments, the driver **811** is capable of driving the emitter **804** to emit optical radiation in a pattern that varies by less than about 10 parts-per-million.

The detector **806** captures and measures light from the tissue measurement site **102**. For example, the detector **806** can capture and measure light transmitted from the emitter **804** that has been attenuated or reflected from the tissue at the measurement site **102**. The detector **806** can output a detector signal **107** responsive to the light captured and measured. The detector **806** can be implemented using one

Appx0151

US 10,470,695 B2

13 14

or more photodiodes, phototransistors, or the like. In some embodiments, a detector 806 is implemented in detector package to capture and measure light from the tissue measurement site 102 of the patient. The detector package can include a photodiode chip mounted to leads and enclosed in an encapsulant. In some embodiments, the dimensions of the detector package are approximately 2 square centimeters. In other embodiments, the dimensions of the detector package are approximately 1.5 centimeters in width and approximately 2 centimeters in length.

The front-end interface 808 provides an interface that adapts the output of the detectors 806, which is responsive to desired physiological parameters. For example, the front-end interface 808 can adapt the signal 807 received from the detector 806 into a form that can be processed by the monitor 809, for example, by a signal processor 810 in the monitor 809. The front-end interface 808 can have its components assembled in the sensor 801, in the monitor 809, in a connecting cabling (if used), in combinations of the same, or the like. The location of the front-end interface 808 can be chosen based on various factors including space desired for components, desired noise reductions or limits, desired heat reductions or limits, and the like.

The front-end interface 808 can be coupled to the detector 806 and to the signal processor 810 using a bus, wire, electrical or optical cable, flex circuit, or some other form of signal connection. The front-end interface 808 can also be at least partially integrated with various components, such as the detectors 806. For example, the front-end interface 808 can include one or more integrated circuits that are on the same circuit board as the detector 806. Other configurations can also be used.

As shown in FIG. 8, the monitor 909 can include the signal processor 810 and a user interface, such as a display 812. The monitor 809 can also include optional outputs alone or in combination with the display 812, such as a storage device 814 and a network interface 816. In an embodiment, the signal processor 810 includes processing logic that determines measurements for desired analytes based on the signals received from the detector 806. The signal processor 810 can be implemented using one or more microprocessors or sub-processors (e.g., cores), digital signal processors, application specific integrated circuits (ASICs), field programmable gate arrays (FPGAs), combinations of the same, and the like.

The signal processor 810 can provide various signals that control the operation of the sensor 801. For example, the signal processor 810 can provide an emitter control signal to the driver 811. This control signal can be useful in order to synchronize, minimize, or reduce jitter in the timing of pulses emitted from the emitter 804. Accordingly, this control signal can be useful in order to cause optical radiation pulses emitted from the emitter 804 to follow a precise timing and consistent pattern. For example, when a transimpedance-based front-end interface 808 is used, the control signal from the signal processor 810 can provide synchronization with an analog-to-digital converter (ADC) in order to avoid aliasing, cross-talk, and the like. As also shown, an optional memory 813 can be included in the front-end interface 808 and/or in the signal processor 810. This memory 813 can serve as a buffer or storage location for the front-end interface 808 and/or the signal processor 810, among other uses.

The user interface 812 can provide an output, e.g., on a display, for presentation to a user of the pulse oximetry system 800. The user interface 812 can be implemented as a touch-screen display, a liquid crystal display (LCD), an organic LED display, or the like. In alternative embodiments, the pulse oximetry system 800 can be provided without a user interface 812 and can simply provide an output signal to a separate display or system.

The storage device 814 and a network interface 816 represent other optional output connections that can be included in the monitor 809. The storage device 814 can include any computer-readable medium, such as a memory device, hard disk storage, EEPROM, flash drive, or the like. The various software and/or firmware applications can be stored in the storage device 814, which can be executed by the signal processor 810 or another processor of the monitor 809. The network interface 816 can be a serial bus port (RS-232/RS-485), a Universal Serial Bus (USB) port, an Ethernet port, a wireless interface (e.g., WiFi such as any 802.1x interface, including an internal wireless card), or other suitable communication device(s) that allows the monitor 809 to communicate and share data with other devices. The monitor 809 can also include various other components not shown, such as a microprocessor, graphics processor, or controller to output the user interface 812, to control data communications, to compute data trending, or to perform other operations.

Although not shown in the depicted embodiment, the pulse oximetry system 800 can include various other components or can be configured in different ways. For example, the sensor 801 can have both the emitter 804 and detector 806 on the same side of the tissue measurement site 102 and use reflectance to measure analytes.

Although the foregoing disclosure has been described in terms of certain preferred embodiments, many other variations than those described herein will be apparent to those of ordinary skill in the art.

Conditional language used herein, such as, among others, "can," "might," "may," "e.g.," and the like, unless specifically stated otherwise, or otherwise understood within the context as used, is generally intended to convey that certain embodiments include, while other embodiments do not include, certain features, elements and/or states. Thus, such conditional language is not generally intended to imply that features, elements and/or states are in any way required for one or more embodiments or that one or more embodiments necessarily include logic for deciding, with or without author input or prompting, whether these features, elements and/or states are included or are to be performed in any particular embodiment. The terms "comprising," "including," "having," and the like are synonymous and are used inclusively, in an open-ended fashion, and do not exclude additional elements, features, acts, operations, and so forth. Also, the term "or" is used in its inclusive sense (and not in its exclusive sense) so that when used, for example, to connect a list of elements, the term "or" means one, some, or all of the elements in the list. Further, the term "each," as used herein, in addition to having its ordinary meaning, can mean any subset of a set of elements to which the term "each" is applied.

While the above detailed description has shown, described, and pointed out novel features as applied to various embodiments, it will be understood that various omissions, substitutions, and changes in the form and details of the systems, devices or algorithms illustrated can be made without departing from the spirit of the disclosure. As will be recognized, certain embodiments of the disclosure described herein can be embodied within a form that does not provide all of the features and benefits set forth herein, as some features can be used or practiced separately from others.

23

US 10,470,695 B2

15 16

The term "and/or" herein has its broadest, least limiting meaning which is the disclosure includes A alone, B alone, both A and B together, or A or B alternatively, but does not require both A and B or require one of A or one of B. As used herein, the phrase "at least one of" A, B, "and" C should be construed to mean a logical A or B or C, using a non-exclusive logical or.

The apparatuses and methods described herein may be implemented by one or more computer programs executed by one or more processors. The computer programs include processor-executable instructions that are stored on a non-transitory tangible computer readable medium. The computer programs may also include stored data. Non-limiting examples of the non-transitory tangible computer readable medium are nonvolatile memory, magnetic storage, and optical storage. Although the foregoing disclosure has been described in terms of certain preferred embodiments, other embodiments will be apparent to those of ordinary skill in the art from the disclosure herein. Additionally, other combinations, omissions, substitutions and modifications will be apparent to the skilled artisan in view of the disclosure herein. Accordingly, the present invention is not intended to be limited by the description of the preferred embodiments, but is to be defined by reference to claims.

Additionally, all publications, patents, and patent applications mentioned in this specification are herein incorporated by reference to the same extent as if each individual publication, patent, or patent application were specifically and individually indicated to be incorporated by reference.

What is claimed is:

1. A wrist-worn physiological monitoring device configured for placement on a user at a tissue measurement site, the device comprising:

a light emission source comprising a plurality of emitters configured to irradiate the tissue measurement site by emitting light towards the tissue measurement site, the tissue measurement site being located on a wrist of the user, the plurality of emitters configured to emit one or more wavelengths;

a plurality of detectors configured to detect the light emitted by the plurality of emitters after attenuation by a circular portion of the tissue measurement site, the plurality of detectors further configured to output at least one signal responsive to the detected light;

a processor configured to receive the at least one signal responsive to the output and determine a physiological parameter of the user; and

a light block forming an enclosing wall between the light emission source and the plurality of detectors, the light block defining the circular portion of the tissue measurement site, the light emission source arranged proximate a first side of the enclosing wall and the plurality of detectors arranged proximate a second side of the enclosing wall, the first side being different than the second side,

wherein the enclosing wall prevents at least a portion of light emitted from the light emission source from being detected by the plurality of detectors without attenuation by the tissue, and wherein the plurality of detectors are arranged in an array having a spatial configuration corresponding to the circular portion of the tissue measurement site.

2. The physiological monitoring device of claim 1, further comprising a display configured to present information related to the determined physiological parameter to the user.

3. The physiological monitoring device of claim 2, wherein the display is a touch-screen display.

4. The physiological monitoring device of claim 1, wherein the enclosing wall of the light block is a circular wall.

5. The physiological monitoring device of claim 1, wherein, when the physiological monitoring device is worn by the user at the tissue measurement site, the plurality of emitters are arranged in a reflectance measurement configuration on a first side of the tissue measurement site, and wherein the plurality of detectors are arranged in a reflectance measurement configuration on the first side of the tissue measurement site when the physiological monitoring device is worn by the user.

6. The physiological monitoring device of claim 1, further comprising a diffuser which receives, spreads, and emits the spread light, wherein the emitted spread light is directed at the tissue measurement site.

7. The physiological monitoring device of claim 1, wherein the light emission source is positioned outside the enclosing wall when the physiological monitoring device is worn by the user at the tissue measurement site, and wherein the plurality of detectors are positioned inside the enclosing wall when the physiological monitoring device is worn by the user at the tissue measurement site.

8. The physiological monitoring device of claim 1, wherein the physiological parameter is selected from the group consisting of arterial oxygen saturation, glucose, and pulse rate.

9. A method of measuring a physiological parameter in a user's blood, the method comprising:

irradiating a tissue measurement site by emitting, from a plurality of emitters of a light emission source of a physiological monitoring device, light of one or more wavelengths toward the tissue measurement site, the tissue measurement site located on a wrist of the user;

detecting, with a plurality of detectors, the light emitted by the plurality of emitters of the light emission source after attenuation through a circular portion of the tissue measurement site; and

providing a cylindrical light block forming an enclosing wall between the light emission source and the plurality of detectors, the light emission source arranged proximate a first side of the enclosing wall and the plurality of detectors arranged proximate a second side of the enclosing wall, the first side being different than the second side, wherein the enclosing wall prevents at least a portion of light emitted from the light emission source from being detected by the plurality of detectors without attenuation by the tissue measurement site, and wherein the plurality of detectors are arranged in an array having a circular spatial configuration, the circular spatial configuration arranged to receive said attenuated light;

outputting, from the plurality of detectors, at least one signal responsive to the detected light;

receiving, by a processor, the outputted at least one signal responsive to the detected light; and processing, by the processor, the received at least one signal responsive to the detected light to determine a physiological parameter.

10. The method of claim 9, wherein the light emission source is positioned outside the enclosing wall when the physiological monitoring device is worn by the user at the tissue measurement site, and wherein the plurality of detec-

US 10,470,695 B2

<table>
<tr><td>17</td><td>18</td></tr>
</table>

tors are positioned inside the enclosing wall when the physiological monitoring device is worn by the user at the tissue measurement site.

**11**. The method of claim **9**, further comprising presenting, with a display of the physiological monitoring device, information related to the determined physiological parameter to the user.

**12**. The method of claim **11**, wherein the display is a touch-screen display.

**13**. The method of claim **9**, wherein when the physiological monitoring device is worn by the user at the tissue measurement site, the plurality of emitters are arranged in a reflectance measurement configuration on a first side of the tissue measurement site, and wherein the plurality of detectors are arranged in a reflectance measurement configuration on the first side of the tissue measurement site when the physiological monitoring device is worn by the user.

**14**. The method of claim **9**, further comprising spreading, with a diffuser, the emitted light and emitting the spread light from the diffuser to the tissue measurement site.

**15**. The method of claim **9**, wherein the physiological parameter is indicative of at least one of pulse rate, perfusion index, oxygen content, and total hemoglobin.

**16**. The method of claim **9**, wherein the plurality of emitters comprise one or more light emitting diodes (LEDs), and wherein the one or more wavelengths comprises at least an infrared wavelength.

**17**. The method of claim **9**, wherein the plurality of detectors comprise a plurality of photodiodes.

**18**. The method of claim **9**, further comprising, directing, with a light concentrator, the light emitted by the light emission source after attenuation through tissue of the user at the tissue measurement site to the plurality of detectors.

**19**. A wrist-worn physiological monitoring sensor comprising:

a light emission source comprising a plurality of optical sources configured to irradiate a tissue measurement site by emitting light towards the tissue measurement site on a user, the tissue measurement site located on a wrist of the user, the plurality of optical sources configured to emit one or more wavelengths;

a plurality of detectors configured to detect the light emitted by the plurality of emitters after attenuation by a circular portion of the tissue measurement site, the plurality of detectors further configured to output at least one signal responsive to the detected light;

a processor configured to receive the outputted at least one signal responsive to the detected light and determine a physiological parameter indicative of a state or trend of wellness of the user; and

a light block forming an enclosing wall between the light emission source and the plurality of detectors, the light emission source arranged proximate a first side of the enclosing wall and the plurality of detectors arranged proximate a second side of the enclosing wall, the first side being different than the second side, the light block

forming a light isolation chamber defined by the enclosing wall, wherein the enclosing wall prevents at least a portion of light emitted from the light emission source from being detected by the plurality of detectors without attenuation by the tissue, and wherein the plurality of detectors are arranged in an array having a circular spatial configuration, the circular spatial configuration arranged to receive said attenuated light.

**20**. The physiological monitoring sensor of claim **19**, wherein the light emission source is located outside the enclosing wall when the physiological monitoring sensor is worn by the user at the tissue measurement site, and wherein the plurality of detectors are arranged inside the enclosing wall when the physiological monitoring sensor is worn by the user at the tissue measurement site.

**21**. The physiological monitoring sensor of claim **19**, further comprising a diffuser which receives, spreads, and emits the spread light, wherein the emitted spread light is directed at the tissue measurement site.

**22**. The physiological monitoring sensor of claim **19**, further comprising a display configured to present information related to the determined physiological parameter to the user.

**23**. The physiological monitoring sensor of claim **22**, wherein the display is a touch-screen display.

**24**. The physiological monitoring sensor of claim **19**, wherein when the physiological monitoring sensor is worn by the user at the tissue measurement site, the plurality of optical sources are arranged in a reflectance measurement configuration on a first side of the tissue measurement site, and wherein the plurality of detectors are arranged in a reflectance measurement configuration on the first side of the tissue measurement site when the physiological monitoring sensor is worn by the user.

**25**. The physiological monitoring device of claim **1**, wherein the plurality of emitters comprise one or more light emitting diodes (LEDs), and wherein the one or more wavelengths comprises at least an infrared wavelength.

**26**. The physiological monitoring device of claim **1**, wherein the plurality of detectors comprise a plurality of photodiodes.

**27**. The physiological monitoring device of claim **1**, further comprising a light concentrator configured to direct the attenuated, reflected light to the plurality of detectors.

**28**. The physiological monitoring sensor of claim **19**, wherein the plurality of optical sources comprise one or more light emitting diodes (LEDs), and wherein the one or more wavelengths comprises at least an infrared wavelength.

**29**. The physiological monitoring sensor of claim **19**, wherein the plurality of detectors comprise a plurality of photodiodes.

**30**. The physiological monitoring sensor of claim **19**, further comprising a light concentrator to direct the attenuated, reflected light to the plurality of detectors.

* * * * *

# <u>CERTIFICATE OF SERVICE</u>

The undersigned counsel hereby certifies that on November 7, 2022, the

foregoing **BRIEF OF APPELLANT MASIMO CORPORATION** was filed using

the Court's CM/ECF system, which will send notice of such filing to all registered

CM/ECF users.

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated: November 7, 2022     By: */s/ Jeremiah S. Helm*
                               Joseph R. Re, *Principal Counsel*
                               Stephen C. Jensen
                               John M. Grover
                               Shannon Lam
                               Jeremiah S. Helm

                               *Attorneys for Appellant*
                               *Masimo Corporation*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a).  This brief contains 10,431 words, excluding the parts of the brief exempt by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).   This brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font Times New Roman.

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated: _November 7, 2022_    By: _/s/ Jeremiah S. Helm_

Joseph R. Re, *Principal Counsel*
Stephen C. Jensen
John M. Grover
Shannon Lam
Jeremiah S. Helm

*Attorneys for Appellant*
*Masimo Corporation*

56054858

-2-