No. 22-1895

IN THE

# United States Court of Appeals

## FOR THE FEDERAL CIRCUIT

_____

MASIMO CORPORATION,

*Appellant,*

*v.*

APPLE INC.,

*Appellee,*

APPEAL FROM THE PATENT TRIAL AND APPEAL BOARD
CASE NO. IPR2020-01722

**REPLY BRIEF OF APPELLANT MASIMO CORPORATION**

Joseph R. Re, *Principal Counsel*
Stephen C. Jensen
John M. Grover
Shannon Lam
**KNOBBE, MARTENS, OLSON &
BEAR, LLP**
2040 Main Street, 14th Floor
Irvine, CA 92614
(949) 760-0404

Jeremiah S. Helm
**KNOBBE, MARTENS, OLSON &
BEAR, LLP**
1717 Pennsylvania Ave., N.W.
Washington, D.C. 20006
(202) 640-6400

*Attorneys for Appellant
Masimo Corporation*

April 9, 2023

# TABLE OF CONTENTS

**Page No.**

CERTIFICATE OF INTEREST ........................................................................ iii

I.     INTRODUCTION ................................................................................ 1

II.    ARGUMENT ........................................................................................ 2

      A.    The Board erred in its analysis of Dr. Madisetti's
           experimental testing ......................................................... 5

      B.    The Board's findings that Chin recognizes "general
           benefits" for a diffuser at "any body part" and teaches a
           diffuser would produce a stronger reflected signal are
           unsupported by substantial evidence ........................................... 16

      C.    The Board's findings regarding Chin's combination with
           Sarantos or Ackermans are not supported by substantial
           evidence ........................................................................... 25

III.   CONCLUSION .................................................................................... 32

CERTIFICATE OF COMPLIANCE .............................................................. 34

# TABLE OF AUTHORITIES

**Page No(s).**

*Brand v. Miller,*
    487 F.3d 862 (Fed. Cir. 2007) .......................................................... 5, 13, 14

*DSS Tech. Mgmt., Inc. v. Apple Inc.*,
    885 F.3d 1367 (Fed. Cir. 2018) ........................................................ 21, 25

*KSR Int'l Co. v. Teleflex Inc.*,
    550 U.S. 398 (2007).............................................................................. 7

*Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd.*,
    719 F.3d 1346 (Fed. Cir. 2013) .................................................... 20

*In re NuVasive, Inc.*,
    842 F.3d 1376 (Fed. Cir. 2016) .................................................... 13

*OSI Pharms., LLC v. Apotex Inc.*,
    939 F.3d 1375 (Fed. Cir. 2019) .................................................... 24

*Wyers v. Master Lock Co.*,
    616 F.3d 1231 (Fed. Cir. 2010) .................................................... 14

## OTHER AUTHORITIES

35 U.S.C. § 311 ............................................................................. 13

Fed. R. App. P. 26.1 ....................................................................... iii

Federal Rule of Appellate Procedure 32 ......................................... 34

## CERTIFICATE OF INTEREST

Counsel for Appellant Masimo Corporation certifies the following:

1.     The full name of every party represented by me is:

Masimo Corporation.

2.     The name of the real party-in-interest represented by me is:

Masimo Corporation.

3.     All parent corporations and any publicly held companies that own more than 10 percent or more of the stock of the party represented by me are:

BlackRock Inc.

4.     The name of all law firms and the partners or associates that appeared for the party in the lower tribunal or are expected to appear for the party in this court and who are not listed on the docket for the current case:

Knobbe, Martens, Olson & Bear, LLP: Jarom D. Kesler, Benjamin A. Katzenellenbogen, and Stephen W. Larson.

5.     The case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal:

 None

6.     Information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees):

None.

# I. **INTRODUCTION**

The facts of this case are straightforward. As part of its petition, Apple relied on conclusory expert testimony to argue that a diffuser would predictably improve reflected signal strength in a reflectance-type pulse oximetry sensor.  Appx0228-0229; Appx0270.   In rebuttal, Masimo's expert, Dr. Madisetti, used industry-standard techniques to experimentally show that adding a diffuser to such a sensor dramatically weakens the reflected signal strength.  *See, e.g.*, Appx1800-1802; Appx1821-1825.   Apple submitted no reply expert declaration, leaving Dr. Madisetti's analysis unrebutted.  The Board nevertheless rejected Dr. Madisetti's unrebutted testimony as not "adequate" based on the Board's own perceptions, without any scientific analysis, and without citing any evidence of record. Appx0024-0025.

The Board's criticism of Dr. Madisetti's experimental testing is that it was performed using a sensor with a single detector instead of the claimed multi-detector sensor.  *Id*.  The Board cites no evidence and provides no basis for its conclusion that Dr. Madisetti's single detector findings would not apply in a multi-detector environment. Instead, the Board concluded the "difference appears significant," that Dr. Madisetti's experiments were not "adequate," and not "probative of the obviousness question."  *Id*.  The Board apparently did not recognize that the only cited reference disclosing a diffuser, Chin, likewise includes a single detector sensor

(albeit with a sensor that detects light passing through tissue rather than light reflecting back from tissue). *See, e.g.*, Appx1328 4:45-47 ("the photodetector"), Appx1329; 6:28-32 ("a detector"); Appx1325 (Fig. 7B, with one detector (178)). In short, the Board erroneously extrapolated from Chin's single-detector *transmissive*-type sensor that a diffuser would predictably increase *reflected* signal strength, but discredited Dr. Madisetti's single-detector measurement of *reflected* signal strength as not probative of obviousness.

The Board's obviousness analysis relied on the Board's finding that a diffuser, by spreading light, would "provide for a 'stronger reflected signal' that facilitates determining measured physiological parameters." Appx0021. But the flexibility provided by the substantial evidence review does not allow the Board to rely on demonstrably wrong findings to buttress an errant obviousness determination. The Board's analysis took a legally impermissible approach, resulting in findings that are unsupported by substantial evidence. And when the Board makes such findings that are unsupported or the result of error, this Court readily reverses, as it should do here.

## II.  <u>ARGUMENT</u>

Chin is the only reference at issue that mentions a diffuser, and Chin does so only twice. Chin first mentions a diffuser at the top of column two, in its background discussion. Chin notes that "*[o]ne type* of oximeter sensor will add a diffusing optic

to diffuse the light emitted from the light-emitting diodes (LEDs) to cause it to pass through more tissue, and thus more blood." Appx1327 2:4-7.[1] This first mention provides no other details about the diffuser or sensor. Chin's other diffuser mention is in column eight, in the context of transmissive-type pulse oximeter. A transmissive-type pulse oximeter has an emitter and detector positioned on opposite sides of the tissue measurement site (*e.g.*, the ear, nostril, or finger). The transmissive-type pulse oximeter monitors light that enters from one side of tissue and penetrates through to the other side. *See, e.g.*, Appx1324 Fig. 5A (illustrating a prior art transmissive-type sensor).

Chin states its transmissive-type pulse oximeter illustrated in Figure 7 has "an optional optical diffuser 180 for diffusing the light from emitter 176, which causes a further spreading or mixing of light and may ***enhance the amount of tissue penetrated*** in some instances." Appx1330 8:25-29. Chin includes no disclosure of using a diffuser in a reflectance-type pulse oximeter. Unlike a transmissive-type pulse oximeter, a reflectance-type pulse oximeter monitors light reflected by tissue using an emitter and detector positioned on the same side of the tissue measurement site. Appx0150 10:14-20.

Chin thus mentions diffusers only briefly, and only in a qualified manner. *See* Appx1327 2:4-7 ("[o]ne type of oximeter"); Appx1330 8:25-29 ("optional optical

---

[1] All emphasis added unless otherwise noted.

diffuser…may enhance…in some instances"). Chin includes no teaching that a diffuser would improve signal strength in a reflectance-type pulse oximeter, and for good reason. As discussed in detail in Masimo's opening brief and further below, an artisan would have understood that causing light to penetrate deeper into tissue would weaken the reflected optical signal detected by a reflectance-type pulse oximeter. Br. 31-38; 45-51. Masimo's expert, Dr. Madisetti, provided experimental testing results that confirmed that adding a diffuser to a reflectance-type pulse oximeter weakens the detected signal strength dramatically. Appx1800-1802; Appx1804; Appx1806; Appx1809; Appx1813-1814; Appx1815-1817; Appx1821-1825. Apple submitted no expert declaration addressing any of Dr. Madisetti's opinions, including the experimental testing results.

Despite the absence of any countervailing evidence to Dr. Madisetti's testing in this highly technical field, the Board's decision "question[ed] the significance of the 'experiments' performed by Dr. Madisetti as alleged support for the proposition that a diffuser would have 'detrimental consequences' if applied to a 'reflectance-type' pulse oximeter sensor." Appx0024. And the Board nevertheless found that Dr. Madisetti's experiments were not "adequate or particularly probative of the obviousness question." Appx0025.

The Board erred by substituting its own expertise for the unrebutted evidence of record. The Board further erred by selectively reading bits and pieces of Chin,

and finding a broad disclosure related to diffusers where none exists. And the Board's finding that a skilled artisan would have been motivated to add Chin's diffuser to a reflectance-type pulse oximeter to predictably obtain a stronger reflected signal is unsupported by substantial evidence. The Board's judgment should be reversed.

## A.    The Board erred in its analysis of Dr. Madisetti's experimental testing

The Board found Dr. Madisetti's experimental testing inadequate and not probative without supporting evidence for that finding. But "in the context of a contested case, it is impermissible for the Board to base its factual findings on its expertise, rather than on evidence in the record." *Brand v. Miller*, 487 F.3d 862, 869 (Fed. Cir. 2007). While the Board's "expertise appropriately plays a role in interpreting record evidence," any such expertise cannot substitute for record evidence. *Id.* 868-69. The Board erred by stepping into the shoes of a rebuttal expert instead of making factual findings based on the evidence of record, including Dr. Madisetti's unrebutted testing results. Appx0024-0025. Dr. Madisetti's unrebutted testing and testimony demonstrate clear flaws in the Board's findings that undermine its obviousness judgment. Br. 31-38.

Apple defends the Board's approach by misstating Masimo's position. Apple suggests that Masimo argued that the Board "must accept an expert's post-hoc experiment…as dispositive evidence of non-obviousness." Resp. 27. Masimo's

actual position is that the Board improperly found Dr. Madisetti's testing inadequate and not probative without identifying an adequate factual basis or scientific explanation. Br. 34. Dr. Madisetti carried out highly probative experiments that confirmed an artisan's understanding that adding a diffuser to a reflectance-type pulse oximeter would substantially weaken the detected optical signal. *Id*. 31-38. Dr. Madisetti's testing used industry-standard approaches. *Id*. 31-33. And Dr. Madisetti explained that the testing applied broadly and confirmed "the basic knowledge of…a POSITA that a diffuser reduces the signal strength [for a reflectance-type device] by spreading it out across a larger area." Appx1761 58:1-14. Dr. Madisetti thus applied his expertise to the highly technical experiments in the highly technical pulse oximetry field.

Apple argues that the Board could reject Dr. Madisetti's testing because it "failed to replicate the structure of Apple's proposed combination of Chin with Sarantos/Mendelson-1991, and separately with Ackermans." Resp. 27. Apple further argues that "Dr. Madisetti's tests were critically misaligned with Apple's obviousness combination" because "Apple's combination employs [a] multidetector configuration…but Dr. Madisetti's experiment used only a single detector system." *Id*. Apple offers no record evidence as support for these arguments. Apple's arguments instead rely on attorney argument that "the results of the experiment are

not indicative of the performance of the combined prior art devices…." *Id.* 29 (quoting Appx0422-0423).

Apple thus suggests, without support, that a diffuser would have a different impact when used with multiple detectors instead of a single detector. *Id.* Masimo disagrees with the unsupported and unexplained assertion that adding detectors somehow changes the impact of the diffuser. Dr. Madisetti's unrebutted testimony was that weakening of the reflected signal is a general phenomenon not limited to a single-detector system. Appx1800-1802; Appx1804; Appx1806; Appx1809; Appx1813-1814; Appx1815-1817; Appx1821-1825; Appx1760 57:12-20. The Board and Apple side-step Dr. Madisetti's analysis with a hindsight-driven approach that does not analyze whether the combination would have been obvious to make. Instead, the Board and Apple assume the combination would be made and justify its creation by working backwards from a *ex post* "combination" figure created specifically for the inter partes review proceeding. That type of retrospective analysis demonstrates hindsight bias. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007) ("A factfinder should be aware, of course, of the distortion caused by hindsight bias and must be cautious of arguments reliant upon ex post reasoning.").

More fundamentally, the Board's unsupported statement that "the type of sensors involved in the context of…the pertinent prior art are those that include

multiple detectors," Appx0024, is plainly wrong.  Dr. Madisetti's experiments informed his opinion regarding Chin, the sole reference disclosing a diffuser, alone and in combination with other references.  Appx1800-1802; Appx1804; Appx1806; Appx1809; Appx1813-1814; Appx1815-1817; Appx1821-1825.  Chin repeatedly discusses a sensor with only one detector.  *See, e.g.*, Appx1328 4:45-47 ("the photodetector"); Appx1329 6:28-32 ("a detector"); Appx1331 9:42-44 ("the photodetector"); Appx1323 (Fig. 3, with one detector 78); Appx1324 (Fig. 5E and 5F, with one detector (d)); Appx1325 (Fig. 7B, with one detector (178)); Appx1326 (Fig. 11, illustrating one photodetector (210)).  Thus Dr. Madisetti's testing tracks Chin's disclosure, which includes sensors with a single detector.  But Dr. Madisetti's testing is far more probative than Chin.  Dr. Madisetti tested a diffuser's impact on a reflectance-type sensor, with emitter and detector on the same side of the tissue, as claimed.  Appx1821-1825.  In contrast, Chin only discusses a diffuser used with a transmissive-type sensor, with emitter and detector on opposite sides of the tissue measurement site.  Appx1330 8:25-29; Appx1325 (Fig. 7B).

Apple argues that Chin's disclosure "simply is not what is at issue in this proceeding."  Resp. 31.  Chin is the sole reference including a diffuser, so of course its disclosure is at issue.  *See, e.g.*, Appx0020-0021 (Board relying on Chin's disclosure); Appx0228-0229; Appx0270 (petition relying on Chin's disclosure).  Apple nevertheless asserts its expert "did not set out to prove, nor did he need to,

that Chin would in fact provide the benefit it espouses for its own device." Resp. 31. But Apple, its expert, and the Board all relied on Chin's disclosure as providing the motivation for adding a diffuser to a reflectance-type sensor. *See* Appx0021 ("We find persuasive Petitioner's view, and the supporting testimony of Dr. Anthony, that a skilled artisan would have recognized from Chin's disclosure that the light spreading benefits of a diffuser provide for a 'stronger reflected signal' that facilitates determining measured physiological parameters."); *see also* Appx0228-0229 (petition relying on "a stronger reflected signal at the detectors" as motivation). The Board further found that Chin would "function predictably as is disclosed" "when used in conjunction with other types of sensor devices." Appx0021. The Board's finding that Chin discloses that a diffuser would have predictably provided a "stronger reflected signal" when used with the reflectance-type pulse oximeters of Santos and Mendelson-1991 is an essential part of the Board's decision. *Id*. Dr. Madisetti's testing demonstrates that the Board's understanding of Chin is factually wrong: a diffuser does not "provide for a 'stronger reflected signal.'" Appx1821-1825. This fact would have been understood by an artisan at the time. *See, e.g.*, Appx1800-1802. Accordingly, and an artisan would have understood that Chin's diffuser for enhancing tissue penetration by light from a transmissive-type pulse oximeter does not benefit a reflectance-type pulse oximeter.

Apple further argues that the Board did not rely "on Chin to provide multiple detectors." Resp. 31. But the Board relied on Chin for its diffuser and the motivation to add that diffuser to a reflectance-type pulse oximeter. Appx0021; *see also* Appx0228-0229; Appx0270 (petition relying on Chin's disclosure). The Board also relied on Chin as teaching that a diffuser would provide a benefit in both transmissive-type and reflectance-type sensors. Appx0022-0023 (distinction between transmission and reflection "do not account adequately for Chin's plain disclosure recognizing the general benefits of a diffuser"). The Board clearly relied on Chin's teachings, which were all made in the context of a single-detector sensor. Apple also argues that its expert's testimony "plainly concerns the benefit a skilled artisan would have recognized for the combined multi-detector system." Resp. 32. But the motivation to make the multidetector system comes entirely from Chin. *See* Appx1179-1180 ¶99 (motivation for combination based solely on Chin's disclosure (Ex. 1006)). Apple repeatedly tries to sidestep any issues with the Board's motivation to combine by arguing that Apple's expert showed "how the combination would function" after it was made. Resp. 31-33. But the disclosure of the diffuser and the support for the expert's analysis again comes from Chin. *See, e.g.*, *id*. 32 (*citing* Appx1179-1182 ¶99). Even Apple concedes that its expert's testimony was "rooted in Chin's diffuser disclosure." *Id*.

Apple also argues that, because "Dr. Madisetti did not conduct an experiment using a multi-detector system," "his testimony as to what results may have come from a multi-detector test is pure speculation." *Id*. 33. As Masimo explained, Dr. Madisetti's testing and testimony was supported with data produced using industry-standard techniques. Br. 31-33; Appx1800-1802. Dr. Madisetti repeatedly indicated that his experiments supported his opinion that an artisan's understanding at the time would have been that "a diffuser in a reflectance sensor significantly reduces the amount of light reaching the detector." *See, e.g.*, Appx1803-Appx1817 ¶¶63, 65, 67, 71, 78-79, 81, 85. Apple's expert even admits that Chin's diffuser would act "in the same way" in the multi-detector combination. Appx1179 ¶98. Each individual detector in a multi-detector system would experience the same significantly decreased signal observed in Dr. Madisetti's testing.

In contrast to Dr. Madisetti's well-supported opinion, the Board provided no explanation or support when finding that the difference between a diffuser's impact in a sensor with a single detector and a sensor with multiple detectors "appears significant." Appx0024. The Board made the opposite finding when it analyzed Chin and found there was "no cogent basis to conclude that Chin's diffuser [applied to a single detector transmissive-type sensor] would not function predictably…when used in conjunction with other types of sensor devices." Appx0021. The Board's inconsistent approach and incorrect factual findings underscore the Board's need for

expert testimony, which Apple chose not to provide. Apple had the opportunity to offer rebuttal testimony and allow its expert to opine on Dr. Madisetti's testing. Instead, Apple opted for mere attorney arguments.[2]

Apple argues no rebuttal testimony was necessary to address Dr. Madisetti's analysis and testimony because Apple submitted an expert declaration "with its petition, which the Board found 'persuasive' and upon which the Board relied." Resp. 34. That earlier declaration did not and could not address Dr. Madisetti's subsequent responsive opinion. Apple cites paragraphs 95-101 and 160-163 from the initial declaration as "demonstrat[ing] the knowledge and motivations" of a skilled artisan. *Id*. 35. Although Apple's expert quotes Chin's statement that a diffuser could cause light "spreading" and increase tissue penetration (Appx1177-1178 ¶95), there is no explanation why passing ***through*** more tissue would result in a stronger ***reflected*** signal (Appx1179 ¶99). Dr. Madisetti's testing illustrates what an artisan would have expected: that spreading light with a diffuser weakens the reflected signal's strength.

Apple suggests that because a petitioner may request review "only on the basis of prior art consisting of patents or printed publications," the Board "was required

---

[2] Apple argues that requiring rebuttal evidence here suggests "that rebuttal declarations are essentially required for petitioners to prevail…." Resp. 35 n.5. Highly technical evidence that materially undermines the petition should require a technical rebuttal. Unsupported attorney argument may not fill that gap.

to perform its analysis primarily on the basis of the paper prior art references." Resp. 35 (*citing* 35 U.S.C. §311). But §311 does not limit the evidence a patent owner may rely on when demonstrating errors in the petition. And §311 does not limit Apple's ability to provide a rebuttal declaration addressing Dr. Madisetti's opinions.

Apple further argues that the Board did not substitute its own opinion in lieu of record evidence, and instead merely weighed evidence. Resp. 37. Indeed, Apple argues that the Board can rely on its own conclusory analysis when determining obviousness. *See* Resp. 37-38 (asserting that the Board is not governed by prohibition against "conclusory statements and unspecific expert testimony" applied to experts). Apple is wrong that an agency factfinder may rely on conclusory statements and unspecific analysis. *In re NuVasive, Inc.*, 842 F.3d 1376, 1383 (Fed. Cir. 2016). Moreover, an agency factfinder cannot substitute its own opinion for record evidence. *Brand*, 487 F.3d at 868-69. Thus, in a contested case, "it is impermissible for the Board to base its factual findings on its expertise, rather than on evidence in the record." *Id*. at 869. Apple asserts that the Board can make findings without expert testimony. Resp. 37. But that flexibility applies when the technology is unusually simple. When dealing with complicated technical issues, like those in this case, expert testimony "may be critical, for example, to establish the existence of certain features in the prior art…or the existence (or lack thereof) of

a motivation to combine references." *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1240 n.5 (Fed. Cir. 2010).

Indeed, the Board's approach of providing its own conclusory and unsupported expert opinion instead of evaluating the evidence of record mirrors the Board's error in *Brand*. In *Brand*, the Board improperly "substituted its own expertise for record evidence" when it gave its opinion of what an artisan "would have deduced" from a drawing. *Brand*, 487 F.3d at 870. Similarly, the record evidence here indicates that "the path that the Board determined that a skilled artisan would follow," of improving signal strength in a reflectance-type sensor using a diffuser, "has never been followed." *Id*. The Board erred by basing its analysis on its own speculation instead of record evidence. *Id.* at 869.

Finally, Apple argues that the Board concluded that "even if some negative or undesirable conditions were to emerge in some circumstances from the use of a diffuser as a part of one type of oximeter sensor, that does not establish the non-obviousness of such a sensor with a diffuser." Resp. 38 (quoting Appx0023-0024). Apple also quotes authority that the Board's motivation benefit may come at the expense of another benefit. Resp. 39. But neither argument addresses what happened in this case. The Board found the motivation for its combination was an alleged increase in the reflected signal strength from using a diffuser. *See* Appx0021 ("a skilled artisan would have recognized from Chin's disclosure that the light

spreading benefits of a diffuser provide for a 'stronger reflected signal'").   Dr. Madisetti's testing demonstrates that the Board's finding is wrong and that a skilled artisan would have understood that a diffuser weakens a reflected signal.   There are no countervailing benefits to weigh against—there is only the expectation that adding a diffuser to a reflectance-type sensor would substantially weaken the reflected signal.   While Apple's briefing might suggest that light spreading is an independent benefit, Resp. 39, the Board treated the stronger reflected signal allegedly resulting from light spreading as the motivating benefit.   Appx0021; *see also* Appx0228-0229; Appx0270 (petition relying on "a stronger reflected signal at the detectors" as motivation).   And there is no evidence that light spreading alone would have been a motivating benefit.

The Board erred in its analysis of Dr. Madisetti's unrebutted testing and expert declaration.   The Board provided no analysis or factual support for its conclusion that Dr. Madisetti's analysis was not "probative of the obviousness question." Appx0024-0025.   The Board further erred by arbitrarily finding Dr Madisetti's testing not "probative" because the tested sensor "has only a single detector." Appx0024-0025.   Indeed, the Board's analysis that Dr. Madisetti's testing with a single detector is not probative directly conflicts with the Board's analysis of Chin. When considering Chin, which includes only a single detector, the Board found "no cogent basis to conclude that Chin's diffuser [applied to a single detector sensor]

would not function predictably…when used in conjunction with other types of sensor devices." Appx0021.  The Board's shifting understanding of the relevance of a single-detector sensor—highly relevant and predictable when considering the prior art but not probative when considering Dr. Madisetti's testimony undermining the prior art—underscores the legally erroneous approach.  Br. 34-37.

Dr. Madisetti's unrebutted testing and testimony demonstrates that adding a diffuser to a reflectance-type pulse oximeter weakens a detected signal.  Br. 31-33.  The Board's motivation for the modification is that an artisan would have expected adding a diffuser would result in a *stronger* signal.  Appx0021.  Dr. Madisetti's testing and testimony provide insight into how an artisan would have understood Chin, and confirm that the Board's motivational finding is wrong.  Br. 37-38.  The expectation of a stronger signal would not have motivated a skilled artisan to add Chin's diffuser to a reflectance-type pulse oximeter.  The Board's legally erroneous approach resulted in reversible error.

## B.    The Board's findings that Chin recognizes "general benefits" for a diffuser at "any body part" and teaches a diffuser would produce a stronger reflected signal are unsupported by substantial evidence

In addition to the errors in the Board's analysis of Dr. Madisetti's unrebutted testimony, the Board's findings are also unsupported by substantial evidence.  The Board found that "Chin's plain disclosure recogniz[es] the general benefits of a diffuser and that its sensor may be attached 'to any body part' in the form of either

a 'reflectance or a transmittance sensor.'" Appx0023. The Board also found that

based on Chin's "any body part" statement "a person of ordinary skill and creativity

reasonably would have recognized that Chin contemplates various sensor types and

that those sensors, including use of a diffuser, may be applied to various body parts

of a user." *Id*. Chin, however, does not disclose a general benefit for a diffuser and

does not teach a diffuser used with a reflectance-type sensor. Br. 39-45. Chin's

"any body part" statement that forms the basis of the Board's understanding is from

Chin's discussion of a thermistor that heats the user's skin. Appx1329 5:26-53. The

Board erred by picking and choosing such isolated and unrelated statements from

Chin and linking those statements together. Br. 39-45.

The Board also erred by finding that Chin teaches a diffuser would provide a

benefit in a reflectance-type sensor by "provid[ing] for a 'stronger reflected signal'

that facilitates determining measured physiological parameters." Appx0021

(quoting Petition (Appx0229) at 63). As discussed, Dr. Madisetti's unrebutted

testimony demonstrates that an artisan would have understood that a diffuser

weakens the reflected signal that is detected. But even beyond Dr. Madisetti's

testimony, the Board's finding that Chin teaches a diffuser that provides a "stronger

reflected signal" is unsupported by substantial evidence. Chin does not teach a

diffuser used with a reflectance-type sensor or any generalized benefit for a diffuser.

Br. 45-51. And Chin does not teach that a diffuser provides a "stronger reflected

signal." *Id*. Chin instead states that a diffuser increases "penetration" "through" tissue. Appx1327 2:4-7; Appx1330 8:25-29. Unlike a transmissive-type sensor, which monitors light that penetrates through tissue, a reflectance-type sensor requires light be reflected by the tissue and return back for detection. *See, e.g.*, Appx0150 10:11-17, 10:32-33.

Apple suggests that Masimo incorrectly framed the issue as "whether Masimo could have presented substantial evidence for its position." Br. 17. But that was not Masimo's argument. Masimo pointed out that the Board's fact finding relied on a statement in Chin that "[t]he sensor could be any type of sensor…. It could attach to any body part, such as the earlobe, finger, etc. The sensor could be a reflectance or a transmittance sensor." Appx1329 5:54-57. Masimo's opening brief explained that this statement, in column 5, was unrelated to either Chin's anemic mention of diffusers in its background (column 2) or its description of the single embodiment with a diffuser (a transmissive-type sensor used on the nostril, column 8). Br. 39-49. Instead, the paragraphs leading up to Chin's "any body part" statement discuss Chin's thermistor. Appx1328-1329 4:45-5:53. The paragraphs after Chin's "any body part" statement likewise discusses thermistors. Appx1329 5:58-6:50.

Chin nowhere indicates that, in the middle of a long discussion about thermistors, Chin decided to explain how diffusers should be used. Apple does not explain why Chin would suddenly stop its extended discussion of thermistors,

interject a general and nonspecific aside explaining how to use diffusers, and then immediately return to the discussion of thermistors. Appx1328-1329 4:45-6:50. Instead, Apple argues that Chin's title demonstrates that "Chin is directed to an 'oximeter sensor with offset emitters and detector and heating device.'" Resp. 20-21. But a thermistor is a heating devices, and Chin consistently explains the central role of the thermistor in the invention. *See, e.g.*, Appx1327 2:34-39 ("present invention" improves blood perfusion "by both heating a patient's skin and providing emitters and a detector which are offset from each other"). Thus, Chin's title confirms the thermistor's central role in Chin, and Chin's corresponding description that thermistors can be used broadly.

Apple also argues that Chin's "any type of sensor" disclosure must be read broadly because it does not reference the particular "sensor 15" illustrated in Chin's Figure 2, but instead identifies "sensors generally." Resp. 21. Figure 2, however, is a high-level illustration of the thermistor management system. Appx1329 5:26-27. There is no particular "sensor 15" illustrated in Figure 2, just a schematic illustrating the connection between the thermistor and the monitor. Chin explains that the thermistor management system in Figure 2 could be used with either a reflectance-type or transmission-type sensor and attach to any body part for heating and temperature control. Appx1329 5:26-62. Chin's "any body part" discussion thus defines the use of the thermistor system in Figure 2.

Apple suggests this is an instance where there are two reasonable interpretations. But there is nothing in Chin that suggests it would be reasonable to apply Chin's discussion of "any body part" to anything other than the broad potential positioning of a thermistor. Even though Chin's "any body part" discussion does not reference "sensor 15," that discussion is nevertheless part of one long and uninterrupted discussion about thermistors. Appx1328-1329 4:45-6:50. The Board's finding that, in the middle of a long discussion of thermistors, Chin inserted three sentences related to diffuser use requires improperly picking and choosing isolated and unrelated pieces of the reference. *See Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd.*, 719 F.3d 1346, 1365 (Fed. Cir. 2013) ("'[o]ne cannot ... pick and choose among isolated disclosures in the prior art to deprecate the claimed invention'") (internal citation omitted). The Board's finding that "Chin's plain disclosure recogniz[es] the general benefits of a diffuser and that its sensor may be attached 'to any body part' in the form of either a 'reflectance or a transmittance sensor'" (Appx0023) is unsupported by substantial evidence.

Masimo also explained that Chin's statement that a diffuser "may enhance the amount of tissue penetrated," does not support the Board's finding of a "stronger reflected signal." Br. 46-47. A transmissive-type sensor relies on light penetrating one side of the body and passing through to the other side, where it is detected. Thus, as shown in Chin's Figure 7B (Appx1325), a diffuser increases the penetration of

light into the body. In contrast a reflectance-type device relies on light reflected back from the tissue. As explained by Dr. Madisetti's unrebutted testimony, an artisan would have expected and understood that increased tissue penetration would result in a decreased reflected signal, as light would be lost deeper into the tissue and not reflected back. Br. 25-26; Appx1800-1802; Appx1821-1825.

Apple argues that it is enough that its expert testified that a diffuser would result in a stronger reflected signal. Resp. 22. But that expert testimony includes no explanation why increasing tissue **penetration** would increase **reflection**. Appx1179-1180 ¶99. Such conclusory testimony cannot support obviousness. *See, e.g., DSS Tech. Mgmt., Inc. v. Apple Inc.*, 885 F.3d 1367, 1377 (Fed. Cir. 2018) ("'conclusory statements and unspecific expert testimony' are insufficient to support the Board's findings"). In contrast, Dr. Madisetti supported his opinion with testing that demonstrates that a diffuser weakened the detected reflected signal. Appx1800-1802; Appx1821-1825. Apple also proposes a new theory for why a diffuser might increase reflected signal strength. Apple argues that "prior to passing through tissue, the increased light hits the surface of the tissue." Resp. 22. But a diffuser does not generate new light, a diffuser just increases the spread and penetration of the existing light. Appx1330 8:25-29. There is no evidence or explanation why increased tissue penetration results in a strengthened reflected signal. Dr. Madisetti's testing

confirms a diffuser would have been expected to weaken the reflected signal strength.

Masimo also explained that Chin's diffuser discussion would not have been understood broadly because Chin uses different strategies for transmissive-type and reflectance-type sensors. Br. 40-44, 49-51. Thus, strategies that might help for one sensor type, *e.g.*, a diffuser that increases the amount of tissue penetrated in a transmissive-type sensor, could negatively impact a different type of sensor. For example, Chin explains that, for thin tissue measurement sites, reflectance-type sensors use an opposing external reflective surface to prevent light from penetrating and passing entirely through the tissue without being reflected. Appx1330 7:28-45; Appx1324 Figs. 5E, 5F. Increasing tissue penetration with, *e.g.*, a diffuser, compounds this problem.

The differences between transmissive-type and reflective-type sensors undermine the Board's finding that Chin discloses a diffuser has a general benefit in any type of sensor. Apple asserts Masimo's argument was "without any cited expert support." Resp. 23. While Masimo based its argument on Chin's disclosure, Dr. Madisetti also provided supporting testimony. Appx1798-1800 ¶¶54-55. Apple next asserts that the fact that Chin must use an external reflective surface to reflect penetrating light back into the measurement site actually supports the Board's diffuser findings. Resp. 23-24. Apple argues that "[i]t stands to reason that more

light penetrating the tissue 146—the effect Chin teaches that its diffuser would have—will result in more light reaching the reflective surface 150 to be reflected back towards detector 142." Resp. 24. But, Chin's external reflective surface is a fix for the problem of too much light penetration, which would reduce the reflectance signal. *See* Appx1330 7:34-38 (reflective surface directs light back into tissue and provides "more light to detector 142 than would be found in a typical reflectance configuration").

The Board's combination incorporates no such external reflective surface and Apple presented no evidence showing such external reflective surface could even be used at the wrist where the Board's combination must be positioned. The claims specifically require measurements at the wrist, a thick measurement site where light cannot penetrate from one side to the other. Appx0153; Br. 43-44. Spreading light and increasing tissue penetration at the wrist would have been expected to weaken a reflectance signal, as Dr. Madisetti confirmed. Appx1800-1802; Appx1804; Appx1806; Appx1809; Appx1813-1814; Appx1815-1817; Appx1821-1825.

Apple further cites Chin's short background statement and short description of a diffuser. Resp. 17. Apple argues that even though the background statement describes "[o]ne type" of sensor, without elaboration, the benefit is not "limited to only that one type of sensor." *Id*. 18. Likewise, Apple argues that Chin's only other mention of a diffuser, in a transmissive-type sensor, should apply to any type of

sensor because "Chin makes no statement or suggestion that its observation about the benefits of diffusers depends on the type of sensor to which the diffuser is applied." *Id*. But, as discussed, Chin includes no teaching that a diffuser in a reflectance-type sensor would strengthen the reflected signal that is detected. And an artisan would have understood that a diffuser would instead weaken the reflected signal.

Moreover, Chin qualifies any benefits from a diffuser when describing its implementation in the transmissive-type sensor:  the diffuser "***may*** enhance the amount of tissue penetrated in ***some*** instances." Appx1330 8:25-29.   Such speculative disclosure does not provide substantial evidence support for the Board's finding that Chin generally discloses that a diffuser would predictably benefit any sensor, including a reflectance-type sensor. *See OSI Pharms., LLC v. Apotex Inc.*, 939 F.3d 1375, 1382 (Fed. Cir. 2019) ("'Mere speculation' is not substantial evidence.").   Apple argues that a reference need not show "conclusive proof of efficacy" to establish obviousness.  Resp. 25.  And Apple argues that the Board found an artisan would have had a reasonable expectation of success, and cites the Board's reliance on Apple's expert's conclusory testimony.  *Id*. 26.  But Apple's arguments do not explain how the Board could find "Chin's plain disclosure recognize[es] the general benefits of a diffuser" (Appx0023) when Chin expressly qualifies the benefits of a diffuser in its transmissive-type sensor embodiment.  Chin

itself indicates that even for a transmissive-type sensor, a diffuser's benefits are not "general" and instead "may enhance" only in "some instances." Appx1330 8:25-29.

Apple cites paragraphs from its expert's declaration (Appx1179-1180 ¶¶99-101) that state, without any analysis, that a diffuser would result in a stronger reflected signal. Resp. 19. As discussed, Dr. Madisetti's unrebutted testimony demonstrated that a diffuser weakens rather than strengthens a reflected signal. Br. 31-33. Chin's discussion of enhancing tissue penetration in a transmissive-type sensor is not a suggestion to use a diffuser in a reflectance-type sensor. Apple's expert's conclusory testimony does not provide substantial evidence support for the Board's findings. *DSS,* 885 F.3d at 1377.

## C.  The Board's findings regarding Chin's combination with Sarantos or Ackermans are not supported by substantial evidence

The Board's obviousness combination relies on either Sarantos or Ackermans for teaching a multi-detector device. As Masimo explained, both Sarantos and Ackermans use specific sensor designs that an artisan would have understood would not benefit from a diffuser's light spreading. Br. 51-58. For example, Sarantos explains that its sensor takes advantage of the relatively more concentrated ring of reflected light close to the emitter. Appx1355-1366 10:67–11:3. As illustrated in Sarantos, its thin rectangular detectors effectively capture more of the high-intensity ring of light than prior art square detectors. Appx1341 Fig. 6 (colored, below). Capturing the ring of reflected light close to the emitter allows Sarantos to reduce

the emitter's intensity and improve power consumption in its wearable fitness monitor.  Appx1360 19:13-21.



FIG. 6

The expert declaration accompanying Apple's petition did not explain why a diffuser's light spreading would be desirable for Sarantos's specific sensor design that captures high-intensity light from a defined area close to the emitter.  Appx1178-1180.

Masimo's expert, Dr. Madisetti, directly addressed Sarantos's design and explained that a diffuser would have undesirably spread the light over a larger area. Appx1811-1812 ¶74.  Without a diffuser, Sarantos's rectangular detectors capture "nearly 85% of the available AC power [signal] in the overall area." Appx1355 10:30-34; *see also id.* 10:34-36 (Sarantos's rectangular detectors "collect nearly four

times as much light as the square photodetector"). Dr. Madisetti explained that an artisan would have expected that adding a diffuser would spread light out from the center and across more tissue. Appx1810-1812 ¶¶73-74. Thus, in addition to weakening the reflected signal in general (as Dr. Madisetti's testing demonstrated), an artisan would have expected that adding a diffuser to Sarantos's sensor would compromise Sarantos's compact design that captures nearly all reflected signal using thin rectangular detectors.

Apple first argues that a "flawed assumption underlying Masimo's argument is that applying a diffuser to Sarantos would necessarily spread emitted light beyond the 1-4 millimeter range Sarantos sets out for its detectors in one embodiment." Resp. 46. Apple treats Sarantos's 1-4 millimeter range as an arbitrary number. In fact, the 1-4 millimeter range corresponds to the narrow band of higher-intensity light captured by Sarantos's thin detector. Dr. Madisetti illustrated this phenomenon using annotated figures from Sarantos that show a maximum concentration of light between 1-4 mm captured using a rectangular detector. Appx1812 (below).



A diffuser would spread out this narrow band of light, thereby disrupting Sarantos'
compact design.

Apple also argues that the portions of Dr. Madisetti's declaration cited in
Masimo's brief "do not even mention" Sarantos's rectangular sensor design that uses
at least a 2:1 ratio. Resp. 47 (citing Appx1810-1812 ¶¶73-74). The cited paragraphs
discuss the relationship between Sarantos's rectangular "HAR" (high aspect ratio)
detectors and the expected spread of reflected light. Appx1811 ¶74. Dr. Madisetti
provided annotated figures (above) that illustrate "HAR" detectors are thin
rectangular detectors with an at least 2:1 dimension ratio. *Id.* Indeed, Dr. Madisetti's
declaration consistently explains that Sarantos designs its detectors so the detectors
capture the narrow band of relatively high-intensity reflected light. *See also*

Appx1792-1794 ¶¶40-41; Appx1807-1808 ¶69 ("Sarantos seeks to improve the collected AC component based on the arrangement and size of its photodetectors.").

Despite Apple having the opportunity to provide a rebuttal expert declaration, Apple chose to provide none. The only record evidence regarding the impact of a diffuser on Sarantos's particular design comes from Dr. Madisetti's unrebutted analysis. Nevertheless, Apple argues that "the record simply contains insufficient evidence" to support Dr. Madisetti's analysis of Sarantos's design. The claimed invention, however, requires "a diffuser which receives, spreads, and emits the spread light." *See, e.g.*, Appx0153 claim 6. Apple provides no explanation or evidence for how a diffuser that spreads light would nevertheless maintain the tight band of relatively high-intensity light captured by Sarantos using narrow rectangular detectors. Resp. 47-48. Indeed, the Board expressly found a diffuser would spread light (though the Board incorrectly found that such spreading would strengthen the reflected signal). *See, e.g.*, Appx0025.

Apple then makes a series of attorney arguments about Sarantos and asserts that Sarantos allows an implementation with its detectors spaced more than 4 mm from the emitter. Resp. 48. As Dr. Madisetti explained, Sarantos's design captures a concentrated band of relatively high intensity reflected light. Appx1792-1794 ¶¶40-41; Appx1807-1808 ¶69; Appx1810-1812 ¶¶73-74. Sarantos's analysis shows that the band typically falls within 4 mm from the emitter. *See, e.g.*, Appx1340-

1341 (Figs. 5-6); Appx1355 10:27-67 (discussing Figures 5-6); Appx1811-1812 ¶74. Apple argues that a diffuser would ensure more light reaches farther from the detector and that, presumably, the detector could then capture that light reflected back from farther to collect more light overall. Resp. 48. But in the context of Sarantos's design, this is undesirable. As Dr. Madisetti explained, a diffuser spreads out emitted light. Appx1810-1812 ¶¶73-74. This results in a decreased light intensity per unit area. *Id.*; Appx1764-1765 61:16-62:1. A diffuser spreading light is also contrary to the goals of Sarantos's design, which uses specifically shaped detectors to capture the relatively high intensity band of light. *See, e.g.*, Appx1340-1341 (Figs. 5-6); Appx1355 10:27-67 (discussing Figures 5-6).

Sarantos's design maximizes the amount of light captured per unit area by the detector. *See* Appx1355 10:34-36 (the high aspect ratio photodetector can "collect nearly four times as much light as the square photodetector"), 10:39-50 (noting the high aspect ratio detector "offers a 300% improvement in collected AC power" signal compared to a square photodetector of the same area). Sarantos's compact design benefits from and requires capturing concentrated reflected light. Appx1792-1794 ¶¶40-41; Appx1807-1808 ¶69. Apple suggests, without citing any support from its expert, that using a diffuser might allow detectors spaced farther apart because "Sarantos's concern with spacing the detectors further apart is the need to diffuse light across the greater distance." Resp. 48-49. Thus, Apple argues, "[o]ne

would not need to use a higher powered sensor to achieve the result the diffuser is already effecting." *Id*. 49. As Dr. Madisetti explained, however, an artisan would have understood that using a diffuser spreads emitted light across a larger area and distance, weakening a reflected light signal and thus disrupting Sarantos's design. Appx1810-1812 ¶¶73-74; Appx1764-1765 61:16-62:1.

Apple also argues that even if adding a diffuser disrupted Sarantos's design, an artisan would nevertheless recognize the benefit of "stronger signal strength and spreading light." Resp. 49. But, as discussed, Dr. Madisetti's unrebutted testing and testimony demonstrate that a diffuser weakens signal strength in a reflectance-type sensor and "spreading light" is not an independent benefit. This is not an instance where an artisan is faced with a design choice that offers certain benefits at the expense of others. Moreover, the Board focused on whether Sarantos is "limited solely to a singular light spreading pattern" without analyzing how a diffuser would impact Sarantos's deliberate design. Appx0025-0026. The Board found that a skilled artisan "would have recognized that a diffuser provides for light to be desirably 'further spread[]' to pass, in some instances, through more tissue and more blood," without explaining how that spreading would work with Sarantos's high aspect ratio detectors. *Id*.

Finally, Apple defends the Board's analysis of the Ackermans combination. Resp. 50-51. As Masimo pointed out in its opening brief, Dr. Madisetti explained

that Ackermans's unique design requires that Ackermans's light emitter and detector are arranged in "a compact way." Appx1817-1818 ¶87 (*quoting* Appx1372 2:31-32). Ackermans uses its specific compact arrangement to minimize motion artifacts. Appx1818-1819 ¶89 (citing Appx1375 5:28-33). A diffuser disrupts that compact design by spreading light across a wider area. *Id*. Dr. Madisetti's testimony was unrebutted. Despite the differences between Sarantos and Ackermans, the Board provided no independent analysis. Appx0027-0029; Br. 56-57. Instead the Board applied the same "reasoning presented above in connection with the combination of Sarantos, Mendelson-1991 and Chin." Appx0028.

Apple argues that the Board was not required to provide an analysis of the Ackermans combination because the arguments presented "the same basic argument." Resp. 50. As Masimo explained, there are factual differences between Ackermans and Sarantos, and Dr. Madisetti provided a different, unrebutted, analysis that the Board never addressed. Br. 56-58. The Board erred by analyzing Ackermans without any independent findings, reasoning, or reference to supporting evidence. The Board's errors discussed above are also fatal to its Ackermans analysis.

## III. CONCLUSION

The Board erred in its analysis of Dr. Madisetti's experimental testing and testimony. The Board made factual findings based on picking and choosing isolated

pieces of references. The Board's improper approach led it to unsupported factual findings. For the reasons set forth above and in Masimo's opening brief, the Board's decision should be reversed.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

April 9, 2023                    /s/ Jeremiah S. Helm
                                 Joseph R. Re
                                 Stephen C. Jensen
                                 John M. Grover
                                 Shannon Lam
                                 Jeremiah S. Helm

                                 *Attorneys for Appellant*
                                 *Masimo Corporation*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a).  This brief contains 6,997 words, excluding the parts of the brief exempt by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2).

2.    This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).  This brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font Times New Roman.

KNOBBE, MARTENS, OLSON & BEAR, LLP

April 9, 2023                    */s/   Jeremiah S. Helm*
                     Jeremiah S. Helm

                     *Attorneys for Appellant*
                     *Masimo Corporation*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned counsel hereby certifies that on April 9, 2023, the foregoing **REPLY BRIEF OF APPELLANT MASIMO CORPORATION** was filed using the Court's CM/ECF system, which will send notice of such filing to all registered CM/ECF users. This Reply Brief was also sent by Email to opposing counsel of record on April 7, 2023.

KNOBBE, MARTENS, OLSON & BEAR, LLP

April 9, 2023

*/s/   Jeremiah S. Helm*
  Jeremiah S. Helm

*Attorneys for Appellant*
*Masimo Corporation*

57174471