[Volume I, Appx0001 – Appx1320]
No. 22-1895

IN THE

# United States Court of Appeals

## FOR THE FEDERAL CIRCUIT

———————————

MASIMO CORPORATION,

*Appellant,*

v.

APPLE INC.,

*Appellee.*

APPEAL FROM THE PATENT TRIAL AND APPEAL BOARD
CASE NO. IPR2020-01722

## JOINT APPENDIX

Joseph R. Re, *Principal Counsel*
Stephen C. Jensen
John M. Grover
Shannon Lam
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main Street, 14th Floor
Irvine, CA 92614
(949) 760-0404

Jeremiah S. Helm
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
1717 Pennsylvania Ave., N.W.
Washington, D.C. 20006
(202) 640-6400

*Attorneys for Appellant*
*Masimo Corporation*

Lauren A. Degnan, *Principal Counsel*
W. Karl Renner
Michael J. Ballanco
**FISH & RICHARDSON P.C.**
1000 Maine Ave., Suite 1000
Washington, DC 20024
Tel: (202) 783-5070

Robert Courtney
**FISH & RICHARDSON P.C.**
60 South 6th Street
Suite 3200
Minneapolis, MN 55402
Tel: (612) 335-5070

*Attorneys for Appellee Apple Inc.*

April 14, 2023

# Table of Contents

| Date | Paper No. /Ex. No. | Document | Pages |
|------|------|----------|-------|
| **VOLUME I** | | | |
| 5/5/2022 | 29 | Final Written Decision | Appx0001-Appx0031 |
| 7/26/2022 | n/a | Notice Forwarding Certified List | Appx0032-Appx0129 |
| n/a | Ex. 1001 | U.S. Patent No. 10,470,695 | Appx0130-Appx0154 |
| 10/2/2020 | 2 | Petition for Inter Partes Review | Appx0156; Appx0175; Appx0177-0183; Appx0227-0229; Appx0231; Appx0237-0241; Appx0268-0270 |
| 8/9/2021 | 13 | Patent Owner's Response | Appx0350-0400 |
| 11/5/2021 | 18 | Petitioner's Reply to Patent Owner's Response | Appx0411; Appx0417-0428 |
| | Ex. 1023 | Petitioner's Demonstratives | Appx0509; Appx0533-0538 |
| 4/5/2022 | 28 | February 9, 2022 Oral Hearing Transcript | Appx0553; Appx0559; Appx0563-0565; Appx0568-0569; Appx0573-0575; Appx0584-0585 |
| | Ex. 1003 | Declaration of Brian W. Anthony | Appx1114; Appx1128-1129; Appx1177-1182; Appx1216-1218 |
| | Ex. 1005 | U.S. Patent No. 8,998,815 | Appx1248-1320 |
| **VOLUME II** | | | |
| | Ex. 1006 | U.S. Patent No. 6,343,223 | Appx1321-Appx1332 |
| | Ex. 1014 | U.S. Patent No. 9,392,946 | Appx1333-1362 |

| Date | Paper No. /Ex. No. | Document | Pages |
|---|---|---|---|
| | Ex. 1015 | Mendelson, Skin Reflectance Pulse Oximetry In Vivo Measurements from the Forearm and Calf | Appx1363-1368 |
| | Ex. 1016 | PCT Pub. No. WO 2011/051888 to Ackermans et al.("Ackermans") | Appx1369-Appx1388 |
| | Ex. 1022 | 9/10/2021 Deposition Transcript of Dr. Vijay Madisetti | Appx1704; Appx1722-1723; Appx1760-1765 |
| | Ex. 2001 | Declaration of Vijay K. Madisetti, Ph.D. | Appx1771-1825 |
| | Ex. 2003 | 7/16/2021 Transcript of Deposition of Dr. Brian Anthony in connection with IPR2020-01722 | Appx1853; Appx1974 |

57405432

Trials@uspto.gov
571-272-7822

Paper 29
Entered: May 5, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

APPLE INC.,
Petitioner,

v.

MASIMO CORPORATION,
Patent Owner.

———————

IPR2020-01722
Patent 10,470,695 B2

———————

Before JOSIAH C. COCKS, ROBERT L. KINDER, and
AMANDA F. WIEKER, *Administrative Patent Judges.*

COCKS, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

IPR2020-01722
Patent 10,470,695 B2

# I.  INTRODUCTION

## A.  Background

Apple Inc. ("Petitioner") filed a Petition requesting an *inter partes* review of claims 1–6, 8, 9, 11–19, and 21–30 of U.S. Patent No. 10,470,695 B2 (Ex. 1001, "the '695 patent").  Paper 2 ("Pet.").  We instituted the petitioned review.  Paper 8 ("Institution Decision" or "Inst. Dec.").

Masimo Corporation ("Patent Owner") filed a Patent Owner Response (Paper 13, "PO Resp.") to oppose the Petition.  Petitioner filed a Reply (Paper 18, "Pet. Reply") to the Patent Owner Response.  Patent Owner filed a Sur-reply (Paper 19, "PO Sur-reply") to the Reply.  We conducted an oral hearing on February 9, 2022.  A transcript has been entered in the record (Paper 28, "Tr.").[1]

We have jurisdiction under 35 U.S.C. § 6(b)(4) and § 318(a).  This Decision is a final written decision under 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73 as to the patentability of claims 6, 14, and 21 of the '695 patent.  We determine Petitioner has shown by a preponderance of the evidence that those claims are unpatentable.

---

[1] In the Patent Owner Response, Patent Owner indicates that claims 1–5, 8, 9, 11–13, 15–19, and 22–30 "have been statutorily disclaimed under 35 U.S.C. § 253(a)," and are "no longer at issue in this proceeding."  PO Resp. 15 (citing Ex. 2004).  At oral argument, Patent Owner again acknowledged that claims 1–5, 8, 9, 11–13, 15–19, and 22–30 have been disclaimed.  Tr. 13.  In its Reply, Petitioner also notes that those claims have been disclaimed "leaving claims 6, 14, and 21 as the only remaining challenged claims."  Pet. Reply 1 n.1 (citing Ex. 2004).  Exhibit 2004 is titled "Disclaimer in Patent Under 37 CFR 1.321(a)" and indicates that claims 1–5, 8, 9, 11–13, 15–19, and 22–30 have been disclaimed.  Ex. 2004, 1.  Accordingly, we regard claims 6, 14, and 21 as the only remaining challenged claims in this proceeding.

IPR2020-01722
Patent 10,470,695 B2

## B. Related Matters

Patent Owner identifies the following matters related to the '695 patent:

*Masimo Corporation v. Apple Inc.*, Civil Action No. 8:20-cv-00048 (C.D. Cal.) (filed Jan. 9, 2020);

*Apple Inc. v. Masimo Corporation*, IPR2020-01520 (PTAB Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,258,265 B1);

*Apple Inc. v. Masimo Corporation*, IPR2020-01521 (PTAB Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,292,628 B1);

*Apple Inc. v. Masimo Corporation*, IPR2020-01523 (PTAB Aug. 31, 2020) (challenging claims of U.S. Patent No. 8,457,703 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01524 (PTAB Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,433,776 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01526 (PTAB Aug. 31, 2020) (challenging claims of U.S. Patent No. 6,771,994 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01536 (PTAB Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,588,553 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01537 (PTAB Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,588,553 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01538 (PTAB Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,588,554 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01539 (PTAB Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,588,554 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01713 (PTAB Sept. 30, 2020) (challenging claims of U.S. Patent No. 10,624,564 B1);

3

IPR2020-01722
Patent 10,470,695 B2

*Apple Inc. v. Masimo Corporation*, IPR2020-01714 (PTAB Sept. 30, 2020) (challenging claims of U.S. Patent No. 10,631,765 B1 patent);

*Apple Inc. v. Masimo Corporation*, IPR2020-01715 (PTAB Sept. 30, 2020) (challenging claims of U.S. Patent No. 10,631,765 B1 patent);

*Apple Inc. v. Masimo Corporation*, IPR2020-01716 (PTAB Sept. 30, 2020) (challenging claims of U.S. Patent No. 10,702,194 patent);

*Apple Inc. v. Masimo Corporation*, IPR2020-01723 (PTAB Oct. 2, 2020) (challenging claims of U.S. Patent No. 10,470,695 B2);[2]

*Apple Inc. v. Masimo Corporation*, IPR2020-01733 (PTAB Sept. 30, 2020) (challenging claims of U.S. Patent No. 10,702,195 B1); and

*Apple Inc. v. Masimo Corporation*, IPR2020-01737 (PTAB Sept. 30, 2020) (challenging claims of U.S. Patent No. 10,709,366 B1).

Paper 4, 2–3.

Patent Owner also identifies the following pending patent applications that claim priority to, or share a priority claim with, the '695 patent:

U.S. Patent Application No. 15/195,199;

U.S. Patent Application No. 16/532,061;

U.S. Patent Application No. 16/532,065;

U.S. Patent Application No. 16/791,955;

U.S. Patent Application No. 16/791,963;

U.S. Patent Application No. 16/835,712;

---

[2] Pursuant to the Board's November 2019, Consolidated Trial Practice Guide, *available at* https://www.uspto.gov/TrialPracticeGuideConsolidated, Petitioner filed a Notice ranking its two petitions that challenge the '695 patent, ranking first the instant proceeding and ranking second IPR2020-01723.  Paper 3, 2.  We exercised our discretion to deny institution of *inter partes* review in IPR2020-01723.  *See* IPR2020-01723, Paper 8.

IPR2020-01722
Patent 10,470,695 B2

U.S. Patent Application No. 16/835,772; and

U.S. Patent Application No. 16/871,874.

*Id.* at 1–2.

## C. The '695 Patent

The '695 patent is titled "Advanced Pulse Oximetry Sensor," and issued on November 12, 2019, from U.S. Patent Application No. 16/226,249, filed December 19, 2018. Ex. 1001, codes (21), (22), (45), (54). The '695 patent summarizes its disclosure as follows:

> This disclosure describes embodiments of non-invasive methods, devices, and systems for measuring blood constituents, analytes, and/or substances such as, by way of non-limiting example, oxygen, carboxyhemoglobin, methemoglobin, total hemoglobin, glucose, proteins, lipids, a percentage therefor (e.g., saturation), pulse rate, perfusion index, oxygen content, total hemoglobin, Oxygen Reserve Index™ (ORI™) or for measuring many other physiologically relevant patient characteristics. These characteristics can relate to, for example, pulse rate, hydration, trending information and analysis, and the like.

*Id.* at 2:36–46.

IPR2020-01722
Patent 10,470,695 B2

Figures 7A and 7B of the '695 patent are reproduced below:



FIG. 7A                    FIG. 7B

Figures 7A and 7B above depict side and top views, respectively, of a three-dimensional pulse oximetry sensor according to an embodiment of the '695 patent. *Id.* at 5:28–33.  Sensor 700 includes emitter 702, light diffuser 704, light block (or blocker) 706, light concentrator 708, and detector 710. *Id.* at 10:49–51.  The sensor functions to irradiate tissue measurement site 102, e.g., a patient's wrist, and detects emitted light that is reflected by the tissue measurement site. *Id.* at 10:43–49.  "[L]ight blocker 706 includes an annular ring having cover portion 707 sized and shaped to form a light isolation chamber for the light concentrator 708 and the detector 710." *Id.* at 11:10–12.  "[L]ight blocker 706 and cover 70[7] ensures that the only light detected by the detector 710 is light that is reflected from the tissue measurement site." *Id.* at 11:16–20.

6

IPR2020-01722
Patent 10,470,695 B2

Figure 8 of the '695 patent is reproduced below:



FIG. 8

Figure 8 above illustrates "a block diagram of an example pulse oximetry system capable of noninvasively measuring one or more blood analytes in a monitored patient." *Id.* at 5:34–36. Pulse oximetry system 800 includes sensor 801 (or multiple sensors) coupled to physiological monitor 809. *Id.* at 12:21–23. Monitor 809 includes "signal processor 810 that includes processing logic that determines measurements for desired analytes based on the signals received from the detector 806" that is a part of sensor 801. *Id.* at 13:37–40. Monitor 809 also includes user interface 812 that provides "an output, e.g., on a display, for presentation to a user of pulse oximetry system 800." *Id.* at 13:64–66.

7

IPR2020-01722
Patent 10,470,695 B2

### D. Illustrative Claim

Claim 6 is illustrative and is reproduced below.[3]

1. A wrist-worn physiological monitoring device configured for placement on a user at a tissue measurement site, the device comprising:

a light emission source comprising a plurality of emitters configured to irradiate the tissue measurement site by emitting light towards the tissue measurement site, the tissue measurement site being located on a wrist of the user,

the plurality of emitters configured to emit one or more wavelengths;

a plurality of detectors configured to detect the light emitted by the plurality of emitters after attenuation by a circular portion of the tissue measurement site,

the plurality of detectors further configured to output at least one signal responsive to the detected light;

a processor configured to receive the at least one signal responsive to the output and determine a physiological parameter of the user; and

a light block forming an enclosing wall between the light emission source and the plurality of detectors,

the light block defining the circular portion of the tissue measurement site, the light emission source arranged proximate a first side of the enclosing wall and the plurality of detectors arranged proximate a second side of the enclosing wall, the first side being difference than the second side,

wherein the enclosing wall prevents at least a portion of light emitted from the light emission source from being detected by the plurality of detectors without attenuation by the tissue, and wherein the plurality of detectors are arranged in an array having a spatial configuration corresponding to the circular portion of the tissue measurement site.

Ex. 1001, 15:32–63.

_____

[3] Because claim 6 depends from independent claim 1, we also reproduce disclaimed claim 1 for completeness.

IPR2020-01722
Patent 10,470,695 B2

 6. The physiological monitoring device of claim 1, further comprising a diffuser which receives, spreads, and emits the spread light, wherein the emitted spread light is directed at the tissue measurement site.

*Id.* at 16:16–19.[4]

### E.   Evidence Relied Upon

Petitioner relies on the following references:

| Reference | Publication/Patent Number | Exhibit |
|---|---|---|
| Sarantos | U.S. Patent No. 9,392,946 B1 issued July 19, 2016 | 1014 |
| Mendelson-1991 | Mendelson et al., *Skin Reflectance Pulse Oximetry: In Vivo Measurements from the Forearm and Calf*, Journal of Clinical Monitoring Vol. 7 No. 1, pp. 7–12 (January 1991) | 1015 |
| Chin | U.S. Patent No. 6,343,223 B1 issued Jan. 29, 2002 | 1006 |
| Ackermans | WO 2011/051888 A2  published May 5, 2011 | 1016 |

Pet. 3–4.  Petitioner also relies on the Declaration of Brian W. Anthony, Ph.D. (Ex. 1003).  Patent Owner relies on the Declaration of Vijay K. Madisetti, Ph.D. (Ex. 2001).

---

[4] Claim 14 (which depends from independent claim 9) and claim 21 (which depends from independent claim 19) add a similar "diffuser" limitation as is set forth in claim 6.

IPR2020-01722
Patent 10,470,695 B2

### F. Asserted Grounds

Petitioner asserts that claims 6, 14, and 21 are unpatentable based upon the following grounds (Pet. 3):[5]

| Claims Challenged | 35 U.S.C. § | References/Basis |
|---|---|---|
| 6, 14, 21 | 103 | Sarantos, Mendelson-1991, Chin |
| 6, 14, 21 | 103 | Ackermans, Chin |

## II. ANALYSIS

### A. Claim Construction

For petitions filed on or after November 13, 2018, a claim shall be construed using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. § 282(b). 37 C.F.R. § 42.100(b) (2019). Both parties submit that no claim term requires express construction. Pet. 5; PO Resp. 14. Based on our analysis of the issues, we conclude that no claim terms require express construction. *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017).

### B. Principles of Law

A claim is unpatentable under 35 U.S.C. § 103 if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406

---

[5] As noted by both parties, because of Patent Owner's statutory disclaimer, these are the only claims and grounds that remain at issue in this proceeding. *See* PO Resp. 16; *see generally* Pet. Reply, PO Sur-reply.

IPR2020-01722
Patent 10,470,695 B2

(2007).  The question of obviousness is resolved on the basis of underlying factual determinations, including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) objective evidence of non-obviousness.[6]  *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).  When evaluating a combination of teachings, we must also "determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue." *KSR*, 550 U.S. at 418 (citing *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)).  Whether a combination of prior art elements would have produced a predictable result weighs in the ultimate determination of obviousness.  *Id.* at 416–417.

In an *inter partes* review, the petitioner must show with particularity why each challenged claim is unpatentable.  *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016); 37 C.F.R. § 42.104(b).  The burden of persuasion never shifts to Patent Owner.  *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015).

We analyze the challenges presented in the Petition in accordance with the above-stated principles.

## C.  Level of Ordinary Skill in the Art

Petitioner identifies the appropriate level of skill in the art as follows:

The person would have had a Bachelor of Science degree in an academic discipline emphasizing the design of electrical, computer, or software technologies, in combination with training or at least one to two years of related work experience with capture and processing of data or information, including but not limited to physiological monitoring technologies.  .  .  .

---

[6] Patent Owner does not present objective evidence of non-obviousness.

11

IPR2020-01722
Patent 10,470,695 B2

> Alternatively, the person could have also had a Master of Science
> degree in a relevant academic discipline with less than a year of
> related work experience in the same discipline.

Pet. 4–5 (citing Ex. 1003 ¶¶ 17–19).

Patent Owner does not offer its own assessment of the level of
ordinary skill. Patent Owner, however, does level a measure of criticism of
Petitioner's assessment of the level of skill in the art as not accounting for
experience in optics or physiology, and focusing on "data processing and not
sensor design." PO Resp. 13. Nevertheless, Patent Owner expresses that it
"applies [Petitioner's] asserted level of skill." *Id.* (citing Ex. 2001 ¶¶ 34–
36). We determine that the Petitioner's expressed level of ordinary skill in
the art is consistent with the '695 patent and the prior art of record.
Accordingly, we adopt it in this Decision.

### D. Obviousness Over Sarantos, Mendelson-1991, and Chin

Petitioner contends that claims 6, 14, and 21 would have been obvious
based on the teachings of Sarantos, Mendelson-1991, and Chin. Pet. 61–63.
Patent Owner disagrees and presents several arguments in opposition. PO
Resp. 16–42; PO Sur-reply 2–13.

### 1. Overview of Sarantos

Sarantos is titled "Heart Rate Sensor With High-Aspect-Ratio
Photodetector Element." Ex. 1014, code (54). Sarantos describes
"[photoplethysmographic (PPG)] sensors designed for use with wearable
biometric monitoring devices" and which measure "physiological
parameters" of a wearer such as "heart rate" and "blood oxygenation levels."
*Id.* at 6:66–7:3, 13:39–47.

12

IPR2020-01722
Patent 10,470,695 B2

Sarantos's Figure 2 is reproduced on the right.  Figure 2 illustrates "a wristband-type wearable fitness monitor that incorporates a PPG sensor[.]"  *Id.* at 5:55–56.  Fitness monitor 200 includes housing 104, back face 128 and light sources 108.  *Id.* at 7:12–23.  "PPG sensors operate by shining light into a person's skin.  This light diffuses through the person's flesh and a portion of this light is then emitted back out of the person's skin in close proximity to where the light was introduced into the flesh."  *Id.* at 7:24–28.



FIG. 2

Sarantos's Figure 18 is reproduced below.



FIG. 18

Figure 18 above illustrates an example of a PPG sensor photodetector layout with multiple light-emitting devices.  *Id.* at 6:39–42.  Photodetector elements 1812 are characterized as being in a "circular array" centered on

13

IPR2020-01722
Patent 10,470,695 B2

light source 1808, which includes two light-emitting devices 1810. *Id.* at

14:60–62; 15:24–43. Sarantos describes that the PPG sensor

> may also include control logic, which may be communicatively
> connected with the light source and each photodetector element
> and configured to cause the light source to emit light, obtain one
> or more measured light intensity measurements from the one or
> more photodetector elements, and determine a heart rate
> measurement based, at least in part, on the one or more light
> intensity measurements.

*Id.* at 2:5–12.

Sarantos's Figure 22 is reproduced below:



**FIG. 22**

Figure 22 above depicts another example configuration of a PPG sensor

according to Sarantos's invention. *Id.* at 6:52–54. Substrate 2272 supports

two high-aspect-ratio (HAR) photodetector elements 2212 positioned on

either side of light source 2208. *Id.* at 17:1–3. Window 2278 is offset from

substrate 2272. *Id.* at 17:3–4. Sarantos explains the following:

14

IPR2020-01722
Patent 10,470,695 B2

> The window 2278 may be held against a person's skin e.g., by being held in place with a strap, when heart rate measurements are obtained to allow light from the light source 2208 to shine through its associated window region 2226 and into the person's skin, where the light then diffuses into the surrounding flesh and is then emitted back out of the person's skin and into the HAR photodetector elements 2212 through the respective window regions 2226 associated with the HAR photodetector elements 2212.

*Id.* at 17:16–25.

Sarantos additionally explains the following:

> In order to reduce the chance that light from the light source 2208 will reach either of the HAR photodetector elements 2212 without first being diffused through the person's skin, the light source 2208 may be separated from the HAR photodetector elements 2212 within the PPG sensor by walls 2274, which may extend to the window 2278 or may stop short of the window 2278.

*Id.* at 17:26–32.

### 2. Overview of Mendelson-1991

Mendelson-1991 is an article from the Journal of Clinical Monitoring titled "Skin Reflectance Pulse Oximetry: In Vivo Measurements from the Forearm and Calf." Ex. 1015, 1. The article "describe[s] preliminary in vivo evaluation of a new optical reflectance sensor for noninvasive monitoring of $SaO_2$ with a modified commercial transmittance pulse oximeter." *Id.* at 2.

15

IPR2020-01722
Patent 10,470,695 B2

Mendelson-1991's Figures 1A and 1B are reproduced below:



The figures above illustrate "(A) Frontal and (B) side views of the heated skin reflectance pulse oximeter sensor." *Id.* The figures show a pulse oximeter sensor that includes, among other things, multiple "photodiodes," "light-emitting diodes (LEDs)," and an "optical shield." *Id.*

3. *Overview of Chin*

Chin is titled "Oximeter Sensor with Offset Emitters and Detector and Heating Device." Ex. 1006, code (54). Chin's Figures 7A and 7B are reproduced below:

16

IPR2020-01722
Patent 10,470,695 B2



Figures 7A and 7B "are side and top views of a nostril sensor according to the invention." *Id.* at 3:64–65. Chin describes that pads 172 and 174 include emitter 176 and detector 178, respectively. *Id.* at 8:20–25. Chin also explains that the sensor may include "optical diffuser 180 for diffusing the light from emitter 176, which causes a further spreading or mixing of light and may enhance the amount of tissue penetrated in some instances." *Id.* at 8:25–28. Chin additionally explains generally that a diffusing optic causes light emitted from an emitter "to pass through more tissue, and thus more blood." *Id.* at 2:4–7.

Chin further describes that "[t]he sensor could be any type of sensor, such as a durable sensor or a disposable sensor" and "could attach to any body part, such as the earlobe, finger, etc." *Id.* at 5:54–56. Chin additionally describes that its sensor "could be a reflectance or a transmittance sensor." *Id.* at 5:56–57.

### 4. Discussion

Petitioner provides a detailed assessment as to where all of the limitations required by claims 6, 14, and 21 are found in Sarantos, Mendelson-1991, and Chin. Pet. 7–25, 63. Specifically, Petitioner expresses that all features of claims 6, 14, and 21, with the exception of a

17

IPR2020-01722
Patent 10,470,695 B2

diffuser, are found in Sarantos and Mendelson-1991. Petitioner points to Chin as disclosing a diffuser. Petitioner also explains that a person of ordinary skill in the art would have had adequate reason to combine the teachings of Sarantos, Mendelson-1991, and Chin. *Id.* at 36–38, 63.

Patent Owner does not dispute that all the features of claims 6, 14, and 21 are found in the cited prior art references, but Patent Owner does disagree that Petitioner has established adequate reasoning to combine those references' teachings. PO Resp. 16–33; PO Sur-reply 8–13. A core basis of that disagreement is said to arise from purported differences between "thick tissue" and "thin tissue" of a user's skin, and that such differences preclude combination of sensors that are intended to be applied to those different tissue types. *See, e.g.*, PO Resp. 16–20; PO Sur-reply 9–10.[7] As a result of that alleged tissue thickness dichotomy, according to Patent Owner, a person of ordinary skill in the art would not have combined aspects of a sensor, e.g., a diffuser, used for "thin tissue" as in Chin, with sensors intended for use on a wrist, e.g., the sensors of Sarantos and Mendelson-1991. PO Resp. 21–33; PO Sur-reply 7–13. We have considered all of Patent Owner's arguments, but for the following reasons find them unavailing.

At the outset, we observe that Patent Owner's attempt to establish a distinction between sensors or devices applied to alleged "thin" tissue as opposed to "thick" tissue draws little, if any, support from the prior art evidence of this proceeding. Patent Owner attempts to discount Chin's

---

[7] We understand that, in Patent Owner's view, "thin tissue" is present at such sites as a user's nostrils and earlobes, whereas "thick tissue" is present, for instance, at a user's wrist. *See, e.g.*, PO Sur-reply 2 ("thin tissue measurement sites (e.g., ear lobe or nostril)"); *id.* at 10 ("thicker tissue sites like the wrist").

IPR2020-01722
Patent 10,470,695 B2

teachings as being limited to "sensors worn at thin tissue measurement sites." PO Resp. 17 (citing Ex. 1006, 1:14–21, 8:21–29). Yet, we do not discern that Patent Owner points to any disclosure in Chin that limits its teachings to any particular tissue sites, let alone only sites regarded as "thin." Indeed, Chin does not describe any tissue site to which its sensor is applied as being "thin." Furthermore, the portions of Chin on which Patent Owner relies simply describe a general background of oximeter sensors (Ex. 1006, 1:41–21) and the sensor configuration of one particular embodiment (*id.* at 8:21–29). While Chin characterizes that particular embodiment as directed to a "nostril sensor" (*id.* at 8:20–21), there is no disclosure purporting to restrict Chin's teachings to use with only a user's nostril.

We share Petitioner's view that Patent Owner provides inadequate evidentiary support to make out a case that there is a dichotomy as between "thin tissue" and "thick tissue" pulse oximeters such that they represent distinct classes of sensors whose various aspects and features are uncombinable. Pet. Reply 3–4. We agree with Petitioner that Patent Owner's reliance only on the uncorroborated testimony of Dr. Madisetti is inadequate to establish the proposed dichotomy. *Id.* at 4 (citing PO Resp. 16–20; Ex. 2001 ¶¶ 52–56). Dr. Madisetti points to no adequate evidence or basis to support his conclusions on the matter. We also take note, as does Petitioner (Pet. Reply 5 n.4), that neither Patent Owner nor Dr. Madisetti provides adequate explanation as to how "thick" or "thin" tissues sites are even defined.

Moreover, in our view, Patent Owner neglects to consider the full extent of Chin's teachings. Although Chin associates its embodiment shown in Figures 7A and 7B with a "nostril sensor," Chin's teachings are not

19

limited strictly to a nostril sensor as the reference unambiguously provides
that its sensor can attach "to any body part," and lists, by way of examples,
"the earlobe, finger, etc." Ex. 1006, 5:55–56. Although, Patent Owner
attempts to discount that disclosure as somehow being limited only to the
specific "wiring arrangement" shown in Chin's Figure 2 (*see, e.g.*, PO Sur-
reply 4–5), that attempt is ill explained and is not consistent with Chin's
plain disclosure that its sensor "could be any type of sensor" and is
"attach[ed] to any body part." Ex. 1006, 5:55–56. Patent Owner also
admonishes Petitioner for offering "no context" for that disclosure (PO Sur-
reply 1), but Chin, itself, provides the context in setting forth that its sensor
is not limited to use with any particular body part. There can be no credible
argument that a skilled artisan would not readily regard Chin's teachings as
extending beyond simply a sensor that is used for a nostril.

We also find unavailing Patent Owner's arguments that one of
ordinary skill in the art would somehow regard Chin's teaching of a diffuser
as being limited either solely to use with a nostril sensor (*see, e.g.*,
Tr. 23:13–17),[8] or only such measurement sites as an "earlobe or nostril"
(*see* PO Sur-reply 2). Chin explains generally that use of a diffuser is
understood to be beneficial in causing light "to pass through more tissue, and
thus more blood." Ex. 1006, 2:4–7. Chin describes that benefit more
particularly in the context of the nostril sensor shown in the embodiment of

---

[8] "[JUDGE]: Yes. Okay. So I've heard what you said but I have a couple of
clarifying questions. So are you suggesting that Chin's teachings are limited
to applying a diffuser to a nostril sensor? It sounds like you have been and I
just wanted to verify.
[COUNSEL]: I definitely am, yes."

IPR2020-01722
Patent 10,470,695 B2

Figures 7A and 7B (*id.* at 8:25–29),[9] but there is nothing that suggests that Chin limits the benefits of a diffuser to one particular tissue type (e.g., nostril tissue). We find persuasive Petitioner's view, and the supporting testimony of Dr. Anthony, that a skilled artisan would have recognized from Chin's disclosure that the light spreading benefits of a diffuser provide for a "stronger reflected signal" that facilitates determining measured physiological parameters. Pet. 63 (citing Ex. 1006, 2:4–7, 8:25–29, 9:64–10:7; Ex. 1003 ¶ 99). Patent Owner simply provides no cogent basis to conclude that Chin's diffuser would not function predictably as is disclosed, i.e., spreading light so that it passes through more tissue and blood, when used in conjunction with other types of sensor devices, such as those of Santos and Mendelson-1991. *See KSR,* 550 U.S. 398 at 416 ("The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results.")

We additionally find unavailing Patent Owner's general argument that a skilled artisan would not have had a reasonable expectation of success in applying a diffuser used in one type of oximeter sensor, such as that in Chin, to other types of oximeter sensors, such as those of Sarantos and Mendelson-1991. *See, e.g.*, PO Resp. 24–25. We do not agree that "Chin fails to disclose any specific way of implement[ing]" its diffuser into a sensor. *See id.* at 24. It clearly does. Chin shows, at least in Figure 7B, a diffuser associated with a nostril sensor. Chin also does not limit its teachings as to a diffuser to any one particular type of sensor, e.g., a nostril sensor. We are

---

[9] "Also shown is an optional optical diffuser 180 for diffusing the light from emitter 176, which causes a further spreading or mixing of light and may enhance the amount of tissue penetrated in some instances." Ex. 1006, 8:25–29.

Appx0021

IPR2020-01722
Patent 10,470,695 B2

not satisfied by Patent Owner's arguments that some structural and operational differences between the sensors of Sarantos and Mendelson-1991 as compared with that of Chin means that a skilled artisan would not have expected success in combining those teachings. *See id.* at 24; *see also id.* at 25–29 (discussing differences between wrist-worn sensors and nostril sensors). A person of ordinary skill in the art is a person of ordinary creativity. *See KSR*, 550 U.S. at 421. It follows readily that a person of ordinary skill and creativity reasonably would have understood how to implement such diffusers in other types of heart rate or pulse oximeter sensors, such as those of Sarantos and Mendelson-1991, in structural configurations necessary to harness the recognized benefits of such diffusers. We credit Dr. Anthony's testimony to that effect. *See, e.g.*, Ex. 1003 ¶¶ 96–101.

Patent Owner's and Dr. Madisetti's opposing views are rooted only in speculation that a skilled artisan would not have appreciated the benefits of a diffuser in other sensors beyond Chin's nostril sensor, which are intended for application to different body parts. *See, e.g.*, PO Resp. 25–29; Ex. 2001 ¶¶ 69–71. Patent Owner and Dr. Madisetti also seemingly attempt to draw distinctions between a wrist-worn "reflectance-type sensor" and a "transmittance-type sensor" for a nostril in connection with use of a diffuser. *See* PO Resp. 25–29; Ex. 2001 ¶¶ 69–71. Yet, those views overly focus on the specific configurations of single embodiments of each of the pertinent references and do not reflect an appropriate obviousness analysis that takes into account the inferences and creatives steps that a skilled artisan would employ. *See KSR*, 550 U.S. at 421 ("[T]he [obviousness] analysis need not seek out precise teachings directed to the specific subject matter of the

IPR2020-01722
Patent 10,470,695 B2

challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ."). Specifically, those views do not account adequately for Chin's plain disclosure recognizing the general benefits of a diffuser and that its sensor may be attached "to any body part" in the form of either a "reflectance or a transmittance sensor." *See* Ex. 1003, 2:4–7, 5:54–57. From at least that disclosure, a person of ordinary skill and creativity reasonably would have recognized that Chin contemplates various sensor types and that those sensors, including use of a diffuser, may be applied to various body parts of a user. *See, e.g.*, Ex. 1003 ¶¶ 96–101.

We also find unavailing Patent Owner's arguments that there is inadequate reasoning to combine the pertinent prior art because Petitioner's proposed combination involving Chin "would make Sarantos-Mendelson perform worse." PO Resp. 29–32; *see also id.* at 20–21 (discussing "experiments" performed by Dr. Madisetti on certain sensors). Importantly, the obviousness evaluation does not require that the combined teachings of references must produce a device that is somehow superior, or free of disadvantages, as compared with other prior art devices. *See Medichem, S.A. v. Rolabo, S.L.,* 437 F.3d 1157, 1165 (Fed. Cir. 2006) ("[A] given course of action often has simultaneous advantages and disadvantages, and this does not necessarily obviate motivation to combine."); *Winner Int'l Royalty Corp. v. Wang*, 202 F.3d 1340, 1349 n.8 (Fed. Cir. 2000) ("The fact that the motivating benefit comes at the expense of another benefit, however, should not nullify its use as a basis to modify the disclosure of one reference with the teachings of another. Instead, the benefits, both lost and gained, should be weighed against one another."). In this case, even if some

23

IPR2020-01722
Patent 10,470,695 B2

negative or undesirable conditions were to emerge in some circumstances from the use of a diffuser as a part of one type of oximeter sensor, that does not establish the non-obviousness of such a sensor with a diffuser. We find more persuasive Petitioner's view, and Dr. Anthony's supporting testimony, that a skilled artisan would have appreciated that a diffuser provides a benefit in spreading light and providing for it to pass through more tissue irrespective of the particular anatomical location of the tissue. *See* Pet. 61–63; Pet. Reply 3–6, 9–12; Ex. 1003 ¶¶ 96–101.

We also question the significance of the "experiments" performed by Dr. Madisetti as alleged support for the proposition that a diffuser would have "detrimental consequences" if applied to a "reflectance-type" pulse oximeter sensor, presumably such as in Sarantos or Mendelson-1991. *See* PO Resp. 20–21; Ex. 2001 ¶¶ 57–60, Appendix. Evidently, Dr. Madisetti applied diffusers of different diffuser material to one commercially available "reflectance-type" pulse oximeter sensor and conducted experiments to detect light based on the different materials juxtaposed with a sensor without any diffuser material. Left unexplained, however, is the basis to conclude that the commercially available sensor and the particular diffuser materials used somehow should be regarded as constituting the type of sensor that emerges from the combined teachings of Sarantos, Mendelson-1991, and Chin. The record provides considerable doubt in that regard. For instance, as noted by Petitioner (*see* Pet. Reply 6–9), the commercially available sensor used by Dr. Madisetti is one that has only a single detector, whereas the type of sensors involved in the context of the '695 patent and the pertinent prior art are those that include multiple detectors. On its face, that difference appears significant, but is not addressed or accounted for by

IPR2020-01722
Patent 10,470,695 B2

Patent Owner or Dr. Madisetti.  Neither Patent Owner nor Dr. Madisetti provides any meaningful explanation as to why the outcome of the experiments sheds light on the question of the obviousness of claims 6, 14, and 21 of the '695 patent in view of the particular prior art teachings on which Petitioner relies.  We do not find Patent Owner's assertions of non-obviousness based on Dr. Madisetti's experiments to be adequate or particularly probative of the obviousness question.

Lastly, we do not find credible Patent Owner's argument that a skilled artisan lacks motivation to incorporate a diffuser into a "Sarantos-Mendelson[-1991] device" because Sarantos discloses positioning of its detectors in such a way that allegedly already maximizes light receipt by the detector, which would be "negat[ed]" were the device to incorporate a diffuser.  PO Resp. 31–32 (citing Ex. 2001 ¶ 74).  Neither Patent Owner nor Dr. Madisetti adequately explains why a skilled artisan would have regarded Sarantos's teachings as being limited solely to a singular light spreading pattern that effectively precludes any modification that alters the pattern.  Indeed, we agree with Petitioner that it simply does not follow from the teachings of the prior art, specifically Chin, that a diffuser applied to a different device such as that arising from the Sarantos and Mendelson-1991 combination, would have some sort of negating effect that would disrupt operation of the device.  *See* Pet. Reply 12.  Rather, it follows from the evidence of record that a skilled artisan would have recognized that a diffuser provides for light to be desirably "further spread[]" to pass, in some instances, through more tissue and more blood.  *See* Pet. Reply 12; Ex. 1006 2:4–9, 8:25–29; Ex. 1003 ¶¶ 96–101.  We credit Dr. Anthony's testimony in that respect over the contrary testimony of Dr. Madisetti (*see, e.g.*, Ex. 2001

25

IPR2020-01722
Patent 10,470,695 B2

¶ 74), as we conclude that Dr. Anthony's testimony is more consistent with the teachings of the prior art of record.

### 5. Summary

We have considered the final record before us including the respective briefings of the parties, and the underlying evidence offered in support thereof.  Based on this record, we conclude that Petitioner has shown by a preponderance of the evidence that claims 6, 14, and 21 would have been obvious in view of the combined teachings of Sarantos, Mendelson-1991, and Chin.  *See* Pet. 61–63.

### E.   Obviousness Over Ackermans and Chen

Petitioner also contends that claims 6, 14, and 21 are unpatentable based on the combined teachings of Ackermans and Chin.  Pet. 102–106 (citing Ex. 1003 ¶¶ 160–163, 167–168).  Patent Owner disagrees.  PO Response 34–43; PO Sur-reply 13–16.

### 1. Overview of Ackermans

Ackermans is titled "Medical Optical Sensor."  Ex. 1016, code (54).  Ackermans characterizes its invention as relating to the measurement of blood oxygenation level using optical sensors.  *Id.* at 1:2–5.  Ackermans's Figure 1 is reproduced below:

26

IPR2020-01722
Patent 10,470,695 B2



## FIG. 1

Figure 1 shows a three-dimensional sectional schematic drawing of an embodiment of a medical optical sensor. *Id.* at 4:5–6. Medical optical sensor 10 "is designed to be attached to the skin with at least the rims 42 and 44 touching the skin." *Id.* at 4:33–34. The medical optical sensor includes light emitter 20 for emitting light 21 and photodetector 30 for detecting reflected light 31 from a user's skin. *Id.* at 4:22–24.

### 2. *Discussion*

Petitioner presents Ackermans's teachings as effectively equivalent to the combined teachings of Sarantos and Mendelson-1991. As with the grounds based on Sarantos and Mendelson-1991, Petitioner contends that Ackermans discloses all the features required by claims 6, 14, and 21 with the exception of a diffuser. Petitioner relies on Chin for disclosure of a

27

diffuser. Patent Owner does not dispute that all the features required by claims 6, 14, and 21 are present in the combined teachings of Ackerman and Chin, but Patent Owner does disagree that Petitioner has established adequate reasoning to combine those references' teachings.

Patent Owner offers arguments to Petitioner's proposed ground based on Ackermans and Chin that essentially mirror those that were offered for the ground based on Sarantos, Mendelson-1991, and Chin. *See* PO Resp. 34–43; PO Sur-reply 13–16. For instance, Patent Owner contends the following: (1) Ackerman discloses a wrist-worn sensor applied to "thick tissue" whereas Chin is limited to a nostril sensor applied to "thin tissue" (*see, e.g.*, PO Resp. 34–35); (2) Petitioner has not explained how Chin's teachings of a diffuser would improve Ackerman's sensor (*see, e.g., id.* at 34–36); (3) Petitioner has not established that a person of ordinary skill in the art would have had a reasonable expectation of success in combining the teachings of Ackermans and Chin (*see, e.g., id.* at 36–37); (4) Petitioner has not accounted for the differences between a wrist-worn sensor and a nostril-based sensor (*see, e.g., id.* at 38–40); (5) combining Chin's diffuser with Ackerman's sensor "would make Ackermans' device perform worse" (*see, e.g., id.* at 40–41); and (6) Ackerman's device already spreads light and that adding a diffuser would "negate[]" that light spreading (*see, e.g., id.* at 41–42).

We conclude that our reasoning presented above in connection with the combination of Sarantos, Mendelson-1991 and Chin also applies to the combination based on Ackermans and Chin. *See supra* § II.D.4. For all of those reasons, we also find Patent Owner's arguments unavailing in the context of the Ackermans and Chin combination.

IPR2020-01722
Patent 10,470,695 B2

We determine that Petitioner has shown by a preponderance of the evidence that claim 6, 14, and 21 of the '695 patent are unpatentable based on the combined teachings of Ackermans and Chin. *See* Pet. 102–106.

## III. CONCLUSION

In summary, we determine that a preponderance of the evidence establishes that claims 6, 14, and 21 of the '695 patent are unpatentable, as shown in the following table:[10]

| Claim(s) | 35 U.S.C. § | References/Basis | Claims Shown Unpatentable | Claims Not Shown Unpaten table |
|---|---|---|---|---|
| 6, 14, 21 | 103 | Sarantos, Mendelson-1991, Chin | 6, 14, 21 | |
| 6, 14, 21 | 103 | Ackermans, Chin | 6, 14, 21 | |
| **Overall Outcome** | | | 6, 14, 21 | |

---

[10] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. §§ 42.8(a)(3), (b)(2).

IPR2020-01722
Patent 10,470,695 B2

## IV.   ORDER

Upon consideration of the record before us, it is:

ORDERED that claims 6, 14, and 21 of the '695 patent have been shown to be unpatentable; and

FURTHER ORDERED that, because this is a final written decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2020-01722
Patent 10,470,695 B2

For PETITIONER:

Walter Renner
Dan Smith
Kenneth Hoover
FISH & RICHARDSON P.C.
axf-ptab@fr.com
dsmith@fr.com
hoover@fr.com


For PATENT OWNER:

John M. Grover
Joseph Re
Stephen Larson
Shannon Lam
Jarom Kesler
Ben Katzenellenbogen
KNOBBE, MARTENS, OLSON, & BEAR, LLP
2jmg@knobbe.com
2jrr@knobbe.com
2swl@knobbe.com
2sxl@knobbe.com
2jzk@knobbe.com
2bak@knobbe.com

# UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

**MASIMO CORPORATION,**
**Patent Owner/Appellant**

**Appeal No. 2022-1895**

**v.**

**APPLE INC.,**
**Petitioner/Appellee**

**Proceeding No.: IPR2020-01722**

---

## NOTICE FORWARDING CERTIFIED LIST

A Notice of Appeal to the United States Court of Appeals for the Federal Circuit was timely filed June 9, 2022, in the United States Patent and Trademark Office in connection with the above identified *Inter Partes Review* proceeding. Pursuant to 35 U.S.C. § 143, a Certified List is this day being forwarded to the Federal Circuit.

Respectfully submitted,

Date:  July 25, 2022

By: *Macia L. Fletcher*

Macia L. Fletcher
Paralegal
Mail Stop 8
P.O. Box 1450
Alexandria, VA 22313-1450
571-272-9035

Under Secretary of Commerce for Intellectual Property and
Director of the United States Patent and Trademark Office

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the foregoing NOTICE

FORWARDING CERTIFIED LIST has been served, via electronic mail, on counsel for Appellant

and Appellee this 25th day of July, 2022, as follows:

| PATENT OWNER: | PETITIONER: |
|---|---|
| Joseph R. Re | Lauren Ann Degnan |
| John M. Grover | Robert Courtney |
| Jeremiah Helm | Laura E. Powell |
| Stephen C. Jensen | Walter Karl Renner |
| Shannon Lam | Ryan Teel |
| KNOBBE, MARTENS, OLSON & BEAR, LLP | FISH & RICHARDSON PC |
| joseph.re@knobbe.com | degnan@fr.com |
| john.grover@kmob.com | courtney@fr.com |
| jeremiah.helm@knobbe.com | powell@fr.com |
| steve.jensen@knobbe.com | renner@fr.com |
| shannon.lam@knobbe.com | teel@fr.com |

By: *Macia L. Fletcher*
Macia L. Fletcher
Paralegal
Mail Stop 8
P.O. Box 1450
Alexandria, VA 22313-1450
571-272-9035

**U.S. DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**

July 25, 2022
<small>(Date)</small>

**THIS IS TO CERTIFY** that the attached document is a list of the papers that comprise the record before the Patent Trial and Appeal Board (PTAB) for the *Inter Partes Review* proceeding identified below.

**APPLE INC.,**
**Petitioner,**

**v.**

**MASIMO CORPORATION,**
**Patent Owner.**

**Case: IPR2020-01722**
**Patent No. 10,470,695 B2**
By authority of the

**DIRECTOR OF THE UNITED STATES**
**PATENT AND TRADEMARK OFFICE**

*Macia L. Fletcher*

*Certifying Officer*



**Prosecution History ~ IPR2020-01722**

| Date | Document |
|------|----------|
| 10/2/2020 | Petition for Inter Partes Review |
| 10/2/2020 | Petitioner's Power of Attorney |
| 10/2/2020 | Petitioner's Notice Ranking Petitions |
| 10/20/2020 | Patent Owner's Mandatory Notices |
| 11/19/2020 | Notice of Filing Date Accorded to Petition |
| 1/22/2021 | Petitioner's Exhibit List |
| 2/19/2021 | Patent Owner's Notice of Waiver of Preliminary Response |
| 5/12/2021 | Decision - Institution of Inter Partes Review |
| 5/12/2021 | Scheduling Order |
| 5/26/2021 | Patent Owner's Objections to Petitioner's Evidence Submitted Before Trial Institution |
| 6/29/2021 | Notice of Deposition - Anthony |
| 7/2/2021 | Notice of Stipulation Modifying Due Dates 1-3 |
| 8/9/2021 | Patent Owner's Response to Petition |
| 8/9/2021 | Patent Owner's Exhibit List |
| 8/16/2021 | Petitioner's Objections to Evidence |
| 8/20/2021 | Notice of Deposition - Madisetti, Ph.D. |
| 8/27/2021 | Patent Owner's Supplemental Mandatory Notice Adding Backup Counsel |
| 11/5/2021 | Petitioner's Reply to Patent Owner's Response |
| 12/17/2021 | Patent Owner's Sur-Reply to Petitioner's Reply |
| 12/29/2021 | Patent Owner's Request for Oral Argument |
| 12/29/2021 | Petitioner's Request for Oral Hearing |
| 12/29/2021 | Petitioner's Updated Mandatory Notices |
| 1/5/2022 | Order - Setting Oral Argument |
| 1/21/2022 | Patent Owner's Mandatory Notice Updating Counsel Information |
| 2/4/2022 | Patent Owner's Demonstratives for Oral Argument |
| 2/4/2022 | Patent Owner's Certificate of Service for Demonstratives |
| 2/4/2022 | Petitioner's Updated Exhibit List |
| 4/5/2022 | Oral Hearing Transcript |
| 5/5/2022 | Final Written Decision |

Trials@uspto.gov
571-272-7822

Paper 29
Entered: May 5, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

APPLE INC.,
Petitioner,

v.

MASIMO CORPORATION,
Patent Owner.

IPR2020-01722
Patent 10,470,695 B2

Before JOSIAH C. COCKS, ROBERT L. KINDER, and
AMANDA F. WIEKER, *Administrative Patent Judges.*

COCKS, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

IPR2020-01722
Patent 10,470,695 B2

# I. INTRODUCTION

## A. Background

Apple Inc. ("Petitioner") filed a Petition requesting an *inter partes* review of claims 1–6, 8, 9, 11–19, and 21–30 of U.S. Patent No. 10,470,695 B2 (Ex. 1001, "the '695 patent"). Paper 2 ("Pet."). We instituted the petitioned review. Paper 8 ("Institution Decision" or "Inst. Dec.").

Masimo Corporation ("Patent Owner") filed a Patent Owner Response (Paper 13, "PO Resp.") to oppose the Petition. Petitioner filed a Reply (Paper 18, "Pet. Reply") to the Patent Owner Response. Patent Owner filed a Sur-reply (Paper 19, "PO Sur-reply") to the Reply. We conducted an oral hearing on February 9, 2022. A transcript has been entered in the record (Paper 28, "Tr.").[1]

We have jurisdiction under 35 U.S.C. § 6(b)(4) and § 318(a). This Decision is a final written decision under 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73 as to the patentability of claims 6, 14, and 21 of the '695 patent. We determine Petitioner has shown by a preponderance of the evidence that those claims are unpatentable.

---

[1] In the Patent Owner Response, Patent Owner indicates that claims 1–5, 8, 9, 11–13, 15–19, and 22–30 "have been statutorily disclaimed under 35 U.S.C. § 253(a)," and are "no longer at issue in this proceeding." PO Resp. 15 (citing Ex. 2004). At oral argument, Patent Owner again acknowledged that claims 1–5, 8, 9, 11–13, 15–19, and 22–30 have been disclaimed. Tr. 13. In its Reply, Petitioner also notes that those claims have been disclaimed "leaving claims 6, 14, and 21 as the only remaining challenged claims." Pet. Reply 1 n.1 (citing Ex. 2004). Exhibit 2004 is titled "Disclaimer in Patent Under 37 CFR 1.321(a)" and indicates that claims 1–5, 8, 9, 11–13, 15–19, and 22–30 have been disclaimed. Ex. 2004, 1. Accordingly, we regard claims 6, 14, and 21 as the only remaining challenged claims in this proceeding.

IPR2020-01722
Patent 10,470,695 B2

## B.  Related Matters

Patent Owner identifies the following matters related to the
'695 patent:

*Masimo Corporation v. Apple Inc.*, Civil Action No. 8:20-cv-00048
(C.D. Cal.) (filed Jan. 9, 2020);

*Apple Inc. v. Masimo Corporation*, IPR2020-01520 (PTAB
Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,258,265 B1);

*Apple Inc. v. Masimo Corporation*, IPR2020-01521 (PTAB
Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,292,628 B1);

*Apple Inc. v. Masimo Corporation*, IPR2020-01523 (PTAB
Aug. 31, 2020) (challenging claims of U.S. Patent No. 8,457,703 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01524 (PTAB
Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,433,776 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01526 (PTAB
Aug. 31, 2020) (challenging claims of U.S. Patent No. 6,771,994 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01536 (PTAB
Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,588,553 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01537 (PTAB
Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,588,553 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01538 (PTAB
Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,588,554 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01539 (PTAB
Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,588,554 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01713 (PTAB Sept. 30,
2020) (challenging claims of U.S. Patent No. 10,624,564 B1);

Appx0038

IPR2020-01722
Patent 10,470,695 B2

*Apple Inc. v. Masimo Corporation*, IPR2020-01714 (PTAB Sept. 30, 2020) (challenging claims of U.S. Patent No. 10,631,765 B1 patent);

*Apple Inc. v. Masimo Corporation*, IPR2020-01715 (PTAB Sept. 30, 2020) (challenging claims of U.S. Patent No. 10,631,765 B1 patent);

*Apple Inc. v. Masimo Corporation*, IPR2020-01716 (PTAB Sept. 30, 2020) (challenging claims of U.S. Patent No. 10,702,194 patent);

*Apple Inc. v. Masimo Corporation*, IPR2020-01723 (PTAB Oct. 2, 2020) (challenging claims of U.S. Patent No. 10,470,695 B2);[2]

*Apple Inc. v. Masimo Corporation*, IPR2020-01733 (PTAB Sept. 30, 2020) (challenging claims of U.S. Patent No. 10,702,195 B1); and

*Apple Inc. v. Masimo Corporation*, IPR2020-01737 (PTAB Sept. 30, 2020) (challenging claims of U.S. Patent No. 10,709,366 B1).

Paper 4, 2–3.

Patent Owner also identifies the following pending patent applications that claim priority to, or share a priority claim with, the '695 patent:

U.S. Patent Application No. 15/195,199;

U.S. Patent Application No. 16/532,061;

U.S. Patent Application No. 16/532,065;

U.S. Patent Application No. 16/791,955;

U.S. Patent Application No. 16/791,963;

U.S. Patent Application No. 16/835,712;

---

[2] Pursuant to the Board's November 2019, Consolidated Trial Practice Guide, *available at* https://www.uspto.gov/TrialPracticeGuideConsolidated, Petitioner filed a Notice ranking its two petitions that challenge the '695 patent, ranking first the instant proceeding and ranking second IPR2020-01723.  Paper 3, 2.  We exercised our discretion to deny institution of *inter partes* review in IPR2020-01723.  *See* IPR2020-01723, Paper 8.

U.S. Patent Application No. 16/835,772; and

U.S. Patent Application No. 16/871,874.

*Id.* at 1–2.

## C. *The '695 Patent*

The '695 patent is titled "Advanced Pulse Oximetry Sensor," and

issued on November 12, 2019, from U.S. Patent Application No.

16/226,249, filed December 19, 2018.  Ex. 1001, codes (21), (22), (45), (54).

The '695 patent summarizes its disclosure as follows:

> This disclosure describes embodiments of non-invasive methods, devices, and systems for measuring blood constituents, analytes, and/or substances such as, by way of non-limiting example, oxygen, carboxyhemoglobin, methemoglobin, total hemoglobin, glucose, proteins, lipids, a percentage therefor (e.g., saturation), pulse rate, perfusion index, oxygen content, total hemoglobin, Oxygen Reserve Index™ (ORI™) or for measuring many other physiologically relevant patient characteristics.  These characteristics can relate to, for example, pulse rate, hydration, trending information and analysis, and the like.

*Id.* at 2:36–46.

5

Figures 7A and 7B of the '695 patent are reproduced below:



FIG. 7A                    FIG. 7B

Figures 7A and 7B above depict side and top views, respectively, of a three-dimensional pulse oximetry sensor according to an embodiment of the '695 patent. *Id.* at 5:28–33. Sensor 700 includes emitter 702, light diffuser 704, light block (or blocker) 706, light concentrator 708, and detector 710. *Id.* at 10:49–51. The sensor functions to irradiate tissue measurement site 102, e.g., a patient's wrist, and detects emitted light that is reflected by the tissue measurement site. *Id.* at 10:43–49. "[L]ight blocker 706 includes an annular ring having cover portion 707 sized and shaped to form a light isolation chamber for the light concentrator 708 and the detector 710." *Id.* at 11:10–12. "[L]ight blocker 706 and cover 70[7] ensures that the only light detected by the detector 710 is light that is reflected from the tissue measurement site." *Id.* at 11:16–20.

6

IPR2020-01722
Patent 10,470,695 B2

Figure 8 of the '695 patent is reproduced below:



FIG. 8

Figure 8 above illustrates "a block diagram of an example pulse oximetry system capable of noninvasively measuring one or more blood analytes in a monitored patient." *Id.* at 5:34–36. Pulse oximetry system 800 includes sensor 801 (or multiple sensors) coupled to physiological monitor 809. *Id.* at 12:21–23. Monitor 809 includes "signal processor 810 that includes processing logic that determines measurements for desired analytes based on the signals received from the detector 806" that is a part of sensor 801. *Id.* at 13:37–40. Monitor 809 also includes user interface 812 that provides "an output, e.g., on a display, for presentation to a user of pulse oximetry system 800." *Id.* at 13:64–66.

7

IPR2020-01722
Patent 10,470,695 B2

*D.   Illustrative Claim*

Claim 6 is illustrative and is reproduced below.[3]

1.  A wrist-worn physiological monitoring device configured for placement on a user at a tissue measurement site, the device comprising:

a light emission source comprising a plurality of emitters configured to irradiate the tissue measurement site by emitting light towards the tissue measurement site, the tissue measurement site being located on a wrist of the user,

the plurality of emitters configured to emit one or more wavelengths;

a plurality of detectors configured to detect the light emitted by the plurality of emitters after attenuation by a circular portion of the tissue measurement site,

the plurality of detectors further configured to output at least one signal responsive to the detected light;

a processor configured to receive the at least one signal responsive to the output and determine a physiological parameter of the user; and

a light block forming an enclosing wall between the light emission source and the plurality of detectors,

the light block defining the circular portion of the tissue measurement site, the light emission source arranged proximate a first side of the enclosing wall and the plurality of detectors arranged proximate a second side of the enclosing wall, the first side being difference than the second side,

wherein the enclosing wall prevents at least a portion of light emitted from the light emission source from being detected by the plurality of detectors without attenuation by the tissue, and wherein the plurality of detectors are arranged in an array having a spatial configuration corresponding to the circular portion of the tissue measurement site.

Ex. 1001, 15:32–63.

---

[3] Because claim 6 depends from independent claim 1, we also reproduce disclaimed claim 1 for completeness.

IPR2020-01722
Patent 10,470,695 B2

6. The physiological monitoring device of claim 1, further comprising a diffuser which receives, spreads, and emits the spread light, wherein the emitted spread light is directed at the tissue measurement site.

*Id.* at 16:16–19.[4]

## E. Evidence Relied Upon

Petitioner relies on the following references:

| Reference | Publication/Patent Number | Exhibit |
|---|---|---|
| Sarantos | U.S. Patent No. 9,392,946 B1 issued July 19, 2016 | 1014 |
| Mendelson-1991 | Mendelson et al., *Skin Reflectance Pulse Oximetry: In Vivo Measurements from the Forearm and Calf*, Journal of Clinical Monitoring Vol. 7 No. 1, pp. 7–12 (January 1991) | 1015 |
| Chin | U.S. Patent No. 6,343,223 B1 issued Jan. 29, 2002 | 1006 |
| Ackermans | WO 2011/051888 A2  published May 5, 2011 | 1016 |

Pet. 3–4.  Petitioner also relies on the Declaration of Brian W. Anthony, Ph.D. (Ex. 1003).  Patent Owner relies on the Declaration of Vijay K. Madisetti, Ph.D. (Ex. 2001).

---

[4] Claim 14 (which depends from independent claim 9) and claim 21 (which depends from independent claim 19) add a similar "diffuser" limitation as is set forth in claim 6.

IPR2020-01722
Patent 10,470,695 B2

### F.  Asserted Grounds

Petitioner asserts that claims 6, 14, and 21 are unpatentable based upon the following grounds (Pet. 3):[5]

| Claims Challenged | 35 U.S.C. § | References/Basis |
|---|---|---|
| 6, 14, 21 | 103 | Sarantos, Mendelson-1991, Chin |
| 6, 14, 21 | 103 | Ackermans, Chin |

### II.  ANALYSIS

### A.  Claim Construction

For petitions filed on or after November 13, 2018, a claim shall be construed using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. § 282(b).  37 C.F.R. § 42.100(b) (2019).  Both parties submit that no claim term requires express construction. Pet. 5; PO Resp. 14.  Based on our analysis of the issues, we conclude that no claim terms require express construction.  *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017).

### B.  Principles of Law

A claim is unpatentable under 35 U.S.C. § 103 if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406

---

[5] As noted by both parties, because of Patent Owner's statutory disclaimer, these are the only claims and grounds that remain at issue in this proceeding. *See* PO Resp. 16; *see generally* Pet. Reply, PO Sur-reply.

IPR2020-01722
Patent 10,470,695 B2

(2007). The question of obviousness is resolved on the basis of underlying factual determinations, including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) objective evidence of non-obviousness.[6] *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). When evaluating a combination of teachings, we must also "determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue." *KSR*, 550 U.S. at 418 (citing *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)). Whether a combination of prior art elements would have produced a predictable result weighs in the ultimate determination of obviousness. *Id.* at 416–417.

In an *inter partes* review, the petitioner must show with particularity why each challenged claim is unpatentable. *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016); 37 C.F.R. § 42.104(b). The burden of persuasion never shifts to Patent Owner. *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015).

We analyze the challenges presented in the Petition in accordance with the above-stated principles.

## C.  Level of Ordinary Skill in the Art

Petitioner identifies the appropriate level of skill in the art as follows:

The person would have had a Bachelor of Science degree in an academic discipline emphasizing the design of electrical, computer, or software technologies, in combination with training or at least one to two years of related work experience with capture and processing of data or information, including but not limited to physiological monitoring technologies. . . .

---

[6] Patent Owner does not present objective evidence of non-obviousness.

11

> Alternatively, the person could have also had a Master of Science degree in a relevant academic discipline with less than a year of related work experience in the same discipline.

Pet. 4–5 (citing Ex. 1003 ¶¶ 17–19).

Patent Owner does not offer its own assessment of the level of ordinary skill. Patent Owner, however, does level a measure of criticism of Petitioner's assessment of the level of skill in the art as not accounting for experience in optics or physiology, and focusing on "data processing and not sensor design." PO Resp. 13. Nevertheless, Patent Owner expresses that it "applies [Petitioner's] asserted level of skill." *Id.* (citing Ex. 2001 ¶¶ 34–36). We determine that the Petitioner's expressed level of ordinary skill in the art is consistent with the '695 patent and the prior art of record. Accordingly, we adopt it in this Decision.

### D. *Obviousness Over Sarantos, Mendelson-1991, and Chin*

Petitioner contends that claims 6, 14, and 21 would have been obvious based on the teachings of Sarantos, Mendelson-1991, and Chin. Pet. 61–63. Patent Owner disagrees and presents several arguments in opposition. PO Resp. 16–42; PO Sur-reply 2–13.

### 1. *Overview of Sarantos*

Sarantos is titled "Heart Rate Sensor With High-Aspect-Ratio Photodetector Element." Ex. 1014, code (54). Sarantos describes "[photoplethysmographic (PPG)] sensors designed for use with wearable biometric monitoring devices" and which measure "physiological parameters" of a wearer such as "heart rate" and "blood oxygenation levels." *Id.* at 6:66–7:3, 13:39–47.

IPR2020-01722
Patent 10,470,695 B2

Sarantos's Figure 2 is reproduced on the right.  Figure 2 illustrates "a wristband-type wearable fitness monitor that incorporates a PPG sensor[.]"  *Id.* at 5:55–56.  Fitness monitor 200 includes housing 104, back face 128 and light sources 108.  *Id.* at 7:12–23.  "PPG sensors operate by shining light into a person's skin.  This light diffuses through the person's flesh and a portion of this light is then emitted back out of the person's skin in close proximity to where the light was introduced into the flesh."  *Id.* at 7:24–28.



Sarantos's Figure 18 is reproduced below.



Figure 18 above illustrates an example of a PPG sensor photodetector layout with multiple light-emitting devices.  *Id.* at 6:39–42.  Photodetector elements 1812 are characterized as being in a "circular array" centered on

13

IPR2020-01722
Patent 10,470,695 B2

light source 1808, which includes two light-emitting devices 1810. *Id.* at

14:60–62; 15:24–43. Sarantos describes that the PPG sensor

> may also include control logic, which may be communicatively
> connected with the light source and each photodetector element
> and configured to cause the light source to emit light, obtain one
> or more measured light intensity measurements from the one or
> more photodetector elements, and determine a heart rate
> measurement based, at least in part, on the one or more light
> intensity measurements.

*Id.* at 2:5–12.

Sarantos's Figure 22 is reproduced below:



**FIG. 22**

Figure 22 above depicts another example configuration of a PPG sensor

according to Sarantos's invention. *Id.* at 6:52–54. Substrate 2272 supports

two high-aspect-ratio (HAR) photodetector elements 2212 positioned on

either side of light source 2208. *Id.* at 17:1–3. Window 2278 is offset from

substrate 2272. *Id.* at 17:3–4. Sarantos explains the following:

14

IPR2020-01722
Patent 10,470,695 B2

> The window 2278 may be held against a person's skin e.g., by
> being held in place with a strap, when heart rate measurements
> are obtained to allow light from the light source 2208 to shine
> through its associated window region 2226 and into the person's
> skin, where the light then diffuses into the surrounding flesh and
> is then emitted back out of the person's skin and into the HAR
> photodetector elements 2212 through the respective window
> regions 2226 associated with the HAR photodetector elements
> 2212.

*Id.* at 17:16–25.

> Sarantos additionally explains the following:

> In order to reduce the chance that light from the light
> source 2208 will reach either of the HAR photodetector elements
> 2212 without first being diffused through the person's skin, the
> light source 2208 may be separated from the HAR photodetector
> elements 2212 within the PPG sensor by walls 2274, which may
> extend to the window 2278 or may stop short of the window
> 2278.

*Id.* at 17:26–32.

### 2. *Overview of Mendelson-1991*

Mendelson-1991 is an article from the Journal of Clinical Monitoring
titled "Skin Reflectance Pulse Oximetry: In Vivo Measurements from the
Forearm and Calf." Ex. 1015, 1. The article "describe[s] preliminary in
vivo evaluation of a new optical reflectance sensor for noninvasive
monitoring of $SaO_2$ with a modified commercial transmittance pulse
oximeter." *Id.* at 2.

15

Appx0050

Mendelson-1991's Figures 1A and 1B are reproduced below:



The figures above illustrate "(A) Frontal and (B) side views of the heated skin reflectance pulse oximeter sensor." *Id.* The figures show a pulse oximeter sensor that includes, among other things, multiple "photodiodes," "light-emitting diodes (LEDs)," and an "optical shield." *Id.*

### 3. Overview of Chin

Chin is titled "Oximeter Sensor with Offset Emitters and Detector and Heating Device." Ex. 1006, code (54). Chin's Figures 7A and 7B are reproduced below:

Appx0051



Figures 7A and 7B "are side and top views of a nostril sensor according to the invention." *Id.* at 3:64–65. Chin describes that pads 172 and 174 include emitter 176 and detector 178, respectively. *Id.* at 8:20–25. Chin also explains that the sensor may include "optical diffuser 180 for diffusing the light from emitter 176, which causes a further spreading or mixing of light and may enhance the amount of tissue penetrated in some instances." *Id.* at 8:25–28. Chin additionally explains generally that a diffusing optic causes light emitted from an emitter "to pass through more tissue, and thus more blood." *Id.* at 2:4–7.

Chin further describes that "[t]he sensor could be any type of sensor, such as a durable sensor or a disposable sensor" and "could attach to any body part, such as the earlobe, finger, etc." *Id.* at 5:54–56. Chin additionally describes that its sensor "could be a reflectance or a transmittance sensor." *Id.* at 5:56–57.

### 4. Discussion

Petitioner provides a detailed assessment as to where all of the limitations required by claims 6, 14, and 21 are found in Sarantos, Mendelson-1991, and Chin. Pet. 7–25, 63. Specifically, Petitioner expresses that all features of claims 6, 14, and 21, with the exception of a

17

IPR2020-01722
Patent 10,470,695 B2

diffuser, are found in Sarantos and Mendelson-1991. Petitioner points to Chin as disclosing a diffuser. Petitioner also explains that a person of ordinary skill in the art would have had adequate reason to combine the teachings of Sarantos, Mendelson-1991, and Chin. *Id.* at 36–38, 63.

Patent Owner does not dispute that all the features of claims 6, 14, and 21 are found in the cited prior art references, but Patent Owner does disagree that Petitioner has established adequate reasoning to combine those references' teachings. PO Resp. 16–33; PO Sur-reply 8–13. A core basis of that disagreement is said to arise from purported differences between "thick tissue" and "thin tissue" of a user's skin, and that such differences preclude combination of sensors that are intended to be applied to those different tissue types. *See, e.g.*, PO Resp. 16–20; PO Sur-reply 9–10.[7] As a result of that alleged tissue thickness dichotomy, according to Patent Owner, a person of ordinary skill in the art would not have combined aspects of a sensor, e.g., a diffuser, used for "thin tissue" as in Chin, with sensors intended for use on a wrist, e.g., the sensors of Sarantos and Mendelson-1991. PO Resp. 21–33; PO Sur-reply 7–13. We have considered all of Patent Owner's arguments, but for the following reasons find them unavailing.

At the outset, we observe that Patent Owner's attempt to establish a distinction between sensors or devices applied to alleged "thin" tissue as opposed to "thick" tissue draws little, if any, support from the prior art evidence of this proceeding. Patent Owner attempts to discount Chin's

---

[7] We understand that, in Patent Owner's view, "thin tissue" is present at such sites as a user's nostrils and earlobes, whereas "thick tissue" is present, for instance, at a user's wrist. *See, e.g.*, PO Sur-reply 2 ("thin tissue measurement sites (e.g., ear lobe or nostril)"); *id.* at 10 ("thicker tissue sites like the wrist").

IPR2020-01722
Patent 10,470,695 B2

teachings as being limited to "sensors worn at thin tissue measurement sites." PO Resp. 17 (citing Ex. 1006, 1:14–21, 8:21–29). Yet, we do not discern that Patent Owner points to any disclosure in Chin that limits its teachings to any particular tissue sites, let alone only sites regarded as "thin." Indeed, Chin does not describe any tissue site to which its sensor is applied as being "thin." Furthermore, the portions of Chin on which Patent Owner relies simply describe a general background of oximeter sensors (Ex. 1006, 1:41–21) and the sensor configuration of one particular embodiment (*id.* at 8:21–29). While Chin characterizes that particular embodiment as directed to a "nostril sensor" (*id.* at 8:20–21), there is no disclosure purporting to restrict Chin's teachings to use with only a user's nostril.

We share Petitioner's view that Patent Owner provides inadequate evidentiary support to make out a case that there is a dichotomy as between "thin tissue" and "thick tissue" pulse oximeters such that they represent distinct classes of sensors whose various aspects and features are uncombinable. Pet. Reply 3–4. We agree with Petitioner that Patent Owner's reliance only on the uncorroborated testimony of Dr. Madisetti is inadequate to establish the proposed dichotomy. *Id.* at 4 (citing PO Resp. 16–20; Ex. 2001 ¶¶ 52–56). Dr. Madisetti points to no adequate evidence or basis to support his conclusions on the matter. We also take note, as does Petitioner (Pet. Reply 5 n.4), that neither Patent Owner nor Dr. Madisetti provides adequate explanation as to how "thick" or "thin" tissues sites are even defined.

Moreover, in our view, Patent Owner neglects to consider the full extent of Chin's teachings. Although Chin associates its embodiment shown in Figures 7A and 7B with a "nostril sensor," Chin's teachings are not

limited strictly to a nostril sensor as the reference unambiguously provides that its sensor can attach "to any body part," and lists, by way of examples, "the earlobe, finger, etc." Ex. 1006, 5:55–56. Although, Patent Owner attempts to discount that disclosure as somehow being limited only to the specific "wiring arrangement" shown in Chin's Figure 2 (*see, e.g.*, PO Sur-reply 4–5), that attempt is ill explained and is not consistent with Chin's plain disclosure that its sensor "could be any type of sensor" and is "attach[ed] to any body part." Ex. 1006, 5:55–56. Patent Owner also admonishes Petitioner for offering "no context" for that disclosure (PO Sur-reply 1), but Chin, itself, provides the context in setting forth that its sensor is not limited to use with any particular body part. There can be no credible argument that a skilled artisan would not readily regard Chin's teachings as extending beyond simply a sensor that is used for a nostril.

We also find unavailing Patent Owner's arguments that one of ordinary skill in the art would somehow regard Chin's teaching of a diffuser as being limited either solely to use with a nostril sensor (*see, e.g.*, Tr. 23:13–17),[8] or only such measurement sites as an "earlobe or nostril" (*see* PO Sur-reply 2). Chin explains generally that use of a diffuser is understood to be beneficial in causing light "to pass through more tissue, and thus more blood." Ex. 1006, 2:4–7. Chin describes that benefit more particularly in the context of the nostril sensor shown in the embodiment of

---

[8] "[JUDGE]: Yes. Okay. So I've heard what you said but I have a couple of clarifying questions. So are you suggesting that Chin's teachings are limited to applying a diffuser to a nostril sensor? It sounds like you have been and I just wanted to verify.
[COUNSEL]: I definitely am, yes."

IPR2020-01722
Patent 10,470,695 B2

Figures 7A and 7B (*id.* at 8:25–29),[9] but there is nothing that suggests that Chin limits the benefits of a diffuser to one particular tissue type (e.g., nostril tissue).  We find persuasive Petitioner's view, and the supporting testimony of Dr. Anthony, that a skilled artisan would have recognized from Chin's disclosure that the light spreading benefits of a diffuser provide for a "stronger reflected signal" that facilitates determining measured physiological parameters.  Pet. 63 (citing Ex. 1006, 2:4–7, 8:25–29, 9:64–10:7; Ex. 1003 ¶ 99).  Patent Owner simply provides no cogent basis to conclude that Chin's diffuser would not function predictably as is disclosed, i.e., spreading light so that it passes through more tissue and blood, when used in conjunction with other types of sensor devices, such as those of Santos and Mendelson-1991.  *See KSR,* 550 U.S. 398 at 416 ("The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results.")

We additionally find unavailing Patent Owner's general argument that a skilled artisan would not have had a reasonable expectation of success in applying a diffuser used in one type of oximeter sensor, such as that in Chin, to other types of oximeter sensors, such as those of Sarantos and Mendelson-1991.  *See, e.g.*, PO Resp. 24–25.  We do not agree that "Chin fails to disclose any specific way of implement[ing]" its diffuser into a sensor.  *See id.* at 24.  It clearly does.  Chin shows, at least in Figure 7B, a diffuser associated with a nostril sensor.  Chin also does not limit its teachings as to a diffuser to any one particular type of sensor, e.g., a nostril sensor.  We are

---

[9] "Also shown is an optional optical diffuser 180 for diffusing the light from emitter 176, which causes a further spreading or mixing of light and may enhance the amount of tissue penetrated in some instances."  Ex. 1006, 8:25–29.

21

IPR2020-01722
Patent 10,470,695 B2

not satisfied by Patent Owner's arguments that some structural and operational differences between the sensors of Sarantos and Mendelson-1991 as compared with that of Chin means that a skilled artisan would not have expected success in combining those teachings. *See id.* at 24; *see also id.* at 25–29 (discussing differences between wrist-worn sensors and nostril sensors). A person of ordinary skill in the art is a person of ordinary creativity. *See KSR*, 550 U.S. at 421. It follows readily that a person of ordinary skill and creativity reasonably would have understood how to implement such diffusers in other types of heart rate or pulse oximeter sensors, such as those of Sarantos and Mendelson-1991, in structural configurations necessary to harness the recognized benefits of such diffusers. We credit Dr. Anthony's testimony to that effect. *See, e.g.*, Ex. 1003 ¶¶ 96–101.

Patent Owner's and Dr. Madisetti's opposing views are rooted only in speculation that a skilled artisan would not have appreciated the benefits of a diffuser in other sensors beyond Chin's nostril sensor, which are intended for application to different body parts. *See, e.g.*, PO Resp. 25–29; Ex. 2001 ¶¶ 69–71. Patent Owner and Dr. Madisetti also seemingly attempt to draw distinctions between a wrist-worn "reflectance-type sensor" and a "transmittance-type sensor" for a nostril in connection with use of a diffuser. *See* PO Resp. 25–29; Ex. 2001 ¶¶ 69–71. Yet, those views overly focus on the specific configurations of single embodiments of each of the pertinent references and do not reflect an appropriate obviousness analysis that takes into account the inferences and creatives steps that a skilled artisan would employ. *See KSR*, 550 U.S. at 421 ("[T]he [obviousness] analysis need not seek out precise teachings directed to the specific subject matter of the

22

challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ."). Specifically, those views do not account adequately for Chin's plain disclosure recognizing the general benefits of a diffuser and that its sensor may be attached "to any body part" in the form of either a "reflectance or a transmittance sensor." *See* Ex. 1003, 2:4–7, 5:54–57. From at least that disclosure, a person of ordinary skill and creativity reasonably would have recognized that Chin contemplates various sensor types and that those sensors, including use of a diffuser, may be applied to various body parts of a user. *See, e.g.*, Ex. 1003 ¶¶ 96–101.

We also find unavailing Patent Owner's arguments that there is inadequate reasoning to combine the pertinent prior art because Petitioner's proposed combination involving Chin "would make Sarantos-Mendelson perform worse." PO Resp. 29–32; *see also id.* at 20–21 (discussing "experiments" performed by Dr. Madisetti on certain sensors). Importantly, the obviousness evaluation does not require that the combined teachings of references must produce a device that is somehow superior, or free of disadvantages, as compared with other prior art devices. *See Medichem, S.A. v. Rolabo, S.L.,* 437 F.3d 1157, 1165 (Fed. Cir. 2006) ("[A] given course of action often has simultaneous advantages and disadvantages, and this does not necessarily obviate motivation to combine."); *Winner Int'l Royalty Corp. v. Wang*, 202 F.3d 1340, 1349 n.8 (Fed. Cir. 2000) ("The fact that the motivating benefit comes at the expense of another benefit, however, should not nullify its use as a basis to modify the disclosure of one reference with the teachings of another. Instead, the benefits, both lost and gained, should be weighed against one another."). In this case, even if some

IPR2020-01722
Patent 10,470,695 B2

negative or undesirable conditions were to emerge in some circumstances from the use of a diffuser as a part of one type of oximeter sensor, that does not establish the non-obviousness of such a sensor with a diffuser. We find more persuasive Petitioner's view, and Dr. Anthony's supporting testimony, that a skilled artisan would have appreciated that a diffuser provides a benefit in spreading light and providing for it to pass through more tissue irrespective of the particular anatomical location of the tissue. *See* Pet. 61–63; Pet. Reply 3–6, 9–12; Ex. 1003 ¶¶ 96–101.

We also question the significance of the "experiments" performed by Dr. Madisetti as alleged support for the proposition that a diffuser would have "detrimental consequences" if applied to a "reflectance-type" pulse oximeter sensor, presumably such as in Sarantos or Mendelson-1991. *See* PO Resp. 20–21; Ex. 2001 ¶¶ 57–60, Appendix. Evidently, Dr. Madisetti applied diffusers of different diffuser material to one commercially available "reflectance-type" pulse oximeter sensor and conducted experiments to detect light based on the different materials juxtaposed with a sensor without any diffuser material. Left unexplained, however, is the basis to conclude that the commercially available sensor and the particular diffuser materials used somehow should be regarded as constituting the type of sensor that emerges from the combined teachings of Sarantos, Mendelson-1991, and Chin. The record provides considerable doubt in that regard. For instance, as noted by Petitioner (*see* Pet. Reply 6–9), the commercially available sensor used by Dr. Madisetti is one that has only a single detector, whereas the type of sensors involved in the context of the '695 patent and the pertinent prior art are those that include multiple detectors. On its face, that difference appears significant, but is not addressed or accounted for by

IPR2020-01722
Patent 10,470,695 B2

Patent Owner or Dr. Madisetti.  Neither Patent Owner nor Dr. Madisetti
provides any meaningful explanation as to why the outcome of the
experiments sheds light on the question of the obviousness of claims 6, 14,
and 21 of the '695 patent in view of the particular prior art teachings on
which Petitioner relies.  We do not find Patent Owner's assertions of non-
obviousness based on Dr. Madisetti's experiments to be adequate or
particularly probative of the obviousness question.

Lastly, we do not find credible Patent Owner's argument that a skilled
artisan lacks motivation to incorporate a diffuser into a "Sarantos-
Mendelson[-1991] device" because Sarantos discloses positioning of its
detectors in such a way that allegedly already maximizes light receipt by the
detector, which would be "negat[ed]" were the device to incorporate a
diffuser.  PO Resp. 31–32 (citing Ex. 2001 ¶ 74).  Neither Patent Owner nor
Dr. Madisetti adequately explains why a skilled artisan would have regarded
Sarantos's teachings as being limited solely to a singular light spreading
pattern that effectively precludes any modification that alters the pattern.
Indeed, we agree with Petitioner that it simply does not follow from the
teachings of the prior art, specifically Chin, that a diffuser applied to a
different device such as that arising from the Sarantos and Mendelson-1991
combination, would have some sort of negating effect that would disrupt
operation of the device.  *See* Pet. Reply 12.  Rather, it follows from the
evidence of record that a skilled artisan would have recognized that a
diffuser provides for light to be desirably "further spread[]" to pass, in some
instances, through more tissue and more blood.  *See* Pet. Reply 12; Ex. 1006
2:4–9, 8:25–29; Ex. 1003 ¶¶ 96–101.  We credit Dr. Anthony's testimony in
that respect over the contrary testimony of Dr. Madisetti (*see, e.g.*, Ex. 2001

IPR2020-01722
Patent 10,470,695 B2

¶ 74), as we conclude that Dr. Anthony's testimony is more consistent with the teachings of the prior art of record.

### 5. Summary

We have considered the final record before us including the respective briefings of the parties, and the underlying evidence offered in support thereof. Based on this record, we conclude that Petitioner has shown by a preponderance of the evidence that claims 6, 14, and 21 would have been obvious in view of the combined teachings of Sarantos, Mendelson-1991, and Chin. *See* Pet. 61–63.

## E. Obviousness Over Ackermans and Chen

Petitioner also contends that claims 6, 14, and 21 are unpatentable based on the combined teachings of Ackermans and Chin. Pet. 102–106 (citing Ex. 1003 ¶¶ 160–163, 167–168). Patent Owner disagrees. PO Response 34–43; PO Sur-reply 13–16.

### 1. Overview of Ackermans

Ackermans is titled "Medical Optical Sensor." Ex. 1016, code (54). Ackermans characterizes its invention as relating to the measurement of blood oxygenation level using optical sensors. *Id.* at 1:2–5. Ackermans's Figure 1 is reproduced below:

Appx0061

IPR2020-01722
Patent 10,470,695 B2



## FIG. 1

Figure 1 shows a three-dimensional sectional schematic drawing of an embodiment of a medical optical sensor. *Id.* at 4:5–6. Medical optical sensor 10 "is designed to be attached to the skin with at least the rims 42 and 44 touching the skin." *Id.* at 4:33–34. The medical optical sensor includes light emitter 20 for emitting light 21 and photodetector 30 for detecting reflected light 31 from a user's skin. *Id.* at 4:22–24.

### 2. Discussion

Petitioner presents Ackermans's teachings as effectively equivalent to the combined teachings of Sarantos and Mendelson-1991. As with the grounds based on Sarantos and Mendelson-1991, Petitioner contends that Ackermans discloses all the features required by claims 6, 14, and 21 with the exception of a diffuser. Petitioner relies on Chin for disclosure of a

27

diffuser.  Patent Owner does not dispute that all the features required by claims 6, 14, and 21 are present in the combined teachings of Ackerman and Chin, but Patent Owner does disagree that Petitioner has established adequate reasoning to combine those references' teachings.

Patent Owner offers arguments to Petitioner's proposed ground based on Ackermans and Chin that essentially mirror those that were offered for the ground based on Sarantos, Mendelson-1991, and Chin.  *See* PO Resp. 34–43; PO Sur-reply 13–16.  For instance, Patent Owner contends the following:  (1) Ackerman discloses a wrist-worn sensor applied to "thick tissue" whereas Chin is limited to a nostril sensor applied to "thin tissue" (*see, e.g.*, PO Resp. 34–35); (2) Petitioner has not explained how Chin's teachings of a diffuser would improve Ackerman's sensor (*see, e.g., id.* at 34–36); (3) Petitioner has not established that a person of ordinary skill in the art would have had a reasonable expectation of success in combining the teachings of Ackermans and Chin (*see, e.g., id.* at 36–37); (4) Petitioner has not accounted for the differences between a wrist-worn sensor and a nostril-based sensor (*see, e.g., id.* at 38–40); (5) combining Chin's diffuser with Ackerman's sensor "would make Ackermans' device perform worse" (*see, e.g., id.* at 40–41); and (6) Ackerman's device already spreads light and that adding a diffuser would "negate[]" that light spreading (*see, e.g., id.* at 41–42).

We conclude that our reasoning presented above in connection with the combination of Sarantos, Mendelson-1991 and Chin also applies to the combination based on Ackermans and Chin.  *See supra* § II.D.4.  For all of those reasons, we also find Patent Owner's arguments unavailing in the context of the Ackermans and Chin combination.

IPR2020-01722
Patent 10,470,695 B2

We determine that Petitioner has shown by a preponderance of the evidence that claim 6, 14, and 21 of the '695 patent are unpatentable based on the combined teachings of Ackermans and Chin. *See* Pet. 102–106.

## III. CONCLUSION

In summary, we determine that a preponderance of the evidence establishes that claims 6, 14, and 21 of the '695 patent are unpatentable, as shown in the following table:[10]

| Claim(s) | 35 U.S.C. § | References/Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 6, 14, 21 | 103 | Sarantos, Mendelson-1991, Chin | 6, 14, 21 | |
| 6, 14, 21 | 103 | Ackermans, Chin | 6, 14, 21 | |
| **Overall Outcome** | | | 6, 14, 21 | |

---

[10] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. §§ 42.8(a)(3), (b)(2).

IPR2020-01722
Patent 10,470,695 B2

IV.   ORDER

Upon consideration of the record before us, it is:

ORDERED that claims 6, 14, and 21 of the '695 patent have been shown to be unpatentable; and

FURTHER ORDERED that, because this is a final written decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2020-01722
Patent 10,470,695 B2

For PETITIONER:

Walter Renner
Dan Smith
Kenneth Hoover
FISH & RICHARDSON P.C.
axf-ptab@fr.com
dsmith@fr.com
hoover@fr.com

For PATENT OWNER:

John M. Grover
Joseph Re
Stephen Larson
Shannon Lam
Jarom Kesler
Ben Katzenellenbogen
KNOBBE, MARTENS, OLSON, & BEAR, LLP
2jmg@knobbe.com
2jrr@knobbe.com
2swl@knobbe.com
2sxl@knobbe.com
2jzk@knobbe.com
2bak@knobbe.com

Trials@uspto.gov
571-272-7822

Paper 8
Entered: May 12, 2021

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

APPLE INC.,
Petitioner,

v.

MASIMO CORPORATION,
Patent Owner.

IPR2020-01722
Patent 10,470,695 B2

Before JOSIAH C. COCKS, ROBERT L. KINDER, and
AMANDA F. WIEKER, *Administrative Patent Judges.*

COCKS, *Administrative Patent Judge.*

DECISION
Granting Institution of *Inter Partes* Review
*35 U.S.C. § 314*

IPR2020-01722
Patent 10,470,695 B2

## I.   INTRODUCTION

### A.   Background

Apple Inc. ("Petitioner") filed a Petition requesting an *inter partes* review of claims 1–6, 8, 9, 11–19, and 21–30 ("challenged claims") of U.S. Patent No. 10,470,695 B2 (Ex. 1001, "the '695 patent").  Paper 2 ("Pet.").  Masimo Corporation ("Patent Owner") waived filing a preliminary response.  Paper 7 ("PO waiver").

We have authority to determine whether to institute an *inter partes* review, under 35 U.S.C. § 314 and 37 C.F.R. § 42.4.  An *inter partes* review may not be instituted unless it is determined that "the information presented in the petition filed under section 311 and any response filed under section 313 shows that there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition." 35 U.S.C. § 314 (2018); *see also* 37 C.F.R. § 42.4(a) ("The Board institutes the trial on behalf of the Director.").

For the reasons provided below and based on the record before us, we determine that Petitioner has demonstrated a reasonable likelihood that Petitioner would prevail in showing the unpatentability of at least one of the challenged claims.  Accordingly, we institute an *inter partes* review on all grounds set forth in the Petition.

2

## B. *Related Matters*

Patent Owner identifies the following matters related to the

'695 patent:

*Masimo Corporation v. Apple Inc.*, Civil Action No. 8:20-cv-00048

(C.D. Cal.) (filed Jan. 9, 2020);

*Apple Inc. v. Masimo Corporation*, IPR2020-01520 (PTAB

Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,258,265 B1);

*Apple Inc. v. Masimo Corporation*, IPR2020-01521 (PTAB

Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,292,628 B1);

*Apple Inc. v. Masimo Corporation*, IPR2020-01523 (PTAB

Aug. 31, 2020) (challenging claims of U.S. Patent No. 8,457,703 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01524 (PTAB

Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,433,776 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01526 (PTAB

Aug. 31, 2020) (challenging claims of U.S. Patent No. 6,771,994 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01536 (PTAB

Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,588,553 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01537 (PTAB

Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,588,553 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01538 (PTAB

Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,588,554 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01539 (PTAB

Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,588,554 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01713 (PTAB Sept. 30,

2020) (challenging claims of U.S. Patent No. 10,624,564 B1);

3

IPR2020-01722
Patent 10,470,695 B2

*Apple Inc. v. Masimo Corporation*, IPR2020-01714 (PTAB Sept. 30, 2020) (challenging claims of U.S. Patent No. 10,631,765 B1 patent);

*Apple Inc. v. Masimo Corporation*, IPR2020-01715 (PTAB Sept. 30, 2020) (challenging claims of U.S. Patent No. 10,631,765 B1 patent);

*Apple Inc. v. Masimo Corporation*, IPR2020-01716 (PTAB Sept. 30, 2020) (challenging claims of U.S. Patent No. 10,702,194 patent);

*Apple Inc. v. Masimo Corporation*, IPR2020-01723 (PTAB Oct. 2, 2020) (challenging claims of U.S. Patent No. 10,470,695 B2);[1]

*Apple Inc. v. Masimo Corporation*, IPR2020-01733 (PTAB Sept. 30, 2020) (challenging claims of U.S. Patent No. 10,702,195 B1); and

*Apple Inc. v. Masimo Corporation*, IPR2020-01737 (PTAB Sept. 30, 2020) (challenging claims of U.S. Patent No. 10,709,366 B1).

Paper 4, 2–3.

Patent Owner also identifies the following pending patent applications that claim priority to, or share a priority claim with, the '695 patent:

U.S. Patent Application No. 15/195,199;

U.S. Patent Application No. 16/532,061;

U.S. Patent Application No. 16/532,065;

U.S. Patent Application No. 16/791,955;

U.S. Patent Application No. 16/791,963;

U.S. Patent Application No. 16/835,712;

---

[1] Pursuant to the Board's November 2019, Consolidated Trial Practice Guide, *available at* https://www.uspto.gov/TrialPracticeGuideConsolidated, Petitioner filed a Notice ranking its two petitions that challenge the '695 patent, ranking first the instant proceeding and ranking second IPR2020-01723. Paper 3, 2. We exercise our discretion to deny institution of *inter partes* review in IPR2020-01723. *See* IPR2020-01723, Paper 8.

U.S. Patent Application No. 16/835,772;

U.S. Patent Application No. 16/791,955; and

U.S. Patent Application No. 16/871,874.

*Id.* at 1–2.

## C. *The '695 Patent*

The '695 patent is titled "Advanced Pulse Oximetry Sensor," and issued on November 12, 2019, from U.S. Patent Application No. 16/226,249, filed December 19, 2018. Ex. 1001, codes (21), (22), (45), (54). The '695 patent summarizes its disclosure as follows:

> This disclosure describes embodiments of non-invasive methods, devices, and systems for measuring blood constituents, analytes, and/or substances such as, by way of non-limiting example, oxygen, carboxyhemoglobin, methemoglobin, total hemoglobin, glucose, proteins, lipids, a percentage therefor (e.g., saturation, pulse rate, perfusion index, oxygen content, total hemoglobin, Oxygen Reserve Index™ (ORI™) or for measuring many other physiologically relevant patient characteristics. These characteristics can relate to, for example, pulse rate, hydration, trending information and analysis, and the like.

*Id.* at 2:36–46.

5

IPR2020-01722
Patent 10,470,695 B2

Figures 7A and 7B of the '695 patent are reproduced below:



FIG. 7A                    FIG. 7B

Figures 7A and 7B above depict side and top views, respectively, of a three-dimensional pulse oximetry sensor according to an embodiment of the '695 patent. *Id.* at 5:28–33. Sensor 700 includes emitter 702, light diffuser 704, light block (or blocker) 706, light concentrator 708, and detector 710. *Id.* at 10:49–51. The sensor functions to irradiate tissue measurement site 102, e.g., a patient's wrist, and detects emitted light that is reflected by the tissue measurement site. *Id.* at 10:43–49. "Light blocker 706 includes an annular ring having cover portion 707 sized and shaped to form a light isolation chamber for the light concentrator 708 and the detector 710." *Id.* at 11:10–12. "[L]ight blocker 706 and cover 70[7] ensures that the only light detected by the detector 710 is light that is reflected from the tissue measurement site." *Id.* at 11:16–20.

6

IPR2020-01722
Patent 10,470,695 B2

Figure 8 of the '695 patent is reproduced below:



FIG. 8

Figure 8 above illustrates "a block diagram of an example pulse oximetry system capable of noninvasively measuring one or more blood analytes in a monitored patient." *Id.* at 5:34–36. Pulse oximetry system 800 includes sensor 801 (or multiple sensors) coupled to physiological monitor 809. *Id.* at 12:21–23. Monitor 809 includes "signal processor 810 that includes processing logic that determines measurement for desired analytes based on the signals received from the detector 806" that is a part of sensor 801. *Id.* at 13:37–40. Monitor 809 also includes user interface 812 that provides an output, e.g., on a display, for presentation to a user of pulse oximetry system 800. *Id.* at 13:64–66.

7

IPR2020-01722
Patent 10,470,695 B2

*D.   Illustrative Claim*

Of the challenged claims, claims 1, 9, and 19 are independent.

Claim 1 is illustrative and is reproduced below.

1. A wrist-worn physiological monitoring device configured for placement on a user at a tissue measurement site, the device comprising:

[a] a light emission source comprising a plurality of emitters configured to irradiate the tissue measurement site by emitting light towards the tissue measurement site, the tissue measurement site being located on a wrist of the user,

[b] the plurality of emitters configured to emit one or more wavelengths;

[c] a plurality of detectors configured to detect the light emitted by the plurality of emitters after attenuation by a circular portion of the tissue measurement site,

[d] the plurality of detectors further configured to output at least one signal responsive to the detected light;

[e] a processor configured to receive the at least one signal responsive to the output and determine a physiological parameter of the user; and

[f] a light block forming an enclosing wall between the light emission source and the plurality of detectors,

[g] the light block defining the circular portion of the tissue measurement site, the light emission source arranged proximate a first side of the enclosing wall and the plurality of detectors arranged proximate a second side of the enclosing wall, the first side being difference than the second side,

[h] wherein the enclosing wall prevents at least a portion of light emitted from the light emission source from being detected by the plurality of detectors without attenuation by the tissue, and wherein the plurality of detectors are arranged in an array having a spatial configuration corresponding to the circular portion of the tissue measurement site.

Ex. 1001, 11:32–63 (bracketed identifiers a–h added).

IPR2020-01722
Patent 10,470,695 B2

### E.   Evidence Relied Upon

Petitioner relies on the following references:

| Reference | Publication/Patent Number | Exhibit |
|---|---|---|
| Sarantos | U.S. Patent No. 9,392,946 B1 issued July 19, 2016 | 1014 |
| Mendelson-1991 | Mendelson et al., *Skin Reflectance Pulse Oximetry: In Vivo Measurements from the Forearm and Calf*, Journal of Clinical Monitoring Vol. 7 No. 1, pp. 7–12 (January 1991) | 1015 |
| Venkatraman | U.S. Patent No. 8,998,815 B2 issued Apr. 7, 2015 | 1005 |
| Chin | U.S. Patent No. 6,343,223 B1 issued Jan. 29, 2002 | 1006 |
| Ackermans | WO 2011/051888 A2  published May 5, 2011 | 1016 |

Pet. 3.  Petitioner also relies on the Declaration of Brian W. Anthony, Ph.D. (Ex. 1003).

### F.   Asserted Grounds

Petitioner asserts that claims 1–6, 8, 9, 11–19, and 21–30 are unpatentable based upon the following grounds (Pet. 3):

| Claims Challenged | 35 U.S.C. § | References/Basis |
|---|---|---|
| 1, 4, 5, 8, 9, 13, 15–19, 24–30 | 103 | Sarantos |
| 1, 2, 4, 5, 8, 9, 11, 13, 15–19, 22, 24–30 | 103 | Sarantos, Mendelson-1991 |
| 3, 12, 23 | 103 | Sarantos, Mendelson-1991, Venkatraman |
| 6, 14, 21 | 103 | Sarantos, Mendelson-1991, Chin |
| 1, 4, 5, 8, 9, 13, 15–17, 1924–26, 28, 29 | 103 | Ackermans |
| 2, 3, 11, 12, 18, 22, 23, 27, 30 | 103 | Ackermans, Venkatraman |

9

IPR2020-01722
Patent 10,470,695 B2

| Claims Challenged | 35 U.S.C. § | References/Basis |
|---|---|---|
| 6, 14, 21 | 103 | Ackermans, Chin |

## II.  ANALYSIS

### A.  Claim Construction

For petitions filed on or after November 13, 2018, a claim shall be construed using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. § 282(b).  37 C.F.R. § 42.100(b) (2019).  Petitioner submits that no claim term requires express construction.  Pet. 5.  Based on our analysis of the issues in dispute at this stage of the proceeding, we conclude that no further claim terms require express construction at this time.  *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017).

### B.  Principles of Law

A claim is unpatentable under 35 U.S.C. § 103 if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007).  The question of obviousness is resolved on the basis of underlying factual determinations, including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) objective evidence of non-obviousness.[2]  *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).  When

---

[2] Patent Owner does not present objective evidence of non-obviousness at this stage.

IPR2020-01722
Patent 10,470,695 B2

evaluating a combination of teachings, we must also "determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue." *KSR*, 550 U.S. at 418 (citing *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)). Whether a combination of prior art elements would have produced a predictable result weighs in the ultimate determination of obviousness. *Id.* at 416–417.

In an *inter partes* review, the petitioner must show with particularity why each challenged claim is unpatentable. *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016); 37 C.F.R. § 42.104(b). The burden of persuasion never shifts to Patent Owner. *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015).

We analyze the challenges presented in the Petition in accordance with the above-stated principles.

### C. Level of Ordinary Skill in the Art

Petitioner identifies the appropriate level of skill in the art as follows:

> The person would have had a Bachelor of Science degree in an academic discipline emphasizing the design of electrical, computer, or software technologies, in combination with training or at least one to two years of related work experience with capture and processing of data or information, including but not limited to physiological monitoring technologies. Alternatively, the person could have also had a Master of Science degree in a relevant academic discipline with less than a year of related work experience in the same discipline.

Pet. 4–5 (citing Ex. 1003 ¶ 17–19).

For purposes of this Decision, we generally adopt Petitioner's assessment as set forth above, which appears consistent with the level of skill reflected in the Specification and prior art.

11

IPR2020-01722
Patent 10,470,695 B2

### D. Obviousness Over Sarantos

Petitioner presents undisputed contention that claims 1, 4, 5, 8, 9, 13, 15–19, and 24–30 would have been obvious based on Sarantos's teachings. Pet. 6–35.

### 1. Overview of Sarantos

Sarantos is titled "Heart Rate Sensor With High-Aspect-Ratio Photodetector Element." Ex. 1014, code (54). Sarantos describes "[photoplethysmographic (PPG)] sensors designed for use with wearable biometric monitoring devices" and which measure "physiological parameters" of a wearer such as "heart rate" and "blood oxygenation levels." *Id.* at 6:66–7:3; 13:39–47.

Santos's Figure 2 is reproduced on the right. Figure 2 illustrates "a wristband-type wearable fitness monitor that incorporates a PPG sensor[.]" *Id.* at 5:55–56. Fitness monitor 200 includes housing 104, back face 128 and light sources 108. *Id.* at 7:12–23. "PPG sensors operate by shining light into a person's skin. This light diffuses through the person's flesh and a portion of this light is then emitted back out of the person's skin in close proximity to where the light was introduced into the flesh." *Id.* at 7:24–28.



FIG. 2

12

IPR2020-01722
Patent 10,470,695 B2

Sarantos's Figure 18 is reproduced below.



**FIG. 18**

Figure 18 above illustrates an example of a PPG sensor photodetector layout
with multiple light-emitting devices. *Id.* at 6:39–42. Photodetector
elements 1812 are characterized as being in a "circular array" centered on
light source 1808, which includes two light-emitting devices 1810. *Id.* at
14:60–62; 15:24–43. Sarantos describes that the PPG sensor

> may include control logic, which may be communicatively
> connected with the light source and each photodetector element
> and configured to cause the light source to emit light, obtain one
> or more measured light intensity measurements from the one or
> more photodetector elements, and determine a heart rate
> measurement based, at least in part, on the one or more light
> intensity measurements.

*Id.* at 2:5–12.

13

IPR2020-01722
Patent 10,470,695 B2

Sarantos's Figure 22 is reproduced below:



**FIG. 22**

Figure 22 above depicts another example configuration of a PPG sensor according to Sarantos's invention. *Id.* at 6:53–55. Substrate 2272 supports two high-aspect-ratio (HAR) photodetector elements 2212 positioned on either side of light source 2208. *Id.* at 17:1–3. Window 2278 is offset from substrate 2272. *Id.* at 17:3–4. Sarantos explains the following:

> The window 2278 may be held against a person's skin e.g., by being held in place with a strap, when heart rate measurements are obtained to allow light from the light source 2208 to shine through its associated window region 2226 and into the person's skin, where the light then diffuses into the surrounding flesh and is then emitted back out of the person's skin and into the HAR photodetector elements 2212 through the respective window regions 226 associated with the HAR photodetector elements 2212.

*Id.* at 17:16–25.

Santos additionally explains the following:

> In order to reduce the chance that light from the light source 2208 will reach either of the HAR photodetector elements 2212 without first being diffused through the person's skin, the light source 2208 may be separated from the HAR photodetector elements 2212 within the PPG sensor by walls 2274, which may

14

IPR2020-01722
Patent 10,470,695 B2

extend to the window 2278 or may stop short of the window 2278.

*Id.* at 17:26–32.

### 2. *Independent claim 1*

    i.   *A wrist-worn physiological monitoring device configured for placement on a user at a tissue measurement site, the device comprising:*

As noted above, Sarantos discloses a "wrist-band type fitness monitor" with a PPG sensor that measures light emitted from a person's skin. *See, e.g.*, Ex. 1014, 5:55–56; 7:12–28; Fig. 2. On this record, the cited evidence supports Petitioner's undisputed contention that Sarantos discloses a wrist-worn physiological monitoring device that is configured for placement on a user at a tissue measurement site.[3] Pet. 7–8.

    ii.   *[a] a light emissions source comprising a plurality of emitters configured to irradiate the tissue measurement site by emitting light towards the tissue measurement site,*

Sarantos discloses multiple examples of light sources that are intended to emit light towards a person's skin. *See, e.g.*, Ex. 1014, elements 108, 1812, 2208. On this record, the cited evidence supports Petitioner's undisputed contentions that limitation 1[a] is disclosed by Sarantos. Pet. 8–10.

---

[3] Whether the preamble is limiting need not be resolved at this stage of the proceeding because Petitioner shows sufficiently for purposes of institution that the recitation in the preamble is satisfied by the prior art.

IPR2020-01722
Patent 10,470,695 B2

> iii.   [b] the plurality of emitters configured to emit one or more
>        wavelengths;

Sarantos describes that its light sources can be formed as "separate
light-emitting devices that are each able to emit different wavelengths of
light" and that "each light emitting device may be used to supply light for a
different type of photoplethysmographic measurement." Ex. 1014, 13:50–
53. At this time, the cited evidence supports Petitioner's undisputed
contentions that limitation 1[b] is disclosed by Sarantos. Pet. 10–11.

> iv.   [c] a plurality of detectors configured to detect the light
>       emitted by the plurality of emitters after attenuation by a
>       circular portion of the tissue measurement site;

Sarantos discloses that its PPG sensor includes multiple detectors,
*e.g.*, detectors 1812, configured in a "circular array." Ex. 1014, 14:60–62;
15:24–43; Fig. 18. Pointing to the combined teachings of multiple
embodiments of Sarantos, e.g., Figs. 18, 22–24, Petitioner contends that a
"[person of ordinary skill in the art] would have understood or at least found
it obvious that the light blocking walls 2274, 2374, 2474 are configured in a
circular manner around the light source 2208, 2308, 2408." Pet. 14–15.

IPR2020-01722
Patent 10,470,695 B2

Petitioner provides a modified and annotated version (reproduced below) of Sarantos's Figure 18 that Petitioner submits is what a skilled artisan would glean from Sarantos's teachings.





**APPLE-1014, FIG. 18 (modified to show light blocking wall)**

According to Petitioner, "the modified FIG. 18 [above] shows a top view of how the light blocking/enclosing walls 2274, 2374, 2474 are configured based on Sarantos' disclosure." Pet. 15. Petitioner further argues that "a [person of ordinary skill in the art] would have understood that the light/blocking wall 2274, 2374, 2474 guides the light emitted by light source 2208, 2308, 2408 to the tissue measurement site" and that the measurement site is "circular." *Id.* at 15–16. On this record, we are satisfied that the cited evidence supports Petitioner's undisputed contentions that limitation 1[c] is present in Sarantos. Pet. 11–18

17

IPR2020-01722
Patent 10,470,695 B2

> v.   *[d] the plurality of detectors further configured to output at least one signal responsive to the detected light;*

Sarantos discloses that "light emanating from the person's skin is then measured by a photodetector element; this measured light intensity is depicted as data trace 348. The date trace 348 may be split into a DC component 346, which does not fluctuate with time, and an AC component 344, which does fluctuate with time." Ex. 1014, 8:3–18. Petitioner contends that "[a person of ordinary skill in the art] would have understood that this data trace would be generated based on signals from Sarantos' elements representative of the intensity of the detect light." Pet. 19 (citing Ex., 1014, 9:8–14; Ex. 1003 ¶ 46). On this record, the cited evidence supports Petitioner's undisputed contentions that limitation 1[d] is disclosed by Sarantos. Pet. 18–21.

> vi.   *[e] a processor configured to receive the at least one signal responsive to the output and determine a physiological parameter of the user; and*

Petitioner points to Sarantos's disclosure pertaining to processor 2768 and control logic 2706 and contends that the processor "is configured to receive data collected by photodetectors to determine a physiological parameter such as the person's heart rate." Pet. 21 (citing Ex. 1014, 20:7–23; Ex. 1003 ¶ 48). On this record, we are satisfied by Petitioner's undisputed contentions that the processor feature of imitation 1[e] is met by Sarantos.

> vii.   *[f] light block forming an enclosing wall between the light emission source and the plurality of detectors,*
>
> *[g] the light block defining the circular portion of the tissue measurement site, the light emissions source arranged*

18

**Appx0084**

IPR2020-01722
Patent 10,470,695 B2

> *proximate a first side of the enclosing wall and the plurality*
> *of detectors arranged proximate a second side of the*
> *enclosing wall, the first side being difference than the*
> *second side, wherein the enclosing wall prevents at least a*
> *portion of light emitted from the light emission source from*
> *being detected by the plurality of detectors without*
> *attenuation by the tissue,*

> *[h] and wherein the plurality of detectors are arranged in*
> *an array having a spatial configuration corresponding to*
> *the circular portion of the tissue measurement site.*

As discussed above in conjunction with limitation 1[c], Petitioner contends that a skilled artisan would have understood from the combined teachings of embodiments of Sarantos's invention appearing, for instance, in Figures 15, 18 and 22–24 that a light blocking wall may be arranged between a circular array of photodetectors.  Petitioner reasons that "this circular array of detectors has a spatial configuration corresponding to the Sarantos' light blocking/enclosing wall 2274, 2374, which protects light from the emitters from reaching the photodetectors directly.  Pet. 24 (citing Ex. 1014, Figs. 15, 18, 22–24, 14:54–15:45, 17:1–18:35.  Petitioner also contends that "the photodetectors in Sarantos are arranged in an array having a spatial configuration corresponding to the circular portion of the tissue measurement site." *Id.* at 25 (citing Ex. 1003 ¶ 52).

At this time, the cited evidence supports Petitioner's undisputed contention that the light block and its arrangement as set forth in limitations 1[f–h] are satisfied based on Sarantos's teachings.

19

IPR2020-01722
Patent 10,470,695 B2

viii. *Summary*

For the foregoing reasons, we are persuaded that Petitioner's cited evidence and reasoning demonstrates a reasonable likelihood that Petitioner would prevail in its contentions that claim 1 is unpatentable over Sarantos.

3. *Claims 4, 5, 8, 9, 13, 15–19, and 24–30*

Claim 9 is an independent method claim that corresponds to the claim 1. Independent claim 19 is similar in scope to claim 1. Claims 4, 5, 8, 13, 15–18, and 24–30 ultimately depend from one of claims 1, 9, and 19. We have considered Petitioner's assessment, and supporting record evidence, in accounting for claims 4, 5, 8, 9, 13, 15–19, and 24–30. *See* Pet. 25–35. On this record, we conclude that Petitioner has also shown a reasonable likelihood of success in its challenges to those claims based on Sarantos.

E. *Obviousness Over Sarantos and Mendelson-1991*

Petitioner also contends that claims 1, 2, 4, 5, 8, 9, 11, 13, 15–19, 22, 24–30 are unpatentable based on the combined teachings of Sarantos and Mendelson-1991. Pet. 35–55.

1. *Overview of Mendelson-1991*

Mendelson-1991 is an article from the Journal of Clinical Monitoring titled "Skin Reflectance Pulse Oximetry: In Vivo Measurements from the Forearm and Calf." Ex. 1015, 1. The article "describe[s] preliminary in vivo evaluation of a new optical reflectance sensor for noninvasive monitoring of $SaO_2$ with a modified commercial transmittance pulse oximeter." *Id.* at 2.

20

Appx0086

IPR2020-01722
Patent 10,470,695 B2

Mendelson-1991's Figures 1A and 1B are reproduced below:



The figures above illustrates "(A) Frontal and (B) side view of the heated skin reflectance pulse oximeter sensor." *Id.* The figures show a pulse oximeter sensor that includes, among other things, multiple "photodiodes," "light-emitting diodes (LEDs)," and an "optical shield." *Id.*

### 2. Discussion

As discussed above, on the current record we conclude that Petitioner has established a reasonable likelihood of success in its challenge to claims 1, 4, 5, 8, 9, 13, 15–19, and 24–30 are unpatentable over Sarantos

21

taken alone. In urging the unpatentability of claims 1, 2, 4, 5, 8, 9, 11, 13,
15–19, 22, 24–30 based on Sarantos and Mendelson-1991, Petitioner relies
on Mendelson-1991's teachings . Specifically on the teachings related to its
optical shield to bolster the position that a skilled artisan would have
appreciated that a light blocking wall may be configured in a circular
arrangement between a circular array of detectors and light emitters to
"ensure that only light that has been attenuated from the tissue measurement
site is detected and not light directly emitted from the emitters." *See, e.g.*,
Pet. 36–37 (citing, for instance, Ex. 1015, 2 Figs. 1(A), 1(B); Ex. 1003 ¶¶
65–66). Petitioner provides a colorized and annotated version of
Mendelson-1991's Figures 1(A) and 1(B), which we reproduce below:



**APPLE-1015, FIG. 1(A) (left), FIG. 1(B) (right)**

Figures 1(A) and 1(B) above highlight Mendelson-1991's
configuration of its optical shield in relation to its photodiodes. Petitioner
argues that "Sarantos and Mendelson-1991 are related to obtaining
physiological parameters using a reflection system in which 1) a light
shield/block layer is located between the emitters and detectors, and

22

IPR2020-01722
Patent 10,470,695 B2

2) emitters emit radiation that is reflected from the human tissue and detected by detectors in a reflection measurement setup." Pet. 36. Petitioner takes the position with respect to the combined teachings of Sarantos and Mendelson-1991:

> Implementing the circular light blocking/enclosing wall 2274, 2374, 2474 would have been obvious to do so because a circular arrangement of detectors surrounds the emitters, the circular light blocking/enclosing wall 2274, 2374, 2474 would ensure that only light that has been attenuated from the tissue measurement site is detected and not light directly emitted from the emitters, as described by both Sarantos and Mendelson-1991.

*Id.* at 37.

Petitioner also contends that "[a person of ordinary skill in the art] would have combined the teachings of Sarantos and Mendelson-1991 because doing so would have amounted to nothing more than the use of a known technique to improve similar devices in the same way and combining prior art elements according to known methods to yield predictable results." *Id.* at 36.

In our view, having considered Petitioner's assertions as to the teaching value of the combination of Sarantos and Mendelson-1991, we conclude the present record supports Petitioner's undisputed contentions that claims 1, 2, 4, 5, 8, 9, 11, 13, 15–19, 22, 24–30 are unpatentable based on that combination.

## F. Additional Grounds

Petitioner provides arguments and evidence, including the Anthony Declaration, in support of Petitioner's following additional grounds:

| Claims Challenged | 35 U.S.C. § | References/Basis |
|---|---|---|
| 3, 12, 23 | 103 | Sarantos, Mendelson-1991, Venkatraman |

23

IPR2020-01722
Patent 10,470,695 B2

| Claims Challenged | 35 U.S.C. § | References/Basis |
|---|---|---|
| 6, 14, 21 | 103 | Sarantos, Mendelson-1991, Chin |
| 1, 4, 5, 8, 9, 13, 15–17, 1924–26, 28, 29 | 103 | Ackermans |
| 2, 3, 11, 12, 18, 22, 23, 27, 30 | 103 | Ackermans, Venkatraman |
| 6, 14, 21 | 103 | Ackermans, Chin |

*See* Pet. 55–106. Patent Owner does not offer, at this stage, any arguments addressing Petitioner's substantive showing. *See generally* PO Waiver. We have reviewed Petitioner's arguments and the cited evidence, and we determine Petitioner has demonstrated a reasonable likelihood of prevailing as to those contentions. Pursuant to USPTO policy implementing the decision in *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348 (2018) ("*SAS*"), we institute as to all claims challenged in the petition and on all grounds in the petition. *See* PTAB Consolidated Trial Practice Guide (Nov. 2019)[4] 5–6, 64.

## III. CONCLUSION

The Supreme Court held that a final written decision under 35 U.S.C. § 318(a) must decide the patentability of all claims challenged in the petition. *See SAS*. After considering the evidence and arguments presented in the Petition, we determine that Petitioner has demonstrated a reasonable likelihood of success in proving that at least one claim of the '695 patent is unpatentable. Accordingly, we institute an *inter partes* review of all claims and all grounds set forth in the Petition.

---

[4] Available at https://www.uspto.gov/TrialPracticeGuideConsolidated.

IPR2020-01722
Patent 10,470,695 B2

At this stage of the proceeding, we have not made a final determination as to the patentability of any challenged claim or as to the construction of any claim term.

## IV.    ORDER

In consideration of the foregoing, it is

ORDERED that, pursuant to 35 U.S.C. § 314(a), an *inter partes* review of claims 1–6, 8, 9, 11–19, and 21–30 of the '695 patent is instituted with respect to all grounds set forth in the Petition; and

FURTHER ORDERED that, pursuant to 35 U.S.C. § 314(c) and 37 C.F.R. § 42.4(b), *inter partes* review of the '695 patent shall commence on the entry date of this Order, and notice is hereby given of the institution of a trial.

25

IPR2020-01722
Patent 10,470,695 B2

For PETITIONER:

Walter Renner
Dan Smith
Kenneth Hoover
FISH & RICHARDSON P.C.
axf-ptab@fr.com
dsmith@fr.com
hoover@fr.com

For PATENT OWNER:

Joseph Re
Stephen Larson
Shannon Lam
Jarom Kesler
KNOBBE, MARTENS, OLSON, & BEAR, LLP
2jrr@knobbe.com
2swl@knobbe.com
2sxl@knobbe.com
2jzk@knobbe.com

26

Filed June 9, 2022

On behalf of:
    Patent Owner Masimo Corporation
By:   John M. Grover (Reg. No. 42,610)
      Stephen W. Larson (Reg. No. 69,133)
      Jarom D. Kesler (Reg. No. 57,046)
      Joseph R. Re (Reg. No. 31,291)
      Shannon H. Lam (Reg. No. 65,614)
      Benjamin A. Katzenellenbogen (Reg. No. 53,102)
      KNOBBE, MARTENS, OLSON & BEAR, LLP
      2040 Main Street, 14th Floor
      Irvine, CA 92614
      Tel.:  (949) 760-0404
      Email:  AppleIPR2020-1722-695@knobbe.com

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

APPLE INC.

Petitioner,

v.

MASIMO CORPORATION,

Patent Owner.

———————

IPR2020-01722
Patent 10,470,695

———————

**PATENT OWNER'S NOTICE OF APPEAL TO
THE U.S. COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

IPR2020-01722
Apple v. Masimo – Patent 10,470,695

Pursuant to 28 U.S.C. § 1295(a)(4)(A), 35 U.S.C. §§ 141(c), 142, and 319, 37 C.F.R. §§ 90.2(a) and 90.3, and Rule 4(a) of the Federal Rules of Appellate Procedure, Patent Owner Masimo Corporation ("Masimo") hereby appeals to the United States Court of Appeals for the Federal Circuit from the Judgment – Final Written Decision (Paper 29) entered on May 5, 2022 (Attachment A) and from all underlying orders, decisions, rulings, and opinions that are adverse to Masimo related thereto and included therein, including those within the Decision Granting Institution of *Inter Partes* Review, entered May 12, 2021 (Paper 8).  Masimo appeals the Patent Trial and Appeal Board's determination that claims 6, 14, and 21 of U.S. Patent 10,470,695 are unpatentable, and all other findings and determinations, including but not limited to claim construction, as well as all other issues decided adverse to Masimo's position or as to which Masimo is dissatisfied in IPR2020-01722 involving Patent 10,470,695.

Masimo is concurrently providing true and correct copies of this Notice of Appeal, along with the required fees, to the Director of the United States Patent and Trademark Office and the Clerk of the United States Court of Appeals for the Federal Circuit.

<div style="margin-left: 40%;">
Respectfully submitted,
KNOBBE, MARTENS, OLSON & BEAR, LLP
</div>

Dated:  June 9, 2022          By: /John M. Grover/
                              John M. Grover (Reg. No. 42,610)
                              Stephen W. Larson (Reg. No. 69,133)

<div style="text-align:center;">-1-</div>

IPR2020-01722
Apple v. Masimo – Patent 10,470,695

Jarom D. Kesler (Reg. No. 57,046)
Joseph R. Re (Reg. No. 31,291)
Shannon H. Lam (Reg. No. 65,614)
Benjamin A. Katzenellenbogen (Reg. No. 53,102)

Attorneys for Patent Owner
Masimo Corporation

-2-

ATTACHMENT A

Trials@uspto.gov
571-272-7822

Paper 29
Entered: May 5, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

APPLE INC.,
Petitioner,

v.

MASIMO CORPORATION,
Patent Owner.

IPR2020-01722
Patent 10,470,695 B2

Before JOSIAH C. COCKS, ROBERT L. KINDER, and
AMANDA F. WIEKER, *Administrative Patent Judges.*

COCKS, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

IPR2020-01722
Patent 10,470,695 B2

## I. INTRODUCTION

### A. Background

Apple Inc. ("Petitioner") filed a Petition requesting an *inter partes* review of claims 1–6, 8, 9, 11–19, and 21–30 of U.S. Patent No. 10,470,695 B2 (Ex. 1001, "the '695 patent"). Paper 2 ("Pet."). We instituted the petitioned review. Paper 8 ("Institution Decision" or "Inst. Dec.").

Masimo Corporation ("Patent Owner") filed a Patent Owner Response (Paper 13, "PO Resp.") to oppose the Petition. Petitioner filed a Reply (Paper 18, "Pet. Reply") to the Patent Owner Response. Patent Owner filed a Sur-reply (Paper 19, "PO Sur-reply") to the Reply. We conducted an oral hearing on February 9, 2022. A transcript has been entered in the record (Paper 28, "Tr.").[1]

We have jurisdiction under 35 U.S.C. § 6(b)(4) and § 318(a). This Decision is a final written decision under 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73 as to the patentability of claims 6, 14, and 21 of the '695 patent. We determine Petitioner has shown by a preponderance of the evidence that those claims are unpatentable.

---

[1] In the Patent Owner Response, Patent Owner indicates that claims 1–5, 8, 9, 11–13, 15–19, and 22–30 "have been statutorily disclaimed under 35 U.S.C. § 253(a)," and are "no longer at issue in this proceeding." PO Resp. 15 (citing Ex. 2004). At oral argument, Patent Owner again acknowledged that claims 1–5, 8, 9, 11–13, 15–19, and 22–30 have been disclaimed. Tr. 13. In its Reply, Petitioner also notes that those claims have been disclaimed "leaving claims 6, 14, and 21 as the only remaining challenged claims." Pet. Reply 1 n.1 (citing Ex. 2004). Exhibit 2004 is titled "Disclaimer in Patent Under 37 CFR 1.321(a)" and indicates that claims 1–5, 8, 9, 11–13, 15–19, and 22–30 have been disclaimed. Ex. 2004, 1. Accordingly, we regard claims 6, 14, and 21 as the only remaining challenged claims in this proceeding.

IPR2020-01722
Patent 10,470,695 B2

### B.   Related Matters

Patent Owner identifies the following matters related to the
'695 patent:

*Masimo Corporation v. Apple Inc.*, Civil Action No. 8:20-cv-00048
(C.D. Cal.) (filed Jan. 9, 2020);

*Apple Inc. v. Masimo Corporation*, IPR2020-01520 (PTAB
Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,258,265 B1);

*Apple Inc. v. Masimo Corporation*, IPR2020-01521 (PTAB
Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,292,628 B1);

*Apple Inc. v. Masimo Corporation*, IPR2020-01523 (PTAB
Aug. 31, 2020) (challenging claims of U.S. Patent No. 8,457,703 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01524 (PTAB
Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,433,776 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01526 (PTAB
Aug. 31, 2020) (challenging claims of U.S. Patent No. 6,771,994 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01536 (PTAB
Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,588,553 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01537 (PTAB
Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,588,553 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01538 (PTAB
Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,588,554 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01539 (PTAB
Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,588,554 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01713 (PTAB Sept. 30,
2020) (challenging claims of U.S. Patent No. 10,624,564 B1);

Appx0099

IPR2020-01722
Patent 10,470,695 B2

*Apple Inc. v. Masimo Corporation*, IPR2020-01714 (PTAB Sept. 30, 2020) (challenging claims of U.S. Patent No. 10,631,765 B1 patent);

*Apple Inc. v. Masimo Corporation*, IPR2020-01715 (PTAB Sept. 30, 2020) (challenging claims of U.S. Patent No. 10,631,765 B1 patent);

*Apple Inc. v. Masimo Corporation*, IPR2020-01716 (PTAB Sept. 30, 2020) (challenging claims of U.S. Patent No. 10,702,194 patent);

*Apple Inc. v. Masimo Corporation*, IPR2020-01723 (PTAB Oct. 2, 2020) (challenging claims of U.S. Patent No. 10,470,695 B2);[2]

*Apple Inc. v. Masimo Corporation*, IPR2020-01733 (PTAB Sept. 30, 2020) (challenging claims of U.S. Patent No. 10,702,195 B1); and

*Apple Inc. v. Masimo Corporation*, IPR2020-01737 (PTAB Sept. 30, 2020) (challenging claims of U.S. Patent No. 10,709,366 B1).

Paper 4, 2–3.

Patent Owner also identifies the following pending patent applications that claim priority to, or share a priority claim with, the '695 patent:

U.S. Patent Application No. 15/195,199;

U.S. Patent Application No. 16/532,061;

U.S. Patent Application No. 16/532,065;

U.S. Patent Application No. 16/791,955;

U.S. Patent Application No. 16/791,963;

U.S. Patent Application No. 16/835,712;

---

[2] Pursuant to the Board's November 2019, Consolidated Trial Practice Guide, *available at* https://www.uspto.gov/TrialPracticeGuideConsolidated, Petitioner filed a Notice ranking its two petitions that challenge the '695 patent, ranking first the instant proceeding and ranking second IPR2020-01723.  Paper 3, 2.  We exercised our discretion to deny institution of *inter partes* review in IPR2020-01723.  *See* IPR2020-01723, Paper 8.

IPR2020-01722
Patent 10,470,695 B2

U.S. Patent Application No. 16/835,772; and

U.S. Patent Application No. 16/871,874.

*Id.* at 1–2.

### C. The '695 Patent

The '695 patent is titled "Advanced Pulse Oximetry Sensor," and
issued on November 12, 2019, from U.S. Patent Application No.
16/226,249, filed December 19, 2018.  Ex. 1001, codes (21), (22), (45), (54).
The '695 patent summarizes its disclosure as follows:

> This disclosure describes embodiments of non-invasive
> methods, devices, and systems for measuring blood constituents,
> analytes, and/or substances such as, by way of non-limiting
> example, oxygen, carboxyhemoglobin, methemoglobin, total
> hemoglobin, glucose, proteins, lipids, a percentage therefor
> (e.g., saturation), pulse rate, perfusion index, oxygen content,
> total hemoglobin, Oxygen Reserve Index™ (ORI™) or for
> measuring many other physiologically relevant patient
> characteristics.  These characteristics can relate to, for example,
> pulse rate, hydration, trending information and analysis, and the
> like.

*Id.* at 2:36–46.

5

IPR2020-01722
Patent 10,470,695 B2

Figures 7A and 7B of the '695 patent are reproduced below:



FIG. 7A                    FIG. 7B

Figures 7A and 7B above depict side and top views, respectively, of a three-dimensional pulse oximetry sensor according to an embodiment of the '695 patent. *Id.* at 5:28–33. Sensor 700 includes emitter 702, light diffuser 704, light block (or blocker) 706, light concentrator 708, and detector 710. *Id.* at 10:49–51. The sensor functions to irradiate tissue measurement site 102, e.g., a patient's wrist, and detects emitted light that is reflected by the tissue measurement site. *Id.* at 10:43–49. "[L]ight blocker 706 includes an annular ring having cover portion 707 sized and shaped to form a light isolation chamber for the light concentrator 708 and the detector 710." *Id.* at 11:10–12. "[L]ight blocker 706 and cover 70[7] ensures that the only light detected by the detector 710 is light that is reflected from the tissue measurement site." *Id.* at 11:16–20.

6

IPR2020-01722
Patent 10,470,695 B2

Figure 8 of the '695 patent is reproduced below:



FIG. 8

Figure 8 above illustrates "a block diagram of an example pulse oximetry system capable of noninvasively measuring one or more blood analytes in a monitored patient." *Id.* at 5:34–36.  Pulse oximetry system 800 includes sensor 801 (or multiple sensors) coupled to physiological monitor 809. *Id.* at 12:21–23.  Monitor 809 includes "signal processor 810 that includes processing logic that determines measurements for desired analytes based on the signals received from the detector 806" that is a part of sensor 801. *Id.* at 13:37–40.  Monitor 809 also includes user interface 812 that provides "an output, e.g., on a display, for presentation to a user of pulse oximetry system 800." *Id.* at 13:64–66.

7

*D. Illustrative Claim*

Claim 6 is illustrative and is reproduced below.[3]

1. A wrist-worn physiological monitoring device configured for placement on a user at a tissue measurement site, the device comprising:

a light emission source comprising a plurality of emitters configured to irradiate the tissue measurement site by emitting light towards the tissue measurement site, the tissue measurement site being located on a wrist of the user,

the plurality of emitters configured to emit one or more wavelengths;

a plurality of detectors configured to detect the light emitted by the plurality of emitters after attenuation by a circular portion of the tissue measurement site,

the plurality of detectors further configured to output at least one signal responsive to the detected light;

a processor configured to receive the at least one signal responsive to the output and determine a physiological parameter of the user; and

a light block forming an enclosing wall between the light emission source and the plurality of detectors,

the light block defining the circular portion of the tissue measurement site, the light emission source arranged proximate a first side of the enclosing wall and the plurality of detectors arranged proximate a second side of the enclosing wall, the first side being difference than the second side,

wherein the enclosing wall prevents at least a portion of light emitted from the light emission source from being detected by the plurality of detectors without attenuation by the tissue, and wherein the plurality of detectors are arranged in an array having a spatial configuration corresponding to the circular portion of the tissue measurement site.

Ex. 1001, 15:32–63.

---

[3] Because claim 6 depends from independent claim 1, we also reproduce disclaimed claim 1 for completeness.

8

6. The physiological monitoring device of claim 1, further comprising a diffuser which receives, spreads, and emits the spread light, wherein the emitted spread light is directed at the tissue measurement site.

*Id.* at 16:16–19.[4]

### E. Evidence Relied Upon

Petitioner relies on the following references:

| Reference | Publication/Patent Number | Exhibit |
|---|---|---|
| Sarantos | U.S. Patent No. 9,392,946 B1 issued July 19, 2016 | 1014 |
| Mendelson-1991 | Mendelson et al., *Skin Reflectance Pulse Oximetry: In Vivo Measurements from the Forearm and Calf*, Journal of Clinical Monitoring Vol. 7 No. 1, pp. 7–12 (January 1991) | 1015 |
| Chin | U.S. Patent No. 6,343,223 B1 issued Jan. 29, 2002 | 1006 |
| Ackermans | WO 2011/051888 A2  published May 5, 2011 | 1016 |

Pet. 3–4.  Petitioner also relies on the Declaration of Brian W. Anthony, Ph.D. (Ex. 1003).  Patent Owner relies on the Declaration of Vijay K. Madisetti, Ph.D. (Ex. 2001).

---

[4] Claim 14 (which depends from independent claim 9) and claim 21 (which depends from independent claim 19) add a similar "diffuser" limitation as is set forth in claim 6.

### F.   Asserted Grounds

Petitioner asserts that claims 6, 14, and 21 are unpatentable based upon the following grounds (Pet. 3):[5]

| Claims Challenged | 35 U.S.C. § | References/Basis |
|---|---|---|
| 6, 14, 21 | 103 | Sarantos, Mendelson-1991, Chin |
| 6, 14, 21 | 103 | Ackermans, Chin |

## II.   ANALYSIS

### A.   Claim Construction

For petitions filed on or after November 13, 2018, a claim shall be construed using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. § 282(b).  37 C.F.R. § 42.100(b) (2019).  Both parties submit that no claim term requires express construction. Pet. 5; PO Resp. 14.  Based on our analysis of the issues, we conclude that no claim terms require express construction.  *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017).

### B.   Principles of Law

A claim is unpatentable under 35 U.S.C. § 103 if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406

---

[5] As noted by both parties, because of Patent Owner's statutory disclaimer, these are the only claims and grounds that remain at issue in this proceeding. *See* PO Resp. 16; *see generally* Pet. Reply, PO Sur-reply.

(2007). The question of obviousness is resolved on the basis of underlying factual determinations, including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) objective evidence of non-obviousness.[6] *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). When evaluating a combination of teachings, we must also "determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue." *KSR*, 550 U.S. at 418 (citing *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)). Whether a combination of prior art elements would have produced a predictable result weighs in the ultimate determination of obviousness. *Id.* at 416–417.

In an *inter partes* review, the petitioner must show with particularity why each challenged claim is unpatentable. *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016); 37 C.F.R. § 42.104(b). The burden of persuasion never shifts to Patent Owner. *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015).

We analyze the challenges presented in the Petition in accordance with the above-stated principles.

## C. Level of Ordinary Skill in the Art

Petitioner identifies the appropriate level of skill in the art as follows:

The person would have had a Bachelor of Science degree in an academic discipline emphasizing the design of electrical, computer, or software technologies, in combination with training or at least one to two years of related work experience with capture and processing of data or information, including but not limited to physiological monitoring technologies. . . .

---

[6] Patent Owner does not present objective evidence of non-obviousness.

> Alternatively, the person could have also had a Master of Science degree in a relevant academic discipline with less than a year of related work experience in the same discipline.

Pet. 4–5 (citing Ex. 1003 ¶¶ 17–19).

Patent Owner does not offer its own assessment of the level of ordinary skill. Patent Owner, however, does level a measure of criticism of Petitioner's assessment of the level of skill in the art as not accounting for experience in optics or physiology, and focusing on "data processing and not sensor design." PO Resp. 13. Nevertheless, Patent Owner expresses that it "applies [Petitioner's] asserted level of skill." *Id.* (citing Ex. 2001 ¶¶ 34–36). We determine that the Petitioner's expressed level of ordinary skill in the art is consistent with the '695 patent and the prior art of record. Accordingly, we adopt it in this Decision.

### D. Obviousness Over Sarantos, Mendelson-1991, and Chin

Petitioner contends that claims 6, 14, and 21 would have been obvious based on the teachings of Sarantos, Mendelson-1991, and Chin. Pet. 61–63. Patent Owner disagrees and presents several arguments in opposition. PO Resp. 16–42; PO Sur-reply 2–13.

### 1. Overview of Sarantos

Sarantos is titled "Heart Rate Sensor With High-Aspect-Ratio Photodetector Element." Ex. 1014, code (54). Sarantos describes "[photoplethysmographic (PPG)] sensors designed for use with wearable biometric monitoring devices" and which measure "physiological parameters" of a wearer such as "heart rate" and "blood oxygenation levels." *Id.* at 6:66–7:3, 13:39–47.

12

Sarantos's Figure 2 is reproduced on the right. Figure 2 illustrates "a wristband-type wearable fitness monitor that incorporates a PPG sensor[.]" *Id.* at 5:55–56. Fitness monitor 200 includes housing 104, back face 128 and light sources 108. *Id.* at 7:12–23. "PPG sensors operate by shining light into a person's skin. This light diffuses through the person's flesh and a portion of this light is then emitted back out of the person's skin in close proximity to where the light was introduced into the flesh." *Id.* at 7:24–28.



FIG. 2

Sarantos's Figure 18 is reproduced below.



FIG. 18

Figure 18 above illustrates an example of a PPG sensor photodetector layout with multiple light-emitting devices. *Id.* at 6:39–42. Photodetector elements 1812 are characterized as being in a "circular array" centered on

13

IPR2020-01722
Patent 10,470,695 B2

light source 1808, which includes two light-emitting devices 1810. *Id.* at

14:60–62; 15:24–43. Sarantos describes that the PPG sensor

> may also include control logic, which may be communicatively
> connected with the light source and each photodetector element
> and configured to cause the light source to emit light, obtain one
> or more measured light intensity measurements from the one or
> more photodetector elements, and determine a heart rate
> measurement based, at least in part, on the one or more light
> intensity measurements.

*Id.* at 2:5–12.

Sarantos's Figure 22 is reproduced below:



**FIG. 22**

Figure 22 above depicts another example configuration of a PPG sensor

according to Sarantos's invention. *Id.* at 6:52–54. Substrate 2272 supports

two high-aspect-ratio (HAR) photodetector elements 2212 positioned on

either side of light source 2208. *Id.* at 17:1–3. Window 2278 is offset from

substrate 2272. *Id.* at 17:3–4. Sarantos explains the following:

14

IPR2020-01722
Patent 10,470,695 B2

> The window 2278 may be held against a person's skin e.g., by
> being held in place with a strap, when heart rate measurements
> are obtained to allow light from the light source 2208 to shine
> through its associated window region 2226 and into the person's
> skin, where the light then diffuses into the surrounding flesh and
> is then emitted back out of the person's skin and into the HAR
> photodetector elements 2212 through the respective window
> regions 2226 associated with the HAR photodetector elements
> 2212.

*Id.* at 17:16–25.

Sarantos additionally explains the following:

> In order to reduce the chance that light from the light
> source 2208 will reach either of the HAR photodetector elements
> 2212 without first being diffused through the person's skin, the
> light source 2208 may be separated from the HAR photodetector
> elements 2212 within the PPG sensor by walls 2274, which may
> extend to the window 2278 or may stop short of the window
> 2278.

*Id.* at 17:26–32.

### 2. Overview of Mendelson-1991

Mendelson-1991 is an article from the Journal of Clinical Monitoring

titled "Skin Reflectance Pulse Oximetry: In Vivo Measurements from the

Forearm and Calf." Ex. 1015, 1. The article "describe[s] preliminary in

vivo evaluation of a new optical reflectance sensor for noninvasive

monitoring of $SaO_2$ with a modified commercial transmittance pulse

oximeter." *Id.* at 2.

15

IPR2020-01722
Patent 10,470,695 B2

Mendelson-1991's Figures 1A and 1B are reproduced below:



The figures above illustrate "(A) Frontal and (B) side views of the heated skin reflectance pulse oximeter sensor." *Id.* The figures show a pulse oximeter sensor that includes, among other things, multiple "photodiodes," "light-emitting diodes (LEDs)," and an "optical shield." *Id.*

### 3. Overview of Chin

Chin is titled "Oximeter Sensor with Offset Emitters and Detector and Heating Device." Ex. 1006, code (54). Chin's Figures 7A and 7B are reproduced below:

Appx0112



FIG. 7A.     FIG. 7B.

Figures 7A and 7B "are side and top views of a nostril sensor according to the invention." *Id.* at 3:64–65. Chin describes that pads 172 and 174 include emitter 176 and detector 178, respectively. *Id.* at 8:20–25. Chin also explains that the sensor may include "optical diffuser 180 for diffusing the light from emitter 176, which causes a further spreading or mixing of light and may enhance the amount of tissue penetrated in some instances." *Id.* at 8:25–28. Chin additionally explains generally that a diffusing optic causes light emitted from an emitter "to pass through more tissue, and thus more blood." *Id.* at 2:4–7.

Chin further describes that "[t]he sensor could be any type of sensor, such as a durable sensor or a disposable sensor" and "could attach to any body part, such as the earlobe, finger, etc." *Id.* at 5:54–56. Chin additionally describes that its sensor "could be a reflectance or a transmittance sensor." *Id.* at 5:56–57.

### 4. Discussion

Petitioner provides a detailed assessment as to where all of the limitations required by claims 6, 14, and 21 are found in Sarantos, Mendelson-1991, and Chin. Pet. 7–25, 63. Specifically, Petitioner expresses that all features of claims 6, 14, and 21, with the exception of a

17

diffuser, are found in Sarantos and Mendelson-1991. Petitioner points to Chin as disclosing a diffuser. Petitioner also explains that a person of ordinary skill in the art would have had adequate reason to combine the teachings of Sarantos, Mendelson-1991, and Chin. *Id.* at 36–38, 63.

Patent Owner does not dispute that all the features of claims 6, 14, and 21 are found in the cited prior art references, but Patent Owner does disagree that Petitioner has established adequate reasoning to combine those references' teachings. PO Resp. 16–33; PO Sur-reply 8–13. A core basis of that disagreement is said to arise from purported differences between "thick tissue" and "thin tissue" of a user's skin, and that such differences preclude combination of sensors that are intended to be applied to those different tissue types. *See, e.g.*, PO Resp. 16–20; PO Sur-reply 9–10.[7] As a result of that alleged tissue thickness dichotomy, according to Patent Owner, a person of ordinary skill in the art would not have combined aspects of a sensor, e.g., a diffuser, used for "thin tissue" as in Chin, with sensors intended for use on a wrist, e.g., the sensors of Sarantos and Mendelson-1991. PO Resp. 21–33; PO Sur-reply 7–13. We have considered all of Patent Owner's arguments, but for the following reasons find them unavailing.

At the outset, we observe that Patent Owner's attempt to establish a distinction between sensors or devices applied to alleged "thin" tissue as opposed to "thick" tissue draws little, if any, support from the prior art evidence of this proceeding. Patent Owner attempts to discount Chin's

---

[7] We understand that, in Patent Owner's view, "thin tissue" is present at such sites as a user's nostrils and earlobes, whereas "thick tissue" is present, for instance, at a user's wrist. *See, e.g.*, PO Sur-reply 2 ("thin tissue measurement sites (e.g., ear lobe or nostril)"); *id.* at 10 ("thicker tissue sites like the wrist").

teachings as being limited to "sensors worn at thin tissue measurement sites." PO Resp. 17 (citing Ex. 1006, 1:14–21, 8:21–29). Yet, we do not discern that Patent Owner points to any disclosure in Chin that limits its teachings to any particular tissue sites, let alone only sites regarded as "thin." Indeed, Chin does not describe any tissue site to which its sensor is applied as being "thin." Furthermore, the portions of Chin on which Patent Owner relies simply describe a general background of oximeter sensors (Ex. 1006, 1:41–21) and the sensor configuration of one particular embodiment (*id.* at 8:21–29). While Chin characterizes that particular embodiment as directed to a "nostril sensor" (*id.* at 8:20–21), there is no disclosure purporting to restrict Chin's teachings to use with only a user's nostril.

We share Petitioner's view that Patent Owner provides inadequate evidentiary support to make out a case that there is a dichotomy as between "thin tissue" and "thick tissue" pulse oximeters such that they represent distinct classes of sensors whose various aspects and features are uncombinable. Pet. Reply 3–4. We agree with Petitioner that Patent Owner's reliance only on the uncorroborated testimony of Dr. Madisetti is inadequate to establish the proposed dichotomy. *Id.* at 4 (citing PO Resp. 16–20; Ex. 2001 ¶¶ 52–56). Dr. Madisetti points to no adequate evidence or basis to support his conclusions on the matter. We also take note, as does Petitioner (Pet. Reply 5 n.4), that neither Patent Owner nor Dr. Madisetti provides adequate explanation as to how "thick" or "thin" tissues sites are even defined.

Moreover, in our view, Patent Owner neglects to consider the full extent of Chin's teachings. Although Chin associates its embodiment shown in Figures 7A and 7B with a "nostril sensor," Chin's teachings are not

limited strictly to a nostril sensor as the reference unambiguously provides that its sensor can attach "to any body part," and lists, by way of examples, "the earlobe, finger, etc." Ex. 1006, 5:55–56. Although, Patent Owner attempts to discount that disclosure as somehow being limited only to the specific "wiring arrangement" shown in Chin's Figure 2 (*see, e.g.*, PO Sur-reply 4–5), that attempt is ill explained and is not consistent with Chin's plain disclosure that its sensor "could be any type of sensor" and is "attach[ed] to any body part." Ex. 1006, 5:55–56. Patent Owner also admonishes Petitioner for offering "no context" for that disclosure (PO Sur-reply 1), but Chin, itself, provides the context in setting forth that its sensor is not limited to use with any particular body part. There can be no credible argument that a skilled artisan would not readily regard Chin's teachings as extending beyond simply a sensor that is used for a nostril.

We also find unavailing Patent Owner's arguments that one of ordinary skill in the art would somehow regard Chin's teaching of a diffuser as being limited either solely to use with a nostril sensor (*see, e.g.*, Tr. 23:13–17),[8] or only such measurement sites as an "earlobe or nostril" (*see* PO Sur-reply 2). Chin explains generally that use of a diffuser is understood to be beneficial in causing light "to pass through more tissue, and thus more blood." Ex. 1006, 2:4–7. Chin describes that benefit more particularly in the context of the nostril sensor shown in the embodiment of

---

[8] "[JUDGE]: Yes. Okay. So I've heard what you said but I have a couple of clarifying questions. So are you suggesting that Chin's teachings are limited to applying a diffuser to a nostril sensor? It sounds like you have been and I just wanted to verify.
[COUNSEL]: I definitely am, yes."

Figures 7A and 7B (*id.* at 8:25–29),[9] but there is nothing that suggests that Chin limits the benefits of a diffuser to one particular tissue type (e.g., nostril tissue). We find persuasive Petitioner's view, and the supporting testimony of Dr. Anthony, that a skilled artisan would have recognized from Chin's disclosure that the light spreading benefits of a diffuser provide for a "stronger reflected signal" that facilitates determining measured physiological parameters. Pet. 63 (citing Ex. 1006, 2:4–7, 8:25–29, 9:64–10:7; Ex. 1003 ¶ 99). Patent Owner simply provides no cogent basis to conclude that Chin's diffuser would not function predictably as is disclosed, i.e., spreading light so that it passes through more tissue and blood, when used in conjunction with other types of sensor devices, such as those of Santos and Mendelson-1991. *See KSR,* 550 U.S. 398 at 416 ("The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results.")

We additionally find unavailing Patent Owner's general argument that a skilled artisan would not have had a reasonable expectation of success in applying a diffuser used in one type of oximeter sensor, such as that in Chin, to other types of oximeter sensors, such as those of Sarantos and Mendelson-1991. *See, e.g.*, PO Resp. 24–25. We do not agree that "Chin fails to disclose any specific way of implement[ing]" its diffuser into a sensor. *See id.* at 24. It clearly does. Chin shows, at least in Figure 7B, a diffuser associated with a nostril sensor. Chin also does not limit its teachings as to a diffuser to any one particular type of sensor, e.g., a nostril sensor. We are

---

[9] "Also shown is an optional optical diffuser 180 for diffusing the light from emitter 176, which causes a further spreading or mixing of light and may enhance the amount of tissue penetrated in some instances." Ex. 1006, 8:25–29.

not satisfied by Patent Owner's arguments that some structural and
operational differences between the sensors of Sarantos and Mendelson-
1991 as compared with that of Chin means that a skilled artisan would not
have expected success in combining those teachings. *See id.* at 24; *see also
id.* at 25–29 (discussing differences between wrist-worn sensors and nostril
sensors). A person of ordinary skill in the art is a person of ordinary
creativity. *See KSR*, 550 U.S. at 421. It follows readily that a person of
ordinary skill and creativity reasonably would have understood how to
implement such diffusers in other types of heart rate or pulse oximeter
sensors, such as those of Sarantos and Mendelson-1991, in structural
configurations necessary to harness the recognized benefits of such
diffusers. We credit Dr. Anthony's testimony to that effect. *See, e.g.*,
Ex. 1003 ¶¶ 96–101.

   Patent Owner's and Dr. Madisetti's opposing views are rooted only in
speculation that a skilled artisan would not have appreciated the benefits of a
diffuser in other sensors beyond Chin's nostril sensor, which are intended
for application to different body parts. *See, e.g.*, PO Resp. 25–29; Ex. 2001
¶¶ 69–71. Patent Owner and Dr. Madisetti also seemingly attempt to draw
distinctions between a wrist-worn "reflectance-type sensor" and a
"transmittance-type sensor" for a nostril in connection with use of a diffuser.
*See* PO Resp. 25–29; Ex. 2001 ¶¶ 69–71. Yet, those views overly focus on
the specific configurations of single embodiments of each of the pertinent
references and do not reflect an appropriate obviousness analysis that takes
into account the inferences and creatives steps that a skilled artisan would
employ. *See KSR*, 550 U.S. at 421 ("[T]he [obviousness] analysis need not
seek out precise teachings directed to the specific subject matter of the

challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ."). Specifically, those views do not account adequately for Chin's plain disclosure recognizing the general benefits of a diffuser and that its sensor may be attached "to any body part" in the form of either a "reflectance or a transmittance sensor." *See* Ex. 1003, 2:4–7, 5:54–57. From at least that disclosure, a person of ordinary skill and creativity reasonably would have recognized that Chin contemplates various sensor types and that those sensors, including use of a diffuser, may be applied to various body parts of a user. *See, e.g.*, Ex. 1003 ¶¶ 96–101.

We also find unavailing Patent Owner's arguments that there is inadequate reasoning to combine the pertinent prior art because Petitioner's proposed combination involving Chin "would make Sarantos-Mendelson perform worse." PO Resp. 29–32; *see also id.* at 20–21 (discussing "experiments" performed by Dr. Madisetti on certain sensors). Importantly, the obviousness evaluation does not require that the combined teachings of references must produce a device that is somehow superior, or free of disadvantages, as compared with other prior art devices. *See Medichem, S.A. v. Rolabo, S.L.,* 437 F.3d 1157, 1165 (Fed. Cir. 2006) ("[A] given course of action often has simultaneous advantages and disadvantages, and this does not necessarily obviate motivation to combine."); *Winner Int'l Royalty Corp. v. Wang*, 202 F.3d 1340, 1349 n.8 (Fed. Cir. 2000) ("The fact that the motivating benefit comes at the expense of another benefit, however, should not nullify its use as a basis to modify the disclosure of one reference with the teachings of another. Instead, the benefits, both lost and gained, should be weighed against one another."). In this case, even if some

negative or undesirable conditions were to emerge in some circumstances from the use of a diffuser as a part of one type of oximeter sensor, that does not establish the non-obviousness of such a sensor with a diffuser. We find more persuasive Petitioner's view, and Dr. Anthony's supporting testimony, that a skilled artisan would have appreciated that a diffuser provides a benefit in spreading light and providing for it to pass through more tissue irrespective of the particular anatomical location of the tissue. *See* Pet. 61–63; Pet. Reply 3–6, 9–12; Ex. 1003 ¶¶ 96–101.

We also question the significance of the "experiments" performed by Dr. Madisetti as alleged support for the proposition that a diffuser would have "detrimental consequences" if applied to a "reflectance-type" pulse oximeter sensor, presumably such as in Sarantos or Mendelson-1991. *See* PO Resp. 20–21; Ex. 2001 ¶¶ 57–60, Appendix. Evidently, Dr. Madisetti applied diffusers of different diffuser material to one commercially available "reflectance-type" pulse oximeter sensor and conducted experiments to detect light based on the different materials juxtaposed with a sensor without any diffuser material. Left unexplained, however, is the basis to conclude that the commercially available sensor and the particular diffuser materials used somehow should be regarded as constituting the type of sensor that emerges from the combined teachings of Sarantos, Mendelson-1991, and Chin. The record provides considerable doubt in that regard. For instance, as noted by Petitioner (*see* Pet. Reply 6–9), the commercially available sensor used by Dr. Madisetti is one that has only a single detector, whereas the type of sensors involved in the context of the '695 patent and the pertinent prior art are those that include multiple detectors. On its face, that difference appears significant, but is not addressed or accounted for by

24

Patent Owner or Dr. Madisetti. Neither Patent Owner nor Dr. Madisetti provides any meaningful explanation as to why the outcome of the experiments sheds light on the question of the obviousness of claims 6, 14, and 21 of the '695 patent in view of the particular prior art teachings on which Petitioner relies. We do not find Patent Owner's assertions of non-obviousness based on Dr. Madisetti's experiments to be adequate or particularly probative of the obviousness question.

Lastly, we do not find credible Patent Owner's argument that a skilled artisan lacks motivation to incorporate a diffuser into a "Sarantos-Mendelson[-1991] device" because Sarantos discloses positioning of its detectors in such a way that allegedly already maximizes light receipt by the detector, which would be "negat[ed]" were the device to incorporate a diffuser. PO Resp. 31–32 (citing Ex. 2001 ¶ 74). Neither Patent Owner nor Dr. Madisetti adequately explains why a skilled artisan would have regarded Sarantos's teachings as being limited solely to a singular light spreading pattern that effectively precludes any modification that alters the pattern. Indeed, we agree with Petitioner that it simply does not follow from the teachings of the prior art, specifically Chin, that a diffuser applied to a different device such as that arising from the Sarantos and Mendelson-1991 combination, would have some sort of negating effect that would disrupt operation of the device. *See* Pet. Reply 12. Rather, it follows from the evidence of record that a skilled artisan would have recognized that a diffuser provides for light to be desirably "further spread[]" to pass, in some instances, through more tissue and more blood. *See* Pet. Reply 12; Ex. 1006 2:4–9, 8:25–29; Ex. 1003 ¶¶ 96–101. We credit Dr. Anthony's testimony in that respect over the contrary testimony of Dr. Madisetti (*see, e.g.*, Ex. 2001

IPR2020-01722
Patent 10,470,695 B2

¶ 74), as we conclude that Dr. Anthony's testimony is more consistent with the teachings of the prior art of record.

### 5. Summary

We have considered the final record before us including the respective briefings of the parties, and the underlying evidence offered in support thereof. Based on this record, we conclude that Petitioner has shown by a preponderance of the evidence that claims 6, 14, and 21 would have been obvious in view of the combined teachings of Sarantos, Mendelson-1991, and Chin. *See* Pet. 61–63.

### E. Obviousness Over Ackermans and Chen

Petitioner also contends that claims 6, 14, and 21 are unpatentable based on the combined teachings of Ackermans and Chin. Pet. 102–106 (citing Ex. 1003 ¶¶ 160–163, 167–168). Patent Owner disagrees. PO Response 34–43; PO Sur-reply 13–16.

### 1. Overview of Ackermans

Ackermans is titled "Medical Optical Sensor." Ex. 1016, code (54). Ackermans characterizes its invention as relating to the measurement of blood oxygenation level using optical sensors. *Id.* at 1:2–5. Ackermans's Figure 1 is reproduced below:

26

IPR2020-01722
Patent 10,470,695 B2



## FIG. 1

Figure 1 shows a three-dimensional sectional schematic drawing of an embodiment of a medical optical sensor. *Id.* at 4:5–6. Medical optical sensor 10 "is designed to be attached to the skin with at least the rims 42 and 44 touching the skin." *Id.* at 4:33–34. The medical optical sensor includes light emitter 20 for emitting light 21 and photodetector 30 for detecting reflected light 31 from a user's skin. *Id.* at 4:22–24.

### 2. Discussion

Petitioner presents Ackermans's teachings as effectively equivalent to the combined teachings of Sarantos and Mendelson-1991. As with the grounds based on Sarantos and Mendelson-1991, Petitioner contends that Ackermans discloses all the features required by claims 6, 14, and 21 with the exception of a diffuser. Petitioner relies on Chin for disclosure of a

Appx0123

diffuser.  Patent Owner does not dispute that all the features required by claims 6, 14, and 21 are present in the combined teachings of Ackerman and Chin, but Patent Owner does disagree that Petitioner has established adequate reasoning to combine those references' teachings.

Patent Owner offers arguments to Petitioner's proposed ground based on Ackermans and Chin that essentially mirror those that were offered for the ground based on Sarantos, Mendelson-1991, and Chin.  *See* PO Resp. 34–43; PO Sur-reply 13–16.  For instance, Patent Owner contends the following:  (1) Ackerman discloses a wrist-worn sensor applied to "thick tissue" whereas Chin is limited to a nostril sensor applied to "thin tissue" (*see, e.g.*, PO Resp. 34–35); (2) Petitioner has not explained how Chin's teachings of a diffuser would improve Ackerman's sensor (*see, e.g., id.* at 34–36); (3) Petitioner has not established that a person of ordinary skill in the art would have had a reasonable expectation of success in combining the teachings of Ackermans and Chin (*see, e.g., id.* at 36–37); (4) Petitioner has not accounted for the differences between a wrist-worn sensor and a nostril-based sensor (*see, e.g., id.* at 38–40); (5) combining Chin's diffuser with Ackerman's sensor "would make Ackermans' device perform worse" (*see, e.g., id.* at 40–41); and (6) Ackerman's device already spreads light and that adding a diffuser would "negate[]" that light spreading (*see, e.g., id.* at 41–42).

We conclude that our reasoning presented above in connection with the combination of Sarantos, Mendelson-1991 and Chin also applies to the combination based on Ackermans and Chin.  *See supra* § II.D.4.  For all of those reasons, we also find Patent Owner's arguments unavailing in the context of the Ackermans and Chin combination.

IPR2020-01722
Patent 10,470,695 B2

We determine that Petitioner has shown by a preponderance of the evidence that claim 6, 14, and 21 of the '695 patent are unpatentable based on the combined teachings of Ackermans and Chin. *See* Pet. 102–106.

## III. CONCLUSION

In summary, we determine that a preponderance of the evidence establishes that claims 6, 14, and 21 of the '695 patent are unpatentable, as shown in the following table:[10]

| Claim(s) | 35 U.S.C. § | References/Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 6, 14, 21 | 103 | Sarantos, Mendelson-1991, Chin | 6, 14, 21 | |
| 6, 14, 21 | 103 | Ackermans, Chin | 6, 14, 21 | |
| **Overall Outcome** | | | 6, 14, 21 | |

---

[10] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding*. *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. §§ 42.8(a)(3), (b)(2).

IPR2020-01722
Patent 10,470,695 B2

<center>IV.   ORDER</center>

Upon consideration of the record before us, it is:

ORDERED that claims 6, 14, and 21 of the '695 patent have been shown to be unpatentable; and

FURTHER ORDERED that, because this is a final written decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

<center>30</center>

IPR2020-01722
Patent 10,470,695 B2

For PETITIONER:

Walter Renner
Dan Smith
Kenneth Hoover
FISH & RICHARDSON P.C.
axf-ptab@fr.com
dsmith@fr.com
hoover@fr.com


For PATENT OWNER:

John M. Grover
Joseph Re
Stephen Larson
Shannon Lam
Jarom Kesler
Ben Katzenellenbogen
KNOBBE, MARTENS, OLSON, & BEAR, LLP
2jmg@knobbe.com
2jrr@knobbe.com
2swl@knobbe.com
2sxl@knobbe.com
2jzk@knobbe.com
2bak@knobbe.com

31

IPR2020-01722
Apple v. Masimo – Patent 10,470,695

## CERTIFICATE OF SERVICE

I hereby certify that the original of this Notice of Appeal was filed via

U.S.P.S. Priority Mail Express on June 9, 2022 with the Director of the United

States Patent and Trademark Office at the address below:

Office of the Solicitor
United States Patent and Trademark Office
Mail Stop 8, P.O. Box 1450
Alexandria, Virginia 22313-1450

A copy of this Notice of Appeal is being filed and served on June 9, 2022 as

follows:

**To the USPTO Patent Trial and Appeal Board:**
Patent Trial and Appeal Board
Madison Building East
600 Dulany Street
Alexandria, VA 22313

(*via PTABe2e – as authorized by the Board*)

**To the U.S. Court of Appeals for the Federal Circuit:**
Clerk of Court
U.S. Court of Appeals for the Federal Circuit
717 Madison Place, N.W.
Washington, DC 20439

(*via CM/ECF – with filing fee*)

**Counsel for Petitioner Apple, Inc.:**

W. Karl Renner
Andrew B. Patrick
patrick@fr.com
Daniel D. Smith
Kenneth Hoover

IPR2020-01722
Apple v. Masimo – Patent 10,470,695

Roberto J. Devoto
Fish & Richardson P.C.
3200 RBC Plaza
60 South Sixth Street
Minneapolis, MN 55402
IPR50095-0004IP1@fr.com
PTABInbound@fr.com; Axf-ptab@fr.com

Dated: June 9, 2022          By: /John M. Grover/
                             John M. Grover (Reg. No. 42,610)
                             Stephen W. Larson (Reg. No. 69,133)
                             Jarom D. Kesler (Reg. No. 57,046)
                             Joseph R. Re (Reg. No. 31,291)
                             Shannon H. Lam (Reg. No. 65,614)
                             Benjamin A. Katzenellenbogen (Reg. No. 53,102)

                             Attorneys for Patent Owner
                             Masimo Corporation

55746407



US010470695B2

(12) **United States Patent**
    Al-Ali

(10) **Patent No.:**    **US 10,470,695 B2**
(45) **Date of Patent:**    ***Nov. 12, 2019**

(54) **ADVANCED PULSE OXIMETRY SENSOR**

(71) Applicant: **MASIMO CORPORATION**, Irvine, CA (US)

(72) Inventor: **Ammar Al-Ali**, San Juan Capistrano, CA (US)

(73) Assignee: **MASIMO CORPORATION**, Irvine, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/226,249**

(22) Filed: **Dec. 19, 2018**

(65) **Prior Publication Data**
    US 2019/0117140 A1    Apr. 25, 2019

**Related U.S. Application Data**

(63) Continuation of application No. 15/195,199, filed on Jun. 28, 2016.

(Continued)

(51) **Int. Cl.**
    *A61B 5/1455*    (2006.01)
    *A61B 5/00*    (2006.01)
    (Continued)

(52) **U.S. Cl.**
    CPC ........ *A61B 5/14552* (2013.01); *A61B 5/0002* (2013.01); *A61B 5/02416* (2013.01);
    (Continued)

(58) **Field of Classification Search**
    None
    See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,960,128 A    10/1990    Gordon et al.
4,964,408 A    10/1990    Hink et al.
    (Continued)

FOREIGN PATENT DOCUMENTS

EP    0781527 A1    7/1997
EP    2277440 A1    1/2011
WO    WO 02/028274    4/2002

OTHER PUBLICATIONS

US 8,845,543 B2, 09/2014, Diab et al. (withdrawn)
    (Continued)

*Primary Examiner* — Eric F Winakur
*Assistant Examiner* — Marjan Fardanesh
(74) *Attorney, Agent, or Firm* — Knobbe, Martens, Olson & Bear, LLP

(57)    **ABSTRACT**

A non-invasive, optical-based physiological monitoring system is disclosed. One embodiment includes an emitter configured to emit light. A diffuser is configured to receive and spread the emitted light, and to emit the spread light at a tissue measurement site. The system further includes a concentrator configured to receive the spread light after it has been attenuated by or reflected from the tissue measurement site. The concentrator is also configured to collect and concentrate the received light and to emit the concentrated light to a detector. The detector is configured to detect the concentrated light and to transmit a signal representative of the detected light. A processor is configured to receive the transmitted signal and to determine a physiological parameter, such as, for example, arterial oxygen saturation, in the tissue measurement site.

**30 Claims, 7 Drawing Sheets**



APPLE 1001

## US 10,470,695 B2

Page 2

### Related U.S. Application Data

(60) Provisional application No. 62/188,430, filed on Jul. 2, 2015.

(51) **Int. Cl.**
*A61B 5/024* (2006.01)
*A61B 5/145* (2006.01)

(52) **U.S. Cl.**
CPC ...... *A61B 5/14532* (2013.01); *A61B 5/14546* (2013.01); *A61B 5/4875* (2013.01); *A61B 5/6826* (2013.01); *A61B 5/7278* (2013.01); *A61B 5/742* (2013.01); *A61B 2562/04* (2013.01)

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,041,187 A | | 8/1991 | Hink et al. |
| 5,069,213 A | | 12/1991 | Polczynski |
| 5,099,842 A | | 3/1992 | Mannheimer et al. |
| 5,163,438 A | | 11/1992 | Gordon et al. |
| 5,319,355 A | | 6/1994 | Russek |
| 5,337,744 A | | 8/1994 | Branigan |
| 5,341,805 A | | 8/1994 | Stavridi et al. |
| D353,195 S | | 12/1994 | Savage et al. |
| D353,196 S | | 12/1994 | Savage et al. |
| 5,377,676 A | | 1/1995 | Vari et al. |
| D359,546 S | | 6/1995 | Savage et al. |
| 5,431,170 A | | 7/1995 | Mathews |
| D361,840 S | | 8/1995 | Savage et al. |
| D362,063 S | | 9/1995 | Savage et al. |
| 5,452,717 A | | 9/1995 | Branigan et al. |
| D363,120 S | | 10/1995 | Savage et al. |
| 5,456,252 A | | 10/1995 | Vari et al. |
| 5,479,934 A | | 1/1996 | Imran |
| 5,482,036 A | | 1/1996 | Diab et al. |
| 5,490,505 A | | 2/1996 | Diab et al. |
| 5,494,043 A | | 2/1996 | O'Sullivan et al. |
| 5,497,771 A | | 3/1996 | Rosenheimer |
| 5,533,511 A | | 7/1996 | Kaspari et al. |
| 5,534,851 A | | 7/1996 | Russek |
| 5,561,275 A | | 10/1996 | Savage et al. |
| 5,562,002 A | | 10/1996 | Lalin |
| 5,584,296 A | * | 12/1996 | Cui .................. A61B 5/14552 356/41 |
| 5,590,649 A | | 1/1997 | Caro et al. |
| 5,601,079 A | | 2/1997 | Wong et al. |
| 5,602,924 A | | 2/1997 | Durand et al. |
| 5,623,925 A | * | 4/1997 | Swenson .............. A61B 5/0205 600/301 |
| 5,632,272 A | | 5/1997 | Diab et al. |
| 5,638,816 A | | 6/1997 | Kiani-Azarbayjany et al. |
| 5,638,818 A | | 6/1997 | Diab et al. |
| 5,645,440 A | | 7/1997 | Tobler et al. |
| 5,685,299 A | | 11/1997 | Diab et al. |
| D393,830 S | | 4/1998 | Tobler et al. |
| 5,743,262 A | | 4/1998 | Lepper, Jr. et al. |
| 5,758,644 A | | 6/1998 | Diab et al. |
| 5,760,910 A | | 6/1998 | Lepper, Jr. et al. |
| 5,769,785 A | | 6/1998 | Diab et al. |
| 5,782,757 A | | 7/1998 | Diab et al. |
| 5,785,659 A | | 7/1998 | Caro et al. |
| 5,791,347 A | | 8/1998 | Flaherty et al. |
| 5,810,734 A | | 9/1998 | Caro et al. |
| 5,823,950 A | | 10/1998 | Diab et al. |
| 5,830,131 A | | 11/1998 | Caro et al. |
| 5,830,137 A | | 11/1998 | Scharf |
| 5,833,618 A | | 11/1998 | Caro et al. |
| 5,860,919 A | | 1/1999 | Kiani-Azarbayjany et al. |
| 5,890,929 A | | 4/1999 | Mills et al. |
| 5,904,654 A | | 5/1999 | Wohltmann et al. |
| 5,919,134 A | | 7/1999 | Diab |
| 5,934,925 A | | 8/1999 | Tobler et al. |
| 5,940,182 A | | 8/1999 | Lepper, Jr. et al. |

| | | | |
|---|---|---|---|
| 5,987,343 A | | 11/1999 | Kinast |
| 5,995,855 A | | 11/1999 | Kiani et al. |
| 5,997,343 A | | 12/1999 | Mills et al. |
| 6,002,952 A | | 12/1999 | Diab et al. |
| 6,011,986 A | | 1/2000 | Diab et al. |
| 6,027,452 A | | 2/2000 | Flaherty et al. |
| 6,036,642 A | | 3/2000 | Diab et al. |
| 6,045,509 A | | 4/2000 | Caro et al. |
| 6,067,462 A | | 5/2000 | Diab et al. |
| 6,081,735 A | | 6/2000 | Diab et al. |
| 6,088,607 A | | 7/2000 | Diab et al. |
| 6,110,522 A | | 8/2000 | Lepper, Jr. et al. |
| 6,124,597 A | | 9/2000 | Shehada |
| 6,128,521 A | | 10/2000 | Marro et al. |
| 6,129,675 A | | 10/2000 | Jay |
| 6,144,868 A | | 11/2000 | Parker |
| 6,151,516 A | | 11/2000 | Kiani-Azarbayjany et al. |
| 6,152,754 A | | 11/2000 | Gerhardt et al. |
| 6,157,850 A | | 12/2000 | Diab et al. |
| 6,165,005 A | | 12/2000 | Mills et al. |
| 6,184,521 B1 | | 2/2001 | Coffin, IV et al. |
| 6,206,830 B1 | | 3/2001 | Diab et al. |
| 6,223,063 B1 | | 4/2001 | Chaiken et al. |
| 6,229,856 B1 | | 5/2001 | Diab et al. |
| 6,232,609 B1 | | 5/2001 | Snyder et al. |
| 6,236,872 B1 | | 5/2001 | Diab et al. |
| 6,241,683 B1 | | 6/2001 | Macklem et al. |
| 6,253,097 B1 | | 6/2001 | Aronow et al. |
| 6,256,523 B1 | | 7/2001 | Diab et al. |
| 6,263,222 B1 | | 7/2001 | Diab et al. |
| 6,278,522 B1 | | 8/2001 | Lepper, Jr. et al. |
| 6,280,213 B1 | | 8/2001 | Tobler et al. |
| 6,285,896 B1 | | 9/2001 | Tobler et al. |
| 6,301,493 B1 | | 10/2001 | Marro et al. |
| 6,308,089 B1 | | 10/2001 | von der Ruhr et al. |
| 6,317,627 B1 | | 11/2001 | Ennen et al. |
| 6,321,100 B1 | | 11/2001 | Parker |
| 6,325,761 B1 | | 12/2001 | Jay |
| 6,334,065 B1 | | 12/2001 | Al-Ali et al. |
| 6,343,223 B1 | | 1/2002 | Chin et al. |
| 6,343,224 B1 | | 1/2002 | Parker |
| 6,349,228 B1 | | 2/2002 | Kiani et al. |
| 6,360,114 B1 | | 3/2002 | Diab et al. |
| 6,368,283 B1 | | 4/2002 | Xu et al. |
| 6,371,921 B1 | | 4/2002 | Caro et al. |
| 6,377,829 B1 | | 4/2002 | Al-Ali |
| 6,388,240 B2 | | 5/2002 | Schulz et al. |
| 6,397,091 B2 | | 5/2002 | Diab et al. |
| 6,430,437 B1 | | 8/2002 | Marro |
| 6,430,525 B1 | | 8/2002 | Weber et al. |
| 6,463,311 B1 | | 10/2002 | Diab |
| 6,470,199 B1 | | 10/2002 | Kopotic et al. |
| 6,501,975 B2 | | 12/2002 | Diab et al. |
| 6,505,059 B1 | | 1/2003 | Kollias et al. |
| 6,515,273 B2 | | 2/2003 | Al-Ali |
| 6,519,487 B1 | | 2/2003 | Parker |
| 6,525,386 B1 | | 2/2003 | Mills et al. |
| 6,526,300 B1 | | 2/2003 | Kiani et al. |
| 6,541,756 B2 | | 4/2003 | Schulz et al. |
| 6,542,764 B1 | | 4/2003 | Al-Ali et al. |
| 6,580,086 B1 | | 6/2003 | Schulz et al. |
| 6,584,336 B1 | | 6/2003 | Ali et al. |
| 6,595,316 B2 | | 7/2003 | Cybulski et al. |
| 6,597,932 B2 | | 7/2003 | Tian et al. |
| 6,597,933 B2 | | 7/2003 | Kiani et al. |
| 6,606,511 B1 | | 8/2003 | Ali et al. |
| 6,632,181 B2 | | 10/2003 | Flaherty et al. |
| 6,639,668 B1 | | 10/2003 | Trepagnier |
| 6,640,116 B2 | | 10/2003 | Diab |
| 6,643,530 B2 | | 11/2003 | Diab et al. |
| 6,650,917 B2 | | 11/2003 | Diab et al. |
| 6,654,624 B2 | | 11/2003 | Diab et al. |
| 6,658,276 B2 | | 12/2003 | Kiani et al. |
| 6,661,161 B1 | | 12/2003 | Lanzo et al. |
| 6,671,526 B1 | | 12/2003 | Aoyagi et al. |
| 6,671,531 B2 | | 12/2003 | Al-Ali et al. |
| 6,678,543 B2 | | 1/2004 | Diab et al. |
| 6,684,090 B2 | | 1/2004 | Ali et al. |
| 6,684,091 B2 | | 1/2004 | Parker |

**US 10,470,695 B2**

Page 3

(56)        **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,697,656 | B1 | 2/2004 | Al-Ali |
| 6,697,657 | B1 | 2/2004 | Shehada et al. |
| 6,697,658 | B2 | 2/2004 | Al-Ali |
| RE38,476 | E | 3/2004 | Diab et al. |
| 6,699,194 | B1 | 3/2004 | Diab et al. |
| 6,714,804 | B2 | 3/2004 | Al-Ali et al. |
| RE38,492 | E | 4/2004 | Diab et al. |
| 6,721,582 | B2 | 4/2004 | Trepagnier et al. |
| 6,721,585 | B1 | 4/2004 | Parker |
| 6,725,075 | B2 | 4/2004 | Al-Ali |
| 6,728,560 | B2 | 4/2004 | Kollias et al. |
| 6,735,459 | B2 | 5/2004 | Parker |
| 6,745,060 | B2 | 6/2004 | Diab et al. |
| 6,760,607 | B2 | 7/2004 | Al-Ali |
| 6,770,028 | B1 | 8/2004 | Ali et al. |
| 6,771,994 | B2 | 8/2004 | Kiani et al. |
| 6,792,300 | B1 | 9/2004 | Diab et al. |
| 6,813,511 | B2 | 11/2004 | Diab et al. |
| 6,816,741 | B2 | 11/2004 | Diab |
| 6,822,564 | B2 | 11/2004 | Al-Ali |
| 6,826,419 | B2 | 11/2004 | Diab et al. |
| 6,830,711 | B2 | 12/2004 | Mills et al. |
| 6,850,787 | B2 | 2/2005 | Weber et al. |
| 6,850,788 | B2 | 2/2005 | Al-Ali |
| 6,852,083 | B2 | 2/2005 | Caro et al. |
| 6,861,639 | B2 | 3/2005 | Al-Ali |
| 6,898,452 | B2 | 5/2005 | Al-Ali et al. |
| 6,920,345 | B2 | 7/2005 | Al-Ali et al. |
| 6,931,268 | B1 | 8/2005 | Kiani-Azarbayjany et al. |
| 6,934,570 | B2 | 8/2005 | Kiani et al. |
| 6,939,305 | B2 | 9/2005 | Flaherty et al. |
| 6,943,348 | B1 | 9/2005 | Coffin, IV |
| 6,950,687 | B2 | 9/2005 | Al-Ali |
| 6,961,598 | B2 | 11/2005 | Diab |
| 6,970,792 | B1 | 11/2005 | Diab |
| 6,979,812 | B2 | 12/2005 | Al-Ali |
| 6,985,764 | B2 | 1/2006 | Mason et al. |
| 6,993,371 | B2 | 1/2006 | Kiani et al. |
| 6,996,427 | B2 | 2/2006 | Ali et al. |
| 6,999,904 | B2 | 2/2006 | Weber et al. |
| 7,003,338 | B2 | 2/2006 | Weber et al. |
| 7,003,339 | B2 | 2/2006 | Diab et al. |
| 7,015,451 | B2 | 3/2006 | Dalke et al. |
| 7,024,233 | B2 | 4/2006 | Ali et al. |
| 7,027,849 | B2 | 4/2006 | Al-Ali |
| 7,030,749 | B2 | 4/2006 | Al-Ali |
| 7,039,449 | B2 | 5/2006 | Al-Ali |
| 7,041,060 | B2 | 5/2006 | Flaherty et al. |
| 7,044,918 | B2 | 5/2006 | Diab |
| 7,048,687 | B2 | 5/2006 | Reuss et al. |
| 7,067,893 | B2 | 6/2006 | Mills et al. |
| 7,096,052 | B2 | 8/2006 | Mason et al. |
| 7,096,054 | B2 | 8/2006 | Abdul-Hafiz et al. |
| 7,132,641 | B2 | 11/2006 | Schulz et al. |
| 7,142,901 | B2 | 11/2006 | Kiani et al. |
| 7,149,561 | B2 | 12/2006 | Diab |
| 7,186,966 | B2 | 3/2007 | Al-Ali |
| 7,190,261 | B2 | 3/2007 | Al-Ali |
| 7,215,984 | B2 | 5/2007 | Diab |
| 7,215,986 | B2 | 5/2007 | Diab |
| 7,221,971 | B2 | 5/2007 | Diab |
| 7,225,006 | B2 | 5/2007 | Al-Ali et al. |
| 7,225,007 | B2 | 5/2007 | Al-Ali |
| RE39,672 | E | 6/2007 | Shehada et al. |
| 7,239,905 | B2 | 7/2007 | Kiani-Azarbayjany et al. |
| 7,245,953 | B1 | 7/2007 | Parker |
| 7,254,429 | B2 | 8/2007 | Schurman et al. |
| 7,254,431 | B2 | 8/2007 | Al-Ali |
| 7,254,433 | B2 | 8/2007 | Diab et al. |
| 7,254,434 | B2 | 8/2007 | Schulz et al. |
| 7,272,425 | B2 | 9/2007 | Al-Ali |
| 7,274,955 | B2 | 9/2007 | Kiani et al. |
| D554,263 | S | 10/2007 | Al-Ali |
| 7,280,858 | B2 | 10/2007 | Al-Ali et al. |
| 7,289,835 | B2 | 10/2007 | Mansfield et al. |
| 7,292,883 | B2 | 11/2007 | De Felice et al. |
| 7,295,866 | B2 | 11/2007 | Al-Ali |
| 7,328,053 | B1 | 2/2008 | Diab et al. |
| 7,332,784 | B2 | 2/2008 | Mills et al. |
| 7,340,287 | B2 | 3/2008 | Mason et al. |
| 7,341,559 | B2 | 3/2008 | Schulz et al. |
| 7,343,186 | B2 | 3/2008 | Lamego et al. |
| D566,282 | S | 4/2008 | Al-Ali et al. |
| 7,355,512 | B1 | 4/2008 | Al-Ali |
| 7,356,365 | B2 | 4/2008 | Schurman |
| 7,371,981 | B2 | 5/2008 | Abdul-Hafiz |
| 7,373,193 | B2 | 5/2008 | Al-Ali et al. |
| 7,373,194 | B2 | 5/2008 | Weber et al. |
| 7,376,453 | B1 | 5/2008 | Diab et al. |
| 7,377,794 | B2 | 5/2008 | Al Ali et al. |
| 7,377,899 | B2 | 5/2008 | Weber et al. |
| 7,383,070 | B2 | 6/2008 | Diab et al. |
| 7,415,297 | B2 | 8/2008 | Al-Ali et al. |
| 7,428,432 | B2 | 9/2008 | Ali et al. |
| 7,438,683 | B2 | 10/2008 | Al-Ali et al. |
| 7,440,787 | B2 | 10/2008 | Diab |
| 7,454,240 | B2 | 11/2008 | Diab et al. |
| 7,467,002 | B2 | 12/2008 | Weber et al. |
| 7,469,157 | B2 | 12/2008 | Diab et al. |
| 7,471,969 | B2 | 12/2008 | Diab et al. |
| 7,471,971 | B2 | 12/2008 | Diab et al. |
| 7,483,729 | B2 | 1/2009 | Al-Ali et al. |
| 7,483,730 | B2 | 1/2009 | Diab et al. |
| 7,489,958 | B2 | 2/2009 | Diab et al. |
| 7,496,391 | B2 | 2/2009 | Diab et al. |
| 7,496,393 | B2 | 2/2009 | Diab et al. |
| D587,657 | S | 3/2009 | Al-Ali et al. |
| 7,499,741 | B2 | 3/2009 | Diab et al. |
| 7,499,835 | B2 | 3/2009 | Weber et al. |
| 7,500,950 | B2 | 3/2009 | Al-Ali et al. |
| 7,509,154 | B2 | 3/2009 | Diab et al. |
| 7,509,494 | B2 | 3/2009 | Al-Ali |
| 7,510,849 | B2 | 3/2009 | Schurman et al. |
| 7,519,327 | B2 | 4/2009 | White |
| 7,526,328 | B2 | 4/2009 | Diab et al. |
| 7,530,942 | B1 | 5/2009 | Diab |
| 7,530,949 | B2 | 5/2009 | Al Ali et al. |
| 7,530,955 | B2 | 5/2009 | Diab et al. |
| 7,563,110 | B2 | 7/2009 | Al-Ali et al. |
| 7,596,398 | B2 | 9/2009 | Al-Ali et al. |
| 7,601,123 | B2 | 10/2009 | Tweed et al. |
| 7,618,375 | B2 | 11/2009 | Flaherty |
| D606,659 | S | 12/2009 | Kiani et al. |
| 7,647,083 | B2 | 1/2010 | Al-Ali et al. |
| D609,193 | S | 2/2010 | Al-Ali et al. |
| D614,305 | S | 4/2010 | Al-Ali et al. |
| RE41,317 | E | 5/2010 | Parker |
| 7,726,209 | B2 | 6/2010 | Ruotoistenmäki |
| 7,729,733 | B2 | 6/2010 | Al-Ali et al. |
| 7,734,320 | B2 | 6/2010 | Al-Ali |
| 7,761,127 | B2 | 7/2010 | Al-Ali et al. |
| 7,761,128 | B2 | 7/2010 | Al-Ali et al. |
| 7,764,982 | B2 | 7/2010 | Dalke et al. |
| D621,516 | S | 8/2010 | Kiani et al. |
| 7,791,155 | B2 | 9/2010 | Diab |
| 7,801,581 | B2 | 9/2010 | Diab |
| 7,822,452 | B2 | 10/2010 | Schurman et al. |
| RE41,912 | E | 11/2010 | Parker |
| 7,844,313 | B2 | 11/2010 | Kiani et al. |
| 7,844,314 | B2 | 11/2010 | Al-Ali |
| 7,844,315 | B2 | 11/2010 | Al-Ali |
| 7,862,523 | B2 | 1/2011 | Ruotoistenmaki |
| 7,865,222 | B2 | 1/2011 | Weber et al. |
| 7,873,497 | B2 | 1/2011 | Weber et al. |
| 7,880,606 | B2 | 2/2011 | Al-Ali |
| 7,880,626 | B2 | 2/2011 | Al-Ali et al. |
| 7,891,355 | B2 | 2/2011 | Al-Ali et al. |
| 7,894,868 | B2 | 2/2011 | Al-Ali et al. |
| 7,899,507 | B2 | 3/2011 | Al-Ali et al. |
| 7,899,518 | B2 | 3/2011 | Trepagnier et al. |
| 7,904,132 | B2 | 3/2011 | Weber et al. |
| 7,909,772 | B2 | 3/2011 | Popov et al. |
| 7,910,875 | B2 | 3/2011 | Al-Ali |
| 7,919,713 | B2 | 4/2011 | Al-Ali et al. |

3

# US 10,470,695 B2

Page 4

(56)                References Cited

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 7,937,128 B2 | 5/2011 | Al-Ali |
| 7,937,129 B2 | 5/2011 | Mason et al. |
| 7,937,130 B2 | 5/2011 | Diab et al. |
| 7,941,199 B2 | 5/2011 | Kiani |
| 7,951,086 B2 | 5/2011 | Flaherty et al. |
| 7,957,780 B2 | 6/2011 | Lamego et al. |
| 7,962,188 B2 | 6/2011 | Kiani et al. |
| 7,962,190 B1 | 6/2011 | Diab et al. |
| 7,976,472 B2 | 7/2011 | Kiani |
| 7,988,637 B2 | 8/2011 | Diab |
| 7,990,382 B2 | 8/2011 | Kiani |
| 7,991,446 B2 | 8/2011 | Al-Ali et al. |
| 8,000,761 B2 | 8/2011 | Al-Ali |
| 8,008,088 B2 | 8/2011 | Bellott et al. |
| RE42,753 E | 9/2011 | Kiani-Azarbayjany et al. |
| 8,019,400 B2 | 9/2011 | Diab et al. |
| 8,028,701 B2 | 10/2011 | Al-Ali et al. |
| 8,029,765 B2 | 10/2011 | Bellott et al. |
| 8,036,727 B2 | 10/2011 | Schurman et al. |
| 8,036,728 B2 | 10/2011 | Diab et al. |
| 8,046,040 B2 | 10/2011 | Ali et al. |
| 8,046,041 B2 | 10/2011 | Diab et al. |
| 8,046,042 B2 | 10/2011 | Diab et al. |
| 8,048,040 B2 | 11/2011 | Kiani |
| 8,050,728 B2 | 11/2011 | Al-Ali et al. |
| RE43,169 E | 2/2012 | Parker |
| 8,118,620 B2 | 2/2012 | Al-Ali et al. |
| 8,126,528 B2 | 2/2012 | Diab et al. |
| 8,128,572 B2 | 3/2012 | Diab et al. |
| 8,130,105 B2 | 3/2012 | Al-Ali et al. |
| 8,145,287 B2 | 3/2012 | Diab et al. |
| 8,150,487 B2 | 4/2012 | Diab et al. |
| 8,175,672 B2 | 5/2012 | Parker |
| 8,180,420 B2 | 5/2012 | Diab et al. |
| 8,182,443 B1 | 5/2012 | Kiani |
| 8,185,180 B2 | 5/2012 | Diab et al. |
| 8,190,223 B2 | 5/2012 | Al-Ali et al. |
| 8,190,227 B2 | 5/2012 | Diab et al. |
| 8,203,438 B2 | 6/2012 | Kiani et al. |
| 8,203,704 B2 | 6/2012 | Merritt et al. |
| 8,204,566 B2 | 6/2012 | Schurman et al. |
| 8,219,172 B2 | 7/2012 | Schurman et al. |
| 8,224,411 B2 | 7/2012 | Al-Ali et al. |
| 8,228,181 B2 | 7/2012 | Al-Ali |
| 8,229,533 B2 | 7/2012 | Diab et al. |
| 8,233,955 B2 | 7/2012 | Al-Ali et al. |
| 8,244,325 B2 | 8/2012 | Al-Ali et al. |
| 8,255,026 B1 | 8/2012 | Al-Ali |
| 8,255,027 B2 | 8/2012 | Al-Ali et al. |
| 8,255,028 B2 | 8/2012 | Al-Ali et al. |
| 8,260,577 B2 | 9/2012 | Weber et al. |
| 8,265,723 B1 | 9/2012 | McHale et al. |
| 8,274,360 B2 | 9/2012 | Sampath et al. |
| 8,280,473 B2 | 10/2012 | Al-Ali |
| 8,289,130 B2 | 10/2012 | Nakajima et al. |
| 8,301,217 B2 | 10/2012 | Al-Ali et al. |
| 8,306,596 B2 | 11/2012 | Schurman et al. |
| 8,310,336 B2 | 11/2012 | Muhsin et al. |
| 8,315,683 B2 | 11/2012 | Al-Ali et al. |
| RE43,860 E | 12/2012 | Parker |
| 8,337,403 B2 | 12/2012 | Al-Ali et al. |
| 8,346,330 B2 | 1/2013 | Lamego |
| 8,353,842 B2 | 1/2013 | Al-Ali et al. |
| 8,355,766 B2 | 1/2013 | MacNeish, III et al. |
| 8,359,080 B2 | 1/2013 | Diab et al. |
| 8,364,223 B2 | 1/2013 | Al-Ali et al. |
| 8,364,226 B2 | 1/2013 | Diab et al. |
| 8,364,389 B2 | 1/2013 | Dorogusker et al. |
| 8,374,665 B2 | 2/2013 | Lamego |
| 8,385,995 B2 | 2/2013 | Al-ali et al. |
| 8,385,996 B2 | 2/2013 | Smith et al. |
| 8,388,353 B2 | 3/2013 | Kiani et al. |
| 8,399,822 B2 | 3/2013 | Al-Ali |
| 8,401,602 B2 | 3/2013 | Kiani |
| 8,405,608 B2 | 3/2013 | Al-Ali et al. |

| | | | | |
|---|---|---|---|---|
| 8,414,499 B2 | 4/2013 | Al-Ali et al. | | |
| 8,418,524 B2 | 4/2013 | Al-Ali | | |
| 8,423,106 B2 | 4/2013 | Lamego et al. | | |
| 8,428,967 B2 | 4/2013 | Olsen et al. | | |
| 8,430,817 B1 | 4/2013 | Al-Ali et al. | | |
| 8,437,825 B2 | 5/2013 | Dalvi et al. | | |
| 8,452,364 B2 * | 5/2013 | Hannula | A61B 5/14552 | |
| | | | | 600/322 |
| 8,455,290 B2 | 6/2013 | Siskavich | | |
| 8,457,703 B2 | 6/2013 | Al-Ali | | |
| 8,457,707 B2 | 6/2013 | Kiani | | |
| 8,463,349 B2 | 6/2013 | Diab et al. | | |
| 8,466,286 B2 | 6/2013 | Bellott et al. | | |
| 8,471,713 B2 | 6/2013 | Poeze et al. | | |
| 8,473,020 B2 | 6/2013 | Kiani et al. | | |
| 8,483,787 B2 | 7/2013 | Al-Ali et al. | | |
| 8,489,364 B2 | 7/2013 | Weber et al. | | |
| 8,498,684 B2 | 7/2013 | Weber et al. | | |
| 8,504,128 B2 | 8/2013 | Blank et al. | | |
| 8,509,867 B2 | 8/2013 | Workman et al. | | |
| 8,515,509 B2 | 8/2013 | Bruinsma et al. | | |
| 8,523,781 B2 | 9/2013 | Al-Ali | | |
| 8,529,301 B2 | 9/2013 | Al-Ali et al. | | |
| 8,532,727 B2 | 9/2013 | Ali et al. | | |
| 8,532,728 B2 | 9/2013 | Diab et al. | | |
| D692,145 S | 10/2013 | Al-Ali et al. | | |
| 8,547,209 B2 | 10/2013 | Kiani et al. | | |
| 8,548,548 B2 | 10/2013 | Al-Ali | | |
| 8,548,549 B2 | 10/2013 | Schurman et al. | | |
| 8,548,550 B2 | 10/2013 | Al-Ali et al. | | |
| 8,560,032 B2 | 10/2013 | Al-Ali et al. | | |
| 8,560,034 B1 | 10/2013 | Diab et al. | | |
| 8,570,167 B2 | 10/2013 | Al-Ali | | |
| 8,570,503 B2 | 10/2013 | Vo et al. | | |
| 8,571,617 B2 | 10/2013 | Reichgott et al. | | |
| 8,571,618 B1 | 10/2013 | Lamego et al. | | |
| 8,571,619 B2 | 10/2013 | Al-Ali et al. | | |
| 8,577,431 B2 | 11/2013 | Lamego et al. | | |
| 8,581,732 B2 | 11/2013 | Al-Ali et al. | | |
| 8,584,345 B2 | 11/2013 | Al-Ali et al. | | |
| 8,588,880 B2 | 11/2013 | Abdul-Hafiz et al. | | |
| 8,600,467 B2 | 12/2013 | Al-Ali et al. | | |
| 8,606,342 B2 | 12/2013 | Diab | | |
| 8,615,290 B2 | 12/2013 | Lin et al. | | |
| 8,626,255 B2 | 1/2014 | Al-Ali et al. | | |
| 8,630,691 B2 | 1/2014 | Lamego et al. | | |
| 8,634,889 B2 | 1/2014 | Al-Ali et al. | | |
| 8,641,631 B2 | 2/2014 | Sierra et al. | | |
| 8,652,060 B2 | 2/2014 | Al-Ali | | |
| 8,655,004 B2 | 2/2014 | Prest et al. | | |
| 8,663,107 B2 | 3/2014 | Kiani | | |
| 8,666,468 B1 | 3/2014 | Al-Ali | | |
| 8,667,967 B2 | 3/2014 | Al-Ali et al. | | |
| 8,670,811 B2 | 3/2014 | O'Reilly | | |
| 8,670,814 B2 | 3/2014 | Diab et al. | | |
| 8,676,286 B2 | 3/2014 | Weber et al. | | |
| 8,682,407 B2 | 3/2014 | Al-Ali | | |
| RE44,823 E | 4/2014 | Parker | | |
| RE44,875 E | 4/2014 | Kiani et al. | | |
| 8,690,799 B2 | 4/2014 | Telfort et al. | | |
| 8,700,112 B2 | 4/2014 | Kiani | | |
| 8,702,627 B2 | 4/2014 | Telfort et al. | | |
| 8,706,179 B2 | 4/2014 | Parker | | |
| 8,712,494 B1 | 4/2014 | MacNeish, III et al. | | |
| 8,715,206 B2 | 5/2014 | Telfort et al. | | |
| 8,718,735 B2 | 5/2014 | Lamego et al. | | |
| 8,718,737 B2 | 5/2014 | Diab et al. | | |
| 8,718,738 B2 | 5/2014 | Blank et al. | | |
| 8,720,249 B2 | 5/2014 | Al-Ali | | |
| 8,721,541 B2 | 5/2014 | Al-Ali et al. | | |
| 8,721,542 B2 | 5/2014 | Al-Ali et al. | | |
| 8,723,677 B1 | 5/2014 | Kiani | | |
| 8,740,792 B1 | 6/2014 | Kiani et al. | | |
| 8,754,776 B2 | 6/2014 | Poeze et al. | | |
| 8,755,535 B2 | 6/2014 | Telfort et al. | | |
| 8,755,856 B2 | 6/2014 | Diab et al. | | |
| 8,755,872 B1 | 6/2014 | Marinow | | |
| 8,760,517 B2 | 6/2014 | Sarwar et al. | | |
| 8,761,850 B2 | 6/2014 | Lamego | | |

# US 10,470,695 B2

Page 5

(56)         References Cited

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 8,764,671 | B2 | 7/2014 | Kiani |
| 8,768,423 | B2 | 7/2014 | Shakespeare et al. |
| 8,771,204 | B2 | 7/2014 | Telfort et al. |
| 8,777,634 | B2 | 7/2014 | Kiani et al. |
| 8,781,543 | B2 | 7/2014 | Diab et al. |
| 8,781,544 | B2 | 7/2014 | Al-Ali et al. |
| 8,781,549 | B2 | 7/2014 | Al-Ali et al. |
| 8,788,003 | B2 | 7/2014 | Schurman et al. |
| 8,790,268 | B2 | 7/2014 | Al-Ali |
| 8,801,613 | B2 | 8/2014 | Al-Ali et al. |
| 8,821,397 | B2 | 9/2014 | Al-Ali et al. |
| 8,821,415 | B2 | 9/2014 | Al-Ali et al. |
| 8,830,449 | B1 | 9/2014 | Lamego et al. |
| 8,831,700 | B2 | 9/2014 | Schurman et al. |
| 8,840,549 | B2 | 9/2014 | Al-Ali et al. |
| 8,847,740 | B2 | 9/2014 | Kiani et al. |
| 8,849,365 | B2 | 9/2014 | Smith et al. |
| 8,852,094 | B2 | 10/2014 | Al-Ali et al. |
| 8,852,994 | B2 | 10/2014 | Wojtczuk et al. |
| 8,868,147 | B2 | 10/2014 | Stippick et al. |
| 8,868,150 | B2 | 10/2014 | Al-Ali et al. |
| 8,870,792 | B2 | 10/2014 | Al-Ali et al. |
| 8,886,271 | B2 | 11/2014 | Kiani et al. |
| 8,888,539 | B2 | 11/2014 | Al-Ali et al. |
| 8,888,708 | B2 | 11/2014 | Diab et al. |
| 8,892,180 | B2 | 11/2014 | Weber et al. |
| 8,897,847 | B2 | 11/2014 | Al-Ali |
| 8,909,310 | B2 | 12/2014 | Lamego et al. |
| 8,911,377 | B2 | 12/2014 | Al-Ali |
| 8,912,909 | B2 | 12/2014 | Al-Ali et al. |
| 8,920,317 | B2 | 12/2014 | Al-Ali et al. |
| 8,921,699 | B2 | 12/2014 | Al-Ali et al. |
| 8,922,382 | B2 | 12/2014 | Al-Ali et al. |
| 8,929,964 | B2 | 1/2015 | Al-Ali et al. |
| 8,942,777 | B2 | 1/2015 | Diab et al. |
| 8,948,834 | B2 | 2/2015 | Diab et al. |
| 8,948,835 | B2 | 2/2015 | Diab |
| 8,965,471 | B2 | 2/2015 | Lamego |
| 8,983,564 | B2 | 3/2015 | Al-Ali |
| 8,989,831 | B2 | 3/2015 | Al-Ali et al. |
| 8,996,085 | B2 | 3/2015 | Kiani et al. |
| 8,998,809 | B2 | 4/2015 | Kiani |
| 9,028,429 | B2 | 5/2015 | Telfort et al. |
| 9,037,207 | B2 | 5/2015 | Al-Ali et al. |
| 9,060,721 | B2 | 6/2015 | Reichgott et al. |
| 9,066,666 | B2 | 6/2015 | Kiani |
| 9,066,680 | B1 | 6/2015 | Al-Ali et al. |
| 9,072,437 | B2 | 7/2015 | Paalasmaa |
| 9,072,474 | B2 | 7/2015 | Al-Ali et al. |
| 9,078,560 | B2 | 7/2015 | Schurman et al. |
| 9,081,889 | B2 | 7/2015 | Ingrassia, Jr. et al. |
| 9,084,569 | B2 | 7/2015 | Weber et al. |
| 9,095,316 | B2 | 8/2015 | Welch et al. |
| 9,106,038 | B2 | 8/2015 | Telfort et al. |
| 9,107,625 | B2 | 8/2015 | Telfort et al. |
| 9,107,626 | B2 | 8/2015 | Al-Ali et al. |
| 9,113,831 | B2 | 8/2015 | Al-Ali |
| 9,113,832 | B2 | 8/2015 | Al-Ali |
| 9,119,595 | B2 | 9/2015 | Lamego |
| 9,131,881 | B2 | 9/2015 | Diab et al. |
| 9,131,882 | B2 | 9/2015 | Al-Ali et al. |
| 9,131,883 | B2 | 9/2015 | Al-Ali |
| 9,131,917 | B2 | 9/2015 | Telfort et al. |
| 9,138,180 | B1 | 9/2015 | Coverston et al. |
| 9,138,182 | B2 | 9/2015 | Al-Ali et al. |
| 9,138,192 | B2 | 9/2015 | Weber et al. |
| 9,142,117 | B2 | 9/2015 | Muhsin et al. |
| 9,153,112 | B1 | 10/2015 | Kiani et al. |
| 9,153,121 | B2 | 10/2015 | Kiani et al. |
| 9,161,696 | B2 | 10/2015 | Al-Ali et al. |
| 9,161,713 | B2 | 10/2015 | Al-Ali et al. |
| 9,167,995 | B2 | 10/2015 | Lamego et al. |
| 9,176,141 | B2 | 11/2015 | Al-Ali et al. |
| 9,186,102 | B2 | 11/2015 | Bruinsma et al. |
| 9,192,312 | B2 | 11/2015 | Al-Ali |
| 9,192,329 | B2 | 11/2015 | Al-Ali |
| 9,192,351 | B1 | 11/2015 | Telfort et al. |
| 9,195,385 | B2 | 11/2015 | Al-Ali et al. |
| 9,210,566 | B2 | 12/2015 | Ziemianska et al. |
| 9,211,072 | B2 | 12/2015 | Kiani |
| 9,211,095 | B1 | 12/2015 | Al-Ali |
| 9,218,454 | B2 | 12/2015 | Kiani et al. |
| 9,226,696 | B2 | 1/2016 | Kiani |
| 9,241,662 | B2 | 1/2016 | Al-Ali et al. |
| 9,245,668 | B1 | 1/2016 | Vo et al. |
| 9,259,185 | B2 | 2/2016 | Abdul-Hafiz et al. |
| 9,267,572 | B2 | 2/2016 | Barker et al. |
| 9,277,880 | B2 | 3/2016 | Poeze et al. |
| 9,289,167 | B2 | 3/2016 | Diab et al. |
| 9,295,421 | B2 | 3/2016 | Kiani et al. |
| 9,307,928 | B1 | 4/2016 | Al-Ali et al. |
| 9,311,382 | B2 | 4/2016 | Varoglu et al. |
| 9,323,894 | B2 | 4/2016 | Kiani |
| D755,392 | S | 5/2016 | Hwang et al. |
| 9,326,712 | B1 | 5/2016 | Kiani |
| 9,333,316 | B2 | 5/2016 | Kiani |
| 9,339,220 | B2 | 5/2016 | Lamego et al. |
| 9,341,565 | B2 | 5/2016 | Lamego et al. |
| 9,351,673 | B2 | 5/2016 | Diab et al. |
| 9,351,675 | B2 | 5/2016 | Al-Ali et al. |
| 9,357,665 | B2 | 5/2016 | Myers et al. |
| 9,364,181 | B2 | 6/2016 | Kiani et al. |
| 9,368,671 | B2 | 6/2016 | Wojtczuk et al. |
| 9,370,325 | B2 | 6/2016 | Al-Ali et al. |
| 9,370,326 | B2 | 6/2016 | McHale et al. |
| 9,370,335 | B2 | 6/2016 | Al-ali et al. |
| 9,375,185 | B2 | 6/2016 | Ali et al. |
| 9,386,953 | B2 | 7/2016 | Al-Ali |
| 9,386,961 | B2 | 7/2016 | Al-Ali et al. |
| 9,392,945 | B2 | 7/2016 | Al-Ali et al. |
| 9,397,448 | B2 | 7/2016 | Al-Ali et al. |
| 9,408,542 | B1 | 8/2016 | Kinast et al. |
| 9,436,645 | B2 | 9/2016 | Al-Ali et al. |
| 9,445,759 | B1 | 9/2016 | Lamego et al. |
| 9,466,919 | B2 | 10/2016 | Kiani et al. |
| 9,474,474 | B2 | 10/2016 | Lamego et al. |
| 9,480,422 | B2 | 11/2016 | Al-Ali |
| 9,480,435 | B2 | 11/2016 | Olsen |
| 9,489,081 | B2 | 11/2016 | Anzures et al. |
| 9,492,110 | B2 | 11/2016 | Al-Ali et al. |
| 9,497,534 | B2 | 11/2016 | Prest et al. |
| 9,510,779 | B2 | 12/2016 | Poeze et al. |
| 9,517,024 | B2 | 12/2016 | Kiani et al. |
| 9,526,430 | B2 | 12/2016 | Srinivas et al. |
| 9,532,722 | B2 | 1/2017 | Lamego et al. |
| 9,538,949 | B2 | 1/2017 | Al-Ali et al. |
| 9,538,980 | B2 | 1/2017 | Telfort et al. |
| 9,549,696 | B2 | 1/2017 | Lamego et al. |
| 9,553,625 | B2 | 1/2017 | Hatanaka et al. |
| 9,554,737 | B2 | 1/2017 | Schurman et al. |
| 9,560,996 | B2 | 2/2017 | Kiani |
| 9,560,998 | B2 | 2/2017 | Al-Ali et al. |
| 9,566,019 | B2 | 2/2017 | Al-Ali et al. |
| 9,579,039 | B2 | 2/2017 | Jansen et al. |
| 9,591,975 | B2 | 3/2017 | Dalvi et al. |
| 9,593,969 | B2 | 3/2017 | King |
| 9,622,692 | B2 | 4/2017 | Lamego et al. |
| 9,622,693 | B2 | 4/2017 | Diab |
| D788,312 | S | 5/2017 | Al-Ali et al. |
| 9,636,055 | B2 | 5/2017 | Al-Ali et al. |
| 9,636,056 | B2 | 5/2017 | Al-Ali |
| 9,649,054 | B2 | 5/2017 | Lamego et al. |
| 9,651,405 | B1 | 5/2017 | Gowreesunker et al. |
| 9,662,052 | B2 | 5/2017 | Al-Ali et al. |
| 9,668,676 | B2 | 6/2017 | Culbert |
| 9,668,679 | B2 | 6/2017 | Schurman et al. |
| 9,668,680 | B2 | 6/2017 | Bruinsma et al. |
| 9,668,703 | B2 | 6/2017 | Al-Ali |
| 9,675,286 | B2 | 6/2017 | Diab |
| 9,687,160 | B2 | 6/2017 | Kiani |
| 9,693,719 | B2 | 7/2017 | Al-Ali et al. |
| 9,693,737 | B2 | 7/2017 | Al-Ali |
| 9,697,928 | B2 | 7/2017 | Al-Ali et al. |
| 9,699,546 | B2 | 7/2017 | Qian et al. |

5

**US 10,470,695 B2**

Page 6

(56)    **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 9,716,937 B2 | 7/2017 | Qian et al. |
| 9,717,425 B2 | 8/2017 | Kiani et al. |
| 9,717,458 B2 | 8/2017 | Lamego et al. |
| 9,723,997 B1 | 8/2017 | Lamego |
| 9,724,016 B1 | 8/2017 | Al-Ali et al. |
| 9,724,024 B2 | 8/2017 | Al-Ali |
| 9,724,025 B1 | 8/2017 | Kiani et al. |
| 9,730,640 B2 | 8/2017 | Diab et al. |
| 9,743,887 B2 | 8/2017 | Al-Ali et al. |
| 9,749,232 B2 | 8/2017 | Sampath et al. |
| 9,750,442 B2 | 9/2017 | Olsen |
| 9,750,443 B2 | 9/2017 | Smith et al. |
| 9,750,461 B1 | 9/2017 | Telfort |
| 9,775,545 B2 | 10/2017 | Al-Ali et al. |
| 9,775,546 B2 | 10/2017 | Diab et al. |
| 9,775,570 B2 | 10/2017 | Al-Ali |
| 9,778,079 B1 | 10/2017 | Al-Ali et al. |
| 9,781,984 B2 | 10/2017 | Baranski et al. |
| 9,782,077 B2 | 10/2017 | Lamego et al. |
| 9,782,110 B2 | 10/2017 | Kiani |
| 9,787,568 B2 | 10/2017 | Lamego et al. |
| 9,788,735 B2 | 10/2017 | Al-Ali |
| 9,788,768 B2 | 10/2017 | Al-Ali et al. |
| 9,795,300 B2 | 10/2017 | Al-Ali |
| 9,795,310 B2 | 10/2017 | Al-Ali |
| 9,795,358 B2 | 10/2017 | Telfort et al. |
| 9,795,739 B2 | 10/2017 | Al-Ali et al. |
| 9,801,556 B2 | 10/2017 | Kiani |
| 9,801,588 B2 | 10/2017 | Weber et al. |
| 9,808,188 B1 | 11/2017 | Perea et al. |
| 9,814,418 B2 | 11/2017 | Weber et al. |
| 9,820,691 B2 | 11/2017 | Kiani |
| 9,833,152 B2 | 12/2017 | Kiani et al. |
| 9,833,180 B2 | 12/2017 | Shakespeare et al. |
| 9,838,775 B2 | 12/2017 | Qian et al. |
| 9,839,379 B2 | 12/2017 | Al-Ali et al. |
| 9,839,381 B1 | 12/2017 | Weber et al. |
| 9,847,002 B2 | 12/2017 | Kiani et al. |
| 9,847,749 B2 | 12/2017 | Kiani et al. |
| 9,848,800 B1 | 12/2017 | Lee et al. |
| 9,848,806 B2 | 12/2017 | Al-Ali et al. |
| 9,848,807 B2 | 12/2017 | Lamego |
| 9,848,823 B2 | 12/2017 | Raghuram et al. |
| 9,861,298 B2 | 1/2018 | Eckerbom et al. |
| 9,861,304 B2 | 1/2018 | Al-Ali et al. |
| 9,861,305 B1 | 1/2018 | Weber et al. |
| 9,866,671 B1 | 1/2018 | Thompson et al. |
| 9,867,575 B2 | 1/2018 | Maani et al. |
| 9,867,578 B2 | 1/2018 | Al-Ali et al. |
| 9,872,623 B2 | 1/2018 | Al-Ali |
| 9,876,320 B2 | 1/2018 | Coverston et al. |
| 9,877,650 B2 | 1/2018 | Muhsin et al. |
| 9,877,686 B2 | 1/2018 | Al-Ali et al. |
| 9,891,079 B2 | 2/2018 | Dalvi |
| 9,895,107 B2 | 2/2018 | Al-Ali et al. |
| 9,898,049 B2 | 2/2018 | Myers et al. |
| 9,913,617 B2 | 3/2018 | Al-Ali et al. |
| 9,918,646 B2 | 3/2018 | Singh Alvarado et al. |
| 9,924,893 B2 | 3/2018 | Schurman et al. |
| 9,924,897 B1 | 3/2018 | Abdul-Hafiz |
| 9,936,917 B2 | 4/2018 | Poeze et al. |
| 9,943,269 B2 | 4/2018 | Muhsin et al. |
| 9,949,676 B2 | 4/2018 | Al-Ali |
| 9,952,095 B1 | 4/2018 | Hotelling et al. |
| 9,955,937 B2 | 5/2018 | Telfort |
| 9,965,946 B2 | 5/2018 | Al-Ali |
| 9,980,667 B2 | 5/2018 | Kiani et al. |
| D820,865 S | 6/2018 | Muhsin et al. |
| 9,986,919 B2 | 6/2018 | Lamego et al. |
| 9,986,952 B2 | 6/2018 | Dalvi et al. |
| 9,989,560 B2 | 6/2018 | Poeze et al. |
| 9,993,207 B2 | 6/2018 | Al-Ali et al. |
| 10,007,758 B2 | 6/2018 | Al-Ali et al. |
| D822,215 S | 7/2018 | Al-Ali et al. |
| D822,216 S | 7/2018 | Barker et al. |

| | | | | |
|---|---|---|---|---|
| 10,010,276 B2 | 7/2018 | Al-Ali et al. | | |
| 10,032,002 B2 | 7/2018 | Kiani et al. | | |
| 10,039,080 B2 | 7/2018 | Miller et al. | | |
| 10,039,482 B2 | 8/2018 | Al-Ali et al. | | |
| 10,052,037 B2 | 8/2018 | Kinast et al. | | |
| 10,055,121 B2 | 8/2018 | Chaudhri et al. | | |
| 10,058,275 B2 | 8/2018 | Al-Ali et al. | | |
| 10,064,562 B2 | 9/2018 | Al-Ali | | |
| 10,066,970 B2 | 9/2018 | Gowreesunker et al. | | |
| 10,076,257 B2 | 9/2018 | Lin et al. | | |
| 10,078,052 B2 | 9/2018 | Ness et al. | | |
| 10,086,138 B1 | 10/2018 | Novak, Jr. | | |
| 10,092,200 B2 | 10/2018 | Al-Ali et al. | | |
| 10,092,249 B2 | 10/2018 | Kiani et al. | | |
| 10,098,550 B2 | 10/2018 | Al-Ali et al. | | |
| 10,098,591 B2 | 10/2018 | Al-Ali et al. | | |
| 10,098,610 B2 | 10/2018 | Al-Ali et al. | | |
| D833,624 S | 11/2018 | DeJong et al. | | |
| 10,123,726 B2 | 11/2018 | Al-Ali et al. | | |
| 10,130,289 B2 | 11/2018 | Al-Ali | | |
| 10,130,291 B2 | 11/2018 | Schurman et al. | | |
| D835,282 S | 12/2018 | Barker et al. | | |
| D835,283 S | 12/2018 | Barker et al. | | |
| D835,284 S | 12/2018 | Barker et al. | | |
| D835,285 S | 12/2018 | Barker et al. | | |
| 10,149,616 B2 | 12/2018 | Al-Ali et al. | | |
| 10,154,815 B2 | 12/2018 | Al-Ali et al. | | |
| 10,159,412 B2 | 12/2018 | Lamego et al. | | |
| 10,188,296 B2 | 1/2019 | Al-Ali et al. | | |
| 10,188,331 B1 | 1/2019 | Al-Ali et al. | | |
| 10,188,348 B2 | 1/2019 | Kiani et al. | | |
| RE47,218 E | 2/2019 | Al-Ali | | |
| RE47,244 E | 2/2019 | Kiani et al. | | |
| RE47,249 E | 2/2019 | Kiani et al. | | |
| 10,194,847 B2 | 2/2019 | Al-Ali | | |
| 10,194,848 B1 | 2/2019 | Kiani et al. | | |
| 10,201,298 B2 | 2/2019 | Al-Ali et al. | | |
| 10,205,272 B2 | 2/2019 | Kiani et al. | | |
| 10,205,291 B2 | 2/2019 | Scruggs et al. | | |
| 10,213,108 B2 | 2/2019 | Al-Ali | | |
| 10,219,706 B2 | 3/2019 | Al-Ali | | |
| 10,219,746 B2 | 3/2019 | McHale et al. | | |
| 10,226,187 B2 | 3/2019 | Al-Ali et al. | | |
| 10,226,576 B2 | 3/2019 | Kiani | | |
| 10,231,657 B2 | 3/2019 | Al-Ali et al. | | |
| 10,231,670 B2 | 3/2019 | Blank et al. | | |
| 10,231,676 B2 | 3/2019 | Al-Ali et al. | | |
| RE47,353 E | 4/2019 | Kiani et al. | | |
| 10,251,585 B2 | 4/2019 | Al-Ali et al. | | |
| 10,251,586 B2 | 4/2019 | Lamego | | |
| 10,255,994 B2 | 4/2019 | Sampath et al. | | |
| 10,258,265 B1 | 4/2019 | Poeze et al. | | |
| 10,258,266 B1 | 4/2019 | Poeze et al. | | |
| 10,271,748 B2 | 4/2019 | Al-Ali | | |
| 10,278,626 B2 | 5/2019 | Schurman et al. | | |
| 10,278,648 B2 | 5/2019 | Al-Ali et al. | | |
| 10,279,247 B2 | 5/2019 | Kiani | | |
| 10,292,628 B1 | 5/2019 | Poeze et al. | | |
| 10,292,657 B2 | 5/2019 | Abdul-Hafiz et al. | | |
| 10,292,664 B2 | 5/2019 | Al-Ali | | |
| 10,299,708 B1 | 5/2019 | Poeze et al. | | |
| 10,299,709 B2 | 5/2019 | Perea et al. | | |
| 10,305,775 B2 | 5/2019 | Lamego et al. | | |
| 10,307,111 B2 | 6/2019 | Muhsin et al. | | |
| 10,325,681 B2 | 6/2019 | Sampath et al. | | |
| 10,327,337 B2 | 6/2019 | Triman et al. | | |
| 2002/0042558 A1 | 4/2002 | Mendelson | | |
| 2003/0036690 A1* | 2/2003 | Geddes | A61B 5/02233 | |
| | | | | 600/323 |
| 2004/0054290 A1 | 3/2004 | Chance | | |
| 2004/0114783 A1 | 6/2004 | Spycher et al. | | |
| 2005/0277819 A1 | 12/2005 | Kiani et al. | | |
| 2006/0161054 A1 | 7/2006 | Reuss et al. | | |
| 2007/0282478 A1 | 12/2007 | Al-Ali et al. | | |
| 2008/0030468 A1 | 2/2008 | Al-Ali et al. | | |
| 2009/0247984 A1 | 10/2009 | Lamego et al. | | |
| 2009/0275813 A1 | 11/2009 | Davis | | |
| 2009/0275844 A1 | 11/2009 | Al-Ali | | |
| 2010/0004518 A1 | 1/2010 | Vo et al. | | |

**US 10,470,695 B2**

Page 7

(56)                    **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2010/0030040 | A1 | 2/2010 | Poeze et al. |
| 2011/0004106 | A1 | 1/2011 | Iwamiya et al. |
| 2011/0082711 | A1 | 4/2011 | Poeze et al. |
| 2011/0085721 | A1 | 4/2011 | Guyon et al. |
| 2011/0105854 | A1 | 5/2011 | Kiani et al. |
| 2011/0125060 | A1 | 5/2011 | Telfort et al. |
| 2011/0208015 | A1 | 8/2011 | Welch et al. |
| 2011/0213212 | A1 | 9/2011 | Al-Ali |
| 2011/0230733 | A1 | 9/2011 | Al-Ali |
| 2011/0237969 | A1 | 9/2011 | Eckerbom et al. |
| 2011/0288383 | A1 | 11/2011 | Diab |
| 2011/0301444 | A1 | 12/2011 | Al-Ali |
| 2012/0041316 | A1 | 2/2012 | Al-Ali et al. |
| 2012/0046557 | A1 | 2/2012 | Kiani |
| 2012/0059267 | A1 | 3/2012 | Lamego et al. |
| 2012/0088984 | A1 | 4/2012 | Al-Ali et al. |
| 2012/0165629 | A1 | 6/2012 | Merritt et al. |
| 2012/0179006 | A1 | 7/2012 | Jansen et al. |
| 2012/0209082 | A1 | 8/2012 | Al-Ali |
| 2012/0209084 | A1 | 8/2012 | Olsen et al. |
| 2012/0283524 | A1 | 11/2012 | Kiani et al. |
| 2012/0296178 | A1 | 11/2012 | Lamego et al. |
| 2012/0319816 | A1 | 12/2012 | Al-Ali |
| 2012/0330112 | A1 | 12/2012 | Lamego et al. |
| 2013/0006076 | A1 | 1/2013 | McHale |
| 2013/0023775 | A1 | 1/2013 | Lamego et al. |
| 2013/0041591 | A1 | 2/2013 | Lamego |
| 2013/0046204 | A1 | 2/2013 | Lamego et al. |
| 2013/0060147 | A1 | 3/2013 | Welch et al. |
| 2013/0096405 | A1 | 4/2013 | Garfio |
| 2013/0096936 | A1 | 4/2013 | Sampath et al. |
| 2013/0190581 | A1 | 7/2013 | Al-Ali et al. |
| 2013/0211214 | A1 | 8/2013 | Olsen |
| 2013/0243021 | A1 | 9/2013 | Siskavich |
| 2013/0253334 | A1 | 9/2013 | Al-Ali et al. |
| 2013/0262730 | A1 | 10/2013 | Al-Ali et al. |
| 2013/0267804 | A1 | 10/2013 | Al-Ali |
| 2013/0274572 | A1 | 10/2013 | Al-Ali et al. |
| 2013/0296672 | A1 | 11/2013 | O'Neil et al. |
| 2013/0296713 | A1 | 11/2013 | Al-Ali et al. |
| 2013/0317370 | A1 | 11/2013 | Dalvi et al. |
| 2013/0324808 | A1 | 12/2013 | Al-Ali et al. |
| 2013/0331660 | A1 | 12/2013 | Al-Ali et al. |
| 2013/0331670 | A1 | 12/2013 | Kiani |
| 2014/0012100 | A1 | 1/2014 | Al-Ali et al. |
| 2014/0034353 | A1 | 2/2014 | Al-Ali et al. |
| 2014/0051953 | A1 | 2/2014 | Lamego et al. |
| 2014/0066783 | A1 | 3/2014 | Kiani et al. |
| 2014/0077956 | A1 | 3/2014 | Sampath et al. |
| 2014/0081100 | A1 | 3/2014 | Muhsin et al. |
| 2014/0081175 | A1 | 3/2014 | Telfort |
| 2014/0094667 | A1 | 4/2014 | Schurman et al. |
| 2014/0100434 | A1 | 4/2014 | Diab et al. |
| 2014/0114199 | A1 | 4/2014 | Lamego et al. |
| 2014/0120564 | A1 | 5/2014 | Workman et al. |
| 2014/0121482 | A1 | 5/2014 | Merritt et al. |
| 2014/0121483 | A1 | 5/2014 | Kiani |
| 2014/0127137 | A1 | 5/2014 | Bellott et al. |
| 2014/0129702 | A1 | 5/2014 | Lamego et al. |
| 2014/0135588 | A1 | 5/2014 | Al-Ali et al. |
| 2014/0142401 | A1 | 5/2014 | Al-Ali et al. |
| 2014/0163344 | A1 | 6/2014 | Al-Ali |
| 2014/0163402 | A1 | 6/2014 | Lamego et al. |
| 2014/0166076 | A1 | 6/2014 | Kiani et al. |
| 2014/0171146 | A1 | 6/2014 | Ma et al. |
| 2014/0171763 | A1 | 6/2014 | Diab |
| 2014/0180038 | A1 | 6/2014 | Kiani |
| 2014/0180154 | A1 | 6/2014 | Sierra et al. |
| 2014/0180160 | A1 | 6/2014 | Brown et al. |
| 2014/0187973 | A1 | 7/2014 | Brown et al. |
| 2014/0194766 | A1 | 7/2014 | Al-Ali et al. |
| 2014/0206963 | A1 | 7/2014 | Al-Ali |
| 2014/0213864 | A1 | 7/2014 | Abdul-Hafiz et al. |
| 2014/0266790 | A1 | 9/2014 | Al-Ali et al. |
| 2014/0275808 | A1 | 9/2014 | Poeze et al. |
| 2014/0275835 | A1 | 9/2014 | Lamego et al. |
| 2014/0275871 | A1 | 9/2014 | Lamego et al. |
| 2014/0275872 | A1 | 9/2014 | Merritt et al. |
| 2014/0275881 | A1 | 9/2014 | Lamego et al. |
| 2014/0276115 | A1 | 9/2014 | Dalvi et al. |
| 2014/0288400 | A1 | 9/2014 | Diab et al. |
| 2014/0303520 | A1 | 10/2014 | Telfort et al. |
| 2014/0316217 | A1 | 10/2014 | Purdon et al. |
| 2014/0316218 | A1 | 10/2014 | Purdon et al. |
| 2014/0316228 | A1 | 10/2014 | Blank et al. |
| 2014/0323825 | A1 | 10/2014 | Al-Ali et al. |
| 2014/0323897 | A1 | 10/2014 | Brown et al. |
| 2014/0323898 | A1 | 10/2014 | Purdon et al. |
| 2014/0330092 | A1 | 11/2014 | Al-Ali et al. |
| 2014/0330098 | A1 | 11/2014 | Merritt et al. |
| 2014/0330099 | A1 | 11/2014 | Al-Ali et al. |
| 2014/0336481 | A1 | 11/2014 | Shakespeare et al. |
| 2014/0357966 | A1 | 12/2014 | Al-Ali et al. |
| 2014/0371548 | A1 | 12/2014 | Al-Ali et al. |
| 2014/0371632 | A1 | 12/2014 | Al-Ali et al. |
| 2014/0378784 | A1 | 12/2014 | Kiani et al. |
| 2015/0005600 | A1 | 1/2015 | Blank et al. |
| 2015/0011907 | A1 | 1/2015 | Purdon et al. |
| 2015/0012231 | A1 | 1/2015 | Poeze et al. |
| 2015/0018650 | A1 | 1/2015 | Al-Ali et al. |
| 2015/0025406 | A1 | 1/2015 | Al-Ali |
| 2015/0032029 | A1 | 1/2015 | Al-Ali et al. |
| 2015/0038859 | A1 | 2/2015 | Dalvi et al. |
| 2015/0045637 | A1 | 2/2015 | Dalvi |
| 2015/0045685 | A1 | 2/2015 | Al-Ali et al. |
| 2015/0051462 | A1 | 2/2015 | Olsen |
| 2015/0080754 | A1 | 3/2015 | Purdon et al. |
| 2015/0087936 | A1 | 3/2015 | Al-Ali et al. |
| 2015/0094546 | A1 | 4/2015 | Al-Ali |
| 2015/0097701 | A1 | 4/2015 | Al-Ali et al. |
| 2015/0099324 | A1 | 4/2015 | Wojtczuk et al. |
| 2015/0099950 | A1 | 4/2015 | Al-Ali et al. |
| 2015/0099951 | A1 | 4/2015 | Al-Ali et al. |
| 2015/0099955 | A1 | 4/2015 | Al-Ali et al. |
| 2015/0101844 | A1 | 4/2015 | Al-Ali et al. |
| 2015/0106121 | A1 | 4/2015 | Muhsin et al. |
| 2015/0112151 | A1 | 4/2015 | Muhsin et al. |
| 2015/0116076 | A1 | 4/2015 | Al-Ali et al. |
| 2015/0126830 | A1 | 5/2015 | Schurman et al. |
| 2015/0133755 | A1 | 5/2015 | Smith et al. |
| 2015/0140863 | A1 | 5/2015 | Al-Ali et al. |
| 2015/0141781 | A1 | 5/2015 | Weber et al. |
| 2015/0165312 | A1 | 6/2015 | Kiani |
| 2015/0173671 | A1 | 6/2015 | Paalasmaa et al. |
| 2015/0196237 | A1 | 7/2015 | Lamego |
| 2015/0201874 | A1 | 7/2015 | Diab |
| 2015/0208966 | A1 | 7/2015 | Al-Ali |
| 2015/0216459 | A1 | 8/2015 | Al-Ali et al. |
| 2015/0230755 | A1 | 8/2015 | Al-Ali et al. |
| 2015/0238722 | A1 | 8/2015 | Al-Ali |
| 2015/0245773 | A1 | 9/2015 | Lamego et al. |
| 2015/0245793 | A1 | 9/2015 | Al-Ali et al. |
| 2015/0245794 | A1 | 9/2015 | Al-Ali |
| 2015/0255001 | A1 | 9/2015 | Haughay et al. |
| 2015/0257689 | A1 | 9/2015 | Al-Ali et al. |
| 2015/0272514 | A1 | 10/2015 | Kiani et al. |
| 2015/0281424 | A1 | 10/2015 | Vock et al. |
| 2015/0318100 | A1 | 11/2015 | Rothkopf et al. |
| 2015/0351697 | A1 | 12/2015 | Weber et al. |
| 2015/0351704 | A1 | 12/2015 | Kiani et al. |
| 2015/0359429 | A1 | 12/2015 | Al-Ali et al. |
| 2015/0366472 | A1 | 12/2015 | Kiani |
| 2015/0366507 | A1 | 12/2015 | Blank |
| 2015/0374298 | A1 | 12/2015 | Al-Ali et al. |
| 2015/0380875 | A1 | 12/2015 | Coverston et al. |
| 2016/0000362 | A1 | 1/2016 | Diab et al. |
| 2016/0007930 | A1 | 1/2016 | Weber et al. |
| 2016/0019360 | A1 | 1/2016 | Pahwa et al. |
| 2016/0023245 | A1 | 1/2016 | Zadesky et al. |
| 2016/0029932 | A1 | 2/2016 | Al-Ali |
| 2016/0029933 | A1 | 2/2016 | Al-Ali et al. |
| 2016/0038045 | A1 | 2/2016 | Shapiro |
| 2016/0045118 | A1 | 2/2016 | Kiani |
| 2016/0051157 | A1 | 2/2016 | Waydo |

Appx0136

**US 10,470,695 B2**

Page 8

(56)          **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2016/0051158 | A1 | 2/2016 | Silva |
| 2016/0051205 | A1 | 2/2016 | Al-Ali et al. |
| 2016/0058302 | A1 | 3/2016 | Raghuram et al. |
| 2016/0058309 | A1 | 3/2016 | Han |
| 2016/0058312 | A1 | 3/2016 | Han et al. |
| 2016/0058338 | A1 | 3/2016 | Schurman et al. |
| 2016/0058347 | A1 | 3/2016 | Reichgott et al. |
| 2016/0058356 | A1 | 3/2016 | Raghuram et al. |
| 2016/0058370 | A1 | 3/2016 | Raghuram et al. |
| 2016/0066823 | A1 | 3/2016 | Kind et al. |
| 2016/0066824 | A1 | 3/2016 | Al-Ali et al. |
| 2016/0066879 | A1 | 3/2016 | Telfort et al. |
| 2016/0071392 | A1 | 3/2016 | Hankey et al. |
| 2016/0072429 | A1 | 3/2016 | Kiani et al. |
| 2016/0073967 | A1 | 3/2016 | Lamego et al. |
| 2016/0081552 | A1 | 3/2016 | Wojtczuk et al. |
| 2016/0095543 | A1 | 4/2016 | Telfort et al. |
| 2016/0095548 | A1 | 4/2016 | Al-Ali et al. |
| 2016/0103598 | A1 | 4/2016 | Al-Ali et al. |
| 2016/0113527 | A1 | 4/2016 | Al-Ali et al. |
| 2016/0143548 | A1 | 5/2016 | Al-Ali |
| 2016/0154950 | A1 | 6/2016 | Nakajima et al. |
| 2016/0157780 | A1 | 6/2016 | Rimminen et al. |
| 2016/0166182 | A1 | 6/2016 | Al-Ali et al. |
| 2016/0166183 | A1 | 6/2016 | Poeze et al. |
| 2016/0196388 | A1 | 7/2016 | Lamego |
| 2016/0197436 | A1 | 7/2016 | Barker et al. |
| 2016/0213281 | A1 | 7/2016 | Eckerbom et al. |
| 2016/0213309 | A1 | 7/2016 | Sannholm et al. |
| 2016/0228043 | A1 | 8/2016 | O'Neil et al. |
| 2016/0233632 | A1 | 8/2016 | Scruggs et al. |
| 2016/0234944 | A1 | 8/2016 | Schmidt et al. |
| 2016/0256058 | A1 | 9/2016 | Pham et al. |
| 2016/0256082 | A1 | 9/2016 | Ely et al. |
| 2016/0267238 | A1 | 9/2016 | Nag |
| 2016/0270735 | A1 | 9/2016 | Diab et al. |
| 2016/0283665 | A1 | 9/2016 | Sampath et al. |
| 2016/0287090 | A1 | 10/2016 | Al-Ali et al. |
| 2016/0287181 | A1 | 10/2016 | Han et al. |
| 2016/0287786 | A1 | 10/2016 | Kiani |
| 2016/0296169 | A1 | 10/2016 | McHale et al. |
| 2016/0296173 | A1 | 10/2016 | Culbert |
| 2016/0296174 | A1 | 10/2016 | Isikman et al. |
| 2016/0310027 | A1 | 10/2016 | Han |
| 2016/0310052 | A1 | 10/2016 | Al-Ali et al. |
| 2016/0314260 | A1 | 10/2016 | Kiani |
| 2016/0324488 | A1 | 11/2016 | Olsen |
| 2016/0327984 | A1 | 11/2016 | Al-Ali et al. |
| 2016/0331332 | A1 | 11/2016 | Al-Ali |
| 2016/0367173 | A1 | 12/2016 | Dalvi et al. |
| 2016/0378069 | A1 | 12/2016 | Rothkopf |
| 2016/0378071 | A1 | 12/2016 | Rothkopf |
| 2017/0000394 | A1 | 1/2017 | Al-Ali et al. |
| 2017/0007134 | A1 | 1/2017 | Al-Ali et al. |
| 2017/0007183 | A1 | 1/2017 | Dusan et al. |
| 2017/0007198 | A1 | 1/2017 | Al-Ali et al. |
| 2017/0010858 | A1 | 1/2017 | Prest et al. |
| 2017/0014083 | A1 | 1/2017 | Diab et al. |
| 2017/0014084 | A1 | 1/2017 | Al-Ali et al. |
| 2017/0024748 | A1 | 1/2017 | Haider |
| 2017/0042488 | A1 | 2/2017 | Muhsin |
| 2017/0055851 | A1 | 3/2017 | Al-Ali |
| 2017/0055882 | A1 | 3/2017 | Al-Ali et al. |
| 2017/0055887 | A1 | 3/2017 | Al-Ali |
| 2017/0055896 | A1 | 3/2017 | Al-Ali et al. |
| 2017/0074897 | A1 | 3/2017 | Mermel et al. |
| 2017/0079594 | A1 | 3/2017 | Telfort et al. |
| 2017/0084133 | A1 | 3/2017 | Cardinali et al. |
| 2017/0086689 | A1 | 3/2017 | Shui et al. |
| 2017/0086723 | A1 | 3/2017 | Al-Ali et al. |
| 2017/0086742 | A1 | 3/2017 | Harrison-Noonan et al. |
| 2017/0086743 | A1 | 3/2017 | Bushnell et al. |
| 2017/0094450 | A1 | 3/2017 | Tu et al. |
| 2017/0143281 | A1 | 5/2017 | Olsen |
| 2017/0147774 | A1 | 5/2017 | Kiani |
| 2017/0156620 | A1 | 6/2017 | Al-Ali et al. |
| 2017/0164884 | A1 | 6/2017 | Culbert et al. |
| 2017/0173632 | A1 | 6/2017 | Al-Ali |
| 2017/0187146 | A1 | 6/2017 | Kiani et al. |
| 2017/0188919 | A1 | 7/2017 | Al-Ali et al. |
| 2017/0196464 | A1 | 7/2017 | Jansen et al. |
| 2017/0196470 | A1 | 7/2017 | Lamego et al. |
| 2017/0224262 | A1 | 8/2017 | Al-Ali |
| 2017/0228516 | A1 | 8/2017 | Sampath et al. |
| 2017/0245790 | A1 | 8/2017 | Al-Ali et al. |
| 2017/0248446 | A1 | 8/2017 | Gowreesunker et al. |
| 2017/0251974 | A1 | 9/2017 | Shreim et al. |
| 2017/0251975 | A1 | 9/2017 | Shreim et al. |
| 2017/0258403 | A1 | 9/2017 | Abdul-Hafiz et al. |
| 2017/0273619 | A1 | 9/2017 | Alvarado et al. |
| 2017/0281024 | A1 | 10/2017 | Narasimhan et al. |
| 2017/0293727 | A1 | 10/2017 | Klaassen et al. |
| 2017/0311851 | A1 | 11/2017 | Schurman et al. |
| 2017/0311891 | A1 | 11/2017 | Kiani et al. |
| 2017/0325698 | A1 | 11/2017 | Allec et al. |
| 2017/0325728 | A1 | 11/2017 | Al-Ali et al. |
| 2017/0325744 | A1 | 11/2017 | Allec et al. |
| 2017/0332976 | A1 | 11/2017 | Al-Ali et al. |
| 2017/0340209 | A1 | 11/2017 | Klaassen et al. |
| 2017/0340219 | A1 | 11/2017 | Sullivan et al. |
| 2017/0340293 | A1 | 11/2017 | Al-Ali et al. |
| 2017/0347885 | A1 | 12/2017 | Tan et al. |
| 2017/0354332 | A1 | 12/2017 | Lamego |
| 2017/0354795 | A1 | 12/2017 | Blahnik et al. |
| 2017/0358239 | A1 | 12/2017 | Arney et al. |
| 2017/0358240 | A1 | 12/2017 | Blahnik et al. |
| 2017/0358242 | A1 | 12/2017 | Thompson et al. |
| 2017/0360306 | A1 | 12/2017 | Narasimhan et al. |
| 2017/0360310 | A1 | 12/2017 | Kiani et al. |
| 2017/0366657 | A1 | 12/2017 | Thompson et al. |
| 2017/0367632 | A1 | 12/2017 | Al-Ali et al. |
| 2018/0008146 | A1 | 1/2018 | Al-Ali et al. |
| 2018/0013562 | A1 | 1/2018 | Haider et al. |
| 2018/0014752 | A1 | 1/2018 | Al-Ali et al. |
| 2018/0014781 | A1 | 1/2018 | Clavelle et al. |
| 2018/0025287 | A1 | 1/2018 | Mathew et al. |
| 2018/0028124 | A1 | 2/2018 | Al-Ali et al. |
| 2018/0042556 | A1 | 2/2018 | Shahparnia et al. |
| 2018/0049694 | A1 | 2/2018 | Singh Alvarado et al. |
| 2018/0050235 | A1 | 2/2018 | Tan et al. |
| 2018/0055375 | A1 | 3/2018 | Martinez et al. |
| 2018/0055385 | A1 | 3/2018 | Al-Ali |
| 2018/0055390 | A1 | 3/2018 | Kiani et al. |
| 2018/0055430 | A1 | 3/2018 | Diab et al. |
| 2018/0055439 | A1 | 3/2018 | Pham et al. |
| 2018/0056129 | A1 | 3/2018 | Narasimha Rao et al. |
| 2018/0064381 | A1 | 3/2018 | Shakespeare et al. |
| 2018/0069776 | A1 | 3/2018 | Lamego et al. |
| 2018/0070867 | A1 | 3/2018 | Smith et al. |
| 2018/0078151 | A1 | 3/2018 | Allec et al. |
| 2018/0078182 | A1 | 3/2018 | Chen et al. |
| 2018/0082767 | A1 | 3/2018 | Al-Ali et al. |
| 2018/0085068 | A1 | 3/2018 | Telfort |
| 2018/0087937 | A1 | 3/2018 | Al-Ali et al. |
| 2018/0103874 | A1 | 4/2018 | Lee et al. |
| 2018/0103905 | A1 | 4/2018 | Kiani |
| 2018/0110469 | A1 | 4/2018 | Maani et al. |
| 2018/0110478 | A1 | 4/2018 | Al-Ali |
| 2018/0116575 | A1 | 5/2018 | Perea et al. |
| 2018/0125368 | A1 | 5/2018 | Lamego et al. |
| 2018/0125430 | A1 | 5/2018 | Al-Ali et al. |
| 2018/0125445 | A1 | 5/2018 | Telfort et al. |
| 2018/0130325 | A1 | 5/2018 | Kiani et al. |
| 2018/0132769 | A1 | 5/2018 | Weber et al. |
| 2018/0132770 | A1 | 5/2018 | Lamego |
| 2018/0146901 | A1 | 5/2018 | Al-Ali et al. |
| 2018/0146902 | A1 | 5/2018 | Kiani et al. |
| 2018/0153418 | A1 | 6/2018 | Sullivan et al. |
| 2018/0153442 | A1 | 6/2018 | Eckerbom et al. |
| 2018/0153446 | A1 | 6/2018 | Kiani |
| 2018/0153447 | A1 | 6/2018 | Al-Ali et al. |
| 2018/0153448 | A1 | 6/2018 | Weber et al. |
| 2018/0161499 | A1 | 6/2018 | Al-Ali et al. |
| 2018/0164853 | A1 | 6/2018 | Myers et al. |

8

**US 10,470,695 B2**

Page 9

(56)    **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2018/0168491 | A1 | 6/2018 | Al-Ali et al. |
| 2018/0174679 | A1 | 6/2018 | Sampath et al. |
| 2018/0174680 | A1 | 6/2018 | Sampath et al. |
| 2018/0182484 | A1 | 6/2018 | Sampath et al. |
| 2018/0184917 | A1 | 7/2018 | Kiani |
| 2018/0192924 | A1 | 7/2018 | Al-Ali |
| 2018/0192953 | A1 | 7/2018 | Shreim et al. |
| 2018/0192955 | A1 | 7/2018 | Al-Ali et al. |
| 2018/0196514 | A1 | 7/2018 | Allec et al. |
| 2018/0199871 | A1 | 7/2018 | Pauley et al. |
| 2018/0206795 | A1 | 7/2018 | Al-Ali |
| 2018/0206815 | A1 | 7/2018 | Telfort |
| 2018/0213583 | A1 | 7/2018 | Al-Ali |
| 2018/0214031 | A1 | 8/2018 | Kiani et al. |
| 2018/0214090 | A1 | 8/2018 | Al-Ali et al. |
| 2018/0218792 | A1 | 8/2018 | Muhsin et al. |
| 2018/0225960 | A1 | 8/2018 | Al-Ali et al. |
| 2018/0228414 | A1 | 8/2018 | Shao et al. |
| 2018/0238718 | A1 | 8/2018 | Dalvi |
| 2018/0238734 | A1 | 8/2018 | Hotelling et al. |
| 2018/0242853 | A1 | 8/2018 | Al-Ali |
| 2018/0242921 | A1 | 8/2018 | Muhsin et al. |
| 2018/0242923 | A1 | 8/2018 | Al-Ali et al. |
| 2018/0242924 | A1 | 8/2018 | Barker et al. |
| 2018/0242926 | A1 | 8/2018 | Muhsin et al. |
| 2018/0247353 | A1 | 8/2018 | Al-Ali et al. |
| 2018/0247712 | A1 | 8/2018 | Muhsin et al. |
| 2018/0249933 | A1 | 9/2018 | Schurman et al. |
| 2018/0253947 | A1 | 9/2018 | Muhsin et al. |
| 2018/0256087 | A1 | 9/2018 | Ai-Ali et al. |
| 2018/0256113 | A1 | 9/2018 | Weber et al. |
| 2018/0279956 | A1 | 10/2018 | Waydo et al. |
| 2018/0285094 | A1 | 10/2018 | Housel et al. |
| 2018/0289325 | A1 | 10/2018 | Poeze et al. |
| 2018/0289337 | A1 | 10/2018 | Ai-Ali et al. |
| 2018/0296161 | A1 | 10/2018 | Shreim et al. |
| 2018/0300919 | A1 | 10/2018 | Muhsin et al. |
| 2018/0310822 | A1 | 11/2018 | Indorf et al. |
| 2018/0310823 | A1 | 11/2018 | Ai-Ali et al. |
| 2018/0317826 | A1 | 11/2018 | Muhsin |
| 2018/0317841 | A1 | 11/2018 | Novak, Jr. |
| 2018/0333055 | A1 | 11/2018 | Lamego et al. |
| 2018/0333087 | A1 | 11/2018 | Al-Ali |
| 2019/0000317 | A1 | 1/2019 | Muhsin et al. |
| 2019/0000362 | A1 | 1/2019 | Kiani et al. |
| 2019/0015023 | A1 | 1/2019 | Monfre |
| 2019/0021638 | A1 | 1/2019 | Ai-Ali et al. |
| 2019/0029574 | A1 | 1/2019 | Schurman et al. |
| 2019/0029578 | A1 | 1/2019 | Ai-Ali et al. |
| 2019/0038143 | A1 | 2/2019 | Ai-Ali |
| 2019/0058280 | A1 | 2/2019 | Ai-Ali et al. |
| 2019/0058281 | A1 | 2/2019 | Ai-Ali et al. |
| 2019/0069813 | A1 | 3/2019 | Ai-Ali |
| 2019/0069814 | A1 | 3/2019 | Ai-Ali |
| 2019/0076028 | A1 | 3/2019 | Ai-Ali et al. |
| 2019/0082979 | A1 | 3/2019 | Ai-Ali et al. |
| 2019/0090748 | A1 | 3/2019 | Ai-Ali |
| 2019/0090760 | A1 | 3/2019 | Kinast et al. |
| 2019/0090764 | A1 | 3/2019 | Al-Ali |
| 2019/0104973 | A1 | 4/2019 | Poeze et al. |
| 2019/0110719 | A1 | 4/2019 | Poeze et al. |
| 2019/0117070 | A1 | 4/2019 | Muhsin et al. |
| 2019/0117139 | A1 | 4/2019 | Al-Ali et al. |
| 2019/0117140 | A1 | 4/2019 | Al-Ali et al. |
| 2019/0117141 | A1 | 4/2019 | Al-Ali |
| 2019/0117930 | A1 | 4/2019 | Al-Ali |
| 2019/0122763 | A1 | 4/2019 | Sampath et al. |
| 2019/0133525 | A1 | 5/2019 | Al-Ali et al. |
| 2019/0142283 | A1 | 5/2019 | Lamego et al. |
| 2019/0142344 | A1 | 5/2019 | Telfort et al. |
| 2019/0150800 | A1 | 5/2019 | Poeze et al. |
| 2019/0150856 | A1 | 5/2019 | Kiani et al. |
| 2019/0167161 | A1 | 6/2019 | Al-Ali et al. |
| 2019/0175019 | A1 | 6/2019 | Al-Ali et al. |
| 2019/0192076 | A1 | 6/2019 | McHale et al. |

OTHER PUBLICATIONS

Written Opinion received in International Application No. PCT/US2016/040190, dated Jan. 2, 2018.
Konig, V. et al., "Reflectance Pulse Oximetry—Principles and Obstetric Application in the Zurich System," J Clin Monit 1998; 14: 403-412.

* cited by examiner



FIG. 1
(PRIOR ART)

FIG. 2



FIG. 3



FIG. 4A



FIG. 4B



FIG. 5



FIG. 7A

FIG. 6
(PRIOR ART)



FIG. 7B



FIG. 8

US 10,470,695 B2

1

# ADVANCED PULSE OXIMETRY SENSOR

## INCORPORATION BY REFERENCE TO ANY PRIORITY APPLICATIONS

The present application is a continuation of U.S. patent application Ser. No. 15/195,199 filed Jun. 28, 2016, which claims priority benefit under 35 U.S.C. § 119(e) from U.S. Provisional Application No. 62/188,430, filed Jul. 2, 2015, entitled "Advanced Pulse Oximetry Sensor," which is incorporated by reference herein. Any and all applications for which a foreign or domestic priority claim is identified in the Application Data Sheet as filed with the present application are hereby incorporated by reference under 37 CFR 1.57.

## FIELD OF THE DISCLOSURE

The present disclosure relates to the field of non-invasive optical-based physiological monitoring sensors, and more particularly to systems, devices and methods for improving the non-invasive measurement accuracy of oxygen saturation, among other physiological parameters.

## BACKGROUND

Spectroscopy is a common technique for measuring the concentration of organic and some inorganic constituents of a solution. The theoretical basis of this technique is the Beer-Lambert law, which states that the concentration $c_i$ of an absorbent in solution can be determined by the intensity of light transmitted through the solution, knowing the pathlength $d_\lambda$, the intensity of the incident light $I_{0,\lambda}$, and the extinction coefficient $\varepsilon_{i,\lambda}$ at a particular wavelength $\lambda$.

In generalized form, the Beer-Lambert law is expressed as:

$$I_\lambda = I_{0,\lambda} e^{-d_\lambda \cdot \mu_{o,\lambda}} \quad (1)$$

$$\mu_{o,\lambda} = \sum_{i=1}^{n} \varepsilon_{i,\lambda} \cdot c_i \quad (2)$$

where $\mu_{a,\lambda}$ is the bulk absorption coefficient and represents the probability of absorption per unit length. The minimum number of discrete wavelengths that are required to solve equations 1 and 2 is the number of significant absorbers that are present in the solution.

A practical application of this technique is pulse oximetry, which utilizes a noninvasive sensor to measure oxygen saturation and pulse rate, among other physiological parameters. Pulse oximetry relies on a sensor attached externally to the patient to output signals indicative of various physiological parameters, such as a patient's blood constituents and/or analytes, including for example a percent value for arterial oxygen saturation, among other physiological parameters. The sensor has an emitter that transmits optical radiation of one or more wavelengths into a tissue site and a detector that responds to the intensity of the optical radiation after absorption by pulsatile arterial blood flowing within the tissue site. Based upon this response, a processor determines the relative concentrations of oxygenated hemoglobin ($HbO_2$) and deoxygenated hemoglobin (Hb) in the blood so as to derive oxygen saturation, which can provide early detection of potentially hazardous decreases in a patient's oxygen supply.

2

A pulse oximetry system generally includes a patient monitor, a communications medium such as a cable, and/or a physiological sensor having one or more light emitters and a detector, such as one or more light-emitting diodes (LEDs) and a photodetector. The sensor is attached to a tissue site, such as a finger, toe, earlobe, nose, hand, foot, or other site having pulsatile blood flow which can be penetrated by light from the one or more emitters. The detector is responsive to the emitted light after attenuation or reflection by pulsatile blood flowing in the tissue site. The detector outputs a detector signal to the monitor over the communication medium. The monitor processes the signal to provide a numerical readout of physiological parameters such as oxygen saturation (SpO2) and/or pulse rate. A pulse oximetry sensor is described in U.S. Pat. No. 6,088,607 entitled Low Noise Optical Probe; pulse oximetry signal processing is described in U.S. Pat. Nos. 6,650,917 and 6,699,194 entitled Signal Processing Apparatus and Signal Processing Apparatus and Method, respectively; a pulse oximeter monitor is described in U.S. Pat. No. 6,584,336 entitled Universal/Upgrading Pulse Oximeter; all of which are assigned to Masimo Corporation, Irvine, Calif., and each is incorporated by reference herein in its entirety.

There are many sources of measurement error introduced to pulse oximetry systems. Some such sources of error include the pulse oximetry system's electronic components, including emitters and detectors, as well as chemical and structural physiological differences between patients. Another source of measurement error is the effect of multiple scattering of photons as the photons pass through the patient's tissue (arterial blood) and arrive at the sensor's light detector.

## SUMMARY

This disclosure describes embodiments of non-invasive methods, devices, and systems for measuring blood constituents, analytes, and/or substances such as, by way of non-limiting example, oxygen, carboxyhemoglobin, methemoglobin, total hemoglobin, glucose, proteins, lipids, a percentage thereof (e.g., saturation), pulse rate, perfusion index, oxygen content, total hemoglobin, Oxygen Reserve Index™ (ORI™) or for measuring many other physiologically relevant patient characteristics. These characteristics can relate to, for example, pulse rate, hydration, trending information and analysis, and the like.

In an embodiment, an optical physiological measurement system includes an emitter configured to emit light of one or more wavelengths. The system also includes a diffuser configured to receive the emitted light, to spread the received light, and to emit the spread light over a larger tissue area than would otherwise be penetrated by the emitter directly emitting light at a tissue measurement site. The tissue measurement site can include, such as, for example, a finger, a wrist, or the like. The system further includes a concentrator configured to receive the spread light after it has been attenuated by or reflected from the tissue measurement site. The concentrator is also configured to collect and concentrate the received light and to emit the concentrated light to a detector. The detector is configured to detect the concentrated light and to transmit a signal indicative of the detected light. The system also includes a processor configured to receive the transmitted signal indicative of the detected light and to determine, based on an amount of absorption, an analyte of interest, such as, for example, arterial oxygen saturation or other parameter, in the tissue measurement site.

17

US 10,470,695 B2

3

In certain embodiments of the present disclosure, the diffuser comprises glass, ground glass, glass beads, opal glass, or a microlens-based, band-limited, engineered diffuser that can deliver efficient and uniform illumination. In some embodiments the diffuser is further configured to define a surface area shape by which the emitted spread light is distributed onto a surface of the tissue measurement site. The defined surface area shape can include, by way of non-limiting example, a shape that is substantially rectangular, square, circular, oval, or annular, among others.

According to some embodiments, the optical physiological measurement system includes an optical filter having a light-absorbing surface that faces the tissue measurement site. The optical filter also has an opening that is configured to allow the spread light, after being attenuated by the tissue measurement site, to be received by the concentrator. In an embodiment, the opening has dimensions, wherein the dimensions of the opening are similar to the defined surface area shape by which the emitted spread light is distributed onto the surface of the tissue measurement site. In an embodiment, the opening has dimensions that are larger than the defined surface area shape by which the emitted spread light is distributed onto the surface of the tissue measurement site. In other embodiments, the dimensions of the opening in the optical filter are not the same as the diffuser opening, but the dimensions are larger than the detector package.

In other embodiments of the present disclosure, the concentrator comprises glass, ground glass, glass beads, opal glass, or a compound parabolic concentrator. In some embodiments the concentrator comprises a cylindrical structure having a truncated circular conical structure on top. The truncated section is adjacent the detector. The light concentrator is structured to receive the emitted optical radiation, after reflection by the tissue measurement site, and to direct the reflected light to the detector.

In accordance with certain embodiments of the present disclosure, the processor is configured to determine an average level of the light detected by the detector. The average level of light is used to determine a physiological parameter in the tissue measurement site.

According to another embodiment, a method to determine a constituent or analyte in a patient's blood is disclosed. The method includes emitting, from an emitter, light of at least one wavelength; spreading, with a diffuser, the emitted light and emitting the spread light from the diffuser to a tissue measurement site; receiving, by a concentrator, the spread light after the spread light has been attenuated by the tissue measurement site; concentrating, by the concentrator, the received light and emitting the concentrated light from the concentrator to a detector; detecting, with the detector, the emitted concentrated light; transmitting, from the detector, a signal responsive to the detected light; receiving, by a processor, the transmitted signal responsive to the detected light; and processing, by the processor, the received signal responsive to the detected light to determine a physiological parameter.

In some embodiments, the method to determine a constituent or analyte in a patient's blood includes filtering, with a light-absorbing detector filter, scattered portions of the emitted spread light. According to an embodiment, the light-absorbing detector filter is substantially rectangular in shape and has outer dimensions in the range of approximately 1-5 cm in width and approximately 2-8 cm in length, and has an opening through which emitted light may pass, the opening having dimensions in the range of approximately 0.25-3 cm in width and approximately 1-7 cm in

4

length. In another embodiment, the light-absorbing detector filter is substantially square in shape and has outer dimensions in the range of approximately 0.25-10 cm$^2$, and has an opening through which emitted light may pass, the opening having dimensions in the range of approximately 0.1-8 cm$^2$. In yet another embodiment, the light-absorbing detector filter is substantially rectangular in shape and has outer dimensions of approximately 3 cm in width and approximately 6 cm in length, and has an opening through which emitted light may pass, the opening having dimensions of approximately 1.5 cm in width and approximately 4 cm in length.

In still other embodiments of the method to determine a constituent or analyte in a patient's blood, spreading, with a diffuser, the emitted light and emitting the spread light from the diffuser to a tissue measurement site is performed by at least one of a glass diffuser, a ground glass diffuser, a glass bead diffuser, an opal glass diffuser, and an engineered diffuser. In some embodiments the emitted spread light is emitted with a substantially uniform intensity profile. And in some embodiments, emitting the spread light from the diffuser to the tissue measurement site includes spreading the emitted light so as to define a surface area shape by which the emitted spread light is distributed onto a surface of the tissue measurement site.

According to yet another embodiment, a pulse oximeter is disclosed. The pulse oximeter includes an emitter configured to emit light at one or more wavelengths. The pulse oximeter also includes a diffuser configured to receive the emitted light, to spread the received light, and to emit the spread light directed at a tissue measurement sight. The pulse oximeter also includes a detector configured to detect the emitted spread light after being attenuated by or reflected from the tissue measurement site and to transmit a signal indicative of the detected light. The pulse oximeter also includes a processor configured to receive the transmitted signal and to process the received signal to determine an average absorbance of a blood constituent or analyte in the tissue measurement site over a larger measurement site area than can be performed with a point light source or point detector. In some embodiments, the diffuser is further configured to define a surface area shape by which the emitted spread light is distributed onto a surface of the tissue measurement site, and the detector is further configured to have a detection area corresponding to the defined surface area shape by which the emitted spread light is distributed onto the surface of the tissue measurement site. According to some embodiments, the detector comprises an array of detectors configured to cover the detection area. In still other embodiments, the processor is further configured to determine an average of the detected light.

For purposes of summarizing, certain aspects, advantages and novel features of the disclosure have been described herein. It is to be understood that not necessarily all such advantages can be achieved in accordance with any particular embodiment of the systems, devices and/or methods disclosed herein. Thus, the subject matter of the disclosure herein can be embodied or carried out in a manner that achieves or optimizes one advantage or group of advantages as taught herein without necessarily achieving other advantages as can be taught or suggested herein.

BRIEF DESCRIPTION OF THE DRAWINGS

Throughout the drawings, reference numbers can be re-used to indicate correspondence between referenced ele-

18

US 10,470,695 B2

5

ments. The drawings are provided to illustrate embodiments of the disclosure described herein and not to limit the scope thereof.

FIG. **1** illustrates a conventional approach to two-dimensional pulse oximetry in which the emitter is configured to emit optical radiation as a point optical source.

FIG. **2** illustrates the disclosed three-dimensional approach to pulse oximetry in which the emitted light irradiates a substantially larger volume of tissue as compared to the point source approach described with respect to FIG. **1**.

FIG. **3** illustrates schematically a side view of a three-dimensional pulse oximetry sensor according to an embodiment of the present disclosure.

FIG. **4A** is a top view of a portion of a three-dimensional pulse oximetry sensor according to an embodiment of the present disclosure.

FIG. **4B** illustrates the top view of a portion of the three-dimensional pulse oximetry sensor shown in FIG. **4A**, with the addition of a tissue measurement site in operational position.

FIG. **5** illustrates a top view of a three-dimensional pulse oximetry sensor according to an embodiment of the present disclosure.

FIG. **6** illustrates a conventional two-dimensional approach to reflective pulse oximetry in which the emitter is configured to emit optical radiation as a point optical source.

FIG. **7A** is a simplified schematic side view illustration of a reflective three-dimensional pulse oximetry sensor according to an embodiment of the present disclosure.

FIG. **7B** is a simplified schematic top view illustration of the three-dimensional reflective pulse oximetry sensor of FIG. **7A**.

FIG. **8** illustrates a block diagram of an example pulse oximetry system capable of noninvasively measuring one or more blood analytes in a monitored patient, according to an embodiment of the disclosure.

DETAILED DESCRIPTION

FIG. **1** illustrates schematically a conventional pulse oximetry sensor having a two-dimensional (2D) approach to pulse oximetry. As illustrated, the emitter **104** is configured to emit optical radiation as a point optical source, i.e., an optical radiation source that has negligible dimensions such that it may be considered as a point. This approach is referred to herein as "two-dimensional" pulse oximetry because it applies a two-dimensional analytical model to the three-dimensional space of the tissue measurement site **102** of the patient. Point optical sources feature a defined, freely selectable, and homogeneous light beam area. Light beams emitted from LED point sources often exhibit a strong focus which can produce a usually sharply-defined and evenly-lit illuminated spot often with high intensity dynamics. Illustratively, when looking at the surface of the tissue measurement site **102** (or "sample tissue"), which in this example is a finger, a small point-like surface area of tissue **204** is irradiated by a point optical source. In some embodiments, the irradiated circular area of the point optical source is in the range between 8 and 150 microns. Illustratively, the emitted point optical source of light enters the tissue measurement site **102** as a point of light. As the light penetrates the depth of the tissue **102**, it does so as a line or vector, representing a two-dimensional construct within a three-dimensional structure, namely the patient's tissue **102**.

Use of a point optical source is believed to reduce variability in light pathlength which would lead to more

6

accurate oximetry measurements. However, in practice, photons do not travel in straight paths. Instead, the light particles scatter, bouncing around between various irregular objects (such as, for example, red blood cells) in the patient's blood. Accordingly, photon pathlengths vary depending on, among other things, their particular journeys through and around the tissue at the measurement site **102**. This phenomenon is referred to as "multiple scattering." In a study, the effects of multiple scattering were examined by comparing the results of photon diffusion analysis with those obtained using an analysis based on the Beer-Lambert law, which neglects multiple scattering in the determination of light pathlength. The study found that that the difference between the average lengths of the paths traveled by red and infrared photons makes the oximeter's calibration curve (based on measurements obtained from normal subjects) sensitive to the total attenuation coefficients of the tissue in the two wavelength bands used for pulse oximetry, as well as to absorption by the pulsating arterial blood.

FIG. **2** illustrates schematically the disclosed systems, devices, and methods to implement three-dimensional (3D) pulse oximetry in which the emitted light irradiates a larger volume of tissue at the measurement site **102** as compared to the 2D point source approach described with respect to FIG. **1**. In an embodiment, again looking at the surface of the tissue measurement site **102**, the irradiated surface area **206** of the measurement site **102** is substantially rectangular in shape with dimensions in the range of approximately 0.25-3 cm in width and approximately 1-6 cm in length. In another embodiment, the irradiated surface area **206** of the measurement site **102** is substantially rectangular in shape and has dimensions of approximately 1.5 cm in width and approximately 2 cm in length. In another embodiment, the irradiated surface area **206** of the measurement site **102** is substantially rectangular in shape and has dimensions of approximately 0.5 cm in width and approximately 1 cm in length. In another embodiment, the irradiated surface area **206** of the measurement site **102** is substantially rectangular in shape has dimensions of approximately 1 cm in width and approximately 1.5 cm in length. In yet another embodiment, the irradiated surface area **206** of the measurement site **102** is substantially square in shape and has dimensions in a range of approximately 0.25-9 cm². In certain embodiments, the irradiated surface area **206** of the measurement site **102** is within a range of approximately 0.5-2 cm in width, and approximately 1-4 cm in length. Of course a skilled artisan will appreciate that many other shapes and dimensions of irradiated surface area **206** can be used. Advantageously, by irradiating the tissue measurement site **102** with a surface area **206**, the presently disclosed systems, devices, and methods apply a three-dimensional analytical model to the three-dimensional structure being measured, namely, the patient's sample tissue **102**.

According to the Beer-Lambert law, the amount of light absorbed by a substance is proportional to the concentration of the light-absorbing substance in the irradiated solution (i.e., arterial blood). Advantageously, by irradiating a larger volume of tissue **102**, a larger sample size of light attenuated (or reflected) by the tissue **102** is measured. The larger, 3D sample provides a data set that is more representative of the complete interaction of the emitted light as it passes through the patient's blood as compared to the 2D point source approach described above with respect to FIG. **1**. By taking an average of the detected light, as detected over a surface area substantially larger than a single point, the disclosed pulse oximetry systems, devices, and methods will yield a

19

**Appx0148**

US 10,470,695 B2

7

8

more accurate measurement of the emitted light absorbed by the tissue, which will lead to a more accurate oxygen saturation measurement.

FIG. 3 illustrates schematically a side view of a pulse oximetry 3D sensor 300 according to an embodiment of the present disclosure. In the illustrated embodiment, the 3D sensor 300 irradiates the tissue measurement site 102 and detects the emitted light, after being attenuated by the tissue measurement site 102. In other embodiments, for example, as describe below with respect to FIGS. 7A and 7B, the 3D sensor 300 can be arranged to detect light that is reflected by the tissue measurement site 102. The 3D sensor 300 includes an emitter 302, a light diffuser 304, a light-absorbing detector filter 306, a light concentrator 308, and a detector 310. In some optional embodiments, the 3D sensor 300 further includes a reflector 305. The reflector 305 can be a metallic reflector or other type of reflector. Reflector 305 can be a coating, film, layer or other type of reflector. The reflector 305 can serve as a reflector to prevent emitted light from emitting out of a top portion of the light diffuser 304 such that light from the emitter 302 is directed in the tissue rather than escaping out of a side or top of the light diffuser 304. Additionally, the reflector 305 can prevent ambient light from entering the diffuser 304 which might ultimately cause errors within the detected light. The reflector 305 also prevents light piping that might occur if light from the detector 302 is able to escape from the light diffuser 304 and be pipped around a sensor securement mechanism to detector 310 without passing through the patient's tissue 102.

The emitter 302 can serve as the source of optical radiation transmitted towards the tissue measurement site 102. The emitter 302 can include one or more sources of optical radiation, such as LEDs, laser diodes, incandescent bulbs with appropriate frequency-selective filters, combinations of the same, or the like. In an embodiment, the emitter 302 includes sets of optical sources that are capable of emitting visible and near-infrared optical radiation. In some embodiments, the emitter 302 transmits optical radiation of red and infrared wavelengths, at approximately 650 nm and approximately 940 nm, respectively. In some embodiments, the emitter 302 includes a single source optical radiation.

The light diffuser 304 receives the optical radiation emitted from the emitter 302 and spreads the optical radiation over an area, such as the area 206 depicted in FIG. 2. In some embodiments, the light diffuser 304 is a beam shaper that can homogenize the input light beam from the emitter 302, shape the output intensity profile of the received light, and define the way (e.g., the shape or pattern) the emitted light is distributed to the tissue measurement site 102. Examples of materials that can be used to realize the light diffuser 304 include, without limitation, a white surface, glass, ground glass, glass beads, polytetrafluoroethylene (also known as Teflon®), opal glass, and greyed glass, to name a few. Additionally, engineered diffusers can be used to realize the diffuser 304 by providing customized light shaping with respect to intensity and distribution. Such diffusers can, for example, deliver substantially uniform illumination over a specified target area (such as, for example, irradiated surface area 206) in an energy-efficient manner. Examples of engineered diffusers can include molded plastics with specific shapes, patterns or textures designed to diffuse the emitter light across the entirety of the patient's tissue surface.

Advantageously, the diffuser 304 can receive emitted light in the form of a point optical source and spread the light to fit a desired surface area on a plane defined by the surface of the tissue measurement site 102. In an embodiment, the diffuser 304 is made of ground glass which spreads the emitted light with a Gausian intensity profile. In another embodiment the diffuser 304 includes glass beads. In some embodiments, the diffuser 304 is constructed so as to diffuse the emitted light in a Lambertian pattern. A Lambertian pattern is one in which the radiation intensity is substantially constant throughout the area of dispersion. One such diffuser 304 is made from opal glass. Opal glass is similar to ground glass, but has one surface coated with a milky white coating to diffuse light evenly. In an embodiment, the diffuser 304 is capable of distributing the emitted light on the surface of a plane (e.g., the surface of the tissue measurement site 102) in a predefined geometry (e.g., a rectangle, square, or circle), and with a substantially uniform intensity profile and energy distribution. In some embodiments, the efficiency, or the amount of light transmitted by the diffuser 304, is greater than 70% of the light emitted by the emitter 302. In some embodiments, the efficiency is greater than 90% of the emitted light. Other optical elements known in the art may be used for the diffuser 304.

In an embodiment, the diffuser 304 has a substantially rectangular shape having dimensions within a range of approximately 0.5-2 cm in width and approximately 1-4 centimeters in length. In another embodiment, the substantially rectangular shape of the diffuser 304 has dimensions of approximately 0.5 cm in width and approximately 1 cm in length. In another embodiment, the diffuser's 304 substantially rectangular shape has dimensions of approximately 1 cm in width and approximately 1.5 cm in length. In yet another embodiment, the diffuser 304 has a substantially square shape with dimensions in the range of approximately 0.25-10 cm².

The light-absorbing detector filter 306, which is also depicted in FIG. 4A in a top view, is a planar surface having an opening 402 through which the emitted light may pass after being attenuated by the tissue measurement site 102. In the depicted embodiment, the opening 402 is rectangular-shaped, with dimensions substantially similar to the irradiated surface area 206. According to an embodiment, the light-absorbing detector filter is substantially rectangular in shape and has outer dimensions of 4 cm in width and 8 cm in length, and has an opening through which emitted light may pass, the opening having dimensions of 2 cm in width and 5 cm in length. In another embodiment, the light-absorbing detector filter is substantially rectangular in shape and has outer dimensions in the range of 1-3 cm in width and 2-8 cm in length, and has an opening through which emitted light may pass, the opening having dimensions in the range of 0.25-2 cm in width and 1-4 cm in length. In yet another embodiment, the light-absorbing detector filter is substantially rectangular in shape and has outer dimensions of 3 cm in width and 6 cm in length, and has an opening through which emitted light may pass, the opening having dimensions of 1.5 cm in width and 4 cm in length.

The top surface of the light-absorbing filter 306 (facing the tissue measurement site 102 and the emitter 302) is coated with a material that absorbs light, such as, for example, black pigment. Many other types of light-absorbing materials are well known in the art and can be used with the detector filter 306. During operation, light emitted from the emitter 302 can reflect off of the tissue measurement site 102 (or other structures within the 3D sensor 300) to neighboring portions of the 3D sensor 300. If those neighboring portions of the 3D sensor 300 possess reflective surfaces, then the light can reflect back to the tissue measurement site 102, progress through the tissue and arrive at the detector 310. Such multiple scattering can result in detecting photons whose pathlengths are considerably lon-

20

US 10,470,695 B2

9

ger than most of the light that is detected, thereby introducing variations in pathlength which will affect the accuracy of the measurements of the pulse oximetry 3D sensor **300**. Advantageously, the light-absorbing filter **306** reduces or eliminates the amount of emitted light that is reflected in this manner because it absorbs such reflected light, thereby stopping the chain of scattering events. In certain embodiments, the sensor-facing surfaces of other portions of the 3D sensor **300** are covered in light-absorbing material to further decrease the effect of reflective multiple scattering.

The light concentrator **308** is a structure to receive the emitted optical radiation, after attenuation by the tissue measurement site **102**, to collect and concentrate the dispersed optical radiation, and to direct the collected and concentrated optical radiation to the detector **310**. In an embodiment, the light concentrator **308** is made of ground glass or glass beads. In some embodiments, the light concentrator **308** includes a compound parabolic concentrator.

As described above with respect to FIG. **1**, the detector **310** captures and measures light from the tissue measurement site **102**. For example, the detector **310** can capture and measure light transmitted from the emitter **302** that has been attenuated by the tissue in the measurement site **102**. The detector **310** can output a detector signal responsive to the light captured or measured. The detector **310** can be implemented using one or more photodiodes, phototransistors, or the like. In addition, a plurality of detectors **310** can be arranged in an array with a spatial configuration corresponding to the irradiated surface area **206** to capture the attenuated or reflected light from the tissue measurement site.

Referring to FIG. **4A**, a top view of a portion of the 3D sensor **300** is provided. The light-absorbing detector filter **306** is illustrated having a top surface coated with a light-absorbing material. The light-absorbing material can be a black opaque material or coating or any other dark color or coating configured to absorb light. Additionally, a rectangular opening **402** is positioned relative to the light concentrator **308** (shown in phantom) and the detector **310** such that light may pass through the rectangular opening **402**, into the light concentrator **308**, and to the detector **310**. FIG. **4B** illustrates the top view of a portion of the 3D sensor **300** as in FIG. **4A**, with the addition of the tissue measurement site **102** in operational position. Accordingly, the rectangular opening **402**, the light concentrator **308** and the detector **310** are shown in phantom as being under the tissue measurement site **102**. In FIGS. **4A** and **4B**, the light concentrator **308** is shown to have dimensions significantly larger than the dimensions of the rectangular opening **402**. In other embodiments, the dimensions of the light concentrator **308**, the rectangular opening **402**, and the irradiated surface area **206** are substantially similar.

FIG. **5** illustrates a top view of a 3D pulse oximetry sensor **500** according to an embodiment of the present disclosure. The 3D sensor **500** is configured to be worn on a patient's finger **102**. The 3D sensor **500** includes an adhesive substrate **502** having front flaps **504** and rear flaps **506** extending outward from a center portion **508** of the 3D sensor **500**. The center portion **508** includes components of the 3D pulse oximetry sensor **300** described with respect to FIGS. **3**, **4A** and **4B**. On the front side of the adhesive substrate **502** the emitter **302** and the light diffuser **304** are positioned. On the rear side of the adhesive substrate **502** the light-absorbent detector filter **306**, the light concentrator **308** and the detector **310** are positioned. In use, the patient's finger serving as the tissue measurement site **102** is positioned over the rectangular opening **402** such that when the front portion of the adhesive substrate is folded over on top of the patient's

10

finger **102**, the emitter **302** and the light diffuser **304** are aligned with the measurement site **102**, the filter **306**, the light concentrator **308** and the detector **310**. Once alignment is established, the front and rear flaps **504**, **506** can be wrapped around the finger measurement site **102** such that the adhesive substrate **502** provides a secure contact between the patient's skin and the 3D sensor **500**. FIG. **5** also illustrates an example of a sensor connector cable **510** which is used to connect the 3D sensor **500** to a monitor **809**, as described with respect to FIG. **8**.

FIG. **6** is a simplified schematic illustration of a conventional, 2D approach to reflective pulse oximetry in which the emitter is configured to emit optical radiation as a point optical source. Reflective pulse oximetry is a method by which the emitter and detector are located on the same side of the tissue measurement site **102**. Light is emitted into a tissue measurement site **102** and attenuated. The emitted light passes into the tissue **102** and is then reflected back to the same side of the tissue measurement site **102** as the emitter. As illustrated in FIG. **6**, a depicted reflective 2D pulse oximetry sensor **600** includes an emitter **602**, a light block **606**, and a detector **610**. The light block **606** is necessary because the emitter **602** and the detector **610** are located on the same side of the tissue measurement site **102**. Accordingly, the light block **606** prevents incident emitter light, which did not enter the tissue measurement site **102**, from arriving at the detector **610**. The depicted 2D pulse oximetry sensor **600** is configured to emit light as a point source. As depicted in FIG. **6**, a simplified illustration of the light path **620** of the emitted light from the emitter **602**, through the tissue measurement site **102**, and to the detector **610** is provided. Notably, a point source of light is emitted, and a point source of light is detected. As discussed above with respect to FIG. **1**, use of a point optical source can result in substantial measurement error due to pathlength variability resulting from the multiple scatter phenomenon. The sample space provided by a 2D point optical emitter source is not large enough to account for pathlength variability, which will skew measurement results.

FIGS. **7A** and **7B** are simplified schematic side and top views, respectively, of a 3D reflective pulse oximetry sensor **700** according to an embodiment of the present disclosure. In the illustrated embodiment, the 3D sensor **700** irradiates the tissue measurement site **102** and detects the emitted light that is reflected by the tissue measurement site **102**. The 3D sensor **700** can be placed on a portion of the patient's body that has relatively flat surface, such as, for example a wrist, because the emitter **702** and detector **710** are on located the same side of the tissue measurement site **102**. The 3D sensor **700** includes an emitter **702**, a light diffuser **704**, a light block **706**, a light concentrator **708**, and a detector **710**.

As previously described, the emitter **702** can serve as the source of optical radiation transmitted towards the tissue measurement site **102**. The emitter **702** can include one or more sources of optical radiation. Such sources of optical radiation can include LEDs, laser diodes, incandescent bulbs with appropriate frequency-selective filters, combinations of the same, or the like. In an embodiment, the emitter **702** includes sets of optical sources that are capable of emitting visible and near-infrared optical radiation. In some embodiments, the emitter **702** transmits optical radiation of red and infrared wavelengths, at approximately 650 nm and approximately 940 nm, respectively. In some embodiments, the emitter **702** includes a single source of optical radiation.

The light diffuser **704** receives the optical radiation emitted from the emitter **302** and homogenously spreads the optical radiation over a wide, donut-shaped area, such as the

21

US 10,470,695 B2

11

area outlined by the light diffuser **704** as depicted in FIG. 7B. Advantageously, the diffuser **704** can receive emitted light in the form of a 2D point optical source (or any other form) and spread the light to fit the desired surface area on a plane defined by the surface of the tissue measurement site **102**. In an embodiment, the diffuser **704** is made of ground glass or glass beads. A skilled artisan will understand that may other materials can be used to make the light diffuser **704**.

The light blocker **706** includes an annular ring having a cover portion **707** sized and shaped to form a light isolation chamber for the light concentrator **708** and the detector **710**. (For purposes of illustration, the light block cover **707** is not illustrated in FIG. 7B.) The light blocker **706** and the cover **707** can be made of any material that optically isolates the light concentrator **708** and the detector **710**. The light isolation chamber formed by the light blocker **706** and cover **708** ensures that the only light detected by the detector **710** is light that is reflected from the tissue measurement site.

The light concentrator **708** is a cylindrical structure with a truncated circular conical structure on top, the truncated section of which of which is adjacent the detector **710**. The light concentrator **708** is structured to receive the emitted optical radiation, after reflection by the tissue measurement site **102**, and to direct the reflected light to the detector **710**. In an embodiment, the light concentrator **708** is made of ground glass or glass beads. In some embodiments, the light concentrator **708** includes a compound parabolic concentrator.

As previously described, the detector **710** captures and measures light from the tissue measurement site **102**. For example, the detector **710** can capture and measure light transmitted from the emitter **702** that has been reflected from the tissue in the measurement site **102**. The detector **710** can output a detector signal responsive to the light captured or measured. The detector **710** can be implemented using one or more photodiodes, phototransistors, or the like. In addition, a plurality of detectors **710** can be arranged in an array with a spatial configuration corresponding to the irradiated surface area depicted in FIG. 7B by the light concentrator **708** to capture the reflected light from the tissue measurement site.

Advantageously, the light path **720** illustrated in FIG. 7A depicts a substantial sample of reflected light that enter the light isolation chamber formed by the light blocker **706** and cover **707**. As previously discussed, the large sample of reflected light (as compared to the reflected light collected using the 2D point optical source approach) provides the opportunity to take an average of the detected light, to derive a more accurate measurement of the emitted light absorbed by the tissue, which will lead to a more accurate oxygen saturation measurement.

Referring now to FIG. 7B, a top view of the 3D sensor **700** is illustrated with both the emitter **702** and the light blocker cover **707** removed for ease of illustration. The outer ring illustrates the footprint of the light diffuser **704**. As light is emitted from the emitter **702** (not shown in FIG. 7B), it is diffused homogenously and directed to the tissue measurement site **102**. The light blocker **706** forms the circular wall of a light isolation chamber to keep incident light from being sensed by the detector **710**. The light blocker cover **707** blocks incidental light from entering the light isolation chamber from above. The light concentrator **708** collects the reflected light from the tissue measurement site **102** and funnels it upward toward the detector **710** at the center of the 3D sensor **700**.

12

FIG. **8** illustrates an example of an optical physiological measurement system **800**, which may also be referred to herein as a pulse oximetry system **800**. In certain embodiments, the pulse oximetry system **800** noninvasively measures a blood analyte, such as oxygen, carboxyhemoglobin, methemoglobin, total hemoglobin, glucose, proteins, lipids, a percentage thereof (e.g., saturation), pulse rate, perfusion index, oxygen content, total hemoglobin, Oxygen Reserve Index™ (ORI™) or many other physiologically relevant patient characteristics. These characteristics can relate to, for example, pulse rate, hydration, trending information and analysis, and the like. The system **800** can also measure additional blood analytes and/or other physiological parameters useful in determining a state or trend of wellness of a patient.

The pulse oximetry system **800** can measure analyte concentrations at least in part by detecting optical radiation attenuated by tissue at a measurement site **102**. The measurement site **102** can be any location on a patient's body, such as a finger, foot, earlobe, wrist, forehead, or the like.

The pulse oximetry system **800** can include a sensor **801** (or multiple sensors) that is coupled to a processing device or physiological monitor **809**. In an embodiment, the sensor **801** and the monitor **809** are integrated together into a single unit. In another embodiment, the sensor **801** and the monitor **809** are separate from each other and communicate with one another in any suitable manner, such as via a wired or wireless connection. The sensor **801** and monitor **809** can be attachable and detachable from each other for the convenience of the user or caregiver, for ease of storage, sterility issues, or the like.

In the depicted embodiment shown in FIG. **8**, the sensor **801** includes an emitter **804**, a detector **806**, and a front-end interface **808**. The emitter **804** can serve as the source of optical radiation transmitted towards measurement site **102**. The emitter **804** can include one or more sources of optical radiation, such as light emitting diodes (LEDs), laser diodes, incandescent bulbs with appropriate frequency-selective filters, combinations of the same, or the like. In an embodiment, the emitter **804** includes sets of optical sources that are capable of emitting visible and near-infrared optical radiation.

The pulse oximetry system **800** also includes a driver **811** that drives the emitter **804**. The driver **111** can be a circuit or the like that is controlled by the monitor **809**. For example, the driver **811** can provide pulses of current to the emitter **804**. In an embodiment, the driver **811** drives the emitter **804** in a progressive fashion, such as in an alternating manner. The driver **811** can drive the emitter **804** with a series of pulses for some wavelengths that can penetrate tissue relatively well and for other wavelengths that tend to be significantly absorbed in tissue. A wide variety of other driving powers and driving methodologies can be used in various embodiments. The driver **811** can be synchronized with other parts of the sensor **801** to minimize or reduce jitter in the timing of pulses of optical radiation emitted from the emitter **804**. In some embodiments, the driver **811** is capable of driving the emitter **804** to emit optical radiation in a pattern that varies by less than about 10 parts-per-million.

The detector **806** captures and measures light from the tissue measurement site **102**. For example, the detector **806** can capture and measure light transmitted from the emitter **804** that has been attenuated or reflected from the tissue at the measurement site **102**. The detector **806** can output a detector signal **107** responsive to the light captured and measured. The detector **806** can be implemented using one

US 10,470,695 B2

13

14

or more photodiodes, phototransistors, or the like. In some embodiments, a detector **806** is implemented in detector package to capture and measure light from the tissue measurement site **102** of the patient. The detector package can include a photodiode chip mounted to leads and enclosed in an encapsulant. In some embodiments, the dimensions of the detector package are approximately 2 square centimeters. In other embodiments, the dimensions of the detector package are approximately 1.5 centimeters in width and approximately 2 centimeters in length.

The front-end interface **808** provides an interface that adapts the output of the detectors **806**, which is responsive to desired physiological parameters. For example, the front-end interface **808** can adapt the signal **807** received from the detector **806** into a form that can be processed by the monitor **809**, for example, by a signal processor **810** in the monitor **809**. The front-end interface **808** can have its components assembled in the sensor **801**, in the monitor **809**, in a connecting cabling (if used), in combinations of the same, or the like. The location of the front-end interface **808** can be chosen based on various factors including space desired for components, desired noise reductions or limits, desired heat reductions or limits, and the like.

The front-end interface **808** can be coupled to the detector **806** and to the signal processor **810** using a bus, wire, electrical or optical cable, flex circuit, or some other form of signal connection. The front-end interface **808** can also be at least partially integrated with various components, such as the detectors **806**. For example, the front-end interface **808** can include one or more integrated circuits that are on the same circuit board as the detector **806**. Other configurations can also be used.

As shown in FIG. **8**, the monitor **909** can include the signal processor **810** and a user interface, such as a display **812**. The monitor **809** can also include optional outputs alone or in combination with the display **812**, such as a storage device **814** and a network interface **816**. In an embodiment, the signal processor **810** includes processing logic that determines measurements for desired analytes based on the signals received from the detector **806**. The signal processor **810** can be implemented using one or more microprocessors or sub-processors (e.g., cores), digital signal processors, application specific integrated circuits (ASICs), field programmable gate arrays (FPGAs), combinations of the same, and the like.

The signal processor **810** can provide various signals that control the operation of the sensor **801**. For example, the signal processor **810** can provide an emitter control signal to the driver **811**. This control signal can be useful in order to synchronize, minimize, or reduce jitter in the timing of pulses emitted from the emitter **804**. Accordingly, this control signal can be useful in order to cause optical radiation pulses emitted from the emitter **804** to follow a precise timing and consistent pattern. For example, when a transimpedance-based front-end interface **808** is used, the control signal from the signal processor **810** can provide synchronization with an analog-to-digital converter (ADC) in order to avoid aliasing, cross-talk, and the like. As also shown, an optional memory **813** can be included in the front-end interface **808** and/or in the signal processor **810**. This memory **813** can serve as a buffer or storage location for the front-end interface **808** and/or the signal processor **810**, among other uses.

The user interface **812** can provide an output, e.g., on a display, for presentation to a user of the pulse oximetry system **800**. The user interface **812** can be implemented as a touch-screen display, a liquid crystal display (LCD), an organic LED display, or the like. In alternative embodiments, the pulse oximetry system **800** can be provided without a user interface **812** and can simply provide an output signal to a separate display or system.

The storage device **814** and a network interface **816** represent other optional output connections that can be included in the monitor **809**. The storage device **814** can include any computer-readable medium, such as a memory device, hard disk storage, EEPROM, flash drive, or the like. The various software and/or firmware applications can be stored in the storage device **814**, which can be executed by the signal processor **810** or another processor of the monitor **809**. The network interface **816** can be a serial bus port (RS-232/RS-485), a Universal Serial Bus (USB) port, an Ethernet port, a wireless interface (e.g., WiFi such as any 802.1x interface, including an internal wireless card), or other suitable communication device(s) that allows the monitor **809** to communicate and share data with other devices. The monitor **809** can also include various other components not shown, such as a microprocessor, graphics processor, or controller to output the user interface **812**, to control data communications, to compute data trending, or to perform other operations.

Although not shown in the depicted embodiment, the pulse oximetry system **800** can include various other components or can be configured in different ways. For example, the sensor **801** can have both the emitter **804** and detector **806** on the same side of the tissue measurement site **102** and use reflectance to measure analytes.

Although the foregoing disclosure has been described in terms of certain preferred embodiments, many other variations than those described herein will be apparent to those of ordinary skill in the art.

Conditional language used herein, such as, among others, "can," "might," "may," "e.g.," and the like, unless specifically stated otherwise, or otherwise understood within the context as used, is generally intended to convey that certain embodiments include, while other embodiments do not include, certain features, elements and/or states. Thus, such conditional language is not generally intended to imply that features, elements and/or states are in any way required for one or more embodiments or that one or more embodiments necessarily include logic for deciding, with or without author input or prompting, whether these features, elements and/or states are included or are to be performed in any particular embodiment. The terms "comprising," "including," "having," and the like are synonymous and are used inclusively, in an open-ended fashion, and do not exclude additional elements, features, acts, operations, and so forth. Also, the term "or" is used in its inclusive sense (and not in its exclusive sense) so that when used, for example, to connect a list of elements, the term "or" means one, some, or all of the elements in the list. Further, the term "each," as used herein, in addition to having its ordinary meaning, can mean any subset of a set of elements to which the term "each" is applied.

While the above detailed description has shown, described, and pointed out novel features as applied to various embodiments, it will be understood that various omissions, substitutions, and changes in the form and details of the systems, devices or algorithms illustrated can be made without departing from the spirit of the disclosure. As will be recognized, certain embodiments of the disclosure described herein can be embodied within a form that does not provide all of the features and benefits set forth herein, as some features can be used or practiced separately from others.

US 10,470,695 B2

15

16

The term "and/or" herein has its broadest, least limiting meaning which is the disclosure includes A alone, B alone, both A and B together, or A or B alternatively, but does not require both A and B or require one of A or one of B. As used herein, the phrase "at least one of" A, B, "and" C should be construed to mean a logical A or B or C, using a non-exclusive logical or.

The apparatuses and methods described herein may be implemented by one or more computer programs executed by one or more processors. The computer programs include processor-executable instructions that are stored on a non-transitory tangible computer readable medium. The computer programs may also include stored data. Non-limiting examples of the non-transitory tangible computer readable medium are nonvolatile memory, magnetic storage, and optical storage. Although the foregoing disclosure has been described in terms of certain preferred embodiments, other embodiments will be apparent to those of ordinary skill in the art from the disclosure herein. Additionally, other combinations, omissions, substitutions and modifications will be apparent to the skilled artisan in view of the disclosure herein. Accordingly, the present invention is not intended to be limited by the description of the preferred embodiments, but is to be defined by reference to claims.

Additionally, all publications, patents, and patent applications mentioned in this specification are herein incorporated by reference to the same extent as if each individual publication, patent, or patent application were specifically and individually indicated to be incorporated by reference.

What is claimed is:

1. A wrist-worn physiological monitoring device configured for placement on a user at a tissue measurement site, the device comprising:

a light emission source comprising a plurality of emitters configured to irradiate the tissue measurement site by emitting light towards the tissue measurement site, the tissue measurement site being located on a wrist of the user, the plurality of emitters configured to emit one or more wavelengths;

a plurality of detectors configured to detect the light emitted by the plurality of emitters after attenuation by a circular portion of the tissue measurement site, the plurality of detectors further configured to output at least one signal responsive to the detected light;

a processor configured to receive the at least one signal responsive to the output and determine a physiological parameter of the user; and

a light block forming an enclosing wall between the light emission source and the plurality of detectors, the light block defining the circular portion of the tissue measurement site, the light emission source arranged proximate a first side of the enclosing wall and the plurality of detectors arranged proximate a second side of the enclosing wall, the first side being different than the second side,

wherein the enclosing wall prevents at least a portion of light emitted from the light emission source from being detected by the plurality of detectors without attenuation by the tissue, and wherein the plurality of detectors are arranged in an array having a spatial configuration corresponding to the circular portion of the tissue measurement site.

2. The physiological monitoring device of claim 1, further comprising a display configured to present information related to the determined physiological parameter to the user.

3. The physiological monitoring device of claim 2, wherein the display is a touch-screen display.

4. The physiological monitoring device of claim 1, wherein the enclosing wall of the light block is a circular wall.

5. The physiological monitoring device of claim 1, wherein, when the physiological monitoring device is worn by the user at the tissue measurement site, the plurality of emitters are arranged in a reflectance measurement configuration on a first side of the tissue measurement site, and wherein the plurality of detectors are arranged in a reflectance measurement configuration on the first side of the tissue measurement site when the physiological monitoring device is worn by the user.

6. The physiological monitoring device of claim 1, further comprising a diffuser which receives, spreads, and emits the spread light, wherein the emitted spread light is directed at the tissue measurement site.

7. The physiological monitoring device of claim 1, wherein the light emission source is positioned outside the enclosing wall when the physiological monitoring device is worn by the user at the tissue measurement site, and wherein the plurality of detectors are positioned inside the enclosing wall when the physiological monitoring device is worn by the user at the tissue measurement site.

8. The physiological monitoring device of claim 1, wherein the physiological parameter is selected from the group consisting of arterial oxygen saturation, glucose, and pulse rate.

9. A method of measuring a physiological parameter in a user's blood, the method comprising:

irradiating a tissue measurement site by emitting, from a plurality of emitters of a light emission source of a physiological monitoring device, light of one or more wavelengths toward the tissue measurement site, the tissue measurement site located on a wrist of the user;

detecting, with a plurality of detectors, the light emitted by the plurality of emitters of the light emission source after attenuation through a circular portion of the tissue measurement site; and

providing a cylindrical light block forming an enclosing wall between the light emission source and the plurality of detectors, the light emission source arranged proximate a first side of the enclosing wall and the plurality of detectors arranged proximate a second side of the enclosing wall, the first side being different than the second side, wherein the enclosing wall prevents at least a portion of light emitted from the light emission source from being detected by the plurality of detectors without attenuation by the tissue measurement site, and wherein the plurality of detectors are arranged in an array having a circular spatial configuration, the circular spatial configuration arranged to receive said attenuated light;

outputting, from the plurality of detectors, at least one signal responsive to the detected light;

receiving, by a processor, the outputted at least one signal responsive to the detected light; and processing, by the processor, the received at least one signal responsive to the detected light to determine a physiological parameter.

10. The method of claim 9, wherein the light emission source is positioned outside the enclosing wall when the physiological monitoring device is worn by the user at the tissue measurement site, and wherein the plurality of detec-

17 18

tors are positioned inside the enclosing wall when the physiological monitoring device is worn by the user at the tissue measurement site.

**11**. The method of claim **9**, further comprising presenting, with a display of the physiological monitoring device, information related to the determined physiological parameter to the user.

**12**. The method of claim **11**, wherein the display is a touch-screen display.

**13**. The method of claim **9**, wherein when the physiological monitoring device is worn by the user at the tissue measurement site, the plurality of emitters are arranged in a reflectance measurement configuration on a first side of the tissue measurement site, and wherein the plurality of detectors are arranged in a reflectance measurement configuration on the first side of the tissue measurement site when the physiological monitoring device is worn by the user.

**14**. The method of claim **9**, further comprising spreading, with a diffuser, the emitted light and emitting the spread light from the diffuser to the tissue measurement site.

**15**. The method of claim **9**, wherein the physiological parameter is indicative of at least one of pulse rate, perfusion index, oxygen content, and total hemoglobin.

**16**. The method of claim **9**, wherein the plurality of emitters comprise one or more light emitting diodes (LEDs), and wherein the one or more wavelengths comprises at least an infrared wavelength.

**17**. The method of claim **9**, wherein the plurality of detectors comprise a plurality of photodiodes.

**18**. The method of claim **9**, further comprising, directing, with a light concentrator, the light emitted by the light emission source after attenuation through tissue of the user at the tissue measurement site to the plurality of detectors.

**19**. A wrist-worn physiological monitoring sensor comprising:

a light emission source comprising a plurality of optical sources configured to irradiate a tissue measurement site by emitting light towards the tissue measurement site on a user, the tissue measurement site located on a wrist of the user, the plurality of optical sources configured to emit one or more wavelengths;

a plurality of detectors configured to detect the light emitted by the plurality of emitters after attenuation by a circular portion of the tissue measurement site, the plurality of detectors further configured to output at least one signal responsive to the detected light;

a processor configured to receive the outputted at least one signal responsive to the detected light and determine a physiological parameter indicative of a state or trend of wellness of the user; and

a light block forming an enclosing wall between the light emission source and the plurality of detectors, the light emission source arranged proximate a first side of the enclosing wall and the plurality of detectors arranged proximate a second side of the enclosing wall, the first side being different than the second side, the light block

forming a light isolation chamber defined by the enclosing wall, wherein the enclosing wall prevents at least a portion of light emitted from the light emission source from being detected by the plurality of detectors without attenuation by the tissue, and wherein the plurality of detectors are arranged in an array having a circular spatial configuration, the circular spatial configuration arranged to receive said attenuated light.

**20**. The physiological monitoring sensor of claim **19**, wherein the light emission source is located outside the enclosing wall when the physiological monitoring sensor is worn by the user at the tissue measurement site, and wherein the plurality of detectors are arranged inside the enclosing wall when the physiological monitoring sensor is worn by the user at the tissue measurement site.

**21**. The physiological monitoring sensor of claim **19**, further comprising a diffuser which receives, spreads, and emits the spread light, wherein the emitted spread light is directed at the tissue measurement site.

**22**. The physiological monitoring sensor of claim **19**, further comprising a display configured to present information related to the determined physiological parameter to the user.

**23**. The physiological monitoring sensor of claim **22**, wherein the display is a touch-screen display.

**24**. The physiological monitoring sensor of claim **19**, wherein when the physiological monitoring sensor is worn by the user at the tissue measurement site, the plurality of optical sources are arranged in a reflectance measurement configuration on a first side of the tissue measurement site, and wherein the plurality of detectors are arranged in a reflectance measurement configuration on the first side of the tissue measurement site when the physiological monitoring sensor is worn by the user.

**25**. The physiological monitoring device of claim **1**, wherein the plurality of emitters comprise one or more light emitting diodes (LEDs), and wherein the one or more wavelengths comprises at least an infrared wavelength.

**26**. The physiological monitoring device of claim **1**, wherein the plurality of detectors comprise a plurality of photodiodes.

**27**. The physiological monitoring device of claim **1**, further comprising a light concentrator configured to direct the attenuated, reflected light to the plurality of detectors.

**28**. The physiological monitoring sensor of claim **19**, wherein the plurality of optical sources comprise one or more light emitting diodes (LEDs), and wherein the one or more wavelengths comprises at least an infrared wavelength.

**29**. The physiological monitoring sensor of claim **19**, wherein the plurality of detectors comprise a plurality of photodiodes.

**30**. The physiological monitoring sensor of claim **19**, further comprising a light concentrator configured to direct the attenuated, reflected light to the plurality of detectors.

* * * * *

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Patent of:     Al-Ali
U.S. Patent No.:     10,470,695     Attorney Docket No.:  50095-0004IP1
Issue Date:          November 12, 2019
Appl. Serial No.:    16/226,249
Filing Date:         December 19, 2018
Title:               ADVANCED PULSE OXIMETRY SENSOR

**Mail Stop Patent Board**
Patent Trial and Appeal Board
U.S. Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

## PETITION FOR *INTER PARTES* REVIEW OF UNITED STATES PATENT NO. 10,470,695 PURSUANT TO 35 U.S.C. §§ 311–319, 37 C.F.R. § 42

Attorney Docket No. 50095-0004IP1
IPR of U.S. Patent No. 10,470,695



**APPLE-1014, FIG. 18.**

With respect to FIG. 22, Sarantos describes a window region 2226 that includes a window 2278 that "***may be held against a person's skin***, e.g., by being held in place with a strap, when heart rate measurements are obtained ***to allow light from the light source 2208***" which is produced by the two light-emitting devices 1810 ***"to shine through its associated window region 2226 and into the person's skin***." APPLE-1014, 17:1-35, 15:24-43. A POSITA would have understood that, in this configuration, the two light-emitting devices 1810 are configured to irradiate the portion of the person's skin adjacent to the window 2278 (the tissue measurement site). APPLE-1003, [31]-[32]; *see e.g.,* APPLE-1014, 17:1-35, 15:24-43, FIGS. 18, 22-24.

9

may be desirable to utilize an LED that predominantly emits light in the red or infrared spectrum." *Id.*, 13:45-49; *see also* 13:49-58; APPLE-1003, [34].

## Limitation [1c]

As explained above with respect to [1pre], Sarantos describes using multiple photodetectors 1812 in a circular configuration to detect light reflected from the person's flesh. APPLE-1014, 8:13-29, 14:60-62, 15:24-27, 20:52-57 (configuration includes "a plurality of photodetector elements ***arranged about the light source***."); APPLE-1003, [35].

In more detail, Sarantos teaches that light emitted by the light source 1808 or emitters 1810 is radiated onto a person's skin, diffuses through the person's flesh, and emitted back out of the person's skin in close proximity to where the light was introduced into the flesh. APPLE-1014, 7:24-36, 1:7-24. As shown in FIGS. 15, 16, and 18, a plurality of photodetector elements 1512/1612/1812 may be used to detect the light after it is attenuated and reflected back from a person's body. APPLE-1014, 8:13-14 ("Light emanating from the person's skin is then measured by a photodetector element"), 14:60-65 (In FIGS. 15 and 16, the photodetector elements are "arranged ***in a circular array*** centered on" the light source), 15:39-42 ("array of photodetector elements 1812" in the same circular configuration as FIG. 15); APPLE-1003, [36].

11

Attorney Docket No. 50095-0004IP1
IPR of U.S. Patent No. 10,470,695



**Sarantos at FIGS. 15 (left), 16 (center) and 18 (right).**

Accordingly, Sarantos discloses or renders obvious "a plurality of detectors configured to detect the light emitted by the plurality of emitters after attenuation by ... the tissue measurement site."

Limitation [1c] also recites that the claimed attenuation is "by a circular portion of the tissue measurement site." To better understand this feature, we turn to the '695 Patent, which explains that it has a diffuser that can be used to define the shape of a surface area onto which light is distributed. APPLE-1001, 3:1-10 ("the diffuser is further configured to define a surface area shape by which the emitted spread light is distributed onto a surface of the tissue measurement site. The defined surface area shape can include … a shape that is substantially … circular, oval, or annular, among others").

12

While claim 1 does not recite a diffuser, [1g] does recite that "the light block defin[es] the circular portion of the tissue measurement site" and [1f] recites that the "light block form[s] an enclosing wall between the light emission source and the plurality of detectors." As is explained below, a POSITA would have understood or found it obvious that the light blocking walls of Sarantos' sensor define a "circular portion of the tissue measurement site." APPLE-1003, [39]-[40].

FIGS. 15 and 18 of Sarantos' show the photodetector elements (1512, 1812) are arranged in a circular array about a light source (1508, 1808). APPLE-1014, FIGS. 15, 18, 14:54-15:45. Furthermore, as shown below in FIGS. 22-24, a light blocking wall (2274, 2374, 2474) is formed between the light source (2208, 2308, 2408) emitting light and photodetector elements (2212, 2312, 2412). APPLE-1014, FIGS. 22-24, 17:1-18:35. The light blocking wall blocks light from the light source from being detected directly by the photodetector elements. *Id.*, 17:25-31 ("the light source 2208 may be separated from the HAR photodetector elements 2212 within the PPG sensor by walls 2274."); APPLE-1003, [39]. The light blocking walls are annotated in red in FIGS. 22-24 below:

13

Attorney Docket No. 50095-0004IP1
IPR of U.S. Patent No. 10,470,695



**APPLE-1014, FIGS. 22 (top), 23 (center), 24 (bottom).**

Based at least on the configuration shown in Sarantos' FIGS. 22-24 (in particular that the photodetector elements 2212, 2312, 2412 are placed in a circular arrangement around the light source 2208, 2308, 2408 and that the light blocking/enclosing walls 2274, 2374, 2474 are between the light source 2208, 2308, 2408 and the photodetector elements 2212, 2312, 2412), a POSITA would have understood or at least found it obvious that the light blocking walls 2274,

14

2374, 2474 are configured in a circular manner around the light source 2208, 2308, 2408.  APPLE-1003, [40]; *see e.g.*, APPLE-1014, FIGS. 22-24, 17:1-18:35.  The modified FIG. 18 below shows a top view of how the light blocking/enclosing walls 2274, 2374, 2474 are configured based on Sarantos' disclosure:



**APPLE-1014, FIG. 18 (modified to show light blocking wall)**

In addition, because the light blocking/enclosing wall 2274, 2374, 2474 blocks the light from being emitted sideways beyond it, a POSITA would have understood that the light blocking/enclosing wall 2274, 2374, 2474 guides the light emitted by light source 2208, 2308, 2408 to the tissue measurement site.  APPLE-1003, [41]; *see e.g.*, APPLE-1014, FIGS. 22-24, 17:1-18:35.  This creates at least

15

an initial circular region in the tissue measurement site because the ring formed by the light blocking/enclosing walls 2274, 2374, 2474 itself is circular. *Id*.

And beyond the initial circular region of the tissue measurement site, Sarantos also generally discloses that the tissue measurement site is circular. APPLE-1003, [42]. For example, Sarantos' FIG. 6 depicts a circular region of the tissue measurement site and a model of the light that is emitted onto a skin. APPLE-1014, FIG. 6, 6:4-8 ("FIG. 6 depicts a simulation of the AC intensity or power of light that is emanated within a 16mm by 16 mm region of skin as a result of light that is shined into the skin at the center of the region.").



**APPLE-1014, FIG. 6**

16

Attorney Docket No. 50095-0004IP1
IPR of U.S. Patent No. 10,470,695

Sarantos also describes arranging photodetector elements according to geometric constraints and explains that the photodetector elements may be arranged to have more than 80-86% overlap with annular (i.e., circular) regions of the tissue measurement site. APPLE-1014, 16:24-45 ("HAR photodetector elements may be sized and arranged to satisfy certain geometric constraints.... An annular region 2158 having an inner radius of $r_i$, and an outer radius of $r_o$ may be centered on the light source 2108 …. In such circumstances, the HAR photodetector may be sized such that … there is at least 80% overlap between the annular region 2158 and the HAR photodetector element 2112 (the overlap is indicated in FIG. 21 by diagonal cross-hatching; approximately 86% of the HAR photodetector 2112 in this example overlaps with the annular region 2158)."); APPLE-1003, [43]:

17

element to improve perfusion.  APPLE-1006, 1:14-17.  Chin teaches the optional

use of a diffusing lens in an oximetry sensor to "cause[] a further spreading or

mixing of light and may enhance the amount of tissue penetrated."  APPLE-1006,

8:25-29; APPLE-1003, [95].

### 2.    The combination of Sarantos, Mendelson-1991, and Chin

It would have been obvious to a POSITA to combine Chin's diffuser with

Sarantos-Mendelson-1991's physiological monitoring device to diffuse the light

that is emitted from the light source emitters so that the emitted light could pass

through more tissue and blood, as taught by Chin.  APPLE-1006, 2:4-7, 8:25-29;

APPLE-1003, [96].

In the combination, the combined pulse oximetry monitor of Sarantos and

Mendelson-1991 is further modified to include Chin's diffuser between the

emitters and the tissue measurement site.  APPLE-1006, 2:4-7, 8:25-29; APPLE-

1003, [97].  The diffuser would be placed at the bottom edge of the wall/optical

shield so that light emitted from the light source emitters would be shielded from

the detectors.  APPLE-1003, [97].  By placing the diffuser at the bottom edge of

the wall/optical shield, the light would travel within the area defined by the

wall/optical shield, be received by the diffuser, and subsequently spread by the

diffuser onto the tissue measurement site.   APPLE-1003, [97]. An example of this

configuration is shown below.



As can be appreciated from the foregoing, a POSITA would have combined

the teachings of Sarantos-Mendelson-1991 and Chin because doing so would have

amounted to nothing more than the use of a known technique to improve similar

devices in the same way and combining prior art elements according to known

methods to yield predictable results.  *See KSR v. Teleflex*, 550 U.S. 398, 417

(2007).  APPLE-1003, [98].  And because a POSITA would be implementing the

diffuser in a known way (specifically the way described in Chin), a POSITA would

have had a reasonable expectation of success in integrating the diffuser of Chin

into the pulse oximetry sensor of the Sarantos-Mendelson-1991 combination.

APPLE-1003, [98]; *see, e.g.,* APPLE-1006, 8:20-28.

In addition, a POSITA would have been motivated to incorporate Chin's

diffuser into the pulse oximeter of Sarantos and Mendelson because the diffuser

will cause the light "to pass through more tissue, and thus more blood," resulting in a stronger reflected signal at the detectors, which "allows it to be more easily processed by the oximeter electronics and software" to determine the measured physiological parameters.  APPLE-1006, 2:4-7, 8:25-29, 9:64-10:7; APPLE-1003, [99].

### 3.    Analysis

### (a)    Limitations [6], [14], and [21]

Neither Sarantos nor Mendelson-1991 disclose a diffuser.  However, using a diffuser to spread emitted light was well-known in the art as evidenced by Chin.

Chin is directed to an oximeter sensor with a heating element to improve perfusion.  APPLE-1006, 1:14-17.  Chin discloses that "[o]ne type of Oximeter Sensor will add a diffusing optic to diffuse the light emitted from the light-emitting diodes (LEDs) to cause it to pass through more tissue, and thus more blood," resulting in a stronger reflected signal at the detectors, which "allows it to be more easily processed by the oximeter electronics and software" to determine the measured physiological parameters.  APPLE-1006, 2:4-7, 8:25-29, 9:64-10:7; APPLE-1003, [101].

63

Attorney Docket No. 50095-0004IP1
IPR of U.S. Patent No. 10,470,695

**APPLE-1016, FIG. 1 (annotated)**



**APPLE-1016, FIG. 2 (annotated)**

In the example shown in FIG. 7, Ackermans' optical sensor 10 is implemented within a wristwatch for placement on a user at a tissue measurement site.  APPLE-1016, 10:29-35.



**APPLE-1016, FIG. 7 (annotated)**

65

1016, 10:29-35.  Accordingly, in Ackermans, the tissue measurement site is
located on a wrist of the user.  APPLE-1003, [110].



**APPLE-1016, FIG. 7 (annotated)**

Furthermore, as explained above in [1pre], [1a], the LED emitters emit light
at different wavelengths, e.g., around 660 nm and 940 nm.  APPLE-1016, 6:1-18;
APPLE-1003, [111].

**Limitation [1c]**

As explained above with respect to [1pre] and shown below in FIG. 1,
Ackermans discloses at least one photo-detector (30) for detecting light (31)
reflected from the skin (50).  APPLE-1016, Abstract, 2:15-23, 4:22-25.  "The [at
least one] photo-detector 30 is circular in shape and mounted in the circular groove
formed by the base plate 45, the outer ring 41 and the inner ring 42."  *Id*.  In some
implementations, a plurality of detectors can be implemented as "small

71

photodiodes that are arranged between the inner ring 43 and the outer ring 41."

*Id.*, 6:9-15.  As noted in [1a], light emitted by the plurality of emitters enters the

skin, is attenuated, reflects back from the skin, and is subsequently detected by the

photodetectors.  *Id.*, 2:15-23, 6:1-8, 7:5-10, Abstract; FIGS. 3A, 3B; APPLE-1003,

[112].  Accordingly, Ackermans discloses "a plurality of detectors configured to

detect the light emitted by the plurality of emitters after attenuation by … the tissue

measurement site."



**APPLE-1016, FIG. 1 (annotated)**

72



**APPLE-1016, FIGS. 3A, 3B (depicting the tissue measurement site and reflection therefrom).**

Feature [1c] also requires the attenuation to be "by a circular portion of the tissue measurement site." As previously discussed in Ground 1A, the'695 Patent explains that a "diffuser" can be used to define the shape of a surface area onto which light is distributed. '695 Patent, 3:1-10 ("the diffuser is further configured to define a surface area shape by which the emitted spread light is distributed onto a surface of the tissue measurement site. The defined surface area shape can include … a shape that is substantially … circular, oval, or annular, among others").

Claim 1 however does not require a diffuser but [1g] does require that "the light block defin[es] the circular portion of the tissue measurement site." As is explained above in [1pre] and in more detail below with respect to feature [1g], the inner ring 43 "shadows the photodetector 30 from emitted light 21" and operates as a light block that prevents light from the emitters 20 from being detected directly by the photodetectors 30 without attenuation by the user's skin. *Id.*, 5:10-15, 6:31-35; APPLE-1003, [114].

73



**APPLE-1016, FIGS. 1 (left), 2(right) (annotated).**

Based at least on the configuration shown in Ackerman's FIGS. 1 and 2 and the inner ring 43's function to block direct light from the emitter 20 to the detectors 30 (without attenuation by the tissue measurement site), a POSITA would have understood that the inner ring 43 effectively guides the light emitted by light source 12 on to the tissue measurement site. APPLE-1003, [115]. This creates at least an initial circular region in the tissue measurement site because inner ring 43 itself is circular. APPLE-1003, [115]. In describing the tissue measurement site, Ackermans' claim 2 explicitly recites that "the inner ring (43) having a rim (44) [ ] defines the perimeter of [a] central part of [the] contact area" with the skin. APPLE-1016, 12:5-22; APPLE-1003, [115].

And even after scattering within the tissue measurement site, the tissue measurement site has a circular shape. APPLE-1016, 5:1-4 ("emitted light 1 is directed onto the skin and partly penetrates into the skin where it interacts with the

74

skin tissue and in particular with blood vessels contained in the skin. A part of the light leaves the tissue again after one or more scattering events and enters the photo-detector 30 as the reflected light"); 31.5:6-10 ("the area through *which the light leaves the skin is essentially circular in shape*").  For at least this reason, it would have been obvious to a POSITA that the circular shape/area of the inner ring 43 in Ackermans renders or results in a "circular portion of the tissue measurement site" (from which subsequent scattering and reflection occurs).  APPLE-1003, [116].  The detectors 30 detect the light after attenuation by this circular portion of the tissue measurement site.  For at least this reason, Ackermans discloses or renders this limitation obvious.

Alternatively, Ackermans also discloses using a sensor unit 100 formed by a matrix of sensors 10, as shown in FIG. 4 below.  APPLE-1016, 7:29-34.  The sensors 10 can be arranged in different configurations, including, for example, circular.  *Id.*, 8:22-24; APPLE-1003, [117].  The sensors 10 in the sensor unit 100 have a light emitter and photo-detector and a circular contact area with the skin. *Id.*, 8:12-21.  Accordingly, even collectively when a sensor unit 100 with multiple sensors 10 are used, a POSITA would have understood that light is emitted from a plurality of emitters, attenuated by a circular region of the tissue measurement site, and detected by a plurality of detectors.  APPLE-1003, [117] (citing APPLE-1016, 7:29-34, 8:12-24).  For this additional reason, Ackermans renders [1c] obvious.

disposed in the interior of the device housing." APPLE-1005, 33:65-34:3.

Venkatraman teaches that such housing would readily incorporate light-transmissive structures that facilitate light transmission and collection. APPLE-1005, 34:5-18. In particular, Venkatraman discloses the use of a light concentrator in the form of a lens to facilitate light collection. *Id.* ("the light-transmissive structures may employ a material and/or optical design to facilitate low light loss (for example, the light-transmissive structures may include **a lens to facilitate light collection** …)"). While Venkatraman does not explicitly teach that the lens direct the light after attenuation to the plurality of detectors, it would have been obvious to a POSITA (for the reasons explained in [18]) that Venkatraman's lens would have been placed between the tissue measurement site and the detectors so that reflected light can be directed onto the photodetectors 16, 18 to "facilitate light collection." APPLE-1005, 34:5-18; APPLE-1003, [158].

(i)    **Limitation [30]**

*Supra* [19], [27].

G.    **GROUND 2C: Claims 6, 14, and 21 are obvious based on Ackermans in view of Chin**

1.    **The combination of Ackermans and Chin**

It would have been obvious to a POSITA to combine Chin's diffuser Ackermans's physiological monitoring device to diffuse the light that is emitted

from the light source emitters so that the emitted light could pass through more tissue and blood, as taught by Chin.  APPLE-1006, 2:4-7, 8:25-29; APPLE-1003, [160].

In the combination, the device of Ackermans is further modified to include Chin's diffuser between the emitters and the tissue measurement site.  APPLE-1006, 2:4-7, 8:25-29; APPLE-1003, [161].  The diffuser would be placed at the bottom edge of the wall/optical shield so that light emitted from the light source emitters would be shielded from the detectors.  APPLE-1003, [161].  By placing the diffuser at the bottom edge of the wall/optical shield, the light would travel within the area defined by the wall/optical shield, be received by the diffuser, and subsequently spread by the diffuser onto the tissue measurement site.   APPLE-1003, [161]. An example of this configuration is shown below.



As can be appreciated from the foregoing, a POSITA would have combined the teachings of Ackermans and Chin because doing so would have amounted to

103

nothing more than the use of a known technique to improve similar devices in the same way and combining prior art elements according to known methods to yield predictable results. *See KSR v. Teleflex*, 550 U.S. 398, 417 (2007). APPLE-1003, [162]. And because a POSITA would be implementing the diffuser in a known way (specifically the way described in Chin), a POSITA would have had a reasonable expectation of success in integrating the diffuser of Chin into the pulse oximetry sensor of Ackermans. APPLE-1003, [162]; *see, e.g.,* APPLE-1006, 8:20-28.

In addition, a POSITA would have been motivated to incorporate Chin's diffuser into the pulse oximeter of Ackermans because the diffuser will cause the light "to pass through more tissue, and thus more blood," resulting in a stronger reflected signal at the detectors, which "allows it to be more easily processed by the oximeter electronics and software" to determine the measured physiological parameters. APPLE-1006, 2:4-7, 8:25-29, 9:64-10:7; APPLE-1003, [163].

## 2.     Analysis

### (a)     Limitations [6], [14], and [21]

Ackermans does not disclose a diffuser. However, using a diffuser to spread emited light was well-known in the art as evidenced by Chin.

Chin is directed to an oximeter sensor with a heating element to improve perfusion. APPLE-1006, 1:14-17. Chin discloses that "[o]ne type of Oximeter

Filed August 9, 2021

On behalf of:
     Patent Owner Masimo Corporation
By:  Joseph R. Re (Reg. No. 31,291)
     Jarom D. Kesler (Reg. No. 57,046)
     Stephen W. Larson (Reg. No. 69,133)
     Shannon H. Lam (Reg. No. 65,614)
     KNOBBE, MARTENS, OLSON & BEAR, LLP
     2040 Main Street, 14th Floor
     Irvine, CA 92614
     Tel.:  (949) 760-0404    Fax:  (949) 760-9502
     E-mail:  AppleIPR2020-1722-695@knobbe.com

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

APPLE, INC.

Petitioner,

v.

MASIMO CORPORATION,

Patent Owner.

IPR2020-01722
Patent 10,470,695

**MASIMO RESPONSE TO PETITION FOR INTER PARTES REVIEW**

# TABLE OF CONTENTS

**Page No.**

I.    INTRODUCTION ...................................................................1

II.    BACKGROUND ...................................................................3

    A.    The Importance of Pulse Oximeters.....................................3

    B.    How Oximetry Works .......................................................4

    C.    The '695 Patent ...............................................................4

III.    OVERVIEW OF ALLEGED PRIOR ART ...........................7

    A.    Sarantos (EX1014) ..........................................................7

    B.    Mendelson (EX1015) .....................................................10

    C.    Ackermans (EX1016) .....................................................11

    D.    Chin (EX1006) ...............................................................12

IV.    LEVEL OF ORDINARY SKILL IN THE ART ..........................13

V.    CLAIM CONSTRUCTION ...................................................14

VI.    PETITIONER FAILS TO SHOW A REASONABLE
    LIKELIHOOD OF UNPATENTABILITY OF ANY
    CLAIM...............................................................................14

    A.    Legal Background ...........................................................14

    B.    Grounds .........................................................................15

    C.    Apple's Grounds Ignore Differences Between Thick
        Tissue and Thin Tissue....................................................16

-i-

# TABLE OF CONTENTS
## (cont'd)

**Page No.**

    1.    Chin's alterations are not necessary for thick tissue.........................................................................16

    2.    Diffusers can make sensors worse by reducing the light reaching the detector...................................20

D.    Ground 1D (Sarantos, Mendelson, Chin): Apple has not demonstrated the obviousness of claims 6, 14, or 21 .....................................................................21

    1.    Apple misplaces its reliance on light passing through more tissue................................................21

    2.    Apple fails to support its similar device, similar way assertion...............................................................23

    3.    Apples' naked allegation of a reasonable expectation of success is conclusory .........................24

    4.    Apple ignores the differences between Sarantos' wrist-worn sensor and Chin's nostril-based sensor ........................................................25

    5.    Apple's proposed modification would make Sarantos-Mendelson perform worse .........................29

    6.    Sarantos-Mendelson already spreads light ...............31

    7.    Apple has not met its burden to provide a *prima facie* case of obviousness against claims 6, 14, or 21 ........................................................................32

E.    Ground 2C (Ackermans and Chin): Apple has not demonstrated the obviousness of claims 6, 14, or 21...........................33

# TABLE OF CONTENTS
## (cont'd)

**Page No.**

1.   Apple misplaces its reliance on light passing through more tissue ................................................... 34

2.   Apple fails to support its similar device, similar way ............................................................................ 35

3.   Apples' naked allegation of a reasonable expectation of success is conclusory ....................... 36

4.   Apple ignores the differences between Ackermans' wrist-worn sensor and Chin's nostril-based sensor ................................................. 38

5.   Apple's proposed modification would make Ackermans perform worse ..................................... 40

6.   Ackermans already spreads light ............................ 41

7.   Apple has not met its burden to provide a *prima facie* case of obviousness against claims 6, 14, or 21 ........................................................................... 42

VII.   CONCLUSION ........................................................... 43

# TABLE OF AUTHORITIES

**Page No(s).**

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
  694 F.3d 1312 (Fed. Cir. 2012) ...........................................................14

*CFMT, Inc. v. YieldUp Int'l Corp.*,
  349 F.3d 1333 (Fed. Cir. 2003) ...........................................................14

*In re Gordon*,
  733 F.2d 900 (Fed. Cir. 1984) .............................................................15

*In re Kahn*,
  441 F.3d 977 (Fed. Cir. 2006) .......................................................23, 35

*In re Kotzab*,
  217 F.3d 1365 (Fed. Cir. 2000) ...........................................................15

*Masimo Corp. v. Philips Elec. N. Am. Corp.*,
  C.A. No. 09–80–LPS, 2015 WL 2379485
  (D. Del. May 18, 2015).........................................................................3

*In re NTP, Inc.*,
  654 F.3d 1279 (Fed. Cir. 2011) ...........................................................15

*Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*,
  520 F.3d 1358 (Fed. Cir. 2008) ...........................................................15

*PersonalWeb Technologies, LLC v. Apple, Inc.*,
  848 F.3d 987 (Fed. Cir. 2017) .......................................................23, 35

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) .........................................14

*In re Royka*,
  490 F.2d 981 (C.C.P.A. 1974)..............................................................14

*Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*,
  655 F.3d 1364 (Fed. Cir. 2011) ...........................................................15

# TABLE OF AUTHORITIES
## (*cont'd*)

**Page No(s).**

## OTHER AUTHORITIES

35 U.S.C. § 103 ................................................................................16

35 U.S.C. § 253 ................................................................................15

37 C.F.R. § 42.100 ...........................................................................14

## I.    INTRODUCTION

Non-invasive blood constituent monitoring has almost limitless potential to inform users and caregivers about the physiological wellness of a wearer of a sensor. Of importance, and therefore, of medical emphasis, is information relating to a wearer's oxygen supply and pulse rate. Hence the development of non-invasive pulse oximetry. Masimo, the owner of U.S. Patent No. 10,470,695 (the "'695 Patent"), is the world leader in pulse oximeters. As COVID-19 overwhelmed hospital capacity in 2020, Masimo's pulse oximeters allowed caregivers to monitor COVID-19 and suspected COVID-19 patients both in the hospital setting and from their homes. *See generally* EX2007. Pulse oximetry is now universally recommended for at-home patients with COVID-19 symptoms. *See* EX2006 at 5.

Pulse oximeters, however, rely on light that probes locations on the body having perfused oxygenated blood, such as in the fingers, ears, toes, the nose, and the forehead. EX2001 ¶ 27. While these measurement sites are acceptable for caregiver monitoring environments, such locations are inconvenient for home or ambulatory use. *Id.* Normal routines require freedom of motion for daily activities, including movement, exercise, and sports. *Id.*

The '695 Patent discloses a reflective pulse oximeter particularly useful for placement on the "wrist." EX1001 at 10:47. The '695 Patent's innovative reflective

-1-

sensor includes a diffuser to distribute light in a manner that increases a likelihood that reflected light will be probative of measurable blood in the wrist.

Masimo reduced the number of issues in this proceeding by statutorily disclaiming several claims. EX2004. The remaining claims recite the addition of a diffuser to the '695 Patent's wrist sensor. As to these claims, Apple has not met its burden to provide a *prima facie* case of obviousness.

Petitioner, Apple, combines the teachings of Chin with Sarantos-Mendelson (Ground 1D) and Ackermans (Ground 2C). But Apple either ignores or fails to appreciate the inherent differences between the amount of tissue available to a wrist worn sensor, as disclosed by Sarantos and Ackermans, versus that available to a nostril sensor, as disclosed by Chin. When, like in Chin, there is thin tissue, Chin suggests multiple modifications, including the inclusion of a diffuser, to attempt to increase the amount of tissue probed by light due to the thinness of the tissue at the nose. A wrist-worn sensor, however, is applied to thick tissue at the wrist. While the wrist has other characteristics that make it a poor measurement site, a POSITA would have understood that the wrist does not have the thin tissue backscattering problem that Chin addresses. Adding a diffuser to the Sarantos-Mendelson or Ackerman wrist sensors using Chin's teachings attempts to solve a problem the wrist measurement site does not have. When there is thick tissue, like in Sarantos, Mendelson, or Ackermans, the addition of a diffuser undesirably reduces an amount

of light that reaches the detector. Apple provides no legitimate basis for why a POSITA, having a Sarantos-Mendelson device, or an Ackermans device, would modify such devices to include Chin's diffuser, when such modification is unneeded and undesired.

For at least these reasons, Apple fails to demonstrate the asserted references render the claims obvious. The Board should affirm the patentability of the challenged claims of the '695 Patent.

## II.    BACKGROUND

### A.    The Importance of Pulse Oximeters

When a patient's oxygen is dropping, a caregiver has only a few minutes to prevent brain damage, heart failure and death. EX2001 ¶ 25. Pulse oximeters readily detect changes in a person's oxygen saturation, which is an indicator of the person's oxygen levels. EX1001 at 1:50-53. Use of pulse oximeters are a standard of care and an essential diagnostic tool in the U.S. throughout clinical care settings. Masimo revolutionized pulse oximetry by introducing the Masimo SET® pulse oximetry technology. Courts have repeatedly recognized and credited Masimo's innovations. *See e.g.*, *Masimo Corp. v. Philips Elec. N. Am. Corp.*, C.A. No. 09–80–LPS, 2015 WL 2379485, at *19 (D. Del. May 18, 2015) ("an entire industry . . . took licenses from Masimo for innovative technology that saved thousands of lives and billions of dollars in healthcare costs.").

Appx0358

### B.    How Oximetry Works

A pulse oximeter's non-invasive sensor generally includes "one or more light-emitting diodes (LEDs) and a photodetector." EX1001 at 2:1-5. "The detector is responsive to the emitted light after attenuation or reflection by pulsatile blood flowing in the tissue site." *Id.* at 2:8-10. The detector outputs a signal that is processed, then an empirically derived lookup table is used to convert processed signals into a numerical readout of physiological parameters such as oxygen saturation (SpO2) and/or pulse rate. *Id.* at 2:10-14.

Because light both transmits through tissue and backscatters or reflects back after entering tissue, pulse oximeter sensors can operate either by transmittance or reflectance. EX2001 ¶ 28. Reflective pulse oximetry is a method by which the emitter and detector are located on the same side of the tissue measurement site. *Id.*; EX1001 at 10:14-16. Transmittance pulse oximetry is a method by which the emitter and detector are located on opposite sides of the tissue measurement site. EX2001 ¶ 28. Typically, optical systems for reflective and transmittance pulse oximeters are designed differently. *Id.*

### C.    The '695 Patent

Emitters are typically very small. Because the emitter has negligible dimension, the emitter is effectively a point. EX1001 at 5:44-46. In theory, using such an emitter, as shown in FIG. 6 below, is thought to reduce differences in the

length the light 620 as it travels from the emitter 602 to the detector 610. *Id.* at 5:66–6:1. This difference is commonly referred to as path length variability. Reducing the variability in the path length produces a more accurate measurement of a person's oxygen supply or pulse rate. *Id.*



FIG. 6
(Prior Art)

*Id.* at FIG. 6 (annotated). In practice, however, tissue and blood scatter light causing the lengths of the light path to vary. *Id.* at 6:1-8, 10:33-36. Path length variability causes measurement errors. *Id.* at 6:1-8, 10:33-36.

The sensors described in the '695 Patent are designed to be worn on the wrist. EX1001 at 10:45-49. And the wrist as a measurement site presents some unique challenges. For example, the tissue at the wrist is sufficiently thick to provide ample backscattering or reflection of light. EX2001 ¶ 33; EX1001, FIG. 6 (showing tissue 102 providing ample backscattering for light 620 to reflect back to the detector 610).

-5-

IPR2020-01722
Apple v. Masimo – Patent 10,470,695

The wrist, however, does not have abundant blood flow near the surface of the tissue. EX2001 at 33.

Accordingly, the sensors of the '695 Patent irradiate a larger volume of tissue than a point source emitter shown above. EX1001 at 6:55–7:3. When applied to the wrist, irradiating a larger volume of tissue increases the likelihood of light interacting with blood which is sparsely spread out in thick tissue. *Id.* For example, FIGS. 7A and 7B (annotated below) show a reflective sensor 700 designed to be worn on a wrist. *Id.* at 10:40-49.



FIG. 7A                    FIG. 7B

*Id.* at FIGS. 7A and 7B (annotated).

Sensor 700 includes one or more emitters 702 (shaded orange). *Id.* at 10:54-55. A diffuser 704 (shaded blue) "homogenously spreads the [light] over a wide, donut-shaped area, such as the area . . . as depicted in FIG. 7B [(also shaded blue)]."

-6-

*Id.* at 10:65–11:2. Sensor 700 includes a detector 710 (shaded green) located on the same side of the wrist as the emitters 702. *Id.* at 10:45-49. Although FIGS. 7A-7B show a single detector 710, the '695 Patent discloses a plurality of detectors corresponding to the irradiated surface area depicted in FIG. 7B. *Id.* at 11:38-43.

FIG. 7A depicts the path light 720 (shaded yellow) that travels from the emitters to the detectors. EX1001 at 11:44-47. Similar to FIG. 6, FIG. 7A again shows the tissue 102 at the wrist to be sufficiently thick to allow for ample light backscatter, or refection off the tissue and toward the detector. In contrast to FIG. 6, the light 720 (shaded yellow) irradiates more surface area of the tissue 102. More irradiation increases the likelihood reflective light will be probative of measurable blood, leading to "a more accurate oxygen saturation measurement." *Id.* at 11:49-53; EX2001 ¶ 32.

### III.    OVERVIEW OF ALLEGED PRIOR ART

Petitioner relies on the following printed publications:

### A.    Sarantos (EX1014)

Sarantos, assigned to Fitbit, Inc., discloses a wristband wearable fitness monitor 200. EX1014 at 7:12-16. Annotated FIG. 2, below left, and the zoomed-in portion, below right, disclose a monitor 200 with light emitters 108 and a detector 212. *Id.* at 7:16-23. When worn by a user, the wristband monitor 200

positions the emitters 108 and the detector 212 on the same side of the wrist,

therefore, Sarantos' disclosure focuses on a reflectance type sensor. EX2001 ¶ 39.



FIG. 2

EX1014 at FIG. 2 (annotated).

In use, light from the emitters irradiate a wearer's skin near the wrist. *Id.*

at 7:25-30. The light backscatters, or reflects, off the tissue and emerges back out of

the skin. *Id.* FIG. 6, below, graphs the results of a simulation to show that

IPR2020-01722
Apple v. Masimo – Patent 10,470,695

backscattered light intensity decreases with increasing distance from the emitter (simulated as centered). *Id.* at 10:51-67; EX2001 ¶ 40.



FIG. 6

EX1014 at FIG. 6 (colored).

In order to capture more of the higher-intensity light emerging from the skin, Sarantos encourages use of its rectangular detectors (shaded blue) over the prior art square detectors (outlined blue). *See* EX1014 at 10:67–11:3; EX2001 ¶ 41. Sarantos also discloses that detectors should be in close proximity to emitters, typically between 1 mm to 4 mm apart. EX1014 at 18:61-66. Sarantos warns that designs outside this range "may prove counterproductive, as a higher-intensity [emitter] may be needed . . . in order to obtain a sufficiently strong signal at the []detector." *Id.* at

19:13-18. A higher-intensity emitter, and/or driving an emitter harder to generate more intensity, consumes additional power, which "may be undesirable in a wearable fitness monitor context." *Id.* at 19:18-21. Wrist-worn monitors, like those of Sarantos, are battery powered. EX2001 ¶ 41. Consuming additional power lowers battery life and is undesirable. *Id.*

Sarantos does not disclose a diffuser.

## B.    Mendelson (EX1015)

Mendelson describes a reflectance type sensor tested on the forearm and calf. EX1015 at Abstract. FIG 1., annotated below, depicts the reflectance sensor.



*Fig 1. (A) Frontal and (B) side views of the heated skin reflectance pulse oximeter sensor. See text for explanation. R & IR LEDs = red and infrared light-emitting diodes.*

*Id.* at Fig. 1 (annotated).

Mendelson does not disclose a diffuser.

### C.    Ackermans (EX1016)

Ackermans describes arranging reflectance type sensors 10 into nodes of a "hexagonal lattice structure," as shown below EX1016 at 9:33-34.



FIG. 4

*Id.* at FIG. 4. In one embodiment, Ackermans discloses that its sensor attaches to the wrist as a wristwatch. *Id.* at 12:29-32.

FIG. 1, annotated below, shows a sensor 10 of one of its nodes having a detector 30 peripheral to an emitter 20. *Id.* at Abstract.



FIG. 1

-11-

*Id.* at FIG. 1 (annotated). The emitter 20 irradiates the skin with light 21. *Id.* As

shown above, the emitted light 21 spreads as it travels toward the skin. EX2001 ¶ 46.

The light 21 backscatters, or reflects off tissue, and the returning light 31 travels

toward detector 30. EX1016 at 5:2-4.

Ackermans does not disclose a diffuser.

### D.    Chin (EX1006)

Chin describes a transmittance-type nostril sensor for measuring oxygen

saturation and pulse rate. EX1006 at 1:14-21, 8:21-29. FIGS 7A and 7B, annotated

below, provide that the sensor includes a piece of bent metal 170 having a detector

178 (shaded blue) offset from an emitter 176 (shaded red). *Id.* at 8:22-24.



*Id.* at FIGS. 7A-7B. A heater 60 and the offset configuration of the emitter and

detector cause "light emitted by the emitters to pass through more blood-perfused

tissue to reach the detector." *Id.* at Abstract, 2:55-57.

The nostril sensor may include an optional optical diffuser 180 (shaded brown

above) for diffusing the light from emitter 176. EX1006 at 8:24-28. Chin's entire

treatment and disclosure of diffuser 180 is as follows: "Also shown is an optional

-12-

IPR2020-01722
Apple v. Masimo – Patent 10,470,695

optical diffuser 180 for diffusing the light from emitter 176, which causes a further

spreading or mixing of light and may enhance the amount of tissue penetrated in

some instances." *Id.*

## IV.   LEVEL OF ORDINARY SKILL IN THE ART

Apple asserts a POSITA "would have been a person with a working

knowledge of physiological monitoring technologies. The [POSITA] would have

had a Bachelor of Science degree in an academic discipline emphasizing the design

of electrical, computer, or software technologies, in combination with training or at

least one to two years of related work experience with capture and processing of data

or information, including but not limited to physiological monitoring technologies."

Petition, Paper 2, 4-5 ("Pet."). Apple asserts "[a]lternatively, the person could have

also had a Master of Science degree in a relevant academic discipline with less than

a year of related work experience in the same discipline." *Id*. at 5.

Masimo notes that Apple's asserted level of skill (1) requires no coursework,

training or experience with optics or optical physiological monitors; (2) requires no

coursework, training, or experience in physiology; and (3) focuses on data

processing and not sensor design. For this proceeding, Masimo nonetheless applies

Apple's asserted level of skill. EX2001 ¶¶ 34-36.

## V.    CLAIM CONSTRUCTION

In its instituting decision, the Board tentatively found no claim terms "require express construction at this time." Institution Decision, Paper 8, at 10 ("Institution"). Masimo offers no particular claim construction herein. Thus, the Board should give the claim terms their ordinary and customary meaning, consistent with the specification, as a POSITA would understand them. 37 C.F.R. § 42.100(b); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (*en banc*).

## VI.    PETITIONER FAILS TO SHOW A REASONABLE LIKELIHOOD OF UNPATENTABILITY OF ANY CLAIM

### A.    Legal Background

A petition based on "obviousness requires a suggestion of all limitations in a claim." *CFMT, Inc. v. YieldUp Int'l Corp.*, 349 F.3d 1333, 1342 (Fed. Cir. 2003) (citing *In re Royka*, 490 F.2d 981, 985 (C.C.P.A. 1974)). A patent claim is not obvious unless "a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so." *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc*., 694 F.3d 1312, 1327 (Fed. Cir. 2012).

To prevail on any obviousness ground, a petitioner may not simply identify individual claim components—it must show why a "skilled artisan, with no knowledge of the claimed invention, would have selected these components for

-14-

combination in the manner claimed." *In re Kotzab*, 217 F.3d 1365, 1371 (Fed. Cir. 2000). The petitioner must support even simple modifications with some motivation to make the change. *See In re Gordon*, 733 F.2d 900, 902 (Fed. Cir. 1984).

An appropriate obviousness inquiry cannot involve even a "hint of hindsight." *Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*, 655 F.3d 1364, 1375 (Fed. Cir. 2011). A petitioner may not "simply retrace[] the path of the inventor with hindsight, discount[] the number and complexity of the alternatives, and conclude[] that the invention . . . was obvious." *Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1364 (Fed. Cir. 2008). Likewise, "[c]are must be taken to avoid hindsight reconstruction by using the patent in suit as a guide through the maze of prior art references, combining the right references in the right way so as to achieve the result of the claims in suit." *In re NTP, Inc.*, 654 F.3d 1279, 1299 (Fed. Cir. 2011) (internal quotations omitted).

### B.    Grounds

Claims 1-5, 8, 9, 11-13, 15-19 and 22-30 have been statutorily disclaimed under 35 U.S.C. § 253(a). *See* EX2004. Therefore, all allegations concerning claims 1-5, 8, 9, 11-13, 15-19 and 22-30 are no longer at issue in this proceeding.

The following grounds remain at issue in this proceeding.

| Ground | Claims Challenged | 35 U.S.C. § | Reference/Basis |
|--------|-------------------|-------------|-----------------|
| **1D** | 6, 14, 21 | 103 | Sarantos, Mendelson, Chin |
| **2C** | 6, 14, 21 | 103 | Ackermans, Chin |

Claims 6 and 21 depend from claims 1 and 19, respectively, and recite "a diffuser which receives, spreads, and emits the spread light, wherein the emitted spread light is directed at the tissue measurement site." EX1001 at claims 6, 21. Claim 14 depends from claim 9 and recites "spreading, with a diffuser, the emitted light and emitting the spread light from the diffuser to the tissue measurement site." *Id.* at claim 14.

### C. Apple's Grounds Ignore Differences Between Thick Tissue and Thin Tissue

#### 1. Chin's alterations are not necessary for thick tissue

Reflectance oximetry requires light to backscatter, or reflect, off of the tissue and be directed back towards the detector(s). EX1001 at 10:14-20. FIG. 6 of the '695 Patent, annotated below, depicts the traditional banana-like shape of light 620

-16-

(shaded yellow) as it reflects off tissue 102 towards the detector 610 (shaded blue).

*Id.* at 10:27-31.



FIG. 6
(PRIOR ART)

*Id.* at FIG. 6 (annotated). FIG 6 does not show all the paths of light from the emitter 602 (shaded red). EX2001 ¶ 52. FIG. 6 instead shows likely paths of the light 620 that, after backscattering, eventually reach the detector 610. *Id.* As illustrated in FIG. 6, the tissue 102 at the measurement site must be sufficiently thick for light backscattering, or reflection, to occur. *Id.*

When the tissue at a measurement site is thin, it may not include sufficient tissue for ample light backscattering. EX2001 ¶ 53. Less backscattering, or reflection, means less light reaches the detector. *Id.* Less light leads to less signal, and less signal leads to less accurate oxygen or pulse rate measurements. *Id.* The tissue at a wrist measurement site is abundantly thick and does not suffer from the problem Chin attempts to solve. *Id.*

Chin describes sensors worn at thin tissue measurement sites. EX1006 at 1:14-21, 8:21-29. To counteract insufficient backscatter at such sites, Chin teaches the

-17-

IPR2020-01722
Apple v. Masimo – Patent 10,470,695

addition of reflective surfaces. EX1006 at FIGS. 5C-5E (comparing the light 138 of

FIG. 5C with that of FIGS. 5D and 5E having added reflective surfaces).



EX1006 at FIGS. 5C-5E (annotated). Chin discloses that the reflective surfaces 133,

134, 150, provide more light to the detector. *Id.* at 7:13-20, 7:35-41. Chin explains:

> [R]eflectors 133 and 134 cause the light path 136 in FIG. 5D to be
> longer than the light path 138 in FIG. 5C. This is due to ***light which
> goes across the entire appendage*** being reflected back in one surface,
> and then again reflected back in from the other surface, bouncing back
> and forth between the reflectors until it reaches the detector from the
> emitter. In FIG. [5]C, by contrast, . . . light which would hit the edges
> ***would typically be absorbed***, rather than being reflected.

*Id.* (emphasis added).

At the nostril, the tissue is so thin that Chin employs three modifications to increase **the amount** of tissue penetrated by light. EX2001 ¶ 55.



EX1006 at FIG. 7B (annotated). First, Chin adds a heater 60. *Id.* at 2:59-62 ("[W]arming of the tissue … increases the amount of blood perfused . . . substantially strengthen[ing] the  . . . signal."). Second, Chin offsets the emitter and detector. *Id.* at 2:39-41 ([T]he emitters and detector are not directly opposite each other, [therefore,] the light . . . pass[es] through more blood perfused tissue."). And third, Chin adds the diffuser 180. *Id.* at 8:25-29 ("[O]ptional optical diffuser 180 . . . may enhance the amount of tissue penetrated in some instances."). Chin's modifications seek to transform its thin tissue measurement sites by **adding tissue**. EX2001 ¶ 55.

A POSITA would understand that Chin's extraordinary efforts to increase the amount of tissue at a thin tissue measurement site are not needed at measurement sites with sufficiently thick tissue. EX2001 ¶ 56. For example, Sarantos, Mendelson, Ackermans, and Venkatraman position their sensors in thick tissue measurement sites. EX1014 at 7:12-16 (Sarantos disclosing a wristband-type wearable fitness monitor); EX1005 at 15:43-45 (Venkatraman disclosing a wrist-worn biometric

monitoring device); EX1015 at Abstract (Mendelson taking measurements from the forearm and calf); EX1016 at 10:31-32 (Ackermans disclosing a medical optical system in form of a wristwatch). Thus, all of Apple's applied references, outside of Chin, already have thick tissue measurement sites to backscatter light and do not suffer the problems Chin attempts to solve. EX2001 ¶ 56.

### 2. Diffusers can make sensors worse by reducing the light reaching the detector

A POSITA would have known there are drawbacks to adding a diffuser into the optical system of a reflectance sensor. EX2001 ¶ 57. For example, although Chin asserts that a diffuser "may enhance the amount of tissue penetrated [by light] in some instances" (EX1006 at 8:26-29), a POSITA would have been aware that a diffuser also reduces the amount of light that reaches the detector. EX2001 ¶ 57.

To confirm that a diffuser reduces light that reaches the detector, Masimo's expert, Dr. Madisetti, conducted experiments applying different diffuser materials to reflectance-type sensors. *Id.* ¶¶ 58-59. Dr. Madisetti showed that a mostly transparent diffuser reduced the amount of light that reached the detector by about 14% to 17%. *Id.* ¶ 59. Dr. Madisetti also showed that a less-transparent diffuser reduced the amount of light that reached the detector by up to about 40% for infrared light and about 50% for red light. *Id.*

A POSITA would have understood that less light at the detector leads to less signal, and less signal leads to less accurate oxygen or pulse rate measurements. *Id.*

Appx0375

¶ 60. Accordingly, a POSITA would have understood that adding a diffuser to a reflectance-type sensor can have significant detrimental consequences to the performance of a pulse oximeter and would only apply Chin's diffuser where necessary – at a thin tissue site such as the nose. *Id.*

### D.     Ground 1D (Sarantos, Mendelson, Chin): Apple has not demonstrated the obviousness of claims 6, 14, or 21

The Board relies on Apple's Petition with respect to the combination of Sarantos, Mendelson, Chin without providing additional analysis. Institution at 23-24. In its Petition, Apple admits its Sarantos-Mendelson combination does not disclose a diffuser. Pet. at 63 ("Neither Sarantos nor Mendelson[] disclose a diffuser."). Apple does not support its assertions that a POSITA would add Chin's diffuser to a Sarantos-Mendelson device are for at least the following reasons.

### 1.     Apple misplaces its reliance on light passing through more tissue

Apple quotes Chin's recitation of the benefit of a diffuser as "further spreading or mixing of light . . . [that] may enhance the amount of tissue penetrated." EX1006 8:25-29. Apple then asserts that it would have been obvious for a POSITA to add Chin's diffuser to a Sarantos-Mendelson device because "the emitted light could pass through more tissue and blood, as taught by Chin." Pet. at 61 (emphasis added).

However, Sarantos and Chin apply their sensors to very different measurement sites. Chin is a nostril sensor applied to ***thin tissue*** with problematic

Appx0376

backscattering. *Id.* To solve Chin's problematic backscattering, Chin modifies its sensor to attempt to make its thin tissue seem to have more tissue, including adding a diffuser. *See supra* § VI.C.1. Sarantos discloses a wrist-worn sensor applied to **thick tissue**, which does not suffer the same thin tissue problem that Chin attempts to solve. EX2001 ¶ 62. Apple's misguided reliance on Chin's statement about its diffuser "pass[ing light] through more tissue and blood" ignores Chin's thin tissue problem. A Sarantos-Mendelson device does not have Chin's thin tissue problem. *Id.* Thus, a POSITA having a Sarantos-Mendelson device would have no reason to look to Chin for Chin's solutions to its thin tissue problem. EX2001 ¶¶ 62-64.

Moreover, a POSITA would have understood that, for sufficiently thick tissue like at the wrist, the addition of a diffuser in a reflectance sensor significantly reduces the amount of light reaching the detector. *See supra* § VI.C.2. Because these tissue sites do have thick tissue, more light, not less light, is generally needed to penetrate the thick tissue. Thus, again, a POSITA having a Sarantos-Mendelson device would not look to Chin's diffuser because the addition of the diffuser into a Sarantos-Mendelson device would negatively impact measurement accuracy. EX2001 ¶ 63.

In its Petition, Apple simply cherry picks a diffuser from a nostril sensor with no credible motivation for its combination. This is classic hindsight reconstruction. Moreover, even if Apple had shown a POSITA could have added Chin's diffuser to a Sarantos-Mendelson device, which it did not, it is not enough to simply make the

mere allegation. *See PersonalWeb Technologies, LLC v. Apple, Inc.*, 848 F.3d 987, 993-94 (Fed. Cir. 2017) (criticizing finding obviousness when the "reasoning seems to say no more than that a skilled artisan, once presented with the two references, would have understood that they ***could*** be combined. And that is not enough; it does not imply a motivation to pick out those two references and combine them to arrive at the claimed invention.") (emphasis added); *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006) ("[R]ejections on obviousness grounds cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness.").

### 2. Apple fails to support its similar device, similar way assertion

Apple asserts that it would have been obvious for a POSITA to combine Chin's diffuser and a Sarantos-Mendelson device because "doing so would have amounted to nothing more than the use of a known technique ***to improve similar devices*** in the ***same way*** . . . ." Pet. at 62 (emphasis added). However, as discussed above, Chin's nostril sensor modifications are directed specifically to solve Chin's thin tissue problem. *See supra* § VI.C.1. Sarantos-Mendelson's wrist worn reflectance sensor is for thick tissue and does not have the same backscattering concerns. EX2001 ¶ 65. Moreover, Apple provides no credible evidence that combining Chin's diffuser would improve a different Sarantos-Mendelson device in any way, let alone the same way. Rather, a POSITA would have known that adding

Chin's diffuser in a thick tissue device would actually decrease the amount of light that reached the detector. *See supra* § VI.C.2.

Thus, a POSITA having a Sarantos-Mendelson device would not have been motivated to combine Chin's diffuser based on Apple's conclusory similar device, similar way assertion.

### 3. Apples' naked allegation of a reasonable expectation of success is conclusory

Apple concludes that a POSITA would have a reasonable expectation of successfully "integrating the diffuser of Chin into the . . . sensor of the Sarantos-Mendelson[] combination" because the POSITA would implement the diffuser "specifically *the way* described in Chin." Pet. at 62 (emphasis added). However, Chin fails to disclose any specific way of implementation. EX2001 ¶ 66. Chin states in total, "Also shown is an optional diffuser 180 for diffusing the light from emitter 176 . . . ." EX1006 at 8:24-25. FIG. 7B, below annotated, fails to provide much additional detail.



*Id.* at FIG. 7B (annotated). Chin's block diagram of its transmittance-type, nostril sensor shows reference number 180 generally pointing toward sensor pad 172 near

Appx0379

the emitter 176. EX2001 ¶ 66. Apple fails to provide any indication of how a POSITA *would*, let alone could, implement Chin's diffuser into a Sarantos-Mendelson device "specifically the way described in Chin."

Moreover, even if a POSITA could combine the teachings of Sarantos-Mendelson with Chin, Apple provides no evidence of a reasonable expectation of success. Sarantos emphasizes use of its rectangular detectors arranged in close proximity to its emitters to *maximize* the amount of light reaching the detectors. EX1014 at 18:61-66. In contrast, combining a reflectance-type sensor with a diffuser on sufficiently thick tissue with ample light backscattering properties, *reduces* the amount of light reaching the detector, in some instances by half or more, without the benefit explained by Chin and relied on by Apple. *See supra* § VI.C.2. Such a reduction can increase errors in oxygen and pulse rate measurements and is contrary to the teachings and operation of Sarantos. EX2001 ¶ 67. Thus, other than its unsupported conclusions, Apple fails to provide any evidence that such combination would be successful.

### 4.    Apple ignores the differences between Sarantos' wrist-worn sensor and Chin's nostril-based sensor

Apple's combination is driven by hindsight and ignores the fact that Sarantos and Chin teach two different types of sensors designed for anatomically different measurement sites.

| Sarantos<br>Wrist-Worn, Reflective-Type | Chin<br>Nostril, Transmissive-Type |
|---|---|
|  |  |

FIG. 2

FIG. 7B.

As shown above, Sarantos teaches a reflectance-type sensor that can be incorporated into a wristband-type wearable fitness monitor. EX1014 at 5:55-58; EX2001 ¶ 69. In contrast, Chin teaches a transmittance-type sensor for the nostril. EX1006 at 8:21-22.

In Sarantos, its wrist-worn sensor shines light into the wearer's tissue and measures the amount of light that emanates back out. EX1014 at 7:24-48. The measured light has two components—a component that remains constant (the "DC"

-26-

component) and a component that fluctuates with heart rate (the "AC" component, also referred to as "light intensity"). *Id.* at 7:49-67. According to Sarantos, the AC component is of "principle interest" because it is indicative of heart rate. *Id.* at 8:1-2. Thus, when Sarantos discloses improvements designed to ensure a "strong" signal, Sarantos is referring to improving this AC component. EX2001 ¶ 69.

While the wrist has ample tissue thickness for backscattering of light, the wrist does not have abundant blood flow near the surface of the tissue, making it difficult to detect the AC component. *Id.* Thus, the wrist presents its own challenges for generating a strong AC signal, making it difficult to measure high-quality data. *Id.*

As shown in FIG. 4 of Sarantos, the AC component (red arrows) is greatest at locations closest to the emitter 408.



FIG. 4

Appx0382

*Id.* at FIG. 4 (annotated). Moreover, the AC component falls off to lower intensities at locations further from the emitter 408. *Id.* at 8:39-63 (the number in each bin indicative of the fraction of overall AC light intensity). Sarantos seeks to improve the collected AC component based on the arrangement and size of its detectors. EX2001 ¶ 69; *see, e.g.*, EX1014 at 10:46-50, 11:12-16, 11:65-67. For example, Sarantos positions its detector(s) close to its emitter (s), typically 1 mm to 4 mm apart, to "obtain a sufficiently strong signal at the []detector." EX1014 at 18:61-66, 19:13-18.

In contrast, Chin teaches a transmittance-type sensor for the nostril. EX1006 at 8:21-22. Unlike the wrist, the nostril walls are relatively thin and highly perfused (meaning there is a lot of blood flow), making it easier to measure a strong AC signal. EX2001 ¶ 70. But because the nostril walls are so thin, light passing directly through the nostril walls encounters only a small volume of blood, giving a worse signal-to-noise ratio. *Id.* Thus, designers of nostril sensors must consider how to cause light to encounter more tissue. *Id.* For example, Chin's detector 178 is offset, or purposefully distanced, from its emitter 176. EX1006 at FIG. 7B. "This causes the light emitted by the emitters to pass through more blood-perfused tissue to reach the detector than it would on the direct path . . . if the emitters and detector were opposite each other." *Id.* at Abstract. This is the exact opposite of the teachings of Sarantos.

Anthony acknowledges that "[a]natomy is certainly one of the considerations" that influences whether particular optical components are used in the sensor. EX2003 at 38:19–39:7. Anthony explained anatomy would affect the sensor design "depending on the amount of local [perfusion] -- or local vascularization you're trying to capture." *Id.* at 51:7-21. Yet, when asked "whether any of the opinions written in [his] declaration evaluate how anatomy might affect the proposed combinations," Anthony didn't find it "necessary to highlight in particular whether it was used on one part of the body or other in forming [his] opinions." *Id.* at 55:21-56:15.

A POSITA actually considering the differences between the nostril and the wrist would have understood that the diffuser would be desirable for Chin's transmissive-type, nostril sensor, but not Sarantos' reflectance-type, wrist-worn sensor. EX2001 ¶ 71. A POSITA would have understood that Chin's diffuser would reduce the amount of light detected by a reflectance-type sensor like Sarantos worn on the wrist, increasing (not correcting) a problem Sarantos is attempting to solve. *See supra* § VI.C.2.

### 5. Apple's proposed modification would make Sarantos-Mendelson perform worse

A POSITA would not have been motivated to combine Chin's diffuser with Sarantos-Mendelson because the proposed modification would degrade the performance of Sarantos' wearable fitness monitor.

Anthony explained there are situations where diffusing light would be undesirable, "for example, if you wanted to focus on a small area to get local as opposed to larger diffuse." EX2003 at 50:7–51:2. By that logic, Sarantos does not need a diffuser because its detector elements are positioned close to the emitters, typically between 1 mm to 4 mm. EX1014 at 19:3-12; EX2001 ¶ 73. Sarantos explains it would be "counterproductive" to position the detector element further than 4 mm from the emitter "as a higher-intensity [emitter] may be needed to ensure that sufficient light is diffused across the increased distance." EX1014 at 19:13-18. Higher-intensity emitters are undesirable because they generally consume additional power, which would be "undesirable in a wearable fitness monitor context." *Id.* at 19:18-21. This is because at the time of the disclosure of the '695 Patent, wearable fitness monitors were battery powered and the consumption of additional power generally drains the battery at a faster rate. EX2001 ¶ 73.

Even if a POSITA added a diffuser to Sarantos' wearable fitness monitor, which they would not, the diffuser would spread the light beyond Sarantos' detector positions EX2001 ¶ 73. To compensate, Sarantos would need to space its detector further from the emitters, which Sarantos explicitly taught would require an undesired higher-intensity emitter. *Id.* A POSITA would not make such a modification because Sarantos explicitly positions its detectors close to the emitters to avoid consuming additional power. *Id.*

-30-

### 6. Sarantos-Mendelson already spreads light

Apple argues a POSITA would have been motivated to incorporate Chin's diffuser into a Sarantos-Mendelson device "because the diffuser will further spread[] or mix[ the] . . . light. . . .'" Pet. at 61 (quoting EX1006 at 2:4-7). But a POSITA would understand that Sarantos' LEDs 2408 (red arrow) are recessed from the skin surface (EX1014 at 15:29-33); and therefore, as that light travels toward the tissue, it already spreads in a pattern expected by Sarantos when it positioned its detectors 2414. EX2001 ¶ 74.



**FIG. 24**

EX1014 at FIG. 24 (annotated). For example, Sarantos already discloses a careful and purposeful positioning of its expanded surface area detectors, called HAR detectors (shaded blue), to encompass its expected spread of light. FIGS. 5 and 6 of Sarantos show positioning of its detectors (shaded blue) into the expected spread of light, and that further spreading of the light would change the light patterns depicted. EX1014 at FIGS. 5, 6.

-31-



EX1014 at FIGS. 5, 6 (colored).

FIG. 6, above, graphs the results of a simulation to show that backscattered light intensity decreases with increasing distance from the emitter (simulated as centered). *Id.* at 10:51-67; EX2001 ¶ 74. A POSITA would not have been motivated to add Chin's diffuser to a Sarantos-Mendelson device because Sarantos already carefully arranged its optical elements to maximize the amount of light reaching the detector. *Id.* A diffuser's further spreading of the light simply negates Sarantos' efforts. *Id.*

### 7. Apple has not met its burden to provide a *prima facie* case of obviousness against claims 6, 14, or 21

The Petition either ignores or fails to appreciate the basic differences between the amount of tissue available at the measurement sites of Sarrantos' wrist worn

-32-

sensor and Chin's nostril sensor. When, like in Chin, there is insufficient tissue, Chin suggests modifications to attempt to increase the amount of tissue probed by light. *See supra* § VI.C.1. However, when there is thick tissue like in Sarantos, Mendelson, Ackermans, or Venkatraman, the addition of a diffuser undesirably reduces an amount of light that reaches the detector. *See supra* § VI.C.2.

Apple provides no legitimate basis for why a POSITA having a Sarantos-Mendelson device would modify such device to include Chin's diffuser when such modification is unneeded and undesired. And, even if Apple had provided a basis that a POSITA ***could*** modify a Sarantos-Mendelson device to include Chin's diffuser, which it did not, Apple failed to show that a POSITA ***would*** make such modifications.

Based on at least the foregoing, Apple has not met its burden to provide a *prima facie* case of obviousness against claims 6, 14, or 21.

### E.    Ground 2C (Ackermans and Chin): Apple has not demonstrated the obviousness of claims 6, 14, or 21

The Board relies on Apple's Petition with respect to the combination of Ackermans and Chin without providing additional analysis. Institution at 23-24. In its Petition, Apple admits "Ackermans does not disclose a diffuser." Pet. at 104. Apple does not support its assertions that a POSITA would add Chin's diffuser to Ackermans' wrist-worn, reflectance sensor for at least the following reasons.

### 1. Apple misplaces its reliance on light passing through more tissue

Apple quotes Chin's disclosure of a diffuser in a sensor causing "a further spreading or mixing of light . . . may enhance the amount of tissue penetrated." EX1006 8:25-29. Apple then asserts that it would have been obvious for a POSITA to add Chin's diffuser to Ackermans' device because "the emitted light could pass through more tissue and blood, as taught by Chin." Pet. at 103 (emphasis added).

However, Ackermans and Chin apply their sensors to very different measurement sites. Ackermans discloses a wrist-worn sensor applied to *thick tissue*, and thick tissue provides ample backscattering of light (despite having other characteristics that make the wrist a poor measurement site). EX2001 ¶ 77. In contrast, Chin is a nostril sensor applied to *thin tissue* with problematic backscattering. *Id.* To solve Chin's problematic backscattering, Chin modifies its sensor to attempt to make its thin tissue seem to have more tissue, including adding a diffuser. *See supra* § VI.C.1.

Apple's misguided reliance on Chin's statement about its diffuser "pass[ing] light] through more tissue and blood" ignores Chin's thin tissue problem. Ackermans device does not have Chin's thin tissue problem. *Id.* Thus, a POSITA having Ackermans' device would have no reason to look to Chin for Chin's solutions to its thin tissue problem. EX2001 ¶ 77.

-34-

Moreover, a POSITA would have understood that, for sufficiently thick tissue like at the wrist, the addition of a diffuser in a reflectance sensor significantly reduces the amount of light reaching the detector. *See supra* § VI.C.2. Thus, again, a POSITA having Ackermans' device would not look to Chin's diffuser because the addition of the diffuser would negatively impact measurement accuracy. EX2001 ¶ 78.

In its Petition, Apple simply cherry picks a diffuser from a nostril sensor with no credible motivation for its combination. This is classic hindsight reconstruction. Moreover, even if Apple had shown a POSITA could have added Chin's diffuser to Ackermans' device, which it did not, it is not enough to simply make the mere allegation. *See PersonalWeb*, 848 F.3d at 993-94; *In re Kahn*, 441 F.3d at 988.

### 2.     Apple fails to support its similar device, similar way

Apple asserts that it would have been obvious for a POSITA to combine Chin's diffuser and Ackermans' device because "doing so would have amounted to nothing more than the use of a known technique ***to improve similar devices*** in the ***same way*** . . . ." Pet. at 103-104 (emphasis added). However, as discussed above, Chin's nostril sensor modifications are directed specifically to solve Chin's thin tissue problem. *See supra* § VI.C.1. Ackermans' wrist-worn reflectance sensor is for thick tissue and does not have the same backscattering concerns. EX2001 ¶ 79. Moreover, Apple provides no credible evidence that combining Chin's diffuser

would improve a different Ackermans device in any way, let alone the same way. Rather, a POSITA would have known that adding Chin's diffuser in a thick tissue device would actually decrease the amount of light that reached the detector. *See supra* § VI.C.2.

Thus, a POSITA having the teachings of Ackermans and Chin based on Apple's conclusory similar device, similar way assertion.

### 3.    Apples' naked allegation of a reasonable expectation of success is conclusory

Apple concludes that a POSITA would have a reasonable expectation of successfully "integrating the diffuser of Chin into the pulse oximetry sensor of Ackermans" because the POSITA would implement the diffuser "specifically ***the way*** described in Chin." Pet. at 104 (emphasis added). However, Chin fails to disclose any specific way of implementation. EX2001 ¶ 80. Chin states in total, "Also shown is an optional diffuser 180 for diffusing the light from emitter 176 . . . ." EX1006 at 8:24-25. FIG. 7B, below annotated, fails to provide much additional detail.



-36-

*Id.* at FIG. 7B (annotated). Chin's block diagram of its transmittance-type, nostril sensor shows reference number 180 generally pointing toward sensor pad 172 near the emitter 176. EX2001 ¶ 80. Apple fails to provide any indication of how a POSITA ***would***, let alone could, implement Chin's diffuser into Ackermans' device "specifically the way described in Chin."

Moreover, even if a POSITA could combine the teachings of Ackermans and Chin, Apple provides no evidence of a reasonable expectation of success. Combining a reflectance-type sensor with a diffuser on tissue already sufficiently thick to provide ample backscattering, ***reduces*** the amount of light reaching the detector, in some instances by half or more. *See supra* § VI.C.2. Such a reduction can increase errors in oxygen and pulse rate measurements. EX2001 ¶ 81. Thus, other than its unsupported conclusions, Apple fails to provide any evidence that such combination would be successful.

Appx0392

### 4.    Apple ignores the differences between Ackermans' wrist-worn sensor and Chin's nostril-based sensor

Apple's combination is driven by hindsight and ignores the fact that Ackermans and Chin teach two different types of sensors designed for anatomically different measurement sites.

| Ackermans<br>Wrist-Worn, Reflective-Type | Chin<br>Nostril, Transmissive-Type |
|---|---|
|  | |

As shown above, Ackermans teaches a reflectance-type sensor that can be implemented within a wristwatch. EX1016 at 4:22-24, 10:31-32; EX2001 ¶ 83. While the wrist has thick tissue providing ample backscattering of light, the wrist does not have abundant blood flow near the surface of the tissue. EX2001 ¶ 83. Thus, the wrist presents its own challenges for finding strong AC signal, making it difficult to measure high-quality data. *Id.*

-38-

In contrast, Chin teaches a transmittance-type sensor for the nostril. EX1006 at 8:21-22. Unlike the wrist, the nostril walls are relatively thin and highly perfused (meaning there is a lot of blood flow), making it easier to measure a strong signal. EX2001 ¶ 84. But because the nostril walls are so thin, light passing directly through the nostril walls encounters only a small volume of blood, giving a worse signal-to-noise ratio. *Id.* Thus, designers of nostril sensors must consider how to cause light to encounter more tissue. *Id.* For example, Chin's detector 178 is offset from its emitter 176. EX1006 at FIG. 7B. "This causes the light emitted by the emitters to pass through more blood-perfused tissue to reach the detector than it would on the direct path . . . if the emitters and detector were opposite each other." *Id.* at Abstract.

Anthony acknowledges that "[a]natomy is certainly one of the considerations" that influences whether particular optical components are used in the sensor. EX2003 at 38:19–39:7. Anthony explained anatomy would affect the sensor design "depending on the amount of local [perfusion] -- or local vascularization you're trying to capture." *Id.* at 51:7-21. Yet, when asked "whether any of the opinion written in [his] declaration evaluate how anatomy might affect the proposed combinations," Anthony didn't find it "necessary to highlight in particular whether it was used on one part of the body or other in forming [his] opinions." *Id.* at 55:21–56:15.

A POSITA actually considering the differences between the nostril and the wrist would have understood that the diffuser would be desirable for Chin's transmissive-type, thing tissue nostril sensor, but not Ackermans' reflectance-type, thick tissue wrist-worn sensor. EX2001 ¶ 85. A POSITA would have understood that Chin's diffuser would reduce the amount of light detected by a reflectance-type sensor like Ackermans worn on the wrist. *See supra* § VI.C.2.

### 5.    Apple's proposed modification would make Ackermans perform worse

A POSITA would not have been motivated to combine Chin's diffuser with Ackermans because the proposed modification would make Ackermans' device perform worse.

Ackermans does not need a diffuser because its "light emitter and the []detector are arranged concentric to each other in a compact way that allows obtaining a high signal quality." EX1016 at 2:31-32; EX2001 ¶ 87. Ackermans makes its sensor compact so the "signal delivered by the []detector 30 is less affected by movement artifacts." EX1016 at 5:28-33. Even if a POSITA added a diffuser to Ackermans' device, which they would not, the diffuser would spread the light out, requiring the detector element to be spaced further from the emitters. EX2001 ¶ 87. A POSITA would not make such a modification because Ackermans explicitly positions its detector close to the light emitter to obtain its purported benefit of a high signal quality. *Id.*

-40-

Moreover, Ackermans is a battery-powered device. EX1016 at 10:31-33. Spacing the detector further from the emitter would require a higher-intensity emitter. EX2001 ¶ 88. Higher-intensity emitters are undesirable because they generally consume additional power, which would be undesirable for a battery-powered device. *Id.* A POSITA would not have made such a modification to Ackermans' battery-powered device to avoid consuming additional power. *Id.*

### 6. Ackermans already spreads light

Apple argues a POSITA would have been motivated to incorporate Chin's diffuser into the pulse oximeter of Ackermans "because the diffuser will cause the light 'to pass through more tissue, and thus more blood.'" Pet. at 104 (quoting EX1006 at 2:4-7). Ackermans' light emitter 20 is recessed from the skin surface. *See* EX1016 at FIG. 1. A POSITA would understand the emitted light 21 spreads in a pattern expected by Ackermans, as indicated below. EX2001 ¶ 89.



FIG. 1

-41-

EX1016 at FIG. 1. Ackermans discloses a compact design to minimize the effects of motion artifacts. EX1016 at 5:28-33. A POSITA would not have been motivated to add Chin's diffuser to Ackerman's device because Ackermans already arranged its optical elements to minimize the effects of motion artifacts. EX2001 ¶ 89. A diffuser's further spreading of the light simply negates Ackermans' express teachings. *Id.*

### 7.    Apple has not met its burden to provide a *prima facie* case of obviousness against claims 6, 14, or 21

The Petition either ignores or fails to appreciate the basic differences between the amount of tissue available at the measurement sites of Ackerman's wrist worn sensor and Chin's nostril sensor. When, like in Chin, there is insufficient tissue, Chin suggests modifications to attempt to increase the amount of tissue probed by light. *See supra* § VI.C.1. However, when there is ample tissue like in Ackermans, Sarantos, Mendelson, or Venkatraman, the addition of a diffuser undesirably reduces an amount of light that reaches the detector. *See supra* § VI.C.2.

Apple provides no legitimate basis for why a POSITA having Ackerman's device would modify such device to include Chin's diffuser when the modification is unneeded and undesired. And, even if Apple had provided a basis that a POSITA *could* modify Ackermans' device to include Chin's diffuser, which it did not, Apple failed to show that a POSITA *__would__* make such modifications.

IPR2020-01722
Apple v. Masimo – Patent 10,470,695

Based on at least the foregoing, Apple has not met its burden to provide a *prima facie* case of obviousness against claims 6, 14, or 21.

## VII.  CONCLUSION

The Board should not find claims 6, 14, and 21 of the '695 Patent obvious on the proposed grounds.

<div style="margin-left:40%">

Respectfully submitted,
KNOBBE, MARTENS, OLSON & BEAR, LLP

</div>

Dated:  August 9, 2021          By:  /Shannon Lam/
                                        Joseph R. Re (Reg. No. 31,291)
                                        Jarom D. Kesler (Reg. No. 57,046)
                                        Stephen W. Larson (Reg. No. 69,133)
                                        Shannon H. Lam (Reg. No. 65,614)

<div style="margin-left:40%">

Attorneys for Patent Owner
Masimo Corporation

</div>

IPR2020-01722
Apple v. Masimo – Patent 10,470,695

# <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to 37 C.F.R. §42.24(d), the undersigned certifies that the foregoing

**MASIMO RESPONSE TO PETITION FOR INTER PARTES REVIEW**,

exclusive of the parts exempted as provided in 37 C.F.R. §42.24(a), contains 7,888

words and therefore complies with the type-volume limitations of 37 C.F.R.

§42.24(a).

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated:  August 9, 2021          /Shannon Lam/
                              Shannon H. Lam (Reg. No. 65,614)
                              Attorney for Patent Owner
                              Masimo Corporation

IPR2020-01722
Apple v. Masimo – Patent 10,470,695

# CERTIFICATE OF SERVICE

I hereby certify that, pursuant to 37 C.F.R. § 42.6(e) and with the agreement

of counsel for Petitioner, a true and correct copy of **MASIMO RESPONSE TO**

**PETITION FOR INTER PARTES REVIEW** is being served electronically on

August 9, 2021, to the e-mail addresses below:

W. Karl Renner
Daniel D. Smith
Kenneth Hoover
Fish & Richardson P.C.
3200 RBC Plaza
60 South Sixth Street
Minneapolis, MN 55402
IPR50095-00041P1@fr.com; PTABInbound@fr.com; dsmith@fr.com;
axf-ptab@fr.com, hoover@fr.com


Dated:  August 9, 2021        By:  /Shannon Lam/
                              Joseph R. Re (Reg. No. 31,291)
                              Jarom D. Kesler (Reg. No. 57,046)
                              Stephen W. Larson (Reg. No. 69,133)
                              Shannon H. Lam (Reg. No. 65,614)

                              Attorneys for Patent Owner
                              Masimo Corporation

53920078

Case No. IPR2020-01722
Attorney Docket: 50095-0004IP1

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

APPLE INC.

Petitioner,

v.

MASIMO CORPORATION,

Patent Owner.

———————————

Case IPR2020-01722
U.S. Patent 10,470,695

———————————

**PETITIONER'S REPLY TO PATENT OWNER RESPONSE**

Case No. IPR2020-01722
Attorney Docket: 50095-0004IP1

therefore, as explained below, the results of the experiment are not indicative of the performance of the combined prior art devices.

For these and other reasons described herein, Apple respectfully submits that the Board should find claims 6, 14, and 21 ("the Challenged Claims") of the '695 patent unpatentable.

## II.    CLAIMS 6, 14, AND 21 ARE UNPATENTABLE

As explained in the Petition, claims 6, 14, and 21 of the '695 patent are rendered obvious by the combination of Sarantos, Mendelson-1991, and Chin (Ground 1D, *see* Petition, 60-64), and by the combination of Ackermans and Chin (Ground 2C, *see* Petition, 102-106).[3]  The POR presents several arguments with respect to these Grounds.  As explained in the sections below, these arguments fail.

### A.    Patent Owner's invented distinction between "thick tissue" and "thin tissue" devices is not supported by the evidence of record

Patent Owner attempts to draw a bright line between pulse oximeters used in body locations having what it terms "thick" tissue (e.g., "the wrist"), and those used in locations having "thin" tissue (e.g., the "nostril").  *See, e.g.,* POR, 16-20. The POR characterizes the pulse oximeter described in Chin as a "thin tissue device" that is so vastly different from "thick tissue" pulse oximeters (e.g., those

---

[3] Petition Grounds 1A-1C and 2A-2B are directed solely to claims disclaimed by Patent Owner.  *See* Ex. 2004.

described in Sarantos and Ackermans) that Chin's teachings are inapplicable to

such devices. *See id.,* 19-20; *see also* APPLE-1022, 23:2-7. This argument lacks

support in—and is in fact contradicted by—the evidence of record.

Patent Owner provides no evidentiary support—besides uncorroborated

testimony from its expert—for this alleged dichotomy between "thin tissue" and

"thick tissue" pulse oximeters. *See* POR, 16-20 (citing EX2001, [52]-[56]).

Similarly, it relies solely on uncorroborated expert testimony to support its

conclusion that pulse oximetry techniques described with respect to one tissue

site—such as those described in Chin—are inapplicable to devices operating at a

different tissue site—such as the wrist-worn devices described in Sarantos and

Ackermans. *See* POR, 16-20 (citing EX2001, [52]-[56]). It is well-settled that

uncorroborated expert testimony, such as Dr. Madisetti's testimony relied on by

Patent Owner, is insufficient to support arguments regarding obviousness. *See TQ*

*Delta v. Cisco Systems*, 942 F. 3d 1352, 1358-1363 (Fed. Cir. 2019) ("This court's

opinions have repeatedly recognized that conclusory expert testimony is

inadequate to support an obviousness determination on substantial evidence review").[4]

Although the POR includes a handful of citations to Chin, Sarantos, and Ackermans in its "thick tissue" / "thin tissue" argument, the cited disclosure does not support Patent Owner's alleged distinction between "thin tissue" and "thick tissue" devices. *See* POR, 16-20 (citing APPLE-1006, 1:14-21, 2:39-62, 7:13-41, 8:21-29, FIGS. 5C-5E, 7B; APPLE-1014, 7:12-16; APPLE-1015, 15:43-45). In fact, neither Sarantos, nor Ackermans, nor Chin describes its pulse oximeter as applicable to only "thick" or "thin" tissue, and none of these references use the terms "thick" or "thin" when describing tissue measurement sites. *See* APPLE-1006, APPLE-1014, APPLE-1016.

No evidence of record supports Patent Owner's alleged distinction. In fact, Chin specifically states that its sensor "could attach to ***any body part***," thereby contradicting Patent Owner's classification of Chin as directed only to "thin tissue" devices. APPLE-1006, 5:55-56. In addition, it was well-known that reflectance

---

[4] Patent Owner and its expert fail to even provide information on how to categorize a particular tissue site as "thick" or "thin." *See* POR, 16-20; *see also* APPLE-1022, 19:15-20:17, 21:18-22:16 (Dr. Madisetti refusing to explain his definition of "thin" tissue).

pulse oximeters, such as those described in Sarantos and Ackermans, "can be used to measure arterial oxygen saturation at virtually any place on the human body." *See, e.g.,* APPLE-1021, 88; *see also* 91 ("Reflectance probes can be placed on virtually any place on the body where we can expect light reflection due to tissue").  This flexibility in the placement location of reflectance pulse oximeters runs counter to the alleged distinction between "thick" and "thin" pulse oximeters upon which Patent Owner bases many of its arguments.  *See, e.g.,* POR, 16-20.

Patent Owner's distinction between "thick tissue" and "thin tissue" pulse oximeters is thus unsupported by the evidence of record.  Accordingly, the many arguments in the POR that rely on this theory must fail.

### B.    Dr. Madisetti's experimental results are not indicative of the performance of devices with multiple photodetectors

Patent Owner also alleges that, contrary to Chin's explicit disclosure, adding diffuser would "have significant detrimental consequences to the performance of a pulse oximeter."  POR, 21; *contra* APPLE-1006, 8:24-28 ("optical diffuser 180… causes a further spreading or mixing of light and may enhance the amount of tissue penetrated in some instances").  To support this argument, the POR cites results of an experiment in which Dr. Madisetti selected and placed two commercially-available diffusers over the emitter of a Masimo pulse oximetry sensor, and measured the amount of reflected light detected by the sensor when performing a simulated measurement of a tissue analog.  *See, e.g.,* POR, 20 (citing EX2001,

6

Case No. IPR2020-01722
Attorney Docket: 50095-0004IP1

[58]-[59]). Beyond showing the feasibility and predictability of the proposed prior art combinations (by combining an optical diffuser with a wrist-worn reflectance pulse oximeter), Dr. Madisetti's experiment is irrelevant to the present proceeding, because the Masimo pulse oximeter used in these experiments includes ***a single photodetector***, as shown in the following excerpt from Dr. Madisetti's declaration:

 

Single-detector device used in Dr. Madisetti's experiment.
EX2001, Appendix p 1 (annotations in original)

Conversely, the devices described in Sarantos and Ackermans, which form the basis of the two proposed combinations, both include ***a plurality of photodetectors***, as required by the claims of the '695 patent. *See* Petition, 11-17, 71-75; APPLE-1001, claim 1 (reciting "a plurality of detectors"). The following annotated figures show these configurations with the multiple photodetectors annotated in green:

7

Case No. IPR2020-01722
Attorney Docket:  50095-0004IP1



APPLE-1014 (Sarantos),
Detail of FIG. 15 (annotated)

APPLE-1016 (Ackermans),
Detail of FIG. 2 (annotated)

*See also* APPLE-1015, 2 (FIG. 1 depicts a device with multiple photodetectors arranged around a central LED).

Devices with multiple detectors will detect additional reflected light that will not be detected by a single detector (*i.e.*, light that strikes the area of the device covered by the additional detector). *See, e.g.,* APPLE-1014, 14:46-55 (explaining that using multiple photodetectors arrange around the light source can lead to more light being detected and thus "increase the signal to ambient noise ratio" of the device); APPLE-1015, 2 ("The major feature of the optical layout design is the multiple photodiode array, which….maximizes the amount of backscattered light that is detected by the sensor").   Thus, the single-detector device used in Dr. Madisetti's experiment is fundamentally different from the devices described in the Sarantos and Ackermans combinations, and therefore the results of the experiment

8

are not indicative of the performance of the combined prior art devices of Sarantos

and Ackermans.  Accordingly, the many arguments in the POR that rely on this

theory must fail.

### C.     Ground 1D: Claims 6, 14, and 21 are obvious over Sarantos in view of Mendelson-1991 and Chin

As explained in the Petition, the Sarantos-Mendelson-1991-Chin

combination renders claim 6, 14, and 21 obvious.  *See* Petition, 60-64.  The POR

presents various arguments with respect to this Ground.  As explained in the

sections below, these arguments fail.

### 1.     A POSITA would have been motivated to add Chin's diffuser to the combined device of Sarantos and Mendelson-1991

As explained in the Petition:

> [A] POSITA would have been motivated to incorporate Chin's diffuser into the pulse oximeter of Sarantos and Mendelson because the diffuser will cause the light "to pass through more tissue, and thus more blood," resulting in a stronger reflected signal at the detectors, which "allows it to be more easily processed by the oximeter electronics and software" to determine the measured physiological parameters.

Petition, 62-63 (quoting APPLE-1006, 2:4-7, 9:64-10:7) (citing APPLE-

1006, 8:25-29; APPLE-1003, [99]).  Patent Owner argues that the "Sarantos

9

discloses a wrist-worn sensor applied to ***thick tissue***, which does not suffer the

same ***thin tissue*** problem that Chin attempts to solve."  POR, 22, 23.  But, as

described above (*see* Section II.A, *supra*), Patent Owner's distinction between

"thick tissue" and "thin tissue" devices has no basis in Chin or Sarantos—neither

reference describes such a distinction—or indeed in any of the evidence of record.

In fact, Chin specifically states that its sensor "could attach to any body part,"

thereby contradicting Patent Owner's classification of Chin as only being

concerned with a "thin tissue problem."  APPLE-1006, 5:55-56.

Patent Owner also argues that "the addition of a diffuser in a reflectance

sensor significantly reduces the amount of light reaching the detector," and relies

only on the results of Dr. Madisetti's single-detector experiment for support.  *See*

POR, 22-24.  But, as explained above (*see* Section II.B, *supra*), the results of Dr.

Madisetti's single-detector experiment are not indicative of the performance of

devices with multiple photodetectors.

Thus, for at least these reasons, these arguments fail.

### 2.    A POSITA would have had a reasonable expectation of success when performing the proposed modification

The Petition states that "because a POSITA would be implementing the

diffuser in a known way (specifically the way described in Chin), a POSITA would

have had a reasonable expectation of success in integrating the diffuser of Chin

into the pulse oximetry sensor of the Sarantos-Mendelson-1991 combination."

Petition, 62 (citing APPLE-1003, [98]; APPLE-1006, 8:20-28). Patent Owner

argues that a POSITA would have had no reasonable expectation of success in

adding Chin's diffuser to the combined device of Sarantos-Mendelson-1991

because it alleges, again relying on the results of Dr. Madisetti's single-detector

experiment, that the amount of light reaching the detectors would be reduced by

the addition of the diffuser. POR, 24-25. But, as explained above (*see* Section

II.B, *supra*), the results of Dr. Madisetti's single-detector experiment are not

indicative of the performance of devices with multiple photodetectors, and

therefore fail to support Patent Owner's argument.

Petitioner's argument regarding reasonable expectation of success,

conversely, is supported by the explicit disclosure of Chin, which, contrary to

Patent Owner's characterizations, is explicitly directed to sensors attached to "any

body part." *See* APPLE-1006, 5:55-56; Petition, 62 (citing APPLE-1003, [98];

APPLE-1006, 8:20-28).

Accordingly, Patent Owner's arguments fail.

### 3. Patent Owner's arguments rely on mischaracterizations of the prior art that ignore explicit disclosures in the references

Patent Owner repeatedly mischaracterizes the prior art references in self-

serving ways to attempt to undermine the combinations described in the Petition.

For example, as previously discussed (*see* Section II.A, *supra*), Patent Owner

characterizes Chin as limited to a "nostril-based" sensor even though the reference explicit states that its sensor "could attach to any body part." APPLE-1006, 5:55-56.

In addition, Patent Owner characterizes Sarantos as limited to configurations where the photodetectors are spaced "1 mm to 4 mm" from the central emitter. *See, e.g.,* POR, 28, 30. But Sarantos specifically states that "implementations discussed herein may be used in products that achieve closer or farther spacing from the light source center, such as spacing closer than 1 mm or farther than 4 mm." APPLE-1014, 18:66-19:2. Further, Patent Owner's arguments regarding these dimensions assume, without support, that the addition of Chin's diffuser would spread the light from Sarantos' emitter to an extent that the pattern of light reaching the photodetectors would be vastly changed, thus disrupting the operation of the device. POR, 29-32. Nothing in the references or in the description of the combination in the Petition suggests that the effect of Chin's diffuser would be so drastic. In fact, even a slight spreading of the emitted light would still "cause [the light] to pass through more tissue, and thus more blood" thereby leading to improved performance, as taught by Chin. *See* APPLE-1006, 2:4-9, 8:25-29.

Thus, Patent Owner's arguments fail.

12

**D.    Ground 2C: Claims 6, 14, 21 are obvious over Ackermans in view of Chin**

As explained in the Petition, the Ackermans-Chin combination renders claims 6, 14, and 21 obvious.  *See* Petition, 102-106.  The POR presents various arguments with respect to this Ground, many of which are nearly identical to those presented with respect to Ground 1D.  As explained in the sections below, these arguments fail.

**1.    A POSITA would have been motivated to add Chin's diffuser to Ackermans' device**

As explained in the Petition:

> [A] POSITA would have been motivated to incorporate Chin's diffuser into the pulse oximeter of Ackermans because the diffuser will cause the light "to pass through more tissue, and thus more blood," resulting in a stronger reflected signal at the detectors, which "allows it to be more easily processed by the oximeter electronics and software" to determine the measured physiological parameters.

Petition, 102-103 (quoting APPLE-1006, 2:4-7, 9:64-10:7) (citing APPLE-1006, 8:25-29; APPLE-1003, [99]).  Patent Owner argues that the "Ackermans discloses a wrist-worn sensor applied to thick tissue," and "a POSITA having Ackermans' device would have no reason to look to Chin for Chin's solutions to its thin tissue problem."  POR, 34.  But, as described above (*see* Section II.A,

13

*supra*), Patent Owner's distinction between "thick tissue" and "thin tissue" devices

has no basis in Chin or Ackermans—neither reference describes such a

distinction—or indeed in any of the evidence of record. In fact, Chin specifically

states that its sensor "could attach to any body part," thereby contradicting Patent

Owner's classification of Chin as only being concerned with a "thin tissue

problem." APPLE-1006, 5:55-56.

Patent Owner also argues that "the addition of a diffuser in a reflectance

sensor significantly reduces the amount of light reaching the detector," and relies

only on the results of Dr. Madisetti's single-detector experiment for support. *See*

POR, 35. But, as explained above (*see* Section II.B, *supra*), the results of Dr.

Madisetti's single-detector experiment are not indicative of the performance of

devices with multiple photodetectors.

Thus, for at least these reasons, these arguments fail.

### 2.   A POSITA would have had a reasonable expectation of success when performing the proposed modification

The Petition states that "because a POSITA would be implementing the

diffuser in a known way (specifically the way described in Chin), a POSITA would

have had a reasonable expectation of success in integrating the diffuser of Chin

into the pulse oximetry sensor of the Sarantos-Mendelson-1991 combination."

Petition, 104 (citing APPLE-1003, [162]; APPLE-1006, 8:20-28). Patent Owner

argues that a POSITA would have had no reasonable expectation of success in

14

# Apple Inc. (Petitioner)
## v.
# Masimo Corporation (Patent Owner)

## Petitioner Demonstratives

Case No. IPR2020-01722
U.S. Patent No. 10,470,695

Before Hon. Josiah C. Cocks, Robert L. Kinder, Amanda F. Wieker
Administrative Patent Judges

**FISH.**

DEMONSTRATIVE EXHIBIT – NOT EVIDENCE

APPLE 1023
Apple v. Masimo
IPR2020-01722

# Issue 2

## Masimo's "Experiment" is Unavailing



DEMONSTRATIVE EXHIBIT – NOT EVIDENCE

# Masimo's "experiment" is unavailing

## <u>Patent Owner's Response</u>

To confirm that a diffuser reduces light that reaches the detector, Masimo's expert, Dr. Madisetti, conducted experiments applying different diffuser materials to reflectance-type sensors. *Id.* ¶¶ 58-59. Dr. Madisetti showed that a mostly transparent diffuser reduced the amount of light that reached the detector by about 14% to 17%. *Id.* ¶ 59. Dr. Madisetti also showed that a less-transparent diffuser reduced the amount of light that reached the detector by up to about 40% for infrared light and about 50% for red light. *Id.*

POR, 20



DEMONSTRATIVE EXHIBIT – NOT EVIDENCE

26

# Masimo's "experiment" is unavailing

## Petitioner's Reply

the devices described in Sarantos and Ackermans, which form the basis of the two proposed combinations, both include *a plurality of photodetectors*, as required by the claims of the '695 patent. *See* Petition, 11-17, 71-75; APPLE-1001, claim 1 (reciting "a plurality of detectors").

Reply, 7





APPLE-1014 (Sarantos),
Detail of FIG. 15 (annotated)

APPLE-1016 (Ackermans),
Detail of FIG. 2 (annotated)

DEMONSTRATIVE EXHIBIT – NOT EVIDENCE

Reply, 7

27

**FISH.**

# Masimo's "experiment" is unavailing

## Petitioner's Reply

==Dr. Madisetti's experiment is irrelevant== to the present proceeding,

==because the Masimo pulse oximeter used in these experiments includes *a single*==

==*photodetector*==, as shown in the following excerpt from Dr. Madisetti's declaration:

Reply, 7

 

==Single-detector== device used in Dr. Madisetti's experiment.
EX2001, Appendix p 1 (annotations in original)

Reply, 7

DEMONSTRATIVE EXHIBIT – NOT EVIDENCE

**FISH.**

28

# Masimo's "experiment" is unavailing

## Petitioner's Reply

Devices with multiple detectors will detect additional reflected light that will not be detected by a single detector (*i.e.*, light that strikes the area of the device covered by the additional detector). *See, e.g.,* APPLE-1014, 14:46-55 (explaining that using multiple photodetectors arrange around the light source can lead to more light being detected and thus "increase the signal to ambient noise ratio" of the device); APPLE-1015, 2 ("The major feature of the optical layout design is the multiple photodiode array, which….maximizes the amount of backscattered light that is detected by the sensor").

Reply, 8 (quoting Sarantos, Mendelson 1991)



DEMONSTRATIVE EXHIBIT – NOT EVIDENCE

29

# Masimo's "experiment" is unavailing

### Petitioner's Reply

Thus, the single-detector device used in Dr. Madisetti's experiment is fundamentally different from the devices described in the Sarantos and Ackermans combinations, and therefore the results of the experiment are not indicative of the performance of the combined prior art devices of Sarantos and Ackermans. Accordingly, the many arguments in the POR that rely on this theory must fail.

Reply, 8-9



DEMONSTRATIVE EXHIBIT – NOT EVIDENCE

30

Trials@uspto.gov                                           Paper # 28
571-272-7822                                        Entered: April 5, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

APPLE INC.,
Petitioner,

v.

MASIMO CORPORATION,
Patent Owner.

————————

IPR2020-01722
Patent 10,470,695 B2

————————

Record of Oral Hearing
Held:  February 9, 2022

————————

Before JOSIAH C. COCKS, ROBERT L. KINDER, and
AMANDA F. WIEKER, *Administrative Patent Judges.*

IPR2020-01722
Patent 10,470,695 B2

1  portion of Chin that you'll hear quite a bit about in our presentation here is

2  column 5, lines 55 through 56 and it's cited throughout Petitioner's briefing,

3  for example, at page 5 of our reply and as we'll discuss in greater detail Chin

4  offers an example in which its diffuser is positioned on a sensor used on a

5  finger which is the very site described by one of the primary references with

6  which it's combined.

7       Go to slide 11.  So in light of this disclosure we return to the primary

8  references to explore what a POSITA would have found obvious and we

9  begin with Sarantos, and in particular Sarantos combined with Mendelson-

10  1991.  Both references describe pulse oximetry devices having centrally

11  located emitters surrounded by plural detectors and viewed by a POSITA

12  Sarantos and Mendelson-1991 would combine with the light blocking wall

13  of Sarantos implemented using a single structure taught by Mendelson-1991.

14  Masimo has not disputed this aspect of the Sarantos-based ground and in

15  fact rather than debate this recalling Masimo disclaimed the independent

16  claims.

17       Let's go to slide 12, please.  So as with Sarantos and Mendelson,

18  Ackermans teaches a medical optical sensor including a centrally located

19  emitter surrounded by multiple photodetectors and again Masimo does not

20  dispute that Ackermans teaches all elements of the independent claims.

21       Let's go to slide 13.  So the petition sets forth evidence substantiating

22  how and why a POSITA would have found it obvious to add Chin's diffuser

23  to both the combined devices of Sarantos and Mendelson-1991 and the

24  device of Ackermans.  The basic configuration of Chin's diffuser in both

25  combinations are shown in the petition in the figure shown at the bottom of

26  this slide.  Now in both combinations Chin's diffuser shown in green is

7

1     MR. SMITH:  Yes, I can.  Give me one second.  I believe that's

2     column 1, lines 21 through 22.

3     JUDGE COCKS:  Thank you.

4     MR. SMITH:  So on slide 25, and moving on to our second issue we'll

5     discuss the experiment described in Masimo's Patent Owner response and

6     why its results are unavailing to the prior art combinations in question in this

7     case.

8     Slide 26.  So the Patent Owner response describes an experiment

9     performed by Masimo's expert Dr. Madisetti.  In this experiment Dr.

10    Madisetti plays two different diffusing films over the emitter of a pulse

11    oximeter and he used the combined device to illuminate a block of material

12    designed to mimic human tissue.  Dr. Madisetti then measured the amount of

13    reflected light received by the single photodetector of the combined device

14    and Masimo has not shown the results of this experiment are indicative to

15    the performance of any of the asserted prior art devices.

16    Let's go to slide 27.  First, the devices of Sarantos and Ackermans

17    include a plurality of photodetectors as opposed to the single photodetector

18    that's described or is present used in the device in the experiment.  The

19    detectors shown in green in the figures at the bottom of slide 27 specifically

20    looking at the left figure from Sarantos we see that the photodetectors that

21    are outlined in green cover a large portion of the area surrounding the central

22    emitter.  Light that's reflected form the tissue measurement site and hits any

23    area covered by these photodetectors will be detected by the device.

24    Let's go to slide 28.  In contrast the pulse oximeter used in Masimo's

25    experiment includes a single photodetector as shown in the figure at the

26    bottom of slide 28. It's taken from Dr. Madisetti's declaration at page 1 of the

11

IPR2020-01722
Patent 10,470,695 B2

1   appendix and we can see in this figure that the single photodetector of the

2   device covers a considerably smaller area than the multiple detectors in

3   Sarantos and in fact light that is spread away from the central emitter by a

4   diffuser in Masimo's single detector device, if light is spreading in directions

5   other than towards that single detector it's not likely to be detected.  By

6   contrast, in the multiple detector devices like Sarantos, a large portion of the

7   area surrounding the central emitter is covered by multiple photodetectors

8   meaning that more of the light wave in the detectors than in a single detector

9   device that has the less area of the surface of the device covered by

10  detectors.

11      Let's go to slide 30.  So the devices described in Sarantos, Mendelson-

12  1991 and Ackermans all have multiple detectors while the device in Dr.

13  Madisetti's experiment only has one.  Masimo thus has not shown that the

14  results of the experiment are indicative of the performance of either the

15  combined device of Sarantos, Mendelson and Chin or the combined device

16  of Ackermans and Chin.  Importantly, Masimo's arguments that rely on

17  these experimental results to show that Chin's diffuser would lead to a

18  reduction in received light, those arguments must fail and with that I'll

19  reserve my remaining time for rebuttal unless there are questions, Your

20  Honors.

21      JUDGE COCKS:  This is Judge Cocks.  Not for me.  Thank you.

22      MR. SMITH:  Thank you.

23      JUDGE KINDER:  Thank you.  This is Judge Kinder.  It sounds like

24  the panel does not have any questions at this time but I think you have a

25  little bit of time left but your rebuttal is 30 minutes so that should be

26  sufficient.  Mr. Grover, whenever you're ready you may begin Patent

12

1    Owner's response.

2          MR. GROVER:  Appreciate it, Your Honor.  John Grover for the

3    Patent Owner Masimo Corporation.  Much like the Petitioner said, the Patent

4    Owner has disclaimed all the claims of the '695 patent except for dependent

5    claims 6, 14 and 21 and for the purpose of this IPR and my arguments today,

6    claims 6, 14 and 24 stand or fall together.  The claims add a diffuser to a

7    wrist worn monitor and even though claim 14 is a method claim my

8    arguments -- I'm going to treat them collectively so that they stand and fall

9    together in my arguments today.

10          Additionally, there are only two grounds left of interest as the

11   Petitioner said.  Ground 1D and it consists of a combination reference which

12   I'm going to refer to as the base reference, that's Sarantos combined with

13   Mendelson and further combined with Chin.  Ground 2C is the base

14   reference Ackermans, also combined with Chin.  So as I discuss -- as you

15   might imagine today I'm going to discuss Chin in some detail and rather than

16   be repetitive I might bounce back and forth between ground 1 and ground 2.

17   I'll try and be very clear which ground I'm talking about by referencing the

18   base references of Sarantos combined with Mendelson or Ackermans by

19   itself.  But if anybody gets confused as to which ground I'm talking about,

20   please interrupt me and let me know and I'll back up.

21          Let's start with the fact that adding a diffuser to an optical sensor

22   reduces the amount of light.  I'm going to go into great detail as to why in a

23   minute, but just keep that in your head as I start talking about the prior art.

24          Let's turn to slide 7 and I'm going to start with Sarantos.   Sarantos is a

25   wrist worn health monitor and it shapes it's detector specifically to try and

26   get as much light as it possible can and I think even the Petitioner mentioned

13

IPR2020-01722
Patent 10,470,695 B2

1    of light in the addition of the diffusers.  For the Berry it was somewhere

2    between 40 and 50 percent and for the Luminit it was somewhere between

3    14 and 17 percent, so this is the only actual evidence in the record that Dr.

4    Madisetti ran these experiments and came up with the proof that there is less

5    light when you add a diffuser.  There's no --

6        JUDGE KINDER:  This is Judge Kinder.

7        MR. GROVER:  Sure.

8        JUDGE KINDER:  I guess can you address the Petitioner's argument

9    that this is a single detector whereas their prior art would envision multiple

10   photodetectors I guess surrounding the sensor?

11       MR.GROVER:  Sure, Judge Kinder.  Yes, I'm happy to talk about that

12   for a minute.  So the question really is trying to skirt the issue because what

13   we're really trying to decide here is given the base references in either

14   ground which are multidetector references would one of ordinary skill go out

15   into the universe and find a diffuser?  That's really the question we're asking.

16   We're not asking would they add more detectors, we're asking would they

17   find a diffuser.  So the real comparison is with a diffuser or without a

18   diffuser and if you think about a diffuser, diffusers spread light over a wider

19   area.  Sarantos had specifically designed his sensors for his high aspect ratio

20   shaped detectors to be in a specific place and Ackermans, well let me just

21   finish that thought.

22       So for Sarantos, he designed the sensors to be in a specific place with

23   respect to the light.  If you spread that light out, there's less light there.  Now

24   if Sarantos had one detector, then maybe there would be less light but maybe

25   there would be more light with multiple detectors but the multiple detector

26   question is really missing the issue.  The issue is whether or not the diffuser

16

IPR2020-01722
Patent 10,470,695 B2

1   actually reduces light and if you look at actually the patent at issue -- let me

2   just make sure I get the cite right, I apologize.  Yes, it's right here.  So if you

3   look at the patent at issue on column 8, 15 to 19, the disclosure says that that

4   diffuser which is very important to the '695 disclosure, that diffuser has an

5   efficiency of something about 70 percent.  So obviously what that means is

6   up to 30 percent is lost which correlates to what Dr. Madisetti found.

7   Diffusers cause the reduction in light.

8        Looking at -- just finishing my thought with ground 2 and Ackermans.

9   Ackermans is trying to minimize the size of its sensor and it's doing to try

10  and avoid noise that comes from motion and so as it minimizes its detector it

11  found its exact desired shape of the ring detector.  If I was to spread that

12  light, there would be less light within that ring.

13       So, 1) Dr. Madisetti's experiment is unrebutted by any testimony from

14  Petitioner's expert.  They could have done their own experiment to show that

15  Dr. Madisetti was incorrect.  They even could have submitted their own

16  expert testimony.  They chose not to.  They chose to rely instead on attorney

17  argument.  Now, that attorney argument is rooted in the fact that there's

18  more detectors taught in some of the prior art but recognize that the prior art

19  doesn't have a diffuser in it.  It's undisputed that both base references with

20  prior art do not contain a diffuser.  So whether or not those same gains

21  would happen in those references is simply unknown.  All right.  Let me

22  move back to   -- does that answer your question?  Okay.

23       JUDGE KINDER:  You addressed it.  Thank you.

24       MR. GROVER:  Okay.  Thank you.  Let me just reset.  Both grounds,

25  ground 1D with the base of Sarantos-Mendelson and ground 2C with the

26  base reference of Ackermans is seeking to maximize the light.  The addition

17

1  surfaces.  If you don't have those reflective surfaces the light from the

2  emitter is going to blast right through that thin tissue of the nose and be lost

3  because the detector isn't aligned with the emitter.  It's a transmissive sensor,

4  meaning the emitter and detector are on opposite sides of the tissue and if

5  you don't have something to spread the light to have it penetrate more tissue,

6  how is the light going to get from the emitter 176 over to the detector 178

7  when, as we can all imagine in our head, that pen light is just going to shine

8  right through the thin tissue of the nose.

9      JUDGE WIEKER:  Mr. Grover?

10      MR. GROVER:  Yes.

11      JUDGE WIEKER:  How would this operate with Chin's disclosure of

12  a finger?  You've been discussing, you know, something like the earlobe or

13  the nostril versus the calf or the wrist.  Where does the finger fit in?

14      MR. GROVER:  That's a good question.  This particular sensor is not

15  taught as being applied to the finger in Chin.  This is a specific nostril

16  sensor.  I can get into it.  I was about to get into Petitioner's argument about

17  the sensor could be applied to any body part but if you --

18      JUDGE WIEKER:  (Indiscernible).

19      MR. GROVER:  -- think about (indiscernible) --

20      JUDGE WIEKER:  Chin does disclose using sensors on other body

21  parts, for example the finger, and then it could be a reflectance or a

22  transmittent sensor, so could you address those disclosures, please?

23      MR. GROVER:  Yes.  I appreciate those disclosures.  Let's look at the

24  discussion of any body part.  Let me just make sure that I'm in the right

25  space for my notes.  If you look at slide 18, please, I think this will answer

26  your question.  This is where Petitioner pointed to the fact that you could

21

1   attach this sensor to any body part but this particular disclosure is related to

2   figure 2.  Figure 2, I think Petitioner made a big deal out of sensor being just

3   generic sensor, but if you look at figure 2 the word sensor exists right there

4   on the right.  Chin is talking about figure 2, there's just simply no question.

5   The paragraph starts out saying figure 2 and figure 2 has no diffuser.  Figure

6   2 simply has the heater and that's called a thermistor in this particular block

7   diagram, and so Chin is saying you could attach this to any body part such as

8   an earlobe or a finger much like you just quoted.

9           However, as soon as Chin moves to specific sensors Chin names the

10  location of that sensor.  So figures 6A and 6B, that's an ear sensor.  That's in

11  column 8, line 4.  Figure 7A-7B, that's a nostril sensor, the one we just

12  talked about column 8, line 20.  Figure 11 is an adhesive ear sensor.  That's

13  in column 9, line 36.  So when we're talking about block diagram in the

14  heater which is figure 2, Chin says you could use those in other places.

15  When we go to the specific sensors, Chin says use it at the ear or use it at the

16  nostril.

17          While we're on this issue let me just finish it out.  Petitioner also

18  references Webster and has a slide, if we can go to Petitioner's slide 17

19  there's two quotes from Webster that Petitioner wants to include to show that

20  you can place Chin's sensor on any body part.  So the first one is,

21          "Reflectance probes can be used to measure arterial oxygen saturation

22  virtually any place on the human body where the probe can be placed."

23          Well, the first problem with that is that's a reflectance sensor.  Chin's

24  specific nostril sensor which is the only embodiment that has the diffuser,

25  that's a transmissive sensor.  So first of all we're not talking about reflectance

26  sensors.  But even if we were, Webster's not talking about sensors with

                                          22

IPR2020-01722
Patent 10,470,695 B2

1  diffusers because those don't exist in Webster. It's just talking about

2  reflectance sensor, and then even if you were to discount those few issues

3  the very next sentence of the first quote which appears on page 88, that very

4  next sentence says oh, and by the way, placing them on every body part has

5  major calibration and accuracy problems. So we take the two sentences

6  together and it says reflectance sensors can be placed anywhere but they

7  probably don't work. I think there's a problem with what Petitioner is trying

8  to use Webster to show.

9       JUDGE COCKS: Counsel, this is Judge Cocks.

10      MR. GROVER: Did that answer –

11      JUDGE COCKS: Counsel, this is Judge Cocks. Can you hear me?

12      MR. GROVER: I can.

13      JUDGE COCKS: Yes. Okay. So I've heard what you said but I have

14  a couple of clarifying questions. So are you suggesting that Chin's teachings

15  are limited to applying a diffuser to a nostril sensor? It sounds like you have

16  been and I just wanted to verify.

17      MR. GROVER: I definitely am, yes. The diffuser --

18      JUDGE COCKS: Okay.

19      MR. GROVER: -- is only shown in one --

20      JUDGE COCKS: Counsel, counsel I understand. Let me --

21      MR. GROVER: Yes.

22      JUDGE COCKS: So Chin's general disclosure in column 2 generally

23  describes that one type of oximeter sensor will add a diffusing optic to

24  diffuse the light emitted from the light emitting diode to cause it to pass

25  through more tissue and thus more blood and Chin equates that in one

26  particular embodiment as being desirable in the nostril sensor. Are you

23

IPR2020-01722
Patent 10,470,695 B2

1   and unrelated to the specific nostril sensor relied on in the petition."

2       So they're pivoting from saying that, you know, that column 5

3   disclosure is just a general statement about, you know, about all pulse

4   oximeters are not tied to anything described in Chin to now tying that to this

5   figure 2 embodiment that I believe they said its salient features are here.

6   You know, we're hearing that for the first time today and just wanted to

7   point out the new argument on the record there.

8       With respect to, you know, to that column 5 quote I didn't hear an

9   explanation as to, you know, as to how that quote can be discounted, how it

10   can be read as not applying -- being able to apply Chin's sensor to any body

11   part and specifically to the finger. You know, the other part of that quote

12   that I believe, Judge Wieker, I believe you keyed in on is the last bit where it

13   says that the sensor can be transmissive or reflectance pulse oximeter as

14   well. So basically, you know, our position is that Masimo, in the briefing

15   they failed to deal with that quote. They failed to counter our arguments

16   and, you know, we believe that even with the new arguments they put on the

17   record today, you know, that they still have failed to counter us on that.

18       I'd like to move on to the arguments with respect to the experimental

19   results. Masimo said something that -- they stated that a diffuser necessarily

20   reduces the amount of light reaching a detector. I think that's a very

21   simplistic interpretation of those results. I think that it's going to depend

22   obviously on the detector configuration as we discussed. You know, light is

23   spread out on to areas where there's not a detector present. Clearly that light

24   is not going to be detected. You know, as we explained in our direct with

25   respect to the single detector device that Masimo used to perform its

26   experiment, there's quite a bit of light that whenever it's spread using a

32

1    diffuser is going to miss that signal detector.  In fact light that is spread from

2    the central emitter in a direction that's not directly at that detector will be

3    missed and will be, you know, be part of the reduced light that, you know,

4    that Masimo is claiming is necessarily a consequence of using a diffuser.

5    But in fact if you had a configuration where the portions of the device's

6    surface were actually covered by detectors, as is shown in Sarantos and

7    Ackermans, that light in fact would not be missed, it would be detected,

8    there wouldn't be a reduction in the way that Masimo says.

9        One other point to make is Masimo is -- they are basically taking the

10    position that a diffuser is always going to be a detriment, that the spreading

11    of light no matter the detector configuration is going to lead to less light

12    being detected.  In fact, with a detector configuration such as that shown in

13    Sarantos and Ackermans where you have a central emitter and detectors that

14    are in fact spread around the perimeter of the emitter, the light that is sent

15    directly up to the tissue measurement site from the emitter that's emitted and

16    reflects back towards the emitter, that light's not going to be detected.  So in

17    fact spreading the light out from that central point could mean that more

18    light will be hitting the detectors and less light will be reflected directly back

19    down on to the emitter and subsequently not detected.

20        So, Your Honors, did you have any other specific questions for us on

21    any of these points?  If not, I think I'm going to conclude there.

22        JUDGE COX:  This is Judge Cox.  I have nothing further.  Thank

23    you.

24        MR. SMITH:  Thank you, Your Honors.

25        JUDGE KINDER:  All right.  Thank you.  Mr. Grover, I believe you

26    have 15 minutes reserved for rebuttal.  If you need more than that we'll see,

33

### IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Patent of:     Al-Ali
U.S. Patent No.:    10,470,695         Attorney Docket No.: 50095-0004IP1
Issue Date:         November 12, 2019
Appl. Serial No.:   16/226,249
Filing Date:        December 19, 2018
Title:              ADVANCED PULSE OXIMETRY SENSOR

### <u>DECLARATION OF DR. BRIAN W. ANTHONY</u>

I, Brian W. Anthony, of Cambridge, MA, declare that:

1.     My name is Dr. Brian W. Anthony.  I am an Associate Principal Research Scientist at the Institute of Medical Engineering & Science at Massachusetts Institute of Technology (MIT).  I am also a Principal Research Scientist at MIT's Mechanical Engineering department, Director of the Master of Engineering in Advanced Manufacturing and Design Program at MIT, a Co-Director of the Medical Electronic Device Realization Center of the Institute of Medical Engineering & Science, and Associate Director of MIT.nano. My current *curriculum vitae* is attached and some highlights follow.

2.     I earned my B.S. in Engineering (1994) from Carnegie Mellon University.  I earned my M.S. (1998) and Ph.D. (2006) in Engineering from MIT. My research focused on high-performance computation, signal processing, and electro-mechanical system design.

APPLE 1003



**APPLE-1014, FIGS. 22 (top), 23 (center), 24 (bottom).**

26.     Based at least on the configuration shown in Sarantos' FIGS. 22-24 (in particular that the photodetector elements 2212, 2312, 2412 are placed in a circular arrangement around the light source 2208, 2308, 2408 and that the light blocking/enclosing walls 2274, 2374, 2474 are between the light source 2208, 2308, 2408 and the photodetector elements 2212, 2312, 2412), it would have been obvious to a POSITA that the light blocking/enclosing walls 2274, 2374, 2474 are configured in a circular manner around the central light source 2208, 2308, 2408.

15

*See e.g.*, APPLE-1014, FIGS. 22-24, 17:1-18:35. The modified FIG. 18 below shows a top view of how the light blocking/enclosing walls 2274, 2374, 2474 are configured based on Sarantos' disclosure:



**APPLE-1014, FIG. 18 (modified to show light blocking wall)**

27.    In addition, because the light blocking/enclosing wall 2274, 2374, 2474 blocks the light emitted by the light source from propagating beyond the wall, a POSITA would have understood that the light blocking/enclosing wall 2274, 2374, 2474 guides the light emitted by light source 2208, 2308, 2408 to the tissue measurement site. S*ee e.g.*, APPLE-1014, FIGS. 22-24, 17:1-18:35. This creates at least an initial circular region in the tissue measurement site because the

16

daily activity." APPLE-1005, 14:30-36. A wrist-worn biometric monitoring device provides such comfort and lack of interference and obstruction. Id.. Venkatraman also discloses the use of a digital display, as shown in FIG. 6B, to display data acquired or stored locally on the wristwatch. APPLE-1005, 53:19-55:51. For example, a LED may be used to display the heart rate of a user. APPLE-1005, 53:60-63.

94. Venkatraman also discloses that the display may include capacitive touch buttons and capacitive screen buttons. APPLE-1005, 55:29-51. "In embodiments where the screen uses capacitive touch detection, [the biometric monitoring device] may always be sampling and ready to respond to any gesture or input without an intervening event such as pushing a physical button." *Id.* A POSITA would have understood Venkatraman's display to be a touch screen because it has capacitive touch buttons and capacitive screen buttons, thereby indicating it is a capacitive touch screen. S*ee e.g.*, APPLE-1005, 55:29-51.

## VII. The combination of Sarantos, Mendelson-1991, and Chin

### A. Overview of Chin

95. Like Mendelson-1991 and Sarantos, Chin is directed to an optical blood measurement sensor. Specifically, Chin teaches an oximeter sensor with a heating element to improve perfusion. APPLE-1006, 1:14-17. Chin teaches the optional use of a diffusing lens in an oximetry sensor to "cause[] a further

64

spreading or mixing of light and may enhance the amount of tissue penetrated."
APPLE-1006, 8:25-29.

### B.    The combination of Sarantos, Mendelson-1991, and Chin

96.    It would have been obvious to a POSITA to combine Chin's diffuser with Sarantos-Mendelson-1991's physiological monitoring device to diffuse the light that is emitted from the light source emitters so that the emitted light could pass through more tissue and blood, as taught by Chin.  APPLE-1006, 2:4-7, 8:25-29.

97.    In the combination, the combined pulse oximetry monitor of Sarantos and Mendelson-1991 is further modified to include Chin's diffuser between the emitters and the tissue measurement site.  APPLE-1006, 2:4-7, 8:25-29.  The diffuser would be placed at the bottom edge of the wall/optical shield so that light emitted from the light source emitters would be shielded from the detectors.  By placing the diffuser at the bottom edge of the wall/optical shield, the light would travel within the area defined by the wall/optical shield, be received by the diffuser, and subsequently spread by the diffuser onto the tissue measurement site.  An example of this configuration is shown below.



98.    As can be appreciated from the foregoing, a POSITA would have combined the teachings of Sarantos-Mendelson-1991 and Chin because doing so would have amounted to nothing more than the use of a known technique to improve similar devices in the same way and combining prior art elements according to known methods to yield predictable results.  *See KSR v. Teleflex*, 550 U.S. 398, 417 (2007).  And because a POSITA would be implementing the diffuser in a known way (specifically the way described in Chin), a POSITA would have had a reasonable expectation of success in integrating the diffuser of Chin into the pulse oximetry sensor of the Sarantos-Mendelson-1991 combination.  *See, e.g.,* APPLE-1006, 8:20-28.

99.    In addition, a POSITA would have been motivated to incorporate Chin's diffuser into the pulse oximeter of Sarantos and Mendelson because the diffuser will cause the light "to pass through more tissue, and thus more blood," resulting in a stronger reflected signal, with less relative noise, at the detectors,

which "allows it to be more easily processed by the oximeter electronics and software" to determine the measured physiological parameters.  APPLE-1006, 2:4-7, 8:25-29, 9:64-10:7.

### C.    Analysis

#### 1.    Claims 6, 14, and 21

100.   Using a diffuser to spread emitted light was well-known in the art as evidenced by Chin.

101.   Chin is directed to an oximeter sensor with a heating element to improve perfusion.  APPLE-1006, 1:14-17.  Chin discloses that "[o]ne type of Oximeter Sensor will add a diffusing optic to diffuse the light emitted from the light-emitting diodes (LEDs) to cause it to pass through more tissue, and thus more blood," resulting in a stronger reflected signal at the detectors, which "allows it to be more easily processed by the oximeter electronics and software" to determine the measured physiological parameters.  APPLE-1006, 2:4-7, 8:25-29, 9:64-10:7.

## VIII.  Ackermans

### A.    Overview of the Ackermans

102.   Ackermans describes an optical sensor 10 for measuring the blood oxygenation levels of a user.  APPLE-1016, Abstract, 1, 2-5.  As shown in FIGS. 1 and 2 below, the optical sensor 10 includes "at least one light emitter (20) for emitting light (21) directed to a part of the skin (50) of a patient and at least one photo-detector (30) for detecting light (31) reflected from the skin (50). A housing

67

(40) for carrying the at least one light emitter (20) and the at least one photo-detector (30) is provided, where the housing (40) has a contact area with the skin (50)." APPLE-1016, Abstract, 4:22-25.



**APPLE-1016, FIG. 1 (annotated)**



**APPLE-1016, FIG. 2 (annotated)**

103.  In the example shown in FIG. 7, Ackermans' optical sensor 10 is implemented within a wristwatch for placement on a user at a tissue measurement site.  APPLE-1016, 10:29-35.



**APPLE-1016, FIG. 7 (annotated)**

104.  The frame 90 of the wristwatch is attachable to the skin 50 of a patient with an elastic band.  APPLE-1016, 10:29-35.  The "optical sensor 10 is positioned at the center of the frame" 90.  *Id*.  Sensor 10 can be used to obtain physiological measurements such as blood oxygen levels (e.g., arterial oxygen saturation levels) and heart rates.  APPLE-1016, 6:15-18, 1:8-18, 13:10-12 (claim 6).  "Electrical signals from the at least one photo-detector are processed [by electrical elements] in order to determine an oximetry value."  *Id.*, 3:10-12, 8:25-9:2, 10:3-10.

69

structures may employ a material and/or optical design to facilitate low light loss (for example, the light-transmissive structures may include **a lens to facilitate light collection** …)"). While Venkatraman does not explicitly teach that the lens direct the light after attenuation to the plurality of detectors, it would have been obvious to a POSITA that Venkatraman's lens would have been placed between the tissue measurement site and the detectors so that reflected light can be directed onto the photodetectors 16, 18 to "facilitate light collection." APPLE-1005, 34:5-18.

## X.    The combination of Ackermans and Chin

### A.    Overview of the combination

160.    It would have been obvious to a POSITA to combine Chin's diffuser Ackermans's physiological monitoring device to diffuse the light that is emitted from the light source emitters so that the emitted light could pass through more tissue and blood, as taught by Chin. APPLE-1006, 2:4-7, 8:25-29.

161.    In the combination, the device of Ackermans is further modified to include Chin's diffuser between the emitters and the tissue measurement site. APPLE-1006, 2:4-7, 8:25-29. The diffuser would be placed at the bottom edge of the wall/optical shield so that light emitted from the light source emitters would be shielded from the detectors. By placing the diffuser at the bottom edge of the wall/optical shield, the light would travel within the area defined by the

103

wall/optical shield, be received by the diffuser, and subsequently spread by the
diffuser onto the tissue measurement site.  An example of this configuration is
shown below.



162.   As can be appreciated from the foregoing, a POSITA would have
combined the teachings of Ackermans and Chin because doing so would have
amounted to nothing more than the use of a known technique to improve similar
devices in the same way and combining prior art elements according to known
methods to yield predictable results.  *See KSR v. Teleflex*, 550 U.S. 398, 417
(2007).  And because a POSITA would be implementing the diffuser in a known
way (specifically the way described in Chin), a POSITA would have had a
reasonable expectation of success in integrating the diffuser of Chin into the pulse
oximetry sensor of Ackermans.  *See, e.g.,* APPLE-1006, 8:20-28.

163.   In addition, a POSITA would have been motivated to incorporate
Chin's diffuser into the pulse oximeter of Ackermans because the diffuser will

104

cause the light "to pass through more tissue, and thus more blood," resulting in a stronger reflected signal at the detectors, which "allows it to be more easily processed by the oximeter electronics and software" to determine the measured physiological parameters. APPLE-1006, 2:4-7, 8:25-29, 9:64-10:7.

### B.    Analysis

164.    The previous discussion of the teachings of Ackermans also applies to the present combination, and is hereby incorporated by reference.

### 1.    Claims 6, 14, and 21

165.    As previously explained, using a diffuser to spread emitted light was well-known in the art as evidenced by Chin.

166.    Chin is directed to an oximeter sensor with a heating element to improve perfusion. APPLE-1006, 1:14-17. Chin discloses that "[o]ne type of Oximeter Sensor will add a diffusing optic to diffuse the light emitted from the light-emitting diodes (LEDs) to cause it to pass through more tissue, and thus more blood." APPLE-1006, 2:4-7, 8:25-29.

167.    It would have been obvious to a POSITA to combine Chin's diffuser with Ackerman's physiological monitoring device to diffuse the light that is emitted from Ackermans' emitters (e.g., emitter 20) so that the emitted light could pass through more tissue and blood, as taught by Chin. APPLE-1006, 2:4-7, 8:25-

105

US008998815B2

(12) **United States Patent**
Venkatraman et al.

(10) Patent No.: **US 8,998,815 B2**
(45) **Date of Patent:** **Apr. 7, 2015**

(54) **WEARABLE HEART RATE MONITOR**

(71) Applicant: **Fitbit, Inc.**, San Francisco, CA (US)

(72) Inventors: **Subramaniam Venkatraman**, Walnut Creek, CA (US); **Shelten Gee Jao Yuen**, Berkeley, CA (US)

(73) Assignee: **Fitbit, Inc.**, San Francisco, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **14/295,059**

(22) Filed: **Jun. 3, 2014**

(65) **Prior Publication Data**

US 2014/0275854 A1 Sep. 18, 2014

**Related U.S. Application Data**

(63) Continuation of application No. 14/292,673, filed on May 30, 2014, which is a continuation-in-part of application No. 13/924,784, filed on Jun. 24, 2013.

(60) Provisional application No. 61/662,961, filed on Jun. 22, 2012, provisional application No. 61/752,826, filed on Jan. 15, 2013, provisional application No. 61/946,439, filed on Feb. 28, 2014, provisional application No. 61/955,045, filed on Mar. 18, 2014, provisional application No. 61/973,614, filed on Apr. 1, 2014, provisional application No. 61/830,600, filed on Jun. 3, 2013, provisional application No. 62/001,624, filed on May 21, 2014, provisional application No. 62/001,585, filed on May 21, 2014.

(51) **Int. Cl.**
| | |
|---|---|
| *A61B 5/02* | (2006.01) |
| *A61B 5/024* | (2006.01) |
| *A61B 5/00* | (2006.01) |
| *A61B 5/0205* | (2006.01) |
| *A61B 5/11* | (2006.01) |
| *A61B 5/0245* | (2006.01) |
| *A61B 5/0402* | (2006.01) |

(52) **U.S. Cl.**
CPC ............. *A61B 5/02405* (2013.01); *A61B 5/721* (2013.01); *A61B 5/0205* (2013.01); *A61B 5/1118* (2013.01); *A61B 5/681* (2013.01); *A61B 5/742* (2013.01); *A61B 5/1123* (2013.01); *A61B 5/02416* (2013.01); *A61B 5/0245* (2013.01); *A61B 5/0402* (2013.01); *A61B 5/6831* (2013.01); *A61B 5/6824* (2013.01)

(58) **Field of Classification Search**
USPC .................................. 600/300, 301, 500, 503
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,367,752 A | | 1/1983 | Jimenez et al. |
| 4,771,792 A | | 9/1988 | Seale |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 1 721 237 B1 | 8/2012 |

OTHER PUBLICATIONS

US Notice of Allowance (Corrected Notice of Allowability), dated Dec. 31, 2014, issued in U.S. Appl. No. 14/292,669.

(Continued)

*Primary Examiner* — Michael D'Angelo
(74) *Attorney, Agent, or Firm* — Weaver Austin Villeneuve & Sampson LLP

(57) **ABSTRACT**

A biometric monitoring device is used to determine a user's heart rate by using a heartbeat waveform sensor and a motion detecting sensor. In some embodiments, the device collects collecting concurrent output data from the heartbeat waveform sensor and output data from the motion detecting sensor, detects a periodic component of the output data from the motion detecting sensor, and uses the periodic component of the output data from the motion detecting sensor to remove a corresponding periodic component from the output data from the heartbeat waveform sensor. From this result, the device may determine and present the user's heart rate.

**13 Claims, 29 Drawing Sheets**



## US 8,998,815 B2

Page 2

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,036,856 | A | 8/1991 | Thornton |
| 5,101,831 | A * | 4/1992 | Koyama et al. ............... 600/500 |
| 5,318,597 | A * | 6/1994 | Hauck et al. .................... 607/20 |
| 5,738,104 | A | 4/1998 | Lo et al. |
| 6,131,076 | A | 10/2000 | Stephan et al. |
| 6,241,684 | B1 * | 6/2001 | Amano et al. ................. 600/531 |
| 6,418,394 | B1 | 7/2002 | Puolakanaho et al. |
| 6,583,369 | B2 | 6/2003 | Montagnino et al. |
| 6,731,967 | B1 | 5/2004 | Turcott |
| 6,997,882 | B1 | 2/2006 | Parker et al. |
| 7,539,532 | B2 | 5/2009 | Tran |
| 7,720,306 | B2 | 5/2010 | Gardiner et al. |
| 8,040,758 | B1 | 10/2011 | Dickinson |
| 8,152,745 | B2 | 4/2012 | Smith et al. |
| 8,211,503 | B2 | 7/2012 | Tsao et al. |
| 8,346,328 | B2 | 1/2013 | Mannheimer et al. |
| 8,386,042 | B2 | 2/2013 | Yudovsky et al. |
| 8,444,578 | B2 | 5/2013 | Bourget et al. |
| 8,475,367 | B1 | 7/2013 | Yuen et al. |
| 8,579,827 | B1 * | 11/2013 | Rulkov et al. ................. 600/503 |
| 8,792,981 | B2 | 7/2014 | Yudovsky et al. |
| 8,920,332 | B2 | 12/2014 | Hong et al. |
| 8,945,017 | B2 | 2/2015 | Venkatraman et al. |
| 8,948,832 | B2 | 2/2015 | Hong et al. |
| 8,954,135 | B2 | 2/2015 | Yuen et al. |
| 8,956,303 | B2 | 2/2015 | Hong et al. |
| 2001/0044588 | A1 | 11/2001 | Mault |
| 2003/0163710 | A1 | 8/2003 | Ortiz et al. |
| 2004/0236227 | A1 | 11/2004 | Gueissaz |
| 2005/0054940 | A1 | 3/2005 | Almen |
| 2005/0245793 | A1 | 11/2005 | Hilton et al. |
| 2006/0195020 | A1 | 8/2006 | Martin et al. |
| 2008/0097221 | A1 | 4/2008 | Florian |
| 2009/0012433 | A1 | 1/2009 | Fernstrom et al. |
| 2009/0292332 | A1 | 11/2009 | Li et al. |
| 2010/0106044 | A1 | 4/2010 | Linderman |
| 2010/0152600 | A1 | 6/2010 | Droitcour et al. |
| 2010/0204550 | A1 | 8/2010 | Heneghan et al. |
| 2010/0249633 | A1 | 9/2010 | Droitcour et al. |
| 2010/0274100 | A1 | 10/2010 | Behar et al. |
| 2010/0292568 | A1 | 11/2010 | Droitcour et al. |
| 2010/0298650 | A1 | 11/2010 | Moon et al. |
| 2010/0298651 | A1 | 11/2010 | Moon et al. |
| 2010/0298653 | A1 | 11/2010 | McCombie et al. |
| 2010/0298661 | A1 | 11/2010 | McCombie et al. |
| 2010/0331145 | A1 | 12/2010 | Lakovic et al. |
| 2010/0331657 | A1 | 12/2010 | Mensinger et al. |
| 2011/0009727 | A1 | 1/2011 | Mensinger et al. |
| 2011/0032105 | A1 | 2/2011 | Hoffman et al. |
| 2011/0066010 | A1 | 3/2011 | Moon et al. |
| 2012/0083705 | A1 | 4/2012 | Yuen et al. |
| 2012/0083714 | A1 | 4/2012 | Yuen et al. |
| 2012/0083715 | A1 | 4/2012 | Yuen et al. |
| 2012/0083716 | A1 | 4/2012 | Yuen et al. |
| 2012/0084053 | A1 | 4/2012 | Yuen et al. |
| 2012/0084054 | A1 | 4/2012 | Yuen et al. |
| 2012/0123232 | A1 | 5/2012 | Najarian et al. |
| 2012/0150074 | A1 | 6/2012 | Yanev et al. |
| 2012/0172733 | A1 | 7/2012 | Park |
| 2012/0226471 | A1 | 9/2012 | Yuen et al. |
| 2012/0226472 | A1 | 9/2012 | Yuen et al. |
| 2012/0232432 | A1 | 9/2012 | Kahn et al. |
| 2012/0245439 | A1 | 9/2012 | Andre et al. |
| 2012/0255875 | A1 | 10/2012 | Vicente et al. |
| 2012/0274508 | A1 | 11/2012 | Brown et al. |
| 2012/0316471 | A1 | 12/2012 | Rahman et al. |
| 2013/0009779 | A1 | 1/2013 | Wittling et al. |
| 2013/0073254 | A1 | 3/2013 | Yuen et al. |
| 2013/0073255 | A1 | 3/2013 | Yuen et al. |
| 2013/0077826 | A1 * | 3/2013 | Cowperthwaite et al. .... 382/103 |
| 2013/0080113 | A1 | 3/2013 | Yuen et al. |
| 2013/0106684 | A1 | 5/2013 | Weast et al. |
| 2013/0151196 | A1 | 6/2013 | Yuen et al. |
| 2013/0158369 | A1 | 6/2013 | Yuen et al. |
| 2013/0211265 | A1 | 8/2013 | Bedingham et al. |

| | | | |
|---|---|---|---|
| 2013/0218053 | A1 | 8/2013 | Kaiser et al. |
| 2014/0073486 | A1 | 3/2014 | Ahmed et al. |
| 2014/0099614 | A1 | 4/2014 | Hu et al. |
| 2014/0107493 | A1 | 4/2014 | Yuen et al. |
| 2014/0135631 | A1 | 5/2014 | Brumback et al. |
| 2014/0142403 | A1 | 5/2014 | Brumback et al. |
| 2014/0241626 | A1 | 8/2014 | Sull et al. |
| 2014/0275821 | A1 | 9/2014 | Beckman |
| 2014/0275852 | A1 | 9/2014 | Hong et al. |
| 2014/0276119 | A1 | 9/2014 | Venkatraman et al. |
| 2014/0278139 | A1 | 9/2014 | Hong et al. |
| 2014/0288390 | A1 | 9/2014 | Hong et al. |
| 2014/0288391 | A1 | 9/2014 | Hong et al. |
| 2014/0288392 | A1 | 9/2014 | Hong et al. |
| 2014/0288435 | A1 | 9/2014 | Richards et al. |
| 2014/0288436 | A1 | 9/2014 | Venkatraman et al. |
| 2014/0288438 | A1 | 9/2014 | Venkatraman et al. |
| 2014/0303523 | A1 | 10/2014 | Hong et al. |
| 2014/0378786 | A1 | 12/2014 | Hong et al. |
| 2014/0378787 | A1 | 12/2014 | Brumback et al. |
| 2014/0378872 | A1 | 12/2014 | Hong et al. |
| 2015/0025393 | A1 | 1/2015 | Hong et al. |
| 2015/0025394 | A1 | 1/2015 | Hong et al. |

OTHER PUBLICATIONS

US Notice of Allowance (Corrected Notice of Allowability), dated Dec. 31, 2014, issued in U.S. Appl. No. 14/295,158.
US Office Action, dated Dec. 24, 2014, issued in U.S. Appl. No. 14/295,076.
US Notice of Allowance (Corrected Notice of Allowability), dated Jan. 5, 2015, issued in U.S. Appl. No. 14/295,122.
U.S. Appl. No. 14/481,020, Sep. 9, 2014, Hong et al.
U.S. Appl. No. 14/481,762, Sep. 9, 2014, Hong et al.
U.S. Appl. No. 14/484,104, Sep. 11, 2014, Brumback et al.
U.S. Appl. No. 14/507,173, Oct. 6, 2014, Hong et al.
U.S. Appl. No. 14/507,184, Oct. 6, 2014, Hong et al.
US Notice of Allowance, dated Nov. 19, 2014, issued in U.S. Appl. No. 13/924,784.
US Office Action, dated Oct. 22, 2014, issued in U.S. Appl. No. 14/290,884.
US Notice of Allowance, dated Sep. 23, 2014, issued in U.S. Appl. No. 14/292,669.
US Notice of Allowance (Corrected Notice of Allowability), dated Oct. 14, 2014, issued in U.S. Appl. No. 14/292,669.
US Notice of Allowance, dated Oct. 14, 2014, issued in U.S. Appl. No. 14/295,144.
US Notice of Allowance, dated Dec. 3, 2014, issued in U.S. Appl. No. 14/295,144.
US Notice of Allowance, dated Sep. 26, 2014, issued in U.S. Appl. No. 14/295,158.
US Notice of Allowance, dated Dec. 8, 2014, issued in U.S. Appl. No. 14/292,673.
US Notice of Allowance, dated Nov. 24, 2014, issued in U.S. Appl. No. 14/295,122.
US Office Action, dated Sep. 29, 2014, issued in U.S. Appl. No. 14/154,009.
US Office Action, dated Nov. 25, 2014, issued in U.S. Appl. No. 14/154,019.
US Office Action, dated Dec. 10, 2014, issued in U.S. Appl. No. 14/484,104.
US Office Action, dated Dec. 4, 2014, issued in U.S. Appl. No. 14/216,743.
US Final Office Action, dated Nov. 21, 2014, issued in U.S. Appl. No. 14/250,256.
US Office Action, dated Oct. 7, 2014, issued in U.S. Appl. No. 14/481,762.
US Final Office Action, dated Dec. 19, 2014, issued in U.S. Appl. No. 14/481,762.
U.S. Appl. No. 14/214,655, Mar. 14, 2014, Hong et al.
U.S. Appl. No. 14/216,743, Mar. 17, 2014, Hong et al.
U.S. Appl. No. 14/250,256, Apr. 10, 2014, Hong et al.
U.S. Appl. No. 14/290,884, May 29, 2014, Richards et al.
U.S. Appl. No. 14/292,669, May 30, 2014, Hong et al.
U.S. Appl. No. 14/292,673, May 30, 2014, Venkatraman et al.

2

US 8,998,815 B2

Page 3

(56)                **References Cited**

OTHER PUBLICATIONS

U.S. Appl. No. 14/295,076, Jun. 3, 2014, Venkatraman et al.
U.S. Appl. No. 14/295,122, Jun. 3, 2014, Venkatraman et al.
U.S. Appl. No. 14/295,144, Jun. 3, 2014, Hong et al.
U.S. Appl. No. 14/295,158, Jun. 3, 2014, Hong et al.
U.S. Appl. No. 14/295,161, Jun. 3, 2014, Hong et al.
US Office Action, dated Aug. 4, 2014, issued in U.S. Appl. No. 13/924,784.
US Office Action, dated Aug. 5, 2014, issued in U.S. Appl. No. 14/292,673.
US Office Action, dated Jul. 31, 2014, issued in U.S. Appl. No. 14/295,122.
US Office Action, dated Mar. 14, 2014, issued in U.S. Appl. No. 14/154,009.
US Office Action, dated Aug. 22, 2014, issued in U.S. Appl. No. 14/250,256.
"Activator is One of the Best Cydia iPhone Hacks | Control your iPhone with Gestures," Iphone-tips-and-advice.com, [retrieved on Jul. 9, 2013 at http://www.iphone-tips-and-advice.com/activation. html], 10 pp.
Chudnow, Alan (Dec. 3, 2012) "Basis Wristband Make Its Debut," *The Wired Self, Living in a Wired World*, published in Health [retrieved on Jul. 22, 2013 at http://thewiredself.com/health/basis-wrist-band-make-its-debut/], 3pp.
Cooper, Daniel (Aug. 16th, 2013) *Withings Pulse review*, http://www. engadget.com/2013/08/16/withings-pulse-revew/, 8 pages.
DesMarais, Christina (posted on Sep. 3, 2013) "Which New Activity Tracker is Best for You?" *Health and Home, Health & Fitness , Guides & Reviews*, [Retrieved on Sep. 23, 2013 at http://www.techli-cious.com/guide/which-new-activity-tracker-is-right-for-you/ 4 pp.
Empson, Rip, (Sep. 22, 2011) "Basis Reveals an Awesome New Affordable Heart and Health Tracker You Can Wear on Your Wrist," [retrieved on Sep. 23, 2013 at http://techcrunch.com/2011/09/22/ basis-reveals-an-awesome-new . . . ], 3 pp.
Fitbit User's Manual, Last Updated Oct. 22, 2009, 15 pages.
Forerunner® 201 personal trainer owner's manual, (Feb. 2006) Garmin Ltd., 48 pp.
Forerunner® 301 personal trainer owner's manual, (Feb. 2006) Garmin Ltd., 66 pp.
Forerunner® 50 with ANT+Sport™ wireless technology, Owner's Manual, (Nov. 2007) Garmin Ltd., 44 pp.
Forerunner® 205/305 Owner's Manual, GPS-enabled trainer for run-ners, (2006-2008) Garmin Ltd., 80 pp.
Forerunner® 405CX Owner's Manual, "GPS-Enabled Sports Watch With Wireless Sync," (Mar. 2009), Garmin Ltd., 56 pp.
Forerunner® 110 Owner's Manual, (2010) "GPS-Enabled Sport Watch," Garmin Ltd., 16 pp.
Forerunner® 210 Owner's Manual, (2010) "GPS-Enabled Sport Watch," Garmin Ltd., 28 pp.

Forerunner® 410 Owner's Manual, (Jul. 2012) "GPS-Enabled Sport Watch With Wireless Sync," Garmin Ltd., 52 pp.
Forerunner® 10 Owner's Manual (Aug. 2012), Garmin Ltd., 10 pp.
Forerunner® 310XT Owner's Manual, Multisport GPS Training Device, (2009-2013), Garmin Ltd., 56 pp.
Forerunner® 405 Owner's Manual, (Mar. 2011) "GPS-Enabled Sport Watch With Wireless Sync,". Garmin Ltd., 56 pp.
Forerunner® 910XT Owner's Manual, (Jan. 2013) Garmin Ltd., 56 pp.
Garmin Swim™ Owner's Manual (Jun. 2012), 12 pp.
Larklife, User Manual, (2012) *Lark Technologies*, 7 pp.
Lark/Larkpro, User Manual, (2012) "What's in the box," *Lark Tech-nologies*, 7 pp.
Lifetrnr, User Manual (2003, specific date unknown), NB new bal-ance®, Implus Footcare, LLC, 3 pages.
Nike+ FuelBand GPS Manual, User's Guide (Product Release Date Unknown, downloaded Jul. 22, 2013), 26 pages.
Nike+SportBand User's Guide, (Product Release Date Unknown, downloaded Jul. 22, 2013), 36 pages.
Nike+SportWatch GPS Manual, User's Guide, Powered by TOMTOM, (Product Release Date Unknown, downloaded Jul. 22, 2013), 42 pages.
"Parts of Your Band," (Product Release Date Unknown, downloaded Jul. 22, 2013) Jawbone UP Band, 1 page.
Polar WearLink® + Coded Transmitter 31 Coded Transmitter W.I.N. D. User Manual, Polar® Listen to Your Body, *Manufactured by Polar Electro Oy*, 11 pages.
Rainmaker, (Jun. 25, 2012, updated Feb 16, 2013) "Garmin Swim watch In-Depth Review," [retrieved on Sep. 9, 2013 at http://www. dcrainmaker.com/2012/06/garmin-swim-in-depth-review.html, 38 pages.
Rainmaker, (Jul. 25, 2013) "Basis B₁ Watch In-Depth Review," [retrieved on Feb. 4, 2014 at http://www.dcrainmaker.com/2013/07/ basis-b1-review.html], 56 pp.
"Withings pulse, Quick Installation Guide" (Jul. 24, 2013) Withings Pulse QIG, v 1.3, withings.com/pulse, 16 pages.
Zijlstra, Wiebren, (2004) "Assessment of spatio-temporal parameters during unconstrained walking," *Eur J Appl Physiol*, 92:39-44.
U.S. Appl. No. 14/599,039, filed Jan. 16, 2015, Venkatraman et al.
US Notice of Allowance, dated Feb. 6, 2015, issued in U.S. Appl. No. 14/290,884.
US Office Action, dated Jan. 23, 2015, issued in U.S. Appl. No. 14/507,184.
US Office Action, dated Jan. 26, 2015, issued in U.S. Appl. No. 14/295,161.
US Office Action, dated Jan. 27, 2015, issued in U.S. Appl. No. 14/507,173.
US Notice of Allowance, dated Jan. 21, 2015, issued in U.S. Appl. No. 14/154,009.

* cited by examiner



**Figure 1**



Attachment Band

Electronics Package

Display

Buttons

Securement Method:
Hook and Loop
Clasp
Band Shape Memory

Figure 2A

Appx1252



Buttons

Charger
Mating
Recess

Device Housing
(Steel, Aluminum,
Plastic, etc.)

Sensor
Protrusion

Attachment Band

Securement Method:
Hook and Loop
Clasp
Band Shape Memory

Figure 2B



Display

Main PCB

Sensor Protrusion

Attachment Band

Figure 2C



Figure 3A

Figure 3B



Figure 3C



Figure 4A

**Figure 4B**



**Figure 4C**



Figure 5



Band-Mounted Optical
Sensors and Light
Emitters

**Figure 6A**

Display

Wristband

Side-Mounted Optical
Heart Rate Detection
Sensors and/or
Emitters

**Figure 6B**



Figure 7

User presses the side of device to take a HR measurement from side mounted optical heart rate detection sensors

Heart Rate Detected
Heart Rate = 75 bpm



**Figure 8**



**Figure 9**



Passive or Active NFC Tag

Bicycle Handle Bar

fitbit Bike Tag

Wireless Personal Monitoring Device

fitbit Speed: 16 mph Cadence: 90 rpm Bike App

**Figure 10**



Figure 11A

Figure 11B

Figure 11C



**Figure 11D**

**Figure 11E**

**Figure 11F**



**Figure 11G**



Figure 12A

Figure 12B

Figure 12C



**Figure 13A**



**Figure 13B**



**Figure 14A (Prior Art)**



**Figure 14B**



**Figure 14C**



**Figure 14D**



**Figure 15A**



**Figure 15B**



**Figure 15C**



**Figure 15D**



Figure 16A

Figure 16B

Figure 16C



**Figure 16D**

**Figure 16E**

**Figure 16F**



**Figure 16G**



**Figure 16H**



**Figure 16I**



Differential
Amplifier or
Instrumentation
Amplifier

Output Signal

## Figure 16J



Figure 17



Figure 18



Figure 19

US 8,998,815 B2

1

**WEARABLE HEART RATE MONITOR**

CROSS REFERENCE TO RELATED
APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 14/292,673, titled "WEARABLE HEART RATE MONITOR" and filed on May 30, 2014, which is a continuation-in-part of U.S. patent application Ser. No. 13/924,784, titled "PORTABLE BIOMETRIC MONITORING DEVICES AND METHODS OF OPERATING SAME" and filed on Jun. 24, 2013, which claims benefit of priority under 35 U.S.C. §119(e) to U.S. Provisional Patent Application No. 61/662,961, titled "WIRELESS PERSONAL BIOMETRICS MONITOR" and filed on Jun. 22, 2012 and 61/752,826, titled "PORTABLE MONITORING DEVICES AND METHODS OF OPERATING SAME" and filed on Jan. 15, 2013; this application also claims benefit of priority under 35 U.S.C. §119(e) to U.S. Provisional Patent Application No. 61/830,600, titled "PORTABLE MONITORING DEVICES AND METHODS OF OPERATING SAME" and filed on Jun. 3, 2013, 61/946,439, titled "HEART RATE DATA COLLECTION" and filed on Feb. 28, 2014, 61/955,045, titled "GPS POWER CONSERVATION USING ENVIRONMENTAL DATA" and filed on Mar. 18, 2014, 61/973,614, titled "GPS ACCURACY REFINEMENT USING EXTERNAL SENSORS" and filed on Apr. 1, 2014, 62/001,624, titled "FITNESS MONITORING DEVICE WITH ALTIMETER" and filed on May 21, 2014, and 62/001,585, titled "WEARABLE HEART RATE MONITOR" and filed on May 21, 2014, all of which are hereby incorporated by reference herein in their entireties.

BACKGROUND

Recent consumer interest in personal health has led to a variety of personal health monitoring devices being offered on the market. Such devices, until recently, tended to be complicated to use and were typically designed for use with one activity, e.g., bicycle trip computers.

Recent advances in sensor, electronics, and power source miniaturization have allowed the size of personal health monitoring devices, also referred to herein as "biometric tracking" or "biometric monitoring" devices, to be offered in extremely small sizes that were previously impractical. For example, the Fitbit Ultra is a biometric monitoring device that is approximately 2" long, 0.75" wide, and 0.5" deep; it has a pixelated display, battery, sensors, wireless communications capability, power source, and interface button, as well as an integrated clip for attaching the device to a pocket or other portion of clothing, packaged within this small volume.

The disclosure provides methods and devices for activating, in energy efficient ways, HR monitor based on user motion and skin proximity. The disclosure also provides methods for operating the LED and photo detector of heart rate monitors to obtain accurate reading of heart rate tailored for different user characteristics such as skin colors.

SUMMARY

One aspect of the disclosure provides methods of determining a user's heart rate when wearing a biometric monitoring device having a plurality of sensors including a heartbeat waveform sensor and a motion detecting sensor. The methods may remove motion artifacts from heartbeat waveform signals when determining a user's heart rate. The methods may be characterized by the following operations: (a)

2

collecting concurrent output data from the heartbeat waveform sensor and output data from the motion detecting sensor, wherein the output data from the heartbeat waveform sensor provides information about the user's heart rate and wherein the output data from the motion detecting sensor provides information about the user's periodic physical movements other than heartbeats; (b) determining a periodic component of the output data from the motion detecting sensor; (c) using the periodic component of the output data from the motion detecting sensor to remove a corresponding periodic component from the output data from the heartbeat waveform sensor; (d) determining the user's heart rate; and (e) presenting the user's heart rate. In some implementations, the motion detecting sensor is an accelerometer or a gyroscope. In some embodiments, the heartbeat waveform sensor may be a photoplethysmography sensor or an ECG sensor.

In certain embodiments, the method contains an additional operation of removing a harmonic of the corresponding periodic component from the output data from the heartbeat waveform sensor. In such embodiments, the periodic component of the output data from the motion detecting sensor may be a fundamental frequency produced from the user's periodic movement. In certain embodiments, the operation removing a corresponding periodic component from the output data from the heartbeat waveform sensor includes applying an adaptive filter to the output data from the heartbeat waveform sensor and the output data from the motion detecting sensor. In certain embodiments, removing a corresponding periodic component from the output data from the heartbeat waveform sensor includes the operation applying an adaptive filter function to the output data from the motion detecting sensor that minimizes the difference between the output data from the heartbeat waveform sensor and the output data from the motion detecting sensor.

In some implementations, the method includes the following additional operations: (i) determining the user's activity level and/or activity type; and (ii) determining parameters of the function based on the user's activity level and/or activity type.

In some implementations, the method includes the following additional operations: (i) analyzing the output data from the motion detecting sensor to infer that the user is substantially stationary; and (ii) temporarily suspending operation (c).

In some method implementations, the operation collecting the output data from the heartbeat waveform sensor includes the following operations: (i) pulsing a light source in the worn biometric monitoring device at a first frequency; and (ii) detecting light from the light source at the first frequency. Pulsing the light source at the first frequency may involve emitting a succession of light pulses of substantially constant intensity.

In certain embodiments, presenting the user's heart rate includes presenting the heart rate on the worn biometric monitoring device. In certain embodiments, presenting the user's heart rate includes presenting the heart rate on an external device that periodically communicates with the worn biometric monitoring device.

Another aspect of the invention pertains to wearable fitness monitoring devices designed or configured to remove motion artifacts from heartbeat waveform signals when determining a user's heart rate. Such devices may be characterized by the following features: a motion sensor configured to provide output corresponding to motion by a user wearing the fitness monitoring device; a heartbeat waveform sensor; and control logic. The control logic includes instructions for: (a) collecting concurrent output data from the heartbeat waveform sen-

US 8,998,815 B2

3

sor and output data from the motion detecting sensor, wherein the output data from the heartbeat waveform sensor provides information about the user's heart rate and wherein the output data from the motion detecting sensor provides information about the user's periodic physical movements other than heartbeats; (b) determining a periodic component of the output data from the motion detecting sensor; (c) using the periodic component of the output data from the motion detecting sensor to remove a corresponding periodic component from the output data from the heartbeat waveform sensor; (d) determining the user's heart rate; and (e) presenting the user's heart rate.

The control logic is typically, though not necessarily, located on the fitness monitoring device. It may be implemented as hardware, software, firmware, or any combination thereof. The data used by the control logic in executing the instructions described herein may be stored (e.g., buffered) by associated memory, registers, and the like, which may be entirely resident on the device or partially resident on a paired secondary device. Examples of suitable architectures for implementing the control logic are presented below with reference to, e.g., FIGS. 11A-G, 12A-C, 13A-B, and 14A-D.

In some devices, the motion detecting sensor is an accelerometer or a gyroscope. In certain embodiments, the device's heartbeat waveform sensor is a photoplethysmographic sensor having (i) a periodic light source, (ii) a photo detector positioned to receive periodic light emitted by the light source after interacting with the user's skin, and (iii) circuitry determining the user's heart rate from output of the photo detector. In some implementations, the photoplethysmographic sensor includes two periodic light sources straddling the photo detector. In some implementations, the photoplethysmographic sensor additionally includes a housing having a recess in which the photo detector is disposed. The housing of the photoplethysmographic sensor may have a second recess in which the periodic light source is disposed. In some designs, the housing protrudes at least about 1 mm above a base surface of the wearable fitness monitoring device arranged to press against the user's skin when worn. Further, the photoplethysmographic sensor further may include a spring configured to resist compression when the protruding housing presses against the user's skin. In certain embodiments, the photoplethysmographic sensor also includes an IML film over the photo detector and the periodic light source. In certain embodiments, the periodic light source is an LED.

In some embodiments, the device's control logic includes instructions for removing a harmonic of the corresponding periodic component from the output data from the heartbeat waveform sensor; in such cases the periodic component of the output data from the motion detecting sensor may be a fundamental frequency produced from the user's periodic movement.

In some implementations, the instructions for removing a corresponding periodic component from the output data from the heartbeat waveform sensor include instructions for applying an adaptive filter to the output data from the heartbeat waveform sensor and the output data from the motion detecting sensor. In some implementations, the instructions for removing a corresponding periodic component from the output data from the heartbeat waveform sensor include instructions for applying an adaptive filter function to the output data from the motion detecting sensor that minimizes the difference between the output data from the heartbeat waveform sensor and the output data from the motion detecting sensor.

In certain embodiments, the device's control logic additionally includes instructions for: (i) determining the user's

4

activity level and/or activity type; and (ii) determining parameters of the function based on the user's activity level and/or activity type. In certain embodiments, the control logic further comprises instructions for: (i) analyzing the output data from the motion detecting sensor to infer that the user is substantially stationary; and (ii) temporarily suspending execution of the instructions of (c).

In some implementations, the instructions for collecting the output data from the heartbeat waveform sensor include instructions for: (i) pulsing a light source in the worn biometric monitoring device at a first frequency; and (ii) detecting light from the light source at the first frequency. The instructions for pulsing the light source at the first frequency may include instructions for emitting a succession of light pulses of substantially constant intensity.

In some cases, the instructions for presenting the user's heart rate include instructions for presenting the heart rate on the worn biometric monitoring device. In some cases, the instructions for presenting the user's heart rate include instructions for presenting the heart rate on an external device that periodically communicates with the worn biometric monitoring device.

Another aspect of this disclosure concerns methods of determining a user's heart rate when wearing a worn biometric monitoring device including a plurality of sensors including a heartbeat waveform sensor and a motion detecting sensor. The methods involve a pre-processing operation prior to motion compensation. The methods may be characterized by the following operations: (a) collecting concurrent output data from the heartbeat waveform sensor and output data from the motion detecting sensor, wherein the output data from the heart beat waveform sensor provides information about the user's heart rate and wherein the output data from the motion detecting sensor provides information about the user's periodic physical movements other than heartbeats; (b) determining a periodic component of the output data from the motion detecting sensor; (c) filtering the output data from the heartbeat waveform sensor to remove variations that are slow with respect to an expected heart rate, wherein the filtering produces high pass filtered output data from the heartbeat waveform sensor; (d) determining the user's heart rate; and (e) presenting the user's heart rate. In various implementations, the methods include using the periodic component of the output data from the motion detecting sensor to remove a corresponding periodic component from the high pass filtered output data from the heartbeat waveform sensor. The filtering may remove a frequency less than about 0.6 Hz (or less than about 0.3 Hz) from the output data from the heartbeat waveform sensor.

In some implementations, the motion detecting sensor is an accelerometer or a gyroscope. The heartbeat waveform sensor may be a photoplethysmography sensor or an ECG sensor.

In certain embodiments, methods include an additional operation of determining the expected heart rate, and from the expected heart rate, setting a high pass frequency for the filtering.

In some cases, determining the expected heart rate includes analyzing the output data from the motion detecting sensor, which may involve inferring a user activity level and/or detecting an intensity of user activity or a type of user activity. As an example, detecting the type of user activity may be detecting running, walking, standing, sitting, or lying down. As a further example, detecting the intensity of user activity may be detecting running or walking.

In some cases, the periodic movement detected by the motion sensor is a wearer's limb movements, which may be,

US 8,998,815 B2

5

e.g., steps, swim strokes, ankle revolutions while bicycling, and leg movements on cardio machines.

In some method implementations, the operation of collecting the output data from the heartbeat waveform sensor includes the following operations: (i) pulsing a light source in the worn biometric monitoring device at a first frequency; and (ii) detecting light from the light source at the first frequency. Pulsing the light source at the first frequency may involve emitting a succession of light pulses of substantially constant intensity.

In certain embodiments, presenting the user's heart rate includes presenting the heart rate on the worn biometric monitoring device. In certain embodiments, presenting the user's heart rate includes presenting the heart rate on an external device that periodically communicates with the worn biometric monitoring device.

In some implementations, a method additional includes the operation for determining the user's resting heart rate, and in such cases, the filtering removes a frequency less than about the frequency of the user's heart rate. In some cases, determining the user's resting heart rate involves measuring the user's heart rate soon after they wake up and are while still stationary in bed. In some cases, determining the user's resting heart rate involves measuring the user's average heart rate of the user while the user is sleeping. In some cases, determining the user's resting heart rate involves making multiple measurements of the user's heart rate when the user is awake and stationary.

Another aspect of the invention pertains to wearable fitness monitoring devices designed or configured to pre-process heartbeat waveform signals when determining a user's heart rate. The wearable fitness monitoring devices may be characterized by the following features: a motion sensor configured to provide output corresponding to motion by a user wearing the fitness monitoring device; a heartbeat waveform sensor; and control logic containing instructions for: (a) collecting concurrent output data from the heartbeat waveform sensor and output data from the motion detecting sensor, wherein the output data from the heart beat waveform sensor provides information about the user's heart rate and wherein the output data from the motion detecting sensor provides information about the user's periodic physical movements other than heartbeats; (b) determining a periodic component of the output data from the motion detecting sensor; (c) filtering the output data from the heartbeat waveform sensor to remove variations that are slow with respect to an expected heart rate, wherein the filtering produces high pass filtered output data from the heartbeat waveform sensor; (d) determining the user's heart rate; and (e) presenting the user's heart rate.

The control logic is typically, though not necessarily, located on the fitness monitoring device. It may be implemented as hardware, software, firmware, or any combination thereof. The data used by the control logic in executing the instructions described herein may be stored (e.g., buffered) by associated memory, registers, and the like, which may be entirely resident on the device or partially resident on a paired secondary device. Examples of suitable architectures for implementing the control logic are presented below with reference to, e.g., FIGS. 11A-G, 12A-C, 13A-B, and 14A-D.

In some devices, the motion detecting sensor is an accelerometer or a gyroscope. In certain embodiments, the device's heartbeat waveform sensor is a photoplethysmographic sensor having (i) a periodic light source, (ii) a photo detector positioned to receive periodic light emitted by the light source after interacting with the user's skin, and (iii) circuitry determining the user's heart rate from output of the

6

photo detector. In some implementations, the photoplethysmographic sensor includes two periodic light sources straddling the photo detector. In some implementations, the photoplethysmographic sensor additionally includes a housing having a recess in which the photo detector is disposed. The housing of the photoplethysmographic sensor may have a second recess in which the periodic light source is disposed. In some designs, the housing protrudes at least about 1 mm above a base surface of the wearable fitness monitoring device arranged to press against the user's skin when worn. Further, the photoplethysmographic sensor further may include a spring configured to resist compression when the protruding housing presses against the user's skin. In certain embodiments, the photoplethysmographic sensor also includes an IML film over the photo detector and the periodic light source. In certain embodiments, the periodic light source is an LED.

In certain embodiments, the control logic includes instructions for using the periodic component of the output data from the motion detecting sensor to remove a corresponding periodic component from the high pass filtered output data from the heartbeat waveform sensor. In certain embodiments, the instructions for filtering include instructions for removing a frequency less than about 0.6 Hz (or less than about 0.3 Hz) from the output data from the heartbeat waveform sensor.

In certain embodiments, the control logic additionally includes instructions for determining the expected heart rate, and from the expected heart rate, setting a high pass frequency for the filtering.

In some cases, the instructions for determining the expected heart rate include instructions for analyzing the output data from the motion detecting sensor. Further, the instructions for analyzing the output data from the motion detecting sensor may include instructions for inferring a user activity level. Additionally, the instructions for analyzing the output data from the motion detection sensor may include instructions for detecting an intensity of user activity or a type of user activity. In some cases, the instructions for detecting the type of user activity include instructions for detecting running, walking, standing, sitting, or lying down. In some cases, the instructions for detecting the intensity of user activity include instructions for detecting running or walking. In some implementations, the periodic movement to be detected by the motion sensor is a wearer's limb movements.

In some implementations, the instructions for collecting the output data from the heartbeat waveform sensor include instructions for: (i) pulsing a light source in the worn biometric monitoring device at a first frequency; and (ii) detecting light from the light source at the first frequency. The instructions for pulsing the light source at the first frequency may include instructions for emitting a succession of light pulses of substantially constant intensity.

In some cases, the instructions for presenting the user's heart rate include instructions for presenting the heart rate on the worn biometric monitoring device. In some cases, the instructions for presenting the user's heart rate include instructions for presenting the heart rate on an external device that periodically communicates with the worn biometric monitoring device.

In certain embodiments, the control logic additionally includes instructions for determining the user's resting heart rate, and the instructions for filtering include instructions for removing a frequency less than about the frequency of the user's heart rate.

The instructions for determining the user's resting heart rate may include instructions for (i) measuring the user's heart rate soon after they wake up and are while still stationary

US 8,998,815 B2

7

in bed, (ii) measuring the user's average heart rate of the user while the user is sleeping, and/or (iii) making multiple measurements of the user's heart rate when the user is awake and stationary.

Another aspect of the disclosure provides methods of determining a user's heart rate when wearing a biometric monitoring device having a plurality of sensors including a heartbeat waveform sensor and a motion detecting sensor. The methods determine heart rate within an expected range. The methods may be characterized by the following operations: (a) collecting concurrent output data from the heartbeat waveform sensor and output data from the motion detecting sensor, wherein the output data from the heartbeat waveform sensor provides information about the user's heart rate and wherein the output data from the motion detecting sensor provides information about the user's periodic physical movements other than heartbeats; (b) determining a periodic component of the output data from the motion detecting sensor; (c) processing the output data from the heartbeat waveform sensor to remove the periodic component from the output data from the heartbeat waveform sensor; (d) using the output data from the motion detecting sensor, determining a range of expected heart rates; (e) determining the user's heart rate from the output data produced in (c), wherein the determined heart rate exists within the range of expected heart rates; and (f) presenting the user's heart rate. In some implementations, the motion detecting sensor is an accelerometer or a gyroscope. In some embodiments, the heartbeat waveform sensor may be a photoplethysmography sensor or an ECG sensor.

In various embodiments, the operation of determining the range of expected heart rates includes the following operations: (i) determining the user's heart rate when the output data from the motion detecting sensor indicates that the user is substantially stationary; (ii) determining the user's activity level and/or activity type from the periodic component of the output data from the motion detecting sensor; and (iii) determining the range of expected heart rates from the user's heart rate determined in (i) and the user's activity level and/or activity type determined in (ii). In some implementations, a minimum expected heart rate in the range of expected heart rates is greater than the user's heart rate determined in (i). In some implementations, the operation of determining the user's activity type includes inferring the activity type from information contained in the output data from the motion detecting sensor or detecting a manually entered selection of activity type. In certain embodiments, determining the range of expected heart rates includes determining the user's step rate from the output data from the motion detecting sensor.

In some cases, the operation of determining the user's heart rate involves calculating the spectral density of the output data produced in (c).

In some cases, the periodic movement detected by the motion sensor is a wearer's limb movements, which may be, e.g., steps, swim strokes, ankle revolutions while bicycling, and leg movements on cardio machines.

In some method implementations, the operation collecting the output data from the heartbeat waveform sensor includes the following operations: (i) pulsing a light source in the worn biometric monitoring device at a first frequency; and (ii) detecting light from the light source at the first frequency. Pulsing the light source at the first frequency may involve emitting a succession of light pulses of substantially constant intensity.

In certain embodiments, presenting the user's heart rate includes presenting the heart rate on the worn biometric monitoring device. In certain embodiments, presenting the

8

user's heart rate includes presenting the heart rate on an external device that periodically communicates with the worn biometric monitoring device.

Another aspect of the invention pertains to wearable fitness monitoring devices designed or configured to determine user's heart rate within an expected range of rates. Such devices may be characterized by the following features: a motion sensor configured to provide output corresponding to motion by a user wearing the fitness monitoring device; a heartbeat waveform sensor; and control logic having instructions for: (a) collecting concurrent output data from the heartbeat waveform sensor and output data from the motion detecting sensor, wherein the output data from the heartbeat waveform sensor provides information about the user's heart rate and wherein the output data from the motion detecting sensor provides information about the user's periodic physical movements other than heartbeats; (b) determining a periodic component of the output data from the motion detecting sensor; (c) processing the output data from the heartbeat waveform sensor to remove the periodic component from the output data from the heartbeat waveform sensor; (d) using the output data from the motion detecting sensor, determining a range of expected heart rates; (e) determining the user's heart rate from the output data produced in (c), wherein the determined heart rate exists within the range of expected heart rates; and (f) presenting the user's heart rate.

The control logic is typically, though not necessarily, located on the fitness monitoring device. It may be implemented as hardware, software, firmware, or any combination thereof. The data used by the control logic in executing the instructions described herein may be stored (e.g., buffered) by associated memory, registers, and the like, which may be entirely resident on the device or partially resident on a paired secondary device. Examples of suitable architectures for implementing the control logic are presented below with reference to, e.g., FIGS. 11A-G, 12A-C, 13A-B, and 14A-D.

In some devices, the motion detecting sensor is an accelerometer or a gyroscope. In certain embodiments, the device's heartbeat waveform sensor is a photoplethysmographic sensor having (i) a periodic light source, (ii) a photo detector positioned to receive periodic light emitted by the light source after interacting with the user's skin, and (iii) circuitry determining the user's heart rate from output of the photo detector. In some implementations, the photoplethysmographic sensor includes two periodic light sources straddling the photo detector. In some implementations, the photoplethysmographic sensor additionally includes a housing having a recess in which the photo detector is disposed. The housing of the photoplethysmographic sensor may have a second recess in which the periodic light source is disposed. In some designs, the housing protrudes at least about 1 mm above a base surface of the wearable fitness monitoring device arranged to press against the user's skin when worn. Further, the photoplethysmographic sensor further may include a spring configured to resist compression when the protruding housing presses against the user's skin. In certain embodiments, the photoplethysmographic sensor also includes an IML film over the photo detector and the periodic light source. In certain embodiments, the periodic light source is an LED.

In certain embodiments, the instructions for determining the range of expected heart rates include instructions for: (i) determining the user's heart rate when the output data from the motion detecting sensor indicates that the user is substantially stationary; (ii) determining the user's activity level and/or activity type from the periodic component of the output data from the motion detecting sensor; and (iii) determining

36

US 8,998,815 B2

9 | 10

the range of expected heart rates from the user's heart rate determined in (i) and the user's activity level and/or activity type determined in (ii). The minimum expected heart rate in the range of expected heart rates may be greater than the user's heart rate determined in (i). In some embodiments, the instructions for determining the user's activity type comprise instructions for inferring the activity type from information contained in the output data from the motion detecting sensor or detecting a manually entered selection of activity type.

In certain embodiments, the instructions for determining the range of expected heart rates include instructions for determining the user's step rate from the output data from the motion detecting sensor. In some implementations, the instructions for determining the user's heart rate include instructions for calculating the spectral density of the output data produced in (c).

In some implementations, the instructions for collecting the output data from the heartbeat waveform sensor include instructions for: (i) pulsing a light source in the worn biometric monitoring device at a first frequency; and (ii) detecting light from the light source at the first frequency. The instructions for pulsing the light source at the first frequency may include instructions for emitting a succession of light pulses of substantially constant intensity.

In some cases, the instructions for presenting the user's heart rate include instructions for presenting the heart rate on the worn biometric monitoring device. In some cases, the instructions for presenting the user's heart rate include instructions for presenting the heart rate on an external device that periodically communicates with the worn biometric monitoring device.

Yet another aspect of the disclosure pertains to methods of determining a user's heart rate when wearing a biometric monitoring device having a plurality of sensors including a heartbeat waveform sensor and a motion detecting sensor. The methods involve duty cycling the operation of the heartbeat waveform sensor. The methods may be characterized by the following operations: (a) collecting concurrent output data from the heartbeat waveform sensor and output data from the motion detecting sensor, wherein the output data from the heartbeat waveform sensor provides information about the user's heart rate and wherein the output data from the motion detecting sensor provides information about the user's periodic physical movements other than heartbeats; (b) determining a periodic component of the output data from the motion detecting sensor; (c) processing the output data from the heartbeat waveform sensor according to a duty cycle, wherein the processing comprises removing the periodic component from the output data from the heartbeat waveform sensor; (d) determining the user's heart rate; and (e) presenting the user's heart rate.

In some implementations, the motion detecting sensor is an accelerometer or a gyroscope. The heartbeat waveform sensor may be a photoplethysmography sensor or an ECG sensor.

In certain embodiments, the duty cycle includes an active phase of about 5 to 15 seconds for acquiring collecting output data from the heartbeat waveform sensor and determining the user's heart rate, followed by an inactive phase. In some implementations, successive active phases are separated by about 1 to 10 minutes. In some implementations, the active phase is triggered by receiving user input requesting a heart rate measurement. In some cases, the heartbeat waveform sensor and output data from the motion detecting sensor is collected in (a) for about 5-15 seconds during each minute of the duty cycle.

In certain embodiments, the methods additionally include the following operations: detecting that the user is attempting to read a heart rate; and temporarily suspending the duty cycling. In some cases, the methods additionally include the following operations: analyzing the output data from the motion detecting sensor to infer a low activity level; and, in response, temporarily suspending the duty cycling.

In some cases, the periodic movement detected by the motion sensor is a wearer's limb movements, which may be, e.g., steps, swim strokes, ankle revolutions while bicycling, and leg movements on cardio machines.

In some method implementations, the operation of collecting the output data from the heartbeat waveform sensor includes the following operations: (i) pulsing a light source in the worn biometric monitoring device at a first frequency; and (ii) detecting light from the light source at the first frequency. Pulsing the light source at the first frequency may involve emitting a succession of light pulses of substantially constant intensity.

In certain embodiments, presenting the user's heart rate includes presenting the heart rate on the worn biometric monitoring device. In certain embodiments, presenting the user's heart rate includes presenting the heart rate on an external device that periodically communicates with the worn biometric monitoring device.

Another aspect of the invention pertains to wearable fitness monitoring devices designed or configured to duty cycle when determining a user's heart rate. The wearable fitness monitoring devices may be characterized by the following features: a motion sensor configured to provide output corresponding to motion by a user wearing the fitness monitoring device; a heartbeat waveform sensor; and control logic comprising instructions for: (a) collecting concurrent output data from the heartbeat waveform sensor and output data from the motion detecting sensor, wherein the output data from the heartbeat waveform sensor provides information about the user's heart rate and wherein the output data from the motion detecting sensor provides information about the user's periodic physical movements other than heartbeats; (b) determining a periodic component of the output data from the motion detecting sensor; (c) processing the output data from the heartbeat waveform sensor according to a duty cycle, wherein the processing comprises removing the periodic component from the output data from the heartbeat waveform sensor; (d) determining the user's heart rate; and (e) presenting the user's heart rate.

The control logic is typically, though not necessarily, located on the fitness monitoring device. It may be implemented as hardware, software, firmware, or any combination thereof. The data used by the control logic in executing the instructions described herein may be stored (e.g., buffered) by associated memory, registers, and the like, which may be entirely resident on the device or partially resident on a paired secondary device. Examples of suitable architectures for implementing the control logic are presented below with reference to, e.g., FIGS. 11A-G, 12A-C, 13A-B, and 14A-D.

In some devices, the motion detecting sensor is an accelerometer or a gyroscope. In certain embodiments, the device's heartbeat waveform sensor is a photoplethysmographic sensor having (i) a periodic light source, (ii) a photo detector positioned to receive periodic light emitted by the light source after interacting with the user's skin, and (iii) circuitry determining the user's heart rate from output of the photo detector. In some implementations, the photoplethysmographic sensor includes two periodic light sources straddling the photo detector. In some implementations, the photoplethysmographic sensor additionally includes a housing having a recess in which the photo detector is disposed. The housing of the photoplethysmographic sensor may have a

Appx1284

US 8,998,815 B2

11                                                         12

second recess in which the periodic light source is disposed. In some designs, the housing protrudes at least about 1 mm above a base surface of the wearable fitness monitoring device arranged to press against the user's skin when worn. Further, the photoplethysmographic sensor further may include a spring configured to resist compression when the protruding housing presses against the user's skin. In certain embodiments, the photoplethysmographic sensor also includes an IML film over the photo detector and the periodic light source. In certain embodiments, the periodic light source is an LED.

In certain embodiments, the duty cycle has an active phase of about 5 to 15 seconds for acquiring collecting output data from the heartbeat waveform sensor and determining the user's heart rate, followed by an inactive phase. In some cases, the successive active phases are separated by about 1 to 10 minutes. In certain implementations, the control logic additionally includes instructions for triggering the active phase by receiving user input requesting a heart rate measurement. In some implementations, the control logic includes instructions for collecting output data from the heartbeat waveform sensor and output data from the motion detecting sensor in (a) for about 5-15 seconds during each minute of the duty cycle.

In certain embodiments, the control logic includes instructions for: (i) detecting that the user is attempting to read a heart rate; and (ii) temporarily suspending the duty cycling. In certain embodiments, the control logic includes instructions for: (i) analyzing the output data from the motion detecting sensor to infer a low activity level; and (ii) temporarily suspending the duty cycling.

In some implementations, the instructions for collecting the output data from the heartbeat waveform sensor include instructions for: (i) pulsing a light source in the worn biometric monitoring device at a first frequency; and (ii) detecting light from the light source at the first frequency. The instructions for pulsing the light source at the first frequency may include instructions for emitting a succession of light pulses of substantially constant intensity.

In some cases, the instructions for presenting the user's heart rate include instructions for presenting the heart rate on the worn biometric monitoring device. In some cases, the instructions for presenting the user's heart rate include instructions for presenting the heart rate on an external device that periodically communicates with the worn biometric monitoring device.

These and other features of the disclosed embodiments will be presented in more detail below with reference to the associated drawings.

BRIEF DESCRIPTION OF DRAWINGS

FIG. 1 illustrates an example portable monitoring device which enables user interaction via a user interface.

FIG. 2A illustrates an example portable monitoring device which may be secured to the user through the use of a band.

FIG. 2B provides a view of the example portable monitoring device of FIG. 2A which shows the skin-facing portion of the device.

FIG. 2C provides a cross-sectional view of the portable monitoring device of FIG. 2A.

FIG. 3A provides a cross sectional view of a sensor protrusion of an example portable monitoring device.

FIG. 3B depicts a cross sectional view of a sensor protrusion of an example portable monitoring device; this protru-

sion is similar to that presented in FIG. 3A with the exception that the light sources and photodetector are placed on a flat and/or rigid PCB.

FIG. 3C provides another cross-sectional view of an example PPG sensor implementation.

FIG. 4A illustrates an example of one potential PPG light source and photodetector geometry.

FIGS. 4B and 4C illustrate examples of a PPG sensor having a photodetector and two LED light sources.

FIG. 5 illustrates an example of an optimized PPG detector that has a protrusion with curved sides so as not to discomfort the user.

FIG. 6A illustrates an example of a portable monitoring device having a band; optical sensors and light emitters may be placed on the band.

FIG. 6B illustrates an example of a portable biometric monitoring device having a display and wristband. Additionally, optical PPG (e.g., heart rate) detection sensors and/or emitters may be located on the side of the biometric monitoring device. In one embodiment, these may be located in side-mounted buttons.

FIG. 7 depicts a user pressing the side of a portable biometric monitoring device to take a heart rate measurement from a side-mounted optical heart rate detection sensor. The display of the biometric monitoring device may show whether or not the heart rate has been detected and/or display the user's heart rate.

FIG. 8 illustrates functionality of an example biometric monitoring device smart alarm feature.

FIG. 9 illustrates an example of a portable biometric monitoring device that changes how it detects a user's heart rate based on how much movement the biometric monitoring device is experiencing.

FIG. 10 illustrates an example of a portable biometric monitoring device that has a bicycle application on it that may display bicycle speed and/or pedaling cadence, among other metrics.

FIG. 11A illustrates an example block diagram of a PPG sensor which has a light source, light detector, ADC, processor, DAC/GPIOs, and light source intensity and on/off control.

FIG. 11B illustrates an example block diagram of a PPG sensor that is similar to that of FIG. 11A which additionally uses a sample-and-hold circuit as well as analog signal conditioning.

FIG. 11C illustrates an example block diagram of a PPG sensor that is similar to that of FIG. 11A which additionally uses a sample-and-hold circuit.

FIG. 11D illustrates an example block diagram of a PPG sensor having multiple switchable light sources and detectors, light source intensity/on and off control, and signal conditioning circuitry.

FIG. 11E illustrates an example block diagram of a PPG sensor which uses synchronous detection. To perform this type of PPG detection, it has a demodulator.

FIG. 11F illustrates an example block diagram of a PPG sensor which, in addition to the features of the sensor illustrated in FIG. 11A, has a differential amplifier.

FIG. 11G illustrates an example block diagram of a PPG sensor which has the features of the PPG sensors shown in FIGS. 11A-KKF.

FIG. 12A illustrates an example of a portable biometric monitoring device having a heart rate or PPG sensor, motion sensor, display, vibromotor, and communication circuitry which is connected to a processor.

FIG. 12B illustrates an example of a portable biometric monitoring device having a heart rate or PPG sensor, motion

US 8,998,815 B2

13                                                        14

sensor, display, vibromotor, location sensor, altitude sensor, skin conductance/wet sensor and communication circuitry which is connected to a processor.

FIG. **12C** illustrates an example of a portable biometric monitoring device having physiological sensors, environmental sensors, and location sensors connected to a processor.

FIG. **13A** illustrates an example of the use of a motion signal and an optical PPG signal to measure a heart rate.

FIG. **13B** illustrates another example of the use of a motion signal and an optical PPG signal to measure heart rate.

FIG. **14A** illustrates an example of a sensor which has an analog connection to a sensor processor.

FIG. **14B** illustrates an example of a sensor which has an analog connection to a sensor processor which, in turn, has a digital connection to an application processor.

FIG. **14C** illustrates an example of a sensor device which has one or multiple sensors connected to an application processor.

FIG. **14D** illustrates an example of a sensor device which has one or multiple sensors connected to sensor processors which, in turn, are connected to an application processor.

FIG. **15A** illustrates an example of a swim detection algorithm using a sequential algorithm flow.

FIG. **15B** illustrates an example of a swim detection algorithm which uses a parallel algorithm flow.

FIG. **15C** illustrates an example of a swim detection algorithm which uses a hybrid of sequential and parallel algorithm flow.

FIG. **15D** illustrates an example of a swim detection algorithm which uses a hybrid of sequential and parallel algorithm flow.

FIG. **16A** illustrates an example schematic of a sample-and-hold circuit and differential/instrumentation amplifier which may be used in PPG sensing.

FIG. **16B** illustrates an example schematic of a circuit for a PPG sensor using a controlled current source to offset "bias" current prior to a transimpedance amplifier

FIG. **16C** illustrates an example schematic of a circuit for a PPG sensor using a sample-and-hold circuit for current feedback applied to photodiode (prior to a transimpedance amplifier).

FIG. **16D** illustrates an example schematic of a circuit for a PPG sensor using a differential/instrumentation amplifier with ambient light cancellation functionality.

FIG. **16E** illustrates an example schematic of a circuit for a PPG sensor using a photodiode offset current generated dynamically by a DAC.

FIG. **16F** illustrates an example schematic of a circuit for a PPG sensor using a photodiode offset current generated dynamically by a controlled voltage source.

FIG. **16G** illustrates an example schematic of a circuit for a PPG sensor including ambient light removal functionality using a "switched capacitor" method.

FIG. **16H** illustrates an example schematic of a circuit for a PPG sensor that uses a photodiode offset current generated by a constant current source (this may also be done using a constant voltage source and a resistor).

FIG. **16I** illustrates an example schematic of a circuit for a PPG sensor that includes ambient light removal functionality and differencing between consecutive samples.

FIG. **16J** illustrates an example schematic of a circuit for ambient light removal and differencing between consecutive samples.

FIG. **17** presents a block diagram of signal processing logic for applying motion compensation to a heartbeat waveform signal in accordance with certain embodiments.

FIG. **18** presents an example of a frequency domain heartbeat waveform sensor signal that undergoes two passes of adaptive filtering. The upper panel of the figure shows the unfiltered signal and the lower panel shows the same signal after two passes of adaptive filtering.

FIG. **19** presents a graph of typical heart rates for different user activity types.

DETAILED DESCRIPTION

This disclosure is directed at biometric monitoring devices (which may also be referred to herein and in any references incorporated by reference as "biometric tracking devices," "personal health monitoring devices," "portable monitoring devices," "portable biometric monitoring devices," "biometric monitoring devices," or the like), which may be generally described as wearable devices, typically of a small size, that are designed to be worn relatively continuously by a person. When worn, such biometric monitoring devices gather data regarding activities performed by the wearer or the wearer's physiological state. Such data may include data representative of the ambient environment around the wearer or the wearer's interaction with the environment, e.g., motion data regarding the wearer's movements, ambient light, ambient noise, air quality, etc., as well as physiological data obtained by measuring various physiological characteristics of the wearer, e.g., heart rate, perspiration levels, etc.

Biometric monitoring devices, as mentioned above, are typically small in size so as to be unobtrusive for the wearer. Fitbit offers several varieties of biometric monitoring devices that are all quite small and very light, e.g., the Fitbit Flex is a wristband with an insertable biometric monitoring device that is about 0.5″ wide by 1.3″ long by 0.25″ thick. Biometric monitoring devices are typically designed to be able to be worn without discomfort for long periods of time and to not interfere with normal daily activity.

In some cases, a biometric monitoring device may leverage other devices external to the biometric monitoring device, e.g., an external heart rate monitor in the form of an EKG sensor on a chest strap may be used to obtain heart rate data or a GPS receiver in a smartphone may be used to obtain position data. In such cases, the biometric monitoring device may communicate with these external devices using wired or wireless communications connections. The concepts disclosed and discussed herein may be applied to both stand-alone biometric monitoring devices as well as biometric monitoring devices that leverage sensors or functionality provided in external devices, e.g., external sensors, sensors or functionality provided by smartphones, etc.

In general, the concepts discussed herein may be implemented in stand-alone biometric monitoring devices as well as, when appropriate, biometric monitoring devices that leverage external devices.

It is to be understood that while the concepts and discussion included herein are presented in the context of biometric monitoring devices, these concepts may also be applied in other contexts as well if the appropriate hardware is available. For example, many modern smartphones include motion sensors, such as accelerometers, that are normally included in biometric monitoring devices, and the concepts discussed herein may, if appropriate hardware is available in a device, be implemented in that device. In effect, this may be viewed as turning the smartphone into some form of biometric monitoring device (although one that is larger than a typical biometric monitoring device and that may not be worn in the same manner). Such implementations are also to be understood to be within the scope of this disclosure.

Appx1286

US 8,998,815 B2

15

The functionality discussed herein may be provided using a number of different approaches. For example, in some implementations a processor may be controlled by computer-executable instructions stored in memory so as to provide functionality such as is described herein. In other implementations, such functionality may be provided in the form of an electrical circuit. In yet other implementations, such functionality may be provided by a processor or processors controlled by computer-executable instructions stored in a memory coupled with one or more specially-designed electrical circuits. Various examples of hardware that may be used to implement the concepts outlined herein include, but are not limited to, application specific integrated circuits (ASICs), field-programmable gate arrays (FPGAs), and general-purpose microprocessors coupled with memory that stores executable instructions for controlling the general-purpose microprocessors.

Standalone biometric monitoring devices may be provided in a number of form factors and may be designed to be worn in a variety of ways. In some implementations, a biometric monitoring device may be designed to be insertable into a wearable case or into multiple, different wearable cases, e.g., a wristband case, a belt-clip case, a pendant case, a case configured to be attached to a piece of exercise equipment such as a bicycle, etc. Such implementations are described in more detail in, for example, U.S. patent application Ser. No. 14/029,764, filed Sep. 17, 2013, which is hereby incorporated by reference for such purpose. In other implementations, a biometric monitoring device may be designed to be worn in only one manner, e.g., a biometric monitoring device that is integrated into a wristband in a non-removable manner may be intended to be worn only on a person's wrist (or perhaps ankle).

Portable biometric monitoring devices according to embodiments and implementations described herein may have shapes and sizes adapted for coupling to (e.g., secured to, worn, borne by, etc.) the body or clothing of a user. An example of a portable biometric monitoring devices is shown in FIG. 1; the example portable biometric monitoring device may have a user interface, processor, biometric sensor(s), memory, environmental sensor(s) and/or a wireless transceiver which may communicate with a client and/or server. An example of a wrist-worn portable biometric monitoring device is shown in FIGS. 2A through 2C. This device may have a display, button(s), electronics package, and/or an attachment band. The attachment band may be secured to the user through the use of hooks and loops (e.g., Velcro), a clasp, and/or a band having memory of its shape, e.g., through the use of a spring metal band. In FIG. 2B, a sensor protrusion and recess for mating a charger and/or data transmission cable can be seen. In FIG. 2C, a cross-section through the electronics package is shown. Of note are the sensor protrusion, main PCB board, and display.

Portable biometric monitoring devices may collect one or more types of physiological and/or environmental data from embedded sensors and/or external data sources and communicate or relay such information to other devices, including devices capable of serving as an Internet-accessible data sources, thus permitting the collected data to be viewed, for example, using a web browser or network-based application. For example, while the user is wearing a biometric monitoring device, the biometric monitoring device may calculate and store the user's step count using one or more biometric sensors. The biometric monitoring device may then transmit data representative of the user's step count to an account on a web

16

service (e.g., www.fitbit.com), computer, mobile phone, or health station where the data may be stored, processed, and visualized by the user. Indeed, the biometric monitoring device may measure or calculate a plurality of other physiological metrics in addition to, or in place of, the user's step count. These include, but are not limited to, energy expenditure, e.g., calorie burn, floors climbed and/or descended, heart rate, heart rate variability, heart rate recovery, location and/or heading, e.g., through GPS, GLONASS, or a similar system, elevation, ambulatory speed and/or distance traveled, swimming lap count, swimming stroke type and count detected, bicycle distance and/or speed, blood pressure, blood glucose, skin conduction, skin and/or body temperature, muscle state measured via electromyography, brain activity as measured by electroencephalography, weight, body fat, caloric intake, nutritional intake from food, medication intake, sleep periods, e.g., clock time, sleep phases, sleep quality and/or duration, pH levels, hydration levels, respiration rate, and other physiological metrics. The biometric monitoring device may also measure or calculate metrics related to the environment around the user such as barometric pressure, weather conditions (e.g., temperature, humidity, pollen count, air quality, rain/snow conditions, wind speed), light exposure (e.g., ambient light, UV light exposure, time and/or duration spent in darkness), noise exposure, radiation exposure, and magnetic field. Furthermore, the biometric monitoring device or the system collecting the data streams from the biometric monitoring device may calculate metrics derived from such data. For example, the device or system may calculate the user's stress and/or relaxation levels through a combination of heart rate variability, skin conduction, noise pollution, and sleep quality. In another example, the device or system may determine the efficacy of a medical intervention, e.g., medication, through the combination of medication intake, sleep data, and/or activity data. In yet another example, the biometric monitoring device or system may determine the efficacy of an allergy medication through the combination of pollen data, medication intake, sleep and/or activity data. These examples are provided for illustration only and are not intended to be limiting or exhaustive. Further embodiments and implementations of sensor devices may be found in U.S. patent application Ser. No. 13/156,304, titled "Portable Biometric Monitoring Devices and Methods of Operating Same" filed Jun. 8, 2011 and U.S. Patent Application 61/680,230, titled "Fitbit Tracker" filed Aug. 6th, 2012, which are both hereby incorporated herein by reference in their entireties.

Physiological Sensors

Biometric monitoring devices as discussed herein may use one, some or all of the following sensors to acquire physiological data, including, but not limited to, the physiological data outlined in the table below. All combinations and permutations of physiological sensors and/or physiological data are intended to fall within the scope of this disclosure. Biometric monitoring devices may include but are not limited to types of one, some, or all of the sensors specified below for the acquisition of corresponding physiological data; indeed, other type(s) of sensors may also or alternatively be employed to acquire the corresponding physiological data, and such other types of sensors are also intended to fall within the scope of the present disclosure. Additionally, the biometric monitoring device may derive the physiological data from the corresponding sensor output data, but is not limited to the number or types of physiological data that it could derive from said sensor.

US 8,998,815 B2

17          18

| Physiological Sensors | Physiological data acquired |
| --- | --- |
| Optical Reflectometer | Heart Rate, Heart Rate Variability |
| Example Sensors: | SpO₂ (Saturation of Peripheral |
| Light emitter and receiver | Oxygen) |
| Multi or single LED and photo | Respiration |
| diode arrangement | Stress |
| Wavelength tuned for specific | Blood pressure |
| physiological signals | Arterial Stiffness |
| Synchronous detection/amplitude | Blood glucose levels |
| modulation | Blood volume |
| | Heart rate recovery |
| | Cardiac health |
| Motion Detector | Activity level detection |
| Example Sensors: | Sitting/standing detection |
| Inertial sensors, Gyroscopic sensors and/or | Fall detection |
| Accelerometers | |
| GPS | |
| Skin Temperature | Stress |
| EMG (eletromyographic sensor) | Muscle tension |
| EKG or ECG (electrocardiographic sensor) | Heart Rate |
| Example Sensors: | Heart Rate Variability |
| Single-lead ECG or EKG | Heart Rate Recovery |
| Dual-lead ECG or EKG | Stress |
| | Cardiac health |
| Magnetometer | Activity level based on rotation |
| Laser Doppler | |
| Power Meter | |
| Ultrasonic Sensor | Blood flow |
| Audio Sensor | Heart Rate |
| | Heart Rate Variability |
| | Heart Rate Recovery |
| | Laugh detection |
| | Respiration |
| | Respiration type, e.g., snoring, breathing, |
| | breathing problems (such as sleep apnea) |
| | User's voice |
| Strain gauge | Heart Rate |
| Example: | Heart Rate Variability |
| In a wrist band | Stress |
| Wet/Immersion Sensor | Stress |
| Example Sensor: | Swimming detection |
| Galvanic skin response | Shower detection |

In one example embodiment, the biometric monitoring device may include an optical sensor to detect, sense, sample and/or generate data that may be used to determine information representative of, for example, stress (or level thereof), blood pressure, and/or heart rate of a user. (See, for example, FIGS. **2A** through **3C** and **11A** through KKG). In such embodiments, the biometric monitoring device may include an optical sensor having one or more light sources (LED, laser, etc.) to emit or output light into the user's body, as well as light detectors (photodiodes, phototransistors, etc.) to sample, measure and/or detect a response or reflection of such light from the user's body and provide data used to determine data that is representative of stress (or level thereof), blood pressure, and/or heart rate of a user (e.g., such as by using photoplethysmography).

In one example embodiment, a user's heart rate measurement may be triggered by criteria determined by one or more sensors (or processing circuitry connected to them). For instance, when data from a motion sensor(s) indicates a period of stillness or of little motion, the biometric monitoring device may trigger, acquire, and/or obtain a heart rate measurement or data. (See, for example, FIGS. **9**, **12**A, and **12**B).

Photoplethysmogram (PPG) signal can be recorded on the body using a light source (e.g., an LED) and a corresponding light detector (e.g., a photodiode). With each cardiac cycle the heart pumps blood to the periphery. Even though this pressure pulse is somewhat damped by the time it reaches the skin, it is enough to distend the arteries and arterioles in the subcuta-

neous tissue. The change in volume caused by the pressure pulse is detected by illuminating the skin with the light from a light-emitting diode (LED) and then measuring the amount of light either transmitted or reflected to a photodiode.

In certain embodiments, PPG or other technique is used to measure a heartbeat waveform. A "heartbeat waveform" generally refers to a variation of any measured signal caused by or correlated with a user's heartbeat driven blood flow. In some embodiments, the measured signal relates to blood circulation caused by the heart pumping blood through the circulatory system, which causes cardiovascular driven variations in capillary volume or other parameter. In some embodiments, the heartbeat waveform is measured by photoplethysmography (PPG). In such embodiments, the heartbeat waveform reflects blood volume changes in capillaries, which correlates with a user's heartbeat and pulse (an arterial palpation caused by the heartbeat). In some embodiments, the measured signal relates to muscular activities of the heart or electrocardiographic signals. In some embodiments, the cardiac activities or signals can be measured by ECG to obtain the heartbeat waveform. A heartbeat waveform represents information for one or more cardiac cycles, which corresponds to a complete heartbeat from its generation to the beginning of the next beat. The frequency of the cardiac cycle is described by the heart rate, which is typically expressed as beats per minute. A heartbeat waveform typically includes information about various stages of a heartbeat, e.g., amplitude, frequency, and/or shape of waveform over one or more cycles. In many embodiments, a heartbeat waveform is used to obtain a user's heart rate.

41

US 8,998,815 B2

19                                                                                     20

This PPG signal can thus be used to estimate the heart rate of the user. PPG reflects a combination of the underlying change in blood volume due to heart beats as well as the change in optical properties of the underlying tissue and the device—skin interface due to subject motion. Typically, the human heart rate is estimated in the range 40-240 beats per min (bpm).

FIG. **12**A illustrates an example of a portable biometric monitoring device having a heart rate or PPG sensor, motion sensor, display, vibromotor, and communication circuitry which is connected to a processor.

FIG. **12**B illustrates an example of a portable biometric monitoring device having a heart rate or PPG sensor, motion sensor, display, vibromotor, location sensor, altitude sensor, skin conductance/wet sensor and communication circuitry which is connected to a processor.

In one embodiment, when the motion sensor(s) indicate user activity or motion (for example, motion that is not suitable or optimum to trigger, acquire, and/or obtain desired heart rate measurement or data (for example, data used to determine a user's resting heart rate)), the biometric monitoring device and/or the sensor(s) employed to acquire and/or obtain a desired heart rate measurement or data may be placed in, or remain in, a low power state. Since heart rate measurements taken during motion may be less reliable and may be corrupted by motion artifacts, it may be desirable to decrease the frequency with which heart rate data samples are collected (thus decreasing power usage) when the biometric monitoring device is in motion.

In another embodiment, a biometric monitoring device may employ data (for example, from one or more motion sensors) indicative of user activity or motion to adjust or modify characteristics of triggering, acquiring, and/or obtaining desired heart rate measurements or data (for example, to improve robustness to motion artifact). For instance, if the biometric monitoring device receives data indicative of user activity or motion, the biometric monitoring device may adjust or modify the sampling rate and/or resolution mode of sensors used to acquire heart rate data (for example, where the amount of user motion exceeds a certain threshold, the biometric monitoring device may increase the sampling rate and/or increase the sampling resolution mode of sensors employed to acquire heart rate measurement or data.) Moreover, the biometric monitoring device may adjust or modify the sampling rate and/or resolution mode of the motion sensor(s) during such periods of user activity or motion (for example, periods where the amount of user motion exceeds a certain threshold). In this way, when the biometric monitoring device determines or detects such user activity or motion, the biometric monitoring device may place the motion sensor(s) into a higher sampling rate and/or higher sampling resolution mode to, for example, enable more accurate adaptive filtering of the heart rate signal. (See, for example, FIG. **9**).

FIG. **9** illustrates an example of a portable biometric monitoring device that changes how it detects a user's heart rate based on how much movement the biometric monitoring device is experiencing. In the case where there is motion detected (e.g., through the use of an accelerometer), the user may be considered by the biometric monitoring device to be "active" and high-sampling-rate heart rate detection may occur to reduce motion artifacts in the heart rate measurement. This data may be saved and/or displayed. In the case that the user is determined by the biometric monitoring device to not be moving (or to be relatively sedentary), low-sampling-rate heart rate detection (which does not consume as much power) may be adequate to measure a heart rate and may thus be used.

Notably, where a biometric monitoring device employs optical techniques to acquire heart rate measurements or data, e.g., by using photoplethysmography, a motion signal may be employed to determine or establish a particular approach or technique to data acquisition or measurement by the heartbeat waveform sensor (e.g., synchronous detection rather than a non-amplitude-modulated approach) and/or analysis thereof. (See, for example, FIG. **11**E). In this way, the data which is indicative of the amount of user motion or activity may cause the biometric monitoring device to establish or adjust the type or technique of data acquisition or measurement used by an optical heartbeat waveform sensor or sensors.

For example, in one embodiment, a biometric monitoring device (or heart-rate measurement technique as disclosed herein) may adjust and/or reduce the sampling rate of optical heart rate sampling when motion detector circuitry detects or determines that the biometric monitoring device wearer's motion is below a threshold (for example, if the biometric monitoring device determines the user is sedentary or asleep). (See, for example, FIG. **9**). In this way, the biometric monitoring device may control its power consumption. For example, the biometric monitoring device may reduce power consumption by reducing the sensor sampling rate—for instance, the biometric monitoring device may sample the heart rate (via the heartbeat waveform sensor) once every 10 minutes, or 10 seconds out of every 1 minute. Notably, the biometric monitoring device may, in addition thereto or in lieu thereof, control power consumption via controlling data processing circuitry analysis and/or data analysis techniques in accordance with motion detection. As such, the motion of the user may impact the heart rate data acquisition parameters and/or data analysis or processing thereof.

Motion Artifact Suppression in Heartbeat Waveform Sensors

As discussed above, the raw heartbeat waveform signal measured by a PPG sensor may be improved by using one or more algorithms to remove motion artifacts. In certain embodiments, data from a motion sensor is employed to gauge a user's motion and an adaptive filter is employed to remove the motion artifact from the heart rate signal when the user's motion is periodic. Movement of the user (for determining motion artifacts) may be measured using sensors including, but not limited to, accelerometers, gyroscopes, proximity detectors, magnetometers, etc. The goal of such algorithms is to remove components of the PPG signal attributable to movement (movement artifacts) using the movement signal captured from the other sensors as a guide. In one embodiment the movement artifacts in the PPG signal may be removed using an adaptive filter based on a hybrid Kalman filter and a least mean square filter or a recursive least squares filter. The heart rate or other feature of a heartbeat waveform may then be extracted from the cleaned/filtered signal using a peak counting algorithm or a power spectral density estimation algorithm. Alternatively, a Kalman filter or particle filter may be used to remove such movement artifacts.

Another approach that may be used to calculate the heart rate frequency is to create a model of the heart rate signal as $Y = Y_{dc} + \Sigma a_k * \cos k\theta + b_k * \sin k\theta$, where k is the order of harmonic components, and $\theta$ is a model parameter for heart rate. This model may then be fit to the signal using either an extended Kalman filter or a particle filter. This model exploits the fact that the signal is not sinusoidal so contains power both at the fundamental harmonic as well as multiple additional harmonics.

42

US 8,998,815 B2

21                                                                                    22

Alternately, the signal may be modeled as $Y = Y_{dc} + \Sigma a_k * \sin(k * w_{motion} t + \theta) + \Sigma b_k * \sin(k * w_{HR} t + \Theta)$, where $w_{motion}$ is estimated directly from the accelerometer signal (or another motion sensor signal).

Various techniques may be employed to improve motion compensation. Some of these techniques are presented in the following sub-sections.

High Band Pass Filter

PPG signals tend to have slow variations due to causes other than heart beats, for example respiration, movement of blood into or out of the measurement region, user motions that change the orientation of the monitoring device. Removing these slow variations by high pass filtering the PPG signal before applying the adaptive filter may improve the performance of the adaptive filter. Therefore, certain embodiments provide a high pass filter placed in front of the adaptive filter. See FIG. **17**. In some implementations, the cutoff frequency of the high pass filter is positioned as high as possible, but no higher than the lowest heart rate expected (which is around 40 bpm for typical applications), so the high pass filter cutoff may be placed somewhere between about 0.3 and 0.6 Hz.

In some implementations, the high pass cutoff frequency is chosen to be approximately the user's previously detected resting heart rate, which may be determined by a variety of techniques. These include at least the following. (1) Measuring a user's heart rate soon after she wakes up and is still stationary in bed. As described elsewhere, the heart rate monitoring device may employ other algorithms to automatically detect when the user is asleep/awake. (2) Measuring the average heart rate of the user while the user is sleeping. As an example, a user's resting heart rate may be calculated from sleeping heart rate using an equation such as resting HR=sleeping HR/0.83. (3) Measuring the heart rate of the user when the user is awake and stationary. Taking a few of these measurements during the day and calculating the Nth percentile of the lowest of these measurements (e.g., N=10 or 5 or 2) provides a good approximation of resting heart rate. The method of approximating resting heart rate during all day activities can further be used to compute a user's resting heart rate at different locations. For example, the biometric monitoring device can compute a user's resting heart rate at home and at work. In addition to facilitating use in a high pass filter, such information can show trends in home and work resting heart rate over time.

High band pass filter frequency may be set based on the user's detected activity level. In such embodiments, the lowest expected heart rate differs based on activity; for example most users will have a heart rate of higher than about 50 bpm when walking or running. Therefore, in certain implementations, the PPG processing logic dynamically adjusts the frequency cutoff of the high pass filter by inferring the activity of the user using, e.g., inertial sensors such as accelerometers. As the user's level of activity increases, as inferred by motion interpreting logic, the high pass filter cutoff may be adjusted upward accordingly. In certain embodiments, when the processing logic determines that the user is engaged in walking, it increases high pass filter cutoff in proportion to the user's step rate, elevation climbed, etc. An example of the basis for such adjustments can be seen by the variation in a normal user's heart rate between running and walking as shown in FIG. **19**.

Create Spectrogram Heart Rate Monitor Output (Time Domain->Frequency Domain)

At an appropriate time in the signal processing, the processing logic transforms the time domain signal to a frequency domain signal, which can be represented as frequency versus time. FIG. **18** presents examples of the frequency domain signal. While the processing logic may perform the transformation using a Fast Fourier Transform, other techniques may be suitable. Examples include wavelet transforms and cepstral transforms.

Motion Compensation Process

The heartbeat waveform analysis logic may track the user's motion, as detected by the device, and apply an adaptive filter to remove or reduce the motion artifact from the heart rate signal when the user's motion is periodic. In certain embodiments, the motion artifact is measured using an accelerometer, a gyroscope, or an accelerometer and a gyroscope.

In certain embodiments, the adaptive filter is applied to the heartbeat waveform data twice in series. In other word, the output of a first pass of the adaptive filter is input for the second pass of the adaptive filter. Although typically unnecessary, the logic may run the adaptive filter more than two times. This approach may be employed to remove both the fundamental frequency and the higher harmonics of the motion artifact, as measured using, e.g., an accelerometer.

On the first pass, the filter typically removes the fundamental frequency of the motion artifact, and on the second pass, it removes a second harmonic (or other lower power harmonic). For example, the user may be walking at nominal rate of 1 Hz to produce an approximately 1 Hz motion artifact in the heartbeat waveform sensor signal. The first pass through the adaptive filter may remove this artifact, but not its first harmonic at nominally 2 Hz, which may interfere with processing the heartbeat waveform signal. Passing the "cleaned" heartbeat waveform signal through the adaptive filter a second time may remove the second harmonic of the motion artifact to further clean the signal. In some implementations, no further cleaning is needed, as higher order harmonics are of low power compared the heart rate signal and/or at frequencies far removed from the heart rate signal.

FIG. **18** presents an example of a frequency domain heartbeat waveform sensor signal that undergoes two passes of adaptive filtering. The upper panel of the figure shows the unfiltered signal and the lower panel shows the same signal after two passes of adaptive filtering. Note that the motion artifacts of both higher and lower frequencies than the true heart rate signal are removed.

Identify Heartbeat Waveform Track

A heartbeat waveform track is a trace of substantially continuous points (with few or no jump discontinuities) in frequency vs. time for the processed heartbeat waveform sensor output data. The points of the trace may have a relatively constant power density.

In certain embodiments, after removing the motion artifact using the adaptive filter, the power spectral density of the signal is calculated. The peak with the highest amplitude can be chosen as the most likely estimate of the current heart rate. Alternately, techniques like dynamic programming or multi target tracking can be used to estimate the heart rate 'track' in the spectrogram in the presence of other tracks caused due to motion and its higher harmonics. In all approaches, one or more of the following techniques may be implemented to improve performance:

1. The minimum heart rate expected for a user is related to the step rate or other cadence measurement of a user who is walking or running. By measuring the step rate of a user with, e.g., an accelerometer, a heart rate monitor can set a lower bound on the expected heart rate of the user. This serves to remove many motion artifacts related peaks which typically occur at lower frequencies. A similar technique can be applied to rates of other user activities such as swim strokes, bicycle peddling cadence, and rates of other activities described herein.

43

US 8,998,815 B2

23

2. The minimum heart rate expected for a user who is biking is related to the speed and incline at which the user is biking. By measuring the speed with a cadence sensor, GPS or other speed measurement sensor, and inclination with an altimeter, GPS or other height measuring sensor, a heart rate monitor can set a lower bound on the expected heart rate of the user. This serves to remove many motion artifacts which typically happen at lower frequencies.

3. Lower bounds on the expected heart rate can also be calculated based on different features in the accelerometer signal like the total power, standard deviation of one or more axes, power in a particular frequency band etc. Higher total accelerometer power or higher standard deviation of one or more axes are typically related to a person engaged in strenuous activity which leads to a higher heart rate.

4. The minimum heart rate of a user walking, running or biking is also higher than the sedentary heart rate of the user. This sedentary heart rate can be calculated when the user is stationary or when he or she is sleeping and may be used as a lower bound on the heart rate, alone or in addition to another mechanism for determining a lower bound (e.g., the lowest heart rate expected for the user's current activity mode).

5. The activity mode of the user like running, walking and biking can either be automatically calculated using other sensors on the device like inertial sensors, or can be manually entered by the user.

Determine Quality of the Heart Rate Estimate

In certain embodiments, the signal processing logic calculates the quality of the heart rate estimate by measuring the magnitude of the power spectral density at the output for the heartbeat trace compared to the background power. This monitor may then provide this to the user as feedback. The feedback can take various forms. In one example, it presents a confidence regarding how much the heart rate estimate can be trusted. In another example, it provides instructions for improving the generation of future heart rate measurements. For example, it may present information on whether the user needs to physically adjust the placement and tightness of the device to achieve a better signal. Further details are presented in the discussion of FIG. **17**.

Example Architecture for Motion Compensation in a Heartbeat Waveform Sensor

FIG. **17** presents an example architecture (and associated process flow) for a variety of motion compensating heartbeat waveform sensor. In the depicted example, the signal processing logic receives two input signals: (1) heartbeat waveform signals from a PPG sensor **1703**, for example, and (2) motion detection sensor **1705** output. The raw output from a heartbeat waveform sensor may be sampled at a defined frequency and the samples may be buffered for processing together. Similarly, the motion signal may be sampled and stored. In certain embodiments, the heartbeat waveform sensor and/or the motion detection sensor outputs are sampled at a rate of about 20 to 200 Hz or about 20 Hz to 60 Hz. In certain embodiments, the heartbeat waveform sensor and motion detection sensor outputs are sampled at the same frequency. In one example, the two signals are sample at 25 Hz. Regardless of the sampling rates, the outputs are stored for a limited time in buffers **1707** and **1709**.

In certain embodiments such as the one depicted in FIG. **17**, one or more additional inputs are provided to the motion compensating logic. In some implementations, an additional input is a user activity level or activity type, as inferred from output data from the motion sensor or other sensors, or detected from a manual setting by the user. Output from device sensors such as motion detecting sensors may be employed for this purpose. In the architecture depicted in

24

FIG. **17**, the signal processing logic employs the user's current state (e.g., sedentary, participating in activity 1, participating in activity 2, etc.—see block **1733**) and the user's activity rate (see block **1735**), sometimes referred to as cadence. The user's activity type/state is optional in some embodiments. Examples of activity types include, in addition to sedentary, walking, running, biking, etc. In some implementations, the device includes a periodic motion rate calculator that calculates the user's step rate or other periodic motion rate. Periodic motion rates are used at various stages in the process.

The buffered heart rate and motion sensor outputs may be separately processed in some embodiments. In other embodiments, they are processed together early in the motion compensation process. In the designs embodied by the architecture of FIG. **17**, both buffered output samples are subjected to the same "pre-processing" operations (see block **1711**). Examples of such pre-processing operations include band pass filtering, high pass filtering, low pass filtering, and denoising. As an example, both types of sample are filtered by a filter, which may remove slow varying components of the outputs, which introduce signal processing challenges as explained above. In the example, both signals are subjected to the same pre-processing but they are not combined.

In some embodiments, pre-processing block **1711** dynamically chooses a cutoff high pass frequency based on user activity level or activity type as described above. Inputs from **1733** and **1735** may be used for this purpose. As an example, a high pass cut off of 0.7 Hz, corresponding to 42 beats per minute, may be appropriate for some user activities but not others. Therefore, in some implementations, the algorithm attempts to determine the user's current activity and choose an appropriate cut off frequency for that activity. In one example, the algorithm determines the user's step rate from the motion sensor output data and uses the step rate to choose an appropriate high pass cut off frequency.

In the embodiment depicted in FIG. **17**, the signal processing logic buffers the pre-processed heartbeat waveform sensor signal in a buffer **1713** and buffers the pre-processed motion sensor signal in a buffer **1715**. In certain embodiments, each buffer holds data samples from about 1 to 40 seconds or from about 5 to 20 seconds. In one example, the buffer holds about 10 seconds of data.

In certain implementations, the signal processing logic includes different channels for processing heartbeat waveform data based on different characteristics of the data. Such characteristics may depend on inferred or user-set characteristics of the user, which, in some cases, may be varied dynamically. Examples of such characteristics include user activity type, user activity level (e.g., cadence or step rate), time of day, time of the week, location, etc. In the embodiment depicted in FIG. **17**, the characteristic is activity type and/or level (e.g., periodic motion rate). As shown, an activity discrimination logic block **1717** receives as inputs the user's state (from block **1733**) and the user's cadence (from block **1735**). The activity discrimination block may be viewed as a form of multiplexer. The signal processing logic uses this information, or other information in other embodiments, to choose a channel. In some implementations, the logic chooses a channel based on user input from a device's user interface, which may be provided on the biometric monitoring device or a secondary device. If the device detects that the user entered a particular mode like "biking," the processing logic may decide that channel for activities including biking should be used to process the heartbeat waveform. In the depicted embodiment, there are three channels: a "stationary" channel, a "first activity" channel, and a "second activity"

US 8,998,815 B2

25                                                          26

channel. Examples of activity processing channels include a channel for walking/running, one for working out, and/or channels for more specific types of working out such as biking, swimming, elliptical training, rock climbing, tennis, etc. Of course, the stationary mode channel is inferred when sensor output suggests that the user is generally inactive. Typically, there may be two or more channels. In certain embodiments, there are 2-20 channels, or 2-10 channels, or 2-5 channels.

In each of the channels, the signal processing logic converts the time domain signals acquired from the sensors to frequency domain signals. In the depicted embodiment, this is accomplished at a logic block **1719** for the stationary mode channel, a logic block **1723** for the first activity channel, and a logic block **1725** for the second activity channel.

As an example, a stationary mode channel may be implemented as follows. First, the stationary mode is determined based on the user's motion. If the user has not moved or moved only slightly during a recent time window (e.g., 5 minutes), the processing logic (e.g., block **1717**) deems the user stationary for purposes of further processing of the buffered sensor output data. In this channel, the logic assumes that there is no motion artifact, so the processing is simplified in comparison to processing other channels.

Some or all of the following operations may be performed in the stationary channel as well as one or more other "activity" channels:

A. Perform a Fast Fourier Transform or other time to frequency domain transform. This may provide an initial "estimate" of the user's heart rate. Before this transform, all processing is conducted in the time domain. As mentioned, block **1719** of FIG. **17** performs this operation in the stationary channel.

B. Identify a heart rate track in the spectral representation of the filtered output data from the heartbeat waveform sensor. This process may be performed as described above. In certain embodiments, this is performed by excluding putative heart rate tracks below an expected level for the user's activity type. In the case of the stationary mode channel, this level is about 30 beats per minute.

C. Optionally smooth the estimated time varying heart rate to provide a smoothed output heart rate. Smoothing may be performed using many different smoothing filters known to those of skill in the art. In the embodiment depicted in FIG. **17**, an optional smoothing logic block **1727** smoothes the time varying heart rate signal using input from blocks **1733** (user state) and **1735** (user cadence).

D. In some implementations, the signal processing logic assesses the "confidence" of the heart rate value determined from motion compensated process. In the embodiments of FIG. **17**, a logic block **1729** makes this assessment. As explained elsewhere herein, the confidence may be determined by any of various techniques. In one approach, it uses information contained in a heartbeat waveform sensor; for example, the signal-to-noise ratio of the sensor's output data. When a low signal-to-noise ratio is detected, the confidence is low; when a high signal to noise ratio is detected, the confidence is higher.

E. Typically, the signal processing logic completes its processing of buffered heartbeat waveform data by presenting its calculated heart rate to the user. See logic block **1731** in FIG. **17**. In certain embodiments, the signal processing logic presents the heart rate value to the user along with the calculated confidence in the presented heart rate. In some cases, the logic presents the heart rate value along with a recommendation for adjusting the device position to improve confidence in subsequent heart rate calculations. As examples, the logic may suggest wearing the device tighter or wearing it higher on the user's forearm.

The heart rate information may be presented to the user visually, audibly, tactilely, etc. The information may be provided via the biometric monitoring device and/or an associated secondary device such as a paired phone, table, computer, or other processing device. In some implementations, the information is provided via a "one touch" heart rate monitor design. See e.g., U.S. patent application Ser. No. 14/154, 009, filed Jan. 1, 2014, and incorporated herein by reference in its entirety.

Turning to the first activity mode channel, an example of the processing for this mode may be implemented as follows. Initially, the first activity mode is determined based on the user's motion. Many criteria may be employed to determine the user's activity mode. At a minimum, the devices should receive sensor output suggesting that the user is engaged in some activity and is not sedentary. In a typical implementation, a motion sensor output shows that the user or a user's limb is moving at a reasonable rate. Alternatively, the processing logic may rely on manual input from the user indicating that the user is engaged in the first activity. Regardless of how the signal processing logic (e.g., block **1717**) determines that the user is participating in the first activity, it begins processing of the buffered output data via the first activity channel. In this channel, the logic assumes that there is a motion artifact that should be removed or reduced before calculating the user's heart rate. Otherwise, the channel processing may be implemented similarly to that of the stationary channel.

The first activity channel may employ an adaptive filter to remove or reduce the motion artifacts from the time domain signal. See block **1721** in the embodiments of FIG. **17**. In certain implementations, the adaptive filter attempts to predict the heartbeat waveform sensor output data from the motion sensor output data. This determines the motion artifact in the heartbeat waveform sensor output because the motion artifact is the only component common to the two output signals. Stated another way, the adaptive filter subtracts the motion artifact from the heart rate output signal to provide "cleaned" heart rate output data. Examples of adaptive filtering that may be employed include least mean square filtering and recursive least squares filtering. Optionally, the processing logic passes the cleaned heartbeat waveform output signal through the adaptive filter a second time, as explained above. Examples of other motion compensation algorithms that may be employed include dynamic programming, and multi-target tracking. As mentioned, the motion compensation process may be employed two more times on the heartbeat waveform signal. The motion sensor output used in motion compensation may represent any of a variety of user physical motions. Examples include periodic limb movements such as steps, swim strokes, ankle revolutions while bicycling, and leg movements on cardio machines such as stationary bicycles, treadmills, and elliptical machines.

Further processing of the heartbeat waveform signal in the first activity channel may proceed generally as described above for the stationary channel. However, identifying the heartbeat track may employ more sophisticated processing. The following are operations that may be employed in first activity channel.

A. Employ an FFT or other frequency domain conversion technique to get an "estimate" of the user's heart rate from the time domain data output from the adaptive filter. See block **1723** for location of this operation in the embodiments of FIG. **17**.

45

US 8,998,815 B2

27

B. Identify a heart rate track in the spectral representation of the filtered output data from the heartbeat waveform sensor. See block **1724** in the embodiments of FIG. **17**. In certain embodiments, this is performed by excluding putative heart rate tracks below an expected level for the user's activity type. In the case of the stationary mode channel, this level is about 40 beats per minute. In some implementations, the logic creates or employs a band of expected heart rate frequencies for each activity type and/or activity level, and, for any given activity type, excludes all potential heart rates outside the band. Examples of information that may be used to define the bands include inferred user activity type, step rate, and defined sensor outputs (e.g., GPS speed while biking, altimeter change for bicycling). In certain embodiments, the minimum heart rate band for any activity is greater than the user's sedentary heart rate (previously determined).

C. Smooth the estimate to get a smoothed output heart rate.

D. Assess the "confidence" of the output heart rate. This process optionally uses the user's motion as determined by a different process. It may optionally use the signal-to-noise ratio of the motion sensor output.

E. Present the calculated heart rate to the user. This information may be presented along with the confidence level and/or a recommendation for adjusting device position to improve confidence. Information may be presented to the user visually, audibly, tactilely, etc. The information may be provided via the biometric monitoring device and/or an associated secondary device such as a paired phone, table, computer, or other processing device. In some implementations, the information is provided via a "one touch" heart rate monitor design. See e.g., U.S. patent application Ser. No. 14/154,009, filed Jan. 1, 2014, and incorporated herein by reference in its entirety.

As mentioned, additional activity channels may be employed, such as the channel associated with block **1725** in FIG. **17**. In many implementations, the additional channels employ variations on the first activity channel depicted in FIG. **17**. The variations may include the location of the boundaries on the minimum and maximum calculated heart rate and how aggressively the logic filters the signal from the heartbeat waveform sensor.

The control logic used to implement the heartbeat waveform processing described herein typically, though not necessarily, located on the fitness monitoring device. It may be implemented as hardware, software, firmware, or any combination thereof. It may be said that the instructions are provided by "programming". Such programming is understood to include logic of any form including hard coded logic in digital signal processors and other devices which have specific algorithms implemented as hardware. Programming is also understood to include software or firmware instructions that may be executed on a general purpose processor. The data used by the control logic in executing the instructions described herein may be stored (e.g., buffered) by associated memory, registers, and the like, which may be entirely resident on the device or partially resident on a paired secondary device. Examples of suitable architectures for implementing the control logic are presented below with reference to, e.g., FIGS. **11**A-G, **12**A-C, **13**A-B, and **14**A-D.

In some embodiments, the control logic includes a processor, chip, card, or board, or a combination of these, which includes logic for performing one or more control functions. In some embodiments, instructions for controlling the heartbeat waveform sensor are stored on a memory device associated with the fitness monitoring device or are provided over a network. Examples of suitable memory devices include semiconductor memory, magnetic memory, optical memory, and

28

the like. The computer program code for controlling the heartbeat waveform sensor can be written in any conventional computer readable programming language such as assembly language, C, and the like. Compiled object code or script is executed by a processor to perform the tasks identified in the program.

Duty Cycling in Heartbeat Waveform Sensors

Device power can be saved by duty cycling the heartbeat waveform sensor during regular activities. The power savings may be achieved by turning off a PPG sensor's light source and/or light detector, and by reducing operation of the signal processing algorithm. The processing logic may duty cycle the sensor light source to correspond with the duty cycle for processing data.

Based on the determined activity state, the heart rate logic determines how frequently to generate a new heart rate reading. When in an activity state associated with high physical activity, the logic may determine the heart rate frequently (e.g., every second). However, when not engaged in a strenuous physical activity, it generates a new heart rate reading less frequently. Since a heart rate estimate requires calculation of a power spectral density, which requires PPG data for a minimum duration (e.g., about 5-15 seconds of data), the duty cycle logic should ensure that the sensor is turned on for the minimum time. In some implementations, duty cycling may be implemented as follows:

1. Once sufficient samples are obtained to calculate a heart rate estimate, the sensor (light source and light detector) may be turned off until the next sample is requested.

2. In the case where the user is actively looking at the estimate on a screen, duty cycling may be turned off and the user sees instantaneous updates in heart rate.

3. If the user is engaged in physical activity like running or biking where high resolution (e.g., 1 second resolution) is desired, again duty cycling may be turned off.

4. When a user is not operating in a way requiring frequent updates, the device logic can switch back to low power mode and can measure heart rate at a low frequency, such as once per minute. Even when the logic does not receive input suggesting that the user is interested in receiving updates, infrequent heart rate measurements may be taken for use in long term trends (e.g., day long).

5. In certain implementations, a device employing duty cycling may reduce the power consumed by an LED light source by 75% and the power consumed by the signal processing algorithm by 90%.

Ambient Light and Skin Color

Ambient light and skin color may make it difficult to extract a user's heart rate from a PPG signal. The effect of ambient light may be reduced by subtracting a value of the received detected light signal when the PPG light source is off from the value of the received detected light signal when the PPG light source is on (assuming that both signals are obtained in close temporal proximity to each other).

The effect of skin color may be reduced by changing the intensity of the PPG light source, the wavelength of the light emitted from the light source, and/or by using the ratio or difference of received signal corresponding to two different wavelengths. Skin color may be determined by using user input (e.g. the user entering their skin color), an image of the person's face, etc., and may then subsequently be used to calibrate the algorithm, light source brightness, light source wavelength, and the receiver gain. The effect of skin color (and tightness with which the user is wearing the device) on the raw PPG signal may also be measured by sending in a signal of known amplitude to the light source(s) and then measuring the received signal from the photodetector(s).

46

Such a signal may be sent for a prolonged period of time (so as to capture data through multiple expected heart beats) and then averaged to produce a steady-state data set that is not heart-rate dependent. This amplitude may then be compared to a set of values stored in a table to determine algorithm calibration, transmitter amplitude and the receiver gain.

Heart Rate Estimate Improvement Using Heuristics

After getting an initial estimate of the heart rate (e.g., by peak counting or a power spectral density estimation), it may be useful to apply bounds on the allowable rates for heart rate. These bounds may be optimized on a per-user basis since each user will have a unique heart rate profile. For example, the sedentary rate of each user may be estimated when they are stationary and this may be used as a lower bound when the user is walking. Similarly, half the frequency of walking as calculated from the pedometer may serve as a good lower bound for the expected heart rate.

The heart rate algorithm may be tailored for each user and may learn the heart rate profile of the user and adapt to the user's behaviors and/or characteristics so as to perform better with time. For example, the algorithm may set bounds on the heart rate expected during a particular physical activity or rate of walking based on historical data from that user. This may help provide better results when the heart rate data is corrupted by noise and/or motion artifacts.

HR Quality Metric

In another example embodiment, a signal quality metric of the heart rate/PPG signal may be used to provide a quantification of the accuracy/precision of the signal being generated. Depending on the values of this metric, the algorithm that determines what the user's heart rate (or other PPG-derived metric such as respiration) is may take certain actions, including asking the user to tighten the watch band, ignoring certain portions of collected heart-rate data (e.g., sections of data that have a low quality metric), and weighting certain portions of the heart-rate data (e.g., data with a higher quality metric may be weighted more heavily when the heart rate is being calculated).

In one embodiment, the signal quality metric may be derived as follows: make a scatter plot where the x-axis is time, and the y-axis is the frequency of a peak in the PPG signal at that given instant in time. An issue to be overcome using this strategy is that there may be multiple and/or zero peaks at a given instant in time. A best fit line captures the linear relationship in this scatter plot. A high quality signal should have a set of peaks that fit well to a line (in a short time span), whereas a bad signal will have a set of peaks that are not well described by a line. Therefore, the quality of the fit to the line provides a good metric for the quality of the PPG signal itself.

Sedentary, Sleep, and Active Classified Metrics

In yet another example embodiment, the biometric monitoring device may employ sensors to calculate heart rate variability when the device determines the user to be sedentary or asleep. Here, the biometric monitoring device may operate the sensors in a higher-rate sampling mode (relative to non-sedentary periods or periods of user activity that exceed a predetermined threshold) to calculate heart rate variability. The biometric monitoring device (or an external device) may employ heart rate variability as an indicator of cardiac health or stress.

Indeed, in some embodiments, the biometric monitoring device may measure and/or determine the user's stress level and/or cardiac health when the user is sedentary and/or asleep (for example, as detected and/or determined by the biometric monitoring device). Some embodiments of a biometric monitoring device of the present disclosure may determine the

user's stress level, health state (e.g., risk, onset, or progression of fever or cold), and/or cardiac health using sensor data that is indicative of the heart rate variability, galvanic skin response, skin temperature, body temperature, and/or heart rate. In this way, processing circuitry of the biometric monitoring device may determine and/or track the user's "baseline" stress levels over time and/or cardiac "health" over time. In another embodiment, the device may measure a physiologic parameter of the user during one or more periods where the user is motionless (or the user's motion is below a predetermined threshold), such as when the user is sitting, lying down, asleep, or in a sleep stage (e.g., deep sleep). Such data may also be employed by the biometric monitoring device as a "baseline" for stress-related parameters, health-related parameters (e.g., risk or onset of fever or cold), cardiac health, heart rate variability, galvanic skin response, skin temperature, body temperature and/or heart rate.

Sleep Monitoring

In some embodiments, the biometric monitoring device may automatically detect or determine when the user is attempting to go to sleep, is entering sleep, is asleep, and/or is awoken from a period of sleep. In such embodiments, the biometric monitoring device may employ physiological sensors to acquire data and the data processing circuitry of the biometric monitoring device may correlate a combination of heart rate, heart rate variability, respiration rate, galvanic skin response, motion, skin temperature, and/or body temperature data collected from sensors of the biometric monitoring device to detect or determine if the user is attempting to go to sleep, is entering sleep, is asleep, and/or is awoken from a period of sleep. In response, the biometric monitoring device may, for example, acquire physiological data (of the types, and in the manners, as described herein) and/or determine physiological conditions of the user (of the types, and in the manners, as described herein). For example, a decrease or cessation of user motion combined with a reduction in user heart rate and/or a change in heart rate variability may indicate that the user has fallen asleep. Subsequent changes in heart rate variability and galvanic skin response may then be used by the biometric monitoring device to determine transitions of the user's sleep state between two or more stages of sleep (for example, into lighter and/or deeper stages of sleep). Motion by the user and/or an elevated heart rate and/or a change in heart rate variability may be used by the biometric monitoring device to determine that the user has awoken.

Real-time, windowed, or batch processing may be used to determine the transitions between wake, sleep, and sleep stages. For instance, a decrease in heart rate may be measured in a time window where the heart rate is elevated at the start of the window and reduced in the middle (and/or end) of the window. The awake and sleep stages may be classified by a hidden Markov model using changes in motion signal (e.g., decreasing motion intensity), heart rate, heart rate variability, skin temperature, galvanic skin response, and/or ambient light levels. The transition points may be determined through a changepoint algorithm (e.g., Bayesian changepoint analysis). The transition between awake and sleep may be determined by observing periods where the user's heart rate decreases over a predetermined time duration by at least a certain threshold but within a predetermined margin of the user's resting heart rate (that is observed as, for example, the minimum heart rate of the user while sleeping). Similarly, the transition between sleep and awake may be determined by observing an increase in the user's heart rate above a predetermined threshold of the user's resting heart rate.

In some embodiments, the biometric monitoring device may be one component of a system for monitoring sleep,

US 8,998,815 B2

31

where the system includes a secondary device configured to communicate with the biometric monitoring device and adapted to be placed near the sleeper (e.g., an alarm clock). The secondary device may, in some implementations, have a shape and mechanical and/or magnetic interface to accept the biometric monitoring device for safe keeping, communication, and/or charging. However, the secondary device may also be generic to the biometric monitoring device, e.g., a smartphone that is not specifically designed to physically interface with the biometric monitoring device. The communication between the biometric monitoring device and the secondary device may be provided through wired communication interfaces or through wireless communication interfaces and protocols such as Bluetooth (including, for example, Bluetooth 4.0 and Bluetooth Low Energy protocols), RFID, NFC, or WLAN. The secondary device may include sensors to assist in sleep monitoring or environmental monitoring such as, for example, sensors that measure ambient light, noise and/or sound (e.g., to detect snoring), temperature, humidity, and air quality (pollen, dust, CO2, etc.). In one embodiment, the secondary device may communicate with an external service such as www.fitbit.com or a server (e.g., a personal computer). Communication with the secondary device may be achieved through wired (e.g., Ethernet, USB) or wireless (e.g., WLAN, Bluetooth, RFID, NFC, cellular) circuitry and protocols to transfer data to and/or from the secondary device. The secondary device may also act as a relay to transfer data to and/or from the biometric monitoring device to and/or from an external service such as www.fitbit.com or other service (e.g., data such as news, social network updates, email, calendar notifications) or server (e.g., personal computer, mobile phone, tablet). Calculation of the user's sleep data may be performed on one or both devices or an external service (e.g., a cloud server) using data from one or both devices.

The secondary device may be equipped with a display to display data obtained by the secondary device or data transferred to it by the biometric monitoring device, the external service, or a combination of data from the biometric monitoring device, the secondary device, and/or the external service. For example, the secondary device may display data indicative of the user's heart rate, total steps for the day, activity and/or sleep goal achievement, the day's weather (measured by the secondary device or reported for a location by an external service), etc. In another example, the secondary device may display data related to the ranking of the user relative to other users, such as total weekly step count. In yet another embodiment, the biometric monitoring device may be equipped with a display to display data obtained by the biometric monitoring device, the secondary device, the external service, or a combination of the three sources. In embodiments where the first device is equipped with a wakeup alarm (e.g., vibramotor, speaker), the secondary device may act as a backup alarm (e.g., using an audio speaker). The secondary device may also have an interface (e.g., display and buttons or touch screen) to create, delete, modify, or enable alarms on the first and/or the secondary device.

Sensor-Based Standby Mode

In another embodiment, the biometric monitoring device may automatically detect or determine whether it is or is not attached to, disposed on, and/or being worn by a user. In response to detecting or determining that the biometric monitoring device is not attached to, disposed on, and/or being worn by a user, the biometric monitoring device (or selected portions thereof) may implement or be placed in a low power mode of operation—for example, the optical heartbeat waveform sensor and/or circuitry may be placed in a lower power

32

or sleep mode. For example, in one embodiment, the biometric monitoring device may include one or more light detectors (photodiodes, phototransistors, etc.). If, at a given light intensity setting (for example, with respect to the light emitted by a light source that is part of the biometric monitoring device), one or more light detectors provides a low return signal, the biometric monitoring device may interpret the data as indicative of the device not being worn. Upon such a determination, the device may reduce its power consumption—for example, by "disabling" or adjusting the operating conditions of the stress and/or heart rate detection sensors and/or circuitry in addition to other device circuitry or displays (for example, by reducing the duty cycle of or disabling the light source(s) and/or detector(s), turning off the device display, and/or disabling or attenuating associated circuitry or portions thereof). In addition, the biometric monitoring device may periodically determine (e.g., once per second) if the operating conditions of the stress and/or heart rate detection sensors and/or associated circuitry should be restored to a normal operating condition (for example, light source(s), detector(s) and/or associated circuitry should return to a normal operating mode for heart rate detection). In another embodiment, the biometric monitoring device may restore the operating conditions of the stress and/or heart rate detection sensors and/or associated circuitry upon detection of a triggerable event—for example, upon detecting motion of the device (for example, based on data from one or more motion sensor(s)) and/or detecting a user input via the user interface (for example, a tap, bump or swipe interaction with the biometric monitoring device). In some related embodiments, the biometric monitoring device may, for power saving purposes, reduce its default rate of heart rate measurement collection to, for instance, one measurement per minute while the user is not highly active and the user may have the option of putting the device into a mode of operation to generate measurements on demand or at a faster rate (e.g., once per second), for instance, by pushing a button.

Optical Sensor(s)

In one embodiment, the optical sensors (sources and/or detectors) may be disposed on an interior or skin-side of the biometric monitoring device (i.e., a side of the biometric monitoring device that contacts, touches, and/or faces the skin of the user (hereinafter "skin-side")). (See, for example, FIGS. 2A through 3C). In another embodiment, the optical sensors may be disposed on one or more sides of the device, including the skin-side and one or more sides of the device that face or are exposed to the ambient environment (environmental side). (See, for example, FIGS. 6A through 7).

FIG. 6A illustrates an example of a portable monitoring device having a band; optical sensors and light emitters may be placed on the band.

FIG. 6B illustrates an example of a portable biometric monitoring device having a display and wristband. Additionally, optical PPG (e.g., heart rate) detection sensors and/or emitters may be located on the side of the biometric monitoring device. In one embodiment, these may be located in side-mounted buttons.

FIG. 7 depicts a user pressing the side of a portable biometric monitoring device to take a heart rate measurement from a side-mounted optical heart rate detection sensor. The display of the biometric monitoring device may show whether or not the heart rate has been detected and/or display the user's heart rate.

Notably, the data from such optical sensors may be representative of physiological data and/or environmental data. Indeed, in one embodiment, the optical sensors provide, acquire and/or detect information from multiple sides of the biometric monitoring device whether or not the sensors are

48

US 8,998,815 B2

33                                                                34

disposed on one or more of the multiple sides. For example, the optical sensors may obtain data related to the ambient light conditions of the environment.

Where optical sensors are disposed or arranged on the skin-side of the biometric monitoring device, in operation, a light source in the biometric monitoring device may emit light upon the skin of the user and, in response, a light detector in the biometric monitoring device may sample, acquire, and/or detect corresponding reflected and/or emitted light from the skin (and from inside the body). The one or more light sources and light detectors may be arranged in an array or pattern that enhances or optimizes the signal-to-noise ratio and/or serves to reduce or minimize power consumption by the light sources and light detectors. These optical sensors may sample, acquire and/or detect physiological data which may then be processed or analyzed (for example, by resident processing circuitry) to obtain data that is representative of, for example, a user's heart rate, respiration, heart rate variability, oxygen saturation ($SpO_2$), blood volume, blood glucose, skin moisture, and/or skin pigmentation level.

The light source(s) may emit light having one or more wavelengths that are specific or directed to a type of physiological data to be collected. Similarly, the optical detectors may sample, measure and/or detect one or more wavelengths that are also specific or directed to a type of physiological data to be collected and/or a physiological parameter (of the user) to be assessed or determined. For instance, in one embodiment, a light source emitting light having a wavelength in the green spectrum (for example, an LED that emits light having wavelengths corresponding to the green spectrum) and a photodiode positioned to sample, measure, and/or detect a response or reflection corresponding with such light may provide data that may be used to determine or detect heart rate. In contrast, a light source emitting light having a wavelength in the red spectrum (for example, an LED that emits light having wavelengths corresponding to the red spectrum) and a light source emitting light having a wavelength in the infrared spectrum (for example, an LED that emits light having wavelengths corresponding to the IR spectrum) and photodiode positioned to sample, measure and/or detect a response or reflection of such light may provide data used to determine or detect $SpO_2$.

Indeed, in some embodiments, the color or wavelength of the light emitted by the light source, e.g., an LED (or set of LEDs), may be modified, adjusted, and/or controlled in accordance with a predetermined type of physiological data being acquired or conditions of operation. Here, the wavelength of the light emitted by the light source may be adjusted and/or controlled to optimize and/or enhance the "quality" of the physiological data obtained and/or sampled by the detector. For example, the color of the light emitted by the LED may be switched from infrared to green when the user's skin temperature or the ambient temperature is cool in order to enhance the signal corresponding to cardiac activity. (See, for example, FIG. **11**D).

The biometric monitoring device, in some embodiments, may include a window (for example, a window that is, to casual inspection, opaque) in the housing to facilitate optical transmission between the optical sensors and the user. Here, the window may permit light (for example, of a selected wavelength) to be emitted by, for example, one or more LEDs, onto the skin of the user and a response or reflection of that light to pass back through the window to be sampled, measured, and/or detected by, for example, one or more photodiodes. In one embodiment, the circuitry related to emitting and receiving light may be disposed in the interior of the device housing and underneath or behind a plastic or glass layer (for example, painted with infrared ink) or an infrared lens or filter that permits infrared light to pass but not light in the human visual spectrum. In this way, the light transmissivity of the window may be invisible to the human eye.

The biometric monitoring device may employ light pipes or other light-transmissive structures to facilitate transmission of light from the light sources to the user's body and skin. (See, for example, FIGS. **4**A through **5**). In this regard, in some embodiments, light may be directed from the light source to the skin of the user through such light pipes or other light-transmissive structures. Scattered light from the user's body may be directed back to the optical circuitry in the biometric monitoring device through the same or similar structures. Indeed, the light-transmissive structures may employ a material and/or optical design to facilitate low light loss (for example, the light-transmissive structures may include a lens to facilitate light collection, and portions of the light-transmissive structures may be coated with or adjacent to reflective materials to promote internal reflection of light within the light-transmissive structures) thereby improving the signal-to-noise-ratio of the photo detector and/or facilitating reduced power consumption of the light source(s) and/or light detectors. In some embodiments, the light pipes or other light-transmissive structures may include a material that selectively transmits light having one or more specific or predetermined wavelengths with higher efficiency than others, thereby acting as a bandpass filter. Such a bandpass filter may be tuned to improve the signal of a specific physiological data type. For example, in one embodiment, an In-Mold-Labeling or "IML" light-transmissive structure may be implemented wherein the light-transmissive structure uses a material with predetermined or desired optical characteristics to create a specific bandpass characteristic, for example, so as to pass infrared light with greater efficiency than light of other wavelengths (for example, light having a wavelength in human visible spectrum). In another embodiment, a biometric monitoring device may employ a light-transmissive structure having an optically opaque portion (including certain optical properties) and an optically-transparent portion (including optical properties different from the optically-opaque portion). Such a light-transmissive structure may be provided via a double-shot or two-step molding process wherein optically opaque material and optically transparent material are separately injected into a mold. A biometric monitoring device implementing such a light-transmissive structure may include different light transmissivity properties for different wavelengths depending on the direction of light travel through the light-transmissive structure. For example, in one embodiment, the optically-opaque material may be reflective to a specific wavelength range so as to more efficiently transport light from the user's body back to the light detector (which may be of a different wavelength(s) relative to the wavelength(s) of the emitted light).

In another embodiment, reflective structures may be placed in the field of view of the light emitter(s) and/or light detector(s). For example, the sides of holes that channel light from light emitter(s) to a user's skin and/or from the user's skin to light detector(s) (or through which light-transmissive structures that perform such channeling travel) may be covered in a reflective material (e.g., chromed) to facilitate light transmission. The reflective material may increase the efficiency with which the light is transported to the skin from the light source(s) and then from the skin back into the detector(s). The reflectively-coated hole may be filled in with an optical epoxy or other transparent material to prevent liquid from entering the device body while still allowing light to be transmitted with low transmission loss.

US 8,998,815 B2

35

36

In another embodiment that implements light-transmissive structures (for example, structures created or formed through IML), such light-transmissive structures may include a mask consisting of an opaque material that limits the aperture of one, some, or all of the light source(s) and/or detector(s). In this way, the light-transmissive structures may selectively "define" a preferential volume of the user's body that light is emitted into and/or detected from. Notably, other mask configurations may be employed or implemented in connection with the concepts described and/or illustrated herein; all such masking configurations to, for example, improve the photoplethysmography signal and which are implemented in connection with the concepts described and/or illustrated herein are intended to fall within the scope of the present disclosure.

In another embodiment, the light emitter(s) and/or detector(s) may be configured to transmit light through a hole or series of holes in the device exterior. This hole or series of holes may be filled in with light-transmissive epoxy (e.g. optical epoxy). The epoxy may form a light pipe that allows light to be transmitted from the light emitter(s) to the skin and from the skin back into the light detector(s). This technique also has the advantage that the epoxy may form a watertight seal, preventing water, sweat or other liquid from entering the device body though the hole(s) on the device exterior that allow the light emitter(s) and detector(s) to transmit to, and receive light from, the biometric monitoring device body exterior. An epoxy with a high thermal conductivity may be used to help prevent the light source(s) (e.g., LED's) from overheating.

In any of the light-transmissive structures described herein, the exposed surfaces of the optics (light-transmissive structures) or device body may include a hard coat paint, hard coat dip, or optical coatings (such as anti-reflection, scratch resistance, anti-fog, and/or wavelength band block (such as ultraviolet light blocking) coatings). Such characteristics or materials may improve the operation, accuracy and/or longevity of the biometric monitoring device.

FIG. 4A illustrates an example of one potential PPG light source and photodetector geometry. In this embodiment, two light sources are placed on either side of a photodetector. These three devices are located in a protrusion on the back of a wristband-type biometric monitoring device (the side which faces the skin of the user).

FIGS. 4B and 4C illustrate examples of a PPG sensor having a photodetector and two LED light sources. These components are placed in a biometric monitoring device that has a protrusion on the back side. Light pipes optically connect the LEDs and photodetector with the surface of the user's skin. Beneath the skin, the light from the light sources scatters off of blood in the body, some of which may be scattered or reflected back into the photodetector.

FIG. 5 Illustrates an example of a biometric monitoring device with an optimized PPG detector that has a protrusion with curved sides as so not to discomfort the user. Additionally, the surface of light pipes that optically couple the photodetector and the LEDs to the wearer's skin are contoured to maximize light flux coupling between the LEDs and photodetectors and the light pipes. The ends of the light pipes that face the user's skin are also contoured. This contour may focus or defocus light to optimize the PPG signal. For example, the contour may focus emitted light to a certain depth and location that coincides with an area where blood flow is likely to occur. The vertex of these foci may overlap or be very close together so that the photodetector receives the maximum possible amount of scattered light.

In some embodiments, the biometric monitoring device may include a concave or convex shape, e.g., a lens, on the skin-side of the device, to focus light towards a specific volume at a specific depth in the skin and increase the efficiency of light collected from that point into the photodetector. (See, for example, FIGS. 4A through 5). Where such a biometric monitoring device also employs light pipes to selectively and controllably route light, it may be advantageous to shape the end of the light pipe with a degree of cylindricity, e.g., the end of the light pipe may be a be a cylindrical surface (or portion thereof) defined by a cylinder axis that is nominally parallel to the skin-side (for example, rather than use an axially-symmetric lens). For example, in a wristband-style biometric monitoring device, such a cylindrical lens may be oriented such that the cylinder axis is nominally parallel to the wearer's forearm, which may have the effect of limiting the amount of light that enters such a lens from directions parallel to the person's forearm and increasing the amount of light that enters such a lens from directions perpendicular to the person's forearm—since ambient light is more likely to reach the sensor detection area from directions that are not occluded by the straps of the biometric monitoring device, i.e., along the user's forearm axis, than from directions that are occluded by the straps, i.e., perpendicular to the user's forearm. Such a configuration may improve the signal-to-noise-ratio by increasing the efficiency of light transferred from the emitter onto or into the skin of the user while decreasing "stray" light from being detected or collected by the photodetector. In this way, the signal sampled, measured and/or detected by the photodetector consists less of stray light and more of the user's skin/body response to such emitted light (signal or data that is representative of the response to the emitted light).

In another embodiment, light-transmissive epoxy may be molded into a concave or convex shape so as to provide beneficial optical properties to sensors as well. For example, during the application of light transmissive epoxy, the top of the light-transmissive structure that is formed by the epoxy may be shaped into a concave surface so that light couples more effectively into the light-transmissive structure.

In one embodiment, the components of the optical sensor may be positioned on the skin-side of the device and arranged or positioned to reduce or minimize the distance between (i) the light source(s) and/or the associated detector(s) and (ii) the skin of the user. See, for example, FIG. 3A, which provides a cross-sectional view of a sensor protrusion of an example portable monitoring device. In FIG. 3A, two light sources (e.g., LEDs) are placed on either side of a photodetector to enable PPG sensing. A light-blocking material is placed between the light sources and the photodetector to prevent any light from the light sources from reaching photodetector without first exiting the body of the biometric monitoring device. A flexible transparent layer may be placed on the lower surface of the sensor protrusion to form a seal. This transparent layer may serve other functions such as preventing liquid from entering the device where the light sources or photodetectors are placed. This transparent layer may be formed through in-mold labeling or "IML". The light sources and photodetector may be placed on a flexible PCB.

Such a configuration may improve the efficiency of light flux coupling between the components of the optical sensor and the user's body. For example, in one embodiment, the light source(s) and/or associated detector(s) may be disposed on a flexible or pliable substrate that may flex, allowing the skin-side of the biometric monitoring device, which may be made from a compliant material, to conform (for example, without additional processing) or be capable of being shaped (or compliant) to conform to the shape of the body part (for example, the user's wrist, arm, ankle, and/or leg) to which the biometric monitoring device is coupled to or attached during

50

37                                                                                            38

normal operation so that the light source(s) and/or associated detector(s) are/is close to the skin of the user (i.e., with little to no gap between the skin-side of the device and the adjacent surface of the skin of the user. See, for example, FIG. **6**A. In one embodiment, the light source(s) and/or associated detector(s) may be disposed on a Flat Flex Cable or "FFC" or flexible PCB. In this embodiment, the flexible or pliable substrate (for example, an FFC or flexible PCB) may connect to a second substrate (for example, PCB) within the device having other components disposed thereon (for example, the data processing circuitry). Optical components of differing heights may be mounted to different "fingers" of flexible substrate and pressed or secured to the housing surface such that the optical components are flush to the housing surface. In one embodiment, the second substrate may be a relatively inflexible or non-pliable substrate, fixed within the device, having other circuitry and components (passive and/or active) disposed thereon.

FIG. **3**B depicts a cross-sectional view of a sensor protrusion of an example portable monitoring device; this protrusion is similar to that presented in FIG. **3**A with the exception that the light sources and photodetector are placed on a flat and/or rigid PCB.

FIG. **3**C provides another cross-sectional view of an example PPG sensor implementation. Of note in this PPG sensor is the lack of a protrusion. Additionally, a liquid gasket and/or a pressure sensitive adhesive are used to prevent liquid from entering the biometric monitoring device body.

Some embodiments of biometric monitoring devices may be adapted to be worn or carried on the body of a user. In some embodiments including the optical heart rate monitor, the device may be a wrist-worn or arm-mounted accessory such as a watch or bracelet. (See, for example, FIGS. **2**A through **7**). In one embodiment, optical elements of the optical heart rate monitor may be located on the interior or skin-side of the biometric monitoring device, for example, facing the top of the wrist (i.e., the optical heart rate monitor may be adjacent to and facing the wrist) when the biometric monitoring device is worn on the wrist. (See, for example, FIGS. **2**A through **3**C).

In another embodiment, the optical heart rate monitor may be located on one or more external or environmental side surfaces of the biometric monitoring device. (See, for example, FIGS. **6**B and **7**). In such embodiments, the user may touch an optical window (behind which optical elements of the optical heart rate monitor are located) with a finger on the opposing hand to initiate a heart rate measurement (and/or other metrics related to heart rate such as heart rate variability) and/or collect data which may be used to determine the user's heart rate (and/or other metrics related to heart rate). (See, for example, FIG. **6**B). In one embodiment, the biometric monitoring device may trigger or initiate the measurement(s) by detecting a (sudden) drop in incident light on the photodiode—for example, when the user's finger is placed over the optical window. In addition thereto, or in lieu thereof, a heart rate measurement (or other such metric) may be trigged by an IR-based proximity detector and/or capacitive touch/proximity detector (which may be separate from other detectors). Such IR-based proximity detector and/or capacitive touch/proximity detector may be disposed in or on and/or functionally, electrically and/or physically coupled to the optical window to detect or determine the presence of, for example, the user's finger.

In yet another embodiment, the biometric monitoring device may include a button that, when depressed, triggers or initiates heart rate measurement (and/or other metrics related to heart rate). The button may be disposed in close proximity to the optical window to facilitate the user pressing the button while the finger is disposed on the optical window. (See, for example, FIG. **7**). In one embodiment, the optical window may be embedded in a push button. Thus, when the user presses the button, it may trigger a measurement of the finger that depresses the button. Indeed, the button may be given a shape and/or resistance to pressing that enhances or optimizes a pressure profile of the button against the finger to provide a high signal-to-noise-ratio during measurement or data acquisition. In other embodiments (not illustrated), the biometric monitoring device may take the form of a clip, a smooth object, a pendant, an anklet, a belt, etc. that is adapted to be worn on the body, clipped or mounted to an article of clothing, deposited in clothing (e.g., in a pocket), or deposited in an accessory (e.g., handbag).

In one specific embodiment, the biometric monitoring device may include a protrusion on the skin- or interior side of the device. (See, FIGS. **2**A through **6**A). When coupled to the user, the protrusion may engage the skin with more force than the surrounding device body. In this embodiment, an optical window or light transmissive structure (both of which are discussed in detail above) may form or be incorporated in a portion of the protrusion. The light emitter(s) and/or detector(s) of the optical sensor may be disposed or arranged in the protrusion near the window or light transmissive structure. (See, for example, FIGS. **2**B and **6**A). As such, when attached to the user's body, the window portion of the protrusion of the biometric monitoring device may engage the user's skin with more force than the surrounding device body—thereby providing a more secure physical coupling between the user's skin and the optical window. That is, the protrusion may cause sustained contact between the biometric monitoring device and the user's skin that may reduce the amount of stray light measured by the photodetector, decrease relative motion between the biometric monitoring device and the user, and/or provide improved local pressure to the user's skin; all of which may increase the quality of the cardiac signal of interest. Notably, the protrusion may contain other sensors that benefit from close proximity and/or secure contact to the user's skin. These may be included in addition to or in lieu of a heartbeat waveform sensor and include sensors such as a skin temperature sensor (e.g., noncontact thermopile that utilizes the optical window or thermistor joined with thermal epoxy to the outer surface of the protrusion), pulse oximeter, blood pressure sensor, EMG, or galvanic skin response (GSR) sensor.

In addition thereto, or in lieu thereof, a portion of the skin-side of the biometric monitoring device may include a friction enhancing mechanism or material. For example, the skin-side of the biometric monitoring device may include a plurality of raised or depressed regions or portions (for example, small bumps, ridges, grooves, and/or divots). Moreover, a friction enhancing material (for example, a gel-like material such as silicone or other elastomeric material) may be disposed on the skin-side. Indeed, a device back made out of gel may also provide friction while also improving user comfort and preventing stray light from entering. As noted above, a friction-enhancing mechanism or material may be used alone or in conjunction with the biometric monitoring device having a protrusion as described herein. In this regard, the biometric monitoring device may include a plurality of raised or depressed regions or portions (for example, small bumps, ridges, grooves, and/or divots) in or on the protrusion portion of the device. Indeed, such raised or depressed regions or portions may be incorporated/embedded into or on a window portion of the protrusion. In addition thereto, or in lieu thereof, the protrusion portion may consist of or be

39                                40

coated with a friction enhancing material (for example, a gel-like material such as silicone). Notably, the use of a protrusion and/or friction may improve measurement accuracy of data acquisition corresponding to certain parameters (e.g., heart rate, heart rate variability, galvanic skin response, skin temperature, skin coloration, heat flux, blood pressure, blood glucose, etc.) by reducing motion of the biometric monitoring device (and thus of the sensor) relative to the user's skin during operation, especially while the user is in motion.

Some or all of the interior or skin-side housing of the biometric monitoring device may also consist of a metal material (for example, steel, stainless steel, aluminum, magnesium, or titanium). Such a configuration may provide a structural rigidity. (See, for example, FIG. 2B). In such an embodiment, the device body may be designed to be hypoallergenic through the use of a hypoallergenic "nickel-free" stainless steel. Notably, it may be advantageous to employ (at least in certain locations) a type of metal that is at least somewhat ferrous (for example, a grade of stainless steel that is ferrous). In such embodiments, the biometric monitoring device (where it includes a rechargeable energy source (for example, rechargeable battery)) may interconnect with a charger via a connector that secures itself to the biometric monitoring device using magnets that couple to the ferrous material. In addition, biometric monitoring device may also engage a dock or dock station, using such magnetic properties, to facilitate data transfer. Moreover, such a housing may provide enhanced electromagnetic shielding that would enhance the integrity and reliability of the optical heartbeat waveform sensor and the heart rate data acquisition process/operation. Furthermore, a skin temperature sensor may be physically and thermally coupled, for example, with thermal epoxy, to the metal body to sense the temperature of the user. In embodiments including a protrusion, the sensor may be positioned near or in the protrusion to provide secure contact and localized thermal coupling to the user's skin.

In a preferred embodiment, one or more components of the optical sensor (which may, in one embodiment, be located in a protrusion, and/or in another embodiment, may be disposed or placed flush to the surface of the biometric monitoring device) are attached, fixed, included, and/or secured to the biometric monitoring device via a liquid-tight seal (i.e., a method/mechanism that prevents liquid ingress into the body of the biometric monitoring device). For example, in one embodiment, a device back made out of a metal such as, but not limited to, stainless steel, aluminum, magnesium, or titanium, or from a rigid plastic may provide a structure that is stiff enough to maintain the structural integrity of the device while accommodating a watertight seal for the sensor package. (See, for example, FIGS. 2B through 3C).

In a preferred embodiment, a package or module of the optical sensor may be connected to the device with a pressure-sensitive adhesive and a liquid gasket. See, for example, FIG. 3C, which provides another cross-sectional view of a PPG sensor implementation. Of note in this PPG sensor is the lack of a protrusion. Additionally, a liquid gasket and/or a pressure sensitive adhesive are used to prevent liquid from entering the device body. Screws, rivets or the like may also be used, for example, if a stronger or more durable connection is required between the optical sensor package/module and the device body. Notably, the present embodiments may also use water-tight glues, hydrophobic membranes such as Gore-Tex, o-rings, sealant, grease, or epoxy to secure or attach the optical sensor package/module to the biometric monitoring device body.

As discussed above, the biometric monitoring device may include a material disposed on the skin- or interior side that includes high reflectivity characteristics—for example, polished stainless steel, reflective paint, and polished plastic. In this way, light scattered off the skin-side of the device may be reflected back into the skin in order to, for example, improve the signal-to-noise-ratio of an optical heartbeat waveform sensor. Indeed, this effectively increases the input light signal as compared with a device body back that is non-reflective (or less reflective). Notably, in one embodiment, the color of the skin or interior side of the biometric monitoring device may be selected to provide certain optical characteristics (for example, reflect certain or predetermined wavelengths of light), in order to improve the signal with respect to certain physiological data types. For example, where the skin- or interior side of the biometric monitoring device is green, the measurements of the heart rate may be enhanced due to the preferential emission of a wavelength of the light corresponding to the green spectrum. Where the skin- or interior side of the biometric monitoring device is red, the measurements of the SpO2 may be enhanced due to the preferential emission of a wavelength of the light corresponding to the red spectrum. In one embodiment, the color of the skin- or interior side of the biometric monitoring device may be modified, adjusted and/or controlled in accordance with a predetermined type of physiological data being acquired.

FIG. 11A depicts an example schematic block diagram of an optical heartbeat waveform sensor where light is emitted from a light source toward the user's skin and the reflection of such light from the skin/internal body of the user is sensed by a light detector, the signal from which is subsequently digitized by an analog to digital converter (ADC). The intensity of the light source may be modified (e.g., through a light source intensity control module) to maintain a desirable reflected signal intensity. For example, the light source intensity may be reduced to avoid saturation of the output signal from the light detector. As another example, the light source intensity may be increased to maintain the output signal from the light detector within a desired range of output values. Notably, active control of the system may be achieved through linear or nonlinear control methods such as proportional-integral-derivative (PID) control, fixed step control, predictive control, neural networks, hysteresis, and the like, and may also employ information derived from other sensors in the device such as motion, galvanic skin response, etc. FIG. 11A is provided for illustration and does not limit the implementation of such a system to, for instance, an ADC integrated within a MCU, or the use of a MCU for that matter. Other possible implementations include the use of one or more internal or external ADCs, FPGAs, ASICs, etc.

In another embodiment, system with an optical heartbeat waveform sensor may incorporate the use of a sample-and-hold circuit (or equivalent) to maintain the output of the light detector while the light source is turned off or attenuated to save power. In embodiments where relative changes in the light detector output are of primary importance (e.g., heart rate measurement), the sample-and-hold circuit may not have to maintain an accurate copy of the output of the light detector. In such cases, the sample-and-hold may be reduced to, for example, a diode (e.g., Schottky diode) and capacitor. The output of the sample-and-hold circuit may be presented to an analog signal conditioning circuit (e.g., a Sallen-Key band-pass filter, level shifter, and/or gain circuit) to condition and amplify the signal within frequency bands of interest (e.g., 0.1 Hz to 10 Hz for cardiac or respiratory function), which may then be digitized by the ADC. See, for example, FIG. 11B.

In operation, circuit topologies such as those already described herein (e.g. a sample-and-hold circuit) remove the DC and low frequency components of the signal and help

US 8,998,815 B2

41                                                                    42

resolve the AC component related to heart rate and/or respiration. The embodiment may also include the analog signal conditioning circuitry for variable gain settings that can be controlled to provide a suitable signal (e.g., not saturated). The performance characteristics (e.g., slew rate and/or gain bandwidth product) and power consumption of the light source, light detector, and/or sample-and-hold may be significantly higher than the analog signal conditioning circuit to enable fast duty cycling of the light source. In some embodiments, the power provided to the light source and light detector may be controlled separately from the power provided to the analog signal conditioning circuit to provide additional power savings. Alternatively or additionally, the circuitry can use functionality such as an enable, disable and/or shutdown to achieve power savings. In another embodiment, the output of the light detector and/or sample-and-hold circuit may be sampled by an ADC in addition to or in lieu of the analog signal conditioning circuit to control the light intensity of the light source or to measure the physiologic parameters of interest when, for example, the analog signal conditioning circuit is not yet stable after a change to the light intensity setting. Notably, because the physiologic signal of interest is typically small relative to the inherent resolution of the ADC, in some embodiments, the reference voltages and/or gain of the ADC may be adjusted to enhance signal quality and/or the ADC may be oversampled. In yet another embodiment, the device may digitize the output of only the sample-and-hold circuit by, for example, oversampling, adjusting the reference voltages and/or gain of the ADC, or using a high resolution ADC. See, for example, FIG. 11C.

PPG DC Offset Removal Techniques

In another embodiment, the sensor device may incorporate a differential amplifier to amplify the relative changes in the output of the light detector. See, for example, FIG. 11F. In some embodiments, a digital average or digital low-pass filtered signal may be subtracted from the output of the light detector. This modified signal may then be amplified before it is digitized by the ADC. In another embodiment, an analog average or analog low-pass filtered signal may be subtracted from the output of the light detector through, for example, the use of a sample-and-hold circuit and analog signal conditioning circuitry. The power provided to the light source, light detector, and differential amplifier may be controlled separately from the power provided to the analog signal conditioning circuit to improve power savings.

In another embodiment, a signal (voltage or current, depending on the specific sensor implementation) may be subtracted from the raw PPG signal to remove any bias in the raw PPG signal and therefore increase the gain or amplification of the PPG signal that contains heart rate (or other circulatory parameters such as heart rate variability) information. This signal may be set to a default value in the factory, to a value based on the user's specific skin reflectivity, absorption, and/or color, and/or may change depending on feedback from an ambient light sensor, or depending on analytics of the PPG signal itself. For example, if the PPG signal is determined to have a large DC offset, a constant voltage may be subtracted from the PPG signal to remove the DC offset and enable a larger gain, therefore improving the PPG signal quality. The DC offset in this example may result from ambient light (for example from the sun or from indoor lighting) reaching the photodetector from or reflected light from the PPG light source.

In another embodiment, a differential amplifier may be used to measure the difference between current and previous samples rather than the magnitude of each signal. Since the magnitude of each sample is typically much greater than the difference between each sample, a larger gain can be applied to each measurement, therefore improving the PPG signal quality. The signal may then be integrated to obtain the original time domain signal.

In another embodiment, the light detector module may incorporate a transimpedance amplifier stage with variable gain. Such a configuration may avoid or minimize saturation from bright ambient light and/or bright emitted light from the light source. For example, the gain of the transimpedance amplifier may be automatically reduced with a variable resistor and/or multiplexed set of resistors in the negative feedback path of the transimpedance amplifier. In some embodiments, the device may incorporate little to no optical shielding from ambient light by amplitude-modulating the intensity of the light source and then demodulating the output of the light detector (e.g., synchronous detection). See, for instance, FIG. 11E. In other aspects, if the ambient light is of sufficient brightness to obtain a heart rate signal, the light source may be reduced in brightness and/or turned off completely.

In yet another embodiment, the aforementioned processing techniques may be used in combination to optically measure physiological parameters of the user. See, for example, FIG. 11G. This topology may allow the system to operate in a low power measurement state and circuit topology when applicable and adapt to a higher power measurement state and circuit topology as necessary. For instance, the system may measure the physiologic parameter (e.g., heart rate) of interest using analog signal-conditioning circuitry while the user is immobile or sedentary to reduce power consumption, but switch to oversampled sampling of the light detector output directly while the user is active.

In embodiments where the biometric monitoring device includes a heart rate monitor, processing of the signal to obtain heart rate measurements may include filtering and/or signal conditioning such as band-pass filtering (e.g., Butterworth filter). To counteract large transients that may occur in the signal and/or to improve convergence of said filtering, nonlinear approaches may be employed such as neural networks or slew rate limiting. Data from the sensors on the device such as motion, galvanic skin response, skin temperature, etc., may be used to adjust the signal conditioning methods employed. Under certain operating conditions, the heart rate of the user may be measured by counting the number of signal peaks within a time window or by utilizing the fundamental frequency or second harmonic of the signal (e.g., through a fast Fourier transform (FFT)). In other cases, such as heart rate data acquired while the user is in motion, FFTs may be performed on the signal and spectral peaks extracted, which may then be subsequently processed by a multiple-target tracker which starts, continues, merges, and deletes tracks of the spectra. In some embodiments, a similar set of operations may be performed on the motion signal and the output may be used to do activity discrimination (e.g., sedentary, walking, running, sleeping, lying down, sitting, biking, typing, elliptical, weight training) which is used to assist the multiple-target tracker. For instance, it may be determined that the user was stationary and has begun to move. This information may be used to preferentially bias the track continuation toward increasing frequencies. Similarly, the activity discriminator may determine that the user has stopped running or is running slower and this information may be used to preferentially bias the track continuation toward decreasing frequencies. Tracking may be achieved with single-scan or multi-scan, multiple-target tracker topologies such as joint probabilistic data association trackers, multiple-hypothesis tracking, nearest neighbor, etc. Estimation and prediction in the tracker may be done through Kalman filters, spline regres-

US 8,998,815 B2

43 44

sion, particle filters, interacting multiple model filters, etc. A track selector module may use the output tracks from the multiple-spectra tracker and estimate the user's heart rate. The estimate may be taken as the maximum likelihood track, a weight sum of the tracks against their probabilities of being the heart rate, etc. The activity discriminator may furthermore influence the selection and/or fusion to get the heart rate estimate. For instance, if the user is sleeping, sitting, lying down, or sedentary, a prior probability may be skewed toward heart rates in the 40-80 bpm range; whereas if the user is running, jogging, or doing other vigorous exercise, a prior probability may be skewed toward elevated heart rates in the 90-180 bpm range. The influence of the activity discriminator may be based on the speed of the user. The estimate may be shifted toward (or wholly obtained by) the fundamental frequency of the signal when the user is not moving. The track that corresponds to the user's heart rate may be selected based on criteria that are indicative of changes in activity; for instance, if the user begins to walk from being stationary, the track that illustrates a shift toward higher frequency may be preferentially chosen.

The acquisition of a good heart rate signal may be indicated to the user through a display on the biometric monitoring device or another device in wired or wireless communication with the biometric monitoring device (e.g., a Bluetooth Low Energy-equipped mobile phone). In some embodiments, the biometric monitoring device may include a signal-strength indicator that is represented by the pulsing of an LED viewable by the user. The pulsing may be timed or correlated to be coincident with the user's heartbeat. The intensity, pulsing rate and/or color of the LED may be modified or adjusted to suggest signal strength. For example, a brighter LED intensity may represent a stronger signal or in an RGB LED configuration, a green colored LED may represent a stronger signal.

In some embodiments, the strength of the heart rate signal may be determined by the energy (e.g., squared sum) of the signal in a frequency band of, for instance, 0.5 Hz to 4 Hz. In other embodiments, the biometric monitoring device may have a strain gauge, pressure sensor, force sensor, or other contact-indicating sensor that may be incorporated or constructed into the housing and/or in the band (in those embodiments where the biometric monitoring device is attached to or mounted with a band like a watch, bracelet, and/or armband—which may then be secured to the user). A signal quality metric (e.g. heart rate signal quality) may be calculated based on data from these contact sensors either alone or in combination with data from the heart rate signal.

In another embodiment, the biometric monitoring device may monitor heart rate optically through an array of photodetectors such as a grid of photodiodes or a CCD camera. Motion of the optical device with respect to the skin may be tracked through feature-tracking of the skin and/or adaptive motion correction using an accelerometer and gyroscope. The detector array may be in contact with the skin or offset at a small distance away from the skin. The detector array and its associated optics may be actively controlled (e.g., with a motor) to maintain a stabilized image of the target and acquire a heart rate signal. This optomechanical stabilization may be achieved using information from motion sensors (e.g., a gyroscope) or image features. In one embodiment, the biometric monitoring device may implement relative motion cancellation using a coherent or incoherent light source to illuminate the skin and a photodetector array with each photodetector associated with comparators for comparing the intensity between neighboring detectors—obtaining a so-called speckle pattern which may be tracked using a variety of image

tracking techniques such as optical flow, template matching, edge tracking, etc. In this embodiment, the light source used for motion tracking may be different than the light source used in the optical heart rate monitor.

In another embodiment, the biometric monitoring device may consist of a plurality of photodetectors and photoemitters distributed along a surface of the device that touches the user's skin (i.e., the skin-side of the biometric monitoring device). (See, for example, FIGS. 2A through 6A). In the example of a bracelet, for instance, there may be a plurality of photodetectors and photoemitters placed at various sites along the circumference of the interior of the band. (See, for example, FIG. 6A). A heart rate signal-quality metric associated with each site may be calculated to determine the best or set of best sites for estimating the user's heart rate. Subsequently, some of the sites may be disabled or turned off to, for example, reduce power consumption. The device may periodically check the heart rate signal quality at some or all of the sites to enhance, monitor and/or optimize signal and/or power efficiency.

In another embodiment, a biometric monitoring device may include a heart rate monitoring system including a plurality of sensors such as optical, acoustic, pressure, electrical (e.g., ECG or EKG), and motion and fuse the information from two or more of these sensors to provide an estimate of heart rate and/or mitigate noise induced from motion.

In addition to heart rate monitoring (or other biometric monitoring), or in lieu thereof, the biometric monitoring device, in some embodiments, may include optical sensors to track or detect time and duration of ultraviolet light exposure, total outdoor light exposure, the type of light source and duration and intensity of that light source (fluorescent light exposure, incandescent bulb light exposure, halogen, etc.), exposure to television (based on light type and flicker rate), whether the user is indoors or outdoors, time of day and location based on light conditions. In one embodiment, the ultraviolet detection sensor may consist of a reverse biased LED emitter driven as a light detector. The photocurrent produced by this detector may be characterized by, for instance, measuring the time it takes for the LED's capacitance (or alternately a parallel capacitor) to discharge.

All of the optical sensors discussed herein may be used in conjunction with other sensors to improve detection of the data described above or be used to augment detection of other types of physiological or environmental data.

Where the biometric monitoring device includes an audio or passive acoustic sensor, the device may contain one or more passive acoustic sensors that detect sound and pressure and that can include, but are not limited to, microphones, piezo films, etc. The acoustic sensors may be disposed on one or more sides of the device, including the side that touches or faces the skin (skin-side) and the sides that face the environment (environmental sides).

Skin-side acoustic or audio sensors may detect any type of sound transmitted through the body and such sensors may be arranged in an array or pattern that optimizes both the signal-to-noise-ratio and power consumption of such sensors. These sensors may detect respiration (e.g., by listening to the lung), respiratory sounds (e.g., breathing, snoring) and problems (e.g., sleep apnea, etc.), heart rate (listening to the heart beat), user's voice (via sound transmitted from the vocal cords throughout the body).

The biometric monitoring devices of the present disclosure may also include galvanic skin-response (GSR) circuitry to measure the response of the user's skin to emotional and physical stimuli or physiological changes (e.g., the transition of sleep stage). In some embodiments, the biometric moni-

US 8,998,815 B2

45

toring device may be a wrist- or arm-mounted device incorporating a band made of conductive rubber or fabric so that the galvanic skin response electrodes may be hidden in the band. Because the galvanic skin response circuitry may be subjected to changing temperatures and environmental conditions, it may also include circuitry to enable automatic calibration, such as two or more switchable reference resistors in parallel or in series with the human skin/electrode path that allows real-time measurement of known resistors to characterize the response of the galvanic skin response circuit. The reference resistors may be switched into and out of the measurement path such that they are measured independently and/or simultaneously with the resistance of the human skin.

Circuits for Performing PPG

PPG circuitry may be optimized to obtain the best quality signal regardless of a variety of environmental conditions including, but not limited to, motion, ambient light, and skin color. The following circuits and techniques may be used to perform such optimization (see FIGS. **16**A through **16**J):

a sample-and-hold circuit and differential/instrumentation amplifier which may be used in PPG sensing. The output signal is an amplified difference between current and previous sample, referenced to a given voltage.

controlled current source to offset "bias" current prior to transimpedance amplifier. This allows greater gain to be applied at transimpedance amplifier stage.

a sample-and-hold circuit for current feedback applied to photodiode (prior to transimpedance amplifier). This can be used for ambient light removal, or "bias" current removal, or as a pseudo differential amplifier (may require dual rails).

a differential/instrumentation amplifier with ambient light cancellation.

a photodiode offset current generated dynamically by a DAC.

a photodiode offset current generated dynamically by controlled voltage source.

ambient light removal using a "switched capacitor" method.

photodiode offset current generated by a constant current source (also can be done with a constant voltage source and a resistor).

ambient light removal and differencing between consecutive samples.

FIG. **16**A illustrates an example schematic of a sample-and-hold circuit and differential/instrumentation amplifier which may be used in PPG sensing. The output signal in such a circuit may be an amplified difference between a current sample and a previous sample, referenced to a given voltage.

FIG. **16**B illustrates an example schematic of a circuit for a PPG sensor using a controlled current source to offset "bias" current prior to a transimpedance amplifier. This allows greater gain to be applied at the transimpedance amplifier stage.

FIG. **16**C illustrates an example schematic of a circuit for a PPG sensor using a sample-and-hold circuit for current feedback applied to photodiode (prior to a transimpedance amplifier). This circuit may be used for ambient light removal, or "bias" current removal, or as a pseudo-differential amplifier.

FIG. **16**D illustrates an example schematic of a circuit for a PPG sensor using a differential/instrumentation amplifier with ambient light cancellation functionality.

FIG. **16**E illustrates an example schematic of a circuit for a PPG sensor using a photodiode offset current generated dynamically by a DAC.

FIG. **16**F illustrates an example schematic of a circuit for a PPG sensor using a photodiode offset current generated dynamically by a controlled voltage source.

46

FIG. **16**G illustrates an example schematic of a circuit for a PPG sensor including ambient light removal functionality using a "switched capacitor" method.

FIG. **16**H illustrates an example schematic of a circuit for a PPG sensor that uses a photodiode offset current generated by a constant current source (this may also be done using a constant voltage source and a resistor).

FIG. **16**I illustrates an example schematic of a circuit for a PPG sensor that includes ambient light removal functionality and differencing between consecutive samples.

FIG. **16**J illustrates an example schematic of a circuit for ambient light removal and differencing between consecutive samples.

Various circuits and concepts related to heart rate measurement using a PPG sensor are discussed in more detail in U.S. Provisional Patent Application No. 61/946,439, filed Feb. 28, 2014, which was previously incorporated herein by reference in the "Cross-Reference to Related Applications" section and which is again hereby incorporated by reference with respect to content directed at heart rate measurements with a PPG sensor and at circuits, methods, and systems for performing such measurements, e.g., to compensate for sensor saturation, ambient light, and skin tone.

Biometric Feedback

Some embodiments of biometric monitoring devices may provide feedback to the user based on one or more biometric signals. In one embodiment, a PPG signal may be presented to the user as a real-time or near-real-time waveform on a display of the biometric monitoring device (or on a display of a secondary device in communication with the biometric monitoring device). This waveform may provide similar feedback to the waveform displayed on an ECG or EKG machine. In addition to providing the user with an indication of the PPG signal which may be used to estimate various heart metrics (e.g., heart rate), the waveform may also provide feedback that may enable the user to optimize the position and pressure with which they are wearing the biometric monitoring device. For example, the user may see that the waveform has a low amplitude. In response to this, the user may try moving the position of the biometric monitoring device to a different location which gives a higher amplitude signal. In some implementations, the biometric monitoring device may, based on such indications, provide instructions to the user to move or adjust the fit of the biometric monitoring device so as to improve the signal quality.

In another embodiment, feedback about the quality of the PPG signal may be provided to the user through a method other than displaying the waveform. The biometric monitoring device may emit an auditory alarm (e.g. a beep) if the signal quality (e.g. signal to noise ratio) exceeds a certain threshold. The biometric monitoring device may provide a visual cue (through the use of a display for example) to the user to either change the position of the sensor and/or increase the pressure with which the device is being worn (for example by tightening a wrist strap in the case that the device is worn on the wrist).

Biometric feedback may be provided for sensors other than PPG sensors. For example, if the device uses ECG, EMG, or is connected to a device which performs either of these, it may provide feedback to the user regarding the waveform from those sensors. If the signal-to-noise-ratio of these sensors is low, or the signal quality is otherwise compromised, the user may be instructed on how they can improve the signal. For example, if the heart rate cannot be detected from the ECG sensor, the device may provide a visual message to the user instructing them to wet or moisten the ECG electrodes to improve the signal.

US 8,998,815 B2

47 48

### Environmental Sensors

Some embodiments of biometric monitoring devices of the present disclosure may use one, some or all of the following environmental sensors to, for example, acquire the environmental data, including environmental data outlined in the table below. Such biometric monitoring devices are not limited to the number or types of sensors specified below but may employ other sensors that acquire environmental data outlined in the table below. All combinations and permutations of environmental sensors and/or environmental data are intended to fall within the scope of the present disclosure. Additionally, the device may derive environmental data from the corresponding sensor output data, but is not limited to the types of environmental data that it could derive from said sensor.

Notably, embodiments of biometric monitoring devices of the present disclosure may use one or more, or all of the environmental sensors described herein and one or more, or all of the physiological sensors described herein. Indeed, biometric monitoring device of the present disclosure may acquire any or all of the environmental data and physiological data described herein using any sensor now known or later developed—all of which are intended to fall within the scope of the present disclosure.

| Environmental Sensors | Environmental data acquired |
| --- | --- |
| Motion Detector | Location |
| Potential Embodiments: | |
| Inertial, Gyroscopic or Accelerometer-based Sensors | |
| GPS | |
| Pressure/Altimeter sensor | Elevation |
| Ambient Temp | Temperature |
| Light Sensor | Indoor vs outdoor |
| | Watching TV (spectrum/flicker rate detection) |
| | Optical data transfer-initiation, QR codes, etc. |
| | Ultraviolet light exposure |
| Audio | Indoor vs. Outdoor |
| Compass | Location and/or orientation |
| Potential Embodiments: | |
| 3 Axis Compass | |

In one embodiment, the biometric monitoring device may include an altimeter sensor, for example, disposed or located in the interior of the device housing. (See, for example, FIGS. 12B and 12C; FIG. 12C illustrates an example of a portable biometric monitoring device having physiological sensors, environmental sensors, and location sensors connected to a processor.) In such a case, the device housing may have a vent that allows the interior of the device to measure, detect, sample and/or experience any changes in exterior pressure. In one embodiment, the vent may prevent water from entering the device while facilitating measuring, detecting and/or sampling changes in pressure via the altimeter sensor. For example, an exterior surface of the biometric monitoring device may include a vent type configuration or architecture (for example, a Gore™ vent) that allows ambient air to move in and out of the housing of the device (which allows the altimeter sensor to measure, detect and/or sample changes in pressure), but reduces, prevents, and/or minimizes water and other liquids from flowing into the housing of the device.

The altimeter sensor, in one embodiment, may be filled with gel that allows the sensor to experience pressure changes outside of the gel. The gel may act as a relatively impervious, incompressible, yet flexible, membrane that transmits external pressure variations to the altimeter while physically sepa-

rating the altimeter (and other internal components) from the outside environment. The use of a gel-filled altimeter may give the device a higher level of environmental protection with or without the use of an environmentally sealed vent. The device may have a higher survivability rate with a gel-filled altimeter in locations including, but not limited to, locations that have high humidity, clothes washers, dish washers, clothes dryers, a steam room or sauna, a shower, a pool, a bath, and any location where the device may be exposed to moisture, exposed to liquid, or submerged in liquid.

### Sensors Integration/Signal Processing

Some embodiments of the biometric monitoring devices of the present disclosure may use data from two or more sensors to calculate the corresponding physiological or environmental data as seen in the table below (for example, data from two or more sensors may be used in combination to determine metrics such as those listed below). The biometric monitoring device may include, but is not limited to, the number, types, or combinations of sensors specified below. Additionally, such biometric monitoring devices may derive the included data from the corresponding sensor combinations, but are not limited to the number or types of data that may be calculated from the corresponding sensor combinations.

| Sensor Integrations | Data derived from signal processing of multiple sensors |
| --- | --- |
| Skin Temp and Ambient Temp | Heat Flux |
| Heart Rate and Motion | Elevation gain |
| Motion detector and other user's motion detector (linked by wireless communication path) | Users in the proximity |
| Motion, any heart rate sensor, galvanic skin response | Sit/Standing detection |
| Any heart rate, heart rate variability sensor, respiration, motion | Sleep Phase detection |
| | Sleep Apnea detection |
| Any heart rate sensor and/or wetness sensor, and/or motion detector | Resting Heart Rate |
| | Active Heart Rate |
| | Heart rate while asleep |
| | Heart rate while sedentary |
| Any heart rate detector | Early detection of heart problems: Cardiac Arrhythmia Cardiac Arrest |
| Multiple heart rate detectors | Pulse transit time |
| Audio and/or strain gauge | Typing detection |
| GPS and photoplethysmography (PPG) | Location-stress correlation: determination of stressful regions determination of low stress regions Activity specific heart rate resting heart rate active heart rate Automatic activity classification and activity heart rate determination |
| Heart rate, galvanic skin response, accelerometer and respiration | User fatigue, for example while exercising |

In some embodiments, the biometric monitoring device may also include a near-field communication (NFC) receiver/transmitter to detect proximity to another device, such as a mobile phone. When the biometric monitoring device is brought into close or detectable proximity to the second device, it may trigger the start of new functionality on the second device (e.g., the launching of an "app" on the mobile phone and radio syncing of physiological data from the device to the second device). (See, for example, FIG. 10). Indeed, the biometric monitoring device of the present disclosure may implement any of the circuitry and techniques described and/or illustrated in U.S. Provisional Patent Application 61/606,559, filed Mar. 5, 2012, "Near Field Commu-

US 8,998,815 B2

49

nication System, and Method of Operating Same", inventor: James Park (the contents of which are incorporated herein by reference for such purpose).

FIG. **10** illustrates an example of a portable biometric monitoring device that has a bicycle application on it that may display bicycle speed and/or pedaling cadence, among other metrics. The app may be activated whenever the biometric monitoring device comes into proximity of a passive or active NFC tag. This NFC tag may be attached to the user's handle-bars.

In another embodiment, the biometric monitoring device may include a location sensor (for example, GPS circuitry) and heartbeat waveform sensor (for example, photoplethys-mography circuitry) to generate GPS- or location-related data and heart rate-related data, respectively. (See, for example, FIGS. **12**B and **12**C). The biometric monitoring device may then fuse, process and/or combine data from these two sensors/circuitries to, for example, determine, correlate, and/or "map" geographical regions according to physiological data (for example, heart rate, stress, activity level, quantity of sleep and/or caloric intake). In this way, the biometric monitoring device may identify geographical regions that increase or decrease a measurable user metric including, but not limited to, heart rate, stress, activity, level, quantity of sleep and/or caloric intake.

In addition thereto, or in lieu thereof, some embodiments of biometric monitoring devices may employ GPS-related data and photoplethysmography-related data (notably, each of which may be considered data streams) to determine or correlate the user's heart rate according to activity levels—for example, as determined by the user's acceleration, speed, location and/or distance traveled (as measured by the GPS and/or determined from GPS-related data). (See, for example, FIGS. **12**B and **12**C). Here, in one embodiment, heart rate as a function of speed may be "plotted" for the user, or the data may be broken down into different levels including, but not limited to, sleeping, resting, sedentary, moderately active, active, and highly active.

Indeed, some embodiments of biometric monitoring devices may also correlate GPS-related data to a database of predetermined geographic locations that have activities associated with them for a set of predetermined conditions. For example, activity determination and corresponding physiological classification (for example, heart rate classification) may include correlating a user's GPS coordinates that correspond to location(s) of exercise equipment, health club and/or gym and physiological data. Under these circumstances, a user's heart rate during, for example a gym workout, may be automatically measured and displayed. Notably, many physiological classifications may be based on GPS-related data including location, acceleration, altitude, distance and/or velocity. Such a database including geographic data and physiological data may be compiled, developed and/or stored on the biometric monitoring device and/or external computing device. Indeed, in one embodiment, the user may create their own location database or add to or modify the location database to better classify their activities.

In another embodiment, the user may simultaneously wear multiple biometric monitoring devices (having any of the features described herein). The biometric monitoring devices of this embodiment may communicate with each other or a remote device using wired or wireless circuitry to calculate, for example, biometric or physiologic qualities or quantities that, for example, may be difficult or inaccurate to calculate otherwise, such as pulse transit time. The use of multiple sensors may also improve the accuracy and/or precision of biometric measurements over the accuracy and/or precision

50

of a single sensor. For example, having a biometric tracking device on the waist, wrist, and ankle may improve the detection of the user taking a step over that of a single device in only one of those locations. Signal processing may be performed on the biometric tracking devices in a distributed or centralized method to provide measurements improved over that of a single device. This signal processing may also be performed remotely and communicated back to the biometric tracking devices after processing.

In another embodiment, heart rate or other biometric data may be correlated to a user's food log (a log of foods ingested by a user, their nutritional content, and portions thereof). Food log entries may be entered into the food log automatically or may be entered by the user themselves through interaction with the biometric monitoring device (or a secondary or remote device, e.g., a smartphone, in communication with the biometric monitoring device or some other device, e.g., a server, in communication with the biometric monitoring device). Information may be presented to the user regarding the biometric reaction of their body to one or more food inputs. For example, if a user has coffee, their heart rate may rise as a result of the caffeine. In another example, if a user has a larger portion of food late at night, it may take longer for them to fall asleep than usual. Any combination of food input and corresponding result in biometrics may be incorporated into such a feedback system.

The fusion of food intake data and biometric data may also enable some embodiments of biometric monitoring device to make an estimation of a user's glucose level. This may be particularly useful for users who have diabetes. With an algorithm which relates the glucose level to the user's activity (e.g. walking, running, calorie burn) and nutritional intake, a biometric monitoring device may be able to advise the user when they are likely to have an abnormal blood sugar level.

Processing Task Delegation

Embodiments of biometric monitoring devices may include one or more processors. For example, an independent application processor may be used to store and execute applications that utilize sensor data acquired and processed by one or more sensor processors (processor(s) that process data from physiological, environmental, and/or activity sensors). In the case where there are multiple sensors, there may also be multiple sensor processors. An application processor may have sensors directly connected to it as well. Sensor and application processors may exist as separate discrete chips or exist within the same packaged chip (multi-core). A device may have a single application processor, or an application processor and sensor processor, or a plurality of application processors and sensor processors.

In one embodiment, the sensor processor may be placed on a daughterboard that consists of all of the analog components. This board may have some of the electronics typically found on the main PCB such as, but not limited to, transimpedance amplifiers, filtering circuits, level shifters, sample-and-hold circuits, and a microcontroller unit. Such a configuration may allow the daughterboard to be connected to the main PCB through the use of a digital connection rather than an analog connection (in addition to any necessary power or ground connections). A digital connection may have a variety of advantages over an analog daughterboard to main PCB connection, including, but not limited to, a reduction in noise and a reduction in the number of necessary cables. The daughterboard may be connected to the main board through the use of a flex cable or set of wires.

Multiple applications may be stored on an application processor. An application may consist of executable code and data for the application, but is not limited to these. Data may

US 8,998,815 B2

51                                                          52

consist of graphics or other information required to execute the application or it may be information output generated by the application. The executable code and data for the application may both reside on the application processor (or memory incorporated therein) or the data for the application may be stored and retrieved from an external memory. External memory may include but is not limited to NAND flash, NOR flash, flash on another processor, other solid-state storage, mechanical or optical disks, RAM, etc.

The executable code for an application may also be stored in an external memory. When a request to execute an application is received by the application processor, the application processor may retrieve the executable code and/or data from the external storage and execute it. The executable code may be temporarily or permanently stored on the memory or storage of the application processor. This allows the application to be executed more quickly on the next execution request, since the step of retrieval is eliminated. When the application is requested to be executed, the application processor may retrieve all of the executable code of the application or portions of the executable code. In the latter case, only the portion of executable code required at that moment is retrieved. This allows applications that are larger than the application processor's memory or storage to be executed.

The application processor may also have memory protection features to prevent applications from overwriting, corrupting, interrupting, blocking, or otherwise interfering with other applications, the sensor system, the application processor, or other components of the system.

Applications may be loaded onto the application processor and/or any external storage via a variety of wired, wireless, optical, or capacitive mechanisms including, but not limited to, USB, Wi-Fi, Bluetooth, Bluetooth Low Energy, NFC, RFID, Zigbee.

Applications may also be cryptographically signed with an electronic signature. The application processor may restrict the execution of applications to those that have the correct signature.

Integration of Systems in a Biometric Monitoring Device

In some implementations of biometric monitoring devices, some sensors or electronic systems in the biometric monitoring device may be integrated with one another or may share components or resources. For example, a photodetector for an optically-based heartbeat waveform sensor (such as may be used in the heart-rate sensors discussed in U.S. Provisional Patent Application No. 61/946,439, filed Feb. 28, 2014, and previously incorporated by reference herein), may also serve as a photodetector for determining ambient light level, such as may be used to correct for the effects of ambient light on the heartbeat waveform sensor reading. For example, if the light source for such a heart rate detector is turned off, the light that is measured by the photodetector may be indicative of the amount of ambient light that is present.

In some implementations of a biometric monitoring device, the biometric monitoring device may be configured or communicated with using onboard optical sensors such as the components in an optical heart rate monitor. For example, the photodetectors of an optical heart-rate sensor (or, if present, an ambient light sensor) may also serve as a receiver for an optically-based transmission channel, e.g., infrared communications.

In some implementations of a biometric monitoring device, a hybrid antenna may be included that combines a radio frequency antenna, e.g., a Bluetooth antenna or GPS antenna, with an inductive loop, such as may be used in a near-field communications (NFC) tag or in an inductive charging system. In such implementations, the functionality for two different systems may be provided in one integrated system, saving packing volume. In such a hybrid antenna, an inductive loop may be placed in close proximity to the radiator of an inverted-F antenna. The inductive loop may inductively couple with the radiator, allowing the inductive loop to serve as a planar element of the antenna for radio-frequency purposes, thus forming, for example, a planar inverted-F antenna. At the same time, the inductive loop may also serve its normal function, e.g., such as providing current to an NFC chip through inductive coupling with an electromagnetic field generated by an NFC reader. Examples of such hybrid antenna systems are discussed in more detail in U.S. Provisional Patent Application No. 61/948,470, filed Mar. 5, 2014, which was previously incorporated herein by reference in the "Cross-Reference to Related Applications" section and which is again hereby incorporated by reference with respect to content directed at hybrid antenna structures. Of course, such hybrid antennas may also be used in other electronic devices other than biometric monitoring devices, and such non-biometric-monitoring-device use of hybrid antennas is contemplated as being within the scope of this disclosure.

Methods of Wearing the Device

Some embodiments of biometric monitoring devices may include a housing having a size and shape that facilitates fixing the biometric monitoring device to the user's body during normal operation wherein the device, when coupled to the user, does not measurably or appreciably impact the user's activity. The biometric monitoring device may be worn in different ways depending on the specific sensor package that is integrated into the biometric monitoring device and the data that the user would like to acquire.

A user may wear some embodiments of the biometric monitoring devices of the present disclosure on their wrist or ankle (or arm or leg) with the use of a band that is flexible and thereby readily fitted to the user. The band may have an adjustable circumference, therefore allowing it to be fitted to the user. The band may be constructed from a material that shrinks when exposed to heat, therefore allowing the user to create a custom fit. The band may be detachable from the "electronics" portion of the biometric monitoring device and, if necessary, replaceable.

In some embodiments, the biometric monitoring device may consist of two major components—a body (containing the "electronics") and a band (that facilitates attaching the device to the user). The body may include a housing (made, for example, of a plastic or plastic-like material) and extension tabs projecting from the body (made, for example, from a metal or metal-like material). (See, for example, FIGS. 2C through 3C). The band (made, for example, of a thermoplastic urethane) may be attachable to the body, e.g., mechanically or adhesively. The band may extend out a fraction of the circumference of the user's wrist. The distal ends of the urethane band may be connected with a Velcro or a hook-and-loop elastic fabric band that loops around a D-Ring on one side and then attaches back to itself. In this embodiment, the closure mechanism may allow the user infinite band length adjustment (unlike an indexed hole and mechanical clasp closure). The Velcro or elastic fabric may be attached to the band in a manner that allows it to be replaced (for example, if it is worn or otherwise undesirable to wear before the useful end of life of the device). In one embodiment, the Velcro or fabric may be attached with screws or rivets and/or glue, adhesives, and/or a clasp to the band.

Embodiments of the biometric monitoring devices of the present disclosure may also be integrated into and worn in a necklace, chest band, bra, adhesive patch, glasses, earring, or toe band. Such biometric monitoring devices may be built in

58

**Appx1305**

53

such a way that the sensor package/portion of the biometric monitoring device is removable and may be worn in any number of ways including, but not limited to, those listed above.

In another embodiment, embodiments of biometric monitoring devices of the present disclosure may be worn clipped to an article of clothing or deposited in clothing (e.g., pocket) or an accessory (e.g., handbag, backpack, wallet). Because such biometric monitoring devices may not be near the user's skin, in embodiments that include heart rate measurements, the measurements may be obtained in a discrete, "on demand" context by the user manually placing the device into a specific mode (e.g., by depressing a button, covering a capacitive touch sensor with a fingertip, etc., possibly with the heartbeat waveform sensor embedded in the button/sensor) or automatically once the user places the device against the skin (e.g., applying the finger to an optical heartbeat waveform sensor).

User Interface with the Device

Some embodiments of a biometric monitoring device may include functionality for allowing one or more methods of interacting with the device either locally or remotely.

In some embodiments, the biometric monitoring device may convey data visually through a digital display. The physical embodiment of this display may use any one or a plurality of display technologies including, but not limited to one or more of LED, LCD, AMOLED, E-Ink, Sharp display technology, graphical displays, and other display technologies such as TN, HTN, STN, FSTN, TFT, IPS, and OLET. This display may show data acquired or stored locally on the device or may display data acquired remotely from other devices or Internet services. The biometric monitoring device may use a sensor (for example, an Ambient Light Sensor, "ALS") to control or adjust the amount of screen backlighting, if backlighting is used. For example, in dark lighting situations, the display may be dimmed to conserve battery life, whereas in bright lighting situations, the display brightness may be increased so that it is more easily read by the user.

In another embodiment, the biometric monitoring device may use single or multicolor LEDs to indicate a state of the device. States that the biometric monitoring device may indicate using LEDs may include, but are not limited to, biometric states such as heart rate or application states such as an incoming message or that a goal has been reached. These states may be indicated through the LED's color, the LED being on or off (or in an intermediate intensity), pulsing (and/or rate thereof) of the LEDs, and/or a pattern of light intensities from completely off to highest brightness. In one embodiment, an LED may modulate its intensity and/or color with the phase and frequency of the user's heart rate.

In some embodiments, the use of an E-Ink display may allow the display to remain on without the battery drain of a non-reflective display. This "always-on" functionality may provide a pleasant user experience in the case of, for example, a watch application where the user may simply glance at the biometric monitoring device to see the time. The E-Ink display always displays content without compromising the battery life of the device, allowing the user to see the time as they would on a traditional watch.

Some implementations of a biometric monitoring device may use a light such as an LED to display the heart rate of the user by modulating the amplitude of the light emitted at the frequency of the user's heart rate. The device may depict heart rate zones (e.g., aerobic, anaerobic, etc.) through the color of an LED (e.g., green, red) or a sequence of LEDs that light up in accordance with changes in heart rate (e.g., a progress bar). The biometric monitoring device may be integrated or incor-

54

porated into another device or structure, for example, glasses or goggles, or communicate with glasses or goggles to display this information to the user.

Some embodiments of a biometric monitoring device may also convey information to a user through the physical motion of the device. One such embodiment of a method to physically move the device is the use of a vibration-inducing motor. The device may use this method alone, or in combination with a plurality of other motion-inducing technologies.

In some implementations, a biometric monitoring device may convey information to a user through audio feedback. For example, a speaker in the biometric monitoring device may convey information through the use of audio tones, voice, songs, or other sounds.

These three information communication methods—visual, motion, and auditory—may, in various embodiments of biometric monitoring devices, be used alone or in any combination with each other or another method of communication to communicate any one or plurality of the following information:

That a user needs to wake up at certain time

That a user should wake up as they are in a certain sleep phase

That a user should go to sleep as it is a certain time

That a user should wake up as they are in a certain sleep phase and in a preselected time window bounded by the earliest and latest time that the user wants to wake up.

That an email was received

That the user has been inactive for a certain period of time. Notably, this may integrate with other applications like, for instance, a meeting calendar or sleep tracking application to block out, reduce, or adjust the behavior of the inactivity alert.

That the user has been active for a certain period of time

That the user has an appointment or calendar event

That the user has reached a certain activity metric

That the user has gone a certain distance

That the user has reached a certain mile pace

That the user has reached a certain speed

That the user has accumulated a certain elevation gain

That the user has taken a certain number of steps

That the user has had a heart rate measurement recently

That the user's heart rate has reached a certain level

That the user has a normal, active, or resting heart rate of a specific value or in a specific range

That the user's heart rate has enter or exited a certain goal range or training zone

That the user has a new heart rate "zone" goal to reach, as in the case of heart rate zone training for running, bicycling, swimming, etc. activities

That the user has swum a lap or completed a certain number of laps in a pool

An external device has information that needs to be communicated to the user such as an incoming phone call or any one of the above alerts

That the user has reached a certain fatigue goal or limit. In one embodiment, fatigue may be determined through a combination of heart rate, galvanic skin response, motion sensor, and/or respiration data

These examples are provided for illustration and are not intended to limit the scope of information that may be communicated by such embodiments of biometric monitoring devices (for example, to the user). Note that the data used to determine whether or not an alert condition is met may be acquired from a first device and/or one or more secondary devices. The biometric monitoring device itself may determine whether the criteria or conditions for an alert have been met. Alternatively, a computing device in communication

55

with the biometric monitoring device (e.g., a server and/or a mobile phone) may determine when the alert should occur. In view of this disclosure, other information that the biometric monitoring device may communicate to the user may be envisioned by one of ordinary skill in the art. For example, the biometric monitoring device may communicate with the user when a goal has been met. The criteria for meeting this goal may be based on physiological, contextual, and environmental sensors on a first device, and/or other sensor data from one or more secondary devices. The goal may be set by the user or may be set by the biometric monitoring device itself and/or another computing device in communication with the biometric monitoring device (e.g. a server). In an example embodiment, the biometric monitoring device may vibrate when a biometric goal is met.

Some embodiments of biometric monitoring devices of the present disclosure may be equipped with wireless and/or wired communication circuitry to display data on a secondary device in real time. For example, such biometric monitoring devices may be able to communicate with a mobile phone via Bluetooth Low Energy in order to give real-time feedback of heart rate, heart rate variability, and/or stress to the user. Such biometric monitoring devices may coach or grant "points" for the user to breathe in specific ways that alleviate stress (e.g. by taking slow, deep breaths). Stress may be quantified or evaluated through heart rate, heart rate variability, skin temperature, changes in motion-activity data and/or galvanic skin response.

Some embodiments of biometric monitoring devices may receive input from the user through one or more local or remote input methods. One such embodiment of local user input may use a sensor or set of sensors to translate a user's movement into a command to the device. Such motions could include but may not be limited to, tapping, rolling the wrist, flexing one or more muscles, and swinging one's arm. Another user input method may be through the use of a button such as, but not limited to, capacitive touch buttons, capacitive screen buttons, and mechanical buttons. In one embodiment, the user interface buttons may be made of metal. In embodiments where the screen uses capacitive touch detection, it may always be sampling and ready to respond to any gesture or input without an intervening event such as pushing a physical button. Such biometric monitoring devices may also take input through the use of audio commands. All of these input methods may be integrated into biometric monitoring devices locally or integrated into a remote device that can communicate with such biometric monitoring devices, either through a wired or wireless connection. In addition, the user may also be able to manipulate the biometric monitoring device through a remote device. In one embodiment, this remote device may have Internet connectivity.

Alarms

In some embodiments, the biometric monitoring device of the present disclosure may act as a wrist-mounted vibrating alarm to silently wake the user from sleep. Such biometric monitoring devices may track the user's sleep quality, waking periods, sleep latency, sleep efficiency, sleep stages (e.g., deep sleep vs REM), and/or other sleep-related metrics through one or a combination of heart rate, heart rate variability, galvanic skin response, motion sensing (e.g., accelerometer, gyroscope, magnetometer), and skin temperature. The user may specify a desired alarm time or window of time (e.g., set alarm to go off between 7 am and 8 am). Such embodiments may use one or more of the sleep metrics to determine an optimal time within the alarm window to wake the user. In one embodiment, when the vibrating alarm is active, the user may cause it to hibernate or turn off by

56

slapping or tapping the device (which is detected, for example, via motion sensor(s), a pressure/force sensor, and/or capacitive touch sensor in the device). In one embodiment, the device may attempt to arouse the user at an optimum point in the sleep cycle by starting a small vibration at a specific user sleep stage or time prior to the alarm setting. It may progressively increase the intensity or noticeability of the vibration as the user progresses toward wakefulness or toward the alarm setting. (See, for example, FIG. **8**).

FIG. **8** illustrates functionality of an example portable biometric monitoring device smart alarm feature. The biometric monitoring device may be able to detect or may be in communication with a device that can detect the sleep stage or state of a user (e.g., light or deep sleep). The user may set a window of time which they would like to be awoken (e.g., 6:15 am to 6:45 am). The smart alarm may be triggered by the user going into a light sleep state during the alarm window.

The biometric monitoring device may be configured to allow the user to select or create an alarm vibration pattern of their choice. The user may have the ability to "snooze" or postpone an alarm event. In one embodiment, the user may be able to set the amount of delay for the "snooze" feature—the delay being the amount of time before the alarm will go off again. They may also be able to set how many times the snooze feature may be activated per alarm cycle. For example, a user may choose a snooze delay of 5 minutes and a maximum sequential snooze number to be 3. Therefore, they can press snooze up to 3 times to delay the alarm by 5 minutes each time they press snooze to delay the alarm. In such embodiments, the snooze function will not turn off the alarm if the user attempts to press snooze a fourth time.

Some biometric monitoring devices may have information about the user's calendar and/or schedule. The user's calendar information may be entered directly into the biometric monitoring device or it may be downloaded from a different device (e.g. a smartphone). This information may be used to automatically set alarms or alarm characteristics. For example, if a user has a meeting at 9 am in the morning, the biometric monitoring device may automatically wake the user up at 7:30 am to allow the user enough time to prepare for and/or get to the meeting. The biometric monitoring device may determine the amount of time required for the user to prepare for the meeting based on the user's current location, the location of the meeting, and the amount of time it would take to get the location of the meeting from the user's current location. Alternatively, historical data about how long the user takes to get to the meeting location and/or prepare to leave for the meeting (e.g. how long it takes to wake up, take a shower, have breakfast, etc. in the morning) may be used to determine at what time to wake the user. A similar functionality may be used for calendar events other than meetings such as eating times, sleeping times, napping times, and exercise times.

In some embodiments, the biometric monitoring device may use information on when the user went to sleep to determine when an alarm should go off to wake the user. This information may supplement calendar information described herein. The user may have a goal of approximately how many hours of sleep they would like to get each night or week. The biometric monitoring device may set the morning alarm at the appropriate time for the user to meet these sleep goals. In addition to amount of time that the user would like to sleep each night, other sleep goals that the user may set may include, but are not limited to, the amount of deep sleep, REM sleep, and light sleep that the user experiences while sleeping, all of which may be used by the biometric monitoring device to determine when to set an alarm in the morning. Addition-

57

58

ally, the user may be alerted at night when they should go to bed to meet their sleep goals. Additionally, the user may be alerted during the day when they should take a nap to meet their sleep goals. The time at which to alert a user that they should take a nap may be determined by factors that optimize the user's sleep quality during the nap, subsequent naps, or night-time sleep. For example, the user is likely to have a hard time falling asleep at night if they took a nap in the early evening. The user may also be advised to eat certain foods or drinks or avoid certain foods or drinks to optimize their sleep quality. For example, a user may be discouraged from drinking alcohol close to their bed time as it is likely to decrease their sleep quality. The user may also be advised to perform certain activities or avoid certain activities to optimize their sleep quality. For example, a user may be encouraged to exercise in the early afternoon to improve their sleep quality. A user may be discouraged from exercising or watching TV close to their bedtime to improve their sleep quality.

User Interface with a Secondary Device

In some embodiments, the biometric monitoring device may transmit and receive data and/or commands to and/or from a secondary electronic device. The secondary electronic device may be in direct or indirect communication with the biometric monitoring device. Direct communication refers herein to the transmission of data between a first device and a secondary device without any intermediary devices. For example, two devices may communicate to one another over a wireless connection (e.g. Bluetooth) or a wired connection (e.g. USB). Indirect communication refers to the transmission of data between a first device and a secondary device with the aid of one or multiple intermediary third devices which relay the data. Third devices may include, but are not limited to, a wireless repeater (e.g. WiFi repeater), a computing device such as a smartphone, laptop, desktop or tablet computer, a cell phone tower, a computer server, and other networking electronics. For example, a biometric device may send data to a smartphone which forwards the data through a cellular network data connection to a server which is connected through the internet to the cellular network.

In some embodiments, the secondary device that acts as a user interface to the biometric monitoring device may consist of a smartphone. An app on the smart phone may facilitate and/or enable the smartphone to act as a user interface to the biometric monitoring device. The biometric monitoring device may send biometric and other data to the smartphone in real-time or with some delay. The smartphone may send a command or commands to the biometric monitoring device, for example, to instruct it to send biometric and other data to the smartphone in real-time or with some delay. For example, if the user enters a mode in the app for tracking a run, the smartphone may send a command to the biometric device to instruct it to send data in real-time. Therefore, the user can track their run on their app as they go along without any delay.

Such a smartphone may have one or multiple apps to enable the user to view data from their biometric device or devices. The app may, by default, open to a "dashboard" page when the user launches or opens the app. On this page, summaries of data totals such as the total number of steps, floors climbed miles traveled, calories burned, calories consumed and water consumed may be shown. Other pertinent information such as the last time the app received data from the biometric monitoring device, metrics regarding the previous night's sleep (e.g. when the user went to sleep, woke up, and how long they slept for), and how many calories the user can eat in the day to maintain their caloric goals (e.g. a calorie deficit goal to enable weight loss) may also be shown. The user may be able to choose which of these and other metrics

are shown on the dashboard screen. The user may be able to see these and other metrics on the dashboard for previous days. They may be able to access previous days by pressing a button or icon on a touchscreen. Alternatively, gestures such as swiping to the left or right may enable the user to navigate through current and previous metrics.

The smartphone app may also have another page which provides a summary of the user's activities. Activities may include, but are not limited to, walking, running, biking, cooking, sitting, working, swimming, working out, weight-lifting, commuting, and yoga. Metrics pertinent to these activities may be presented on this page. For example, a bar graph may show how the number of steps the user took for different portions of the day (e.g. how many steps every 5 minutes or 1 hour). In another example, the amount of time the user spent performing a certain activity and how many calories were burned in this period of time may be displayed. Similar to the dashboard page, the app may provide navigational functionality to allow the user to see these and other metrics for past days. Other time periods such as an hour, minute, week, month or year may also be selected by the user to enable them to view trends and metrics of their activities over shorter or larger spans of time.

The smartphone app may also have an interface to log food that has been, or will be, eaten by the user. This interface may have a keyword search feature to allow the user to quickly find the food that they would like to enter into their log. As an alternative to, or in addition to, searching for foods, users may have the ability to find a food to log by navigating through a menu or series of menus. For example, a user may choose the following series of categories—breakfast/cereal/healthy/oat-meal to arrive at the food which they would like to log (e.g., apple-flavored oatmeal). At any one of these menus, the user may be able to perform a keyword search. For example, the user may search for "oatmeal" after having selected the category "breakfast" to search for the keyword "oatmeal" within the category of breakfast foods. After having selected the food that they would like to log, the user may be able to modify or enter the serving size and nutritional content. After having logged at least one food, the app may display a summary of the foods that were logged in a certain time period (e.g. a day) and the nutritional content of the foods (individual and total calorie content, vitamin content, sugar content, etc.).

The smartphone app may also have a page that displays metrics regarding the user's body such as the user's weight, body fat percentage, BMI, and waist size. It may display a graph or graphs showing the trend of one or multiple of these metrics over a certain period of time (e.g., two weeks). The user may be able to choose the value of this period of time and view previous time periods (e.g., last month).

The smartphone app may also have a page which allows the user to enter how much water the user has consumed. Each time the user drinks some water, they may enter that amount in the unit of their choice (e.g., ozs., cups, etc.). The app may display the total of all of the water the user has logged within a certain time period (e.g., a day). The app may allow the user to see previously-logged water entries and daily totals for previous days as well as the current day.

The smartphone app may also have a page that displays online friends of the user. This "friends" page may enable the user to add or request new friends (e.g., by searching for their name or by their email address). This page may also display a leaderboard of the user and his or her friends. The user and his or her friends may be ranked based on one or more metrics. For example, the user and his or her friends may be ranked using the total of the past seven days' step counts.

61

US 8,998,815 B2

<table>
<tr><td>59</td><td>60</td></tr>
</table>

The smartphone app may also have a page that shows metrics regarding the user's sleep for the previous night and/or previous nights. This page may also enable the user to log when they slept in the past by specifying when they went to bed and when they woke. The user may also have the ability to enter a subjective metric about their sleep (e.g., bad night's rest, good night's rest, excellent night's rest, etc.). The user may be able to view these metrics for days or time periods (e.g., two weeks) in the past. For example, the sleep page may default to showing a bar graph of the amount of time the user slept each night in the last two weeks. The user may be able to also view a bar graph of the amount of time the user slept each night in the last month.

The user may also be able to access the full capabilities of the smartphone app described herein (e.g., the ability to enter food logs, view dashboard, etc.) through an alternative or additional interface. In one embodiment, this alternative interface may consist of a webpage that is hosted by a server in indirect communication with the biometric monitoring device. The webpage may be accessed through any internet connected device using a program such as a web browser.

Wireless Connectivity and Data Transmission

Some embodiments of biometric monitoring devices of the present disclosure may include a means of wireless communication to transmit and receive information from the Internet and/or other devices. The wireless communication may consist of one or more interfaces such as Bluetooth, ANT, WLAN, power-line networking, and cell phone networks. These are provided as examples and should not be understood to exclude other existing wireless communication methods or protocols, or wireless communications techniques or protocols that are yet to be invented.

The wireless connection may be bi-directional. The biometric monitoring device may transmit, communicate and/or push its data to other devices, e.g., smart phones, computers, etc., and/or the Internet, e.g., web servers and the like. The biometric monitoring device may also receive, request and/or pull data from other devices and/or the Internet.

The biometric monitoring device may act as a relay to provide communication for other devices to each other or to the Internet. For example, the biometric monitoring device may connect to the Internet via WLAN but also be equipped with an ANT radio. An ANT device may communicate with the biometric monitoring device to transmit its data to the Internet through the biometric monitoring device's WLAN (and vice versa). As another example, the biometric monitoring device may be equipped with Bluetooth. If a Bluetooth-enabled smart phone comes within range of the biometric monitoring device, the biometric monitoring device may transmit data to, or receive data from, the Internet through the smart phone's cell phone network. Data from another device may also be transmitted to the biometric monitoring device and stored (or vice versa) or transmitted at a later time.

Embodiments of biometric monitoring devices of the present disclosure may also include functionality for streaming or transmitting web content for display on the biometric monitoring device. The following are typical examples of such content:

1. Historical graphs of heart rate and/or other data measured by the device but stored remotely

2. Historical graphs of user activity and/or foods consumed and/or sleep data that are measured by other devices and/or stored remotely (e.g., such as at a website like fitbit.com)

3. Historical graphs of other user-tracked data that are stored remotely. Examples include heart rate, blood pressure, arterial stiffness, blood glucose levels, cholesterol, duration of TV watching, duration of video game play, mood, etc.

4. Coaching and/or dieting data based on one or more of the user's heart rate, current weight, weight goals, food intake, activity, sleep, and other data.

5. User progress toward heart rate, weight, activity, sleep, and/or other goals.

6. Summary statistics, graphics, badges, and/or metrics (e.g., "grades") to describe the aforementioned data

7. Comparisons between the aforementioned data for the user and similar data for his/her "friends" with similar devices and/or tracking methods

8. Social content such as Twitter feeds, instant messaging, and/or Facebook updates

9. Other online content such as newspaper articles, horoscopes, weather reports, RSS feeds, comics, crossword puzzles, classified advertisements, stock reports, and websites

10. Email messages and calendar schedules

Content may be delivered to the biometric monitoring device according to different contexts. For instance, in the morning, news and weather reports may be displayed along with the user's sleep data from the previous night. In the evening, a daily summary of the day's activities may be displayed.

Various embodiments of biometric monitoring devices as disclosed herein may also include NFC, RFID, or other short-range wireless communication circuitry that may be used to initiate functionality in other devices. For instance, a biometric monitoring device may be equipped with an NFC antenna so that when a user puts it into close proximity with a mobile phone, an app is launched automatically on the mobile phone.

These examples are provided for illustration and are not intended to limit the scope of data that may be transmitted, received, or displayed by the device, nor any intermediate processing that may occur during such transfer and display. In view of this disclosure/application, many other examples of data that may be streamed to or via a biometric monitoring device may be envisioned by one reasonably skilled in the art.

Charging and Data Transmission

Some embodiments of biometric monitoring devices may use a wired connection to charge an internal rechargeable battery and/or transfer data to a host device such as a laptop or mobile phone. In one embodiment, similar to one discussed earlier in this disclosure, the biometric monitoring device may use magnets to help the user align the biometric monitoring device to a dock or cable. The magnetic field of magnets in the dock or cable and the magnets in the device itself may be strategically oriented so as to force the biometric monitoring device to self-align with the dock or cable (or, more specifically, a connector on the cable) and so as to provide a force that holds the biometric monitoring device in the dock or to the cable. The magnets may also be used as conductive contacts for charging or data transmission purposes. In another embodiment, a permanent magnet may only be used in the dock or cable side and not in the biometric monitoring device itself. This may improve the performance of the biometric monitoring device where the biometric monitoring device employs a magnetometer. If there is a magnet in the biometric monitoring device, the strong field of a nearby permanent magnet may make it significantly more difficult for the magnetometer to accurately measure the earth's magnetic field. In such embodiments, the biometric monitoring device may utilize a ferrous material in place of a magnet, and the magnets on the dock or cable side may attach to the ferrous material.

In another embodiment, the biometric monitoring device may contain one or more electromagnets in the biometric monitoring device body. The charger or dock for charging and

**61**

data transmission may also contain an electromagnet and/or a permanent magnet. The biometric monitoring device could only turn on its electromagnet when it is close to the charger or dock. The biometric monitoring device may detect proximity to the dock or charger by looking for the magnetic field signature of a permanent magnet in the charger or dock using a magnetometer. Alternatively, the biometric monitoring device may detect proximity to the charger by measuring the Received Signal Strength Indication (RSSI) of a wireless signal from the charger or dock, or, in some embodiments, by recognizing an NFC or RFID tag associated with the charger or dock. The electromagnet could be reversed, creating a force that repels the device from the charging cable or dock either when the device doesn't need to be charged, synced, or when it has completed syncing or charging. In some embodiments, the charger or dock may include the electromagnet and may be configured (e.g., a processor in the charger or dock may be configured via program instructions) to turn the electromagnet on when a biometric monitoring device is connected for charging (the electromagnet may normally be left on such that a biometric monitoring device that is placed on the charger is drawn against the charger by the electromagnet, or the electromagnet may be left off until the charger determines that a biometric monitoring device has been placed on the charger, e.g., through completion of a charging circuit, recognition of an NFC tag in the biometric monitoring device, etc., and then turned on to draw the biometric monitoring device against the charger. Upon completion of charging (or of data transfer, if the charger is actually a data transfer cradle or a combined charger/data transfer cradle), the electromagnet may be turned off (either temporarily or until the biometric monitoring device is again detected as being placed on the charger) and the biometric monitoring device may stop being drawn against the charger. In such embodiments, it may be desirable to orient the interface between the biometric monitoring device and the charger such that, in the absence of a magnetic force generated by the electromagnet, the biometric monitoring device would fall off of the charger or otherwise shift into a visibly different position from the charging position (to visually indicate to a user that charging or data transfer is complete).

**Sensor Use in Data Transfer**

In some implementations, biometric monitoring devices may include a communications interface that may switch between two or more protocols that have different data transmission rates and different power consumption rates. Such switching may be driven by data obtained from various sensors of the biometric monitoring device. For example, if Bluetooth is used, the communications interface may switch between using Bluetooth base rate/enhanced data rate (BR/EDR) and Bluetooth low energy (BLE) protocols responsive to determinations made based on data from the sensors of the biometric monitoring device. For example, the lower-power, slower BLE protocol may be used when sensor data from accelerometers in a biometric monitoring device indicates that the wearer is asleep or otherwise sedentary. By contrast, the higher-power, faster BR/EDR protocol may be used when sensor data from the accelerometers in a biometric monitoring device indicates that the wearer is walking around. Such adaptive data transmission techniques and functionality are discussed further in U.S. Provisional Patent Application No. 61/948,468, filed Mar. 5, 2014, which was previously incorporated herein by reference in the "Cross-Reference to Related Applications" section and which is again hereby incorporated by reference with respect to content directed at adaptive data transfer rates in biometric monitoring devices.

**62**

Such communication interfaces may also serve as a form of sensor for a biometric monitoring device. For example, a wireless communications interface may allow a biometric monitoring device to determine the number and type of devices that are within range of the wireless communications interface. Such data may be used to determine if the biometric monitoring device is in a particular context, e.g., indoors, in a car, etc., and to change its behavior in various ways in response to such a determination. For example, as discussed in U.S. Provisional Patent Application No. 61/948,468 (incorporated by reference above), such contexts may be used to drive the selection of a particular wireless communications protocol to use for wireless communications.

**Configurable App Functionality**

In some embodiments, biometric monitoring devices of the present disclosure may include a watch-like form factor and/or a bracelet, armlet, or anklet form factor and may be programmed with "apps" that provide specific functionality and/or display specific information. Apps may be launched or closed by a variety of means including, but not limited to, pressing a button, using a capacitive touch sensor, performing a gesture that is detected by an accelerometer, moving to a specific location or area detected by a GPS or motion sensor, compressing the biometric monitoring device body (thereby creating a pressure signal inside the device that may be detected by an altimeter inside the biometric monitoring device), or placing the biometric monitoring device close to an NFC tag that is associated with an app or set of apps. Apps may also be automatically triggered to launch or close by certain environmental or physiological conditions including, but not limited to, detection of a high heart rate, detection of water using a wet sensor (to launch a swimming application, for example), a certain time of day (to launch a sleep tracking application at night, for example), a change in pressure and motion characteristic of a plane taking off or landing to launch and close an "airplane" mode app. Apps may also be launched or closed by meeting multiple conditions simultaneously. For example, if an accelerometer detects that a user is running and the user presses a button, the biometric monitoring device may launch a pedometer application, an altimeter data collection application, and/or display. In another case where the accelerometer detects swimming and the user presses the same button, it may launch a swimming lap-counting application.

In some embodiments, the biometric monitoring device may have a swim-tracking mode that may be launched by starting a swimming app. In this mode, the biometric monitoring device's motion sensors and/or magnetometer may be used to detect swim strokes, classify swim stroke types, detect swimming laps, and other related metrics such as stroke efficiency, lap time, speed, distance, and calorie burn. Directional changes indicated by the magnetometer may be used to detect a diversity of lap turn methods. In a preferred embodiment, data from a motion sensor and/or pressure sensor may be used to detect strokes.

In another embodiment, a bicycling app may be launched by moving the biometric monitoring device within proximity of an NFC or RFID tag that is located on the bicycle, on a mount on the bicycle, or in a location associated with a bicycle including, but not limited to, a bike rack or bike storage facility. (See, for example, FIG. **10**). The app launched may use a different algorithm than is normally used to determine metrics including, but not limited to, calories burned, distance traveled, and elevation gained. The app may also be launched when a wireless bike sensor is detected including, but not limited to, a wheel sensor, GPS, cadence

**63**

63

sensor, or power meter. The biometric monitoring device may then display and/or record data from the wireless bike sensor or bike sensors.

Additional apps include, but are not limited to, a programmable or customizable watch face, stop watch, music player controller (e.g., mp3 player remote control), text message and/or email display or notifier, navigational compass, bicycle computer display (when communicating with a separate or integrated GPS device, wheel sensor, or power meter), weight-lifting tracker, sit-up reps tracker, pull up reps tracker, resistance training form/workout tracker, golf swing analyzer, tennis (or other racquet sport) swing/serve analyzer, tennis game swing detector, baseball swing analyzer, ball throw analyzer (e.g., football, baseball), organized sports activity intensity tracker (e.g., football, baseball, basketball, volleyball, soccer), disk throw analyzer, food bite detector, typing analyzer, tilt sensor, sleep quality tracker, alarm clock, stress meter, stress/relaxation biofeedback game (e.g., potentially in combination with a mobile phone that provides auditory and/or visual cues to train user breathing in relaxation exercises), teeth brushing tracker, eating rate tracker (e.g., to count or track the rate and duration by which a utensil is brought to the mouth for food intake), intoxication or suitability to drive a motor vehicle indicator (e.g., through heart rate, heart rate variability, galvanic skin response, gait analysis, puzzle solving, and the like), allergy tracker (e.g., using galvanic skin response, heart rate, skin temperature, pollen sensing and the like (possibly in combination with external seasonal allergen tracking from, for instance, the internet and possibly determining the user's response to particular forms of allergen, e.g., tree pollen, and alerting the user to the presence of such allergens, e.g., from seasonal information, pollen tracking databases, or local environmental sensors in the biometric monitoring device or employed by the user), fever tracker (e.g., measuring the risk, onset, or progress of a fever, cold, or other illness, possibly in combination with seasonal data, disease databases, user location, and/or user provided feedback to assess the spread of a particular disease (e.g., flu) in relation to a user, and possibly prescribing or suggesting the abstinence of work or activity in response), electronic games, caffeine affect tracker (e.g., monitoring the physiologic response such as heart rate, heart rate variability, galvanic skin response, skin temperature, blood pressure, stress, sleep, and/or activity in either short term or long term response to the intake or abstinence of coffee, tea, energy drinks and/or other caffeinated beverages), drug affect tracker (e.g., similar to the previously mentioned caffeine tracker but in relation to other interventions, whether they be medical or lifestyle drugs such as alcohol, tobacco, etc.), endurance sport coach (e.g., recommending or prescribing the intensity, duration, or profile of a running/bicycling/swimming workout, or suggesting the abstinence or delay of a workout, in accordance with a user specified goal such as a marathon, triathlon, or custom goal utilizing data from, for instance, historical exercise activity (e.g., distance run, pace), heart rate, heart rate variability, health/sickness/stress/fever state), weight and/or body composition, blood pressure, blood glucose, food intake or caloric balance tracker (e.g., notifying the user how many calories he may consume to maintain or achieve a weight), pedometer, and nail biting detector. In some cases, the apps may rely solely on the processing power and sensors of the present disclosure. In other cases, the apps may fuse or merely display information from an external device or set of external devices including, but not limited to, a heart rate strap, GPS distance tracker, body composition scale, blood

64

pressure monitor, blood glucose monitor, watch, smart watch, mobile communication device such as a smart phone or tablet, or server.

In one embodiment, the biometric monitoring device may control a music player on a secondary device. Aspects of the music player that may be controlled include, but are not limited to, the volume, selection of tracks and/or playlists, skipping forward or backward, fast forwarding or rewinding of tracks, the tempo of the track, and the music player equalizer. Control of the music player may be via user input or automatic based on physiological, environmental, or contextual data. For example, a user may be able to select and play a track on their smart phone by selecting the track through a user interface on the biometric monitoring device. In another example, the biometric monitoring device may automatically choose an appropriate track based on the activity level of the user (the activity level being calculated from biometric monitoring device sensor data). This may be used to help motivate a user to maintain a certain activity level. For example, if a user goes on a run and wants to keep their heart rate in a certain range, the biometric monitoring device may play an upbeat or higher tempo track if their heart rate is below the range which they are aiming for.

Automated Functions Triggered by User's Activity

Sleep Stage Triggered Functionality

Sleep stages can be monitored through various biometric signals and methods disclosed herein, such as heart rate, heart rate variability, body temperature, body motions, ambient light intensity, ambient noise level, etc. Such biometrics may be measured using optical sensors, motion sensors (accelerometers, gyroscopic sensors, etc.), microphones, and thermometers, for example, as well as other sensors discussed herein.

The biometric monitoring device may have a communication module as well, including, but not limited to, Wi-Fi (802.xx), Bluetooth (Classic, low power), or NFC. Once the sleep stages are estimated, the sleep stages may be transmitted to a cloud-based system, home server, or main control unit that is connected to communication-enabled appliances (with Wi-Fi, Bluetooth, or NFC) wirelessly. Alternatively, the biometric monitoring device may communicate directly with the communication-enabled appliances. Such communication-enabled appliances may include, for example, kitchen appliances such as microwave ovens, coffee grinders/makers, toasters, etc.

Once the sleep stages indicate that it is close the time for the user to wake up, the biometric monitoring device may send out a trigger to the appliances that the user has indicated should be operated automatically. For example, the coffee grinder and maker may be caused to start making coffee, and the toaster may be caused to start warming up bread. The microwave oven may be caused to start cooking oatmeal or eggs as well, and electric kettle to start boiling water. So long as the ingredients are appropriately prepared, this automated signal may trigger breakfast-cooking.

Alertness Detection

Alertness, e.g., a low alertness may correlate with a person being drowsy, may also be detected from the biometrics listed above, and may be used to trigger an appliance such as a coffee maker to start brewing coffee automatically.

Hydration

The portable biometric monitoring device in combination with an activity level tracker may submit the user's activity level to a cloud-based system, home server, main control unit, or appliances directly. This may trigger some actions of the appliances, especially related to hydration, such as starting

US 8,998,815 B2

65                                                              66

the ice cube maker of a refrigerator, or lowering operating temperature of a water purifier.

Power Saving

Many appliances typically operate in a low-power idle state that consumes power. Using aggregated information of the user's biometric signals, communication-enabled appliances may be caused to go into a super-low power mode. For example, a water dispenser at home may shut itself down into a super-low-power mode when the user is asleep or out for work, and may start cooling/heating water once the user's activity at home is expected.

Restaurant Recommendation System Based on Location and Activity

Aggregation of real-time biometric signals and location information may be used to create an educated-guess on one or multiple users' needs for a given time, e.g., unusual drink. Combining this guessed need with historical user data on the user's activity levels, activity types, activity time, and activity durations, as well as food intake data logged by the users, an app on a smart phone and/or smart watch may recommend a restaurant that would meet the user's life-style and current need.

For example, a user who just finished a six mile circuit may launch this app. The app may know that this person maintained a high activity level for the past hour, and thus determine that the person may be dehydrated. From the historical user data, the app may also know, for example, that the user's diet is heavy on vegetables but low in sugar. With an optimization algorithm that considers the user's current location, price ranges, and other factors mentioned above, the app may recommend a restaurant that offers smoothies, for example.

Swim Tracking

In some embodiments of a biometric tracking device, the biometric tracking may include a swimming algorithm that may utilize data from one or more motion sensors, altitude sensors (e.g., such as a barometric pressure sensor), orientation sensors (e.g., magnetometer), location service sensor (e.g., GPS, wireless triangulation), and/or temperature sensors. The sensors may be embedded in a single device mounted to, for instance, the wrist. In other embodiments, extra sensor devices may be attached to the swimmer's forehead, back of the head, goggles, back, hip, shoulder, thighs, legs, and/or feet.

Three potential functional components of swimming exercise analysis are as follows:

Stroke count detection—provides stroke counts per lap, where a lap is defined to be a one-way traverse from one end of the pool to the opposite end.

Stroke type classification—describes the swimming stroke type of the user (e.g., crawl stroke, breast stroke, back stroke, butterfly stroke, side stroke, kicking without strokes, body streamline, etc.) and can be any or a combination of:

a. Classification of each stroke that a user takes

b. Classification of the predominant stroke type used per complete lap.

c. Classification of stroke type used per fractional lap (e.g. half a lap of freestyle, half a lap of breast stroke)

Lap count—counts the laps traversed by the user. One method of determining a lap is by detecting when the user turns in a pool.

Turning is defined to be a 180 degree change in heading direction. As a turn is detected, start and end of a lap may be inferred. Taking a break (no motion for a certain period of time) at a point in the pool (typically at one end or the other) before starting to swim again is also considered a turn as long as the following heading direction is opposite the heading prior to the break.

In some embodiments, these functional components may be combined in a multitude of ways.

Algorithm Structure

The three functional components of the swimming exercise analysis may be performed sequentially, in parallel, or in hybrid order (a combination of some sequential blocks and some parallel blocks).

Sequential Approach (See FIG. **15**A)

In one embodiment, raw and/or pre-processed sensor signals may first be analyzed by a stroke detector algorithm. The stroke detector algorithm may use temporal peaks (local maxima and/or local minima) in a motion sensor (e.g., accelerometer, gyroscope) as an indication that a stroke has been taken. Then one or more heuristic rules may also be applied to remove peaks that do not represent strokes. For example, the magnitudes of the peaks, temporal distance of two adjacent peaks, peak-to-peak amplitude, and/or morphological characteristics of the peaks (e.g., sharpness) may indicate that certain peaks do not represent strokes. When sensors provide more than one dimensional data, e.g., such as 3-axis accelerometers, or 3 axis motion sensors+altimeter (totaling 4-axis data), timings and relevant sizes of peaks in all axes may be taken into account to determine whether or not the peaks in one or more of the axes are generated by a stroke or not.

If a single peak representing a stroke or group of peaks from multiple data axes representing strokes are observed, features may be extracted from a segment of data that are obtained from the time between when the previous peak is detected and when the current peak is detected. Features include, but are not limited to, maximum and minimum values, number of ripples in the segment, powers measured in various metrics, e.g., L1 power and L2 power, standard deviation, mean, etc. The extracted features may then be put through a machine learning system where the system coefficients are computed off-line (supervised learning) or are adapted as the user uses the biometric monitoring device (unsupervised learning). The machine learning system may then return a stroke classification for each detected stroke.

The turn-detector algorithm may search for sudden changes in motion by calculating derivatives, moving average, and/or using high-pass filtering on the signals of the sensors (the sensors including, but not limited to, those listed in this disclosure). Principal Component Analysis (PCA) can also and/or alternatively be performed on the signal(s). If one principle component is different from the sub-sequential one, then it may be determined that a turn occurred. Whole or partial coefficients of a transform, such as the Fast Fourier Transform (FFT) may be used as features as well. Parametric models such as Autoregressive (AR) models may also be used. Time-varying model parameters may then be estimated using Linear Prediction Analysis (LPA), Least Mean Squares filtering (LMS), Recursive Least Squares filtering (RLS), and/or Kalman filtering. Estimated model parameters are then compared to determine if there is an abrupt change in their values.

In one embodiment, the skill level and/or swimming styles (e.g., speed) of the swimmer may be inferred from sensor data, and then used in turn detection. For example, advanced swimmers typically have more powerful strokes (i.e., large accelerometer peak magnitudes) and take fewer strokes to complete a lap. Therefore, metrics that estimate the swimmer's skill level or characteristics may be used in a turn detection algorithm. These metrics may include, but are not limited to averaged motion signals, or integrated motion signals in particular arm movements, estimated heading speed, and detected patterns of an advanced swimmer in motion signals. The swimmer's skill level or other characteristics

67

68

may also be determined through user input. For example, the user may input that they are an advanced, intermediate, or beginner swimmer.

One or many (combined) features from these analyses may be used to detect if a given data sample, and/or neighboring data samples, have characteristics of a turn. To obtain the optimal combination of the features and decision boundary, one can utilize machine learning techniques such as logistic regression, decision tree, neural nets, etc.

In some embodiments, if a turn is detected, the swimming data accrued since the previous turn may be summarized, such as the number of strokes, stroke type for each stroke and for the lap, split time, etc. If no turn is detected, the stroke counter and type may be updated. Unless the user quits swimming, the algorithm may go back to stroke count detection.

Parallel Approach (See FIG. **15**B)

In the parallel approach, some or all of the three functional components may be executed in parallel. For example, stroke-type detection and turn detection may be performed jointly, while stroke count detection is run independently.

In such embodiments, two functional components, stroke-type and turn detection, may be implemented in a single algorithm that simultaneously detects stroke-types and turns. For example, a classifier of swimming stroke types, e.g., movement analysis that detects free style strokes, breast stroke strokes, back strokes, butterfly strokes, and of turn types (e.g. tumble turn, flip turn, two hand touch) may return a detected type of stroke or a type of detected turn. During the detection, temporal as well as spectral features may be extracted. A moving window may first be applied to multiple axes of data. Statistics of this windowed segment may then be computed, namely, maximum and minimum value, number of ripples in the segment, powers measured in various metrics (e.g., L1 power and L2 power, standard deviation, mean). Independent component analysis (ICA) and/or principal component analysis (PCA) can be applied as well to find any hidden signals that better represent turn-type and stroke-type characteristics. Temporal features may then be computed from this (potentially improved) signal representation. For temporal features, various nonparametric filtering schemes, low-pass filtering, band-pass filtering, high-pass filtering, may be applied to enhance desired signal characteristics.

Spectral analysis such as FFT, wavelet transform, Hilbert transform, etc., may be applied to this windowed segment as well. Whole or partial transform coefficients may be chosen as features. Parametric models such as AR, moving average (MA), or ARMA (autoregressive and moving average) models may be used, and the parameters of such a model may be found via autocorrelation and/or partial autocorrelation, or LPA, LMS, RLS, or Kalman filter. The entire or part of estimated coefficients may be used as features.

Different lengths of moving average windows may be run in parallel, and provide features listed above, and the whole or part of the features may be utilized as features as well.

Machine-learned coefficients (supervised learning) may then be applied to these extracted features. One or more machine learning techniques, namely multiple layers of binomial linear discriminant analysis (e.g., logistic regression), multinomial logistic regression, neural net, decision tree/forest, or support vector machine, can be trained, and then used.

As the window of interest moves, the features may be extracted and these newly-extracted features will return either a stroke type or detected turn via a machine learning system.

The stroke detector algorithm may run in parallel independent of stroke type and turn detection. Temporal peaks of raw or pre-filtered sensor signals may be detected and chosen by heuristic rules.

At the summarizing stage (the stage where metrics regarding the swim may be determined, displayed, and/or stored) of the algorithm, post-processing may be applied to the sequence of stroke type and turn detections. If a turn is confirmed with certain confidence, the swimming metric data from the previous turn may be summarized along with stroke counts detected. If no turn is confirmed, the moving average window may proceed. Until the user stops swimming, the algorithm may continue to update swimming metrics regarding the exercise of the user, including, but not limited to, a total number of turns, total number of laps, total number of strokes, average strokes per lap, number of strokes in the last lap, the change in number of strokes per lap, etc.

Hybrid Approach (See FIGS. **15**C and **15**D)

In a hybrid approach, the stroke type and stroke count detection may be run in parallel, followed by turn detection.

Stroke-type detection may return a stroke type via machine learned coefficients. A first moving window may take segments of sensor signals. Then features, either entire features or a subset of the moving window features listed in herein, may be extracted. The machine learning coefficients, trained off-line, may then be applied to the features to determine which stroke-type generated the given segments of sensor signals.

Along with stroke type detection, stroke count detection may be run simultaneously.

Once the stroke type and counts are detected, turn detection may be performed with either the entire feature or a subset of the features listed.

If a turn is detected, completion of a lap may be recorded in the swimming summary metrics of the user. A post process may be applied to detected stroke types to determine the most prominent stroke type for the completed lap. Then the algorithm may move to the stroke-type and count detection stages unless the user stops swimming. If no turn is detected, the algorithm may continue updating stroke types and counts of the current lap until a turn is detected.

Blood Glucose Level and Heart Rate

Biometric monitoring devices that continuously measure biometric signals may provide meaningful information on preconditions of, progress towards, and recoveries from diseases. Such biometric monitoring devices may have sensors and run algorithms accordingly to measure and calculate biometric signals such as heart rate, heart rate variability, steps taken, calories burned, distance traveled, weight and body fat, activity intensity, activity duration and frequency, etc. In addition to the measured biometric signals, food intake logs provided by users may be used.

In one embodiment, a biometric monitoring device may observe heart rate and its changes over time, especially before and after a food intake event or events. It is known that heart rate is affected by blood sugar level, whereas it is well known that high blood sugar level is a pre-diabetic condition. Thus, mathematical models that describe the relation between time elapsed (after food intake) and blood sugar level may be found via statistical regression, where data are collected from normal, pre-diabetic, and diabetic individuals to provide respective mathematical models. With the mathematical models, one may predict whether an individual with specific heart rate patterns is healthy, pre-diabetic, or diabetic.

Knowing that many heart failures are associated with pre-diabetic or diabetic conditions, it is possible to further inform users of biometric monitoring devices with possible heart failures, e.g., coronary heart disease, cerebrovascular disease and peripheral vascular disease etc., of such risks based on their biometric data.

US 8,998,815 B2

69

Users' activity intensity, type, duration, and frequency may also be taken into account, when developing the mathematical models, as an argument that controls "probability" of the disease onset, using recommended exercise guidelines such as guidelines provided by American Heart Association (http://www.heart.org/). Many guidelines on nutrition and weight management are also available in academia and to the general public to prevent cardiovascular and diabetic disease. Such guidelines may be incorporated into the mathematical models with the user data accumulated over time, such as ingredients of the food that the users consumed, and weight and body fat trends.

If users have set their family members as their friends on a social network site, which stores and displays biometric data, the likelihood of the family members getting a disease may also be analyzed and the users informed of the results.

In addition to informing users regarding a potential development of disease, recommended life-style including exercise regime and recipes with healthier ingredients and methods of preparation may be provided to the users.

Unification of Grocery Shopping, Cooking, and Food Logging

Grocery Organizing and Recipe Recognition System

Receipts from grocery shopping may contain copious information, especially regarding an individual's eating habits. A novel system that combines information from grocery store receipts with an individual's biometric data, as collected by a biometric monitoring device, for example, is presented here. The system may collect and analyze data (information) regarding an individual, and may then recommend options that may change the individual's life-style so as to improve their health. The implementation of this system may involve cloud computing, hardware platform development for sensing and interface, and mobile/website site development.

In one embodiment, when a user checks out at a grocery store, the list of groceries (as obtained from the receipt or, for example, from an email receipt or invoice) may be transmitted automatically to a remote database (e.g., a cloud server), that may also store the user's biometric data. When the user gets home and organizes items in their refrigerator and/or pantry, an app on their smart phone/watch may recommend which items in the pantry or refrigerator to throw away based on historical data on food items (e.g., if food items are expired or likely to have gone bad). Alerts indicating when food has expired or that it should be consumed in the near future to avoid spoilage may be automatically sent to the user independently of such activity. For example, these alerts may be sent out to the user whenever a certain threshold has been met (e.g., in two days the milk will expire). The alerts may also be sent to the user through means other than through a smart phone/watch. For example, the alerts may be presented to the user through a web interface, through email, through an alert on a laptop computer, on a tablet computer, desktop computer, or any other electronic device which is in direct or indirect communication with the computer which maintains and/or analyzes the database of food

Using the updated list of food items, and based on the user's historical food consumption data, the app may recommend recipes to the user. In one embodiment, preference may be given to recipes that use the items what should be eaten first (e.g., before they expire, go bad, or become less fresh faster than other ingredients). To recommend the optimal recipe that is nutritionally balanced, correctly portioned, and tailored to the user's activity, the app may also analyze the user's activity data as well. For example, if the user lifted weights in the morning, high-protein meals may be recommended. In

70

another example, if the user was not very active, the size of the recipe may be decreased to lower the number of calories that the final meal contains.

Note that these strategies may be applied to multiple users that either share the same food and/or meals. For example, a combined food database may be created for a household so that if one member of the house got eggs and another member of the house got milk from the grocery store that both eggs and milk would be represented in the food database. Similarly, the nutritional preferences (e.g., vegetarian, allergic to certain foods, etc.), activity, basal metabolic rate, and total calorie burn may be used to form a recommendation on what food/recipe to prepare and/or purchase.

Biometric signals including, but not limited to, heart rate and heart rate variability may provide indications of preconditions of diseases. This information may be used to recommend that the user purchase, consume, and/or prepare particular foods so as to reduce their risk of the disease(s) for which they have the pre-conditions. For example, if a user has a precondition for cardiac problems, it may be recommended that they purchase more vegetables, consume less fatty foods, and prepare food in methods which require less oil (e.g., not deep frying).

Control "Smart Appliance"

In another embodiment, various appliances may all be Wi-Fi enabled, and may communicate with servers. Since the app (which may be connected to the appliances via, for example, the cloud or the Internet) may know which food items the refrigerator contains, the app may communicate with the refrigerator to lower or raise the temperature of the refrigerator depending on the food items. For example, if many of the food items are more sensitive to cold, such as vegetables, the refrigerator may be instructed to raise the temperature. The app may also directly communicate with the refrigerator as well via Bluetooth, BTLE, or NFC.

Food Logging

The app may also provide items to log in as the user's food based on a grocery shopping list (which may, for example, be a list maintained within the app) and food recipes that the app recommended. In case of precooked meals (e.g., frozen dinner) or produce that does not require any further processing before being eaten, the user may simply input their serving size (or in the case that the user eats the whole meal, the user may not need to enter a serving size), and then the food logging will be completed. Since the grocery list or receipt provides the exact brand and maker of certain foods, more accurate nutritional information may be logged into the user's account.

When a user logs a food item that is cooked by following a recipe suggested by the app, the app may calculate nutritional information from the ingredients and cooking procedure. This may provide more accurate estimate of calorie intake than a simple categorization of the end product/meal, since many recipes exist to prepare a particular type of food, e.g., meatballs for pasta may be made with beef, turkey, pork, etc., and may include varying degrees of carbohydrates.

Sport Metric Acquisition Using a Sensor Device

In some embodiments, a sensor may be mounted on a racket, e.g., tennis racket, to help to measure the different strokes of the player. This may be applicable to most, if not all, racket sports including, but not limited to, tennis, racquetball, squash, table tennis, badminton, lacrosse, etc., as well as sports played with a bat like baseball, softball, cricket, etc. Similar techniques may also be used to measure different aspects of golf. Such a device can be mounted on the base of the racket, on the handle or on the shock absorber typically mounted on the strings. This device may have various sensors

67

71                                                          72

like an accelerometer, gyroscope, magnetometer, strain sensor, and/or microphone. The data from these sensors may either be stored locally or transmitted wirelessly to a host system on a smartphone or other wireless receiver.

In some embodiments of a biometric monitoring device, a wrist mounted biometric monitoring device including an accelerometer, gyroscope, magnetometer, microphone, etc. may perform similar analysis of the user's game or motions. This biometric monitoring device may take the form of a watch or other band worn on the user's wrist. Racket- or bat-mounted sensors that measure or detect the moment of impact between the bat or racket and the ball and wirelessly transmit such data to the wrist-mounted biometric monitoring device may be used to improve accuracy of such algorithms by accurately measuring the time of impact with the ball.

Both wrist and racket-/bat-mounted devices may help measure different aspects of the user's game including, but not limited to, stroke-type (forehand, backhand, serve, slice, etc.), number of forehands, number of backhands, ball spin direction, topspin, service percentage, angular velocity of racket head, backswing, shot power, shot consistency, etc. The microphone or the strain sensor may be used in addition to the accelerometer to identify the moment at which the ball impacts the racket/bat. In cricket and baseball, such a device may measure the backswing, the angular velocity of the bat at the time of impact, the number of shots on the off-side vs. leg-side (cricket). It may also measure the number of swings and misses and the number of defensive vs. offensive strokes. Such a device may also have a wireless transmitter to transmit such statistics in real time to a scoreboard or to individual devices held by spectators.

The wrist- or racket-mounted device may have a small number of buttons (e.g., two) that may be used by the player to indicate when a volley is won or when an unforced error occurs. This will allow the algorithm to calculate the fraction of winners and unforced errors that are forehands vs. backhands. The algorithm may also keep track of the number of aces vs. double-faults in tennis. If both players use such a system, the system may also automatically keep track of the score.

Bicycle Handlebar Based ECG

In some embodiments of biometric monitoring devices, a user's heart rate may be monitored using an electrode in contact with the left hand and an electrode in contact with the right hand (an ECG heart rate measurement). As riding a bicycle requires the user to make hand contact with either side of the handlebars, this particular activity is well suited to tracking user heart rate using ECG techniques. By embedding electrodes in the handlebars or handlebar grips or tape, the user's heart rate may be measured whenever the user is holding the handlebars. For bicycles that have grips (as opposed to using handlebar tape), electrodes may be incorporated into a special grip that may be used to replace the existing grips, e.g., the factory-installed grips, which are typically non-conductive. The left and right grips may be electrically connected to electronics that measure the ECG signal, using a wire, for example. In the case that the handlebars themselves are conductive, the handlebars may be used to electrically connect one of the grips to the electronics that measure the ECG signal. The electronics that measure the ECG signal may be incorporated into one or both of the grips. Alternatively, the electronics that measure the ECG signal may be located in a separate housing. In one embodiment, this separate housing may be mounted on the bicycle handlebar or stem. It may have functions and sensors that typical bicycle computers have (e.g., speed sensor, cadence sensor, GPS sensor). It may also have atypical sensors such as a wind speed sensor, GSR

sensor(s), and accelerometer sensor (potentially also incorporated into the handlebars). This embodiment may use techniques described in this disclosure to calculate activity metrics including, but not limited to, calorie burn, and transmit these metrics to secondary and tertiary device(s) (e.g. smartphones and servers).

Electrodes for the ECG may be incorporated into parts of the bike or accessories other than into grip tape and handlebar grips such as into gloves, brake hoods, brake levers, or the handlebars themselves. These electrodes or additional electrodes may be used to measure GSR, body fat and hydration in addition to, or in alternative to, heart rate. In one example, the user's heart rate may be measured using conductive threads (used as ECG electrodes) sewn into grip tape installed on the handlebar. The grip tape electrodes may be connected to a central bike computer unit that contains electronics to measure GSR, hydration, and/or heart rate. The biometric monitoring device may display this information on a display. If the user's hydration or heart rate exceeds a certain threshold, the user may be alerted to drink more, drink less, increase intensity or decrease intensity. In the case that the bike computer measures only one or two of GSR, hydration or heart rate, algorithms may be used to estimate metrics which that cannot be measured directly. For example, if the biometric monitoring device can only measure heart rate and duration of exercise, a combination of heart rate and duration of exercise may be used to estimate hydration and alert the user when they should drink. Similarly, heart rate and exercise duration may be used to alert the user when they should eat or drink something other than water (e.g., a sports drink).

Indirect Metric Estimation

Bicycle computers typically measure a variety of metrics including, but not limited to, speed, cadence, power, and wind speed. In the case that the portable biometric monitoring device does not measure these metrics or is not in communication with devices which may be able to supply these metrics, these and other metrics may be inferred using the sensors that the portable biometric monitoring device does have. In one embodiment, the portable biometric monitoring device may measure heart rate. It may use this measurement to infer/estimate the amount of power that the user is outputting. Other metrics such as the user's age, height, and weight may help inform the power measurement. Additional sensor data such as GPS-measured speed, altitude gain/descent, bicycle attitude (so as the measure the incline or decline of a slope), and accelerometer signals may be used to further inform the power estimate. In one embodiment, an approximately linear relationship between heart rate and power output may be used to calculate the user's power output.

In one embodiment, a calibration phase may occur where the user takes data from the portable biometric monitoring device and a secondary device that may be used during calibration as a baseline but not be used at a later time (e.g., a power meter). This may allow a relationship between sensor data measured by the portable monitoring device and sensor data measured by the secondary device data to be determined. This relationship may then be used when the secondary device is not present to calculate estimated values of data that is explicitly provided by the secondary device but not by the biometric monitoring device.

Activity Based Automatic Scheduling

In one embodiment, the day's travel requirements (to work, from work, between meetings) may be scheduled for the user based on the information in their calendar (or emails or text messages etc.), with the aim of meeting daily activity goal(s) or long term activity goal(s). The user's historical data may be used to help plan both meeting the goal(s) and also the transit

time required. This feature may be combined with friends or colleagues. The scheduling may be done such that a user may meet a friend along the way as they walk to work, or meet a colleague on the way to a meeting (the user might need to set a rendezvous point, though). If there is real-time communication between biometric monitoring devices of the user and the user's friend, the user may be directed to walk a longer route if data from the friend's biometric monitoring device indicates that their friend is running late.

In another embodiment, walking/running/fitness routes may be suggested to the user based (in whole or in part) on their proximity to the user. The data for such recommendations could also or additionally be based on GPS info from other users. If there is real-time communication, the user may be directed to a busy route or a quiet route as preferred. Knowing heart rate and basic fitness information about other users may allow the system to suggest a route to match a user's fitness level and the desired exercise/exertion level. Again this information may be used for planning/guiding a user to longer term activity/fitness goals.

Location/Context Sensing and Applications

Through one or more methods, embodiments of the biometric monitoring devices disclosed herein may have sensors that can determine or estimate the location and or context (e.g. in a bus, at home, in a car) of the biometric monitoring device. Purpose-built location sensors such as GPS, GLONASS, or other GNSS (Global Navigation Satellite System) sensors may be used. Alternatively, location may be inferred, estimated or guessed using less precise sensors. In some embodiments in which it is difficult to know the user's location, user input may aid in the determination of their location and or context. For example, if sensor data makes it difficult to determine if a user was in a car or a bus, the biometric monitoring device or a portable communication device or a cloud server which is in communication with the biometric monitoring device may present a query to the user asking them if they took the bus today or took a car. Similar queries may occur for locations other than vehicular contexts. For example, if sensor data indicate that the user completed a vigorous workout, but there is no location data that indicates that the user went to a gym, the user may be asked if they went to the gym today.

Vehicular Transportation Detection

In some embodiments, sensors of the biometric monitoring device and/or a portable electronic device in communication with the biometric monitoring device and/or a server which communicates with the biometric monitoring device may be used to determine what type of vehicle (if any) the user is, or was, in. Note that in the embodiments below, a sensor in one or more biometric monitoring devices and/or portable electronic devices may be used to sense the relevant signal. Also note that while specific network protocols such as WiFi or Bluetooth may be used in the following descriptions, one or more alternative protocols such as RFID, NFC, or cellular telephony may also be used.

In one embodiment, the detection of a Bluetooth device associated with a vehicle may be used to infer that the user is in a vehicle. For example, a user may have a car that has a Bluetooth multimedia system. When the user gets close enough to their car for a long enough period of time, the sensor device may recognize the Bluetooth identification of the multimedia system and assume that the user is in the car. Data from other sensors may be used to corroborate the assumption that the user is in the vehicle. Examples of data or signals from other sensors that may be used to confirm that the user is in a car include a GPS speed measurement that is higher than 30 mph and accelerometer signals that are characteristic of being in a car. Information intrinsic to the Bluetooth ID may be used to determine that it is a Wi-Fi router of a vehicle or type of vehicle. For example, the Bluetooth ID of a router in a car may be "Audi In-Car Multimedia." The keyword "Audi" or "Car" may be used to guess that the router is associated with a vehicle type of "car." Alternatively, a database of Bluetooth ID's and their associated vehicles may be used.

In one embodiment, a database of Bluetooth ID's and their associated vehicles may be created or updated by the user of a biometric monitoring device or through portable communication device data. This may be done with and/or without the aid of user input. In one embodiment if a biometric monitoring device can determine whether or not it is in a vehicle, vehicle type, or specific vehicle without the use of Bluetooth ID, and it encounters a Bluetooth ID that moves with the vehicle, it may send the Bluetooth ID and information regarding the vehicle to a central database to be catalogued as a Bluetooth ID that corresponds with a vehicle. Alternatively, if a user inputs information about the vehicle they are in or were in at a previous point in time and there is a Bluetooth ID that was encountered during or close to the time that the user indicated they were in the vehicle, the Bluetooth ID and vehicle information may be sent to a central database and associated with one another.

In another embodiment, the detection of a Wi-Fi device associated with a vehicle may be used to infer that the user is in that vehicle or type of vehicle. Some trains, buses, airplanes, cars, and other vehicles have Wi-Fi routers in them. The SSID of the router may be detected and used to infer or aid an inference that a user is in a specific vehicle or type of vehicle.

In one embodiment, a database of SSID's and their associated vehicles may be created or updated with the user of a biometric monitoring device or through portable communication device data. This may be done with and/or without the aid of user input. In one embodiment, if a biometric monitoring device can determine whether or not it is in a vehicle, vehicle type, or specific vehicle without the use of an SSID, and it encounters an SSID that moves with the vehicle, the biometric monitoring device may send the SSID and information regarding the vehicle to a central database to be catalogued as an SSID that corresponds with a vehicle. Alternatively, if a user inputs information about the vehicle they are in or were in at a previous point in time and there is an SSID that was encountered during or close to the time that the user indicated they were in the vehicle, the SSID and vehicle information may be sent to a central database and associated with one another.

In another embodiment of a biometric monitoring device, location sensors may be used to determine the track of a user. This track may then be compared to a database of routes for different modes of transit. Modes of transit may include, but are not limited to walking, running, biking, driving, taking a bus, taking a train, taking a tram, taking the subway, and/or motorcycling. If the user's track corresponds well with a route of a specific mode of transit, it may be assumed that the user used that mode of transit for the period of time that it took them to traverse the route. Note that the speed with which the route or sections of the route were completed may improve the guess of the mode of transit. For example, a bus and a car may both be able to take the same route, but the additional stopping of the bus at bus stops may allow the device to determine that the user was taking a bus rather than a car. Similarly, the discrimination between biking and driving a route may be aided by the typical difference of speed between

US 8,998,815 B2

75 76

the two. This difference in speed may also depend on the time of day. For example, some routes may be slower by car during rush hour.

In another embodiment, a biometric monitoring device may be able to detect that the user is in or near a vehicle based on measurements of the magnetic field of vehicle. In some embodiments, the magnetic field signature of a location typically associated with the vehicle (e.g., train station, subway station, bus stop, car garage) may also be used to infer that the user is currently in, will be, or has been in a vehicle. The magnetic field signature may be time invariant or time varying.

If it is determined that the user was indeed in a vehicle for a period of time, other metrics about the user may be modified to reflect such a status. In the case that the biometric monitoring device and/or portable electronic device can measure activity metrics such as steps taken, distance walked or run, altitude climbed, and/or calories burned, these metrics may be modified based on information about vehicular travel. If any steps taken or altitude climbed were incorrectly logged during the time that the user is in a vehicle, they may be removed from the log of metrics about the user. Metrics derived from the incorrectly logged steps taken or altitude climbed such as distance travelled and calories burned may also be removed from the log of metrics about the user. In the case that it can be determined in real-time or near real-time whether or not the user is in a vehicle, the sensors detecting metrics which should not be measured while in a vehicle (e.g. steps taken, stairs climbed) may be turned off or algorithms which are used to measure these metrics may be turned off to prevent incorrectly logged metrics (as well to save power). Note that metrics regarding vehicle use such as type of vehicle taken, when it was taken, which route was taken, and how long the trip took may be recorded and used later to present the user with this data and/or to correct other activity and physiological metrics about the user.

Location Sensing Using Bluetooth

Methods similar to those described above may also be used by a biometric monitoring device to determine when the user comes into proximity of static locations. In one embodiment, Bluetooth ID's from computers (e.g., tablet computers) at restaurants or stores may be used to determine the user's location. In another embodiment, semi-fixed Bluetooth ID's from portable communication devices (e.g., smartphones) may be used to determine a user's location. In the case of semi-fixed Bluetooth ID sources, multiple Bluetooth ID's may be need to reach an acceptable level of confidence of the location of the user. For example, a database of Bluetooth ID's of the coworkers of a user may be created. If the user is within range of several of these Bluetooth ID's during typical working hours, it may be assumed that the user is at work. The detection of other Bluetooth ID's may also be used to record when two users meet up. For example, it may be determined that a user went for a run with another user by analyzing pedometer data and Bluetooth ID's. Similar such concepts are discussed in further detail in U.S. Provisional Patent Application No. 61/948,468, filed Mar. 5, 2014, and previously incorporated by reference with regard to such concepts.

Uncertainty Metric for GPS Based on Location

When fusing sensor signals with GPS signal to estimate informative biometrics, such as steps, live pace, speed, or trajectory of trips, quality of the GPS signal is often very informative. However, GPS signal quality is known to be time-varying, and one of the factors that affects the signal quality is environmental surroundings.

Location information may be used to estimate GPS signal quality. A server may store a map of area types, where the area types are pre-determined by number and kind of objects that deteriorate GPS signals. The types may, for example, be: large building area, small building area, open area, side-by-water area, and forested area. These area types are then queried when GPS sensor gets turned on with its very first few location estimates, which are expected to be rough and inaccurate. With the rough GPS estimates of the location, possible types of areas may be returned, and these area types may then be taken into account in the calculation of the GPS signal quality and reliability.

For example, if a user is in or near an urban canyon (an area surround by tall buildings) such as downtown San Francisco, a low certainty may be associated with any GNSS location measurements. This certainty may be used later by algorithms that attempt to determine the user's track, speed, and/or elevation based on, at least in part, GPS data.

In one embodiment, a database of location and GPS signal quality may be created automatically using data from one or more GNSS sensors. This may be automatically performed by comparing the GNSS tracks with a map of streets and seeing when the GNSS sensors show characteristics of a user travelling along a street (e.g., having a speed of 10 mph or higher), but their track is not located on a road. The database of GPS certainty based on approximate location may also be inferred from maps showing where there are tall buildings, canyons, or dense forests.

Location Sensing Using Vehicular GNSS and/or Dead Reckoning

Many vehicles have integrated GNSS navigation systems. Users of vehicles that don't have integrated GNSS navigations systems often buy a GNSS navigation system for their car that is typically mounted non-permanently in the driver's field of view. In one embodiment, a portable biometric monitoring device may be able to communicate with the vehicle's GNSS system. In the case where the portable biometric monitoring device is also used to track location, it may receive location information from the vehicle GNSS. This may enable the biometric monitoring device to turn off its own GNSS sensor (in the case that it has one), therefore reducing its power consumption.

In addition to GNSS location detection, a vehicle may be able to transmit data about its steering wheel orientation and/or its orientation with respect to the earth's magnetic field in addition to its speed as measured using the tire size and tire rotational velocity. This information may be used to perform dead-reckoning to determine a track and/or location in the case that the vehicle does not have a GNSS system or the vehicle's GNSS system cannot get a reliable location measurement. Dead-reckoning location information may supplement GNSS sensor data from the biometric monitoring device. For example, the biometric monitoring device may reduce the frequency with which it samples GNSS data and fill in the gap between GNSS location data with locations determined through dead reckoning.

Step Counter Data Fusion with Satellite-Based Location Determination

In some implementations of a biometric monitoring device, data from various different sensors may be fused together to provide new insights as to activities of the wearer of the biometric monitoring device. For example, data from an altimeter in the biometric monitoring device may be combined with step count data obtained by performing peak detection analysis on accelerometer data from an accelerometer of the biometric monitoring device to determine when the wearer of the biometric monitoring device is, for example, climbing stairs or walking uphill (as opposed to riding an elevator or an escalator or walking across flat ground).

77

In another example of sensor data fusion, data from a step counter such as that discussed above may be combined with distance measurements derived from GPS data to provide a refined estimate of total distance traveled within a given window. For example, GPS-based distance or speed data may be combined with step-counter-based distance or speed (using steps taken multiplied by stride length, for example) using a Kalman filter in order to obtain a refined distance estimate that may be more accurate than either the GPS-based distance or speed measurement or the step-counter-based distance or speed measurement alone. In another implementation, a GPS-based distance measurement may be filtered using a smoothing constant that is a function of the step rate as measured by, for example, an accelerometer. Such implementations are discussed further in U.S. Provisional Patent Application No. 61/973,614, filed Apr. 1, 2014, which was previously incorporated herein by reference in the "Cross-Reference to Related Applications" section and which is again hereby incorporated by reference with respect to content directed at distance or speed estimation refinement using data from satellite-based location systems and step count sensors.

Biometric and Environmental/Exercise Performance Correlation

Some embodiments of portable monitoring devices described herein may detect a variety of data including biometric data, environmental data, and activity data. All of this data may be analyzed or presented to a user to facilitate analysis of or correlation between two or more types of data. In one embodiment, a user's heart rate may be correlated to car speed, biking speed, running speed, swimming speed or walking speed. For example, the user may be presented with a graph that plots biking speed on the X axis and heart rate on the Y axis. In another example, a user's heart rate may be correlated to music that they were listening to. The biometric monitoring device may receive data regarding what music the user was listening to through a wireless connection (e.g., Bluetooth) to a car radio. In another embodiment, the biometric monitoring device may also function as a music player itself, and therefore can record which song was played when.

Weight Lifting Aid

Without the aid of a personal trainer or partner, it may be difficult to do a weight-lifting routine properly. A portable biometric monitoring device may aid a user in completing a weight lifting routine by communicating to the user how long they should hold up each weight, how quickly they should lift it, how quickly they should lower it, and how many repetitions of each lift to perform. The biometric monitoring device may measure the user's muscle contractions using one or more EMG sensors or strain sensors. The user's muscle contractions may also be inferred by measuring vibrations of one or more body parts (for example using an accelerometer), sweat (e.g., using a GSR sensor), rotation of one or multiple body parts (e.g., using a gyroscope), and/or a temperature sensor on one or more body parts. Alternatively, a sensor may be placed on the weight lifting apparatus itself to determine when the using is lifting, with how much speed they are lifting or lowering, how long they are lifting for, and how many repetitions of lifts they have performed.

In one embodiment, if the biometric monitoring device or weight lifting apparatus detects that the user is approaching their failure limit (when the user can no longer support the weight), the weight lifting apparatus may automatically lift the weight or prevent the weight from being lowered. In another embodiment, a robot in communication with the biometric monitoring device or weight lifting apparatus may automatically lift the weight or prevent the weight from being

78

lowered. This may allow the user to push themselves to their limit without needing a partner/spotter (to lift the weight in case of failure) and without risking injury from dropping the weight.

Glucose Level Monitoring Aid

In some embodiments, a portable biometric monitoring device may be configured to aid users who need to monitor their glucose levels (e.g., diabetics). In one embodiment, the portable biometric monitoring device may indirectly infer a user's glucose level or a metric related to the user's glucose level. Sensors other than those typically used in monitoring glucose monitoring (using continuous or discrete finger-prick types of sensors) may be used in addition to, as an alternative to, or as an aid to the typical glucose monitoring methods. For example, an biometric monitoring device may alert the user that they should check their blood glucose level based on data measured from sensors on the biometric monitoring device. If the user has performed a certain type of activity for a certain amount of time, their blood glucose level is likely to have decreased, and therefore, the biometric monitoring device may display an alert, create an auditory alert, or vibrate to alert the user that their blood glucose may be low and that they should check it using a typical glucose measurement device (e.g., a finger-prick type glucose monitor). The biometric monitoring device may allow the user to input the glucose level that is measured from the glucose meter. Alternatively, the glucose measurement may be automatically transmitted to the biometric monitoring device and/or a third device in direct or indirect communication with the biometric monitoring device (e.g., a smart phone or server). This glucose measurement may be used to inform the algorithm used by the biometric monitoring device to determine when the next glucose level alert should be delivered to the user. The user may also be able to enter what food they ate, are eating, or are planning to eat into the biometric monitoring device or a device in direct or indirect communication with the biometric monitoring device. This information may also be used to determine when the user should be alerted to check their blood glucose level. Other metrics and sensor data described herein (e.g., heart rate data) may also be used alone or in combination to determine when the user should be alerted to check their blood glucose.

In addition to being alerted when glucose levels should be checked, a biometric monitoring device may also display an estimate of the current glucose level. In another embodiment, data from the biometric monitoring device may be used by a secondary device (e.g., a smart phone or server) to estimate the user's glucose level and/or present this data to the user (e.g., by displaying it on a smartphone, on a webpage, and/or by communicating the data through audio).

A biometric monitoring device may also be used to correlate exercise, diet, and other factors to blood glucose level. This may aid users in seeing the positive or negative effects of these factors on their blood glucose levels. The blood glucose levels with which the activity is correlated to may be measured by the user using a different device (e.g., a finger-prick monitor or continuous blood glucose monitor), by the biometric monitoring device itself, and/or by inferring the blood glucose level or a metric related to the glucose level using other sensors. In some embodiments of biometric monitoring devices, a user may wear a continuous glucose monitoring device and a biometric monitoring device. These two devices may automatically upload data regarding activities and glucose levels to a third computing device (e.g., a server). The server may then analyze the data and/or present the data to the user so that they become more aware of the relationship between their activities and glucose levels. The server may

71

US 8,998,815 B2

also receive input on the user's diet (e.g., the user may enter what foods they eat) and correlate the diet with glucose levels. By helping the user understand how diet, exercise, and other factors (e.g., stress) affects their blood glucose levels, biometric monitoring devices may aid users who have diabetes.

UV Exposure Detection

In one embodiment, the biometric monitoring device may have the ability to monitor an individual's exposure to UV radiation. UVA and UVB may be measured with one or multiple sensors. For example, a photodiode having a bandpass filter which passes only UVA may detect UVA exposure and a photodiode having a bandpass filter which passes only UVB may detect UVB exposure. The user's skin pigmentation may also be measured using a camera or reflectometer (light emitter and light detector which determines the efficiency with which light is reflected off the skin). Using UVA, UVB, and skin pigmentation data, the biometric monitoring device may provide a user with information regarding the amount of UV exposure they have been subjected to. The biometric monitoring device may also provide estimates or alarms regarding over exposure to UV, potential for sunburn, and potential for increasing their risk of skin cancer.

Screen Power Saving Using User Presence Sensors

The portable biometric monitoring device may have one or more a displays to present information to the user. In one embodiment sensors on the biometric monitoring device may determine the user is using the biometric monitoring device and/or wearing the biometric monitoring device to determine the state of the display. For example, a biometric monitoring device having a PPG sensor may use the PPG sensor as a proximity sensor to determine when the user is wearing the biometric monitoring device. If the user is wearing the biometric monitoring device, the state of the screen (e.g. a color LCD screen) may be changed to "on" or "standby" from its typical state of being off.

Power Conservation With Respect to Satellite-Based Location Determination Systems

In some implementations, certain systems included in a biometric monitoring device may consume relatively large amounts of power compared to other systems in the biometric monitoring device. Due to the small space constraints of many biometric monitoring devices, this may seriously affect overall battery charge life for the biometric monitoring device. For example, in some biometric monitoring devices, a satellite-based location determination system may be included. Each time the satellite-based location determination system is used to obtain a position fix using data from the GPS satellite constellation, it uses power drawn from the biometric monitoring device battery. The biometric monitoring device may be configured to alter the frequency with which the satellite-based location determination system obtains a location fix based on data from one or more sensors of the biometric monitoring device. This adaptive location fix frequency functionality may help conserve power while still allowing the satellite-based location determination system to provide location fixes at useful intervals (when appropriate).

For example, if a biometric monitoring device has an ambient light sensor, data from the ambient light sensor may be used to determine whether the lighting conditions indicate that the biometric monitoring device is likely indoors as opposed to outdoors. If indoors, the biometric monitoring device may cause the location fix frequency to be set to a level that is lower than the location fix frequency that may be used when the lighting conditions appear to indicate that the biometric monitoring device is outdoors. This has the effect of decreasing the number of location fixes that are attempted when the biometric monitoring device is indoors and thus less likely to obtain a good location fix using a satellite-based location determination system.

In another example, if motion sensors of the biometric monitoring device indicate that the wearer of the biometric monitoring device is substantially stationary, e.g., sleeping or generally not moving more than a few feet every minute, the location fix frequency of the satellite-based location determination system may be set to a lower level than if the motion sensors indicate that the wearer of the biometric monitoring device is in motion, e.g., walking or running from one location to another, e.g., moving more than a few feet.

In yet another example, the biometric monitoring device may be configured to determine if the biometric monitoring device is actually being worn by a person—if not, the biometric monitoring device may set the location fix frequency to a lower level than if the biometric monitoring device is actually being worn. Such determinations regarding whether or not the biometric monitoring device is being worn may be made, for example, when motion data collected from motion sensors of the biometric monitoring device indicate that the biometric monitoring device is substantially immobile, e.g., not even demonstrating small movements experienced by biometric monitoring devices when the wearer is sleeping or sedentary, or when data, for example, from a heartbeat waveform sensor indicates that no heart rate is detected. For optical heartbeat waveform sensors, if there is little or no change in the amount of light detected by the light detection sensor when the light source is turned on and off, this may be indicative of the fact that the heartbeat waveform sensor is not pressed against a person's skin and that, by inference, the biometric monitoring device is not being worn. Such adaptive satellite-based location determination system fix frequency concepts are discussed in more detail in U.S. Provisional Patent Application No. 61/955,045, filed Mar. 18, 2014, which was previously incorporated herein by reference in the "Cross-Reference to Related Applications" section and which is again hereby incorporated by reference with respect to content directed at power conservation in the context of satellite-based location determination systems.

It is to be understood that biometric monitoring devices, in addition to including the features discussed below in more detail, may also include one or more features or functionalities discussed above or discussed in the various applications incorporated by reference in the above discussion. Such implementations are to be understood as being within the scope of this disclosure.

There are many concepts and embodiments described and illustrated herein. While certain embodiments, features, attributes, and advantages have been described and illustrated herein, it should be understood that many others, as well as different and/or similar embodiments, features, attributes and advantages are apparent from the description and illustrations. As such, the above embodiments are merely provided by way of example. They are not intended to be exhaustive or to limit this disclosure to the precise forms, techniques, materials and/or configurations disclosed. Many modifications and variations are possible in light of this disclosure. It is to be understood that other embodiments may be utilized and operational changes may be made without departing from the scope of the present disclosure. As such, the scope of the disclosure is not limited solely to the description above because the descriptions of the above embodiments have been presented for the purposes of illustration and description.

Importantly, the present disclosure is neither limited to any single aspect nor embodiment, nor to any combinations and/or permutations of such aspects and/or embodiments. Moreover, each of the aspects of the present disclosure, and/or

US 8,998,815 B2

**81**                                                    **82**

embodiments thereof, may be employed alone or in combination with one or more of the other aspects and/or embodiments thereof. For the sake of brevity, many of those permutations and combinations will not be discussed and/or illustrated separately herein.

What is claimed is:

1. A wearable fitness monitoring device comprising:

a motion sensor configured to provide output corresponding to motion by a user wearing the fitness monitoring device;

a heartbeat waveform sensor; and

control logic comprising instructions for:

(a) collecting concurrent output data from the heartbeat waveform sensor and output data from the motion detecting sensor, wherein the output data from the heart beat waveform sensor provides information about the user's heart rate and wherein the output data from the motion detecting sensor provides information about the user's periodic physical movements other than heartbeats;

(b) processing the output data from the motion detecting sensor to determine a periodic component of the output data from the motion detecting sensor;

(c) determining an expected heart rate by analyzing the output data from the motion detecting sensor and detecting an intensity of user activity or a type of user activity;

(d) from the expected heart rate, setting a high pass frequency for filtering;

(e) filtering the output data from the heartbeat waveform sensor, using the high pass frequency, to remove variations that are slow with respect to an expected heart rate, wherein the filtering produces high pass filtered output data from the heartbeat waveform sensor;

(f) determining the user's heart rate; and

(g) presenting the user's heart rate.

2. The wearable fitness monitoring device of claim 1, wherein the heartbeat waveform sensor is a photoplethysmographic sensor comprising (i) a periodic light source, (ii) a photo detector positioned to receive periodic light emitted by the light source after interacting with the user's skin, and (iii) circuitry determining the user's heart rate from output of the photo detector.

3. The wearable fitness monitoring device of claim 2, wherein the photoplethysmographic sensor further comprises a housing having a recess in which the photo detector is disposed.

4. The wearable fitness monitoring device of claim 1, wherein the control logic further comprises instructions for using the periodic component of the output data from the motion detecting sensor to remove a corresponding periodic component from the high pass filtered output data from the heartbeat waveform sensor.

5. The wearable fitness monitoring device of claim 1, wherein the instructions for filtering comprise instructions for removing a frequency less than about 0.6 Hz from the output data from the heartbeat waveform sensor.

6. The wearable fitness monitoring device of claim 1, wherein the instructions for analyzing the output data from the motion detecting sensor comprise instructions for inferring a user activity level.

7. The wearable fitness monitoring device of claim 1, wherein the instructions for detecting the intensity of user activity comprise instructions for detecting running or walking.

8. The wearable fitness monitoring device of claim 1, wherein the periodic movement detected by the motion sensor is a wearer's limb movements.

9. The wearable fitness monitoring device of claim 1, wherein the motion detecting sensor is an accelerometer or a gyroscope.

10. The wearable fitness monitoring device of claim 1, wherein the instructions for collecting the output data from the heartbeat waveform sensor comprise instructions for:

pulsing a light source in the wearable biometric monitoring device at a first frequency; and

detecting light from the light source at the first frequency.

11. The wearable fitness monitoring device of claim 10, wherein the instructions for pulsing the light source at the first frequency comprise instructions for emitting a succession of light pulses of substantially constant intensity.

12. The wearable fitness monitoring device of claim 1, wherein the instructions for presenting the user's heart rate comprise instructions for presenting the heart rate on the wearable biometric monitoring device.

13. The wearable fitness monitoring device of claim 1, wherein the control logic further comprises instructions for determining the user's resting heart rate, and wherein the instructions for filtering comprise instructions for removing a frequency less than about the frequency of the user's resting heart rate.

\*    \*    \*    \*    \*